IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SCOTT BROWN, )
)
        Plaintiff, )
)
v. )
)
FRANK PETERSON, Individually and )
in his official capacity as a )
City of Kodiak Police Officer; )
JEFF HOLDEN, Individually and in )
his official capacity as a City )
of Kodiak Police Officer, CITY )
OF KODIAK; and JOHN AND JANE )
DOES 1 - 10, )
)
        Defendants. )
)

APR 2 3 2008

Case No. 3:05-cv-0002 [TMB]

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DOUGLAS E. CROYLE

April 9, 2008

APPEARANCES:

    FOR THE PLAINTIFF:        MR. ROBERT M. HERZ
                                         Attorney at Law
                                         425 G Street, Suite 600
                                         Anchorage, Alaska 99501
                                         (907) 277-7171

    FOR THE DEFENDANTS:       MR. FRANK S. KOZIOL
                                         Attorney at Law
                                         618 Christensen Drive
                                         Anchorage, Alaska 99501
                                         (907) 258-7706

**Ex. A**

## Page 2

1     TABLE OF CONTENTS
2     Direct Examination by Mr. Herz         04
3     Cross Examination by Mr. Koziol        93
4     Redirect Examination by Mr. Herz      122
5     EXHIBITS MARKED:
6     A - Letters from Mr. Koziol            23
7     B - Fax cover letters from Mr. Koziol  24
8     C - Email to Peterson                  27

## Page 3

1              PROCEEDINGS
2         (Anchorage, Alaska - 4/9/2008)
3     (On record)
4     REPORTER: On record. My name is Nathaniel Hile, notary
5  public in and for the state of Alaska, and a court reporter who
6  represents Computer Matrix Court Reporters whose business
7  address is 700 West Second Avenue. This is the first tape in
8  the video conference deposition of Douglas Croyle, taken
9  pursuant to notice by the plaintiff. The case is in the United
10 States District Court for the District of Alaska, Brown versus
11 Peterson, et al. Today is April 9th, 2008; the time is 12:57
12 Alaska standard time. We're at the offices of Pacific Office
13 Center, 310 K Street, Suite 200, Anchorage, Alaska.
14    Counsel, please identify yourself for the record, stating
15 your representation, starting with the plaintiff's attorney.
16    MR. HERZ: Robert Herz, last name's spelled H-E-R-Z, for
17 plaintiff Scott Brown.
18    MR. KOZIOL: Frank Koziol for the defendants.
19    REPORTER: Thank you. Sir, if you'll, please, raise your
20 right hand and I'll swear you in.
21    (Oath administered)
22    MR. CROYLE: I do.
23    REPORTER: Thank you.
24              DOUGLAS E. CROYLE
25

## Page 4

1  having been first duly sworn under oath, testified as follows
2  on:
3              DIRECT EXAMINATION
4     REPORTER: Can you state your full name and spell your
5  last name for the record, please.
6  A   My name is Douglas Eugene Croyle, last name C-R-O-Y-L-E.
7     REPORTER: Thank you. And a mailing address, please.
8  A   895 East Tenth North, Mountain Home, Idaho 83647.
9     REPORTER: Thank you. And a daytime telephone or message
10 phone, please?
11 A   Area code 208-587-3229.
12    REPORTER: Thank you. Counsel, if there are no
13 stipulations, Mr. Herz, you may proceed.
14    MR. HERZ: Thank you.
15 BY MR. HERZ:
16 Q   Good afternoon, Mr. Croyle, how are you?
17 A   I'm doing fairly well.
18 Q   Okay. Can you hear me all right?
19 A   Yeah, I can hear you just fine.
20 Q   Okay. And can you see me all right?
21 A   Yes.
22 Q   Okay. Have -- have you ever been deposed before in a
23 civil case?
24 A   For this one and -- and one or two others ones in the
25

## Page 5

1  past. So.....
2  Q   Are -- are you saying you've been.....
3  A   When -- when this was a DUI case I was deposed for that in
4  Kodiak when it.....
5  Q   So.....
6  A   .....when Brown was up for DUI.
7  Q   Okay. So that was in a criminal case?
8  A   Yeah.
9  Q   And.....
10 A   Yeah, I guess it -- for a civil case, no.
11 Q   Okay. And -- so you testified at -- at a criminal trial
12 involving Mr. Brown, is that what you recall?
13 A   Yes.
14 Q   And then.....
15 A   Yes.
16 Q   .....and then you indicated there were a couple other
17 cases, what were those?
18 A   I had one just about six months ago here, it was a civil
19 case in Mountain Home. That was about a dog -- dog
20 complaint, vicious animal. And there was one other that I
21 did when I was in the coast guard so that was a while
22 back.
23 Q   And -- and was that a civil case as well or a criminal
24 case?
25

Page 6

1  A   No, that was a civil case, it was.....
2  Q   Okay.
3  A   .....something that happened on base, somebody got injured
4      in the gym.
5  Q   All right. And then the -- the one in Mountain Home were
6      you a witness, a plaintiff or a defendant?
7  A   I was a witness, 911 dispatch.
8  Q   Okay. All right. So you understand that in -- in a civil
9      dep -- deposition, you've been placed under oath and
10     you're sworn to tell the tooth -- truth, right?
11 A   Yes, sir.
12 Q   And it's the same kind of oath you would take if you were
13     sworn to tell the truth in a criminal case, you understand
14     that, right?
15 A   Yes, sir.
16 Q   Okay. When I put a question to you, if you don't
17     understand it, if you ask me to -- if you tell me you
18     don't understand it I'll rephrase it or ask it in a
19     different way so -- with the hope that that makes it
20     understandable to you, all right?
21 A   Okay.
22 Q   If you don't -- if I ask a question and you don't indicate
23     that you don't understand it and you answer the question
24     then the -- the assumption is that you answered the
25

Page 7

1      question that I asked and you understood the question when
2      it was put do you, do you understand that?
3  A   Yes, sir.
4  Q   Okay. And -- and is that acceptable to you?
5  A   Yes.
6  Q   Okay. Mr. Croyle, you just indicated that you recently
7      gave testimony in a civil case in Mountain Home as a
8      witness and you indicated something about 911 dispatch.
9      Can you tell me currently what you're doing for
10     employment?
11 A   I'm working for Elmore Country Sheriff's Office as a 911
12     dispatcher.
13 Q   And how long have you held that position?
14 A   I've been with them three years as of the 18th of last
15     month.
16 Q   Going back from -- and -- and so that would be what, March
17     18th of 2005 when you started that job?
18 A   Yes, sir.
19 Q   And prior to that where were you working?
20 A   I took a year off and I just stayed at home. Prior to
21     that from October of 2000 until 2004 I worked for Kodiak
22     Police Department.
23 Q   October of 2000 until 2004, what was your -- do you know
24     your separation date from Kodiak Police Department?
25

Page 8

1  A   No, I don't recall it.
2  Q   And the year off at home, why did you do that?
3  A   Because I didn't have to work.
4  Q   Why not?
5  A   Why -- as in why I didn't have to work?
6  Q   Correct.
7  A   I had my money that I cashed out of the Alaska retirement
8      fund, when I left the city of Kodiak I had about $25,000
9      and that was more than enough money to live on along with
10     my military retirement checks so I just took a year off.
11 Q   Okay. And prior to October of 2000 what were you doing
12     for employment?
13 A   I was with the United States Coast Guard.
14 Q   Okay. Prior to working for the Kodiak Police Department
15     did you have any experience working for either a trooper's
16     office, a city police department, a sheriff's office or a
17     -- or you know, municipal or state law enforcement agency?
18 A   No, sir.
19 Q   Okay. So beginning in October of 2000, that was the first
20     time you worked as -- as a dispatcher for a law
21     enforcement agency of some municipality or state?
22 A   That's correct.
23 Q   Tell me about the training you received, did -- prior to
24     beginning in October of 2000 did you have training by the
25

Page 9

1      Kodiak Police Department for -- and -- and I take it, if I
2      understand correctly, you went to work in October, 2000 in
3      -- in their dispatch and communications division of the
4      police department, right?
5  A   Right. There at Kodiak, that -- that's correct.
6  Q   And did you have training for that position administered
7      by Kodiak Police Department before beginning that job or
8      did you receive training after you began the job?
9  A   I received training after I began that job.
10 Q   Okay. Tell me about the training that you did receive
11     after beginning that job?
12 A   Okay. They had a training program, a manual that they
13     had. You worked for your first three to six months
14     depending on how well you functioned and -- and were
15     picking up things, and they would assign -- you'd do all
16     the different call types, you'd take different calls,
17     they'd monitor your call taking, they'd critique what you
18     were doing, medical dispatch, legal -- police dispatch for
19     the city, police dispatch for Alaska State Troopers when
20     we'd pick them up in the evening. And then we were sent
21     off -- I was about -- I was there about nine months before
22     they sent me off to emergency medical dispatch training
23     which was done in Juneau. And then two years later we did
24     a emergence -- emergency medical dispatch update and that
25

Page 10

1   was done in Kenai. All the rest of the training that we
2   did was all hands-on, it was literally you were working
3   with somebody else that had already been there for quite a
4   bit of time and you worked with two or -- two people until
5   the sergeant, and at that time that was Nancy Perry (ph),
6   felt that you were good enough to stand on your own. So
7   most of the training that was done was -- was done either
8   hands-on or as a -- a pamphlet we would get every now and
9   then for 911 dispatch manual that would come in monthly,
10  we would do the questions and then -- and that type of
11  thing there, but for most of it it was all hands-on
12  training.
13 Q  Okay. You indicated that for a period of time while you
14  were being supervised there would be one or two people
15  that you would be working with. Who were the two people
16  or -- or if there were more, who were the people that were
17  supervising you during that training period?
18 A  Delana Hatfield was the main one. I worked with Nancy
19  Perry who was the sergeant and Nanc -- and then when Nancy
20  shifted off and gave me to Delana, they were the two
21  primary people and they were the ones that were signing
22  all your training -- the training book off.
23 Q  Okay. By January 4th of 2003 were you no longer being
24  supervised?
25

