DOUGLAS CROYLE　　　　　　　　　　4/9/2008　　　　　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

21 (Pages 78 to 81)

**Page 78**

1　　　record for a second?
2　　　(Off record)
3　　　(On record)
4　Q　Okay. Mr. Croyle, on the radio log on that second page
5　　　there, 10464, that radio transmission from K20, Officer
6　　　Peterson, says individual tried going into house. And is
7　　　-- are the next words, I am out with him or if that's
8　　　not.....
9　A　Yeah.
10　Q　Is that what it says?
11　A　Yes. It says -- yeah, individual tried going into the
12　　　house, I am out with him, rig is in the street.
13　Q　Rig in street. Okay.
14　A　And then I came right back at him and asked him what's his
15　　　location. Because the last I knew he was coming down
16　　　Pillar Mountain Road.
17　Q　Right. So and then -- then K18 is Officer Holden, right?
18　A　Yes, sir.
19　Q　And that's the call at -- or that's the radio transmission
20　　　at 1703?
21　A　Yes, sir.
22　Q　And 10/20, he's giving his location?
23　A　Yes, and he was on Pillar Mountain and he's heading down
24　　　from the gravel pit towards the photo shop.
25

**Page 79**

1　Q　Okay. And then at that point Officer Peterson then radios
2　　　at 1704 that he's on Purtov at 1219, right?
3　A　Yes, sir.
4　Q　And then at 1704 K18, Officer Holden, indicates that --
5　　　this is a radio call directly from Holden to Peterson,
6　　　he's radioing to K20, to Peterson code four, right?
7　A　Yes, sir.
8　Q　And code four is what?
9　A　That he's safe. So what he was telling -- what Jeff was
10　　　telling me is K20's code four, that he's -- he's okay,
11　　　he's safe. And he's at 1219 Purtov. And that he's in
12　　　route, that's.....
13　Q　So -- so Holden's indicating he's in route?
14　A　Hold -- Holden's telling me where Frank is at and where
15　　　he's at. Holden's -- because I was asking where -- where
16　　　are you at, where are you at. I don't know if Frank
17　　　talked to him car to car or officer to officer and not on
18　　　the primary channel, I don't know what it was, but Jeff
19　　　was the one who was telling me that he's okay.
20　Q　Okay. So there could -- there could have been radio
21　　　transmissions from car to car or officer to officer that
22　　　aren't reflected on this radio log?
23　A　Right.
24　Q　Okay. And so you're indicating based on what you're
25

**Page 80**

1　　　reading here that Holden said K20, Peterson's code four,
2　　　he's okay, and he's at -- and he's at 1219 Purtov?
3　A　Yes.
4　Q　And then the next -- the next word at the end there, E --
5　　　ENR or END.....
6　A　Yes.
7　Q　.....is in route?
8　A　Yes.
9　Q　Meaning that Holden's in route?
10　A　Meaning that Holden's in route, that's right.
11　Q　And do you know who Five Charlie or 5C15 is?
12　A　5C11 and 5C15, no, I don't remember who they were.
13　Q　Okay.
14　A　You'd have to go back to the AST trooper logs to find out
15　　　what those numbers were assigned to.
16　Q　Okay. Now the -- the -- you have another form there, a
17　　　complaint card?
18　A　Yes, sir.
19　Q　Okay.
20　A　The one I've got is 10082.
21　Q　I'm -- I'm sorry?
22　A　10082.
23　Q　10082?
24　A　2, yes.
25

**Page 81**

1　Q　Okay. Now I think you indicated previously that you --
2　　　the -- the sequence is you fill out your handwritten
3　　　notes, then you begin doing work on the reg -- the
4　　　register of incidents and then you start filling out
5　　　information on the complaint card, right?
6　A　Yes, sir.
7　Q　And I take it the first thing you start filling out on the
8　　　complaint card is your dispatch notes, the narrative?
9　A　Right.
10　Q　Okay. And the rest of the informa -- and -- and.....
11　A　Okay. On the dispatch card you're putting in your date,
12　　　your time of call, you type in the case number, this is
13　　　not a computer assigned number, that -- that's why that
14　　　register of incidents was so important because that gave
15　　　us our case numbers. And then the next line is what the
16　　　call was and the -- or you just put the NCI code -- NCIC
17　　　code in, then you'd start filling out the data from your
18　　　notes and from the phone call and you're just up to
19　　　writing that. So that -- what I'm typing up while they're
20　　　in service going up the hill, I'm filling out the basic
21　　　information that I've got.
22　Q　Okay. And any -- and that card, we've heard previous
23　　　testimony, that just needs to be done by the time your
24　　　shift is over, right?
25

DOUGLAS CROYLE
Vol 1
4/9/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

22 (Pages 82 to 85)

Page 82

1  A  Yes.
2  Q  And.....
3  A  Yes.
4  Q  .....and -- and not all of the information needs to be
5     entered at the time the incident's occurring because you
6     can fill that card out any time before your shift is over?
7  A  Right.
8  Q  And is there any way to know looking at that card as you
9     see it there on -- on document 10082, when the information
10    was filled in and in what sequence?
11 A  Okay. Okay. It would have been the citizen report giving
12    the REDDI would have been the initial thing, the 94/04.
13    The location and the name of the person who called, Lori
14    Skonberg, her phone number and the address. Now the --
15    all the check boxes underneath there like AST, alcohol,
16    arrest, all that, that's all disposition, that's all
17    filled out when you close the card. So everything after
18    that address lines, all those check boxes, that's done
19    when the case is closed, when the card is closed. You go
20    straight into text. And so I'd go -- after I type in Lori
21    Skonberg and her phone number, address on Salief which can
22    also be the location of the incident and not necessarily
23    what her residence address is. I'd have gone in and
24    started filling out the text boxes and the first one --
25

Page 83

1     the first block, the first paragraph in there, three
2     lines, is from Lori Skonberg and the second one is from
3     the female that called regarding getting sprayed with
4     gravel at Safeway and describing the people that were in
5     the car. The closing part where it says arrested Scott
6     Brown, blah, blah, blah, and the A -- A -- Alaska State
7     Trooper case number, that would have been put on after the
8     event is said and done when there's an actual disposition.
9     So that was put on sometime later.
10 Q  Okay. My question was is there any way to know looking at
11    that card as you see it today, what sequence those boxes
12    were filled in?
13    MR. KOZIOL: Objection. Asked and answered.
14 A  Okay. The date would have been filled in right away,
15    time, case number, the initial dispatch -- the reason for
16    dispatch, the REDDI, that would have been done all
17    immediately. Location, Lori Skonberg and address and that
18    information, as fast as you can get it in there, but the
19    actual text that could have been later, that can be hours
20    later if it has to be. As I said this wasn't a really
21    busy night so it was probably done right then. The arrest
22    information, that's when the case is closed so that's a
23    couple hours later.
24 Q  So your -- your answer is based on your -- your
25

Page 84

1     recollection of this particular card?
2  A  That would have been just with any of them. Right off the
3     bat once -- once you assign your incident case number to
4     any call, once you assigned that number, that's when you
5     start building your -- building your contact -- the
6     contact card, that case card. The complaint card is what
7     we used to call it. And you always put your date, your
8     time, your initial dispatch purpose, that all went in
9     right off the bat, location. You -- we always functioned
10    on a who, what, where, when, why because that was the five
11    main things we were looking for. When we're getting our
12    contact information, when we're taking call information we
13    need to know what's going on, where it's at, when it's
14    happening, and so in this case I'm just filling in
15    information on it as fast as I can. And that's the same
16    thing with any of the other cards too. Unless you were in
17    a situation where you're doing 40 or 50 events in an eight
18    hour shift, you pretty much have the time to put
19    everything on that card right away, it was a reason why
20    they required us to type a minimum of 35 words a minute,
21    you had to get that information in as fast as you could.
22 Q  And so my question your -- your recollection of filling
23    out this card is that's how you did it in this instance?
24 A  Yes, sir.
25

