Case 3:05-cv-00002-TMB    Document 89-11    Filed 05/27/2008    Page 1 of 20
FRANK PETERSON                    4/1/2008              BROWN v. PETERSON, et al.,
Vol 1                                                  Case No. 3:05-cv-0002 TMB

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SCOTT BROWN,                          )
                                      )
                 Plaintiff,           )
                                      )
v.                                    )
                                      )
FRANK PETERSON, Individually and)
in his official capacity as a    )
City of Kodiak Police Officer;   )
JEFF HOLDEN, Individually and in)
his official capacity as a City )
of Kodiak Police Officer, CITY   )
OF KODIAK; and JOHN AND JANE      )
DOES 1 - 10,                      )
                                      )
                 Defendants.          )
                                      )
Case No. 3:05-cv-0002 [TMB]

VIDEOTAPED DEPOSITION OF OFFICER FRANK R. PETERSON, JR.

April 1, 2008

APPEARANCES:

    FOR THE PLAINTIFF:          MR. ROBERT M. HERZ
                                Attorney at Law
                                425 G Street, Suite 600
                                Anchorage, Alaska  99501
                                (907) 277-7171

    FOR THE DEFENDANTS:         MR. FRANK S. KOZIOL
                                Attorney at Law
                                618 Christensen Drive
                                Anchorage, Alaska  99501
                                (907) 258-7706

    ALSO PRESENT:               CHIEF T.C. KAMAI

**Ex. I**

Page 2

TABLE OF CONTENTS

1
2    Direct Examination by Mr. Herz                    4
3    Cross Examination by Mr. Koziol                 164
4    Redirect Examination by Mr. Herz               223
5    Recross Examination by Mr. Koziol              265
6    APPENDIX 1 - Stipulation and Order             271
7    BATES STAMPED DOCUMENTS:

```
8   13284   12640   12611   12656   12645   12671
9   12660   12690   12676   12710   12694   12850
10  12386   12750   12730   12714   12771   12755
11  12792   12778   12865   12858   12816   12817
12  12799   12895   12917   12909   12942   12928
13  12957   12976   12956   12957   12950   12967
14  12995   12986   13009   13019   13039   13032
15  13058   13050   13065   13110   13083   13126
16  13127   13115   13137   13188   13179   13201
17  13194   13160-13165    13172    456    13280
18  13271   13274   13255-13283     10082   10050
19  10051   11737   11738   10463-10465
20  10041-10046     11526
```
21
22
23
24
25

Page 3

1                P R O C E E D I N G S
2              (Kodiak, Alaska - 4/1/2008)
3    (On record)
4        REPORTER: My name is Salena Hile. I'm a court reporter
5    for Computer Matrix and a Notary Public in the state of Alaska.
6    Today is April 1st, 2008, and we're scheduled for the
7    deposition of Frank Peterson, would begin at 9:00 a.m. We're
8    at the Comfort Inn, 1395 Airport Way, Kodiak, Alaska. This is
9    in the United States District Court for the district of Alaska,
10   Scott Brown, plaintiff, versus Frank Peterson, individually and
11   in his official capacity as a city of Kodiak police officer,
12   Jeff Holden, individually and in his official capacity as a
13   city of Kodiak Police Officer, city of Kodiak, and John and
14   Jane Does 1 through 10. The case number is civil number
15   A05-0002 CV. This deposition is being taken on behalf of the
16   plaintiff.
17       Counselor's, please identify yourselves for the record and
18   who you represent, starting with the plaintiff's attorney,
19   please.
20       MR. HERZ: Robert Herz. Last name's spelled H-E-R-Z,
21   representing plaintiff, Scott Brown.
22       MR. KOZIOL: Frank Koziol for the defendants.
23       REPORTER: And I thank you. And, sir, can you please
24   state your name for the record.
25       MR. KAMAI: Charles T.C. Kamai.

Page 4

1        REPORTER: All right. Thank you. Okay, so is it Officer
2    Peterson?
3        OFFICER PETERSON: Yes.
4        REPORTER: Please raise your right hand.
5        (Oath administered)
6        OFFICER PETERSON: I do.
7        REPORTER: Thank you. You can put your hand down.
8            OFFICER FRANK R. PETERSON, JR.
9    having first been duly sworn under oath, testified as follows
10   on:
11              DIRECT EXAMINATION
12       REPORTER: Please state your full name for the record and
13   spell your last name.
14   A    Frank Robert Peterson, Jr., P-E-T-E-R-S-O-N.
15       REPORTER: And a mailing address, please.
16   A    P.O. Box 8868, Kodiak, Alaska 99615.All right.
17       REPORTER: And a daytime telephone number or a message
18   phone where you could be contacted.
19   A    907-486-2582.
20       REPORTER: Thank you. All right. If there are no
21   stipulations, Mr. Herz, you may begin.
22       MR. HERZ: Thank you.
23       MR. KOZIOL: There actually is a stipulation. The parties
24   entered into a stipulation and order regarding production by
25   City of Kodiak of confidential or potentially confidential

Page 5

1    materials and I believe the Court has signed that order and
2    according to the terms of the stipulation, if it's expected
3    that such materials would be gone into in a particular
4    deposition, as I do think it will in this deposition, that that
5    stipulation be attached to the deposition and given to our
6    court reporter according to the terms. So I'd like to note
7    that we should do that.
8        MR. HERZ: Okay.
9        MR. KOZIOL: And I will provide that to the court
10   reporter. Maybe we can -- do you want to attach it as an
11   exhibit or what would work best for you if we're going to be
12   attaching something to the deposition?
13       REPORTER: As a stipulation?
14       MR. KOZIOL: Yes.
15       REPORTER: We can attach it as an exhibit or it can just
16   be attached to the deposition as an appendix. It's really
17   not --
18       MR. KOZIOL: As opposed to an exhibit. All right. So
19   then we'll maintain the integrity of 1, 2, 3 exhibits and why
20   don't we attach it as Appendix 1 then.
21       REPORTER: Okay.
22       MR. KOZIOL: Okay. All right.
23       MR. HERZ: That's fine. Okay.
24   BY MR. HERZ:
25   Q   Officer Peterson, have you ever been deposed before in a

FRANK PETERSON                    4/1/2008              BROWN v. PETERSON, et al.,
Vol 1                                                   Case No. 3:05-cv-0002 TMB

3  (Pages  6 to 9)

Page  6

1   civil case?
2 A  No, I haven't.
3 Q  Okay.  But you have testified before in the capacity of a
4    police officer in criminal cases, right?
5 A  Yes.
6 Q  Okay.  And you realize you're under oath.
7 A  Yes.
8 Q  And the same kind of oath that would apply in a criminal
9    case applies here in this civil case.
10 A  Yes.
11 Q  You understand that.
12 A  Yes.
13 Q  Okay.  When I ask you questions, if you don't understand
14    the question, you need to let me know; all right?  And
15    I'll either rephrase it or I'll ask it differently in a
16    manner so that you can understand it.  If I ask a question
17    and you answer the question, the presumption is that you
18    understood the question and were able to answer it the way
19    it was put to you, okay?  Is that agreeable?
20 A  Yes.
21 Q  Okay.  If I understand correctly, you were first hired
22    back in November of 1999 with the Kodiak Police
23    Department; is that correct?
24 A  Yes.
25 Q  Okay.  And prior to that time, you were working with the

Page  7

1   Kodiak Area Native Association, right?
2 A  Yes.
3 Q  When you left that job, you were making just a little over
4    $19 an hour, right?
5 A  KANA?
6 Q  Yes.
7 A  Yes.
8 Q  Okay.  And when you took the job with the Kodiak Police
9    Department, how much were you making back in November of
10    '99?
11 A  If I recall correctly, it's 17.91.
12 Q  17.91?
13 A  Yes.
14 Q  Okay.  And you're making how much now?
15 A  27.50 maybe -- approximately.
16 Q  Okay.  You had three months' training at the academy,
17    right?
18 A  Yes.
19 Q  And three months' on-the-job training, right?
20 A  Yes.
21 Q  So on-the-job training meaning that you were supervised by
22    a field training officer?
23 A  Yes.
24 Q  Who was your field training officer?
25 A  Sergeant Bohach was one.  Dave Johnston was one and Ken

Page  8

1   Parker was one and I can't remember if I had another one
2    or not.
3 Q  Okay.  And at the academy, you were trained in writing
4    police reports, right?
5 A  Correct.
6 Q  You were trained that police reports should contain
7    essential, important information, right?
8 A  Yes.  Yes.
9 Q  The information should be accurate?
10 A  Yes.
11 Q  Should be precise?
12 A  Yes.
13 Q  Okay.  And you were given training in the law, right?
14 A  Yes.
15 Q  So that you could -- in enforcing the law, you knew what
16    the laws were.  You understood what constitutional rights
17    were.  You understood how to execute the laws properly,
18    right?
19 A  Yes.
20 Q  Okay.  Were you given training on what the legal standards
21    were for making investigatory stops?
22 A  Yes.
23 Q  And determining probable cause?
24 A  Yes.
25 Q  Making warrantless entries into homes?

Page  9

1 A  Yes.
2 Q  Okay.  You understand the difference between reasonable
3    suspicion and probable cause?
4 A  Yes.
5 Q  What is reasonable suspicion?
6 A  Less than 50 percent believing -- reasonable person
7    believing, to the best of my knowledge, that something is
8    true or not and then probable cause being more than
9    50 percent that something -- a reasonable person would
10    believe something is true or accurate.
11 Q  Okay.  So that's your understanding of the legal standard
12    for what reasonable suspicion is?
13 A  Yes.
14 Q  Okay.  And that's your understanding of the legal
15    definition of probable cause?
16 A  Yes.
17 Q  Okay.  Now, I understand you're going to be separating
18    from the Kodiak Police Department shortly.
19 A  Yes.
20 Q  When's that going to take place?
21 A  Friday.
22 Q  All right.  And you're going back to the Kodiak Area
23    Native Association for work?
24 A  No.
25 Q  No?  Do you have work lined up?

