Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 1 of 20

FRANK PETERSON
Vol 1
4/1/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

21 (Pages 78 to 81)

Page 78

1  does Sergeant Bradbury's report indicate about headlights
2  being on or off?
3  A  They were off.
4  Q  Okay. Now, the information regarding -- you did provide
5  information regarding headlights in your narrative report,
6  right?
7  A  Correct.
8  Q  And you included information in your affidavit about
9  headlights, right?
10 A  Correct.
11 Q  And although the information's different, you did include
12 information about headlights, right?
13 A  Yes.
14 Q  And you also included information about the vehicle almost
15 crossing -- or crossing into your lane and almost hitting
16 you.
17 A  Yes.
18 Q  That was included in your affidavit and in your report,
19 right?
20 A  Yes.
21 Q  Okay. And no other reasons were provided in the affidavit
22 or in the report for contacting the vehicle, right?
23 A  Correct.
24 Q  And no other information as far as you know was left out,
25 right?

Page 79

1  A  Correct.
2  Q  Okay. Affidavit involving a Matthew Bravo, Bates Stamp
3  13039, affidavit signed by you, notarized 13 November '02,
4  no case number. Ask that you take a look at paragraphs 1
5  and 2. I just want to just go back to the Reutov case
6  just briefly. Even though your narrative report doesn't
7  match your affidavit, Bradbury's report does match your
8  affidavit. Bradbury's report corroborated the information
9  in your affidavit that the headlights were out, right?
10 A  Correct.
11 Q  So there was another officer who could corroborate and
12 actually provided information that matched information in
13 your affidavit.
14 A  Correct.
15 Q  Okay. All right. Now, going to Bravo, you took a look at
16 this affidavit?
17 A  Which one is it?
18 Q  In Bravo? Did you take a look at the first two
19 paragraphs?
20 A  Yes. Yes.
21 Q  And this is a traffic stop case?
22 A  Correct.
23 Q  And the reason for the traffic stop?
24 A  Reckless driving.
25 Q  Driver crossed the centerline in front of you?

Page 80

1  A  Almost hits trooper vehicle and another vehicle I think.
2  Q  Uh-huh. Okay. And so based on that, you turned on your
3  overhead lights.
4  A  Correct.
5  Q  Right? So you personally observed reckless driving. You
6  saw the driver cross the centerline and almost hit a
7  vehicle or several vehicles, right?
8  A  Correct.
9  Q  And so that was the basis for your stop.
10 A  Correct.
11 Q  That was your reasonable suspicion for making an
12 investigatory detention.
13 A  Correct.
14 Q  Right? All right. And no other reasons were listed in
15 the affidavit?
16 A  Correct.
17 Q  And none were left out.
18 A  (Nods affirmatively)
19 Q  Now.....
20    REPORTER: There was no audible answer for that and none
21 were left out.
22 Q  And none were left out.
23 A  Correct.
24    REPORTER: He didn't.....
25    MR. HERZ: Okay. Thank you.

Page 81

1  A  Sorry.
2  Q  Now, I'm going to show you the narrative report from
3  Bravo, Bates Stamp 13032, and ask that you take a look at
4  the first paragraph.
5     MR. KOZIOL: I think I've seen this already. Sorry.
6     MR. HERZ: That's fine.
7     MR. KOZIOL: Sorry. I did.
8     MR. HERZ: Yeah.
9     MR. KOZIOL: Getting confused at times.
10 Q  Okay. And narrative report again has the same reason for
11 the traffic stop as in the affidavit, right?
12 A  Yes.
13 Q  And that being that you observed the vehicle cross the
14 centerline and almost hit several vehicles.
15 A  Yes.
16 Q  Okay. And no other reasons were provided in the narrative
17 report for making contact, right?
18 A  Correct.
19 Q  All the information in the narrative report for the
20 reasons for the contact match the reasons in the
21 affidavit.
22 A  Correct.
23 Q  And no other information was left out of the narrative
24 report.
25 A  Yes.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax      907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 2 of 20

FRANK PETERSON  
Vol 1  
4/1/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

22 (Pages 82 to 85)

Page 82

1  Q  Okay.
2     REPORTER: Mr. Herz, you didn't give that Bates number.
3     MR. HERZ: I'm sorry. That's 13032. 13032.
4     REPORTER: Thank you.
5  Q  Okay. State vs. Coe, 13058, affidavit filed by you,
6     notarized 29 November '02, paragraph 1. Traffic stop,
7     right?
8  A  Correct.
9  Q  Basis for the stop is?
10 A  Speed.
11 Q  That provided your reasonable suspicion to do an
12    investigatory detention, right?
13 A  Correct.
14 Q  No other basis for the investigatory detention provided in
15    the affidavit, right?
16 A  Correct.
17 Q  And so other reasons given and no reasons left out, right?
18 A  Correct.
19 Q  All right. Now I'm going to ask that you look at Bates
20    Stamp 13050, look at the first paragraph. And again the
21    affidavit matches the information -- the narrative report
22    matches the information in the affidavit, right?
23 A  Correct.
24 Q  Reason given in the narrative for the stop is speed,
25    right?

Page 83

1  A  Correct.
2  Q  And no other reasons in the narrative are provided for the
3     stop.
4  A  Correct.
5  Q  And none are left out.
6  A  Correct.
7  Q  All right. State vs. Stenglein, affidavit signed by you,
8     notarized 30 November '02, no case number. Ask that you
9     take a look at paragraph 1. Traffic stop again, right?
10 A  Yes.
11 Q  Reason for the stop is?
12 A  Failed to use his turn signal.
13 Q  So traffic infraction, right?
14 A  Correct.
15 Q  And again that provides your basis for reasonable
16    suspicion to conduct an investigatory detention, right?
17 A  Yes.
18 Q  It's the only reason provided in the affidavit for making
19    contact with the driver, right?
20 A  Correct.
21 Q  No other reasons are given?
22 A  Correct.
23 Q  And none are left out, right?
24 A  Yes.
25 Q  All right. Now I'm going to ask that you look at Bates

Page 84

1     Stamp number 13065, look at the first paragraph.
2     Information in the narrative matches the information in
3     the affidavit, right?
4  A  Correct.
5  Q  Reason for the stop is speeding.
6  A  Not using his turn signal.
7  Q  Oh, I'm sorry. Failure to use a turn signal, traffic
8     infraction, right?
9  A  Correct.
10 Q  That's the only reason provided in the narrative report
11    for the traffic stop, right?
12 A  Correct.
13 Q  No other reasons are provided?
14 A  Correct.
15 Q  And none are left out.
16 A  Yes.
17 Q  Okay. Now turning your attention to an affidavit in State
18    vs. Anderson, affidavit signed by you, Bates Stamp 13110,
19    notarized 5 December '02. Ask that you take a look at the
20    first paragraph. Traffic stop, right?
21 A  Yes.
22 Q  And basis for the stop?
23 A  Speed.
24 Q  And that provided your basis for contacting the driver,
25    right?

Page 85

1  A  Correct.
2  Q  Gave you reasonable suspicion for an investigatory
3     detention?
4  A  Yes.
5  Q  No other reasons are provided in the affidavit for
6     contacting the driver.
7  A  Correct.
8  Q  And no other reasons were left out, right?
9  A  Yes.
10 Q  I'm going to show you Bates Stamp 13083, first page of
11    your narrative from Anderson. Take a look at that. Again
12    the narrative report, the information provided in it for
13    why you stopped the vehicle is consistent with the
14    information provided in the affidavit, right?
15 A  Correct.
16 Q  Reason for the stop as stated in the narrative report was
17    speed, right?
18 A  Correct.
19 Q  No other reasons for the stop were provided or stated in
20    the narrative report.
21 A  Correct.
22 Q  And none were left out.
23 A  Correct.
24 Q  Okay. Last affidavit for 2002 is State vs. Snodgrass,
25    Bates Stamps -- it's a two-page affidavit -- 13126, 13127.

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax    907-243-1473  
jpk@gci.net  
sahile@gci.net

Page 86

1  It's an affidavit signed by you, notarized 14 December
2  '02. I'm going to ask that you look at paragraph 1.
3  A  Okay.
4  Q  This is a traffic stop as well, right?
5  A  Correct.
6  Q  And the reason for the stop?
7  A  No headlights.
8  Q  No headlights. So traffic infraction.
9  A  Correct.
10 Q  Right? So and driver commits a traffic infraction, that
11    gives you authority to make an investigatory detention,
12    right?
13 A  Correct.
14 Q  And as always, you need to provide the basis for your
15    investigatory detention in your affidavit, right?
16 A  Correct.
17 Q  And you did so in this case?
18 A  Correct.
19 Q  And no other reasons for the investigatory detention are
20    listed?
21 A  Yes.
22 Q  And none were left out.
23 A  Yes.
24 Q  And looking at Bates Stamp 13115 from your narrative
25    report in the same case, you can take a look at

Page 87

1  paragraph 1. Again the information in your narrative
2  report is consistent with the information in the
3  affidavit, isn't it?
4  A  Yes.
5  Q  Reason for the investigatory detention is headlights were
6    not illuminated. Traffic infraction, right?
7  A  Yes.
8  Q  No other basis is stated in the narrative report for
9    stopping the driver, right?
10 A  Correct.
11 Q  And none.....
12 A  Yes.
13 Q  .....was left out.
14 A  Yes.
15 Q  Okay.
16    MR. HERZ: Counsel, there's three more for -- that ends
17    2002. There's three more in '03 and then I propose we take a
18    break, okay?
19    MR. KOZIOL: Let's do it.
20 Q  All right. Turning your attention to the first case in
21    '03, State vs. Baker, affidavit filed by you, no case
22    number, notarized on 4 January '03. Take a look at the
23    first paragraph, please. And traffic stop, right?
24 A  Correct.
25 Q  Basis for the traffic stop was?