Page 11

1 A  I want to say it was about four months from -- so it was
2   probably closer to February I wasn't being supervised
3   anymore. It was -- there was a time frame there in that
4   initial three months where I almost quit because it was
5   just too far out of the box for me at the time. I just
6   got out of the coast guard, I'd been working military
7   communications for 22 years and the civil -- the civil
8   aspects and the way that the city did things was so
9   totally different from what I was used to I almost quit.
10  Nancy Perry talked to me about that and I went to an extra
11  month of supervision. So I'm thinking it was at the end
12  of February is when I started standing unsupervised, I'm
13  not exactly sure, but that would be about right.
14 Q  Okay. So by -- and -- and that would be in the year 2000,
15  right?
16 A  No, that would have been in 2001.
17 Q  2000.....
18 A  Because I started in October of 2000.
19 Q  Okay. Gotcha. All right. And so by January 4th, 2003
20  you're -- you're no longer being supervised; is that
21  correct?
22 A  That's correct.
23 Q  Now on -- when you're on a shift unsupervised, is there
24  anybody else working communications alongside with you or
25

Page 12

1   are you there by yourself?
2 A  That depending on scheduling. For the most part we stood
3   single person shifts. Sometimes there would be an overlap
4   and you might have somebody with you for a couple of extra
5   hours, but for the most part you were on your own.
6 Q  Okay. On January 4th, 2003 was there anybody with you at
7   dispatch between 4:00 and 6:00 o'clock in the evening that
8   you have any recollection of?
9 A  No, sir, there was nobody there.
10 Q  Okay. Now you know Frank Peterson, right?
11 A  Yes, sir.
12 Q  Okay. He -- he has described you as a good friend, do you
13  agree with that assessment?
14 A  I would hope that would be true.
15 Q  Okay. So do you consider him to be a good friend?
16 A  Yes, sir, I do.
17 Q  And why do you consider him a good friend?
18 A  Outside of the police station we shared several common
19  interests, both in fishing, family values, I like fencing,
20  I was teaching him how to fence, we just got along very
21  well, he was a little older than my oldest child at the
22  time and in a lot of ways he seemed like a son. So.....
23 Q  So you -- you did some fishing together, how -- how often
24  would you fish together?
25

Page 13

1 A  Oh, just every now and then, once every three or four
2   months. It wasn't -- it wasn't something that we did all
3   the time. In Kodiak I had a tendency to where once I left
4   the police department to not associate with anybody there.
5   It was I didn't want to be bothered with work and I didn't
6   want to hear people talking about work. So being able to
7   get together with Frank and doing hiking or go fishing
8   once or twice or go fencing, that was -- that was outside
9   of work. And that was something that I had made a
10  condition of, we're not going to talk about work, we're
11  not going to deal with work, we have to do that 40 hours a
12  week, when we're off we're off, when we're out of there
13  we're out of there. And that's pretty much our
14  relationship.
15 Q  And aside from spending personal time with Frank Peterson,
16  just you and he, did your families socialize together as
17  well?
18 A  Only a couple of times. My wife was working then and so
19  was I so our schedules didn't mesh very much. I spent a
20  couple of -- I went over and visited Frank a couple of
21  times, there -- there was a gathering at a couple of
22  parties that were at his house that we went to, but for
23  the most part we didn't associate that much with Shelly
24  and the kids.
25

DOUGLAS CROYLE
Vol 1
4/9/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

5 (Pages 14 to 17)

Page 14

1  Q  Okay. Did you ever have beers together?
2  A  I can't drink so no, I -- I -- we never got together for
3     drinking.
4  Q  Okay.
5  A  I have a bad pancreas so I can't drink.
6  Q  Okay. Were you ever socializing together where he was
7     drinking?
8  A  Twice, yeah, that I remember. I talked to him about that
9     too.
10 Q  And why did you talk to him about that?
11 A  Because he's a native American indian and they don't
12    handle alcohol well.
13 Q  Did you see times -- did -- were -- when you were around
14    him and he was drinking did you think he was having
15    problems handling his alcohol?
16 A  No, but I was concerned about it because it doesn't take
17    much to go that -- I -- I have a brother that's an
18    alcoholic and I had a mother that was an alcoholic and so
19    when I saw Frank drinking I -- I would tell him that I
20    didn't approve of it because it -- he's just not
21    physically made up to -- to do that. And when we were
22    together we didn't generally drink.
23 Q  Okay. Did you see him -- when you saw him drink did you
24    see him get intoxicated? Is.....
25

Page 15

1  A  One occasion.
2  Q  .....is that why it concerned you?
3  A  That -- that concerned me, yeah.
4  Q  Okay.
5  A  Like I said he's a friend and it was something that was
6     unnecessary. I felt in regards to that that sometimes he
7     was trying to fit in with the rest of the guys on the --
8     on the force and they would get together and drink beer
9     and not think anything of it. And I just disagreed with
10    that, it -- it's just a stance I've had almost all my
11    life. So that's just where I was at.
12 Q  Did you -- did you and he -- did you and Frank Peterson
13    ever, you know, do things like play cards together, shoot
14    darts, shoot pool, anything like that?
15 A  No. No. And I was invited a couple of times, but I never
16    went.
17 Q  All right. How about Officer Holden, did you ever
18    socialize with him?
19 A  One time he was at a party that was over at Frank's, but
20    for the most part I didn't socialize with Jeff, it -- I
21    can't even tell you where he lives on Kodiak. So.....
22 Q  Okay. So.....
23 A  Sitka.
24 Q  .....how would you describe your relationship with -- with
25

Page 16

1     Officer Holden, is -- is he a friend or -- or an
2     acquaintance or how would you describe that?
3  A  A friend at work, an acquaintance outside. As I said I --
4     I didn't associate with Jeff at all. He was a retired
5     coastie just like I was and so aside from talking when --
6     when things were quiet in dispatch, we really didn't have
7     that much to do together.
8  Q  Okay. Were you able to observe Officer Holden and Frank
9     Peterson, I mean, can -- are you able to describe what
10    kind of relationship those two men had together?
11 A  In the officer room and like in dispatch they seemed to
12    get along very well together. I don't recall of any
13    instances where there was any temper or anything like that
14    going on between them. They worked on the same shift for
15    quite a while when I was dispatching and they were my city
16    officers, they would back each other up, they'd be going
17    to bar fights or various calls and they would -- they
18    would always try and arrive together or be in close
19    proximity in case somebody needed assistance. That was
20    pretty much a unwritten policy at the police department,
21    you didn't want officers to go on calls alone as long as
22    you could avoid it.
23 Q  Okay.
24 A  And for traffic stops you always try to get two officers
25

Page 17

1     on the scene. And that was just the way it was.
2  Q  Are you affiliated with any particular church, Mr. Croyle?
3  A  In Kodiak I was with the Berean Baptist Church on Ismailov
4     and we were members there for pretty much the whole time
5     we were in Kodiak. When we left there we're now
6     affiliated with First Southern Baptist in Mountain Home.
7  Q  Okay. Now you indicated that there was a dispatcher
8     manual that you had for training purposes; is that right?
9  A  I -- I'd call it a manual, really what it was was a unit
10    training folder with about 50 to 80 pages of separate
11    items that had to be signed off so that they knew that you
12    were functional in whatever that criteria was.
13 Q  So were you -- I'm sorry, go ahead.
14 A  So it -- so that -- so that's pretty much what the manual
15    was. One of the complaints that I used to make to both
16    Delana and to -- and to the shift sergeant, Nancy Perry,
17    was that they really should have a -- a manual similar to
18    what the military uses where everything's there. Instead
19    of having to go through and find different items we had a
20    standard operating procedure and you shouldn't have to
21    rely on memory. When I was leaving Kodiak, when I'd given
22    my notice to leave, Delana Hatfield was actually working
23    on a standard operating procedure that was updated because
24    a lot of the information we had in that training manual
25

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax      907-243-1473
jpk@gci.net
sahile@gci.net

Page 18

1  was up to 10 years old. And so much of it was out of
2  date.
3  Q  So were you required to read that training manual?
4  A  Act -- yes, we were required to read that and was also --
5     it's where they would sign off our -- our practical
6     factors if you want to call it that, but that's what that
7     was for.
8  Q  Okay. Now the -- I take it you indicated there was a lot
9     of hands-on training. Were the things you were taught
10    hands-on, those were things that were not in the training
11    manual?
12 A  That was stuff that was actually like a line item, being
13    able to enter a warrant in -- in the warrants program in
14    the computer, can you find it in NCIC, did you pull up the
15    right form, did you execute, were there any errors, did
16    you have to do supplementals, that's what's in the manual.
17    The manual itself isn't like you would pick up oh, an
18    operations manual for how to run your digital television
19    set, it wasn't setup like that.
20 Q  Okay.
21 A  You -- stack of information, you'd have a couple of
22    paragraphs that tell you where to find something and then
23    they would refer you off to other books, you had to find
24    all of these different things. And as I said a lot of
25

Page 19

1     that information was out of date. When I went to work
2     there in -- in 2000, 2001 I was working on my own and they
3     had information that they just give you when -- when they
4     were signing off your practical, your wor -- your ability
5     to do the work. There was some of that stuff that was no
6     longer in -- in force, it was superseded or it was updated
7     and it's still in this training file. And it's like from
8     1987 and it was computers that were -- it was before the
9     computer systems even came in. And it was their file
10    keeping and things that -- that just were no longer valid.
11    Changes to the NCIC system, to the data input systems that
12    had been upgraded, but hadn't been reflected in the
13    manual. The manual really wasn't well kept up. From --
14    from a military viewpoint, for a guy that did 22 years and
15    trained hundreds of people to do the job that I did, that
16    manual was pretty bad.
17 Q  Okay. And so would it be fair to say that a lot of the
18    things that you did, that you were trained to do, were --
19    were not contained in any manual, it was just things that
20    either Sergeant Perry or Officer Hatfield told you about
21    and gave you verbal instructions about?
22 A  That is -- that would be very -- very correct.
23 Q  The -- you indicated there was a standard operating
24    procedure, can you describe to me what that is?
25