Page 85

1  Q  Okay. And you're -- you are inferring that -- oh, well,
2     and I take it what -- when you said unless you're doing 40
3     or 50 incidents you've got time to do it as it's
4     happening. And so I take it to mean when you -- by that
5     when you don't have time then that card can get filled in
6     later?
7  A  Yes, sir.
8  Q  Okay. And.....
9  A  The text can.
10 Q  And so.....
11 A  The text.....
12 Q  I'm sorry, go ahead.
13 A  .....the text can.
14 Q  Uh-huh.
15 A  It's the top part -- everything above the comments blocks,
16    that has to go in right away. The text you can fill in at
17    a later time if you have to, that's why you take notes and
18    that's why we had access to the -- the voice files if you
19    had to go back and pull the information.
20 Q  Why did that information have to go in then?
21 A  Okay. That -- the way we were taught to do the incident
22    card so that at least the top part, when they pull -- pull
23    the case number, the original reason for that call to be
24    dispatched, the location, who was involved, that had to be
25

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax       907-243-1473
jpk@gci.net
sahile@gci.net

### Page 86

1  there, your contact information had to be there. Now if a
2  person would have called and been anonymous instead of
3  Laurie Stonberg's -- Skonberg's name there it would be
4  anonymous, we got a lot of anonymous calls. So a lot of
5  people who call police departments even here who don't
6  want to give any personal information at all, they just
7  want to say this is happening. That's just the way people
8  are. But in our dispatch situation we would fill out the
9  top part of that card right away. The actual bottom where
10 it says -- on the bottom of that card it says log or
11 report, that's closing information, that's done after --
12 when -- when the officers say close case number whichever
13 or card number whatever, and they'll tell you if it's a
14 log, which means that they don't have to a paperwork file
15 on it, it's just officers -- handled by officers, it's
16 done. The officers involved, that's at the end. If you
17 can put it in there, you've already got the -- on your --
18 you have -- have that information of who you dispatched or
19 who responded is already in your radio log or somewhere
20 else, you can pull that information over to fill that in.
21 It's like one of the things -- if I look at the Kodiak
22 Police Department radio log, the handwritten one, I got
23 5C11 responding, but he never got there, 5C18 went
24 instead. They switched off so 5C11 doesn't even show up
25

### Page 87

1  on this -- this card, yet he was an officer that talked to
2  me saying that he was going to respond to the case, but he
3  never got there. So you -- we were taught to time, case
4  number, the reason for the call, the reason for the
5  dispatch, why is the officer responding, the location,
6  name and then so that had to be there right off the bat so
7  we -- we could always go back and say this is why this --
8  this officer went to this event. The comments and stuff,
9  that can be pulled off of notes later, it can be pulled
10 off of the voice recorder later, if you're -- if you're
11 really having a lot of calls, if it's a very busy shift.
12 In an eight hour period if you're getting 50 calls you're
13 getting a call every 10 minutes if you're real -- having
14 an officer respond though it can get very hectic. So when
15 you're working dispatch and even today working dispatch
16 here in Elmore Country, it's a feast or famine situation.
17 You can have one call and have nothing happen for three
18 hours and then you can have all hell break loose on you
19 and you have 15 calls happening in five minutes. So it --
20 it -- you get the information on there as fast as you can.
21 You get all your comments entered as fast as you can
22 because you don't know what's going to happen five minutes
23 from now. This call here for this REDDI report, right
24 after this REDDI report I have an ambulance call going to
25

### Page 88

1  the same address. I don't have that case card -- I don't
2  have the card here for the ambulance call. Okay. Because
3  event number 2 was a 911 request for an ambulance for
4  pepper spray to the same residence, but I don't have the
5  case card for that number 2, it's directly tied together,
6  but one went to an ambulance and one went to the police
7  department.
8  Q  And that call came in at 17:11, right?
9  A  1709.
10 Q  You -- you pulled the 1709 number from what?
11 A  Off of those -- 11121, handwritten notes, second page,
12    spiralgraph notebook.
13 Q  Okay. And so -- and then on the 10464, you've got it
14    written down as 1711 so the call came.....
15 A  That's a 27 -- no, that's a 27/29 times two.
16 Q  No, below that?
17 A  That's 20 asking for a -- a driving status and any wants
18    or warrants.
19 Q  Look at the next line down, 1711.....
20 A  Yes.
21 Q  .....AMB call, ambulance called?
22 A  Yeah, ambulance called. Okay.
23 Q  So is that when you dispatched the ambulance?
24 A  Yes.
25

### Page 89

1  Q  Okay. So the call came in and 1709, ambulance goes out at
2     1711?
3  A  Right. And when you look at the transcript for that voice
4     transcript, that's on a phone call, voice transcript, what
5     is this. It says police tape 10 -- 10045, pages -- third
6     page, Pages 6 through 9. This lady called, Beverly --
7     Beverly called and asked for an ambulance. All she told
8     (indiscernible) something happened, cops are here, I need
9     an ambulance. And I asked her what she need -- you need
10    an ambulance and she said yeah, they sprayed pepper spray.
11    And then she sets the phone down, you know, I get a couple
12    words out, I'm -- I'm just trying to figure out what's
13    going on, I keep -- and I kept asking her. She just -- I
14    finally just dispatched a -- an ambulance. Normally in a
15    situation if officers are on scene the officers are the
16    ones requesting an ambulance. And so that caused a little
17    bit of confusion. But also at minute 11 when I did the
18    ambulance call, that's the tones, you toned them, you gave
19    a call -- ambulance call or you tone out and you say fire
20    call. You -- you turn around and do it again and that's
21    when you gave the infor -- information. And I told them
22    at minute 11 just a couple seconds after the first set of
23    tones, ambulance request at 1219 Purtov and officers are
24    on scene. So the ambulance knows they're responding to a
25

Page 90

1   thing where there's officers present and they're going to
2   be safe going there. That's -- that's just the way that
3   goes. But as I said I don't have the case card for that,
4   I don't have the ambulance response times or anything. So
5   -- and that was directly related to the same thing.
6  Q  But is -- is someone -- on -- on every ambulance call is
7      somebody transported, is there a medical transport.....
8  A  No.
9  Q  .....on every med -- on every ambulance call?
10 A  No. You can send an ambulance out, the patient can refuse
11     transport. And they do, a lot of patients -- we'll get
12     there, the EMTs do their -- whatever they need to do and
13     the patient can refuse to go to the hospital, they can
14     refuse, they don't -- it's not mandatory they be
15     transported.
16 Q  So on a -- on an incident -- register of incidents if
17     there's an ambulance dispatch what would you write if
18     somebody's not transported under -- in the column?
19 A  That would be on the case card.
20 Q  Pardon me?
21 A  That -- that would be on your case card in the comments
22     box. And you'd put down patient refused or no transport
23     or, you know, ambulance clear. It's really dependent on
24     -- on what happened with that. Now the ambulance crew
25