FRANK PETERSON                                4/1/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                     Case No. 3:05-cv-0002 TMB

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1 A   Yes. | 1   taught me a little bit about geology. |
| 2 Q   What are you doing? | 2 Q   Before you were a Kodiak -- before you were with the |
| 3 A   Shungnak Tribal Council. | 3   Kodiak Police Department, were you friends with Doug |
| 4 Q   Okay.  And what are you going to be doing in that | 4   Coyle? |
| 5   capacity? | 5 A   No. |
| 6 A   Director of social services. | 6 Q   So that's a relationship that you began after -- and |
| 7 Q   All right.  And what are you going to be earning in that | 7   correct me if I'm wrong, he started with the Kodiak Police |
| 8   position? | 8   Department after you did; is that right? |
| 9 A   I'm not sure exactly how much per hour, but it's a salary | 9 A   Correct. |
| 10   position of 45,000 a year. | 10 Q   Okay.  And so -- and that was what, in -- just shortly |
| 11 Q   And why are you leaving the Kodiak Police Department? | 11   after you did, right?  I mean that was in the year 2000? |
| 12 A   Spend more time with my family. | 12 A   I can't remember. |
| 13 Q   And how many hours per week do you anticipate you're going | 13 Q   Okay.  But you were friends with Doug Coyle before January |
| 14   to be working with -- in your new job? | 14   of 2003; isn't that right? |
| 15 A   Approximately 40 hours a week. | 15 A   I can't remember when he started. |
| 16 Q   And how many hours are you working now with the Kodiak | 16 Q   Okay. |
| 17   Police Department? | 17 A   I would assume, yes. |
| 18 A   It varies, but a minimum of 40 hours a week. | 18 Q   Okay.  And in addition to going to his house and learning |
| 19 Q   So aside from occasional overtime, you're going to be able | 19   to cut jewels and being taught things about geology, you |
| 20   to spend the same amount of time with your family as you | 20   would also socialize in other places, right?  With each |
| 21   do now, right? | 21   other?  Go out and have some beers? |
| 22 A   Yes. | 22 A   Negative.  No. |
| 23 Q   Okay.  So is there any other reason you're leaving the | 23 Q   Shoot darts, shoot pool? |
| 24   Kodiak Police Department? | 24 A   No. |
| 25 A   Education. | 25 Q   No? |

| Page 11 | Page 13 |
|---|---|
| 1 Q   And by that, what do you mean? | 1 A   No. |
| 2 A   I'll be going to school full-time as well. | 2 Q   You never gathered outside of his residence for purposes |
| 3 Q   And doing what? | 3   of socialization? |
| 4 A   I'm sorry? | 4 A   Might have been my residence or another gathering that was |
| 5 Q   For what purpose? | 5   going on at the police department, but as far as going to |
| 6 A   Get my degree in business administration with an emphasis | 6   the bars, no.  As far as going out, no.  I'm trying to |
| 7   in accounting and management. | 7   think if we went to the movies or not.  Might have done |
| 8 Q   Okay.  Has anyone with either the City of Kodiak or within | 8   that. |
| 9   the Kodiak Police Department encouraged you or suggested | 9 Q   Uh-huh. |
| 10   that you should resign from your position? | 10 A   But other than that, no. |
| 11 A   No. | 11 Q   Okay.  I noticed from some of the paperwork I've received |
| 12 Q   Has anybody put any pressure on you to resign? | 12   in discovery, including your employment application, that |
| 13 A   No. | 13   you spent some time as a missionary with the Mormon |
| 14 Q   Have you felt as though there's been any pressure for you | 14   church. |
| 15   to resign? | 15 A   Yes. |
| 16 A   On the contrary. | 16 Q   So is it fair to assume that that's your religious |
| 17 Q   Okay.  Do you know who Douglas Croyle is? | 17   preference?  You're Mormon? |
| 18 A   I do. | 18 A   Yes. |
| 19 Q   Who's that? | 19 Q   Okay.  And are you practicing? |
| 20 A   Doug worked for the Kodiak Police Department as a | 20 A   No. |
| 21   dispatcher and he's also a friend of mine. | 21 Q   No.  All right.  So do you consume alcohol? |
| 22 Q   And when you say he's a friend of yours, can you expand on | 22 A   Yes. |
| 23   that? | 23 Q   Okay.  But you've never consumed alcohol with Doug Coyle. |
| 24 A   We worked together and while he was here in Kodiak, we -- | 24 A   I can't remember. |
| 25   I went to his place.  He taught me how to cut jewels, | 25 Q   So it's possible you've consumed alcohol with Doug Coyle. |

### Page 14

1  A   Yes.
2      MR. KOZIOL:  Objection to form.
3  Q   But you're saying if you consumed alcohol with Doug Coyle,
4      it was not at any bar.
5  A   Yes.
6  Q   All right.  Do you know if Doug Coyle is Mormon?
7  A   No, I don't.
8  Q   Okay.  And what about the McMann family, are they Mormon?
9  A   I don't know.
10 Q   Don't know?
11 A   Unh-unh.  (Negative)
12 Q   And how close would you describe your friendship with Doug
13     Coyle?  Would you say you were close?
14 A   Yes.
15 Q   Okay.  Now, when you started November of '99, did that
16     first three months starting in November '99, was that when
17     you went to the Sitka Academy.....
18 A   No.
19 Q   .....for training?
20 A   No.
21 Q   When did that occur?
22 A   The academy?
23 Q   Yes.
24 A   Towards the end of 2000.  August, November.
25 Q   Okay.

### Page 15

1  A   No.  September, October, November, approximately.
2  Q   So that began about nine months after your official hire
3      date?
4  A   Correct.  I completed a year at the academy.
5  Q   You did a year at the academy.
6  A   I completed my first year.....
7  Q   Oh, okay.
8  A   .....while I was at the academy.
9  Q   All right.  And the three months on the [sic] training,
10     when did that begin?
11 A   Right after beginning my employment with the city.
12 Q   So you were supervised by field training officers, the
13     ones you've previously named, between November and the end
14     of January of 2000 and then from February of 2000 until
15     September, you began your duties with the Kodiak Police
16     Department without being in the presence of a field
17     training officer?
18 A   I believe so, yes.
19 Q   Okay.  And so from February of 2000 to September of 2000,
20     you operated in that capacity and not having gone to the
21     Sitka Academic; is that right?
22 A   Between February of 2000 and which month?
23 Q   And September.
24 A   Correct.  I believe so.
25 Q   Then you went to the -- all right.  And then you went to

### Page 16

1      the academy September, October, November.  Then you
2      returned in December of 2000?
3  A   December, yes.
4  Q   Okay.  And it would be I think, what, fair to say that for
5      the first three months, you were always in the company of
6      a field training officer when you're doing whatever duties
7      you were assigned?
8  A   Yes.
9  Q   Okay.  Between February of 2000 and September of 2000,
10     were you working patrol?
11 A   Yes.
12 Q   And of course you're not here between September and
13     November of 2000 because you're down in Sitka, right?
14 A   Whenever it started, yes.
15 Q   Okay.  And then when you returned, you returned to patrol?
16 A   Yes.
17 Q   All right.  And you were in the patrol capacity and under
18     the supervision of the sergeant in charge of patrol when
19     you're assigned those duties, right?
20 A   Yes.
21 Q   Okay.  Then in November of 2001, you were notified that
22     you were going to be the school liaison officer, right?
23 A   I'm not sure which date it was.  Was it 2001?
24 Q   You can't look to somebody else for.....
25 A   If you have the paperwork, I can -- okay.

### Page 17

1  Q   .....an answer here.
2  A   Sorry.
3  Q   You got to answer the question.
4  A   I don't -- I can't remember.
5  Q   And those duties began in the beginning of the 2002 school
6      year, right?
7  A   I believe so.
8  Q   And in Kodiak, does the school year begin in August or
9      September?
10 A   I think it varies, end of August, beginning of September.
11 Q   Okay.  So you were in the patrol division after the Sitka
12     Academy without interruption; is that true, between
13     December of 2000 up until you became school liaison
14     officer?
15 A   True.
16 Q   Okay.  And then in your capacity as school liaison officer
17     beginning with the school year of 2002, your primary
18     duties are there, right?
19 A   Correct.
20 Q   And you're no longer assigned to the patrol division,
21     right?
22 A   Correct.
23 Q   And so in that capacity, were you working day shifts?  As
24     school liaison officer, were you working day shifts?
25 A   Yes.

FRANK PETERSON
Vol 1                                          4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

6  (Pages 18 to 21)

Page 18

1  Q  Okay.  And your day would begin at what time?
2  A  Usually 8:00.
3  Q  And end when?
4  A  Usually 4:00.
5  Q  Okay.  And between 8:00 and 4:00, were you essentially
6     always at a school somewhere in the Kodiak School
7     District?
8  A  Essentially, yes.
9  Q  Okay.  How many different schools were you responsible
10    for?
11 A  The high school, the middle school, Main Elementary, and
12    East Elementary.
13 Q  And so -- I'm sorry.  How many elementary schools?
14 A  Two.
15 Q  Two.  So.....
16 A  Correct.
17 Q  .....one high school, one middle school, and two
18    elementary schools.
19 A  Correct.
20 Q  Okay.  And that pretty much consumed your day on a
21    day-to-day basis, did.....
22 A  Yes.
23 Q  All right.  So not very much patrol work, stopping
24    vehicles, traffic enforcement while you're serving in that
25    capacity, right?

Page 19

1  A  Correct.
2  Q  Okay.  And you continue as the school liaison officer and
3     in that capacity up until you are deployed to active
4     military duty, right?
5  A  Yes.
6  Q  Okay.  And that occurs in October of 2004?
7  A  August I believe.
8  Q  Okay.  If documents that have been provided indicate that
9     you went to active military duty in October, would.....
10 A  That's fine.  I thought it was August.
11 Q  Okay.  And during the -- and you were deployed until March
12    of '06?
13 A  Correct.
14 Q  And during that time, you weren't here in Kodiak?
15 A  January, February, March of '06, I was.
16 Q  Okay.  But you weren't working for the Kodiak Police
17    Department?
18 A  No.
19 Q  And the reason for that is what?
20 A  They gave me a certain amount of time before I was done
21    with the military, so I didn't want to get back to work
22    right away.
23 Q  Okay.  They being who?
24 A  The military.
25 Q  Okay.  And of course between August or October of '04 and

Page 20

1     your return in March of '06, no patrol activities, right?
2  A  Correct.
3  Q  And no work as a police officer.
4  A  Correct.
5  Q  All right.  All right.  And then in -- upon your return in
6     March of '06, you returned to your duties as the school
7     liaison officer, right?
8  A  Yes.
9  Q  All right.  And actually that position's usually referred
10    to as the school liaison officer, SLO, and then also the
11    D.A.R.E. officer and DARE's an acronym, D.A.R.E., right?
12 A  Correct.
13 Q  Okay.  And what do those initials stand for?
14 A  Drug Abuse Resistance Education.
15 Q  Okay.  And so from March of '06 until -- well, there were
16    some allegations that arose in September of '06 regarding
17    Jessie McMann, right?
18 A  Yes.
19 Q  Okay.  And so you fulfilled your position as school
20    liaison officer up until those allegations arose, right?
21 A  Yes.
22 Q  Okay.  And in -- those allegations arose on
23    September 15th, '06.  Were you relieved from all duty or
24    just reassigned from the school liaison position?
25 A  During what period of time?