Page 88

1  A  Not using a turn signal and a brake light was out.
2  Q  Okay. Two different traffic infractions, right?
3  A  Correct.
4  Q  And you listed both of them, right?
5  A  Correct.
6  Q  Both independently and together provided you a basis for
7    stopping this driver.
8  A  Correct.
9  Q  And so you listed all the reasons.
10 A  Yes.
11 Q  Right? And so based on that, you made an investigatory
12    detention of this driver, right?
13 A  Correct.
14 Q  No other reasons are listed in the affidavit.
15 A  Correct.
16 Q  And none were left out, right?
17 A  Right.
18 Q  Is that correct?
19 A  As far as I know. Right. We talked about this before and
20    as far as I know, yes.
21 Q  Okay. Is there anything about these cases as you've gone
22    through them that would cause you to believe that the
23    affidavits are not accurate?
24 A  No.
25 Q  And is there anything about the narrative reports in all

Page 89

1  these cases as you've gone through them that would cause
2  you to believe that they're inaccurate?
3  A  No.
4  Q  Okay. Thank you. I'm going to refer to narrative
5    report -- your first page of your narrative report in
6    Baker, Bates Stamp 13137. 13137. Okay. And ask that you
7    look at the first paragraph. Okay. Reasons provided in
8    the narrative report match the reasons in the affidavit,
9    right?
10 A  Correct.
11 Q  And basis for the traffic stop in this case was that the
12    lack of a turn signal and the brake light not functioning,
13    right?
14 A  Correct.
15 Q  No other reasons for the traffic stop are enumerated in
16    the narrative report.
17 A  Correct.
18 Q  And no other reasons for the traffic stop are left out of
19    the narrative report, right?
20 A  Right.
21 Q  Okay. All right. All right. Next is -- I'm not going to
22    pronounce this correctly, I don't think -- Kashevarof.
23    State of Alaska vs. Kashevarof, affidavit signed by you,
24    no case number, no notarization date, Bates Stamp 13188.
25    I'm going to ask that you take a look at paragraph 1 of

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 4 of 20

FRANK PETERSON  
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

24 (Pages 90 to 93)

Page 90

1 the affidavit. Traffic stop, correct?
2 A Correct. Yes.
3 Q And basis for the traffic stop is?
4 A Failed to stop at a stop sign.
5 Q So traffic infraction, right?
6 A Yes.
7 Q And again that gives you reasonable suspicion to conduct
8   an investigatory detention?
9 A Yes.
10 Q And you did, right?
11 A Yes.
12 Q And that was the reason stated for the detention that was
13   stated in your affidavit?
14 A Yes.
15 Q And no other reasons for the detention were stated in your
16   affidavit.
17 A Yes.
18 Q And none were left out.
19 A Yes.
20 Q And referring to Bates Stamp number 13179, first page of
21   your narrative report from that case.
22 A You just want me to read the first paragraph, correct?
23 Q Yes. Narrative report's consistent with your affidavit,
24   right?
25 A Yes.

Page 91

1 Q The reason provided in your narrative report for the stop
2   of the vehicle is failure to stop at a stop sign, right?
3 A Yes.
4 Q No other reasons for the contact with the vehicle are
5   provided in your narrative report.
6 A Yes.
7 Q And no reasons for contacting the driver were left out of
8   the narrative report, were there?
9 A Yes.
10 Q Okay. Last case from '03 not involving plaintiff is State
11   vs. Orcutt, Bates Stamp number 13201, affidavit signed by
12   you, notarized 23 May '03. I'm going to ask that you look
13   at paragraphs 1 and 2. Okay. This was a REDDI call,
14   right?
15 A Correct.
16 Q And because it was a REDDI call, you listed that in your
17   affidavit that you'd received a REDDI call.....
18 A Correct.
19 Q .....right? And you had also received information that
20   the vehicle -- you had a license plate number and it was
21   being driven in an unsafe manner, right?
22 A Correct.
23 Q Caller reported the vehicle crossing the centerline, the
24   sidelines, hitting the brakes, and accelerating, driving
25   erratically, right?

Page 92

1 A Correct.
2 Q Okay. And you headed in the direction that you thought
3   the vehicle might in, right?
4 A Yes.
5 Q And you conducted a traffic stop, you indicate, on the
6   vehicle.
7 A Yes.
8 Q Without any other information.
9 A Yes.
10 Q Right? Okay. And so in this particular case, in Orcutt,
11   you had just information of a vehicle being driven
12   erratically and that was a REDDI call and on that basis
13   you made your stop, right?
14 A Yes.
15 Q And that was the reasonable suspicion for conducting your
16   investigatory detention, right?
17 A Yes.
18 Q And there was no other reason listed in the affidavit in
19   support of the complaint, right?
20 A Correct.
21 Q And no other information was left out, right?
22 A Yes.
23 Q Okay. And -- now I'm going to ask -- take a look at
24   13194, which is the first page of your narrative in that
25   case. And the information in the narrative report matches

Page 93

1   the information in your affidavit, right?
2 A Yes.
3 Q You indicate that in your narrative report the Kodiak
4   Police Department received a REDDI call.
5 A Yes.
6 Q Specifically using that terminology, right?
7 A Yes.
8 Q And that the driver is driving erratically, right?
9 A Yes.
10 Q And so you went in the direction in which you thought the
11   vehicle might be and as soon as you saw it, turned on your
12   overhead lights and stopped it.
13 A Yes.
14 Q So same reasons provided in your affidavit are provided in
15   the narrative report, right?
16 A Yes.
17 Q And no other reasons for stopping the vehicle are provided
18   in your narrative report?
19 A Correct.
20 Q And no reasons were left out, right?
21 A Yes.
22 Q Okay. And so that's -- those are 28 cases between 2000
23   and 2003. Okay? Are you aware of any other DWI cases
24   that you worked on during that period of time?
25 A No.

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax     907-243-1473  
jpk@gci.net  
sahile@gci.net

Page 94

1  MR. HERZ: Okay. At this point, I propose that we take a
2  break and go off record.
3  (Off record)
4  (On record)
5  REPORTER: Okay. We're back on record and the time is
6  1:03 p.m. Officer, I'd like to remind you that you're still
7  under oath.
8  A  Yes, ma'am.
9  Q  Okay. Officer Peterson, so in reviewing the 28 cases
10    between 2000 and 2003, not including the present case
11    involving Mr. Brown, in each case, you would list the
12    basis for your stop both in your affidavit and in your
13    narrative report, right?
14 A  Correct.
15 Q  And when there was more than one basis for the stop, you
16    would list all of the reasons -- all the bases that you
17    had for making the stop in your affidavit and in your
18    report, right?
19 A  Yes. Yes. Sorry.
20 Q  And when there was mention of alcohol being involved, you
21    would include that information in your report even if the
22    information about alcohol being involved came after you
23    had already been dispatched to the call, right?
24 A  Correct.
25 Q  And when you actually had information from dispatch that

Page 95

1   it was a REDDI call like in Diaz at Bates 12771 or in
2   Orcutt 13201, those were both REDDI calls, you included
3   that information in your report, right?
4  A  Yes.
5  Q  And even when there wasn't specifically a dispatch on a
6     REDDI call, but when you had received information that the
7     driver was possibly drunk, when you got that information
8     from dispatch, like in the Johnson case, Bates number
9     12956, you included that in your report, right?
10 A  Yes.
11 Q  And not only did you include it in your report, you
12    included the information in your affidavit. It appeared
13    in both places.
14 A  Yes.
15 Q  Okay. So now let's turn to Mr. Brown's case. I take it
16    you've had time to prepare for this deposition; is that
17    right?
18 A  I've reviewed the report, yes.
19 Q  Okay. Have you reviewed anything else?
20 A  Yes.
21 Q  What else have you reviewed?
22 A  Different transcripts from Grand Juries, the trial, DMV
23    hearing.
24 Q  Okay. You didn't testify at the DMV hearing though,
25    right?

Page 96

1  A  No, I did not.
2  Q  Okay. But you testified at an evidentiary hearing on
3     April 3rd, 2003?
4  A  Yes.
5  Q  And you reviewed that transcript?
6  A  Yes.
7  Q  And you testified at a Grand Jury proceeding on
8     March 27th, 2003. You testified at that hearing, right?
9  A  Yes.
10 Q  And you reviewed that transcript?
11 A  Yes.
12 Q  And you testified at another Grand Jury proceeding on
13    June 19th, 2003?
14 A  Yes.
15 Q  And you reviewed that transcript?
16 A  Yes.
17 Q  And then you testified at a trial, right?
18 A  Yes.
19 Q  And you reviewed that transcript.
20 A  Yes.
21 Q  Okay. And what else have you reviewed?
22 A  Requests for -- what's the word -- you're requested to --
23    Mr. Koziol, for when you were supposed to reveal all the
24    documents? What's that called again?
25 MR. KOZIOL: Production?

Page 97

1  A  Yes. Those requests. I received copies of those letters.
2     I received my personnel file. I reviewed that. Something
3     else I reviewed. I can't remember what else. It seemed
4     like it was a lot though.
5  Q  Okay. And how recently did you review your own police
6     report?
7  A  Within the last week.
8  Q  Okay. And how about the affidavit in support of the
9     complaint you filed in the case?
10 A  About the same time.....
11 Q  Same time?
12 A  .....probably last week.
13 Q  Okay. Now, in addition to reviewing documents, you also
14    prepared for this deposition by discussing your testimony?
15    I'm not going to ask about content.
16 A  No, I just.....
17 Q  Have.....
18 MR. KOZIOL: Well, I don't think you should -- I'm going
19 to object as to what we talked about. I mean the topics even.
20 I don't think you're entitled to ask him about topics.
21 Q  Well, I can ask have you discussed -- have you prepared
22    for this deposition by discussing information that you
23    might expect to be -- questions you might expect to be
24    asked during the course of this deposition?
25 MR. KOZIOL: Objection. Would request -- attorney-client

Page 98

1  privilege. Request you not the question. I don't think you're
2  entitled to ask that.
3      MR. HERZ: So you're instructing him.....
4      MR. KOZIOL: I requested him not to answer, yeah.
5      MR. HERZ: You're instructing him not to answer.
6      MR. KOZIOL: Yeah. I don't instruction. I request. It's
7  his privilege, but I request him that he not answer.
8      MR. HERZ: Okay.
9      MR. KOZIOL: You may ask him -- just so you and I
10 understood. You may ask him whether we met, you know,
11 yesterday or whatever and he can answer yes to that, that we
12 met.
13     MR. HERZ: Well.....
14     MR. KOZIOL: But I don't think you can get into the --
15 even the topics of conversation.
16     MR. HERZ: Well, I think I can ask whether he's been
17 prepped about questions he might expect and the answers he
18 might give.
19     MR. KOZIOL: No, I don't think you can.
20     MR. HERZ: Well.....
21     MR. KOZIOL: I think that's an invasion of the
22 attorney-client privilege.
23     MR. HERZ: All right. I think not and I'm going to ask
24 the questions. You can keep making your objections. I'm going
25 to make it.....