Page 20

1  A  Okay. For your call taking procedures it depends. Now it
2     changed when we shifted -- when I was working there we
3     were using the computer system a lot and I -- we were
4     working Filemaker Pro, I'm pretty sure that's the -- the
5     computer program we were using. And because that system
6     did not automatically assign categories, it was a -- you'd
7     pull up the -- like your case card, you'd pull that up,
8     all that information is entered manually. When we -- when
9     Brewster, the city IT guy, migrated the system to Forms
10    Plus, that became an automatic numbering system. So it
11    helped do away with things like the register of incidents,
12    all the hand work that we were duplicating effort to do a
13    call. You'd get a call, you'd do your -- jot a couple of
14    notes in your spiral notebook, you'd go through a -- a
15    notebook in anywhere from one to three months. So you'd
16    jot -- jot down some basic information to help you focus
17    on what was said and then you'd have to -- the very first
18    thing you did was go to your regiter -- register of your
19    incident essentially and you'd write in that -- your
20    preliminary information on that because if you got another
21    call and you didn't have a chance to enter your data card,
22    you didn't want to get -- get the -- the case numbers
23    mixed up. And that was a problem that was -- that was
24    there right up until the time I left. So you'd -- you'd
25

Page 21

1     take your call, you'd jot down your basic notes, you'd
2     grab your register of incident reporting and write down
3     your basic information on -- on that line, then you'd open
4     up your -- your File Make Pro card and start entering your
5     data. And all the time while you're doing that you're --
6     you're taking call information on the phone and your
7     private dispatch officers. So we're multi tasking and you
8     have to stay on top of what's being done. And if there's
9     just one person in that room and it's a crazy night it can
10    really get ugly. You can get behind and if you mess your
11    -- your register of incident reports up you wind up giving
12    officers wrong case numbers and so you -- that was why
13    that was the very first thing you did. And then you
14    jotted your numbers down on the case incident report and
15    you started on the case card.
16 Q  And in -- in this case -- and -- and so that operating
17    procedure, that wasn't in a manual, that was something you
18    were taught to do?
19 A  That was something we were taught to do.
20 Q  Okay. And in your opinion something as basic as that,
21    should that appear in a -- in a training manual or an
22    operations manual for dispatchers?
23 A  Absolutely.
24 Q  Now in this case have -- have you had an opportunity to
25

Page 22

1  review documents associated with the case?
2  A   Yes, I have. I've -- I got documents from both you and
3      from Koziol.
4  Q   And what -- what documents have you received?
5  A   Oh, well, I got copies of the registers, of the case card,
6      of the handwritten notes, two pages out of my spiralgraph
7      notebook, copy of my radio -- handwritten radio log. I
8      was also sent radio -- I guess this is off of the voice
9      recorder, a transcript off the voice recorder. I got a
10     copy of my Kodiak Police Department training sheet which I
11     just looked at and kind of laughed, and my personnel file
12     there.
13 Q   Okay.
14 A   So I -- I've got the basics from that.
15 Q   And do you -- do you have any corre -- you -- you think
16     you received something from my office, do you know what
17     you received from my office?
18 A   I have it all here. You sent a couple of packages, one is
19     from Iron Hand Investigations and -- actually I have two
20     copies of that, and a transcript of proceedings and the
21     notice of the videotape deposition, that -- that paperwork
22     I've got.
23 Q   Okay. I'm sure we sent you a notice of videotape
24     deposition, are you sure that our office sent you a report
25

Page 23

1      from Iron Hand Investigations or is that something that
2      Mr. Koziol may have sent you because it discussed
3      dispatcher issues?
4  A   It -- it -- okay. This was from you to him and so I guess
5      he sent it to me. So -- okay. So if you didn't send me
6      those then he did.
7  Q   So other than the notice of videotape deposition, you
8      didn't get anything from my office, did you?
9  A   Automatic cover sheet, notice of deposition, that's what
10     I've got from you guys, looks like everything else came
11     from Koziol.
12 Q   Okay. Were there any letters sent to you by Mr. Koziol,
13     any correspondence in the form of a letter?
14 A   He sent me a -- he sent me several verifications, one by
15     express mail, a copy of my personnel file, Bates Stamp
16     numbers for that, a time card and basically it's just
17     duplication of the stuff that he faxed.
18 Q   Okay. How -- how many letters from Mr. Koziol do you
19     have?
20 A   I have three.
21 Q   Okay.
22 A   Two from April 1 and one from March 22nd.
23 Q   Okay. And do you have any other letters from him?
24 A   Okay. Let's see here, April 1, April 3, April 1 and March
25

Page 24

1      25th. And the rest were faxes.
2  Q   You -- you mean faxed letters?
3  A   Yes, he sent me a fax of -- it was like 34 pages long. It
4      was just the transcripts and can't believe I didn't bring
5      that. There was the curriculum vitae and revised reports
6      from James Ellar -- Ellar. That was pretty much it.
7  Q   Okay. Can we attach the four letters that you received as
8      an exhibit to this deposition, we'll call that exhibit A,
9      can you send those to the court reporter?
10 A   Sure.
11            (Deposition Exhibit A marked)
12 Q   Okay. So.....
13 A   I'll be -- I'd be more than happy to.
14 Q   .....that would be a -- a letter from the 27th, two on the
15     1st and one on the 3rd, right?
16 A   27, 1, 1 and 3. Yeah.
17 Q   Okay. And now on the faxes that you received, were there
18     any cover -- cover letters or introductory letters or
19     anything that came with them or did he just send you
20     documents with no cover letter?
21 A   I have cover letters for one, two, three, four, for -- for
22     the stuff that I got, yes.
23 Q   For the fax -- for the things that we're faxed to you?
24 A   Yes.
25

Page 25

1  Q   All right.
2  A   One was -- one was the disposition information and the
3      other one is 30 something pages.
4  Q   Okay. I -- I -- can we attach the cover letters that came
5      with the faxes, I don't want the entire fax material, in
6      other words I don't.....
7  A   Okay.
8  Q   .....want duplicates of the reports or things like that.
9      But any introductory, you know, cover letter that went
10     with those faxes, you're -- you're indicating.....
11 A   Okay.
12 Q   .....there's -- there's four of those as well?
13 A   Yes, sir.
14 Q   Okay. Can -- and can you send those to the court reporter
15     as well and call that Exhibit B?
16 A   Okay.
17            (Deposition Exhibit B marked)
18 Q   Okay. Now did you have any email correspondence with Mr.
19     Koziol?
20 A   No, sir.
21 Q   Did you have any -- any other written documents other than
22     the ones you've just described here?
23 A   No.
24 Q   Okay. Did you have any phone call -- phone conversations
25

Page 26

1  with Mr. Koziol?
2  A  Yes, sir.
3  Q  How many?
4  A  I had one.....
5  Q  When.....
6  A  .....just one.
7  Q  Okay. And when did you have that conversation?
8  A  It was last week. I don't actually remember the day, I
9     didn't really pay any attention to it. It was -- it was
10    just the one, he told me that he was representing Officers
11    Holden and -- and Peterson, and he explained about how
12    civil cases work. And so that was what that was, wanted
13    to verify that I'd received letters and the information.
14    And that's really pretty much what was there. He -- he
15    wanted to be sure that I was willing to -- to testify,
16    wanted to know -- he asked me the time line, he went
17    through the time line for how the call came in and how it
18    was dispatched and what I recall from that. And then we
19    set it up to -- to meet here, he told me that this was
20    going to be happening.
21 Q  Okay. So you went through the facts of the case with him?
22 A  The -- the basic -- he wanted to understand how we -- how
23    we would do the register of incidents, how that was
24    pertinent, how we filled out the -- the case cards, the
25

Page 27

1     time line for what I have in handwritten notes versus
2     radio traffic and the actual transcript that was sent in
3     for the phone calls that I got from Lori Skonberg, the
4     other female and from Beverly Brown when she called for an
5     ambulance.
6  Q  Okay. And how long did that telephone call where you
7     talked about the facts of the case, how long did that call
8     last?
9  A  I don't know, a half an hour, 45 minutes at the most.
10 Q  And did you make any handwritten notes about your
11    conversation with Mr. Koziol when you had that
12    conversation?
13 A  No, sir, I didn't.
14 Q  Have you made any handwritten notes about any of the --
15    concerning any of the documents that you've read and
16    reviewed in this case?
17 A  No, sir, I haven't.
18 Q  Did you -- did you -- I mean, including, you know, marking
19    up the documents themselves, making notes in the margins
20    or anything like that?
21 A  Nope. Nope.
22 Q  Have you talked to Officer -- and let me kind of divide up
23    the -- sort of the time frame here, okay, between --
24    between 2003, January 4, 2003 and when you retired from
25

Page 28

1     the Kodiak Police Department in 2004, did you have any
2     conversations at all about this case with Officer
3     Peterson?
4  A  Actually no, none that I recall.
5  Q  Okay. How about with Officer Holden?
6  A  No. It was -- it was just another DUI case, it was -- you
7     know, it -- I notarized the paperwork as it came in and it
8     was done, it was -- you know, it was just one of hundreds
9     that we dealt with, he -- he was nothing special.
10 Q  Okay. How about after leaving the department in 2004 up
11    until today, have you ever talked to Officer Peterson
12    about this case?
13 A  Actually I got an -- I asked in an email -- I asked him
14    what was going on and he -- he sent me back and said that
15    -- an email back and stated that this was going on and if
16    Schlessor (ph) would have done his job properly then this
17    would have been unnecessary, but that -- that's all it is.
18    I can provide a copy of that email if you want it.
19 Q  Okay. That would be great, we'll attach that as Exhibit
20    C.
21           (Deposition Exhibit C marked)
22 Q  When you asked him what was going on, you were asking him
23    what was going on with this case?
24 A  Well, I was asking him what was going on because I had
25

Page 29

1     heard that he was leaving the police department. And so I
2     was just wanting to know what was going on with his life
3     and where he was at. He was -- he went overseas to Iraq
4     with the Alaska National Guard and I was concerned about
5     that and how his family's doing and his new boy and I
6     wanted him to know about my book finally coming out and it
7     was -- it was just friend chat.
8  Q  Okay. So.....
9  A  That was it.
10 Q  Go ahead.
11 A  The -- the -- the case itself really wasn't an issue, it
12    was more of just like a question of what's -- what's going
13    on.
14 Q  Okay. And was it your impression that -- did you -- did
15    you form the impression that the reason he was leaving the
16    Kodiak Police Department was at -- was at least due to
17    this case?
18    MR. KOZIOL: Objection. Form.
19 Q  You -- when he makes an objection you still answer the
20    question, the objection's for the judge and the judge can
21    decide how to deal with that later. So.....
22 A  Okay. Well, why I don't know. He told me he was going to
23    move on, he thought it was it time to move on. When he'd
24    come back from Iraq and we were talking here in Idaho, he
25