Page 91

1   works different. So what -- that's just the way that is.
2   And I can't tell you what was put on that card because I
3   don't have it.
4  Q  Well, I'm asking of the register of incidents, you know,
5      if an ambulance is dispatched, what do you -- what would
6      you -- if they're not being transported what would you
7      write?
8  A  That's on the case card. For -- for my situation here,
9      the circumstances, it was a 911 request to ambulance for
10     pepper spray. I put it down for medical transport, that's
11     what our.....
12 Q  Did -- did you put.....
13 A  .....that's what our NCIC codes go for. So a lot of times
14     you're trying to fit an incident description into the NCIC
15     code. It's not necessarily exact, you just have to -- to
16     put it in the one that's most pertinent. So in this
17     situation I sent an ambulance for medical transport. If
18     they refused there's nothing on the incident -- incident
19     sheet that says that, that's on the case card.
20 Q  Do you -- how many other dispatchers worked at the Kodiak
21     Police Department around the same time you did, between
22     2000 and 2004, before you left, not including Officer
23     Hatfield and Sergeant Perry?
24 A  Well, Sergeant Perry retired and Hatfield became the
25

Page 92

1   sergeant. And then there was myself, McMann, two, three,
2   four, I want to say we had five, sometimes six
3   dispatchers.
4  Q  Do you know them by name?
5  A  I don't remember them all. One is still there, Rhonda. I
6      don't remember what her last name is. Sandy M. was there.
7      Lori was there -- Lily, we called her Lily. And there was
8      another lady that was there and myself. So that's --
9      that's like five of us and the sergeant would jump in and
10     take shifts too so we had six dispatchers for the
11     department. I would have to.....
12 Q  Including yourself?
13 A  Yeah, including myself.
14 Q  Okay. And do you think they are did equally good work?
15 A  No, absolutely not. Some -- some did outstanding --
16     outstanding work. A lot of it was -- we had a couple that
17     came in and tried -- tried -- went through the hiring
18     process and didn't make it, they washed out. We had a --
19     we had one or two dispatch -- female dispatchers that were
20     competent, they could do the job, but they were really
21     better suited for something else. Every dispatcher's got
22     their own personality, their own potential, own weakness.
23     There's stuff that I do today that I'm still trying to
24     overturn 22 years of military training on. The guys here
25

Page 93

1   like to laugh at me because if I have to give a read back
2   on somebody's name and they spell the name, I'll use
3   military terminology, you know, Alpha, Bravo, Charlie,
4   Delta, Echo, Foxtrot and these guys are spelling it Adam,
5   Boy, Union, Frank. They use name for letter. And that's
6   just not something that I'm -- I'm still comfortable with,
7   to this day I still fall back on that, that's what I did.
8   So you have some that are really good with 10 codes, we
9   can -- and Vivian was -- Vivian McMann was awesome, she
10  had all the 10 codes memorized for Kodiak Police
11  Department and for the Alaska State Troopers and for the
12  coast guard base. And they were three entirely different
13  sets of 10 codes. Me, I would just write the last numbers
14  down for -- the off -- the AST guys would start talking 10
15  code and I'd just write down the last two numbers, just
16  drop the 10. And, I mean, sometimes I knew what they were
17  and sometimes I had to look them up. So that -- every
18  dispatcher's different.
19 Q  Who are the dispatchers that were outstanding?
20 A  I -- I really thought very, very highly of Vivian, Rhonda
21     turned out to be really good when she got through her --
22     her break in period. Delana Hatfield was probably one of
23     the best dispatchers I've ever seen. She actually didn't
24     use a spiral notebook. So she was typing things straight
25

Page 94

1  into the system as it worked. For myself, I -- I would
2  consider myself above average as a dispatcher, but I did
3  have my weak points, still have my weak points. So, you
4  know, Vivian for sure, I -- I felt very, very highly of
5  her. And there was a younger lady that was there, I can't
6  even remember what her name was, she was about 23 years
7  old, very, very good, very -- exc -- excellent dispatcher.
8  She was the daughter of one of the state troopers, but I
9  can't remember what her name was.
10 Q  Let me throw out a couple of names for you. Susan Stout?
11 A  Yeah.
12 Q  Karen.....
13 A  I -- I know (indiscernible).....
14 Q  .....Karen Viall?
15 A  Karen Vi -- Viall, she's now working for the prosecutor.
16    She was good, but it wasn't her -- she didn't enjoy the
17    work.
18 Q  And Lisa George?
19 A  Lisa, we called her Lily. Lisa would get very technical.
20 Q  Okay. But the.....
21 A  She would get bogged down in -- Lisa's fault was she could
22    get bogged down in details.
23 Q  None of those were the names of the young dispatcher that
24    you thought was really outstanding?
25

Page 95

1  A  No. No, I can't remember what her name is, she was just a
2     little bit before then.
3  Q  Okay.
4  A  Lisa was good, but she would get tied up in details and be
5     more focused on what color the car seats were in a vehicle
6     than just getting plate and vehicle type. She'd want to
7     know everything, what the people are wearing in the car.
8     In a large 911 dispatch center where all you work -- we
9     have 50 people on a shift, she would have been excellent
10    because she could focus on just exactly what she had to
11    focus with. With the Kodiak Police Department you're
12    doing multiple dispatches, you don't have the time to
13    worry about what color the cars are, what color -- you
14    know, what color the -- not -- not really what the color
15    of the car is, what color the interior of the car is or
16    what the people inside the car are wearing. You don't
17    have that time, you need a basic description, you need
18    enough to identify the drivers if you can get it and you
19    need the plate, you need the vehicle plate. And that was
20    one of the problems that I had with -- when I dispatched
21    Frank on this call was at that time we did not have the
22    vehicle plate. Lori Skonberg tried to get it and didn't.
23    So we ended up dispatching on a vehicle description.
24 Q  Did any of the dispatchers that either you named or I
25

Page 96

1     named, did -- to your knowledge did any of them have any
2     complaints or difficulties or problems with you either on
3     the job or personally to your knowledge?
4  A  Vivian and Lisa had issues with the training program, the
5     station's training program just as I did. As for personal
6     animosity, I don't know of any.
7  Q  Okay. And same question the other way around, were any of
8     the dispatchers you've named or that I've named, did you
9     have problems with them either on the job or personally?
10 A  No.
11 Q  Okay. And for any of the dispatchers you named or I
12    named, do you consider them all honest people?
13 A  Yes.
14 Q  Okay.
15    MR. HERZ: I don't have any other questions.
16        DOUGLAS E. CROYLE
17 testified as follows on:
18        CROSS EXAMINATION
19 BY MR. KOZIOL:
20 Q  Mr. Croyle, I -- I may go over some of the same grounds in
21    part because Mr. Herz kind of bounced around in terms of
22    time frames and all and I want to make sure that I
23    understand the sequence of events as this case unfolded.
24    Am -- am I correct that this particular afternoon when
25

Page 97

1  this event occurred, January 4th, 2003, you were not
2  particularly busy as a dispatcher, did I understand that
3  right?
4  A  Yes, sir.
5  Q  Okay. And then you received -- you first received -- in
6     chronological order, you first received a call from Lori
7     Skonberg. And the first thing you did as I understand it
8     is write some notes at 1651 on 11120 regarding some of the
9     things Lori Skonberg told you, correct?
10 A  Yes.
11 Q  But you didn't write all of the things that Lori Skonberg
12    told you that were important, right?
13 A  No.
14 Q  Okay. Now how soon after you wrote your notes did you
15    fill out any portion of the Kamai Exhibit A2 which is the
16    top line of the register, how -- how soon after you wrote
17    your notes did you start writing that in, information
18    there on the first line?
19 A  It would have been immediately afterwards.
20 Q  I'm sorry?
21 A  It would -- it would have been immediately afterwards.
22 Q  Okay.
23 A  As soon as I told the officers what's going on I'm filling
24    out this card. It had -- it's going to be within --
25