Page 21

1  Q  While the investigation was ongoing.
2  A  Reassigned.
3  Q  Okay.  And you were reassigned to what?  Patrol?
4  A  Investigations.
5  Q  Investigations.  Okay.  And how long did you fulfill the
6     position -- that position?
7  A  Until the Internal Affairs investigation was complete.
8  Q  And how long did that take?
9  A  I can't recall.
10 Q  Okay.  After that investigation was completed, were you
11    then reassigned from investigations to patrol?
12 A  Yes.
13 Q  All right.  And you've been in patrol ever since.
14 A  Yes.
15 Q  Okay.  After that investigation was completed, there were
16    findings made that you had engaged in conduct unbecoming a
17    police officer, right?
18 A  Yes.
19 Q  And you were not only reassigned, but you were demoted,
20    weren't you?
21 A  No.
22 Q  No?  You didn't lose a pay grade or anything like that?
23 A  According to me, that's not considered a demotion.  That's
24    just not receiving an increase.  Demotion would mean, to
25    me, going down a rank, going down a pay grade.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 22

1  Q   Okay. So you didn't lose pay.
2  A   No.
3  Q   Okay. And since not receiving a pay -- that pay increase,
4      have you received any pay increases since that
5      investigation?
6  A   Yes.
7  Q   How many?
8  A   One.
9  Q   So would you agree you've got more experience as a school
10     liaison/D.A.R.E officer than as a patrol officer?
11 A   No.
12 Q   You would agree that you've spent more years in the
13     capacity as a school liaison officer and a D.A.R.E.
14     officer than you have as a patrol officer, would you not?
15     As far as calendar years or months? Yeah?
16 A   I'd have to say I spent more months on patrol than I did
17     in the school liaison responsibilities.
18 Q   Now, you had about nine months where you were unsupervised
19     before going to the academy, right? In the year 2000.
20 A   Okay.
21 Q   And then you had the period of time from 2001 until the
22     summer of 2002, right? So that was about 18 months.
23 A   In December.....
24 Q   When you became school liaison officer.
25 A   In 2002?

Page 23

1  Q   Right.
2  A   Okay.
3  Q   So that's about -- so now we're up to about 27 months in
4      patrol total?
5  A   To today?
6  Q   No.
7  A   Okay.
8  Q   Then -- and then you became school liaison officer in the
9      fall -- in August or September of 2002 and you fulfilled
10     that function until October of '04 when you went active
11     military. So that's 24 months right there. It's 25
12     months, right?
13 A   No. During the summer months, I'd be back on patrol.
14 Q   Okay. So that'd be summer of '03, right, and summer of
15     '04, right?
16 A   Correct.
17 Q   So we'd want to take, what, six months.....
18 A   Correct.
19 Q   .....off there? So that'd be 19 and then you came back
20     active military and worked school liaison from March of
21     '06 to the end of the school year which would have been in
22     June.
23 A   Two months. Beginning of June, end of May. That's when
24     the end of the school year is.
25 Q   So all of March, all of April, all of May. Three months,

Page 24

1      three and a half months, right?
2  A   Correct.
3  Q   Then the school year begins again in.....
4  A   End of August, beginning of September.
5  Q   Okay. So there's four months. So now we're back up to
6      23, 24 months, right?
7  A   Okay.
8  Q   Yes? And -- all right. And then you're removed from that
9      position. Now you've been on patrol since.
10 A   Uh-huh. (Affirmative)
11 Q   Okay. So at this point, you've had more patrol experience
12     than school liaison experience, at the point we're talking
13     about as of today.
14 A   I think so.
15 Q   Okay.
16     MR. HERZ: Could we go off record for a second.
17     (Off record)
18     (On record)
19     REPORTER: All right, we're back on record.
20 Q   And then going back to the date of this incident in
21     January of 03, you had had approximately nine months of
22     patrol experience unsupervised between finishing your
23     field training officer work and going to the academy
24     and -- in February of 2000 up until September of 2000 and
25     you had, as we previously discussed, another -- you had a

Page 25

1      month in December after coming back from the academy,
2      right?
3  A   I believe so.
4  Q   And then from January of '01 to December of '01, right?
5      Of patrol experience?
6  A   Go back 2000 -- December, January, February -- 2001, we
7      got 12 months there.
8  Q   Right.
9  A   Correct?
10 Q   Right.
11 A   2002.....
12 Q   You go from January to September because in September or
13     August, you go back to -- you begin your duties as school
14     liaison officer, right?
15 A   I can't recall. I know I received the D.A.R.E. training
16     in 2002, but I can't remember if I was actually in the
17     schools then.
18 Q   Okay.
19 A   I know initially -- well, the -- it was sporadic.
20 Q   According to the memo circulated, your duties as school
21     liaison officer were supposed to begin beginning of the
22     school year of 2002.
23 A   Okay.
24 Q   All right? So you have about 30, 31 months in patrol
25     experience by the time you start your school liaison work,

FRANK PETERSON
Vol 1
4/1/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

8 (Pages 26 to 29)

## Page 26

1  right?
2  A  Okay.
3  MR. KOZIOL: You wouldn't happen to have -- if you
4  referenced a document, you wouldn't happen to have a page
5  number for the document. I -- satisfied with the page number,
6  just that.....
7  MR. HERZ: You mean the memo that said your duties begin
8  as school liaison officer.....
9  MR. KOZIOL: Yeah. If you have it handy.
10  MR. HERZ: .....the beginning of the school year? Yeah.
11  Hang on a second. I can do that. So Page 13284, it's a memo,
12  Kodiak Police Department Personnel Order 2001-27. To all
13  personnel, date November 9, 2001, subjection SLO/D.A.R.E.
14  officer. One, Officer Frank Peterson's new SLO/D.A.R.E.
15  officer beginning with the 2002-2003 school year.
16  MR. KOZIOL: Thank you.
17  MR. HERZ: Two, Officer Tom Maloney will be reassigned at
18  the end of 2001-2002 school year. Distribution, all personnel,
19  post, and roll call. Signed T.C. Kamai, Chief of Police.
20  Q  Okay. Now, we requested in discovery all the complaints
21  and all the affidavits that you've filed in all DWI cases
22  in the four years preceding January 2003. And we received
23  copies of 5 DWI complaints that you filed in the year
24  2000, 70 DWI complaints you filed in the year 2001, and 12
25  DWI complaints you filed in the year 2002. Does that

## Page 27

1  sound about right to you?
2  A  I don't know.
3  Q  And that'd be a total of 24 DWI complaints you filed in
4  the three years prior to January of 2003 while you were on
5  patrol?
6  A  I don't know.
7  Q  Now, when you were -- well, I mean do you have any reason
8  to suspect that those numbers are incorrect, that.....
9  A  No.
10  Q  .....we've been provided incomplete.....
11  MR. KOZIOL: Let him finish his question.
12  A  Oh.
13  MR. KOZIOL: Wait for a pause and then answer.
14  A  Sorry.
15  Q  Or that we've been provided incomplete information?
16  A  No.
17  Q  Okay. Now, in your training in writing police reports, is
18  the only training that you received in writing a police
19  report at the academy or did you receive any additional
20  training anywhere else?
21  A  No to the first question. At the academy, it wasn't the
22  only place, and then yes, I have received training
23  elsewhere.
24  Q  Okay. And where else have you received training on
25  writing police reports?

## Page 28

1  A  On-the-job training.
2  Q  Okay.
3  A  Field training.
4  Q  All right. And what about affidavits in support of a
5  complaint, you received training in that at the academy?
6  A  Yes.
7  Q  And did you receive -- is that the only place you received
8  training in writing affidavits in support of complaints?
9  A  No.
10  Q  And where else did you receive that kind of training?
11  A  Field training.
12  Q  Okay. In the affidavit in support of a complaint, you
13  understand that the purpose of that is to present probable
14  cause in support of the criminal complaint you're filing?
15  A  Correct.
16  Q  Okay. All right. And a DWI case, you would agree it's
17  important to -- when you're stopping a vehicle, to set
18  forth in the affidavit in support of the complaint the
19  basis for why you're making the stop on the vehicle,
20  right?
21  A  Yes.
22  Q  And that could be speeding, right?
23  A  Yes.
24  Q  Or a headlight out?
25  A  Yes.

## Page 29

1  Q  Or the driver committed some sort of traffic infraction
2  like not using a turn signal when they made a turn, right?
3  A  Yes.
4  Q  It could be that their tags on their license plate on the
5  vehicle are expired.
6  A  Yes.
7  Q  Or that they're not displaying a current tag.
8  A  Yes.
9  Q  And so that would be important to list in the affidavit in
10  support of the complaint why you made the stop on the
11  vehicle, right?
12  A  Yes.
13  Q  Okay. And then it would be important in -- and you agree
14  that there's a difference between receiving a REDDI call,
15  right, and a call regarding reckless driving. There can
16  be a difference.
17  A  Yes.
18  Q  Okay. And just so the record's clear, a REDDI call is
19  what?
20  A  Report Every Drunk Driver Immediately.
21  Q  Okay. And in the case of somebody driving recklessly, it
22  doesn't necessarily mean that they're driving drunk,
23  right?
24  A  Correct.
25  Q  And in the case of a REDDI call, there doesn't have to be

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax      907-243-1473

jpk@gci.net
sahile@gci.net

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

9 (Pages 30 to 33)

## Page 30

1    any indication that the person was driving recklessly.
2  A  I don't understand that.
3  Q  Well, somebody could call in a report of a drunk driver
4    because they saw the person leave a bar and they saw them
5    intoxicated and they saw them get in a car and they could
6    call that in as a drunk driving call, right? A possibly
7    intoxicated driver.  No indication that there was reckless
8    driving there at all, right?
9  A  Yes.
10 Q  Okay.  So you can get a REDDI call without there being any
11    suggestion that somebody drove recklessly, right?
12 A  Yes.
13 Q  Okay.  I want you to take a look at an affidavit you filed
14    in support of a complaint on January 14th, 2000.
15    MR. HERZ:  This is Page 12640, Counsel.  And this is State
16 of Alaska vs. Blaine Briggs.
17    MR. KOZIOL:  Could I see it first then?
18    MR. HERZ:  Sure.
19    MR. KOZIOL:  I didn't bring all the possible documents I
20 could have brought.
21    MR. HERZ:  Why don't you go through the entire notebook.
22 Could we go off record.
23    (Off record)
24    (On record)
25    REPORTER:  All right, we're on record.