Page 99

1      MR. KOZIOL: Okay.
2      MR. HERZ: .....for the record.
3      MR. KOZIOL: All right. Fine.
4      MR. HERZ: Okay?
5  Q  So -- first off, did you meet yesterday with Mr. Koziol?
6  A  Yes.
7  Q  Okay. And have you met -- before yesterday, have you met
8     with Mr. Koziol?
9  A  No.
10 Q  Have you talked on the phone with Mr. Koziol?
11 A  Yes.
12 Q  Okay. Before yesterday in your conversations on the
13    phone, did you discuss what kinds of questions you might
14    be asked and what kinds of answers you might give either
15    at deposition or trial in this case?
16     MR. KOZIOL: Objection. Attorney-client privilege and I'd
17 request the witness not answer the question.
18 Q  Are you going to answer?
19 A  No, I'm not.
20 Q  Okay. Yesterday when you met with Mr. Koziol, were you --
21    in meeting with him, did you discuss what kinds of
22    questions you might be expected to hear today and what
23    kinds of answers you might give.
24     MR. KOZIOL: Same objection and request the witness not to
25 answer. Attorney-client privilege.

Page 100

1  A  I won't answer.
2  Q  Okay. And today during breaks, were you meeting with
3     Mr. Koziol?
4  A  Yes.
5  Q  And during the breaks, were you prepped about questions
6     you might be asked or answers you might give during the
7     course of this deposition this morning?
8      MR. KOZIOL: Objection. Attorney-client privilege.
9  Request the witness not answer.
10 A  I won't answer.
11 Q  And during lunch, did you meet with Mr. Koziol?
12 A  Yes.
13 Q  And again were you prepped about questions you might be
14    asked and answers you might give during the course of this
15    deposition this afternoon?
16     MR. KOZIOL: Objection. Attorney-client privilege.
17 Request the witness not answer.
18 A  I won't answer.
19 Q  Now, in your affidavit in support of the complaint in this
20    case -- well, let me strike that. Let me show you what
21    are Bates Stamped Pages 450 through 454. This is your
22    narrative report. And I want to ask you about the bottom
23    where it says typed by slash date and reviewed by. I'm
24    going to ask that you look at that. My question is the
25    typed by date where it says 1/6/2003, is.....

Page 101

1      MR. KOZIOL: Mr. Herz, I would just continue to request
2  that -- you haven't made copies for me of these exhibits and
3  I'd like you to give them to me first so then I can try to find
4  them if I've got them so that I can stay with you and what
5  you're doing. Okay? Thanks. I think we're moving into areas
6  now that I -- I just might note that it's a combination of your
7  discovery request and mine because we have different numbers on
8  them. That's okay, but I guess for the record I'd like to say
9  it's 450, 451, and then 10043 and then 452 and then 453.
10     MR. HERZ: All right. Let's -- let me do some -- I'll use
11 a different form. Hang on.
12     MR. KOZIOL: 454. I think we exchanged a lot of the same
13 documents.
14     MR. HERZ: How about we use Bates Stamp number 13160
15 through 13165. Want to hand those back to me.
16     MR. KOZIOL: That's fine. And what I brought -- and I can
17 follow along now, is I brought my 10041 through 10046. So I'm
18 on the same page as you are now.
19     MR. HERZ: Okay.
20     MR. KOZIOL: Thank you.
21 Q  So I was asking you about at the bottom where it says
22    typed by date.
23 A  Correct.
24 Q  When you prepare a narrative report, are you the one
25    typing it?

FRANK PETERSON  
Vol 1  
4/1/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

27 (Pages 102 to 105)

Page 102

1  A  When I prepare one, yes.
2  Q  Okay. And that typed by date, would that be a date that
3     you entered? Is that a date.....
4  A  Yes.
5  Q  .....that you entered onto the report?
6  A  Yes.
7  Q  And does that reflect the date on which you prepared this
8     narrative report?
9  A  Possibly. It could have began on January 4th and then I
10    could have submitted it on January 6th. So I could have
11    worked on it on January 6th as well.
12 Q  Okay. So you don't know when you began the report?
13 A  Correct.
14 Q  Okay. It's possible you could have began the report on
15    January 6th and finished it on January 6th.
16 A  Correct.
17 Q  You don't know.
18 A  Correct.
19 Q  Okay. Now, the supervisor who signed off on the report,
20    who is that?
21 A  Looks like Sergeant Maloney's.
22 Q  Okay. And why are you having difficulty with being able
23    to tell?
24 A  I can't tell what the initials are.
25 Q  Because?

Page 103

1  A  It's photocopied probably.
2  Q  Well, isn't it also because somebody put an OK stamp right
3     over the initials?
4  A  True.
5  Q  Okay. So it'd be a lot easier if the OK stamp wasn't
6     there, right, or if it was not on top of the initials,
7     right?
8  A  True.
9  Q  Okay. All right. And so it could be Maloney, but you're
10    not sure.
11 A  Correct.
12 Q  And how would we determine who it is if we wanted to know?
13 A  Ask Sergeant Maloney if those are his initials.
14 Q  Okay. And on what day was the review completed by
15    whomever did it? Let's assume for purposes of this
16    question, it was Sergeant Maloney.
17 A  I don't know.
18 Q  Well, isn't the reviewing officer supposed to date the
19    report as to when the review was done?
20 A  Not necessarily, no.
21 Q  Is the review always done on the same day the report is
22    completed?
23 A  No.
24 Q  So from this document, we can't tell when this document
25    was reviewed by a supervising officer; is that right?

Page 104

1  A  Correct.
2  Q  Now I'm going to ask you to look at Bates Stamp
3     number 13172 which was the affidavit you filed in support
4     of your complaint in State vs. Brown and I'm going to ask
5     for you to look at paragraphs 1 and 2.
6  A  Okay.
7  Q  And in paragraph 1, the information provided here in the
8     affidavit is that Kodiak Police Department received
9     information about a truck driving recklessly, right?
10 A  Correct.
11 Q  And they gave some -- you provide some detail that the
12    report mentioned the vehicle was fishtailing, had lost
13    control and spun in a circle, which would be more detail
14    about the vehicle driving recklessly, right?
15 A  Correct.
16 Q  Okay. And the caller indicated that the vehicle was being
17    driving up Pillar Mountain Road, right?
18 A  Correct.
19 Q  Okay. Now, you did not personally see the vehicle drive
20    recklessly, right?
21 A  Correct.
22 Q  And you didn't personally see the vehicle fishtail?
23 A  Correct.
24 Q  And you didn't personally see the vehicle lose control and
25    spin in a circle, right?

Page 105

1  A  Correct.
2  Q  All right. Paragraph 2 -- so you got a call about a
3     vehicle driving recklessly. So in paragraph 1, do you
4     have reasonable suspicion at this point to pull over this
5     vehicle, to conduct an investigatory stop?
6  A  Yes.
7  Q  For reckless driving?
8  A  For reckless driving? No.
9  Q  You have a -- based on the information provided in this
10    paragraph, do you have reasonable suspicion.....
11 A  Yes.
12 Q  .....to stop the vehicle for reckless driving?
13 A  Yes.
14 Q  Okay. Do you have enough -- having not personally seen
15    the reckless driving, you don't have lawful authority to
16    make an arrest for reckless driving, do you?
17 A  Correct.
18 Q  Okay. Now, paragraph 2, you indicate you went up Pillar
19    Mountain Road, you saw a gold-colored flatbed pickup
20    heading down the road, you followed it, and you observed
21    the vehicle pull into 1219 Purtov Road and you saw a male
22    driver leave the side of the vehicle who you identified as
23    Scott Brown. Okay. Now, nothing in that paragraph of
24    your affidavit adds any more information that provides you
25    any additional grounds for reasonable suspicion to conduct

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax     907-243-1473  
jpk@gci.net  
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 8 of 20

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

28 (Pages 106 to 109)

## Page 106

1  an investigatory stop, right?
2  A  Correct.
3  Q  And you don't have any other information provided there
4  that would give you any lawful authority to make an arrest
5  at this point, right?
6  A  Correct.
7  Q  Okay. All right. So at this point in your affidavit, you
8  have reasonable suspicion to conduct an investigatory stop
9  for reckless driving and no lawful authority to make an
10  arrest. Yes?
11  A  Correct.
12  Q  Okay. And it's also true that in your affidavit you've
13  provided no other grounds to support reasonable suspicion,
14  right?
15  A  For?
16  Q  In your affidavit, there are no other grounds
17  mentioned.....
18  A  Correct.
19  Q  .....that support reasonable suspicion; isn't that right?
20  A  Correct.
21  Q  Okay. You don't -- you haven't personally observed the
22  vehicle violate any traffic laws, right?
23  A  Correct.
24  Q  And during the time that you were able to turn your
25  vehicle around on Pillar Mountain Road and follow this

## Page 107

1  vehicle to Purtov Street, you observed no traffic
2  violations; isn't that right?
3  A  Correct.
4  Q  And you don't indicate in the affidavit that you had
5  received a report that the driver was intoxicated. That's
6  not in your affidavit, is it?
7  A  Correct.
8  Q  So you then indicate in paragraph 3 you yell to the
9  defendant and instructed him to stop. The defendant
10  continued into his residence and you followed, right?
11  A  Correct.
12  Q  All right. Now, in your narrative report -- and I'm
13  referring to now Bates Stamp Pages 13160. It's the first
14  page of your narrative report. And I'm going to ask that
15  you look at the first three paragraphs.
16  A  Okay.
17  Q  Okay. Have you looked at those paragraphs?
18  A  Correct.
19  Q  Okay. Now, you write Kodiak Police Department received a
20  telephone call from Laurie Sconeberg. That's in the first
21  line of the first paragraph, right?
22  A  Correct.
23  Q  Now, when you were responding to this call, you didn't
24  know the identify of the person who called in, did you?
25  A  Correct.