Page 30

1  stopped and visited on his way back across country, and I
2  told him that I thought he would probably be leaving the
3  police department within a couple of years. Life
4  experience changes the way you view things and I didn't
5  think that he would stay with the department. So I don't
6  know if -- if he -- now I would have to say that this case
7  had nothing to do with him leaving, you know, but that's
8  not something we really discussed, it's all -- you know,
9  that's just -- from my impressions I think he thought it
10 was time to move on.
11 Q  Did he ever confide in you about any disciplinary action
12    that was taken against him by the department or any
13    investigations that were -- that had been undertaken that
14    involved him?
15 A  No, sir. That was one of those -- going back to our basic
16    friendship was we did not talk about work and we did not
17    talk about work issue. So that's -- that was -- that's
18    ground we never -- we never went on. As a matter of fact
19    it wasn't until I read some of the paperwork that was sent
20    to me that I even realized some of the issues that he had
21    been -- been dealing with. So.....
22 Q  Okay. The -- other than this one email correspondence
23    between you and Officer Peterson, was there any other
24    communication written or oral between you and Frank
25

Page 31

1  Peterson since leaving -- since you left the department in
2  2004 concerning this case?
3  A  No, none at all.
4  Q  Okay. And going back again to between January 4th, 2003
5    and before you left the department in 2004, did you have
6    any communication written or oral with anyone in the
7    Kodiak Police Department about this case?
8  A  That would have been -- there would -- there was a
9    discussion with Sergeant Hatfield, it was the critique of
10   the 911 call, we critiqued all of them. So she sat --
11   when we sat down afterwards they'd go back and pull the
12   tapes and then listen to the audio and then sit down with
13   you and tell you what you could have done better or what
14   you did really well. That was just a critique that was --
15   that was done probably within a month of when this
16   happened. I recall very vaguely her commenting that when
17   I dispatched the ambulance I was a couple minutes slow on
18   that. And her -- and as I told her, I said the lady
19   called and asked for an ambulance and then put the phone
20   down and I couldn't get additional information. I thought
21   I dispatched someone with what I had. But that would have
22   been with Delana and that -- as I said that would have
23   been within a month of that event so that would have been
24   by the end of January, probably first week of February.
25

Page 32

1  Q  All right. Same time period between the date of the
2     incident, January 4th, 2003 and the -- and before you left
3     the department, do -- did you have any conversations with
4     anyone, not just Officer Peterson or not just somebody
5     within the Kodiak Police Department, but anyone regarding
6     this case?
7  A  As -- as a civil -- the civil case?
8  Q  Regarding your.....
9  A  Or -- or the DUI?
10 Q  .....regarding the incident.
11 A  Okay. Regarding the incident that would have been at
12    Michael Gray's office, the lawyer for the city or the
13    prosecutor for Kodiak, Joe Schlessor also there at those
14    law -- at the law offices. That was the first time I saw
15    the vehicle video and they went to court on that. I gave
16    my testimony at the court and was dismissed and I never
17    even bothered checking to see how the case came out, I
18    really didn't care. So I -- I mean, I'm looking at this
19    and I'm thinking I really don't care. So that was Mike
20    Gray and Schlessor and that would have been in the Kodiak
21    district court for -- for that -- when it was -- when it
22    was a DUI case. So that -- that was that. Other than
23    that, no, I didn't talk to anybody about it.
24 Q  Okay. And then same questions different time period.
25

Page 33

1  From the time you left in 2004 until today, any conver --
2  any conversations other -- other than the one you had with
3  Mr. Koziol recently, any conversations with anyone in the
4  Kodiak Police Department or the city of Kodiak about this
5  case?
6  A  No. Just the one email that I sent to Frank asking what
7    was going on in his life and that -- that's the only thing
8    about the case.
9  Q  Okay. And so.....
10 A  I talked to your legal advisor or your -- Lori at your
11   office I think on three or four occasions. And she was
12   just verifying that I had gotten information and telling
13   me about the deposition. Other than that's there's been
14   nobody else.
15 Q  Okay. And so no one outside -- between 2004 when you left
16   the department today other than Mr. Koziol and the contact
17   with the legal assistant in my office, you've had no
18   conversations about this incident in -- in any way with
19   anyone else; is that right?
20 A  No. Except what -- as I said with the email to Frank.
21 Q  Okay. Now you indicated you -- that you really didn't
22   care and I guess I'm going to have to follow-up on that.
23   If -- if -- if Frank's a good friend of yours, almost like
24   a son, why wouldn't you care about this case, why wouldn't
25

DOUGLAS CROYLE  
Vol 1  
4/9/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB  
10 (Pages 34 to 37)

Page 34

1  you have an interest in whether he's being sued and
2  whether he's going to be held civilly liable or maybe have
3  to pay out money to Scott Brown, that doesn't concern you
4  if he's such.....
5  A   Well.....
6  Q   .....a good friend?
7  A   .....it doesn't concern me, he -- the city's representing
8  him, he's got his legal representation, it's not like he's
9  paying out of pocket for lawyers. He's covered as a city
10 officer, from my understanding in Kodiak even as a
11 dispatcher that legal indemnity and all of that is covered
12 by the city. So unless something really bad happens in
13 court and Frank gets -- if -- if that happens that's just
14 part of his life, it's not part of my life. And it's
15 going to sound a little cold perhaps, but as a 911
16 dispatcher emergencies are the other person's problem, all
17 I'm doing is sending the help that's necessary. His
18 issues, things that are going on, that's not my life, I
19 have my own life and my own issues to take care of.
20 Q   Okay. Now you earlier indicated that when -- when you're
21 getting information on a call you jot down notes in the
22 spiral notebook to help you focus on what's happening and
23 then you turn to the register and -- and then you get to
24 the data card and your mult -- you indicated you're multi
25

Page 35

1  tasking because you're also taking information from phone
2  calls and dispatching out officers and you indicated it --
3  it can get really hectic, pretty crazy, right?
4  A   Yes, sir.
5  Q   Okay. And having looked at all the materials including
6  your radio log and your handwritten notes and looking at
7  the register for January 4th, how would you describe that
8  day, was that a -- was that a busy shift for you or not?
9  A   Looking at the register, actually for that period it was
10 really not a bad night from the number of cases. As you
11 look at my -- at the register of incident and offenses, I
12 came on shift at about 4:00 o'clock, worked until
13 midnight, and we did 10 or 11 events, that's is not a
14 truly hectic date. We had days where we did 50 or 60
15 events in an eight hour period. And that's when it can
16 get really crazy, this was just -- this is just the
17 beginning, you know, it was -- it was -- it wasn't that
18 bad a day.
19 Q   Okay. When you're referring to the register of incidents
20 and offenses are -- is the document you're looking at, are
21 you looking at a -- at the bottom right-hand corner is
22 there a sticker on there that says date 4/2/08, Exhibit
23 A2, Kamai?
24 A   Yes, sir.
25

Page 36

1  Q   Okay. And it says Computer Matrix and a phone number?
2  A   Computer Matrix and yeah, a phone number on it.
3  Q   Okay. So that's -- so that's the document you're
4  referring to?
5  A   Yes, I'm looking at the second page.
6  Q   Right. It begins at the top, left-hand corner, it says
7  case number and then it says 200300101?
8  A   Yes, sir.
9  Q   Okay. I just want to make sure we're talking about the
10 same sheet of paper. All right. So the -- let me ask you
11 about your -- your handwritten notes in the spiral
12 notebook. You indicated that when a phone call comes in
13 that's the -- that's the first place you start writing
14 information down; is that right?
15 A   Right.
16 Q   And that's.....
17 A   Generally it's in shorthand, it's not word for word, it's
18 just enough so that we can glance it and we can okay, this
19 is the basic information that I needed and, you know, you
20 can fill the card in later if you have to. So this gives
21 you your basic information.
22 Q   Okay. And now the -- the sheet you're looking at, you --
23 you have your handwritten notes there in front of you; is
24 that right?
25

Page 37

1  A   Yes, sir.
2  Q   What -- what -- do you know what a Bates Stamp number is?
3  A   No, actually I don't.
4  Q   Okay. Do you -- do you see some numbers at the bottom
5  right of your handwritten notes?
6  A   Okay. Like the 11120?
7  Q   Okay. That may be. I -- I've got different numbers on
8  mine, but they may, in fact, be the same notes. We've had
9  -- we've had the notes produced in a number of -- in a
10 number of different times and so we -- we've got multiple
11 copies of things. So if you've got 11120, that's fine.
12 Let me just.....
13 A   I've got 11120 which is the one with the blackout bar and
14 11121 which starts off at the top with 12/19 refers to --
15 to the ambulance call.
16 Q   Okay. So you're working off 11120 and 111.....
17 A   Yes.
18 Q   .....21? All right.
19 A   Yes.
20 Q   I've got -- I've got those notes in front of me. I -- I
21 want you to take a look at 11120 and you've written down a
22 -- a time there, right, is that 1651?
23 A   Yes, sir, 1651.
24 Q   And when you write down the time where are you getting the
25

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax     907-243-1473  
jpk@gci.net  
sahile@gci.net

DOUGLAS CROYLE  
Vol 1  
4/9/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

11 (Pages 38 to 41)

Page 38

1 time from?
2 A I'm just -- that's when the phone is calling and I look up
3 and I take the time off the computer.
4 Q Okay.
5 A So computer monitor, bottom right-hand corner, that's
6 where that time frame came from.
7 Q Okay.
8 A So that's where I got my time from.
9 Q And do you know what the X or the mark to the left of the
10 1651 is, do you know where that came from?
11 A Yep, I know exactly where that came from. When I go --
12 when I look through my spiral notebook after I -- I write
13 down the 1651, basic information, when -- when I go back
14 and I'm checking my data cards, making sure information's
15 been transferred over, I would X it off so that I knew
16 that everything related to that time call was done. So
17 that's my -- that's my shorthand saying that data entry
18 was taken care of, the Safeway -- the next one was taken
19 of. And if you go through you'll see that wherever --
20 even on -- on the next page, on 11121, there's still one
21 -- there's even one below that for the section of my
22 entry. It's just something that I did.....
23 Q All right. And.....
24 A .....that's my own shorthand, that's -- that's what that's
25