### Page 98

1   within two minutes of the call.
2 Q You're filling out the register; is that right?
3 A Yeah, the register and starting the card.
4 Q Okay.
5 A I've got my notes and I'm -- I'm -- so right off the bat I
6   know I have a REDDI call, I have to dispatch an officer, I
7   take the register of incident, time of report, what the
8   offense is, and tell the officers so they can start
9   rolling and finish the -- finish the rest of the stuff up
10  while they're going out to their vehicles.
11 Q Okay. So in our sequence of events you fill out your
12  notes on 11120 and is it as you're filling out Kamai A2,
13  that register of incidents, that you call or you talk to
14  Officer Peterson or do you do that before you start
15  filling out the register of incidents?
16 A I would have -- because it's a REDDI call I would have
17  gotten a hold of them -- as I said, I thought that Frank
18  had come up to the console and I told him to his face, but
19  I might have called him in the officers' ready room,
20  I'm.....
21 Q Okay.
22 A But it -- I'm telling him that as I'm writing this
23  information down. That's just part of multi tasking.
24 Q So it's off......
25

### Page 99

1 A He's going to have a REDDI, blah, blah, blah and I'm
2   writing.
3 Q All right. So contemporaneously with your filling out the
4   register of incidents you're likely telling Frank either
5   face to face or on the phone?
6 A Yes.
7 Q Okay. And if -- if that -- if then Kamai A2 is
8   contemporaneously, what then is it likely you told Frank
9   either face to face or on the phone?
10 A I would have told Frank that hey, I got a REDDI call, it's
11  a -- it's a gold flatbed truck, 45, 50 on Salief, it's
12  heading toward Pillar Mountain Road. She also says it's
13  fast and reckless and -- and that -- it's -- oh, I
14  wouldn't have said fast, I probably would have told him
15  it's reckless and cold (ph). But the fact that I wrote it
16  as an offense as a REDDI and put it on the card as a
17  REDDI, I would have told Frank at that time it was a
18  REDDI.
19 Q Okay. And I note that.....
20 A (Indiscernible - simultaneous speech).....
21 Q .....you wrote down under circumstances on Kamai A2, did
22  360 on Salief. Is it likely you told Frank that?
23 A No, I don't think so. I could have told him, I don't
24  remember. I -- I honestly don't remember.
25

### Page 100

1 Q If you're filling this out contemporaneously with talking
2   to him, why isn't it likely that you told him that also?
3 A I could have, I just don't remember.
4 Q Okay.
5 A Okay. I -- I -- I honestly -- I just don't remember.
6 Q All right. You -- you do remember characterizing it as a
7   driver driving.....
8 A Right.
9 Q .....recklessly? Yes?
10 A Yes. When it was -- I told him REDDI/reckless for sure.
11 Q Okay. All right. And the contemporaneous writing you
12  filled out when you're talking to Frank, is that the
13  sections two, three, four, five, six, seven and eight on
14  Kamai A2?
15 A Okay. I wouldn't have told him who -- who -- what the
16  complaint was, I might have, but it wasn't necessary.
17  Seven on A2, that -- that's the location because I would
18  have told him this guy's going 45, 50.
19 Q Listen to my question.
20  MR. HERZ: Let him finish the answer.
21 Q Okay. Go ahead.
22 A Okay. Now I'm confused, where -- where are we at?
23 Q Okay. I -- I shifted from asking you.....
24 A (Indiscernible - simultaneous speech).....
25

### Page 101

1 Q What? Let -- let me finish my question.
2 A Go ahead.
3 Q I shifted from asking you what you told Frank, you already
4   answered that question, all right?
5 A All right.
6 Q My question is what you -- what you contemporaneously
7   filled out when you were talking to Frank, what you were
8   writing down on Kamai A2, was that sections two, three,
9   four, five, six, seven and eight?
10 A Yes.
11 Q Okay. Now if you'd look at 10082, that's the -- we're
12  calling it the complaint card?
13 A Yes.
14 Q When in our sequence of events are you typing out the top
15  half of this -- of that card including citizen report,
16  DWI, REDDI, UR -- UCR code 9404, when are you filling that
17  out?
18 A I've dispatched them, I'm starting to type if I'm not
19  already typing.
20 Q Okay.
21 A I'm doing it, it's one right after the other. It -- it's
22  not sitting back, it's -- it's one, two, three, four,
23  doing it as fast as you can.
24 Q Okay. All right. Now I want to continue on
25

DOUGLAS CROYLE
Vol 1
4/9/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

27 (Pages 102 to 105)

Page 102

1  chronologically and I think we need to move to the radio
2  logs which are 10463 to 10465. You received a call from
3  Skonberg at 1651 and -- and that's indicated by 11120 of
4  your handwritten notes, correct?
5  A  Yes, sir.
6  Q  You -- you dispatched Peterson at 1653 and -- is that
7     right, because that's what shows under time reported on
8     Kamai A2 and I think you indicated in answering Mr. Herz'
9     question that time reported basically for that purpose
10    means time dispatched?
11 A  Yes, sir.
12 Q  Okay. All right. So then we're at 1653 and then really
13    the first entry on the radio log of 10463 is 1656 where
14    Frank Peterson tells you he's in service, correct?
15 A  Yes.
16 Q  And then three minutes later Officer Holden tells you he's
17    in service, correct?
18 A  Yes, sir.
19 Q  And you concluded that they're both in service on this
20    dispatch of a REDDI based upon information that you later
21    learned over the radio, that is that it appears given
22    Holden's location that he's working this case too,
23    correct?
24 A  Yes.
25

Page 103

1  Q  All right.
2  A  Yes.
3  Q  All right. And then at 1659 we've got another K20 which
4     is Frank Peterson, and what have you written down there?
5  A  Okay. I've got -- I'm coming down?
6  Q  Yes.
7  A  So he went up towards Pillar Mountain Road so he's coming
8     down Pillar Mountain Road.
9  Q  And -- and who's the he?
10 A  That would have been Frank.
11 Q  Okay. And then a license plate number is given to you,
12    correct?
13 A  Right.
14 Q  So is he communicating to you he sees the -- the gold
15    flatbed truck?
16 A  He -- he's saying that he's coming down and he sees this
17    -- this vehicle plate. I'm assuming it's the gold flatbed
18    truck, but I don't know, he's just giving me a plate.
19 Q  Okay. I mean, you have -- he's speaking in sentences,
20    right, and you're just shorthanding it?
21 A  Yes.
22 Q  Okay. And you remember the full sentences?
23 A  No.
24 Q  Okay.
25

Page 104

1  A  No, it's been a long time.
2  Q  Right. Okay. And then at the same time Officer Holden is
3     telling you what, giving you his location?
4  A  Yes, sir, he's on Birch and Thorshine.
5  Q  Okay. And then I think we went over 1700, Frank is
6     telling you that -- is he telling you he's attempting to
7     make a traffic stop on that particular vehicle that has
8     that license plates or has made it or what can you infer
9     from that?
10 A  Okay. On a traffic call, he says he's traffic on that
11    plate which I know is one that came down Pillar Mountain
12    Road.
13 Q  Right.
14 A  So he's on this plate. At that time all that means is
15    that he's got his lights on, maybe his siren on, he's
16    trying to pull the vehicle over.
17 Q  Okay. He's not necessarily communicating to you that he's
18    already made the stop?
19 A  No.
20 Q  Okay.
21 A  Just that he -- he's -- he's in the process of -- of doing
22    a traffic stop.
23 Q  All right. And then chronologically we go back to your
24    notes again, am I right, and at 1657 you receive a -- a
25