## Page 31

1  Q  Before we go back to looking at some of the affidavits you
2    filed in some other DWI cases, I want to go back just for
3    a moment and you indicated -- and talk about your change
4    in your job.  You indicated that you were going to be
5    working eight hours a day for.....
6  A  Correct.
7  Q  And also going to school.
8  A  Yes.
9  Q  Where are you going to be going to school?
10 A  I've applied for admission to the University of Alaska
11    Southeast Distance Education Program.
12 Q  Okay.  And so you'd be doing that work -- the school work
13    while you are still living in Kodiak?
14 A  Correct.
15 Q  And would you be doing that while you're -- during your
16    eight hours while you're working for the company you're
17    going to be employed with.....
18 A  Well.....
19 Q  .....or is that after those eight hours of work are over?
20 A  After the eight hours are over.
21 Q  And how many hours do you think you're going to have to
22    spend per day doing schoolwork?
23 A  I'm not sure.  Two or three.
24 Q  So -- and what about on weekends, do you think you're
25    going to have to be doing schoolwork on weekends too?

## Page 32

1  A  I imagine, but I'm not sure again.
2  Q  So in a -- so realistically you're not really going to be
3    able to spend any more time with your family at all, are
4    you?  In fact you may be spending less time with them.
5  A  No.
6  Q  You don't think so.
7  A  No, I don't.
8  Q  And you're doing this and taking a $12,000 a year pay cut
9    as well.
10 A  Correct.
11 Q  And so you still maintain that the reason you're changing
12    jobs is because you want to spend more time with your
13    family.
14    MR. KOZIOL:  Objection to form.
15 A  Yes.
16 Q  Okay.  Now, we were -- let's return to the affidavits you
17    filed in other DWI cases.  Returning to the Blaine Briggs
18    affidavit that was signed -- notarized on January 14th,
19    2000.  Look at paragraph 1 and what was the basis for the
20    stop that you put down in that affidavit?
21    MR. KOZIOL:  Could you pause for a moment?  Did they -- it
22 didn't look like they copied it in the same order.
23    REPORTER:  What number is that?
24    MR. KOZIOL:  Okay.  All right.  Thank you.
25    REPORTER:  They didn't.....

## Page 33

1    MR. HERZ:  Are we back on record?
2  Q  Have you looked at paragraph 1?
3  A  Yes, I have.
4  Q  What's the basis for the vehicle stop in that case?
5  A  I increased my speed to 40 miles per hour and was able
6    to -- unable to pace the truck.  I increased my speed to
7    44 miles per hour and eventually caught up to the vehicle
8    only after it stopped at the stop sign at Mill Bay Road
9    and Birch Street.
10 Q  So your basis for the stop was excessive speed?
11 A  Correct.
12 Q  Okay.  Okay.  All right.  Now I'm going to ask you to take
13    a look at Page 12611 which is the first page of your
14    police report filed in that case.  Look at the first
15    paragraph.  And you indicate there the basis for your stop
16    is excessive speed, right?
17 A  Correct.
18 Q  Okay.  And no other reasons are given for the stop, right?
19 A  Not in there.
20 Q  Okay.  Okay.  Let's look at the affidavit filed -- there's
21    an affidavit.....
22    REPORTER:  I don't think it's in there.
23    MR. HERZ:  Which one?
24    MR. KOZIOL:  The last one you just.....
25    REPORTER:  12611.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

FRANK PETERSON                    4/1/2008                  BROWN v. PETERSON, et al.,
Vol 1                                                      Case No. 3:05-cv-0002 TMB

10 (Pages 34 to 37)

**Page 34**

1    MR. HERZ: That's from the narrative report. Remember I
2    told you we were just going to -- I was going to give you the
3    notebook. I was going to make reference to the Bates Stamp
4    pages.
5    REPORTER: But did you tell him?
6    MR. KOZIOL: Okay. Matter of courtesy, if you're showing
7    him a document that I don't have, you should give it to me
8    first so I can read it. Okay?
9    REPORTER: Yes, you did tell me.
10   MR. KOZIOL: I thought it was here.
11   MR. HERZ: You've got all the affidavits. If I.....
12   REPORTER: Yeah. This is.....
13   MR. HERZ: If you want, you can look at this notebook.
14   MR. KOZIOL: No. All I ask you to do is before you hand
15   it to the witness -- my witness just show it to me first.
16   MR. HERZ: Okay. Take a look at every tabbed page.
17   MR. KOZIOL: No, I don't want to -- well, I don't want to
18   do it that way. It's not going to take very much time. You're
19   just handing it to me first and I'll hand it to the witness.
20   MR. HERZ: Okay.
21   REPORTER: These are by years? This little book is by
22   years, so this first pocket is the first year which is -- hang
23   on. Let me -- '00, '01, '02, and '03. Okay. That's that
24   little book. Okay. The Bates numbers are on the bottom.....
25   MR. KOZIOL: Okay.

**Page 35**

1    REPORTER: And they should have been copied -- that I said
2    the first year wasn't.
3    MR. HERZ: We're still on record?
4    REPORTER: Yep.
5    MR. HERZ: Okay.
6    Q   Okay. The next affidavit I want to show you is Bates
7        Stamp 12656, Loletta Madrid. It's an affidavit signed by
8        you. It's not notarized. There's no case number. I'm
9        going to ask you to look at paragraph 1.
10   A   Okay.
11   Q   And the basis for your stop was a headlight being out?
12   A   Correct.
13   Q   Okay. I show you Page 12645, first page of your police
14       report.
15   MR. KOZIOL: Are you going to direct him to a particular
16   paragraph you want him to read?
17   Q   First paragraph.
18   MR. KOZIOL: Okay.
19   Q   Basis of the stop as stated in your police report was
20       headlight being out, right?
21   A   Correct.
22   Q   So no other reason given for the stop?
23   A   No.
24   Q   Okay. I'm going to refer you to an affidavit filed in a
25       case State of Alaska vs. Kevin Wade Brennick, Bates Stamp

**Page 36**

1    12671. I'm going to ask you to look at paragraphs 1, 2,
2    and 3 of the affidavit. The basis for the contact, that
3    was not a stop of a vehicle case, was it?
4    A   Do you want me to read the rest of it?
5    Q   No. I just want you to read the first three paragraphs.
6        You didn't stop a vehicle there.
7    A   In the first three paragraphs, no.
8    Q   Okay. You made contact with some individuals because you
9        got a phone call that a vehicle was stuck behind the
10       Safeway parking lot, right?
11   A   Okay.
12   Q   So -- and so you went to the scene to make contact with
13       those individuals, right?
14   A   Correct.
15   Q   That was not a traffic stop case.
16   A   Correct.
17   Q   Okay. And I need to get a page reference. I'm going to
18       show you what's Bates Stamped 12660, first page of your
19       police report from that Kevin Wade Brennick case. Look at
20       the first two paragraphs, please. And your narrative
21       report matches your affidavit you made. The purpose of
22       your contact was because you received a phone call about a
23       truck being stuck in the parking lot and some individuals
24       were seen with open beer containers in their possession,
25       right?

**Page 37**

1    A   I contacted the witnesses, yes.
2    Q   Right. And that was what you put in your.....
3    A   Right. Correct.
4    Q   .....affidavit. That's what.....
5    A   Correct.
6    Q   .....you put in your report. The report matches the
7        affidavit, right?
8    A   Right.
9    Q   No other reasons were given for the contact.
10   A   Of the juveniles?
11   Q   No. Of -- for contacting the drivers.
12   A   I don't know. I didn't -- the juveniles were the ones
13       that I contacted.
14   Q   Well, and after you contacted them, you contacted the
15       drivers.
16   A   Can I read that? Okay.
17   Q   Right?
18   A   Correct.
19   Q   After you made contact with the people who reported the
20       incident, the manager of the Safeway and the juveniles who
21       witnessed what happened, you then contacted the drivers of
22       the stuck vehicle.
23   A   Correct.
24   Q   Okay. And just so we're clear, I'm going to show you
25       again Page 12660, you can look at the third paragraph.

FRANK PETERSON                      4/1/2008              BROWN v. PETERSON, et al.,
Vol 1                                                     Case No. 3:05-cv-0002 TMB

11 (Pages 38 to 41)

Page 38

1    Right. Consistent with your affidavit, right?
2 A  Correct.
3 Q  Contact the manager who made a report, contact the
4    juveniles, then you contacted the drivers, right?
5 A  Correct.
6 Q  Okay. And because that was not a vehicle stop, there was
7    no investigatory detention at the moment you approved the
8    drivers, right? You didn't pull up in your patrol car
9    with your lights flashing.....
10 A I can't remember.
11 Q .....right? Okay. I'm going to show you Bates Stamp
12   number 12690, Roth Rowland Warnecke, affidavit signed by
13   you, notarized July 4, 2000. Okay. Ask that you look at
14   paragraphs 1, 2, and 3.
15 A Okay.
16 Q Reason for the contact is you received a call from the
17   troopers requesting your assistance with somebody who
18   maybe had been driving while intoxicated?
19 A Yes.
20   MR. KOZIOL: Let me just -- the you, you're expanding it
21 to the Kodiak Police Department because it says Kodiak Police
22 Department received the call.
23   MR. HERZ: Well, I'll rephrase.
24 Q Kodiak Police Department received a call. You were
25   dispatched to that call, correct?