## Page 108

1  Q  Okay. So when you prepared this report, did you go back
2  and listen to the call to dispatch in order to get that
3  name?
4  A  No.
5  Q  How did you get that name?
6  A  I can't remember.
7  Q  But it -- you had to have looked at something or heard
8  something in order to get that name, right?
9  A  Correct.
10  Q  And you don't know what it is.
11  A  No.
12  Q  You don't know if you listened to a tape. You don't know
13  if you read some dispatcher's notes. You don't know.
14  A  No.
15  Q  Okay. But it could have been the dispatcher's notes?
16  A  Could have been, yes.
17  Q  Okay. All right. Now, you indicate here that the caller
18  said she saw a vehicle spray gravel all over a woman
19  standing in front of the store, right?
20  A  Correct.
21  Q  Okay. So it was your understanding based on the way you
22  wrote this report that the caller was personally observing
23  that event happen.
24  A  Correct.
25  Q  Okay. And that she had personally observed that even

## Page 109

1  happen right -- just before she had made phone call,
2  right?
3  A  Correct.
4  Q  Okay. And she followed the pickup and she observed it
5  lose control according to her statement and do a 360. So
6  she's behind the vehicle, watching it in front of her
7  doing a 360; is that right?
8  A  Correct.
9  Q  Okay. Then your next paragraph -- and so what you've got
10  here in the first paragraph is again somebody reporting
11  reckless driving, right?
12  A  In the report, yes.
13  Q  Right. And that matches -- this information in the
14  narrative report again matches the information in the
15  first paragraph of the affidavit, right?
16  A  Correct.
17  Q  Okay. And the second paragraph of your narrative says
18  another woman called, did not give her name. She was in
19  the Safeway parking lot, gold-colored pickup with dualies
20  spread gravel on her, right?
21  A  Correct.
22  Q  And now that in and of itself is not necessarily a crime,
23  is it?
24  A  Spraying the gravel?
25  Q  Yeah. I mean that could have just been an accident,

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB    Document 89-12    Filed 05/27/2008    Page 9 of 20

FRANK PETERSON
Vol 1                                 4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

29 (Pages 110 to 113)

Page 110

1  right?
2  A  Correct.
3  Q  Okay. I mean that's not necessarily -- I mean that in and
4     of itself doesn't mean somebody drove recklessly, right?
5  A  Not necessarily.
6  Q  Right. I mean you have to create -- do you know the
7     definition of driving recklessly?
8  A  I have an idea of what it is. I don't know the definition
9     itself.
10 Q  Okay. Tell us what you think the definition of driving
11    recklessly is.
12 A  Substantial risk of injury or harm to another person or
13    property.
14 Q  Substantial and unjustifiable risk, right?
15 A  I can't remember.
16 Q  A risk that's a gross deviation from the standard of
17    conduct that a reasonable person would have engaged in
18    knowing that the risk existed, right?
19 A  I can't remember.
20 Q  So -- all right. So you're not sure what the definition
21    of recklessly is.
22 A  Reckless driving.
23 Q  Or -- well -- and in order to be -- in order to engage in
24    reckless driving, you have to act recklessly. So do you
25    know the definition of recklessness under Alaska law?

Page 111

1  A  No, I don't.
2  Q  Okay. All right. So she says somebody sprayed gravel on
3     her, passenger has dark hair, appeared scruffy. Driver
4     appears to have blond hair. No information there that
5     changes anything or adds -- well, there's nothing there
6     that would give a reasonable suspicion for anything else
7     other than reckless driving if that, right?
8  A  Correct.
9  Q  Okay. So based on paragraph 1 and paragraph 2, all you at
10    this point still have is reasonable suspicion of reckless
11    driving.
12 A  Correct.
13 Q  Okay. And nothing in either of those paragraphs suggests
14    that you have any lawful authority to make an arrest for
15    anything, right?
16 A  Correct.
17 Q  Okay. So paragraph 3, you head to Pillar Mountain.
18    You're up near the water tanks on Pillar Mountain Road.
19    You see two vehicles coming down. The second vehicle's a
20    gold-colored flat pickup and now you identify a license
21    plate number, right?
22 A  Correct.
23 Q  Okay. There was no license plate number at -- up until
24    this point that had been identified by any of the callers,
25    correct?

Page 112

1  A  Correct.
2  Q  All right. You turned your vehicle around, you
3     followed -- you rounded the corner of Pillar Mountain,
4     turned onto Maple. You saw the vehicle turn onto Matson
5     and at this point as the vehicle turns onto Matson, you
6     now illuminate your overhead lights, right?
7  A  No.
8  Q  No?
9  A  As he was -- he was turning onto Matson or as I was?
10 Q  I observed the vehicle turn onto Matson. I illuminated my
11    overhead lights and followed the vehicle.
12 A  Okay.
13 Q  Is that right?
14 A  Correct.
15 Q  So as you are observing the vehicle turn onto Matson, what
16    road are you on?
17 A  Maple.
18 Q  Okay. So you're on Maple and he's turning onto Matson and
19    that's when you turn your lights on.
20 A  Correct.
21 Q  Okay. You indicate I observed the vehicle turn on Purtov,
22    I followed it, I saw it pull into the driveway of Purtov,
23    right?
24 A  Correct.
25 Q  Nothing in that paragraph has changed anything from the

Page 113

1     other two paragraphs. You observed no vehicle
2     infractions, no traffic infractions. You still don't have
3     anything other than reasonable suspicion to conduct an
4     investigatory stop for reckless driving. That's all you
5     have based on the paragraphs you've written here. Right?
6  A  Correct.
7  Q  And you still don't have any lawful authority based on the
8     information you've provided here to make an arrest for
9     anything, do you?
10 A  Correct.
11 Q  All right. In the fourth paragraph, you say I observed a
12    man jump from the side of the vehicle who you later
13    identify as Scott Brown. You jumped out of your vehicle
14    and yelled to the man to stop. You yelled several times.
15    He didn't stop. He entered his residence and started to
16    shut the door. You were behind him. He or you closed the
17    door and then you entered the residence, right?
18 A  Correct.
19 Q  Okay. Now, nothing in your narrative report indicates
20    that there were any other grounds for reasonable suspicion
21    to stop Mr. Brown other than reckless driving.
22 A  Correct.
23 Q  And the narrative report matches the information in the
24    affidavit, doesn't it?
25 A  Correct.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 10 of 20

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

30 (Pages 114 to 117)

Page 114

1  Q  Okay. Now, when the -- now you've testified on a couple
2     of occasions that you believe you were told by the
3     dispatcher that this was a REDDI call.
4  A  Correct.
5  Q  That information does not appear in your affidavit, does
6     it?
7  A  No.
8  Q  That information does not appear in your narrative report,
9     does it?
10 A  No.
11 Q  And if you were to be believed, the affidavit's not
12    accurate, is it?
13 A  Correct.
14 Q  You left out extremely important information from your
15    affidavit.
16 A  Correct.
17 Q  Right? And in all these other cases where there were
18    multiple reasons for providing reasonable suspicion, you
19    included those, but you didn't include those multiple
20    reasons in this affidavit.
21 A  Correct.
22 Q  And you left out important, critical information out of
23    your narrative report too, right? That you -- a second
24    reason -- multiple reasons for reasonable suspicion that's
25    not included in your narrative report.

Page 115

1  A  The REDDI?
2  Q  Yes.
3  A  Correct.
4  Q  And unlike all these other cases that we talked about this
5     morning where there were multiple reasons for reasonable
6     suspicion, you included those in your other narrative
7     reports, but you left it out of this one.
8  A  Correct.
9  Q  That's -- if your testimony is to be believed, right?
10 A  Correct.
11 Q  Okay. Now, when the call came in about the reckless
12    driving, you were at the station house, correct? Or were
13    you on patrol?
14 A  I was at the station house.
15 Q  You were at the station house. Okay. How long had you
16    been at the station house?
17 A  Approximately 53 minutes.
18 Q  Okay. And what were you doing?
19 A  I don't know. I can't remember.
20 Q  Okay. And where were you when the call came in?
21 A  The patrol room.
22 Q  And where is that in relationship to where the dispatch
23    center is? Is it the same room?
24 A  No.
25 Q  Can you hear calls coming into the dispatch center when

Page 116

1     you're in the patrol room?
2  A  Yes.
3  Q  And how's that possible?
4  A  They're relatively close. I hear the ringing. I don't
5     hear the communication.
6  Q  Okay. So you can hear the phone ring, but you can't hear
7     the caller talking to the dispatcher.
8  A  Correct.
9  Q  You can't hear the content of the conversations.
10 A  Correct.
11 Q  All right. So when you're in the patrol room and a call
12    comes in and the dispatcher wants you to respond to a
13    call, how does the dispatch center -- the dispatcher on
14    duty communicate to you that it's time to respond to a
15    call?
16 A  They call back to the patrol room.
17 Q  They call back doing -- on a radio, on a cell phone, on a
18    landline telephone? How are they calling you?
19 A  On the telephone.
20 Q  This is a hard-wired, landline inside the police station?
21 A  Correct.
22 Q  Okay. And you can call out on these phones outside the
23    police station or you can make internal calls within the
24    police station on this?
25 A  Correct.