Page 39

1 for.
2 Q And -- and the purpose of getting this -- the -- putting
3 information in the spiral notebook is to get the -- the
4 critical, essential information jotted down so you don't
5 forget it, right?
6 A Not that -- yeah, but you -- that you could look at --
7 well, yes, okay. And it says -- once again that's pretty
8 much shorthand for me.....
9 Q Okay.
10 A .....it's not verbatim. And if you look on the phone call
11 transcripts you'll see that the -- the information I put
12 down there was what I needed, but doesn't necessarily
13 contain all the information that's in the phone call.
14 Q Okay. But you didn't have the transcript at the time that
15 you're writing these notes down, right?
16 A No.
17 Q Right. So you're just working off what you heard on the
18 phone call?
19 A Right.
20 Q Okay.
21 A And if you have questions we could pull up the voice
22 matrix. So like after your call is done and then you're
23 going what -- what was that or I missed something or did I
24 miss something, you could go back and play -- play back
25

Page 40

1 that audio. You couldn't change it, but you could go and
2 access it and play the -- the call back if you needed to.
3 Q And you could do that -- you could do that seconds or even
4 -- or minutes later if you needed to?
5 A Minutes for -- it usually took three to five minutes for
6 any voice or radio traffic to record to the -- the -- go
7 through the server and come back and be available as an
8 audio file.
9 Q How -- how long would it take you to do that?
10 A It would take three to five minutes depending on how fast
11 the server was working.
12 Q Okay. So.....
13 A So it worked (indiscernible) seconds, you could swing
14 around in the chair and punch the button, that's not the
15 way it worked.
16 Q All right. So within in three minutes you could, if you
17 needed to, go back and listen to that call to get more
18 data?
19 A Yes.
20 Q Okay. And for 1651 what we've got for data is Safeway,
21 gold flatbed truck, 45 to 50, Salief, Pillar Mountain,
22 fast and reckless and then Lori Skonberg's name, right?
23 A Yep. And her phone number.
24 Q And her phone number. And what you left off was the 48
25

Page 41

1 which is the same prefix for everybody in Kodiak, right?
2 So.....
3 A Yes, that's correct.
4 Q So it's 486-5548?
5 A Yes.
6 Q Okay. And then the next entry was at 16 -- for your
7 handwritten notes was 1657?
8 A Right.
9 Q Which -- and it says Safeway slash and then black hair,
10 hyphen stubble, blond hair hyphen and nothing, right?
11 A Right.
12 Q And then the license, DWG484, that came in even later,
13 right, wasn't that phoned in by Officer Peterson?
14 A Actually that was given over the radio.
15 Q Rad -- I mean, radioed in, right.
16 A Yes.
17 Q Okay.
18 A And that's where I scribbled that down because I would
19 have to run that plate.
20 Q Okay. All right. Then you're saying standard procedure
21 would be to then go to the register of incidents so
22 that.....
23 A Right.
24 Q .....just so that you've got a case number assigned to the
25

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax   907-243-1473  
jpk@gci.net  
sahile@gci.net

DOUGLAS CROYLE  
Vol 1  
4/9/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

12 (Pages 42 to 45)

Page 42

1   incident, right?
2 A  Yes, sir.
3 Q  And you just need to get -- I mean, it would be fair to
4   say that just so you don't screw up and assign the wrong
5   case number to the wrong incident, all you really need to
6   do is just get enough information down so that the case
7   number matches the incident, right?
8 A  That's -- that's correct.
9 Q  Okay. So you could, at least in theory, put down the
10  facts, Safeway, gold flatbed truck, and that would at
11  least hold your place in the register and you could go
12  back and fill in with add -- additional information as
13  time allowed you to, right?
14 A  Yes.
15 Q  Okay. Now I notice on the register that for the time you
16  put in 16 -- time reported in column three.....
17 A  Right.
18 Q  .....you put in the time of 1653.....
19 A  Right.
20 Q  .....and I noticed in your handwritten notes you've got
21  the time of 1651.
22 A  Right.
23 Q  So.....
24 A  That's when the call one -- 1651 is when I'm picking up
25

Page 43

1   the phone and going -- looking at the computer going okay
2   so I'm -- I'm starting from there. 1653 completes the
3   call when it's -- when I've hung the phone up or
4   dispatched. So 1653 is when I would be telling the
5   officers this is what this is. And the offense code as a
6   REDDI would be what I dispatched it as verbal to the
7   officer.
8 Q  Okay. But.....
9 A  So.....
10 Q  .....but the.....
11 A  .....and -- and that gets a minute break there, but that's
12  the time frame between talking on the phone and the point
13  where I actually have it written down in the -- on the
14  incident report sheet and -- and get it out.
15 Q  Okay. But the -- the column says time reported not time
16  dispatch?
17 A  Right.
18 Q  Now you're saying even though it's asking for the time
19  reported, it was -- the -- the way you filled out the
20  incident -- the register of incidents you used time for
21  dispatch?
22 A  Yeah, a lot of time it was time of dispatch or it could
23  have been because I glanced at a different clock and it
24  was a different time. That was -- that's a problem we had
25

Page 44

1   there. But yes, between 1651, 1653, would have been my
2   time of dispatch. It.....
3 Q  What do you mean that was a problem that we had there?
4 A  Well, we had a server that had one time, 911 computer had
5   a different time, the operations computer that we used,
6   did all the data entry, would often be off by as much as
7   three minutes. And then we had a wall clock and none of
8   them ever matched.
9 Q  And.....
10 A  So you're looking at five or six different clocks in the
11  work space and none of them have the same time.
12 Q  And nobody thought that was a problem?
13 A  It was a problem and they would update it and it would go
14  out of system and out of sync. And if you walk into -- to
15  the Kodiak police department today and walked into their
16  dispatch I can probably lay money that their computer
17  systems all have different times on them.
18 Q  So and -- and did your supervisors know that that was a
19  problem?
20 A  Yeah.
21 Q  And did they ever instruct anybody that there should be
22  one clock and only one clock that the dispatchers so that
23  all the times being used were consistent?
24 A  That was never, never an issue. They never -- they never
25

Page 45

1   gave that instruction ever.
2 Q  Don't you think though that kind of instruction would have
3   been called for under the circumstances?
4 A  Absolutely.
5 Q  Okay. Now in this case when you dispatched the officers,
6   the officers were not on patrol, were they?
7 A  No, they were in the officers' room.
8 Q  Okay.
9 A  Which was just a short hallway away from dispatch.
10 Q  But you couldn't leave your post to go talk to them,
11  right?
12 A  If I had to I could.
13 Q  Okay. In this case though.....
14 A  It's approximately 15 feet, yeah.
15 Q  I'm sorry?
16 A  You're talking a distance of 15 feet.
17 Q  So tell me when you dispatched them how did you do it?
18 A  I had the impression that Frank had heard the phone call
19  and he'd come up to the dispatch center. And I seem to --
20  in my memory I told him -- he was the opposite side of the
21  counter and I -- and I gave him what I had. I got a
22  REDDI, Safeway -- from Safeway, Lori Skonberg called it
23  in. It -- it's a gold flatbed truck heading up Pillar
24  Mountain Road. That -- that's pretty much what I
25

Computer Matrix, LLC                     Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 46

1   remember. I -- I seem to recall telling him to his face.
2   If I didn't tell him to his face I would have called him
3   on the officers' -- on the officers' room phone and told
4   him the same information. But I recall telling him to his
5   face, I don't know how accurate -- if that's true or not,
6   it's been a long time.
7  Q  Do you know who Lori Skonberg is?
8  A  I knew she worked for -- worked for the city, I think it
9   was housing or something, but I didn't -- I didn't know
10  Lori. I just -- she was just one of those names of people
11  that you ran into every now and then in Kodiak and.....
12 Q  And why was that, why would you hear that name now and
13  then in Kodiak?
14 A  As I -- as I recall she worked for Kodiak's version of
15  housing and urban development for HUD, for low rent
16  apartments or something like that. I seem to recall she
17  was -- that's where she was. Kodiak is not that big, you
18  run into -- to people and after a while you know half the
19  town at least by sight. But I -- I -- I seem to recall
20  that she worked for -- for the -- for the city's housing
21  for low income people.
22 Q  Okay. Now -- so you don't -- your recollection is you --
23  you gave the dispatch information to Frank Peterson face
24  to face, right?
25

Page 47

1  A  Yes.
2  Q  That's your recollection?
3  A  That's my recollection.
4  Q  And -- and if that didn't happen then you did it over the
5   phone, right?
6  A  Yes.
7  Q  Okay.
8  A  I would have called the officers' room and given it over
9   the phone.
10 Q  And did you -- did you -- you -- did you see Officer
11  Holden at that time?
12 A  No. I don't recall Jeff coming out of the officers' room
13  at all. So I think I told Frank and he turned around and
14  went back just across that little room and -- and told
15  Jeff what was going on and they both rolled a couple
16  minutes after that. I don't recall telling Officer Holden
17  at all.
18 Q  Okay. How did -- how did you know Officer Holden was in
19  the patrol room?
20 A  Oh, they were both in doing reports.
21 Q  Okay. And how do you know what Frank told him?
22 A  I don't.
23 Q  Okay.
24 A  I mean, I -- I don't -- like I said I don't recall --
25

Page 48

1   Frank had to have told him something because when they
2   went Frank went up -- up high on Pillar Mountain and Jeff
3   went down low in case the vehicle had turned off. I think
4   he was checking Hillside and that area down there. So
5   Jeff knew what was -- what was happening. And I don't
6   know, I'd have to go back and look at the dispatch logs,
7   you know, because what Jeff went down Birch and Thorshine
8   (ph) up towards Hillside, up in that area so Frank had to
9   have told him where they were going and what they were
10  after.
11 Q  All right. Now there's nothing written down about what
12  you told Officer Peterson when you dispatched him, is
13  there?
14     MR. KOZIOL: Objection. Form. Leading.
15 A  No. No.
16 Q  Okay.
17 A  But that was not ever -- up to the day that I left, that
18  was never a requirement. We dispatched officers out of
19  the officers' room all the time and for many different
20  types of calls and we never had to keep any record at all
21  of what we told them.
22 Q  Be -- because that wasn't in the training manual and
23  nobody told you to do that?
24 A  It was -- it wasn't an operating procedure, it wasn't
25