Page 105

1     call from another woman, correct?
2  A  That's correct.
3  Q  And you wrote some notes down, you jotted some notes down
4     there and I think Mr. Herz went over those. And then am I
5     right going back to your radio log, you communicate the
6     information from that caller to Frank Peterson?
7  A  Yes.
8  Q  Okay.
9  A  Yes.
10 Q  And then what have you set forth here that you
11    communicated to Frank Peterson?
12 A  Well, there -- there's another call that describes the
13    vehicle as having dualies on the back, has a dark haired
14    passenger and the driver's an unshaven with blond hair.
15    That information is what I gave to him at 5:00.
16 Q  All right.
17 A  .....1700.
18 Q  And then it looks like a minute later he's talking to you
19    again, right?
20 A  Yeah.
21 Q  On the next page, 10464?
22 A  Right.
23 Q  And now you jotted down some words, individual tried going
24    into house, and am (ph) out with him, rig in street. Rig
25

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net

Page 106

1  meaning his police vehicle?
2  A  Yes.
3  Q  Okay.
4  A  That -- that was a little confusing because I thought he
5     was on Pillar Mountain Road.
6  Q  Right. Right. But is the communication that he gave you
7     at this point that both he and the individual that was in
8     that gold flatbed truck were out of their vehicles?
9  A  Yes, sir.
10 Q  All right. And then at 1701 and 1703 you're asking him
11    what is your location and he's not responding?
12 A  That's correct.
13 Q  Okay. But then two minutes later at 1704 he tells you
14    where he is?
15 A  Yes, sir.
16 Q  Okay. And how is he comm -- do you know how he's
17    communicating with you at this point, is it -- is it
18    some.....
19 A  If he was out of his vehicle.....
20 Q  Right.
21 A  .....if he stated he was out of his vehicle, it's on his
22    vest radio.
23 Q  Okay.
24 A  So he -- he's hitting his -- his clip on portable.
25

Page 107

1  Q  And do you know whether at 1701 he was talking to you from
2     his car or from his vest -- vest radio, do you know?
3  A  No, I don't.
4  Q  Okay. And before he told you where he's at at 1704,
5     Purtov 1219, one minute earlier than that he -- he then
6     tells you he's on the street, his car's on the street,
7     right?
8  A  Yes, sir.
9  Q  Okay. And then at that same time, 1703, we have Officer
10    Holden giving you information and what is Officer Holden
11    telling you at 1703?
12 A  Okay. At 1703 he's say -- he's saying 10/20, his
13    location. He's on Pillar Mountain, heading down from the
14    gravel pit to Thorshine.
15 Q  Okay.
16 A  So.....
17 Q  And he.....
18 A  .....when.....
19 Q  Right. I'm sorry, go ahead.
20 Q  When -- I was going to say so it looked -- it appears to
21    me that -- that Jeff thought he was initially up the hill
22    too.
23 Q  Right. And at this point, 1703, Jeff Holden doesn't know
24    where Officer Peterson is with the suspect?
25

Page 108

1  A  Yeah.
2  Q  Right.
3  A  That -- that's -- I would say that is correct.
4  Q  Okay. And at 1704 Officer Holden is indicating --
5     acknowledging where -- am I right, where Peterson is?
6  A  Yes, sir.
7  Q  Okay.
8  A  Because I've been calling and I was getting agitated
9     because Frank wasn't answering. Jeff came up and told me
10    that he -- he was code four. Frank was code four on 1219
11    Purtov and that he was in the.....
12 Q  Okay. And -- and code four is, I think you told us, is
13    that Frank is all right?
14 A  Yeah, that officer's okay, everything's okay, we're safe.
15 Q  But then at that same time we have Frank Peterson stating
16    need you now?
17 A  Yeah, that was just a couple of seconds later.
18 Q  Okay. That makes it -- did -- did you view that as an
19    emergency then, a -- a problem that Frank was having?
20 A  Yes. At -- at that point an officer calls for assistance,
21    that's a different ball game entirely and that became --
22    that became an issue.
23 Q  Because that -- that becomes high priority then for you as
24    a dispatcher?
25

Page 109

1  A  Yes.
2  Q  All right.
3  A  Everything else goes out the window, that -- all were
4     concentrating is on officer safety.
5  Q  Okay. And then a minute later you're -- the radio log
6     indicates that Jeff Holden heard that call for help,
7     correct? Oh, I'm sorry.....
8  A  Because at '05 Frank tells him -- tells Jeff, tells K18 I
9     need you now. And then Jeff came -- said -- called back
10    and told him he copied, that.....
11 Q  Gotcha.
12 A  .....that he heard him.
13 Q  Okay. And then what happens at 1706 with 5C11?
14 A  Okay. Frank had called -- when he -- when he called out I
15    need you now and he's calling for assistance, the --
16    Alaska State Troopers that were also patrolling the area,
17    they -- 5C11 heard that call and said he's responding,
18    5C11 to 1219 Purtov. He didn't tell me where he was at,
19    but that he was in route.
20 Q  Right.
21 A  And then 5C15 who was also out there at the same time was
22    asking where's he at, question, where's he at.
23 Q  Okay.
24 A  What -- what -- what's he on.
25

Computer Matrix, LLC                 Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501  Fax    907-243-1473         jpk@gci.net
                                                                  sahile@gci.net

DOUGLAS CROYLE                    4/9/2008           BROWN v. PETERSON, et al.,
Vol 1                                                 Case No. 3:05-cv-0002 TMB

29 (Pages 110 to 113)

Page 110

1  Q  And then who is -- who's 62?
2  A  62 is -- is another trooper.
3  Q  And -- and is his call in relationship to the call for
4     help, because you wrote I/S, in service for 62?
5  A  Yes.
6  Q  He -- he's also thinking of responding?
7  A  Yes. That's -- he's in service and he's going to respond.
8  Q  And how do you know that if you just put in service that
9     he's going to respond also?
10 A  Well, because he -- he wasn't on my board, he wasn't on my
11    officers' patrol list, so for somebody to come up out of
12    -- out of the blue who wasn't somebody that we were
13    dealing with already on the call, 62 just went in service.
14    I'm -- I'm -- that's the -- the thing that happens.
15    Officer calls for assistance you'll have off duty officers
16    and everybody else whose got a radio on will all respond.
17 Q  Okay. And then what is 5C15 telling you at 1706?
18 A  He says that he's in route.
19 Q  Okay. And then what did you write down there precisely?
20 A  Okay. It -- at 5C15 when -- at minute six he asked me
21    early on in that -- in that mix what's he on and then 62
22    went in service and then I said 5C15, K20 and K18 are on a
23    REDDI at 1219 Purtov and requesting assistance.
24 Q  Oh, so at this point you're telling that particular
25

Page 111

1     trooper, 5C15, that this is a REDDI call that the two --
2     that Holden and Peterson are responding to?
3  A  Yes, sir.
4  Q  Okay. And then the next entry, 5C15 tells you what at
5     1706?
6  A  That he's in route.
7  Q  Okay. And then next -- a minute later 1707, what does
8     Frank Peterson tell you?
9     MR. HERZ: It's not Peterson.
10    MR. KOZIOL: Oh, I'm sorry, that's Holden?
11    MR. HERZ: Yeah.
12 Q  Yeah, what does Officer Holden tell you?
13 A  He's telling me that he's on scene -- at scene.
14 Q  Okay.
15 A  So basically at '07 Holden arrived at 1219 Purtov.
16 Q  Okay. And at 1709 what does 5C18 tell you? Is that 18?
17 A  Yeah, 5C18 and he's in route.
18 Q  Okay. And then a minute later 17010 -- 1710.....
19 A  He.....
20 Q  .....rather, what does 62.....
21 A  Yeah.
22 Q  .....tell you?
23 A  62 is saying he's on scene, he's at scene.
24 Q  Okay. And then why don't you take me to the next entry,
25