Page 39

1 A  Correct.
2 Q  So you responded to a call from the troopers requesting
3    assistance with a person who was -- might have been
4    driving while intoxicated, right?
5 A  Yes.
6 Q  And you went to the post in that case, right?
7 A  Yes.
8 Q  And that was a case where the troopers were investigating
9    a dead body and the defendant was a mortician who was
10   called to the post to assist with the dead body, right?
11 A Yes.
12 Q And there was some question about whether the mortician
13   might be intoxicated or not and the trooper had to do his
14   duties and so he asked you to follow up with the mortician
15   to see if he was intoxicated or not, right?
16 A I imagine.
17 Q I'm going to show you what's Bates Stamped 12676. It's
18   the first page of your narrative report from that case.
19 A Which paragraph?
20 Q Take a look at the first two.
21 A Okay.
22 Q And your report's consistent with your affidavit. The
23   reason you respond is because you went contacted to go to
24   the trooper post to investigate that case, right?
25 A Yes.

Page 40

1 Q  And that again was not a traffic stop case.
2 A  Correct.
3 Q  Right? So presumably you didn't respond with your red and
4    blue lights flashing, right?
5 A  Correct.
6 Q  Okay. I'm going to ask that you take a look at Bates
7    Stamp Page 12710, State of Alaska vs. Amy Peterson. Again
8    this is an affidavit signed you, not notarized, no case
9    number. Take a look at paragraph 1. That was a traffic
10   stop case, right?
11 A Yes.
12 Q And the reasonable suspicion for making an investigatory
13   detention was that she rolled through a stop sign, right?
14 A Partially, yes.
15 Q And what else?
16 A She entered my road -- my side of the roadway.
17 Q Okay. So she crossed over -- out of her appropriate
18   traffic lane.....
19 A Correct.
20 Q .....into the wrong lane of traffic, right? And both of
21   those can give you reasonable suspicion to conduct an
22   investigatory stop on a vehicle, right?
23 A Yes.
24 Q And you listed both of those in paragraph 1, right?
25 A Yes.

Page 41

1 Q  Okay. I'm going to show you what's been Bates Stamped as
2    12694, first page of your narrative police report for the
3    Amy Peterson case, and take a look at the first two
4    paragraphs. And the narrative report again is consistent
5    with your affidavit, right?
6 A  Yes.
7 Q  And no other reasons are given for the traffic stop in
8    that case, right?
9 A  No.
10 Q Okay. All right. Now, turning to year 2001 -- those were
11   all the cases in 2000 -- I'm going to ask you to take a
12   look at the affidavit you filed in State of Alaska versus
13   Quinten Reed. This is an affidavit signed by you, Bates
14   Stamped number 12850, notarized October 24, 2001. I'm
15   going to ask that you take a look at paragraph 1 of the
16   affidavit. And the basis of the -- that was a traffic
17   stop case, right?
18 A Yes.
19 Q And the basis for the traffic stop was excessive speed
20   again?
21 A Yes.
22 Q All right. And so that gave you reasonable suspicion to
23   conduct an investigatory detention, right?
24 A Yes.
25 Q All right. And I'm going to show you Bates Stamp number

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

12 (Pages 42 to 45)

Page 42

1   12386 and ask that you look at paragraphs 1 and 2. And
2   again your narrative report's consistent with your
3   affidavit, right?
4   A   Correct.
5   Q   Basis for the stop was excessive speed?
6   A   Correct.
7   Q   And based on that, you made a traffic stop. You turned on
8   your overhead lights, made an investigatory detention,
9   right?
10  A   Yes.
11  Q   Okay. No other reasons were given for the stop.
12  A   No.
13  Q   Okay. I'm going to show you an affidavit you filed in
14  State vs. Francisco, affidavit signed by you, again no
15  case number, no notarization date. It's Bates Stamp
16  number 12750, and ask that you look at paragraph 1. That
17  was a traffic stop case, right?
18  A   Correct.
19  Q   And it's 4:05 in the morning on June 9th and the reason
20  for the traffic stop was no illuminated headlights, right?
21  A   Yes.
22  Q   And that gave you reasonable suspicion to conduct an
23  investigatory detention, right?
24  A   Yes.
25  Q   And no other reasons were given for the detention.

Page 43

1   A   Correct.
2   Q   I'm going to ask you to look at Bates Stamp number 12735,
3   first page of your narrative report from that --
4   Mr. Francisco's case, and ask that you look at the first
5   paragraph of your report. And the report's consistent
6   with your affidavit, right?
7   A   Yes.
8   Q   Basis for the stop was headlights not being illuminated.
9   A   Correct.
10  Q   Right? And no other reasons were given for the stop,
11  correct?
12  A   Correct.
13  Q   All right. I'm going to ask that you look at another
14  affidavit filed in the case of Andres Indi Jauregui -- I
15  don't know if I'm pronouncing that correctly, but it's an
16  affidavit filed by you, notarized on April 14, 2001, Bates
17  Stamp number 12730, and ask that you look at the first
18  three paragraphs of your affidavit. That was a traffic
19  stop case, right?
20  A   Correct.
21  Q   Now, that was a case where a caller called the Kodiak
22  Police Department and provided a license plate number
23  reporting that a dark green 1979 model pickup truck almost
24  ran the caller off the road and several other vehicles as
25  well, right?

Page 44

1   A   Yes.
2   Q   And you indicated that while you were stopped at Birch
3   Street you saw a green pickup with that license plate
4   stopped at the intersection and the caller had also
5   identified that the driver looked to Hispanic. You saw a
6   driver that looked to be Hispanic. The caller had
7   indicated the passenger was white. You saw a passenger
8   that was white, right?
9   A   Correct.
10  Q   And you turned around and followed the vehicle, right?
11  A   I can't recall. Is that what I said?
12  Q   End of paragraph 2.
13  A   Okay. Correct.
14  Q   But you didn't activate your overhead lights at that
15  point. Right?
16  A   I don't know. I'm not sure.
17  Q   You also indicate that you received information from
18  dispatch that that vehicle with that license plate had
19  expired tags as of April 1999.
20  A   Correct.
21  Q   And you indicate at that point you stopped the vehicle.
22  A   Correct.
23  Q   Okay. I'm going to show you what's been Bates Stamped as
24  12714, the first page of your narrative report from that
25  same case. Going to ask that you look at paragraphs 1, 2,

Page 45

1   3, and 4.
2   A   Okay.
3   Q   And the information you provide in your narrative is that
4   you had report of again a vehicle that had almost run
5   somebody off the road and you also had information that
6   the plates were expired. Same reasons that you put in
7   your affidavit.
8   A   Correct.
9   Q   Right? No other reasons were given for the stop.
10  A   No.
11  Q   And in this case, what you indicated is after you received
12  the report from dispatch that the plates were expired, you
13  indicated, quote, I had my probably [sic] cause to stop
14  the vehicle but continued to follow for a short time to
15  observe, but I didn't want to observe too long because of
16  the initial report that I received and then I stopped the
17  vehicle. So after you got the report of the expired tags,
18  you felt like you had enough to stop the vehicle.
19  A   Yes.
20  Q   Okay. And no other reasons were given for stopping the
21  vehicle in that case.
22  A   Correct.
23  Q   Okay. All right. I'm going to show you an affidavit,
24  State of Alaska vs. Diaz, again affidavit signed by you,
25  no notarization date, no case number, Bates Stamp 12771.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

FRANK PETERSON
Vol 1
     4/1/2008     BROWN v. PETERSON, et al.,
                         Case No. 3:05-cv-0002 TMB

13 (Pages 46 to 49)

### Page 46

1  I'm going to ask that you look at paragraphs 1 and 2 and
2  3.
3 A Okay.
4 Q That was a traffic stop case, right?
5 A Correct.
6 Q And you had received a REDDI report?
7 A Yes.
8 Q And you were also stopped by some citizen on the road who
9  flashed their lights at you and indicated that there was a
10  vehicle that was all over the road, gave you the license
11  plate number that matched the license plate number on the
12  REDDI call, right?
13 A Yes.
14 Q And you then saw the vehicle matching the REDDI report and
15  when you caught up to it, turned on your lights, made an
16  investigatory detention, right?
17 A Yes.
18 Q And your reasonable suspicion in that case was the REDDI
19  report.
20 A I think it was against the wall as well, causing damage.
21 Q But you didn't know that until you approached the wall,
22  right?
23 A I said I turned on my lights so I'd prevent him from
24  causing any more damage to the vehicle -- or the building.
25  I apologize. Correct? Correct me if I'm wrong.

### Page 47

1 Q I turned on my lights in order to halt whatever the driver
2  of the vehicle was doing, to prevent any further damage to
3  the vehicle. So that's why you turned on your lights, no
4  because you got a REDDI report?
5 A Correct.
6 Q Okay. So your reasonable suspicion for contacting the
7  driver was he was damaging a vehicle?
8 A Correct.
9 Q Okay. All right. Okay. I'm going to show you the first
10  page of your narrative report, Bates Stamp number 12755.
11  I'm going to ask that you look at the first three
12  paragraphs. Okay. And again your narrative report
13  matches your affidavit, right?
14 A Yes.
15 Q And you'd received a REDDI call?
16 A Yes.
17 Q You'd been flagged down by a motorist who observed bad
18  driving?
19 A Yes.
20 Q Right? You saw the vehicle up against the wall?
21 A Yes.
22 Q Right? And so -- and even though your testimony is that
23  your investigatory detention was your concern about the
24  driver doing damage to the building, because you had
25  received a REDDI call, that was information you had, you

### Page 48

1  listed it in your affidavit and you listed it in your
2  report, right?
3 A Correct.
4 Q Okay. And there were no other reasons for -- that were
5  listed in either your affidavit or your report for making
6  contact with this vehicle.
7 A Correct.
8 Q Okay. And all the reasons for contacting the vehicle were
9  listed in both your affidavit and your report, right?
10 A Correct.
11 Q Okay. Okay. I'm going to show you an affidavit filed in
12  State of Alaska versus Malutin, Bates Stamp 12792,
13  affidavit signed by you, notarized 1 July 2001. I'm going
14  to ask that you look at paragraphs 1 and the first
15  sentence of 2. And the basis for -- this again was a
16  traffic stop, right?
17 A Correct.
18 Q Basis of the stop was you had information that the driver
19  didn't have a valid license, right?
20 A Correct.
21 Q And so you had reasonable suspicion to conduct an
22  investigatory detention based on that reason, right?
23 A Correct.
24 Q Okay. And I'm going to show you the first page of your
25  narrative report, Page 12778 Bates Stamp, ask that you

### Page 49

1  look at the first two paragraphs. And the information
2  again is consistent with the information in your
3  affidavit, right?
4 A Yes.
5 Q Reason for the contact was because you'd received
6  information the license was expired or revoked. That's
7  why you made your investigatory detention and contacted
8  the driver, right?
9 A Revoked, yes.
10 Q And that was your reasonable suspicion for making the
11  detention, right?
12 A Yes.
13 Q And no other reasons were provided in the affidavit or in
14  the report, right?
15 A Correct.
16 Q And there were no other reasons for making the contact.
17 A Correct.
18 Q All right. All right. I'm going to ask that you take a
19  look at an affidavit you filed in the State of Alaska vs.
20  Musson, William James Musson, III, Bates Stamp number
21  12865, affidavit signed by you, no case number, notary
22  date October 27, 2001, and ask that you take a look at the
23  first paragraph. All right. In this case, you received
24  information about some juveniles at McDonald's who might
25  be intoxicated?