Page 117

1  Q  Okay. And it's -- is it your testimony -- correct me if
2     I'm wrong, it's when you were contacted on this telephone
3     call from the dispatcher that the dispatcher said what to
4     you?
5  A  I've got a REDDI report. There's a vehicle, gold-colored,
6     flatbed pickup truck just left Safeway heading towards
7     Pillar Mountain......
8  Q  Okay. So your testimony is that's when you got that
9     information, right?
10 A  Correct.
11 Q  And you've seen the dispatch logs in this case?
12 A  Correct.
13 Q  Okay. And you know that at the time of your dispatch at
14    1656 there's nothing in the dispatch log that says that
15    you got dispatched to a REDDI call.
16 A  Correct.
17 Q  You're aware of that, right?
18 A  Correct.
19 Q  Okay. And Officer Holden was dispatched three minutes
20    later at 1659, right?
21 A  Correct.
22 Q  And there's nothing in the dispatch log for when he was
23    dispatched that he got dispatched to a REDDI call, is
24    there?
25 A  Correct.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

Page 118

1  Q  All right. And in fact the word REDDI doesn't even appear
2     in the log until after you're already inside Mr. Brown's
3     house and you're calling for Officer Holden's assistance
4     and somebody else, a 5 Charlie 10 or a 5 Charlie 15 -- I
5     don't know who those people are -- is dispatched on a
6     REDDI call. That's the first time the words REDDI appear
7     in the dispatch log, right?
8  A  I can't remember.
9  Q  And it's like 1704.....
10 A  Okay.
11 Q  .....on the log or 1707. Right?
12 A  I don't know.
13 Q  Okay. But those words certainly don't appear at any time
14    when you're dispatched, right?
15 A  Okay.
16 Q  Or when Officer Holden's dispatched.
17 A  Correct.
18 Q  All right. So the dispatch log itself for when you are
19    dispatched does not corroborate your testimony that you
20    got dispatched to a REDDI call, does it?
21 A  The dispatch log as far as the radio log?
22 Q  The dispatch log for when you were dispatched at 1656
23    doesn't corroborate.....
24 A  Correct.
25 Q  .....that -- okay. And Officer Holden's report, have you

Page 119

1     seen that?
2  A  I can't remember.
3     MR. HERZ: I'm going to refer to Bates Stamp number 456,
4     Counsel.
5     MR. KOZIOL: .....moment here.
6     MR. HERZ: I'm going to wait.
7     MR. KOZIOL: I think I know which one. It just -- I'm
8     working off of different numbers.
9     MR. HERZ: Sure.
10    MR. KOZIOL: Yes. Thank you.
11    MR. HERZ: Okay.
12 Q  Now, did Officer Holden get the same phone call as you?
13 A  No.
14 Q  Did he get a phone call?
15 A  No.
16 Q  Well, why is he dispatched at three minutes after you?
17 A  I received the information.
18 Q  Yeah.
19 A  And told Officer Holden that I was going on a REDDI report
20    and I was heading in such and such a direction.
21 Q  Okay. So your testimony is you're the one who told Holden
22    that it was a REDDI call.
23 A  Correct.
24 Q  And that would be pretty critical information for Holden
25    to know too, right, because if he sees the vehicle before,

Page 120

1     he would have authority then to stop that driver for
2     possibly being a drunk driver, right?
3  A  Correct.
4  Q  And if you don't tell him that, he might not have that
5     authority, right?
6  A  Correct.
7  Q  Okay. Now -- and so you're saying that in essence by you
8     telling him that you were responding to a REDDI call, the
9     reason he left the department three minutes after you was
10    essentially because you were dispatching him to the same
11    phone call?
12 A  I don't understand that.
13 Q  Well, I mean you told him you were responding to a REDDI
14    call. How come he leaves the station three minutes later?
15 A  I don't know.
16 Q  So let me show you page -- what's Bates Stamped as 456.
17    This is Officer Holden's report.
18 A  Okay.
19 Q  Okay? And by the way, would he prepare -- when he signs
20    his report January 12th, '03, reasonable to assume that's
21    the date he's preparing his report?
22 A  Not necessarily.
23 Q  Okay. But.....
24 A  It could be the day he's turning it in.
25 Q  The day he's turning it in? So it could have been

Page 121

1     prepared earlier.
2  A  Correct.
3  Q  But this is only a -- this is less than a one-page report,
4     so any reason why it would have taken so long to produce a
5     less than one-page report?
6     MR. KOZIOL: Objection to form. Lack of foundation.
7  A  I don't know.
8  Q  Okay. So take a look at the first paragraph.
9  A  Okay.
10 Q  So first paragraph, he says, January 4, 2003,
11    approximately 1653, Kodiak Police Department received a
12    report of a flatbed truck driving reckless on Selief Lane
13    and on Pillar Mountain Road. Peterson and I responded
14    from the Kodiak Police Department. That's what it says,
15    right?
16 A  Okay. Yes.
17 Q  Okay. He doesn't say that he received a report of a truck
18    driving recklessly from you. Right?
19 A  Correct.
20 Q  He doesn't say he receives information from you that there
21    was a report -- a REDDI report on a truck. He doesn't
22    write that either, does he?
23 A  No.
24 Q  He says that the Kodiak Police Department received a
25    report of a truck driving reckless. So did he get

Computer Matrix, LLC                  Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473        jpk@gci.net
                                                                   sahile@gci.net

## Page 122

1  information from dispatch or from you?
2  A  From me.
3  Q  Okay. And so when he writes Kodiak Police Department
4     received a report, he's referring to the information that
5     you're giving him.
6  A  I don't know.
7  Q  Okay. His next paragraph, I want you to look at that.
8  A  Okay. Okay.
9  Q  So he says at approximately 1701, he says I hear Officer
10    Peterson say on the radio he's going in to a house and I
11    would see his patrol vehicle in the street. So between
12    the first paragraph and that first line, there's nothing
13    in his report about being dispatched on a REDDI call, is
14    there?
15 A  Correct.
16 Q  There's nothing that says you told him it was a REDDI
17    call, right?
18 A  Correct.
19 Q  There's nothing that dispatch told him it was a REDDI
20    call.
21 A  Correct.
22 Q  Okay. So there's nothing in his report that would
23    corroborate your claim that a REDDI call -- that you were
24    told by dispatch that a REDDI call came in.
25 A  Correct.

## Page 123

1  Q  Okay. So -- now, you would say that leaving out the
2     information about the REDDI call in your affidavit was a
3     mistake, right?
4  A  Correct.
5  Q  But you made the same mistake in your narrative report,
6     right?
7  A  Correct.
8  Q  Now, in Reutov, you made a mistake in -- in your
9     affidavit, you said that the lights were not illuminated,
10    right?
11 A  Correct.
12 Q  But in your.....
13    MR. KOZIOL: That might have Yasov, but it's close enough
14    probably. Wasn't it with a Y?
15    MR. HERZ: I think that was his first name.
16    MR. KOZIOL: Oh, Reutov was his first name or.....
17    MR. HERZ: And I think Reutov was the last name.
18    MR. KOZIOL: Okay. All right.
19    MR. HERZ: I can.....
20    MR. KOZIOL: All right. That's -- we're talking about the
21    same one.
22    MR. HERZ: Okay.
23 Q  But in the -- in your probable cause statement in your
24    affidavit, you said the lights were not illuminated and in
25    your report, you said they were illuminated, right?

## Page 124

1  A  Correct.
2  Q  Okay. So there was a difference between your report and
3     the affidavit, right?
4  A  Correct.
5  Q  Okay. And -- but the same mistake was not made by
6     Sergeant Bradbury. Bradbury's report and your report are
7     different, right? In Bradbury's -- isn't that right?
8  A  Correct.
9  Q  But Bradbury's report corroborated your affidavit, right?
10 A  Correct.
11 Q  So the mistake only appeared once, didn't it?
12 A  Correct.
13 Q  Okay. And it only -- and the mistake only appeared by one
14    officer in this -- in that case, in Reutov's case, that
15    being you.
16 A  Correct.
17 Q  Right? Okay. Even assuming it was a typo, the mistake
18    only appeared once, right?
19 A  Correct.
20 Q  All right. But in this case, you're saying that you made
21    the mistake in your affidavit, right?
22 A  Correct.
23 Q  You made the mistake in your narrative report.
24 A  Correct.
25 Q  The mistake appears also by another officer, that being

## Page 125

1     Dispatcher Coyle because he doesn't put it in the dispatch
2     log at the time he dispatches you, right?
3     MR. KOZIOL: Objection. Form.
4  A  I don't know.
5  Q  Well, you've seen the dispatch log, haven't you?
6  A  I can't remember what it looks like.
7  Q  Okay. But you've testified it wasn't -- there was no
8     mention of a REDDI dispatch at the time that you actually
9     left at.....
10 A  Correct.
11 Q  .....1656.
12    MR. KOZIOL: Objection. Form.
13 Q  So the mistake would have also been made by Dispatcher
14    Coyle also, right, because he left out of the dispatch log
15    just like you left it out of your affidavit and you left
16    it out of your report.
17 A  No.
18    MR. KOZIOL: Objection. Form.
19 Q  So you don't think it's a mistake by the dispatcher if
20    he's dispatching you to a REDDI call not to list next to
21    your designation K20 and the time you're dispatched that
22    he's dispatching you to a REDDI call?
23    MR. KOZIOL: Objection. Form.
24 A  That's correct.
25 Q  You don't think that's a mistake.

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 13 of 20

FRANK PETERSON
Vol 1                                    4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

33 (Pages 126 to 129)

Page 126

1  A   No.
2  Q   Okay. Do you -- the same -- well, and would you agree
3      that if Officer Holden is told by you that there's a REDDI
4      call and he's responding to a REDDI call that it would be
5      a mistake for him to leave that out of his report?
6  A   Yes.
7  Q   So you made the -- he made the same mistake as you.
8  A   Correct.
9  Q   And why don't you think the dispatcher when he dispatches
10     somebody on a REDDI call need not list that in the
11     dispatch log?
12 A   Whether it's need not or doesn't, it's different from what
13     they do, what's common practice with the dispatchers and
14     radio logs. When they're dispatching police officers,
15     they don't necessarily say you're responding to such and
16     such a location because of such and such a call like they
17     do with the fire department.
18 Q   You're -- let me see if I understand your question [sic].
19 A   Okay.
20 Q   You're saying that when a dispatcher receives a complaint
21     from a citizen about a drunk driver that the dispatcher
22     doesn't need to say, you know, Officer Peterson, I got a
23     call about a car, go find it?
24 A   He told me that -- sorry. He told that to me over the
25     phone.

Page 127

1  Q   I understand. But whether it's over the phone or over the
2      radio -- okay -- don't you need to know why you're being
3      dispatched?
4  A   Yes.
5  Q   And if the call is about a drunk driver, don't you need to
6      know that so that you've got a basis for stopping the
7      driver?
8  A   Yes.
9  Q   And so doesn't the dispatcher have a responsibility to
10     indicate why he's dispatching an officer on a call?
11     MR. KOZIOL: Objection. Form. Where? Orally or in
12 writing?
13     MR. HERZ: In writing.
14     MR. KOZIOL: Okay. Well, be specific because you've been
15 talking about oral.
16 Q   Doesn't the log need to represent what's happening, when
17     it's happening, and why it's happening?
18     MR. KOZIOL: Objection. Form.
19 A   No. The radio log -- the dispatch log is communications
20     back and forth between the dispatcher and officers, what
21     he says to us and what we say to him only.
22 Q   Okay. And so you're saying that because it wasn't over a
23     radio, it was a phone call within the department, he
24     doesn't have any responsibility to note that information
25     in the dispatch log.....