Page 49

1   something we had to worry about. We had the phones
2   recorded if we needed to have phone lines checked and we
3   had the radio traffic recorded if they needed to check
4   radio traffic. What we told the officers and sent them
5   out the door on, that's -- that was whatever the
6   dispatcher tells them.
7  Q  Right. And what I'm asking is there was no -- there was
8   no written manual that said when you dispatch an officer
9   you should -- you should record what you told the officer
10  when you dispatched him?
11 A  No, there wasn't anything there for that at all.
12 Q  And there was no instruction for any supervisor that when
13  you dispatch an officer out of the patrol room either by
14  phone or face to face that you should make some record of
15  the dispatch?
16 A  No, that wasn't a requirement either.
17 Q  Okay. So nobody trained you to do that?
18 A  Yeah, that's true, nobody -- no, that wasn't -- it wasn't
19  a requirement, it wasn't part.....
20 Q  Okay.
21 A  .....of the training.
22 Q  And do you know -- and -- and what do you think of that
23  policy, do -- do you think there may be some problems with
24  the fact that you're dispatching officers and there's no
25

Page 50

1  record of it?
2  A  Well, it comes to light in this type of a situation,
3     doesn't it?
4  Q  Yeah, doesn't it.
5  A  Now so as I said, there were -- I had issues with the way
6     that that police department did things, but that was just
7     me, I -- I was -- was used to a different environment.
8     There should have been something, there should be -- even
9     to this day when we're working here, everything is -- is
10    recorded, I mean, our work space is recorded. So there's
11    always verification of what is said, there's no -- there's
12    no question. It's not like we're sitting here now and
13    saying this happened and this is what I told them, but I
14    couldn't tell you verbatim what I told Frank, I -- I
15    really can't.
16 Q  Okay. Let -- let me ask you about your existing work
17    space where you are right now. Do you ever dispatch
18    officers from a patrol room either by voice to voice or
19    face to face communication or over the telephone like you
20    were doing in Kodiak?
21 A  Yes.
22 Q  And what is the requirement there about recording what you
23    dispatch the officer on, either when you talk to him by
24    telephone or face to face, is there any sort of guidance
25

Page 51

1  or instruction that you've been given or anything in your
2  training manual that says that information should be
3  written down?
4  A  Actually it is recorded. As I said our space is recorded.
5     There is no requirement at Mountain Home Police Department
6     or Elmore County Sheriff's Office at this time that verbal
7     dispatch to an officer in the space is required to be
8     recorded, you know, handwritten -- written down because
9     the space is recorded.
10 Q  Okay. And so you -- your understanding is it's not
11    required because the information's available in some other
12    format?
13 A  Yes.
14 Q  What's the practice of the dispatchers there though, do
15    they write it down anyway or not?
16 A  Most of us do.
17 Q  So even when you telephone to an officer in a patrol room
18    there and dispatch them or have verbal face to face, you
19    -- you still record that information even though you know
20    it's being audio recorded anyway?
21 A  Yes.
22 Q  Now for the register of incidents obviously in the last
23    category where it says action taken, that's filled in
24    later, right?
25

Page 52

1  A  That's when the case's closed, yes.....
2  Q  Right.
3  A  .....when you close the card.
4  A  And the information that you got for category six, seven
5     and eight, that information that you had in other formats
6     or in other locations at the time that you took this phone
7     call, right?
8  MR. KOZIOL: Objection. Form.
9  A  Not very strict as to who the complainant is, so that came
10    off of the -- the phone call information entered at 1651.
11    That's Lori Skonberg, seven -- the address of the
12    reporting party or the location. So that wasn't set in
13    stone either, so that -- it -- where the incident
14    occurred, that was on Salief. Officers assigned, you'll
15    see if you look at various registers of incidents, if we
16    have the time to write out the officers' names we do that
17    or we could use their K numbers. So I wrote out Peterson
18    and Holden. So that -- that -- the code four is the
19    offense, that's what you dispatched it as. It's not what
20    it changes to, but what you actually dispatched it as. So
21    I dispatched this as a REDDI and so that's what Frank
22    Peterson went out the door pursuing was a REDDI, that's
23    what Holden should have been going out the door following
24    Frank on was a REDDI. This was -- turned into an arrest
25

Page 53

1  DUI, we didn't change our offense code. The only thing
2  that would happen is that like in this case Alaska State
3  Troopers assisted, that gets added to the case card later
4  because they have to do supplementals. And.....
5  Q  Okay. My -- my question was for category six, complainant
6     Lori Skonberg, you have that information in your
7     handwritten notes.....
8  A  Yes.
9  Q  .....right? Okay. And Salief, category seven, the
10    address, that -- as you indicated that could be the
11    location of the incident, that was in your handwritten
12    notes, right?
13 A  Yes.
14 Q  All right.
15 A  Correct.
16 Q  And so that's information that if you needed to, if you
17    didn't have time to fill in at the time you were filling
18    in information on that register line, you could go back
19    and fill that in later because you had that information in
20    another location, right?
21 A  Yes.
22 Q  Okay.
23 A  That was the whole purpose of keeping your -- your spiral
24    notes.
25

Page 54

1  Q  Okay. And so is -- is there any way to know in this case
2     when all of the information for that incident line got
3     filled in, whether it got filled in, you know, for
4     instance category five, in other words do we have any way
5     of knowing whether categories two, three and five got
6     filled in first and then four, six, seven and eight got
7     filled in later, is there any way to know when they all
8     got filled in?
9  A  Okay. Two, three and four are right off the bat. Okay.
10    Your -- your time, your offense, that's right off the bat.
11    Circumstances, you're going to want to jot something
12    there, whether it's just a gold flatbed, the rest of the
13    information you can get back to because you have it. But
14    you had to put down your time, you had to put down your
15    offense and your basic reason for the card going out the
16    door. The rest of the information, I could have filled it
17    in later, I -- I honestly don't remember. As I said this
18    is just one of hundreds of cases. I -- I just know that I
19    -- what I did know right off the bat. You did your two,
20    three, four, five and you could fill out the rest as you
21    went.
22 Q  Okay.
23 A  I -- I can't -- I can't answer that question other than
24    yeah, I could have done it later, but I don't recall doing
25

Page 55

1     it later.
2  Q  Okay. And -- and I understand you can fill out the
3     category four or -- or you should fill out category four
4     as it's happening, but there's -- you can -- that's
5     information that you can also go back and fill in later,
6     isn't it?
7  A  Not generally.
8  Q  Okay.
9  A  Most of the time that was -- that's your dispatch call and
10    so whether it's a medical or it's a REDDI, if it's a
11    reckless, if it's a -- I mean, you can go down the list.
12    Traff -- just a traffic offense, anything from animal
13    calls. That -- your -- your offense code you put down
14    when you created -- when you assigned the number.
15 Q  Okay. Generally, but that didn't always happen, right.
16    MR. KOZIOL: Objection. Form.
17 A  For me that was -- that was just the way I did it. For --
18    I -- I don't know about other officers, you'd have to talk
19    to them about it. For me that was what I was taught to
20    do, you put in your time, you put in the -- the -- the
21    offense and that had to go there so that that case number
22    is always valid. So that was just the way I was taught to
23    do that.
24 Q  Okay. I understand the way it was that you were taught,
25

Page 56

1     but -- but as I understand your testimony, well, that's
2     generally what was expected. It sounds like that's not --
3     that that's not something that happened all the time?
4     MR. KOZIOL: Objection. Misstates his testimony.
5  A  Okay. Depending on how hectic your situation is, that's a
6     possibility. What I was taught to do, that was the very
7     first thing you did, your time and offense. The rest of
8     it you could fill in later. And -- and, of course, the
9     action taken, the end of the form, that's after
10    everything's said and done, that's case closure. When the
11    officers come in sometimes days later and tell you close
12    case number such and such with this, that was your
13    disposition.
14 Q  Okay.
15 A  So.....
16 Q  Let -- let me turn your attention to the radio log in this
17    case, do you have that in -- piece of paper there?
18 A  Okay. Which one are we talking about, the handwritten one
19    or the transcript?
20 Q  The handwritten one.....
21 A  Okay.
22 Q  .....where you -- where you've got the categories time, to
23    and from, you got some REDDI.....
24 A  Okay.
25

Page 57

1  Q  .....codes, some 10 codes.....
2  A  Uh-huh. (Affirmative)
3  Q  .....which Bates Stamp numbers do you see on that page?
4  A  10463 and 10464 and 10465.
5  Q  Okay. All right. Now calling your time to -- calling
6     your attention to the time where it says 1656.....
7  A  Uh-huh. (Affirmative)
8  Q  .....you see a radio transmission from K20?
9  A  Right.
10 Q  And that's Frank Peterson, right?
11 A  Yeah.
12 Q  And the code you've written in there, is that an I slash
13    S?
14 A  Yeah, in service.
15 Q  In service. Okay. And was it your understanding that
16    when officers went in service that they were supposed to
17    indicate why they were going in service or what they were
18    going in service for?
19 A  No.
20 Q  That was not an accepted prac.....
21 A  No.
22 Q  .....that was not an accepted practice in Kodiak?
23 A  Officers would go in -- what they're doing when they're
24    saying they're in service is they're saying they're out of
25

DOUGLAS CROYLE
Vol 1
4/9/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

16 (Pages 58 to 61)

Page 58

1  the building, they're in their vehicle, they're on the
2  road. That's all that means.
3  Q  Okay. Well, but I guess my question is -- let me -- let
4     me kind of give you a couple of different scenarios to
5     compare and contrast, okay? Officer Peterson or any
6     officer comes into the station house and works on some
7     paperwork, I don't know, 15 minutes, 20 minutes, half
8     hour. He gets his paperwork done, he's got nothing left
9     to do in the station house and so now he's going to go to
10    his patrol car and go in service and just start doing
11    patrol work, cruising the city, cruising the streets,
12    doing what he should be doing. So he's not leaving the
13    building for any particular purpose other than to just go
14    on patrol. Okay?
15 A  Okay.
16 Q  Versus leaving the building because he's been dispatched
17    on a call. He's left the building for a particular
18    purpose to go do something in particular like in this
19    case.....
20 A  Okay.
21 Q  .....do you under.....
22 A  Okay.
23 Q  .....see where I'm at?
24 A  Yeah.
25