Page 112

1     1711, and that's Frank Peterson, what is he telling you?
2  A  Okay. He's asking 27/29, so he's asking for driving
3     status and warrant -- warrant status on two people and he
4     gave the Alaska driver's license number.
5  Q  Okay. Now from what you've recorded up to this point,
6     you've recorded one trooper having arrived at the scene,
7     right?
8  A  Yes.
9  Q  Do you know whether or not the other two troopers ever
10    arrived at the scene?
11 A  No, I don't see them as ever having arrived.
12 Q  But does that -- if they arrived is it your view that they
13    should have told you?
14 A  Yes, but they don't always do.
15 Q  Okay. So you don't know whether the other two troopers
16    arrived or not?
17 A  No. I know 62 is there, I know 18 is there, I know 20's
18    there.
19 Q  Right. And 18 and 20 are -- are Holden and Peterson?
20 A  Holden and Peterson.
21 Q  Okay. And then at 1711 you have a 2FH, what's FH, is that
22    FH there or.....
23 A  That was firehall.
24 Q  I'm sorry?
25

Page 113

1  A  That -- that's our firehall, our ambulance and our fire
2     department, that's the -- that's the way we dispatched
3     them, that was the code for sending tones and for -- and
4     so that was just the code we used, FH is for a medical
5     call or for a fire call. It -- it dispatches either the
6     ambulance or the fire department.
7  Q  All right.
8  A  The FH is saying at minute 11 I sent tones for an
9     ambulance and then after those tones were done it sets off
10    all those duty people's pagers, then you send the same
11    thing out again and gets your data to -- for people to go
12    out for that call.
13 Q  And then what happens.....
14 A  So I sent tones.....
15 Q  I'm sorry, go ahead. Sorry.
16 A  And so I sent the tone, waited, resent the tone,
17    dispatched the ambulance.
18 Q  Okay. And then what happened at 1712?
19 A  Okay medic three said that they're responding. Okay. And
20    then I turn around and tell medic three this is -- this
21    was standard procedure, you -- you sent your tone, you
22    toned out to give the information, the ambulance or the
23    fire department say they're going and then we would turn
24    around and tell them where they're going to again. So
25

Page 114

1  medic three at minute 12 says that they're responding and
2  I come back and tell them -- basically I confirmed then
3  (ph) you're responding to 1219 Purtov.
4  Q  Okay. And going to the next page, 10465, at 1713, it
5     looks like Frank -- you're talking to Frank Peterson at
6     this point?
7  A  Yes, sir.
8  Q  And what -- what is occurring here?
9  A  Okay. Back at minute 11 when he asked for the 27/29.....
10 Q  Right.
11 A  .....he gave two license numbers, OLNs. Okay. Two
12    minutes later I'm coming back to him giving him info,
13    basically the information on whatever those printouts were
14    for Joseph Brown and for Beverly Brown. We didn't have to
15    record what all that data was because it's a printout.
16 Q  Okay.
17 A  And -- and just access it. So that's DMV records and any
18    outstanding wants or warrants.
19 Q  And you don't happen to recall what that information was
20    at this point?
21 A  It would have been standard driver's license information,
22    the name of the -- the OLN, whether -- what the person's
23    full name was, what their address of record is, when they
24    had gotten their driver's license, when that license was
25

Page 115

1  going to expire and then driver's history for citations,
2  revocation, suspension, that would all be on that DMV
3  printout.
4  Q  Okay. And then at 1713 you get a call from Frank
5     Peterson, what is occurring there?
6  A  Okay. Frank at -- at a minute 13 is saying that he's in
7     service. He has one 10/80 so he has one arrest for 10/55
8     which was a DUI and he has a name unknown and will provide
9     at station. So at that point in time whether Frank
10    realized or remembered that I talked about Mr. Brown, I
11    don't even know who he's arrested. All he's telling me is
12    he's got one arrest for DUI and that the name was unknown.
13 Q  Right. But the information you gave him was for Joseph
14    Brown, not Scott Brown, right?
15 A  For Joseph Brown, yes.
16 Q  And did you learn later that it was Scott Brown that was
17    arrested?
18 A  Yes.
19 Q  All right. Okay. And then at 1713 you get a call from
20    62?
21 A  Right.
22 Q  Right. And.....
23 A  And he's -- or.....
24 Q  Go ahead.
25

Page 116

1  A  Okay. He's saying he's in service.
2  Q  All right. And then if you go down to the next -- the
3     next note at 1713, you've got K -- you're talking to K18?
4  A  Right.
5  Q  And what are you talking about there?
6  A  I asked him his status, it's been a couple minutes.....
7  Q  Okay. Hold on. Wait a second, we -- we got a technical
8     problem, hold on.
9  A  Okay.
10    (Off record)
11    (On record)
12 Q  All right. Mr. Croyle, I think we were at 1718 and you
13    made a call to Officer Holden, can you tell us what
14    occurred at 1718?
15 A  Well, that was after you -- at 13 and 18, both of those
16    were status checks.....
17 Q  Okay.
18 A  .....because he stayed on scene after 20 and 62 departed.
19 Q  All right. And he -- then let's go to the other 1718
20    where then he calls you or talks to you, what -- what
21    information do you get?
22 A  He asked for a 27/29 on a Washington OLN. So that's a
23    Washington driver's license, he wants to get that driving
24    status, any wants or warrants and that was on -- on one of
25

Page 117

1  the Browns.
2  Q  Okay. And what occurs at 1721?
3  A  That's when I gave him the information on Damon Brown. So
4     it would have been the information on the Washington DMV
5     report and that he had no warrants because there's no
6     information there that he had a 29.
7  Q  Okay. And then what's the next entry at 1721?
8  A  That's Jeff acknowledging the information that I gave him.
9  Q  Okay. And then 1724 you got two entries, what's going on
10    there?
11 A  Okay. It's been three minutes, my officer's still on
12    scene, asking him what his status is and he comes back and
13    says he's code four so he's okay.
14 Q  Okay. And then 1728 you have four entries, describe
15    what's going on then?
16 A  Okay. At 1728 the first one's from Jeff saying that he's
17    in service so now he's leaving that residence. The
18    ambulance says it's in route to the hospital, so that's
19    leaving the residence. And 5C15 and 5C18 are telling me
20    they're in service.
21 Q  Now can you infer from that them telling you they're in
22    service that they're leaving the scene of this incident?
23 A  Yes, though they never told me they arrived.
24 Q  Ah. Okay. But we can infer they arrived if they're
25

Computer Matrix, LLC                Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473        jpk@gci.net
                                                                  sahile@gci.net

DOUGLAS CROYLE 4/9/2008 BROWN v. PETERSON, et al.,
Vol 1 Case No. 3:05-cv-0002 TMB

31 (Pages 118 to 121)

Page 118

```
1     telling you we're leave -- they're leaving?
2  A  Yeah.
3  Q  Okay. So you would conclude that three troopers got to
4     the scene?
5  A  Yes.
6  Q  Okay. All right. And then at 1732 what -- what's going
7     on?
8  A  At 1732 Jeff arrives back at the police department.
9  Q  Okay.
10 A  He -- he -- so he's basically back at the station. And
11    then at 35 the hos -- the ambulance arrives at the
12    hospital.
13 Q  Right. And, I guess -- I'm -- I'm sorry, if I asked you
14    this, I don't actually remember, at 1716 did -- is that
15    when Frank Peterson told you he had arrived at the jail?
16 A  Yes, sir.
17 Q  Okay. And then tell me what's happening at 1743, two
18    entries?
19 A  Okay. At 1743 -- well, Jeff left the station again at
20    1740. At 1743 he arrived at the hospital. So he's
21    following up for the ambulance transport.
22 Q  Okay. And then 1747?
23 A  Medic three is -- at 43 medic three says that they're
24    available at Providence and at -- then at 47 they're --
25
```