FRANK PETERSON
Vol 1                                    4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

14  (Pages 50 to 53)

Page 50

1  A   Is that what it said?  Correct.
2  Q   Okay.  And you indicate you responded to the parking lot
3      and saw that there was a car facing backward in the
4      drive-through.
5  A   Correct.
6  Q   You indicate you approached the vehicle and recognized the
7      passenger, recognized the driver, and contacted the driver
8      at that point, right?
9  A   Is that in the second paragraph?  Correct.
10 Q   Okay.  I'm going to ask that you take a look at the first
11     two paragraphs of your narrative report, Bates Stamp
12     number 12858.  Okay.  Now, just to go back to your
13     affidavit, your affidavit indicates that you had a report
14     that there were some intoxicated juveniles at McDonald's,
15     but it doesn't indicate that they were driving, right?
16     Not in your affidavit.
17 A   Correct.
18 Q   Okay.  And so you didn't have based on that dispatch
19     reasonable suspicion to stop a car.  You were looking for
20     some intoxicated juveniles, based on the information
21     provided in your affidavit, correct?
22 A   Yes.
23 Q   And when you saw the vehicle backwards in the
24     drive-through, you didn't have any reason when you first
25     saw it to necessarily believe that the report of the

Page 51

1      intoxicated juveniles had anything to do with the vehicle
2      that was backwards in the drive-through.
3  A   Not necessarily.
4  Q   Okay.  But maybe.
5  A   No.  No.  Not necessarily.  In talking to Dan Greene, he
6      was the officer that I was talking to, there was a reason
7      that I went over there and I imagine he would have told
8      me.  I might not have written it in the affidavit, but --
9      I don't know.
10 Q   Dan Greene?
11     MR. KOZIOL:  He was not shown the police report yet in
12 this case, have you?
13     MR. HERZ:  Yeah, I have, but I'm just.....
14     MR. KOZIOL:  Oh, okay.
15     MR. HERZ:  I'm asking about -- okay.
16 Q   You looked at the first two paragraphs here, right?
17 A   Correct.
18 Q   Okay.  There's nothing in there about contact with Dan
19     Greene.
20 A   Correct.
21 Q   Okay.  And nothing in there that indicated that the
22     intoxicated juveniles were also -- had been driving or
23     were parked backwards at the drive-through, right?
24 A   It says I received information about juveniles at
25     McDonald's who were intoxicated.  I responded to

Page 52

1      McDonald's parking lot and saw that there was a blue
2      Pontiac bearing Alaska license CEU64, facing backwards in
3      McDonald's drive-through.
4  Q   Right.  So you don't indicate you had contact with Dan
5      Greene.....
6  A   Right.
7  Q   .....just that you received information and it doesn't say
8      that when you received the information, you had
9      information about a car that was parked backwards.  You
10     knew the car was parked backwards after you responded.
11 A   Correct.
12 Q   Okay.  Now, in referring to Bates Stamp number 12858, you
13     indicate that -- and you just read those.  You indicate
14     that you were talking with Kodiak Police Officer Dan
15     Greene who was not working at the time and he indicated he
16     had just been in McDonald's and his daughter pointed out
17     some kids who appeared to be intoxicated.  So he didn't
18     indicate that he had seen any intoxicated juveniles
19     driving, just that there were some intoxicated juveniles,
20     right?
21 A   Okay.
22 Q   Is that right?
23 A   According to the report, yes.
24 Q   Okay.  And so -- and of course juveniles aren't allowed to
25     drink, right?

Page 53

1  A   Correct.
2  Q   Okay.  So you're going there to make contact with some
3      potentially intoxicated juveniles and to investigate that
4      case.  That's the reason you're going to the scene, right?
5  A   Correct.
6  Q   All right.  And it's only after you get to the scene that
7      you see a vehicle parked backwards in the drive-through.
8  A   Correct.
9  Q   All right.  And you don't yet know when you see that
10     whether that vehicle has anything to do with the
11     intoxicated juveniles you're looking for at that point.
12     You don't have any reason to associate those two yet.
13 A   Correct.
14 Q   Okay.  And what you write is I park my vehicle in the
15     parking lot and I approach the vehicle on foot.  So it
16     would be fair to say that's -- you don't have your red,
17     white, blue lights on.  You're not making an investigatory
18     detention.  You're approaching the vehicle on foot.
19 A   Yes.
20 Q   Okay.  All right.  But your affidavit and your narrative
21     report are consistent.  They both indicate that you were
22     responding to a call about intoxicated juveniles not a
23     traffic stop.
24 A   Yes.
25 Q   Correct?  All right.  All right.  I'm going to ask you to

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

15  (Pages 54 to 57)

Page 54

1    turn your attention to an affidavit in State of Alaska vs.
2    Briggs, no case number.  It is signed by you, notarized
3    date of July 21, 2001, Bates Stamp number 12817.
4       MR. KOZIOL:  16 and 17, right?
5       MR. HERZ:  12 -- yeah.  12816 and 12817, correct.
6    Q   And I'm going to ask that you look at paragraphs 1, 2, and
7        3.  In this case, you do conduct a traffic stop,
8        right?
9    A   Correct.
10   Q   And the -- you had received a report, Kodiak Police
11       Department had received a call regarding a white vehicle
12       driving recklessly, right?
13   A   Correct.
14   Q   And then you were also in addition to that stopped by a
15       taxicab driver saying that he was almost hit by a vehicle
16       that matched the description of a white vehicle driving
17       recklessly, right?
18   A   Yes.
19   Q   Okay.  And then you observed a white four-door vehicle
20       drive through a stoplight without stopping, correct?
21   A   Yes.
22   Q   And so you conducted a traffic stop.
23   A   Yes.
24   Q   And so the reasonable -- your reasonable suspicion for
25       conducting an investigatory detention was the vehicle

Page 55

1    running the stop sign.
2    A   Yes.
3    Q   But you also had information of the vehicle driving
4        recklessly.
5    A   Yes.
6    Q   And of course driving through a stop sign could also be
7        construed as driving recklessly, right?
8    A   Okay.
9    Q   That's not always true, is it?
10   A   No, not necessarily.
11   Q   Okay.  But anyhow, so you had two kinds of information,
12       one, a vehicle driving recklessly and also you personally
13       observed the vehicle drive through a stop sign.
14   A   Yes.
15   Q   And so you certainly could stop the vehicle for driving
16       through the stop sign.
17   A   Yes.
18   Q   For that traffic infraction.  Okay.  And -- all right.
19       So -- and so you gave those two -- at least that
20       information's in there to support your purpose of
21       conducting the investigatory detention, right?
22   A   Yes.
23   Q   All right.  I'm going to show you your narrative report,
24       12799.  Ask that you take a look at first two paragraphs.
25       All right.  And your narrative report matches your

Page 56

1    affidavit, right?
2    A   Yes.
3    Q   And you got a report of a reckless driver and then you
4        observed -- you also had contact with somebody who also
5        indicated that the car was driving recklessly.
6    A   Yes.
7    Q   And you observed a car that matches the description go
8        through a stop sign and so you conduct a traffic stop.
9    A   Yes.
10   Q   All the same reasons put in your affidavit, right?
11   A   Yes.
12   Q   No other reasons provided in the affidavit or in the
13       narrative report, right?
14   A   Correct.
15   Q   And no other reasons were left out, right?
16   A   Correct.
17   Q   Okay.  Those are all the cases from 2001, so we'll now
18       turn to the cases in 2002.  This is an affidavit, Robert
19       James Reddick, signed by -- affidavit signed by you, no
20       case number, no notarization date, and ask that you take a
21       look at paragraphs 1 and 2 and the first sentence in
22       paragraph 3.  In this case in your affidavit, you
23       indicate that the Kodiak Police Department received a call
24       that there was a vehicle in the ditch, right?
25   A   Correct.

Page 57

1    Q   And as you were responding to the scene, you stopped the
2        vehicle to see if it -- which was driving to see if that was
3        the vehicle that had been stuck, right?
4    A   Is that what it says?
5    Q   Well, you just read the affidavit.  I'm asking you.
6    A   I'm sorry.
7       MR. KOZIOL:  I'm going to object as to argumentative.
8    A   No.  The vehicle wasn't moving, it says.
9    Q   I responded to the scene and saw a vehicle and stopped to
10       determine if that was the one stuck.
11   A   Correct.  I stopped.
12   Q   You stopped.
13   A   Correct.
14   Q   Okay.  So is it clear or not clear to you whether the
15       other vehicle was moving or not?
16   A   Which vehicle?
17   Q   The vehicle that -- you -- well.....
18   A   The lady I contacted?
19   Q   You contacted the driver.  Is it clear to you in your
20       affidavit whether she was moving when you stopped?
21   A   No.
22   Q   It's not clear to you.
23   A   Not clear.
24   Q   Okay.  But you contacted a driver and she said that she's
25       the one who called the police, right?