Page 128

1  A   Correct.
2  Q   .....in the radio log. Okay. All right. And what about
3      handwritten notes that the dispatchers take when they
4      receive calls.....
5      MR. KOZIOL: Objection. Form.
6  Q   .....wouldn't that information be important to have in
7      their handwritten notes, that information they get in
8      phone calls.
9      MR. KOZIOL: Objection. Form.
10 A   I don't know.
11 Q   Well, don't they use that information to impart
12     information on to the officers?
13     MR. KOZIOL: Objection. Form.
14 A   I don't know. Not necessarily.
15 Q   Okay. Now, I want you to assume for purposes of this
16     question that you don't have information from the
17     dispatcher about a REDDI call, okay? That what you have
18     information on is a reckless driver. All right?
19 A   Okay.
20 Q   And as set forth in your affidavit and set forth in your
21     narrative report, that's all you have. You don't have any
22     other information about that you've personally observed
23     traffic infractions and you haven't personally observed
24     any misdemeanor crimes being committed in your presence.
25     Okay?

Page 129

1  A   Okay.
2  Q   You would agree that under those circumstances you don't
3      have authority to arrest; is that right?
4  A   Correct.
5  Q   Okay. When -- and so would you agree that when you get to
6      Purtov Street and Mr. Brown is getting out of his
7      vehicle -- again assume for the purposes of this question
8      that you have not gotten a report from dispatch about a
9      REDDI call -- that at that point what you have is
10     reasonable suspicion to conduct an investigatory
11     detention.
12 A   Correct.
13 Q   All right. And at that point, you don't have -- you have
14     not observed a misdemeanor being committed in your
15     presence, correct?
16 A   Correct.
17 Q   All right. And so when Mr. Brown goes into his house at
18     that point, again what you have is reasonable suspicion to
19     conduct an investigatory stop or detention but no lawful
20     authority to make an arrest.
21 A   Correct.
22 Q   All right. And you agree there was -- you did not have a
23     warrant to enter his house at that point, right?
24 A   Correct.
25 Q   And he did not give you consent to enter his house.

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 14 of 20

FRANK PETERSON
Vol 1                           4/1/2008
                                          BROWN v. PETERSON, et al.,
                                          Case No. 3:05-cv-0002 TMB

34 (Pages 130 to 133)

Page 130

1  A   Correct.
2  Q   And nobody else gave you consent to enter his house.
3  A   Correct.
4  Q   Okay. And is it your belief that when you have reasonable
5      suspicion to conduct an investigatory stop that that is
6      sufficient to make a warrantless entry into somebody's
7      home?
8      MR. KOZIOL: Objection. Form.
9  A   No.
10 Q   That's not your belief.
11 A   No.
12 Q   Okay. So when -- so is it your belief that if you have
13     reasonable suspicion to conduct an investigatory stop and
14     a person doesn't -- walks away from you and walks into --
15     and you've told them to stop so that you can conduct your
16     investigation and they don't stop and they go inside their
17     home that you have legal authority to enter their home
18     without consent or a warrant?
19     MR. KOZIOL: Objection. Form. I'm confused now. For
20 what offense? Are we still back on the reckless or something
21 else?
22     MR. HERZ: I'm.....
23     MR. KOZIOL: We don't know -- your question.
24 Q   Assume for these questions you have not received a report
25     of a REDDI driver. All you've got is information

Page 131

1   regarding reckless driving, okay?
2  A   Uh-huh. (Affirmative)
3  Q   And you've got reasonable suspicion to conduct an
4      investigatory stop for reckless driving and you try to
5      conduct that investigation and the person walks away from
6      you and you tell them to stop so that you can conduct your
7      investigation and they walk away and they go inside their
8      home. Is it your understanding that you have -- just
9      because you have reasonable suspicion to conduct an
10     investigation that you have legal authority under those
11     circumstances to enter a home without a warrant and
12     without consent?
13 A   No.
14 Q   Okay. And why is that? Why don't you have that legal
15     authority to do that?
16 A   Based on a misdemeanor that happened outside my presence.
17     Ask the question again, please.
18 Q   I asked the question that.....
19 A   Okay.
20 Q   I asked the question that.....
21 A   Okay.
22 Q   .....again assuming there's no REDDI call.
23 A   Right.
24 Q   You've just got reasonable suspicion to conduct an
25     investigation on reckless driving. You -- and you try to

Page 132

1   conduct that investigation and the person you want to
2   investigate walks away.
3  A   Correct.
4  Q   And you tell them to stop so you can conduct your
5      investigation and they don't and they go inside their
6      house.
7  A   Okay.
8  Q   Okay? And my question I put to you was do you believe
9      that under those circumstances where you've got reasonable
10     suspicion to conduct an investigation and the person walks
11     away from you, refuses to submit themselves to the
12     investigation, and they walk inside their house even after
13     you've told them to stop, that without a warrant and
14     without consent, you can enter their home and you said no,
15     I don't believe.....
16 A   Correct.
17 Q   .....I have that legal authority.
18 A   Correct.
19 Q   And I'm asking you why is that? What's your understanding
20     as to why you don't have the authority to enter a house
21     under those circumstances?
22 A   It was a misdemeanor that happened outside my presence, if
23     I was assuming that it was a reckless driving case.
24 Q   Okay. So -- and if there was a misdemeanor committed in
25     your presence, then what?

Page 133

1      MR. KOZIOL: Objection. Form.
2  Q   Can you -- to conduct an investigatory investigation of a
3      misdemeanor committed in your presence where there's just
4      reasonable suspicion to conduct the investigation and no
5      probable cause, do you have authority to go inside
6      somebody's house without a warrant and without consent?
7      MR. KOZIOL: Objection. Form.
8  A   So they've committed a misdemeanor in my presence, but
9      there's only reasonable suspicion that they did it?
10 Q   Well, you think they have.
11 A   I mean -- I don't understand.
12 Q   Okay. I'll rephrase the question. Where there's probable
13     cause to arrest somebody on a misdemeanor -- okay -- and
14     they walk away from you, can you enter a home to make an
15     arrest?
16     MR. KOZIOL: Objection. Form.
17 Q   Without a warrant and without consent.
18     MR. KOZIOL: Same objection.
19 A   Yes.
20 Q   And what's your understanding of what your legal authority
21     is for that?
22 A   There are certain exceptions to the warrant rule and it's
23     my understanding that hot pursuit is one of them. If I
24     believe that somebody's committed a misdemeanor, then they
25     pose a threat to somebody's life or property or well

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 15 of 20

FRANK PETERSON
Vol 1
4/1/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

35 (Pages 134 to 137)

Page 134

1  being, that I can enter their residence without a warrant.
2  Q  Okay. And did you have that understanding back on
3     January 4th, 2003, or is that something you learned as
4     this case progressed after that day? Was that your
5     understanding of the rule on hot pursuit back on
6     January 4th, 2003, or is that your understanding that
7     you've come to have because of all the litigation in this
8     case since that date?
9  A  That was my understanding then as well.
10 Q  Okay. So now are there any circumstances that you're
11    aware of where if you have only reasonable suspicion you
12    can pursue somebody into their home without a warrant and
13    without consent?
14 A  No.
15 Q  Okay. Now, let's assume that this was in fact a REDDI
16    case and again you don't have probable cause to make an
17    arrest for driving under the influence, but you've got
18    reasonable suspicion based on the fact that somebody
19    called in and said I think there's a driver that's
20    intoxicated and you find the driver and they go inside
21    their house, do you -- with only reasonable suspicion, can
22    you go -- can you follow them in their house without a
23    warrant and without consent?
24    MR. KOZIOL: Objection. Form.
25 A  With only reasonable suspicion?

Page 135

1  Q  Uh-huh.
2  A  I don't think so.
3  Q  Okay. So if you have only reasonable suspicion to
4     investigate drunk driving and you only have -- let's
5     assume -- in this case, you would say, if I understand you
6     correctly, you had reasonable suspicion to conduct an
7     investigation for driving under the influence, right,
8     because of the REDDI call?
9  A  And probably cause?
10 Q  Well, let's take it one step at a time.
11 A  Okay.
12 Q  You would say that you had reasonable suspicion to conduct
13    an investigation for driving under the influence based on
14    the REDDI call, yes?
15 A  Correct.
16 Q  And you also had reasonable suspicion for -- to conduct an
17    investigation for reckless driving, right?
18 A  Correct.
19 Q  But neither of those standing alone would give you
20    authority to go into Mr. Brown's house, right?
21 A  Correct.
22 Q  All right. So I take it from your testimony you think you
23    had more than that. You actually had probable cause to
24    make an arrest.
25 A  Correct.