Page 59

1  Q  Okay. So what -- what was -- what was considered the
2     accepted practice in Kodiak when an officer -- not when
3     the officer leaves the building just because he's done
4     with his paperwork and now he's just going to get in his
5     patrol car and go patrol, going in service, versus going
6     in service because he's been told, you know, there's a --
7     you know, a bar fight or he needs to go down to the Mecca
8     Bar or he's been told there's an accident on Thorshine and
9     -- and there's an injury and he needs to go respond to
10    that. Was -- was there an expectation, a practice, that
11    when an officer goes in service because he's been
12    dispatched to a particular call that he is supposed to
13    indicate when he radios in, okay, I'm in service and I'm
14    responding to the fight or I'm responding to the accident
15    to indicate why he's going into service?
16 A  Okay. That really depended on officers, every officer was
17    different. Some would say responding blah, blah, blah,
18    but others would say in service. It -- there was nothing
19    uniform other than -- than that. You could have an
20    officer on patrol, dispatch him to an incident, domestic
21    violence or whatever, and they would say they're
22    responding from a location, wherever they are, so that
23    other officers that are out might say okay, well, I'm
24    closer than he is. But there was nothing and it -- was no
25

Page 60

1  standard practice the entire time I was with Kodiak where
2  they said that they were -- they had to say they were
3  responding. They would -- some would respond and some
4  would say they were in service.
5  Q  What's the practice in -- in the sheriff's department
6     where you're working now in Mountain Home?
7  A  Okay. In Elmore County it is -- they always respond, they
8     always respond with a location. So if we send them on a
9     call they're responding from. Elmore County is the size
10    of Kodiak Island, okay, we have 135 miles of interstate
11    and the country itself is -- is huge, you know, we have --
12    when -- when we send a deputy on a call or a city officer
13    on a call, the area that they're covering is so large that
14    they always say they're responding from. So you always
15    know where they're at when they get the call so you --
16    that you can address whether or not -- time, distance
17    relationship to getting other help there, whether we have
18    to call in Idaho State Police to help because of a time
19    difference.
20 Q  What about -- what about when you dispatch them from the
21    station house there, do they indicate they're going into
22    service and what call they're going into service to?
23 A  Yes.....
24 Q  So.....
25

Page 61

1  A  .....they sure do.
2  Q  .....they'll -- they'll indicate if -- do you know what a
3     10/50 is?
4  A  Yes.
5  Q  What is that?
6  A  Okay. Here a 10/50's a collision PD, collision property
7     damage.
8  Q  What was it in Kodiak?
9  A  I actually don't remember.
10 Q  Well.....
11 A  Because the 10 codes changed. Alaska State Troopers had
12    most of the same 10 codes that we had, but half of dozen
13    of them were different. You just have to learn a new 10
14    code every time you do.
15 Q  Yeah. Wasn't a -- wasn't the 10 code in -- for -- in
16    Kodiak for 10/50 was a DWI?
17 A  It might have been. I real -- I -- I honestly don't
18    remember.
19 Q  Okay.
20 A  I -- I think for a DWI, it -- here's it's 10/55.
21 Q  Okay.
22 A  So.....
23 Q  So for -- for -- where your location is now, let's stay
24    you dispatch an officer from the station house on a DUI, a
25

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax      907-243-1473
jpk@gci.net
sahile@gci.net

Page 62

1  10/55. If it -- would it -- would it be the -- the
2  requirement or practice of that department for the officer
3  to radio back in once he's in his patrol car, he's left
4  the station house, in service on possible 10/55, is.....
5  A  Actually the date -- well, they could do that. It would
6     be in service responding. And then they would say what --
7     what they're going on.
8  Q  So they're responding to 10/55?
9  A  Yes.
10 Q  Okay. All right.
11 A  And that -- we're getting away from 10 codes.....
12 Q  Uh-huh.
13 A  .....it's a transition thing that's going on because of
14    the problem of 10 codes, every community has got a
15    different one. And so everything is going to plain voice.
16    And so now when they get out there, the -- responding to
17    the REDDI on 184 at milepost whatever, you know, or the
18    DUI. We had the same type of calls in Alaska, REDDI, a
19    report of a possible drunk driver. We can't have the
20    exact same code here for a REDDI in -- in Idaho. So
21    that's just -- that's just the way it is.
22 Q  Okay. So.....
23 A  And the (indiscernible) so.....
24 Q  So the practice -- the practice and -- and the -- and the
25

Page 63

1  requirement is for an officer responding from the station
2  house to a dispatch is to radio in saying in service,
3  responding to possible DUI because -- instead of using the
4  10 code?
5  A  That -- that's -- yes, that's here in Idaho.
6  Q  Okay. But that wasn't -- that wasn't how the officers
7     were trained down in Kodiak?
8  A  As -- as I said the officers in Kodiak, all of them
9     responded different. So some of them would say they're in
10    service. Some of them would say responding to. And you
11    just put them in service so that you knew they were out of
12    the station proper and they're on the street. There was
13    no cut and dry response that they were supposed to give or
14    if there was they didn't enforce it.
15 Q  Okay. And your training as a dispatcher were you given in
16    any training, hands-on training, any instruction anywhere
17    that if an officer simply radioed in in service that you
18    were supposed to either -- if they didn't say any more
19    that if you knew why they were going in service, if they
20    had been dispatched to a call like you had dispatched them
21    on a REDDI call that you were supposed to indicate that in
22    the radio log after you wrote in service, I slash S, REDDI
23    call or if they didn't say it -- well, let me -- I -- I
24    won't ask a compound question, let me just ask that
25

Page 64

1  question. Were you given any training or instruction of
2  any sort that if all the officer did was say in service
3  that if you knew why they were being dispatched and they
4  were being dispatched from the station house that you were
5  supposed to write it in to the radio log?
6  A  No, that was not required.
7  Q  Okay. Was there any custom or practice among dispatchers
8     to include that information if they knew it?
9  A  That was once again by dispatcher, it wasn't a requirement
10    and it wasn't something that they trained you to put in
11    there. The whole purpose of the radio log since
12    everything is recorded was -- it -- it's basically a
13    shorthand note so you could keep track of where
14    everybody's at and time frame. It's not a verbatim log of
15    everything that's said over the radio. I mean, that's
16    just impossible unless you're writing shorthand. People
17    talk at 250 words a minute or more and you just can't -- I
18    type 55, okay, I can't do a verbatim conversation, that
19    was never a requirement, that was the purpose of the
20    recordings.
21 Q  Okay. But it -- this isn't -- this isn't a test of
22    whether it's verbatim or not, it -- it's a question of
23    getting essential information down. And -- and you would
24    agree that indicating where you're located when you're
25

Page 65

1  responding or why you're responding is kind of essential
2  information, wouldn't you agree?
3  MR. KOZIOL: Objection. Form.
4  A  Actually no because the officer being dispatched telling
5     me he's in service tells me he's in his vehicle. I know
6     why he's in his vehicle, but it's not necessary for me to
7     put it down. I've already filled in that case card, I
8     know why he's going out there. What happens if it's a low
9     priority call, he gets on his way and he -- he stops to
10    help somebody else before he gets to the original call,
11    that happens too. So the fact that he's in service was
12    just enough.
13 Q  Well, if he stops to -- to do something else he's supposed
14    to call in and tell you that he's doing that, right?
15 A  Yes, if he could.
16 Q  And you would record that information down, right?
17 A  Yes.
18 Q  Okay.
19 A  He could be dispatched on one thing, but now there's a
20    time delay in the response.
21 Q  Okay.
22 A  That -- that happens quite a bit here, dispatch an officer
23    for one thing and they're on their way and they run into
24    something else. It -- it's just -- just -- just the
25

DOUGLAS CROYLE                    4/9/2008              BROWN v. PETERSON, et al.,
Vol 1                                                   Case No. 3:05-cv-0002 TMB

18 (Pages 66 to 69)

Page 66

1   nature of the beast, that's.....
2 Q  Okay.
3 A  .....just the way it is.
4 Q  And then you indicated that you don't -- you didn't feel
5   like it was necessary to write -- write that information
6   down because it's getting recorded. Those -- those
7   recordings aren't preserved forever, are they?
8 A  I don't know how long they are. I knew that -- that when
9   I was in Kodiak they were in the process of archiving
10  audio recordings from years before and they were copying
11  -- they copied them over to disk. That was the job of
12  Sergeant Perry and later for Sergeant Hatfield, that was
13  one of the main things that they did.
14 Q  Are -- are you talking.....
15 A  And so.....
16 Q  I'm sorry, go ahead.
17 A  .....so -- so the recording, I don't know if they still
18  exist now. So that's just -- that's just it, you know,
19  they're not all carved in stone.
20 Q  Well, when you're talking about recordings, you're talking
21  about they're archiving 911 calls or radio dispatchers,
22  the -- the dispatch -- the dispatch radio traffic, what
23  are you talking.....
24 A  Okay.
25

Page 67

1 Q  .....about they're archiving?
2 A  Okay. They -- the archiving that they were doing when I
3   was there was they archived all the phone traffic and
4   radio traffic for 911 calls.
5 Q  Okay.
6 A  The regular, everyday traffic, dispatches for REDDIs,
7   unless it was a 911 they didn't -- they didn't archive.
8 Q  Okay. So -- and so what I'm talking about is not the 911
9   calls, I'm talking about the -- the -- the kind of traffic
10  that's reflected in this radio log that you're looking at
11  as far -- on Pages 10463, 10464, 10465, if that's being
12  recorded those recording aren't being preserved, are they?
13 A  You'd have to talk to Delana and to Perry, I don't know.
14 Q  Well, let me ask you this. Assume for purposes of this
15  question that those recordings are preserved and those --
16  they're around for maybe 30 days unless somebody
17  specifically asks for a particular recording to be
18  preserved. Okay? So assume -- assume that unless
19  somebody's asked for it it doesn't get preserved. Does it
20  in -- in.....
21 A  Okay. It's -- or written.
22 Q  All right. So in light of that, if after 30 days those
23  recordings are gone, doesn't that put more emphasis on
24  having slightly more information in the radio log as being
25

Page 68

1   more important than not?
2 A  That is a documentary and training issue you need to take
3   up with Kodiak Police Department.
4 Q  But.....
5 A  I'm a worker bee, I just do what I was taught to do.
6 Q  But wouldn't you agree though that if the recordings
7   aren't being preserved that having more information in the
8   radio log rather than less would be helpful down the road
9   if issues come up about what kind of information was
10  passed along between officer and dispatcher or dispatcher
11  and officer, wouldn't you agree that would be pretty
12  helpful?
13 A  Well, yes. At the same time in the space where I'm at
14  now, we don't keep these radio logs, we don't have them,
15  we're not allowed to have a spiral notebook in the space.
16  Everything is recorded, audio, verbal, it's all there.
17  This is archaic, this -- the system that -- that we
18  transitioned from from Form Maker -- from Forms to Forms
19  Plus -- File Maker Forms to -- that was a huge jump, it --
20  it was a five year jump in technology from where we were
21  at. You know, what we've got now is little pieces of
22  paper with some -- some scribbles on them, it's -- it's
23  not verbatim. I have to deal with memory, this is five
24  years ago.
25