Page 119

```
1     they're returning to quarters. So they're leaving the
2     hospital, going back to the ambulance shed.
3  Q  And is 1760 an unrelated -- unrelated to our incident
4     entry?
5  A  Yeah, that's totally unrelated, 516 or 5C18 is busy, 10/6
6     I'm busy. And he's at the Walstad (ph) which was a Fish
7     and Game vessel.
8  Q  Okay. And if we return to 10082, that's the complaint
9     card, and did I understand you correctly that it's likely
10    you typed up the -- in the description box the first four
11    lines that you likely typed that up right after you typed
12    up the -- the top half?
13 A  Right. After I got down through the address line so the
14    circumstances, location, name, phone number, address, that
15    would have all been done immediately. And looking at the
16    time line between the notes and the two minutes to the
17    point where I dispatched it, that -- I probably typed that
18    first block of information, the first four lines there
19    immediately.
20 Q  Okay. And then we know you got the -- the call from the
21    second woman at 1657 and again because you -- you told us
22    that you weren't particularly busy that afternoon, is it
23    likely you typed in the fifth and sixth line shortly after
24    you made those notes or immediately after you made those
25
```

Page 120

```
1     notes?
2  A  It would have been shortly after.
3  Q  Okay.
4  A  Shortly after I got done talking to her, maybe a.....
5  Q  Within a minute or two?
6  A  Within a couple of minutes, yeah.
7  Q  Okay. And the -- the UCR code for -- which is 9404, what
8     is that?
9  A  That's a uniform criminal reporting code for NCIC.....
10 Q  Okay.
11 A  .....and so that code -- that -- there's a whole book,
12    it's the size of a New York phone book, full of UCR codes,
13    NCIC codes.
14 Q  Oh, I take -- did I give you -- send you Kamai C which is
15    -- has some codes on it?
16 A  Yes, you did.
17 Q  And is that a -- is that a document that you were using
18    when you were dispatching on this occasion?
19 A  Yes, sir, it's one of the pages of it -- of -- of that.
20    It's the -- the quick one, it's our -- our quick sheet.
21    So the -- for the most common codes that we run into you
22    could just glance at it and pull your UCR code right away.
23 Q  And on Kamai C what does it say for 9404?
24 A  That's a citizen report, DWI, also is a REDDI.
25
```

Page 121

```
1  Q  Okay. And that matches what you've typed in, citizen
2     report DWI/REDDI?
3  A  Yes, sir.
4  Q  Okay. Now I'd like to direct your attention to a exhibit
5     we haven't talked about, Kamai Exhibit B, which is Kodiak
6     Police Department contact card.
7  A  Okay.
8  Q  And there is an entry there that relates to our case, is
9     there not?
10 A  Yes, sir.
11 Q  And could you just read that entry into our record here?
12 A  Okay. There's a date of 01/04/03, arrested by Officer
13    Peterson, DWI, case number's 200300101.
14 Q  All right. So you obviously filled this in -- well, let
15    me ask you, I -- I won't say what's obvious. When did you
16    fill this in? And let me ask you this, did you type this
17    in?
18 A  Yeah, I typed that in, that would have gone in after the
19    case was closed.
20 Q  And when was the case closed?
21 A  Okay. The case would have been closed when Officer
22    Peterson came in and gave me a deposition -- disposition
23    of -- of what had happened. He -- it's an arrest, it's
24    going to be a report, that's on -- on the case card where
25
```

Computer Matrix, LLC         Phone - 907-243-0668         jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501     Fax    907-243-1473     sahile@gci.net

DOUGLAS CROYLE  
Vol 1

4/9/2008

BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

32 (Pages 122 to 125)

Page 122

1   you -- to log a report. It's going to be a report. A --
2   AST was involved and this is an arrest. And that point
3   after I've got that information closed on the case card,
4   we would pull up all the contacts so there -- there would
5   be a contact card for Scott Randall Brown, there's a
6   contact card for his wife, Beverly, there'd be a contact
7   card for Damon. So everybody that's involved with that
8   case would have been notated in some way. There would
9   have been witness of. So if you were to go back and --
10  and pull those contact cards you'd have that information
11  on there.
12 Q Right. Okay. And.....
13 A The incident is that date, witnessed arrest of and the
14  case number.
15 Q Is it likely that Officer Peterson gave you that
16  information prior to your shift ending that day?
17 A Yeah. Yes.
18 Q Okay. And you likely typed this up on the contact card
19  that information that appears on Kamai B before your shift
20  ended?
21 A Yes.
22 Q All right. And then I think you had told Mr. Herz that
23  going back to 10082, the last two lines in the information
24  box beginning with the word arrested, that would have been
25

Page 123

1   completed before your shift ended?
2 A Yes, sir, that would have been re -- that would have been
3   done after Officer Peterson told me that there -- it's an
4   arrest and it's a report.....
5 Q Right. And then you would have.....
6 A .....I would have put that in.
7 Q That's when you would have also put in Xs in -- in two of
8   those boxes?
9 A Yeah, that's going to go up -- actually there's three.
10 Q Oh, yeah, sorry.
11 A AST was involved so AST was there, it was a DUI so there's
12  alcohol was involved and it was an arrest so arrest is
13  checked.
14 Q Okay. On -- going back to your handwritten notes, 11120,
15  it appears somebody blackened out information that was
16  unrelated to our case and left in at the bottom Alan
17  Schmitt, lawyer. Is it likely that the Alan Schmitt
18  lawyer words relate to what was blacked out just
19  immediately above and not relating to our case?
20 A That's quite possible. That's quite poss -- I don't -- I
21  don't know what Alan Schmitt's there for, I don't know why
22  that was left.
23 Q Right. You -- from -- from the documents we've reviewed,
24  if your notes on 11120 and 11121 are chronological and --
25

Page 124

1   and they appear to be chronological, don't they?
2 A Yes, sir.
3 Q There was no mention of Alan Schmitt, a lawyer, between
4   1657 and 1709, was there, as far as you know?
5 A No.
6 Q Okay.
7 A And I don't know why it's there, it's just.....
8 Q And I think you indicated to us that this system, I think
9   -- I think you had called it archaic, which relies a lot
10  on your hand -- making handwritten notes and then typing
11  also, I think you called it archaic, and that was under
12  the File Maker Pro system?
13 A Yes.
14 Q Okay. And then I think you also said things vastly
15  improved when there was a new system which went into
16  effect. And do you remember what the name of that new
17  system was, you mentioned it and I didn't quite get it?
18 A I think it's Forms Plus. Forms.....
19 Q What is that?
20 A .....Forms Plus.
21 Q Forms Plus. Okay. We've had people.....
22 A Talk.....
23 Q I'm sorry, go ahead.
24 A I -- I said you could talk to Mr. Christopher Brewster,
25

Page 125

1   the city IT tech, he can tell you exactly what that
2   program is.
3 Q We've also had people call it Safety Suite, do you
4   remember anybody calling it Safety Suite?
5 A Yep, we called that thing -- yeah, some part of the
6   program.
7 Q You've heard both terms.....
8 A Yes.
9 Q .....used for the same program?
10 A Yes.
11 Q Okay. And we had testimony that that Safety Suite system
12  went into effect in mid 2003, the same year as this
13  incident. Is -- is that in accordance with your memory or
14  is your memory different as to when that -- the new,
15  better system went into effect?
16 A We -- we started migrating that system, I want to say in
17  June of '03, June or July. And it was -- by October it
18  was up and fully 100 percent.
19 Q By October of '03?
20 A Yes.
21 Q Okay. Looking at a document -- I think I have another
22  question for you, just bear with me for a moment. If you
23  could go to Kamai A2?
24 A Okay.
25