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

16 (Pages 58 to 61)

## Page 58

1   A   Correct.
2   Q   All right. And at that point, you now were receiving
3        information from her that the individuals in the stuck
4        vehicle were intoxicated, right?
5   A   Okay. Correct.
6   Q   Okay. And so you then proceed on -- and she indicates
7        that she saw the passenger in the vehicle with a can of
8        beer. So you then proceed on and make contact with the
9        driver of the stuck vehicle.
10  A   Correct.
11  Q   Right? Okay. And so you've provided in your affidavit
12       the reasons for your contact with the driver of the
13       vehicle, right -- for making contact with them.
14  A   Correct.
15  Q   Okay. All right. Now, let me show you Bates Stamp number
16       12895, first page of your narrative. Take a look at the
17       first two paragraphs of your report.
18  A   Okay.
19  Q   All right. So Kodiak Police Department received an
20       anonymous call about a vehicle stuck, right?
21  A   Correct.
22  Q   And you responded to the scene and halfway there you saw a
23       truck coming down -- vehicle -- you saw a vehicle moving.
24  A   Correct.
25  Q   Okay. So now from your narrative report, it's clear that

## Page 59

1        you're contacting a moving vehicle not a stuck vehicle,
2        right?
3   A   Yeah, it's not stuck.
4   Q   Right. And not stuck and moving. Not just parked, right?
5        You saw a truck coming down.
6   A   Correct.
7   Q   Okay. And you contacted the driver of that vehicle and
8        she indicated that she contacted the police, that she had
9        observed a vehicle in a ditch and she thought that the men
10       were intoxicated, right?
11  A   Correct.
12  Q   So now you have information alcohol was involved, right?
13  A   Correct.
14  Q   And you included that information both in your affidavit
15       and in the report, that there was this possibility of
16       alcohol involvement, didn't you?
17  A   Correct.
18  Q   Okay. And then so you proceeded on and made contact with
19       the vehicle, right?
20  A   Correct.
21  Q   Okay. And so again the reasons for the contact are in the
22       affidavit and in the report and they're consistent, right?
23  A   Correct.
24  Q   And no other reasons were provided in either document and
25       no reasons were left out, correct?

## Page 60

1   A   Correct.
2   Q   Okay. Affidavit, State of Alaska vs. James Bennett,
3        affidavit signed by you, no notary date, no case number.
4        Ask that you take a look at paragraph 1.
5   A   Okay.
6   Q   And.....
7        MR. KOZIOL: What's the Bates Stamp on that?
8        MR. HERZ: 12917.
9   Q   Now, this wasn't a traffic stop. You were called to --
10       you were informed by -- somebody had called Kodiak Police
11       Department requesting assistance because they wanted
12       somebody criminally trespassed from their property.....
13  A   Correct.
14  Q   .....right? So not involving a traffic stop.
15  A   Not that I know of from what I recall.
16  Q   Okay. All right. And I'm just going to show you Bates
17       Stamp number 12909 -- but I mean again the reason for
18       contacting the person in this case who ultimately you
19       determined was the driver was provided in the affidavit.
20  A   So there was a traffic stop?
21  Q   Right? No. I'm saying the reason you contacted this
22       person who you ultimately determined to be a driver.....
23  A   Okay.
24  Q   .....is provided in the affidavit.....
25  A   Correct.

## Page 61

1   Q   .....right?
2   A   Correct.
3   Q   The reason you made contact is because you had been
4        dispatched because somebody wanted assistance with
5        criminally trespassing somebody.
6   A   Correct.
7   Q   So the reason for the contact is provided.
8   A   Correct.
9   Q   Okay. And now I'm going to show you Page 12909 which is
10       the first page of your narrative report and ask that you
11       take a look at paragraphs 1 and 2 -- oh, I'm sorry. Okay.
12       Narrative report's consistent with your affidavit, right?
13  A   Correct.
14  Q   Reason for the contact is because you were dispatched to
15       make contact with the complaining person who wanted to
16       criminally trespass somebody, right?
17  A   Correct.
18  Q   And that is the reason for your contact, right?
19  A   Correct.
20  Q   Listed both in the affidavit and in the narrative report,
21       right?
22  A   Correct.
23  Q   No other reasons for the contact were listed in either
24       document.
25  A   Correct.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax      907-243-1473

jpk@gci.net
sahile@gci.net

FRANK PETERSON                              4/1/2008
Vol 1                                                      BROWN v. PETERSON, et al.,
                                                           Case No. 3:05-cv-0002 TMB

17 (Pages 62 to 65)

### Page 62

1 Q  And no other reasons exist, right?
2 A  Correct.
3 Q  All right.
4     MR. KOZIOL:  We're about 11:00 o'clock.  Could we take
5 another break?
6     MR. HERZ:  Sure.
7     MR. KOZIOL:  Every hour would be helpful.
8     (Off record)
9     (On record)
10 Q  All right.  Continuing on with 2002, I'm going to show you
11    an affidavit, State of Alaska vs. Hayes, affidavit signed
12    by you, not notarized, no notary date, no case number.
13    Going to ask that you look at the first paragraph of the
14    affidavit.
15 A  Okay.
16 Q  Bates Stamp number 12942.  This is a traffic stop case,
17    right?
18 A  Correct.
19 Q  And reasonable suspicion for the stop was?
20 A  Speed.
21 Q  Speed.  Right.  Exactly.  And so based on the vehicle
22    traveling at an excessive speed, you stopped the driver,
23    right?
24 A  Correct.
25 Q  Okay.  And no other reason provided for contact with the

### Page 63

1     driver in the affidavit, correct?
2 A  Yes.
3 Q  All right.  Going to show you Bates Stamp Page 12928, a --
4     your first page from the narrative report in that case,
5     the Hayes case, and ask that you take a look at the first
6     paragraph.  And the narrative report's consistent with
7     your affidavit, correct?
8 A  Correct.
9 Q  Reason for the stop listed in your narrative report is
10    excessive speed, right?
11 A  Correct.
12 Q  And no other reasons given in either the affidavit or in
13    the report, right?
14 A  Correct.
15 Q  And no reasons left out, right?
16 A  Correct.
17 Q  Okay.  Going to turn your attention to the next affidavit,
18    State of Alaska vs. Johnson, Bates Stamp 12957.  This is
19    an affidavit signed by you, notarized July 26, '02, and no
20    case number and -- I'm sorry.  That's the second page of
21    the Johnson affidavit.  Strike that, please.  Next
22    affidavit actually is Chris Cutler, Bates Stamp
23    number 12976, affidavit signed by you, notarized 18 August
24    2002, and I'm going to ask that you take a look at
25    paragraph 1.  Oh, I'm sorry.  Did we go -- strike that

### Page 64

1     again.  I'm -- I've got -- I flipped a page inadvertently.
2     I do want to go back to Janet Johnson which is the next
3     affidavit after Hayes and it's Bates Stamp number 12956,
4     and it is an affidavit that was notarized -- signed by you
5     and notarized July 26, 2002, no case number.  And I do
6     want you to look at the first two paragraphs.
7     MR. KOZIOL:  Just for completeness, Mr. Herz, it's --
8     the affidavit is 12956 and 19957.
9     MR. HERZ:  That's correct.
10 Q  And I want you to look at the first two paragraphs of
11    that.  All right.  Now, in this case, the Johnson case,
12    you indicate that the Kodiak Police Department received a
13    call of a vehicle being operated by an intoxicated female,
14    right?
15 A  Correct.
16 Q  Okay.  Now, you don't refer to it as a REDDI call, but you
17    do indicate that the report is that the driver is
18    intoxicated; is that right?
19 A  Correct.
20 Q  Okay.  And so that's included in the affidavit, right?
21 A  Correct.
22 Q  And the reporter -- the caller who's reporting this
23    indicates where the vehicle's leaving, which direction
24    it's heading, and gives a general description of the
25    vehicle being a silver GMC pickup, right?  Paragraph 1.

### Page 65

1 A  Correct.
2 Q  All right.  Then you indicate in paragraph 2 -- excuse
3     me -- that you saw a silver GMC pickup, you followed it,
4     and you saw it cross the double yellow line and pass a
5     vehicle in the no passing zone.  You saw one of the
6     vehicles take evasive action and you conducted your
7     traffic stop, right?
8 A  Correct.
9 Q  Okay.  And so the -- so you observe a number of traffic
10    violations personally, right?
11 A  Correct.
12 Q  Which formed your basis for conducting an investigatory
13    detention in this case, right?
14 A  Correct.
15 Q  And you also had the report of an intoxicated driver.
16 A  Correct.
17 Q  And you listed both of those things in your affidavit.
18 A  Correct.
19 Q  And those -- again as we discussed earlier at the very
20    beginning, you put in the affidavit the reasons you're
21    making contact with the driver to justify your
22    investigatory detention.  That's what you include in the
23    affidavit, right?
24 A  Correct.
25 Q  All right.  So I'm now going to ask you to take a look at

FRANK PETERSON
Vol 1                              4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

18 (Pages 66 to 69)

Page 66

1    Bates Stamp page number 12950, first page of your
2    narrative report in the Johnson case.
3  A    Which paragraphs?
4  Q    I think it's the first two, but just let.....
5  A    Okay.
6  Q    .....me double-check. First three.
7  A    Okay.
8  Q    Okay. And again your narrative report's consistent with
9    your affidavit, right?
10 A    Correct.
11 Q    You provide in the narrative report that you received --
12    that the police department received a report of --
13    anonymous caller reporting a drunk driver, right?
14 A    Correct.
15 Q    So again even though you didn't refer to it specifically
16    as a REDDI call, you did indicate that there was
17    information -- a call about a drunk driver.
18 A    Correct.
19 Q    And you also indicate that you personally observed the
20    vehicle cross the double yellow line and.....
21    MR. HERZ: Can we go off record.
22    (Off record)
23    (On record)
24    REPORTER: Okay. We're back on record. I wanted to note
25 for the record that I changed the videotapes. This is the

Page 67

1  second tape in the videotaped deposition of Officer Peterson.
2    MR. HERZ: Thank you.
3  Q    So I was asking you to take a look at Bates Stamp
4    Page 12950, ask that you take a look at the first three
5    paragraphs of your narrative report and we were discussing
6    that. And just to recap, you had indicated in the report
7    that -- that the report was consistent with your
8    affidavit, that you had included the information that
9    you'd received a report of a drunk driver. Even though it
10    wasn't specifically referred to as a REDDI call, you did
11    include the information that the police department had
12    gotten a report of a drunk driver, right?
13 A    Correct.
14 Q    And that you'd personally observed that vehicle cross the
15    double yellow line and also force another vehicle to take
16    evasive action, right?
17 A    No. When you say that vehicle, my report indicates that I
18    was unsure if the vehicle I saw was the vehicle reported
19    leaving Elks.
20 Q    Well, the -- right. The report was that there was a
21    silver GMC pickup truck.
22 A    Correct. And I was behind a Yukon that had a -- the
23    report indicates to me that there's some confusion there,
24    not knowing if that's the vehicle that actually the Elks.
25 Q    Okay. So -- and in fact you had recontacted dispatch and

Page 68

1    asked if the vehicle was a pickup truck and if so did the
2    vehicle have a camper on the back.
3  A    Correct.
4  Q    Right? Thinking that maybe there was some confusion.....
5  A    They might have gotten it -- correct.
6  Q    .....about the covered portion of the SUV.
7  A    Correct.
8  Q    Okay. And so -- but in any event, you continue to follow
9    this GMC Yukon that was silver, right?
10 A    Correct.
11 Q    And then you observed this Yukon cross the double yellow
12    line and also force another vehicle to take evasive
13    action.
14 A    Correct.
15 Q    All right. And so based on your observations of the
16    driver crossing the double yellow line and forcing another
17    vehicle to take evasive action, that provided you a
18    reasonable suspicion for conducting an investigatory
19    detention, stopping that vehicle.
20 A    Correct.
21 Q    Right? Whether it -- whether this was the vehicle that
22    was called in or not, right?
23 A    Correct.
24 Q    Okay. But in any event, the narrative report is
25    consistent with the affidavit, right?