Page 136

1  Q  Based on what?
2  A  Based on the information received by the callers, based on
3     dispatch, based on my seeing the vehicle, following the
4     vehicle, attempting to conduct a traffic stop, and then
5     pulling in behind Mr. Brown and him running into the
6     house.
7  Q  Okay. So you think the probable cause was based on a
8     statement of the REDDI call, driver might be
9     intoxicated.....
10 A  Correct.
11 Q  .....and a hearsay report of reckless driving, right?
12 A  Correct.
13 Q  And you saw the vehicle.
14 A  Correct.
15 Q  Did that give you more probable cause -- did that add
16    something to those calls so that -- that gave you probable
17    cause instead of reasonable suspicion?
18 A  Can you rephrase the question?
19 Q  Well, when you got the call -- the REDDI call.....
20 A  Uh-huh. (Affirmative)
21 Q  .....right? That gave you reasonable suspicion to conduct
22    an investigative detention, right?
23 A  Correct.
24 Q  Okay. And when you got the call about the reckless
25    driving, same thing, right? That gave you reasonable

Page 137

1     suspicion.
2  A  Correct.
3  Q  Did seeing the vehicle give you something more than what
4     you already had?
5  A  Everything put together.
6  Q  Okay. But did seeing the vehicle at that point give you
7     probable cause?
8  A  Correct.
9  Q  Just seeing the vehicle gave you probable cause to make an
10    arrest?
11 A  It's everything combined. It confirmed.....
12 Q  I'm asking you at what point you got probable cause.
13    After you got the REDDI call.....
14 A  Uh-huh. (Affirmative)
15 Q  .....you saw the vehicle. Did you have probable cause to
16    make an arrest for DUI?
17 A  I would have said no.
18 Q  Okay. After you saw the vehicle and you followed it and
19    you didn't see any traffic infractions committed, did you
20    have probable cause to make an arrest for DUI?
21 A  No.
22 Q  Okay. After you followed it to Purtov Street and the
23    driver got out and went inside his house, at that point,
24    did you have probable cause to make an arrest?
25 A  No.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 16 of 20

FRANK PETERSON
Vol 1                                              4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

36 (Pages 138 to 141)

Page 138

1  Q  Okay. So between the time you got the phone call and the
2     time Mr. Brown entered his home, you had reasonable
3     suspicion and nothing more that gave you probable cause.
4  A  All the information put together was probable cause.
5  Q  Well, so -- we'll back it up one more time.
6  A  Okay.
7  Q  Let's start again. You get the call for a REDDI call.
8  A  Okay.
9  Q  Do you have probable cause to make an arrest for DUI?
10 A  Arrest, no.
11 Q  Okay. You see the vehicle. Do you have probable cause to
12    make an arrest for DUI?
13 A  No.
14 Q  Okay. You've got the call, you see the vehicle, you
15    follow it. You don't see any traffic infractions. You
16    don't see any bad driving.
17 A  Correct.
18 Q  Okay. You've got those three things. Do you have
19    probable cause to make an arrest for DUI?
20 A  No.
21 Q  Okay. You get the call, you see the vehicle, you follow
22    it, but you don't see any traffic infractions. You follow
23    it to Purtov Street. Mr. Brown gets out of his car. Do
24    you have probable cause to make an arrest for DUI?
25 A  No.

Page 139

1  Q  Okay. You get the call, you see the vehicle, you follow
2     it, you don't see any traffic infractions. Mr. Brown gets
3     to his house, he gets out of his car, he goes inside his
4     house. Do you have probable cause to make an arrest for
5     DUI?
6  A  No.
7  Q  So between the -- so that's everything -- that's
8     everything you just listed. You don't have probable cause
9     to make an arrest for DUI after you add up all those
10    things, do you?
11 A  Yes, I do.
12 Q  Explain. You just said.....
13    MR. KOZIOL: Let him explain, okay?
14 Q  Right.
15 A  I thought you were going to go farther after that last
16    one, you go inside because that's what you've been doing.
17    I thought you were going to go, he goes in the bathroom,
18    and then.....
19 Q  Okay.
20 A  Okay.
21 Q  This is -- so you.....
22 A  Inside, I'm going to say yes, I do.
23 Q  Okay. But before you go inside, you don't, do you?
24 A  Correct.
25 Q  Okay. That's what I'm getting at. You didn't have

Page 140

1     probable cause to make an arrest for DUI until you got
2     inside the house, right?
3  A  Correct.
4  Q  All right. Up until you get inside the house, you don't
5     have probable cause to make an arrest for anything, do
6     you?
7  A  Correct.
8  Q  Okay. And so you've just testified that in order to make
9     a warrantless entry without consent into somebody's home,
10    you need to be in hot pursuit of a misdemeanor committed
11    in your presence.
12 A  DUI specifically.
13 Q  Right.
14 A  Or harm to somebody's property or life.
15 Q  Right. And you didn't see any misdemeanor committed in
16    your presence, right?
17 A  Correct.
18 Q  And so you didn't have probable cause at any -- before you
19    got into the house that there was any crime that had been
20    committed because you didn't have probable cause until
21    after you got in the house, right?
22 A  Correct.
23 Q  Okay. So based on your understanding of hot pursuit, you
24    didn't have a hot pursuit situation because you didn't
25    have a misdemeanor committed in your presence where you

Page 141

1     were pursuing somebody for a misdemeanor arrest. You
2     didn't have probable cause to make an arrest yet.
3     MR. KOZIOL: Objection. Form.
4  Q  Did you?
5  A  Correct.
6  Q  Okay.
7     MR. KOZIOL: We've been going about an hour. Can we take
8     a break?
9     MR. HERZ: I'm almost done with this line of questioning
10    and then yes.
11 Q  When you got to the door, you indicated in your report
12    that Mr. Brown was trying to shut it and you actually got
13    your hand either on the door or on the door handle and
14    you've testified in a couple different instances that out
15    of reflex or something, you actually shut the door.....
16 A  Correct.
17 Q  .....right? And so the door was shut, right?
18 A  Correct.
19 Q  And I think you've indicated that you could see through a
20    glass panel some activity going inside the house, right?
21 A  I can't remember.
22 Q  Okay. With the door shut, you didn't knock on the door,
23    right, and announce your presence and say Kodiak Police
24    Officer, let me in, right?
25 A  Correct.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net

Page 142

1  Q  So you didn't announce your authority and you didn't
2     announce your presence.
3  A  Correct.
4  Q  You just open the door and let yourself in.
5  A  Correct.
6  Q  Okay.
7     MR. HERZ: All right. If you'd like to take a break, we
8  can take a break.
9     MR. KOZIOL: Yeah.
10    (Off record)
11    (On record)
12    REPORTER: All right, we're back on record.
13 Q  Okay. While we were on break, did you meet with
14    Mr. Koziol?
15 A  Yes, I did.
16 Q  And during the meeting with Mr. Koziol, did he discuss
17    with you questions you might be asked or answers you might
18    give during the course of this deposition in response to
19    any of the questions I've asked you during the last
20    session?
21    MR. KOZIOL: Objection. Attorney-client privilege.
22 Request the witness not to answer.
23 A  I won't answer.
24 Q  I want to turn your attention to the investigation
25    involving Jessie McMann, okay?

Page 143

1  A  Okay.
2  Q  When did your relationship with Jessie McMann begin?
3  A  I'm not sure when I met her for the first time. It was
4     back when her mother was working for the police
5     department, but I met her again in 2006 when I got back to
6     the schools.
7  Q  Okay. And you got back to the schools in March of 2006,
8     right?
9  A  I don't think it was right away. I had to go through some
10    training. When I got back from Iraq, they wanted me to go
11    through some field training basically, a shorter version
12    of it.
13 Q  Okay. But I take it you resumed your position as the
14    school liaison officer though before the end of the spring
15    term in -- sometime March/April of '06, right?
16 A  Correct.
17 Q  Okay. And now at that time, Jessie McMann was 16 years of
18    age?
19 A  Correct.
20 Q  And you agree at some point your relationship with her was
21    inappropriate, right?
22 A  Correct.
23 Q  And when did your -- when would you say the beginning of
24    that inappropriate relationship started?
25 A  I don't know.

Page 144

1  Q  It was before the end of the spring '06 term though,
2     right?
3  A  Correct.
4  Q  And it continued through the summer and into the beginning
5     of the '06-'07 school year.....
6  A  Correct.
7  Q  .....right? Okay. And have you reviewed the report
8     produced by Russell Consulting LLC, the -- that was the
9     company that was hired to investigate your -- the claim of
10    conduct unbecoming an officer involving you?
11 A  Yes, I have.
12 Q  You've read that report?
13 A  Yes.
14 Q  And do you agree with everything that's in it?
15    MR. KOZIOL: Objection. Form.
16 A  Yes.
17 Q  Okay. So under -- on Page 26 of the report, Bates Stamp
18    13280, sub (c), disciplinary personnel actions, three
19    examples of behavior specifically prohibited include (f)
20    sexual activities on duty. Officer Peterson admitted he
21    discussed a potential sexual relationship with A after she
22    turned 18. He sent A many personal text messages
23    throughout the day even while she was in class.
24    MR. KOZIOL: Wait. You're skipping around now. So I
25 think you should note for the record you just skipped like a

Page 145

1  sentence and then you dropped down.
2     MR. HERZ: He admitted -- he.....
3     MR. KOZIOL: For completeness sake, I really wish you
4  wouldn't do that or just show it to him.
5  Q  He admitted that he knew A had a crush on him and he
6     discussed this matter with two teachers at the school.
7  A  Correct.
8  Q  He admitted he used his own cell phone to send these
9     messages because the messages were personal not job
10    related, even though they were sent while he was on duty
11    as a school resource officer. Right?
12 A  Correct.
13 Q  Officer Peterson complimented A, A being Jessie McMann,
14    right.....
15 A  Correct.
16 Q  .....on her nice ass. A admitted that Officer Peterson
17    also told her she had nice boobs. So.....
18 A  Can I see that?
19    MR. KOZIOL: Is there a question?
20 Q  Jessie McMann stated that Officer Peterson told her she
21    had nice boobs.
22 A  I don't remember that, but if that's what was said, then
23    that's.....
24 Q  So you may have said that.
25 A  I may have, yes.

Case 3:05-cv-00002-TMB   Document 89-12   Filed 05/27/2008   Page 18 of 20

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

38 (Pages 146 to 149)

Page 146

1  Q  To Jessie McMann.
2  A  May have, yes.
3  Q  Okay. And you agree that the communications between you
4     were sometimes sexual in nature.....
5  A  Yes.
6  Q  .....or can involve sexual content, right?
7  A  Yes.
8  Q  Okay. Also on 13280(c), disciplinary personnel actions,
9     (g) duty, 3, officers of the department while on duty will
10    not engage in activity or personal business which would
11    cause them to neglect their duties. Officer Peterson's
12    phone records confirm his admission of considerable text
13    messaging between himself and A. He sent her 2,294 text
14    messages May slash June, 1,386 text messages in June slash
15    July, 306 text messages in July slash August, and 765 text
16    messages August slash September, right?
17 A  Correct.
18 Q  And you agree with that?
19 A  Correct.
20 Q  You indicated that you used your own cell phone because
21    the calls were personal not job related. You recognize
22    that an audit of your department issued phone records
23    would reveal an inordinate amount of texting done.
24 A  I don't understand that. Of my job -- work phone?
25 Q  You indicated that you recognize that an audit of your

Page 147

1     department issued phone records would reveal the
2     inordinate amount of texting done.
3  A  Correct.
4  Q  Okay. You admitted that Jessie McMann was the only
5     student you sent text messages to, that you admitted you
6     sent text messages while she was in class during school
7     hours. Right?
8  A  Correct.
9  Q  You spent considerable time with her each schoolday
10    talking with her in your office, at lunch, or in the
11    hallways.
12 A  Correct.
13 Q  You admitted that you spent more time with her than any
14    other student and that your relationship was personal not
15    related to your duties and responsibilities as a school
16    resource officer.
17 A  Correct.
18 Q  In addition to these thousands of text messages, you also
19    indicated there were emails between you, right?
20 A  Correct.
21 Q  And what computer did -- did you send emails to her?
22 A  Correct.
23 Q  And she sent emails to you?
24 A  Correct.
25 Q  What computer did you use to send the emails?