Page 69

1 Q  Right.
2 A  I -- I can only tell you to the best -- yeah, we could
3   have done things better, updating from Forms Plus -- to
4   Forms Plus from File Maker Pro was a huge jump, but I can
5   tell you they're still not recording all the traffic,
6   they're still not recording and keeping all the phone
7   calls. Unless an officer comes in or there was an arrest
8   or somebody died or a major medical event, they're not
9   keeping that documentation. That's too much data.
10 Q  You mean down in Kodiak they're not keeping it?
11 A  Yeah. I -- I -- I would seriously doubt that they're
12  keeping it.
13 Q  Okay.
14 A  I haven't talked to Delana in years so, you know.
15 Q  All right. Now if -- if an officer radioed in in service
16  and didn't give you a location from where they're
17  responding and didn't tell you why they were responding,
18  even though it wasn't your -- you weren't trained to and
19  there was no requirement that you indicate, your -- for
20  you to supply that information, were you trained in any
21  way to prompt the officer to supply that information to
22  you?
23 A  We could ask it. I mean, we could straight out ask them
24  what's your location?
25

Page 70

1  Q  Were you trained to?
2  A  Yes.
3  Q  You were trained to do that?
4  A  Yes. That -- that was -- officer safety was one of the
5     first and foremost things that we were trained on. If our
6     officers aren't safe they can't do their job and they
7     can't help the citizen. So if we had a question of where
8     they were at we could literally straight up ask them, we
9     could ask them in 10 codes or we could ask them in plain
10    language over the air.
11 Q  Okay. So looking at your time entry at 1700 where Frank
12    Peterson's radioed in. The circle with the T that means
13    traffic stop, right?
14 A  Yes, sir.
15 Q  Okay. And he supplied -- he's -- this is where he radios
16    in the license plate, Delta Whiskey Tango 484?
17 A  Right.
18 Q  Okay. Is there anything missing there?
19 A  Okay. We take a look at the break. Yeah, what's missing
20    is where he's at, his location.
21 Q  He didn't radio in his location, did he?
22 A  No.
23 Q  And he's supposed to do.....
24 A  He called traffic.....
25

Page 71

1  Q  .....he's supposed to do that, isn't he?
2  A  I would think yes.
3  Q  Okay.
4  A  When he actually stopped and gets out of his vehicle I
5     have to know where he's at.
6  Q  Okay. And you're trained if he doesn't supply that to ask
7     him what his location is, right, for officer.....
8  A  That's correct.
9  Q  .....safety reasons? Okay.
10 A  Right.
11 Q  Is there a radio transmission from you to him asking him
12    for his location? What's your next radio transmission to
13    him, Mr. Croyle?
14 A  At 1700 after I (indiscernible) have to get the plate, I
15    gave him the information that came in from the secondary
16    call, describing that vehicle. And I would have to
17    actually look at the daily transcripts to see if I got
18    anything else. As I said it's not verbatim. Okay. And I
19    don't have.
20 Q  Okay. Well, a minute later you asked what his location
21    is, right, at 1701?
22 A  Yes.....
23 Q  And then.....
24 A  .....1701.
25

Page 72

1  Q  .....and then again at 1702 you asked again what his
2     location is, right?
3  A  Yes.
4  Q  So a -- a com -- total elapsed time has gone by and he
5     hasn't indicated what his location is?
6  A  Right.
7  Q  Even after you've had to query him twice?
8  A  Yes.
9  Q  And then at 1703 his response his car on street?
10 A  Yes.
11 Q  Car's on the street.
12 Q  Okay.
13 A  Yeah, that -- that's just the way it went.
14 Q  What was the -- the -- in -- in addition to an officer
15    indicating he's made a traffic stop in -- on a vehicle, I
16    take it the -- that the officer's supposed to radio in as
17    he's making a traffic stop what the license plate and what
18    his location is, right?
19 A  Yes, sir.
20 Q  And was it not also something he was supposed to radio in
21    was the purpose of the traffic stop?
22 A  No. That was not.....
23 Q  That -- that was not something.....
24 A  That was never -- that was never anything they had to do.
25

Page 73

1     All -- a traffic stop could be anything from a broken
2     taillight, taking a corner without using your turn
3     signals, speeding, running a stop sign, it could be
4     anything. When they call traffic all that tells us is
5     that they're pulling a vehicle over, at that point in time
6     their lights are on and they're pulling somebody over.
7  Q  And I take it some officers if they're responding to a
8     REDDI call would radio in traffic, possible REDDI or REDDI
9     stop or something like that and other officers would not?
10 A  Yes, that would be true -- that would be a true
11    statement.....
12 Q  Okay.
13 A  .....some would, some wouldn't.
14 Q  And there was no -- was there any training or instruction
15    that you received as a dispatcher that if -- if they were
16    making a traffic stop to inquire what the purpose of the
17    traffic stop was?
18 A  No.
19 Q  Even.....
20 A  That was not our -- we didn't have to know that.
21 Q  Okay. If they were -- if -- if they had been dispatched
22    to a REDDI and they're making a REDDI stop, would it be
23    something that if they didn't tell you they were making a
24    REDDI stop that would be information as a dispatcher you
25

DOUGLAS CROYLE                    4/9/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                          Case No. 3:05-cv-0002 TMB

20 (Pages 74 to 77)

Page 74

1    would include in the radio log that it was a possible
2    REDDI or a REDDI stop?
3  A  Okay. I -- I -- I'm not understanding what you're -- what
4    you're saying there.
5  Q  Okay.
6  A  I'm not.....
7  Q  I'll rephrase. If -- if you know they're making a REDDI
8    stop, that's what they were dispatched on and they radio
9    in that they're making a traffic stop, but they don't say
10   traffic stop, possible REDDI, would that be something --
11   would that be information a dispatcher in Kodiak would
12   include in the radio log here that the officer's called in
13   a traffic stop and it -- and it's a possible REDDI?
14 A  No. No. That would.....
15 Q  Do -- again would that be up to the dispatcher?
16 A  .....that would be making the assumption that something
17   was happening, okay, that -- that would be making an
18   assumption that something was happening. Even pulling
19   somebody over we don't know at that point, okay, we have
20   the description of the vehicle he's been dispatched on,
21   but that doesn't mean that the vehicle he pulls over is
22   that vehicle.
23 Q  Exactly.
24 A  What would have happened if -- what would have happened if
25

Page 75

1    that driver would have pulled over and Frank would have
2    gone up there and the guy is stone cold -- cold sober and
3    hasn't been anywhere near anything and it was just an ID.
4    Okay. Thank you very much and the guy goes his way. As a
5    dispatcher I'm sending him out on a call, what he does
6    when he pulls a vehicle over -- I don't know why he's
7    pulling that vehicle over, I can assume why he's pulling
8    it over, but I don't know why he's pulling it over. So
9    you wouldn't make a -- a comment in the radio log unless
10   you had stated the question or asked the question.
11 Q  Okay. So in -- in -- it's all possible that when you
12   dispatch him on a REDDI call and while he's gone out on a
13   REDDI call he sees something really egregious happen and
14   as we talked about before he stops -- he stops responding
15   to that call to go to something more urgent, right?
16 A  Yes.
17 Q  Maybe he makes a traffic -- maybe he sees somebody driving
18   that needs to be pulled over right now because whatever
19   they're doing is really serious, right?
20 A  Uh-huh. (Affirmative)
21 Q  So.....
22 A  Yep.
23 Q  .....and so if he makes a traffic stop on another car for
24   a different reason wouldn't that be a really good reason
25

Page 76

1    for the officers to be required to tell dispatch that
2    they're stopping a car because of -- for the reason they
3    were dispatched or they're stopping a different car for a
4    different reason that they weren't dispatched for?
5    MR. KOZIOL: Objection. Form.
6  A  No, that's -- that doesn't work. The officers when
7    they're on the road, they're there, they're -- they're --
8    whatever situation they're in is real time and they're
9    dealing with it in real time. I can dispatch an officer
10   on a REDDI call and maybe they never find the vehicle,
11   that happens a lot in Kodiak. You could dispatch an
12   officer on a REDDI call and they locate the vehicle and
13   find out there was nothing at all, they were having
14   problems driving or their vehicle had problems. A REDDI
15   call is -- is a citizen saying we think he's drunk. And
16   -- and that -- until the officer gets on scene, that's --
17   that's what he's been dispatched for, but he has to make
18   the determination of whether or not that's what the case
19   is.
20 Q  But.....
21 A  So what -- what they tell us when they pull an officer
22   over -- when an officer pulls a vehicle over, that's up to
23   them, why they do it. All we know in dispatch and all we
24   care about is it's traffic, where they are and what --
25

Page 77

1    what the vehicle is they're on so we can send somebody
2    else to assist.
3  Q  Okay. I -- I understand what you're saying. I'm asking
4    you as a -- as a mat -- matter of policy if you dispatched
5    somebody on a REDDI call and the officer pulls somebody
6    over, don't you think it's helpful to know whether they
7    pulled over somebody in response to why they were
8    dispatched, why you dispatched them, as opposed to pulling
9    over somebody else for a different reason so that you know
10   whether your -- the original dispatch is being responded
11   to any longer or something else is going on?
12 A  Yes.
13 Q  Okay.
14 A  I can -- I can agree with you.
15   MR. KOZIOL: Robert, it's a quarter to.
16   MR. HERZ: Yeah.
17   MR. KOZIOL: You going to go and get more time because we
18 ain't never going to get done by three.
19   MR. HERZ: Okay.
20   MR. KOZIOL: I'm just warning you, the screen's going to
21 go black in 15 minutes.
22   MR. HERZ: How -- where are we on -- on tape here too?
23   REPORTER: You're good on tape.
24   MR. HERZ: We're good on tape? Okay. Can we go off
25

Computer Matrix, LLC                Phone - 907-243-0668                jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax   907-243-1473              sahile@gci.net