DOUGLAS CROYLE　　　　　　　　4/9/2008　　　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

33 (Pages 126 to 129)

Page 126

1  Q   What's going on at 2102?
2  A   At 2102. Ambulance, a medical assist. That's by Officer
3      Olen (ph). She's a -- she worked in the jail, she was a
4      corrections officer.
5  Q   Okay.
6  A   She requested an ambulance for an inmate with ankle pain.
7  Q   All right. And then under officer assigned, what is that?
8  A   That's Firehall, that's the medics. That's the medic
9      three.....
10 Q   Okay. And do you know is that inmate that you're
11     referring to with the ankle pain, is that Scott Brown?
12 A   I can't tell you from this.
13 Q   Okay.
14 A   I'd have to see the card, it would be on the card.
15 Q   Okay. I -- I think that's all the questions I have.
16     Thank you.
17 A   Okay. I have one question.....
18     MR. KOZIOL: But Mr. Herz might have some more questions
19 first. We're not quite done.
20 A   Okay.
21     MR. KOZIOL: I.....
22     MR. HERZ: Yeah, real -- real quick.
23                DOUGLAS E. CROYLE
24 testified as follows on:
25

Page 127

1                REDIRECT EXAMINATION
2  BY MR. HERZ:
3  Q   Looking at that same form that you were just looking at,
4      2102 -- I mean, Kamai A2 at 2102, 9:00 -- 9:00 o'clock,
5      two minutes after 9:00, you said you wouldn't know if that
6      was Scott Brown, you'd need to see the card. Which card
7      are we talking about?
8  A   The -- the case card. This has got a case number.
9  Q   Right.
10 A   So you'd have to pull 20030106.
11 Q   Okay. So the com -- when you mean the card you're talking
12     about the case card or the complaint card? And.....
13 A   Right.
14 Q   .....and for our purposes the corresponding case card or
15     complaint card we've been talking about has been what's on
16     10082, it would be that kind of a card?
17 A   Yes, sir, it would be exactly the same type of a card.
18 Q   Okay. Just wanted to make sure about that. Then with
19     regard to Forms Plus and Safety Suite, you're saying that
20     the new program that was used goes by both names or are
21     they two different.....
22 A   Yeah.
23 Q   They -- they are definitely the same thing?
24 A   They're the same -- they're the same program, we called it
25

Page 128

1      both. One -- Safety Suite was the -- the software to load
2      in the new contact card information and it automatically
3      wrote data to the contact cards, it automatically gave you
4      a case number, it took away a lot of the multiple
5      duplicational work we had and really, really sped things
6      up.
7  Q   Okay. Now my last question is I've noticed you've had a
8      pink highlighter in your hand and you've been marking
9      things. What have you been doing with your pink
10     highlighter?
11 A   Okay. And this is the question I had for you. In the
12     very beginning here when I was talking to you we had Exb
13     -- exit -- Exhibits A, B and C. A was fax sheet covers, B
14     is the letter covers and C is Frank's email; is that
15     correct?
16 Q   I think the A exhibits were all the letters, the Bs were
17     the fax cover sheets and the C was Frank's email.
18 A   Okay. I need an address, you wanted it sent to the clerk
19     of court?
20 Q   You need an address for the court reporter.
21 A   Court reporter. Okay.
22 Q   Which you're about to get.
23     REPORTER: 700.....
24 A   Okay.
25

Page 129

1      REPORTER: .....West Second Avenue, Anchorage.....
2  A   Okay.
3      REPORTER: .....Alaska 99501.
4  A   Okay. Do you want me to send this just standard mail, do
5      you need it expressed, how fast -- soon do you need it?
6  Q   What -- if you -- I think standard mail would be fine as
7      long as it goes out in the mail tomorrow. Can you get it
8      out in the mail tomorrow?
9  A   Yes.
10 Q   Okay.
11 A   I can get it out for you tomorrow morning.
12 Q   All right.
13 A   I just want to make.....
14 Q   So I -- I don't have anything -- I'm sorry?
15 A   Okay. I just want to make sure I'm sending it -- I'm
16     going to send it to the clerk of the court?
17 Q   No you send it to.....
18 A   Oh, to the court reporter.
19     MR. KOZIOL: Give him your name.
20     REPORTER: I'm going to -- that was my.....
21     MR. KOZIOL: Yeah.
22     REPORTER: This goes to Computer Matrix Court Reporters.
23 A   Okay. And do I need to put the -- both of you lawyers
24     names on there so you can get copies, is that what you
25

DOUGLAS CROYLE  
Vol 1

4/9/2008

BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

34 (Pages 130 to 132)

Page 130

1  want done?
2  MR. KOZIOL: We're -- we're going to get the copies from
3  the court reporter in the ordinary course of things so I don't
4  think you need to make multiple copies, they -- they'll make
5  them for us.
6  A  Okay. That's what I -- that's the only question I had for
7  you gentlemen.
8  Q  Okay. And that's all -- and -- and so what were -- what
9  were you marking though with your highlighter, what were
10  you doing?
11  A  Oh, I was doing that -- that's the only thing I had to
12  write with, I was digging through my coat and my pockets
13  for a pen and the only thing I had was a highlighter with
14  me. So I put down the exhibits and the letter covers so I
15  could do them as Exhibit A, Exhibit B, Exhibit C and where
16  to mail it to. That's all.
17  Q  Excellent. All right. Thank you very much.
18  MR. KOZIOL: Okay.
19  MR. HERZ: I don't have anything further.
20  MR. KOZIOL: Thank you. Bye-bye. We're off the record.
21  REPORTER: This concludes the deposition, the time is 4:12
22  p.m. Off record.
23       (END OF PROCEEDINGS)
24
25

Page 131

1       CERTIFICATE
2  UNITED STATES OF AMERICA  )
                            )ss
3  STATE OF ALASKA          )
4    I, Joseph P. Kolasinski, Notary Public in and for the
5  state of Alaska, residing in Anchorage in said state, do hereby
6  certify that the deponent in the foregoing matter was duly
7  sworn to testify to the truth, and nothing but the truth;
8    That said testimony was taken at the time and place
9  therein stated;
10    That the testimony of said witness was recorded
11  electronically and thereafter transcribed under my direction
12  and reduced to print;
13    That the foregoing is a full, complete, and true record of
14  said testimony.
15    I further certify that I am not a relative, nor employee,
16  nor attorney, nor of counsel of any of the parties to the
17  foregoing matter, nor in any way interested in the outcome of
18  the matter therein named.
19    IN WITNESS WHEREOF I have hereunto set my hand and affixed
20  my seal this 21st day of April 2008.
21
22
          Joseph P. Kolasinski, Notary Public
23        in and for the State of Alaska.
          My Commission Expires: 03/12/2012
24
25

Page 132

1       WITNESS CERTIFICATE
2  RE: BROWN v. PETERSON, et al.,
   CASE NUMBER:  3:05-cv-0002 [TMB]
3  DEPOSITION OF: DOUGLAS E. CROYLE
   DATE TAKEN:    APRIL 9, 2008
4
     I hereby certify that I have read the foregoing deposition
5  and accept it as true and correct, with the following
   exceptions:
6
   Page    Line         Description
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
   If additional paper is needed, please sign and date each sheet.
23
24        _____
          DOUGLAS E. CROYLE      DATE
25