Page 69

1  A    Correct.
2  Q    You provide the information that there was a report of
3    drunk driver and you provide the information about the
4    vehicle you observed crossing the double yellow line and
5    forcing another vehicle to take evasive action, right?
6  A    Correct.
7  Q    And same reasons in the report as in the affidavit, right?
8  A    Correct.
9  Q    No other reasons given.
10 A    Correct.
11 Q    And no other reasons left out, right?
12 A    As far as I know.
13 Q    Okay. All right. Next affidavit I want you to take a
14    look at now is the Cutler affidavit at 12976, affidavit
15    signed by you, dated 18 August 2002, and ask that you take
16    a look at the first paragraph.
17 A    Okay.
18 Q    This is a traffic stop, right?
19 A    Correct.
20 Q    Based on?
21 A    Speed.
22 Q    Right. So the reasonable suspicion for conducting the
23    investigatory detention was stated in the affidavit, that
24    being excessive speed, right?
25 A    Correct.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Page 70

1  Q   And so -- and it was based on that you contacted the
2      driver, right?
3  A   Correct.
4  Q   Okay. So now I'm going to ask that you take a look at
5      Bates Stamp Page 12967, first page of your narrative in
6      Cutler.
7  A   First paragraph only?
8  Q   Right.
9  A   Okay.
10 Q   Are you done with that?
11 A   Yes.
12 Q   And the narrative report's consistent with the affidavit,
13     right?
14 A   Correct.
15 Q   You list the fact that you observed a vehicle speeding,
16     you locked it on your radar and that was the basis for
17     your stop.
18 A   Speed, correct.
19 Q   Right. Consistent with the affidavit.
20 A   Correct.
21 Q   Right? No other reasons given in the affidavit, no other
22     reasons given in the narrative of your report, right?
23 A   Correct.
24 Q   And no reasons left out, right?
25 A   As I can recall, yes.

Page 71

1  Q   All right. Next affidavit I want you to look at is State
2      vs. Kuiler, affidavit signed by you, notarized 26 August
3      2002, Bates Stamp 12995, no case number. Ask that you
4      look at paragraphs 1 and 2.
5  A   Okay.
6  Q   Okay. All right. In this affidavit, you indicate that
7      the Kodiak Police Department received a call regarding
8      somebody passed out behind the wheel of a parked car with
9      the engine running, right?
10 A   Correct.
11 Q   And also that someone was passed out on the ground next to
12     the vehicle, right?
13 A   Correct.
14 Q   All right. And so you locate the vehicle. You note the
15     engine's running and the parking lights are on. You saw a
16     person in the driver's seat. And so you make contact with
17     the driver.
18 A   Correct.
19 Q   All right. And so -- and again this -- you provide a
20     basis for why you're making contact with the driver in the
21     report, right?
22 A   Correct.
23 Q   All right. And this could be the person needs emergency
24     help or -- you don't know what's going on, do you?
25 A   Correct.

Page 72

1  Q   All right. Could be an intoxicated driver. You don't
2      know.
3  A   Correct.
4  Q   All right. But that's the basis for your contact, right?
5  A   Correct.
6  Q   And no other reasons are given for the contact,
7  A   No.
8  Q   And no other reasons were left out, right?
9  A   As far as I can recall, yes.
10 Q   Well, that's the third time you've said that. Are you
11     saying that in all these cases, you......
12 A   I'm going to, yes, because when you ask that, I don't know
13     if there's something that I haven't put in there.
14 Q   So in all 30 of these cases, you're going to indicate that
15     it's possible you've left out reasons for making contact
16     with the driver? You didn't list it in your affidavit and
17     you didn't list it in your report. Is that going to be
18     your testimony?
19 A   Yes.
20 Q   So your testimony's going to be that in every single case
21     where you conduct a DWI investigation that it's possible
22     that in every single affidavit that you signed under oath
23     you may have left out important information for the
24     reasons related to the stopping of your vehicle that
25     you're making contact with?

Page 73

1  A   To the best of my recollection, yes. As far as I can
2      remember. I don't know if there's something else that was
3      out there that I didn't put in there.
4  Q   And you're testifying that it's also possible that in all
5      30 cases where you produced a narrative police report that
6      not only did you potentially leave out important
7      information in the affidavit in support of the complaint
8      in each of those cases, you may have left out important
9      information in each one of the narrative reports that went
10     along with those cases? Is that what your testimony's
11     going to be?
12 A   It's possible. Not in every single one, but it's possible
13     that I left some information out in some of the reports.
14 Q   Relay it -- for the reasons for your stop and the reason
15     for contacting the driver.
16 A   Relay it? What's that?
17 Q   Related.
18 A   Oh, related.
19 Q   Related to the reasons for the stop and related to the
20     reasons that you contacted the driver.
21 A   I don't want to be concrete, saying that I included
22     everything all the time.
23 Q   And -- so -- my question is do you think that you left out
24     information in any of these cases that we've talked about
25     so far?

FRANK PETERSON
Vol 1
4/1/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

Page 74

```
 1        MR. KOZIOL:  Objection.  Asked and answered.
 2  A   No.
 3  Q   Okay.  Thank you.  Now, I'm going to ask that you refer
 4        to -- do you still have the narrative report in Kuller?
 5  A   No.  You put it back.
 6  Q   Okay.  All right.  And just to make sure, in reference to
 7        the Kuller narrative 12986, the reasons you contacted the
 8        driver in that case were the same -- the reasons you've
 9        provided in your narrative report, they're the same
10        reasons that you indicated in your affidavit, right?
11  A   You haven't let me read it yet.
12  Q   Pardon me?
13  A   You haven't let me read it yet.
14  Q   Oh, all right.  12986.  Paragraphs 1 and 2.
15  A   Thank you.  Okay.
16  Q   Okay.  So again the reasons that you enumerate in your
17        affidavit for contacting this driver are the same reasons
18        that are included in your narrative report, right?
19  A   Correct.
20  Q   And no other reasons are listed.
21  A   Correct.
22  Q   And no other reasons were left out.
23  A   Yes.
24  Q   Okay.  Taking your attention to an affidavit involving a
25        Yakov Reutov, affidavit signed by you, dated -- or
```

Page 75

```
 1        notarized 8 September 2002, no case number, and ask that
 2        you take a look at paragraphs 1 and 2.  And the affidavit
 3        in this case, in the Reutov case, this is a traffic stop
 4        case, right?
 5  A   Correct.
 6  Q   And the reason for your contact with the driver was
 7        headlights weren't on, right?
 8  A   Partially correct.
 9  Q   And then also because the driver was in the wrong --
10        driving in the wrong lane again, right?
11  A   Correct.
12  Q   And so both of those would provide a basis -- and
13        headlights aren't on at September 8th, 2002, it's 2:53 in
14        the morning, so headlights would need to be one at that
15        time, right?
16  A   Correct.
17  Q   So both of those reasons would provide a reasonable
18        suspicion for conducting a stop on the driver, right?
19  A   Correct.
20  Q   And those are the two reasons that are listed in your
21        affidavit.
22  A   Correct.
23  Q   Right.  And no other reasons are listed.
24  A   Correct.
25  Q   All right.  I'm going to ask that you take a look at Bates
```

Page 76

```
 1        Stamp Page 13009, your narrative report in this case.  And
 2        again the narrative report, the reasons given for the stop
 3        are consistent with your affidavit, right?
 4  A   Correct.
 5  Q   Headlights are not.....
 6        MR. KOZIOL:  Go ahead.
 7  Q   Headlights are not illuminated and he crossed over into
 8        your traffic lane, right?
 9  A   Correct.
10  Q   Okay.
11        MR. KOZIOL:  Could I see that?
12  Q   And so the reasons in the narrative report match the
13        reasons in the affidavit.
14        MR. KOZIOL:  I think you misspoke, Mr. Herz.  The police
15  report here says the headlights were illuminated.  I didn't
16  want you to mislead the witness on that.
17  Q   What does your report say about the headlights being
18        illuminated?
19  A   It says they were illuminated.
20  Q   And what does your affidavit say about the headlights
21        being illuminated?
22  A   Headlights were still not illuminated.
23  Q   Okay.  And your -- when your reports are written -- this
24        indicates that you were on foot on September 8th, 2002.
25        It's 2:53 in the morning.  It says at the bottom of
```

Page 77

```
 1        Page 13009 date the report's completed, it says 9/8/02 at
 2        0518 hours, so a little bit more than two hours, you're
 3        writing this report, right?  Okay.
 4        MR. KOZIOL:  You should.....
 5  A   Correct.
 6        MR. KOZIOL:  .....yeah.  Answer audibly.
 7  Q   Now, the report's reviewed by a supervisor, isn't it?
 8  A   Yes.
 9  Q   Okay.  Can you tell in the bottom left-hand corner who
10        signed off on the report?
11  A   Sergeant Bradbury.
12  Q   Okay.  And how can you tell that?
13  A   Those are his initials.
14  Q   Okay.  And does the sergeant look at the charging
15        documents as well as the -- or your affidavit in support
16        of your complaint as well as your narrative report when he
17        signs off on the reports?
18  A   No.
19  Q   Okay.  Okay.  I'm going to show you Bates Stamp
20        Page 13019.
21        MR. KOZIOL:  13019.
22        MR. HERZ:  13019.
23        MR. KOZIOL:  Right.
24  Q   And ask that you take a look at paragraph 1 of a report
25        written Carrie Bradbury.  First paragraph, please.  What
```

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net