Page 148

1  A  My personal computer at home.
2  Q  Okay. And is that computer still in existence?
3  A  Yes.
4  Q  And is the hard drive that was used at that time still
5     intact?
6  A  I think so.
7  Q  Okay. And similar to the text messaging, were the emails
8     sometimes of a sexual nature?
9  A  Yes.
10 Q  Okay. Did you and she ever exchange photographs.....
11 A  No.
12 Q  .....over the Internet?
13 A  Negative.
14 Q  Or what about on MySpace?
15 A  No.
16 Q  Okay. Did she ever send you photographs of her?
17 A  No.
18 Q  She ever send you photographs of her in any state of
19    undress?
20 A  No.
21 Q  Okay. Were there any photographs of her in any what would
22    be considered revealing or skimpy clothing?
23 A  No.
24 Q  Any photographs that depicted her or showed her naked
25    breasts?

Page 149

1  A  No.
2  Q  Or vaginal or genital area?
3  A  No.
4  Q  Or buttocks?
5  A  No.
6  Q  At any time, did you have physical contact with Jessie
7     McMann?
8  A  Negative. No.
9  Q  Did you ever hold hands?
10 A  No.
11 Q  Did you ever hug?
12 A  No.
13 Q  Did you ever kiss?
14 A  No.
15 Q  Was there any time where you touched her breasts.....
16 A  No.
17 Q  .....either through her clothing or underneath her
18    clothing?
19 A  No.
20 Q  Is there any time that you touched her genital areas
21    either through her clothing or underneath her clothing?
22 A  No.
23 Q  Any time you touched her buttocks either under her
24    clothing or over her clothing?
25 A  No.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Page 150

1  Q  Is there any time where she touched you?
2  A  No.
3  Q  Where she touched you in any sexual way?
4  A  No.
5  Q  Did she ever touch your buttocks either under your
6     clothing or over your clothing?
7  A  No.
8  Q  Okay. Was there any time where she touched your penis
9     either over your clothing or under your clothing?
10 A  No.
11 Q  Was there any sexual act of any sort including sexual
12    penetration of any sort as defined under Alaska State law?
13 A  No.
14 Q  And you know what the definition of sexual penetration
15    under Alaska State law is, right?
16 A  Yes.
17 Q  Was there any sexual touching as defined under Alaska
18    State law?
19 A  No.
20 Q  And you know what the definition of sexual touching is
21    under Alaska State law, right?
22 A  Yes.
23    MR. HERZ: Go ahead and take a break to make the change?
24    REPORTER: Yes. This concludes the second videotape in
25    the deposition of Officer Peterson.

Page 151

1     (Off record)
2     (On record)
3     REPORTER: We're back on record, this is the third tape in
4     the videotaped deposition of Officer Peterson.
5  Q  You initially told the investigating officer from Russell
6     Consulting that you didn't have any knowledge of Jessie
7     McMann posting messages on your MySpace Website, right?
8  A  I don't recall that. May I see it?
9  Q  13271.
10 A  Correct.
11 Q  Then you later admitted that you actually deleted her
12    messages because you knew that it would not look good for
13    you.
14 A  Correct.
15 Q  So initially you weren't honest with the investigating
16    officer, right?
17 A  Correct.
18 Q  And what was it about these text messages that would not
19    look good for you?
20 A  They were of a sexual nature.
21 Q  And you agree that you placed at least ten phone calls to
22    her cell phone or your personal cell phone from two
23    extensions in the officers room at the Kodiak Police
24    Department? 13274.
25 A  Correct.

Page 152

1  Q  Did at some point Jessie McMann send you a text message on
2     your cell phone saying have some awesome fucking dreams?
3  A  I think so. I can't remember.
4  Q  And when your wife discovered that text message, you
5     denied it was from Jessie, didn't you?
6  A  I can't remember. If it says it, then yes.
7  Q  Okay. Would you agree that when your wife suspected you
8     were having an affair with Jessie McMann that -- and she
9     confronted you about text messages such as this that you
10    denied that you were having -- you were texting each other
11    and that the texts were of a sexual nature?
12 A  No.
13 Q  So you were up front with your wife, here are all these
14    sexual text messages, have a look?
15 A  No.
16    MR. KOZIOL: Objection. Form.
17 Q  Did you initially tell your wife that the text message
18    have some awesome fucking dreams was actually from Jessie
19    McMann's mother?
20 A  I don't know. I can't remember.
21 Q  That would have been a lie, right? Do you think Vivian
22    McMann sent you a text message saying have some fucking
23    awesome dreams?
24 A  I don't think so, no.
25 Q  Okay. So if you told your wife that, that would have been

Page 153

1     a lie, right?
2  A  True.
3  Q  Okay. Does your wife have any reason to lie about you
4     telling that story.....
5  A  No.
6  Q  .....to her?
7  A  No.
8  Q  Okay. So during the course of the investigation with
9     Russell Consulting, there were times where you told Greg
10    Russell things that were not true, right?
11 A  One time.
12 Q  And during the course of this relationship, this
13    inappropriate relationship with Jessie McMann, there were
14    things you told your wife that weren't true as well,
15    right?
16 A  Correct.
17 Q  So in this instance when there are things that might make
18    you look bad, either personally or in the performance of
19    your job, there have been occasions under those
20    circumstances where you've not been truthful in order to
21    make yourself look better.
22 A  Can you rephrase that?
23 Q  In the context of this investigation.....
24 A  Okay.
25 Q  .....right?

## Page 154

1  A  Right.
2  Q  Which involved your duties as a police officer, when
3     circumstances arose that either would make you look bad
4     personally or make you look bad in the context of
5     performing your duties, in order to make yourself look
6     better, you said things that weren't true.
7  A  Correct.
8  Q  So there are times when in order to make yourself look
9     better when -- in the performance of your duties, you have
10    not been truthful.
11 A  Correct.
12 Q  You would agree that you didn't follow departmental
13    procedures in this instance involving Jessie McMann,
14    right?
15 A  Yes.
16 Q  Okay. Phone number 486-8755 is what number? Do you
17    recognize it?
18 A  No.
19 Q  Okay. How about 539-6604, do you recognize that number?
20 A  Yes.
21 Q  What number is that?
22 A  That was my old cell phone number.
23 Q  And how about 539-2341?
24 A  I think that was Jessica's.
25 Q  Okay.

## Page 155

1     MR. HERZ: The Russell Consulting report is Bates Stamps
2  13255 through 13283. I intend to attach it as an exhibit.
3  It'll be sealed according to the stipulation of the parties
4  that will also be attached to the deposition.
5     MR. KOZIOL: Are we going to make it an exhibit?
6     MR. HERZ: Yeah. So -- not at this time. I mean but all
7  the documents that have been referenced are going to get copied
8  in Anchorage and attached later.
9     MR. KOZIOL: Oh, I'm only interested in whether we're
10 marking any as exhibits or we're just going to have them
11 attached and described by way of Bates Stamping.
12    MR. HERZ: My intent would be to have them attached just
13 as we did with the affidavits in support of the complaints
14 which we copied. The references to the -- because you wanted
15 those attached, right? The information from the narrative
16 reports, what we have discussed is that because that's a lot of
17 copying, we're going to do that in Anchorage and attach those
18 when we get up there.
19    MR. KOZIOL: Okay. And we're not going to really mark
20 anything an exhibit then. These are just going to be
21 attachments and described by Bates Stamp numbers, right?
22    MR. HERZ: Yeah. That's -- that's fine.
23    MR. KOZIOL: Okay. Just trying to be clear on this.
24    REPORTER: Okay. So can you give me those numbers again.
25    MR. HERZ: Yeah. 13255 through 13283.

## Page 156

1     REPORTER: Okay.
2  Q  All right. In the course of discovery in this case,
3     Mr. Koziol identified a number of documents that were
4     produced by the State of Alaska District Attorney's
5     office, and indicated that those documents were not going
6     to be produced due to attorney-client relationship -- or
7     attorney-client privilege. And so my question to you is
8     is it your testimony that the State of Alaska District
9     Attorney's office and in particular Joe Slusser (ph)
10    and/or Mike Gray were attorneys that represented your
11    interests during the course of the criminal case involving
12    Scott Brown?
13    MR. KOZIOL: I'm going to object. I think the objection
14 probably also included work product. If it didn't, it should
15 have. But it probably was a twofold objection. But be that as
16 it may, I wanted to set that forth.
17    MR. HERZ: Work product being work product produced on
18 behalf of the defendants here, right?
19    MR. KOZIOL: No. The State's work product.
20    MR. HERZ: You and the defendants.....
21    MR. KOZIOL: We don't need to argue about it. I'm just
22 saying that's my recollection of the objection in addition
23 to.....
24    MR. HERZ: So if I understand what you're saying, you're
25 claiming a work product privilege on behalf of the State of

## Page 157

1  Alaska?
2     MR. KOZIOL: I'm just saying I believe that's what the
3  objection said.
4     MR. HERZ: Okay.
5  Q  Well, I -- without regard to defense counsel making a
6     claim of work product on behalf of the nonparty, is it
7     your position that the State of Alaska District Attorney's
8     officer and Joe Slusser and/or Mike Gray were attorneys
9     that represented your interests in State criminal court?
10 A  Yes.
11 Q  They were your lawyers.
12 A  Yes.
13 Q  Okay. And did they -- and I'm not going to ask about
14    content. I don't want to know content. Did they -- as
15    you being their client, did you and they consult with one
16    another about how the proceedings would go forward?
17 A  Yes.
18 Q  And did they ask and solicit from you your ideas and
19    opinions about questions to ask and things to do in court?
20 A  No.
21 Q  You assisted with them though in preparing the case,
22    right?
23 A  Correct.
24 Q  And in fact at one point, you went out and got an exhibit,
25    some beer containers?