Page 158

1  A  Correct.
2  Q  For purposes of going to court, right?
3  A  Correct.
4  Q  All right. Now, and you knew that Mr. Brown had -- was
5     upset and angry about what he was claiming to be an
6     unlawful arrest and a warrantless entry in his home. He
7     was making those claims even on the day that he was
8     arrested, right?
9  A  Correct.
10 Q  Okay. And when the -- when his criminal trial lawyer
11    filed a motion to suppress all the evidence in the
12    criminal case based on an allegation of there being an
13    unlawful entry and hence an unlawful arrest, you
14    understood, right, that if he was successful in winning
15    that motion that would strengthen his argument and make
16    his case easier in claiming that he was unlawfully
17    arrested and the entry into his home was illegal, right?
18    MR. KOZIOL: Objection. Form.
19 A  Correct.
20 Q  And you also understood that if he was not successful, if
21    that motion was defeated and the Court found that the
22    entry into the home was lawful and the arrest was lawful
23    that his claim would be much weaker, right?
24    MR. KOZIOL: Objection. Form.
25 A  Correct.

Page 159

1  Q  And so you understood that the State District Attorney's
2     office was -- and so that -- those were -- that was -- you
3     know, the outcome of that decision affected you, didn't
4     it? It could certainly affect you later on in any kind of
5     a civil case, right? You understood that.
6  A  Correct.
7  Q  And so you understood that the testimony that would -- the
8     questions you'd be asked and the answers you would give
9     was important in not only the criminal case but in any
10    potential civil litigation later, right?
11 A  Correct.
12 Q  And you also understood that anything that you could do to
13    assist in preparing that case would also not only be
14    important in the outcome of the criminal case but also in
15    any civil litigation later on, right?
16 A  Correct.
17 Q  Okay. And so you felt that your interests were being
18    represented by the District Attorney's office?
19 A  Correct.
20 Q  And that your interests -- they -- you know, if they
21    wanted to and they could, they could ask your opinions
22    about those interests and you could have provided them?
23 A  Who?
24 Q  If they felt it necessary, you understood that they could
25    ask for your opinions about how your interests were being

Page 160

1     represented and you could provide your input, right?
2  A  District Attorney's office?
3  Q  Yeah.
4  A  Correct.
5  Q  Okay. And were there times where they sought your input
6     and asked for your opinions about things during the course
7     of the criminal litigation?
8     MR. KOZIOL: Objection. Form.
9  A  I imagine.
10 Q  Okay. You don't.....
11 A  I can't remember.
12 Q  Okay. But it's certainly something that would have
13    happened or could have happened?
14 A  Correct.
15 Q  Okay. And so explain to me how the -- how it is that
16    you're the client for the District Attorney's office.
17    MR. HERZ: I'm going to ask that the witness be segregated
18    during.....
19    MR. KOZIOL: Can't. He's a party.
20    MR. HERZ: Okay.
21    MR. KOZIOL: This is Mr. Holden.
22    MR. HERZ: All right.
23 Q  So tell me about your relationship as their client? How
24    is it that you became a client for the District Attorney's
25    office?

Page 161

1  A  What do you mean?
2  Q  Well, you're claiming that they were your attorneys in the
3     criminal case and that they represented your interests.
4     How did that come about?
5  A  I became a police officer with the City of Kodiak.
6  Q  Uh-huh. All right. And so is it your position that
7     whenever you got to court because there's no municipal
8     prosecutor's office here that the State of Alaska is
9     representing you and representing your interests every
10    time you go to court?
11 A  Sort of.
12 Q  Okay. Was there anything that you can think of during the
13    course of that criminal case where they didn't represent
14    your interests or did they do their best and raised all
15    the arguments you would have wanted them to raise?
16    MR. KOZIOL: Objection. Form.
17 A  They're the lawyers. I'm a police officer. I don't tell
18    them how to do their job and what happens after I arrest
19    somebody is up to them. If they want help with something,
20    then I'll provide it.
21 Q  Okay. And did you provide it? I mean you went out and
22    got -- went out and bought a beer container for them as
23    evidence, right?
24 A  No.
25 Q  You didn't buy it?

Page 162

1  A  No.
2  Q  Okay. Where'd that come from?
3  A  Safeway Liquor.
4  Q  For free?
5  A  Yes.
6  Q  Oh, okay. Okay. But you went out and got some evidence
7     at their request, right?
8  A  Correct.
9  Q  All right. And -- but -- so you're not going to tell them
10    what to do, but you'll consult with them, right?
11 A  If what you mean by consult is talk with them about a
12    case, yes.
13 Q  Yeah. And if they've got an idea and you've got an idea,
14    you'll share your ideas with them, right?
15 A  Yes.
16 Q  Okay. And you might even suggest things to them that they
17    might not have thought of?
18 A  I can't think of a situation when that would happen.
19 Q  Okay. You don't -- there's no give and take like that?
20 A  Not that I can think of.
21 Q  Okay. So what else about it would you say makes them your
22    attorneys where you're their client and they're
23    representing you?
24 A  The District Attorney is the -- basically the superior law
25    enforcement officer in Kodiak, so as law enforcement

Page 163

1     officers, we do what -- or what we're instructed to do by
2     him. I guess I'm.....
3  Q  Okay. That.....
4  A  I'm looking for something else I guess. I don't
5     understand.
6  Q  I'm looking -- what I hear you saying is that you view
7     them as being potentially law enforcement of some sort and
8     I'm trying to get -- Mr. Koziol's claimed that the
9     documents they've produced in the context of the criminal
10    case are shielded from being released to me because of an
11    attorney-client relationship you have with them. So I'm
12    trying to figure out how it is that you're their client,
13    how they represented you, how it is that you've got a
14    relationship where you're a client and they're your
15    attorneys as opposed to you're in law enforcement and
16    they're in law enforcement. Okay? Because there's a
17    difference. So I'm trying to explore why it is that
18    you're claiming that they're your lawyers and that they've
19    represented your interests and I want to find out what
20    they did and how they did it.
21 A  I don't know that.
22 Q  Okay. You didn't hire them, right?
23 A  Correct.
24 Q  You didn't retain them?
25 A  Correct.

Page 164

1  Q  You didn't pay them anything.
2  A  Correct.
3  Q  Okay. But they did represent your interests in the
4     criminal case.
5  A  Correct.
6  Q  And they -- and you feel they protected your interests.
7  A  To the best of their abilities.
8  Q  Okay. And was there any issue that you wanted raised that
9     they didn't raise?
10 A  No.
11 Q  Okay.
12    MR. HERZ: That's all the questions I have.
13    MR. KOZIOL: We'll take a stretch -- five-minute stretch
14    and then we'll being.
15    (Off record)
16    (On record)
17    REPORTER: Okay. We're on record.
18    OFFICER FRANK R. PETERSON, JR.
19 testified as follows on:
20    CROSS EXAMINATION
21 BY MR. KOZIOL:
22 Q  Officer Peterson, I'm going to be moving around from topic
23    to topic because I have different topics I want to talk to
24    you about that were brought up by Mr. Herz. You have
25    testified that you're leaving the Kodiak Police Department

Page 165

1     to go to your new job because you want to spend more time
2     with your family and in any Mr. Herz's follow-up
3     questions, you said that you'd be working -- you would be
4     working 40 hours each job and in your new job that you're
5     about to take you'll additionally be going to school. Can
6     you explain to us how that -- given that answer, how that
7     means you'll be able to spend more time with your family
8     in your new job as compared to your old job?
9  A  With the Kodiak Police Department, we work shift work. My
10    days off are Thursday and Friday. Shift work meaning that
11    there are shifts from 8:00 to 4:00 in the afternoon, 4:00
12    in the afternoon to midnight, and then midnight until 8:00
13    in the morning. In 2007, I had two rotations of grave
14    shift where I worked midnight to 8:00, started January,
15    February, and March, and then I went to rotation of day
16    shift, then a rotation of swing shift and then concluded
17    2007 with a rotation of grave shift again. So six months
18    where I didn't sleep with my wife except for Thursday and
19    Friday, don't have the same weekends as my children do, so
20    the opportunity for camping and going out and doing things
21    with them is limited. Mandatory overtime, I get called in
22    for cases. Shift coverage, that's something I have to
23    cover, so even if I'm working a day shift or a swing
24    shift, get called in earlier, have to stay late, it's
25    going to affect my time with my family as well.

Page 166

1  Q  Okay. The incident that brings us here today was
2     January 4th, 2003, and I think you've testified that you
3     were working at that point as a school liaison officer.
4  A  Correct.
5  Q  During that general time frame.
6  A  Correct.
7  Q  But yet you actually responded to a call to dispatch and
8     you went out on patrol. Can you tell me why that was and
9     more particularly what percentage of your time during that
10    time frame when you were a school liaison officer would
11    you spend doing school liaison duties versus patrol
12    duties.
13    MR. HERZ: Objection. Compound question.
14    MR. KOZIOL: I'll withdraw it and rephrase.
15 Q  Why were you not working as a school liaison officer at
16    the time the dispatcher dispatched you to this call which
17    led to the arrest of Scott Brown?
18 A  When I became the school liaison officer, it was with the
19    understanding that I would also be covering shift work as
20    a patrol officer when needed. This was one of those
21    situations. I was asked to come in and work -- told to
22    come in and work actually not asked. I didn't have the
23    option but to fill in for an officer that wasn't there.
24 Q  All right. Let's take the 2002-2003 school year where you
25    were school liaison officer. I've stated that correctly,

Page 167

1     true?
2  A  Okay. Yes.
3  Q  All right. What percentage of your work time was spent as
4     a school liaison officer as compared to doing patrol
5     duties?
6  A  That was the first year of the program, the first year
7     that I was actually assigned to the schools and we were
8     short manned during that year and I recall spending
9     probably 30 or 40 percent of my time on patrol versus
10    school -- school offices.
11 Q  Okay.
12 A  I can't even recall having a school office at the time.
13 Q  Okay. Now, we spent -- Mr. Herz has spent probably
14    several hours going through past reports you've written
15    and past affidavits that you've filled out relating to DUI
16    arrests, all prior to the arrest of Mr. Brown. Do you
17    remember that?
18 A  Correct. Yes.
19 Q  And what I watched him do and I want to see if you agree
20    with me, he basically was comparing what you said in your
21    police report with what you put in affidavits and
22    basically then asking you were the two consistent or not
23    and I think you basically said there was consistency
24    there, although I think there was one exception and that
25    had to do with the Yosef Reutov case or something therein

Page 168

1     close, if I'm mispronouncing it. Would you agree with
2     that?
3  A  Yes.
4  Q  Okay. And that Yosef Reutov case, that was an example of
5     a mistake you made, right?
6  A  Correct.
7  Q  Okay. There was an inconsistency between the affidavit
8     and the police report, right?
9  A  Yes.
10 Q  And I take it you make mistakes just as anyone else would
11    including other police officers, right, on occasion.
12 A  Yes.
13 Q  Okay. I don't want to belabor the point, but I do want to
14    further make the point, so I want to show you 12690 and
15    12676 and I'll hand those to Mr. Herz so he knows what I'm
16    giving you.
17    MR. HERZ: Which particular paragraphs are you going
18    to.....
19    MR. KOZIOL: The first several paragraphs in each.
20    Basically the same paragraphs that you showed him.
21    MR. HERZ: Which would be 1 and 2.
22    MR. KOZIOL: I think so.
23    MR. HERZ: Okay.
24 Q  In 12690 which is your affidavit in the Roland Warnecke
25    case, you state in paragraph 1 that the Kodiak Police

Page 169

1     Department received a call from the Alaska State Troopers
2     requesting our assistance with a person who had been
3     driving and was intoxicated. And I want to emphasize the
4     word driving. You report that there was a report of
5     driving by an intoxicated person, correct?
6  A  Correct.
7  Q  Does your police report 12676 indicate therein that there
8     was driving occurring by the alleged intoxicated person?
9  A  No.
10 Q  Okay. So that's an inconsistency, right?
11 A  Correct.
12 Q  And would you agree that's a significant fact, a
13    significant inconsistency?
14 A  Yes.
15 Q  Okay. So a mistake you made, correct?
16 A  Yes.
17 Q  Okay. And I want to show you 12730 and 12714. Again
18    these were shown to you by Mr. Herz.
19    MR. KOZIOL: Do you want me to give you these or can you
20    get them? This is in the Andres Jauregui case.
21 Q  And in your affidavit in the Jauregui case, if you look at
22    paragraph 1, you do not state that the reporting person
23    said that the vehicle passed him at a high speed, almost
24    hitting him and other vehicles in front of him. That's no
25    so stated in there, is it?

Page 170

1  A  No.
2  Q  And I'll you your police report and look at paragraph 2.
3     You do so state that in there.
4  A  Correct.
5  Q  Okay. Would you consider the failure to put that in the
6     affidavit a mistake or not?
7  A  Yes.
8  Q  Okay. So you I take it along with other police officers
9     sometimes make mistakes in what you've put in and what you
10    don't put in in narrative reports and affidavits, correct?
11 A  Yes.
12 Q  Okay. Now -- so we have three examples of mistakes in
13    earlier cases when we compare the affidavit to the
14    narrative report, right?
15 A  Yes.
16 Q  In our case when Mr. Herz was talking with you, there was
17    no mistake that you noted at least in comparison between
18    the affidavit and the narrative report, right?
19 A  Correct.
20 Q  Okay. They were consistent and congruent even, right?
21 A  Yes.
22 Q  Okay. The mistake you're acknowledging in the Brown case
23    is the failure to put into both the narrative report and
24    the affidavit something you heard orally from the
25    dispatcher, correct?

Page 171

1  A  Yes.
2  Q  And would you agree with me the only way we're going to
3     know whether on all these 28 cases whether you made a
4     similar mistake to the Brown mistake in those 28 cases
5     would be not to look at the police report and compare it
6     to the affidavit but to look at dispatch records and
7     perhaps even tapes or transcripts of the dispatch calls to
8     complaining citizens if there were complaining citizens to
9     see whether you omitted any material important fact in
10    either your report or your affidavit. Would you agree?
11 A  Yes.
12 Q  Okay. So when you always qualified to Mr. Herz as far as
13    I know, I didn't make any further mistakes and leave out
14    material facts, the only way you'd really know that is to
15    actually check with dispatch records and/or dispatch tapes
16    of calls made to dispatch to see if you left anything out
17    in either or both the affidavit or the police report,
18    correct?
19 A  Correct.
20 Q  All right. Now, it has been my observation and in fact
21    you can confirm that it's true in the two narratives I
22    reported to you and I'll give them back to you, 12676 and
23    12714, that your narrative report -- and also your
24    affidavits for those cases too. Your narrative report
25    talks about in the first paragraph what the Kodiak Police

Page 172

1     Department -- the information the Kodiak Police Department
2     received, right?
3  A  Correct.
4  Q  That's how you start out these reports. And would you
5     agree with me that in some of the other cases that have
6     been discussed, some of the other 28 cases, when we're
7     talking about a case that's been triggered -- your
8     involvement's been triggered by a call to Kodiak Police
9     Department, that's how you start out the reports. You
10    start summarizing what occurred at the Kodiak Police
11    Department.....
12 A  Yes.
13 Q  .....right? Okay. Now, I further notice and disagree --
14    and correct me if I'm wrong. I further notice that you
15    don't make an attempt in these police reports to
16    distinguish between what the Kodiak Police Department
17    learned from a caller or callers versus what you were told
18    by the police dispatcher as you got dispatched out. You
19    don't make that distinction in your reports. Would you
20    agree with me?
21 A  Yes.
22 Q  Okay. So I want to now focus on when you -- when you're
23    doing reports and when the work you've done as a result of
24    getting dispatched, based upon a call the Kodiak Police
25    Department has received, how you actually get the

Page 173

1     information that goes into typically the first and/or
2     second paragraph of these reports. Okay. That's going to
3     be my topic and the line of questions I'm going to ask
4     you; all right?
5  A  Okay.
6  Q  Do you sometimes when you write these reports talk to the
7     dispatcher and find -- when you're about ready to make
8     your report -- after you've done your work in the case, do
9     you talk to the dispatcher orally and have the dispatcher
10    tell you what information the Kodiak Police Department
11    received from the callers?
12 A  Yes.
13 Q  Okay. Do you sometimes look at any dispatch records to
14    also fill in the information in these reports?
15 A  Yes.
16 Q  And what kind of dispatch records will you look at on
17    occasion?
18 A  The complaint log. A lot of times that's where they'll
19    put the information anyway so we don't actually have to go
20    up to dispatch and get the information. We can look at it
21    on our computer.
22 Q  Is that a little form?
23 A  Yes.
24 Q  Okay. And it's your understanding that form is filled out
25    at the end -- at least by the end of the dispatcher shift,

Computer Matrix, LLC                Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473       jpk@gci.net
                                                                 sahile@gci.net

Page 174

1  the same day?
2  A  Yes.
3  Q  Okay. And do you ever look at the radio logs in filling
4     out these reports?
5  A  Rarely.
6  Q  Okay. But occasionally.
7  A  Occasionally.
8  Q  Okay. And do you occasionally ever listen to the actual
9     call being made to dispatch in filling out these reports?
10 A  Yes.
11 Q  Okay. And is there any set written protocol as to how you
12    do it in filling out typically the first paragraph or is
13    it left to your discretion how to do it?
14 A  Left to our discretion.
15 Q  Okay. Now, would you agree with me the most accurate way
16    of setting forth what the Kodiak Police Department learned
17    from a call, that is what the dispatcher learned, would be
18    to actually listen to the tape and then write down in your
19    reports what was on the tape?
20 A  Yes.
21 Q  That would be the most accurate, right?
22 A  Yes.
23 Q  Less accurate I guess would be to rely on the dispatcher's
24    memory or even let's say the dispatcher's written report,
25    but that could still be quite accurate also.

Page 175

1  A  Correct.
2  Q  Okay. All right. Now, in the Brown case, when you were
3     writing your narrative report and when you were doing your
4     affidavit again you start out in each saying the Kodiak
5     Police Department received a telephone call. Okay? Or in
6     your narrative report, you state -- and I'll just read it,
7     the Kodiak Police Department received a telephone call
8     from Laurie Sconeberg. In your affidavit, you say the
9     Kodiak Police Department received a report of a
10    gold-colored flatbed pickup truck. My question to you is
11    do you remember what sources of information you checked
12    before you wrote your affidavit and your investigative
13    report?
14 A  No.
15 Q  Do you remember? You could have talked to Douglas Coyle?
16 A  Correct.
17 Q  You could have looked at the card -- the dispatch card?
18 A  Correct.
19 Q  You could have looked at radio logs.
20 A  Yes.
21 Q  And do you think you could have also listened to the tape?
22 A  I could have.
23 Q  And you don't have a memory of doing any of that.
24 A  No.
25 Q  Okay. But as Mr. Herz suggested, you had to get some

Page 176

1     additional information from one of those sources because,
2     for example, in your report, you have written down
3     received a telephone call from Laurie Sconeberg, and that
4     never was reported to you according to your memory orally
5     by the dispatcher in the dispatch call; is that true?
6  A  Yes.
7  Q  Okay. So we know from that that you had to go elsewhere
8     in drafting these documents, but we still don't know
9     where, right?
10 A  Right.
11 Q  Okay. Now, I want to show you a document that hasn't been
12    referred to yet. This document has been Bates Stamped
13    10082. I'm handing you 10082. What does that document
14    appear to be?
15 A  A complaint card that we used to use at the police
16    department.
17 Q  Okay. And what's its date?
18 A  4th of January 2003.
19 Q  And who filled it out?
20 A  Doug Coyle.
21 Q  Okay. And does it appear this complaint card relates to
22    this incident involving Mr. Brown?
23 A  Yes.
24 Q  Okay. And you know that because it's got the name Laurie
25    Sconeberg and Selief toward Pillar Mountain Road.

Page 177

1  A  And the information in the body.
2  Q  Right. And the description in the body.
3  A  Correct.
4  Q  Okay. And in this document, it does set forth citizen
5     report, DWI, REDDI, correct?
6  A  Correct.
7  Q  All right. And I think you've testified it's your belief
8     that Mr. Coyle would have filled this out by the end of
9     his shift.
10 A  Correct.
11 Q  Okay. Now, if you had consulted this document when you
12    filled out your affidavit and your narrative report in
13    this case and you'd paid attention to the DWI REDDI, would
14    you have put it in your affidavit and your narrative
15    report?
16    MR. HERZ: Objection. Calls for speculation.
17 A  I don't know.
18 Q  Well.....
19 A  I might have looked at it.
20 Q  No, no, no, no. Listen to my question.
21 A  Sorry.
22 Q  If you had looked at this document and noted -- seen that
23    it said DWI REDDI, would you have likely put that
24    important fact in your report and your affidavit, if you
25    had noticed it?

Page 178

1   MR. HERZ: Objection. Calls for speculation.
2  A  Yes.
3  Q  Because you've already told us that the REDDI fact was
4     important, right?
5  A  Yes.
6     MR. HERZ: Hang on a second. Oh, this fell off. Thank
7  you. Did you pick up the objection?
8     REPORTER: Yes.
9     MR. HERZ: You did?
10    REPORTER: Yes.
11    MR. HERZ: Okay.
12 Q  10082 is support, is it not, in your opinion for your
13    conclusion that Douglas Coyle did indeed tell you this was
14    a REDDI report?
15 A  Yes.
16    MR. HERZ: I'm sorry. I didn't hear the question.
17 Q  10082 indeed is support -- provides support for your
18    conclusion that Douglas Coyle indeed did tell you this was
19    a REDDI report when you got dispatched, true?
20 A  Yes.
21 Q  Okay.
22    MR. KOZIOL: Just give me a second.
23 Q  I want to show you what's been Bates Stamped 10050 and
24    10051. I'll hand to Mr. Herz first. What are 10050 --
25    let's start with that. What's 10050?

Page 179

1  A  State of Alaska, Department of Administration, Division of
2     Motor Vehicles, Notice and Order of Revocation.
3  Q  Okay. And is that a document that you filled out?
4  A  Correct.
5  Q  Okay. In this case, the Brown case, the underlying Brown
6     criminal case?
7  A  Yes.
8  Q  And why did you fill this out?
9  A  It's one of the documents we fill out when we process
10    somebody for a DWI.
11 Q  Okay. And when was this document filled out?
12 A  The 4th of January 2003.
13 Q  And when it's filled out, what do you do with the document
14    after it's filled out?
15 A  Initially when we're in the booking room and we read this
16    document to whoever's been arrested for DWI, we have them
17    sign it, issue them their copy of it, and then we take it
18    back to where we're doing our reports and complete it.
19 Q  Okay. And did you do that in this case? Did you give a
20    copy of this to Mr. Brown?
21 A  Yes, I did.
22 Q  And you believe that transaction of giving him a copy is
23    memorialized on the booking tape?
24 A  Yes.
25 Q  Okay. And then I want you to look at 10051 and ask you to

Page 180

1     identify what that document is.
2  A  This is the back of the Notice and Order of Revocation.
3  Q  Okay. It's the back of 10050.
4  A  Correct.
5  Q  All right. And did you fill that out?
6  A  I did.
7  Q  And when did you fill that out? 10051, when did you fill
8     it out?
9  A  I'm not sure.
10 Q  Let me direct your attention to -- down at the bottom, it
11    says personally appearing before me and being fully sworn,
12    subscribed before me on 7 January 200- -- I believe --
13    it's just cut off -- that it's 2003.
14 A  Correct.
15 Q  Does that likely -- so you're -- this is getting
16    notarized, right?
17 A  Correct.
18 Q  And do you sign it when it's notarized?
19 A  No.
20 Q  Okay. When do you sign it?
21 A  When we complete our report, I do everything, sign it, and
22    then the dispatch has my signature on record and they
23    notarize it according to my signature.
24 Q  Okay. So they -- do we know from this document 10051 that
25    you had signed it at least by January 7th, 2008.....

Page 181

1  A  Yes.
2  Q  .....2003. Right?
3  A  Yes.
4  Q  Okay. And could you have signed it earlier than that?
5  A  Yes.
6  Q  How much earlier reasonably speaking could you have signed
7     it before then?
8  A  Could have been done the day that I arrested him and
9     filled out this -- the front of the form.
10 Q  Okay. And we have a difference of, what, four days,
11    right, from the 3rd to the 7th?
12 A  Three days.
13 Q  Three days? 4th to the 7th. Three days. Based on your
14    habit and custom, is it more likely you would have signed
15    it closer to the 4th or the closer to the time that it was
16    actually notarized?
17 A  Closer to the 4th.
18 Q  Okay. And based on your habit and custom, how much closer
19    to the 4th?
20 A  I try to get this done as soon as I can because it's got a
21    lot of information that I'm going to take from memory.
22 Q  So is it likely you filled it out on the 4th?
23 A  Yes.
24 Q  Okay. And by it, I meant 10051.
25 A  Correct.

Page 182

1  Q  That's how you understood it.
2  A  Yes.
3  Q  Okay.
4  A  The back of 10050?
5  Q  Yes. Now, Mr. Herz asked you to define probable cause and
6     reasonable suspicion and I'm sorry to say I didn't quite
7     understand what you meant in your words. Would -- does
8     the Kodiak Police Department in its procedure -- policy
9     and procedure manual set forth what it actually means,
10    probably cause and reasonable suspicion?
11 A  Yes.
12 Q  Okay. And I want to go with -- I want to show it to you
13    because then I want you to apply these words to later
14    questions I have; all right?
15 A  Okay.
16 Q  And I'm going to show you what's been marked 11737 and
17    11738. And before I do, you're familiar with criminal law
18    standards of beyond a reasonable doubt, right?
19 A  Yes.
20 Q  Okay. Are you familiar at all with the civil standard of
21    preponderance by the evidence?
22 A  A little.
23 Q  Okay. And then you're familiar with reasonable suspicion
24    and probable cause, right?
25 A  Yes.

Page 183

1  Q  Okay. Now, I want to describe a spectrum for you and I
2     want to see whether you agree with how I describe this
3     spectrum and it's a spectrum of certainty or uncertainty
4     depending on which end of the spectrum you're looking at.
5     So let's take from zero to 100 with zero being absolute
6     complete uncertainty and a hundred percent being
7     certainty. Is it your understanding that the
8     preponderance of the evidence standard in civil cases is a
9     little over 50 percent on our scale?
10 A  Yes.
11 Q  Okay. Is it your understanding that beyond a reasonable
12    doubt is a higher standard than preponderance of the
13    evidence and thus it needs to move somewhere between
14    preponderance of the evidence and 100 percent.
15 A  Yes.
16 Q  It's got to be in that range.
17 A  Yes.
18 Q  Right? Okay. And is it your understanding that probable
19    cause is less than preponderance of the evidence, less
20    than a little more than 50 percent. Somewhere between
21    zero and 50 percent, is that your understanding?
22 A  Yes.
23 Q  And is reasonable suspicion a lesser standard than
24    probable cause?
25 A  Yes.

Page 184

1  Q  So probable cause is somewhere between zero and 50 percent
2     and then reasonable suspicion is somewhere between zero
3     and probable cause but still below 50 percent, correct?
4  A  Yes.
5  Q  Okay. And am I right that in your training and
6     experience, nobody ever has defined this spectrum where
7     reasonable doubt is, what percentage between 50 and a
8     hundred, right?
9  A  Right.
10 Q  You've never heard a DA or a defense attorney get up and
11    say, in case of a defense attorney, it's 99.9 percent and
12    or the DA saying it's 51 percent. You've never heard
13    that, right?
14 A  Correct.
15 Q  Okay. And have you concluded that the reason why you
16    never heard that is it's probably objectionable and an
17    attorney would never be allowed to say that.
18 A  Correct.
19 Q  Okay. It remains undefined in terms of percentages,
20    right?
21 A  Right.
22 Q  Okay. And have you ever in your experience as a police
23    officer ever heard anyone define on a percentage basis
24    what probable cause or reasonable suspicion is as it lies
25    somewhere between zero and 50 percent? You never heard

Page 185

1     anybody say that either, have you?
2  A  No.
3  Q  Okay. All right. So when you testified a little earlier
4     with MR. Herz that probable cause -- you said something
5     about it being 50 percent or more or something and I
6     didn't quite understand it. You didn't mean to define
7     probable cause in terms of percentage, did you?
8  A  No.
9  Q  Because you were never trained that way, right?
10 A  Correct.
11 Q  Okay. It doesn't mean preponderance of the evidence,
12    probable cause, right?
13 A  No.
14 Q  Okay. So since we're not able to define it as a
15    percentage of likelihood or unlikelihood, we just got to
16    go with words. All right?
17 A  Okay.
18 Q  And that's how you've gone with it as you've applied your
19    experience and training. You go with words, what did
20    probable cause words say and you try to give content to
21    them and what does reasonable suspicion mean and apply it,
22    right?
23 A  Right.
24 Q  Okay. So let me hand you -- I'm just going to read it to
25    you. 11737. And I'll represent to you this is from your

Computer Matrix, LLC                Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473        jpk@gci.net
                                                                 sahile@gci.net

FRANK PETERSON                 4/1/2008              BROWN v. PETERSON, et al.,
Vol 1                                                Case No. 3:05-cv-0002 TMB

48 (Pages 186 to 189)

## Page 186

1   training manual. According to the Supreme Court, probable
2   cause exists.....
3       MR. HERZ: Wait, wait, wait. I thought this was from the
4   policy and procedures manual.
5       MR. KOZIOL: Didn't I just say that?
6       MR. HERZ: I thought you said it was from a training
7   manual.
8       MR. KOZIOL: I'm sorry. I mean the policy and procedure
9   manual.
10      MR. HERZ: Okay. And you're reading policy -- statements
11  of policy and procedure not legal definitions, right?
12      MR. KOZIOL: I'm reading what I'm about to read. It
13  actually is a quote from a Supreme Court case, but it's in the
14  policy and procedure manual.
15 Q So it's at 11737 and it's from the policy and procedure
16   manual of the Kodiak Police Department and it says
17   according to the Supreme Court, quote, probable cause
18   exists where the facts and circumstances within their --
19   and then parens -- the arresting officers -- end of
20   parens -- knowledge and of which they had reasonable
21   trustworthy information are sufficient in themselves to
22   warrant a man of reasonable caution in the belief that an
23   offense has been or is being committed. That's probable
24   cause and that's how you were trained, right?
25 A Correct.

## Page 187

1  Q Okay. And then I'll to you reasonable suspicion from
2     11738.
3       MR. HERZ: 11738.
4       MR. KOZIOL: Yeah.
5       MR. HERZ: Okay. This is not a legal definition because
6   this is not a quote from a Supreme Court decision, is it?
7       MR. KOZIOL: This one does not say it's a quote.
8  Q It says reasonable suspicion involves a standard less than
9     probable cause, generally defined by the courts as a
10    circumstance or collection of circumstances that would
11    lead a trained, experienced officer to believe that
12    criminal activity may be afoot. Okay? And that's how
13    you're trained as to reasonable suspicion.
14 A Yes.
15 Q Right? Okay. And does it appear that those two documents
16    are from your policy and procedure manual?
17 A Yes.
18 Q Okay. So now I want to go over the information that you
19    had in your possession prior to the entry into Mr. Brown's
20    home the day of our incident, January 4th, 2003. The
21    dispatcher, Douglas Coyle, gave you information regarding
22    a caller that had called in while you were at the police
23    station, and then you picked up the phone at the police
24    station and then he related certain facts to you, correct?
25 A Yes.

## Page 188

1  Q And my understanding of your testimony as to what he said
2     to you based on your answers to Mr. Herz's questions was
3     he told you he received a REDDI report, right?
4  A Yes.
5  Q He told you that the vehicle involved was a gold, flatbed
6     truck.
7  A Correct.
8  Q He told you that the vehicle had slid through the Safeway
9     parking lot throwing rocks on the caller?
10 A Yes.
11 Q Did he tell you that the vehicle was driving recklessly?
12 A Do you want -- am I looking for the word recklessly?
13 Q Yes. That's my question.
14 A No.
15 Q Okay. Did he tell you that the vehicle was -- had done a
16    360?
17 A Yes.
18 Q Did he tell you that the vehicle was fishtailing?
19 A Yes.
20 Q Did he tell you that the caller said that the driver
21    appears to be drunk?
22 A I can't remember.
23 Q Okay. Did he tell you that the vehicle was going up
24    Pillar Mountain -- was reportedly going up Pillar
25    Mountain?

## Page 189

1  A No.
2  Q Did he tell you -- okay. Didn't tell you anything about
3     the supposed location or the journey of the vehicle?
4  A He did. He did.
5  Q What did he tell you about that topic?
6  A It said that it was on Selief heading towards Pillar
7     Mountain.
8  Q Okay. All right. And then you -- I think you indicated
9     you gave -- you remember giving certain information to
10    Officer Holden who was with you in the patrol room,
11    correct?
12 A Correct.
13 Q And my recollection of what you told Mr. Herz was you told
14    Officer Holden that you got a REDDI report, right?
15 A Correct.
16 Q Do you remember telling Officer Holden -- giving him any
17    other details like the details that you just told me?
18    Would you have tried to summarize those other facts for
19    him too?
20 A Yes, I would have.
21 Q Okay. And then you left the room -- the patrol room,
22    right?
23 A Correct.
24 Q And was Officer Holden still in the room when you left?
25 A I think so.

Computer Matrix, LLC                    Phone - 907-243-0668                jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473                 sahile@gci.net

FRANK PETERSON  
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

49 (Pages 190 to 193)

Page 190

1  Q  And had he also come on duty at 1600 hours as you did?
2  A  Yes.
3  Q  Okay. Now, have you been trained as a police officer up
4     to that period of time that both reasonable suspicion and
5     probable cause can be established by hearsay, that is by
6     facts that come to you that are not based on your own
7     personal observations?
8  A  Yes.
9  Q  Okay. And those facts coming to you by hearsay can be as
10    solid and reliable as facts that you observe.
11 A  Yes.
12 Q  Can be, right?
13 A  Yes.
14 Q  Okay. Whether or not it's a fact you observe, the
15    relevance of that really has to do with whether you can
16    make an arrest for a misdemeanor committed or not
17    committed in your presence, right? That's the importance
18    of whether it's hearsay or not, right?
19 A  Can you say that again?
20 Q  Yes. Isn't it the importance of whether you observed a
21    fact or it just came to you by hearsay, doesn't that
22    really -- it doesn't really affect the probable cause or
23    reasonable suspicion. What it affects is your ability to
24    arrest because you can't arrest for misdemeanors not
25    committed in your presence except for DUI.

Page 191

1  A  Correct.
2     MR. HERZ: Objection to the form of the question.
3  Misstates the law.
4  Q  Okay. Did you agree with what I just said?
5  A  Correct.
6     MR. KOZIOL: Okay. And go ahead. I'll let you explain
7  what misstatement there was because I don't want to misstate
8  the law. What did I misstate?
9     MR. HERZ: There still has to be regarding the hearsay
10 statement some determination about reliability and credibility.
11 So the mere fact that it's hearsay alone is not sufficient and
12 does not just affect whether there's authority to make an
13 arrest or not make an arrest.
14    MR. KOZIOL: Okay. A little further than my question.
15 Q  But let me ask you this about your knowledge of hearsay.
16    There are certain circumstances, am I right, where if you
17    get hearsay reports, you might want to have some indicia
18    of reliability of the hearsay report. And what I mean by
19    that is if you're getting a report, you know it's a report
20    from a -- somebody who's a criminal informant, somebody
21    that has a criminal record and you're getting a report
22    from such a person. Is it your understanding that you
23    would want some further indication of reliability of that
24    information that's coming to you?
25 A  Yes.

Page 192

1  Q  But apart from that, if you have a citizen who you have no
2     reason to believe is not telling you the truth, telling it
3     to you accurately and you have a citizen who is reporting
4     their own personal observations, you may consider that
5     information in your probable cause decision making and
6     that information is as good as your own observations --
7     could be as good as your own observations, right?
8  A  Correct.
9  Q  Okay. Now applying the standards I just gave to you --
10    just read to you and -- maybe I should have them at the
11    ready. This reasonable suspicion standard, lead a
12    trained, experienced officer to believe that criminality
13    activity may be afoot. Okay? Reasonable suspicion as you
14    were trained. When you got the report from the dispatcher
15    before you left the -- strike that. Let me rephrase. You
16    got the information from the dispatcher. You go out and
17    then you see a gold, flatbed truck coming down from Pillar
18    Mountain -- not going up but coming down, right?
19 A  Correct.
20 Q  And about how many minutes after your being dispatched did
21    you have that sighting? Can you tell me that? And if you
22    can't tell me that, where would the information be that
23    would tell us that?
24 A  You can -- I can't remember exactly. You can look at the
25    complaint lot, determine what time the complaint was

Page 193

1     received, and then you can go to the radio log and find
2     out when I called out observing the vehicle.
3  Q  And is the complaint log that card I just showed you?
4  A  Yes.
5  Q  Okay. Let me get that again. When was that call about?
6  A  1653 hours.
7  Q  Okay. And then if we go to the dispatch radio log, that
8     could show us when you did what?
9  A  When I first observed the vehicle or at least called on
10    the radio saying that I first observed the vehicle.
11 Q  Okay. And I'll hand Mr. Herz first before I hand you
12    10463 to 10465. So let me had you that. I'm going to ask
13    you whether that document -- any of those documents there
14    contain the answer to the question when you would have
15    called dispatch.
16 A  Yes.
17 Q  And what's the -- what is it -- the time?
18 A  1659.
19 Q  And what does it say?
20 A  Two coming down and one of them was Delta Whiskey Tango
21    484.
22 Q  Okay. So that's six minutes after you were dispatched.
23 A  Correct.
24 Q  Okay. So -- and what did you see at 1659?
25 A  I was going up Pillar Mountain and observed two vehicles

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668  
Fax     907-243-1473

jpk@gci.net  
sahile@gci.net

Page 194

1    coming down, one of them the gold, flatbed pickup truck.
2  Q  Okay. Prior to that time, that is seeing that vehicle,
3    did you get a call from -- well, strike that. I don't
4    want to have you at a disadvantage. Let me give you those
5    documents back, 10463 and -- to 10465. At 1659, that's
6    when you saw the vehicle coming down.....
7  A  Correct.
8  Q  .....Pillar Mountain, right? And then did you get a call
9    from dispatch where you got more information regarding a
10   citizen's complaint?
11 A  Correct.
12 Q  At least according to this document.
13 A  Yes.
14 Q  Right? Okay. And what time was that?
15 A  1700.
16 Q  Okay. And I want you to try to remember now in your
17   memory as opposed to what's there on that document, but do
18   you remember what then dispatch additionally told you at
19   1700?
20 A  No.
21 Q  Okay. You just more information.
22 A  Correct.
23 Q  Okay. Do you remember whether it was confirming
24   information of the information you'd already gotten? That
25   it was similar?

Page 195

1  A  Yes. Pertaining to the incident?
2  Q  Yes.
3  A  Yes.
4  Q  But pertaining to the activities of this gold bed truck
5    before you saw it, by citizens complaining about it.
6  A  Rephrase the question, please.
7  Q  Okay. When dispatch called you at 1700 when you're out
8    there after you've said you saw the gold bed truck, do you
9    remember did the dispatcher tell you that we got another
10   call from a caller complaining about this gold, flatbed
11   truck and the dispatcher giving you more information about
12   that vehicle's behavior?
13 A  I don't remember.
14 Q  Okay. And I want to see if this refreshes your -- so read
15   the 1700 entry.....
16 A  Okay.
17 Q  .....and see if that refreshes your memory as to what the
18   dispatcher told you at 1700. It's at the bottom -- the
19   very bottom.
20 A  Yeah. Another call states vehicle has dualies on back,
21   passenger, dark haired, unshavened, driver, blonde hair.
22 Q  So here's my question to you. Does that refresh you about
23   what was told to you by the dispatcher in that second call
24   or not? I mean does it bring back a memory.
25 A  No, it doesn't.

Page 196

1  Q  Okay. All right. But you have no reason to believe, do
2    you, that the dispatcher didn't tell you this.
3  A  No. If it's on the radio, it was told to me.
4  Q  Okay. All right. So after you got the information you
5    got from the dispatcher at the police station and then
6    after you identified the gold, flatbed truck coming down
7    Pillar Mountain and then you started to turn around, that
8    moment in time, do you believe you had reasonable
9    suspicion based on the circumstances that that vehicle and
10   that driver may have engaged in criminal activity?
11 A  Yes.
12 Q  Okay. And did you have -- more specifically, did you have
13   reasonable suspicion to believe that that criminal
14   activity was driving under the influence?
15 A  Yes.
16 Q  And did you also have reasonable suspicion to believe
17   under that definition that that driver was -- had been
18   driving recklessly?
19 A  Yes.
20 Q  Okay. Now, looking at the definition of probable cause
21   and staying at that moment in time where you see this
22   gold, flatbed truck with the driver in it, did you believe
23   you had probable cause wherein you had reasonable,
24   trustworthy information sufficient to warrant a man of
25   reasonable caution to believe that an offense had been

Page 197

1    committed? Okay. That's the definition. Reasonably
2    trustworthy information to believe a man of caution would
3    believe that an offense had been committed. With that
4    definition, do you believe you had probable cause to
5    conclude that the driver of that gold bed vehicle had
6    committed the offense of reckless driving?
7  A  Yes.
8  Q  Okay. And did you believe you had probable cause to
9    conclude, using that definition, that the driver of that
10   vehicle had -- was driving under the influence of alcohol?
11 A  Yes.
12 Q  Now, I think you told us that you didn't believe you could
13   arrest at that moment in time the driver for reckless
14   driving because that was a misdemeanor not in your
15   presence, correct?
16 A  Correct.
17 Q  But I take it you believe you could have cited him for it.
18 A  Correct.
19 Q  And I take it you believe you could have detained him to
20   do an investigative stop for it.
21 A  Correct.
22 Q  Okay. Just not arrested him.
23 A  Correct.
24 Q  Okay. Regarding the DUI, did you believe at the time you
25   turned your vehicle around that you had probable cause to

Page 198

1  make an arrest for DUI of that driver based upon this.....
2  A  Yes.
3  Q  .....definition?
4  A  Yes.
5  Q  Okay. Did you believe that probable cause to make an
6     arrest at that moment in time when you turned your vehicle
7     around to go after this driver entitled you to hot pursue
8     him into the house if he refused your entreaties to stop?
9  A  Yes.
10 Q  And that's in fact what you did.
11 A  Yes.
12 Q  And you entered that house thinking you were lawfully
13    entering that house because you were pursuing somebody
14    that you had both reasonable suspicion and probable cause
15    to believe had committed the crime of DUI.
16 A  Yes.
17 Q  Now, I want to pause here for a moment on training that
18    you may have received at that point in time regarding hot
19    pursuit. Okay?
20 A  Okay.
21 Q  I didn't see anything in the manual entitled hot pursuit
22    and when you can hot pursue somebody in a house or not.
23    Am I correct in that, that it's not really in the manual?
24 A  I don't know.
25 Q  Okay. You don't remember it being in the manual.

Page 199

1  A  Correct.
2  Q  Okay. You can't contradict me when I say I haven't see
3     it.
4  A  Exactly. Correct.
5  Q  So the training you received about hot pursuit, was that
6     basically at the academy?
7  A  Basically, yes.
8  Q  Okay. And how many -- how long ago prior to this incident
9     were you trained at the academy?
10 A  2000 -- end of 2000.
11 Q  Okay.
12 A  So two years and a couple of months.
13 Q  Okay. And did that training -- did they have you read
14    legal cases? Did you ever read legal cases or not?
15 A  We did. I can't remember if there was anything pertaining
16    to hot pursuit though.
17 Q  That's all I'm talking -- okay. Fair enough. Do you
18    remember reading legal cases about hot pursuit?
19 A  I can't remember.
20 Q  Okay. Do you remember them training you in general that
21    you can hot pursue into a house on a serious offense but
22    you can't on a minor offense?
23 A  Correct.
24 Q  It's kind of a guideline like that?
25 A  Correct.

Page 200

1  Q  As you sit here now, can you really tell us where exactly
2     they said the line was between a serious offense and a
3     minor offense, which -- wherein the distinction would
4     allow you to go into a house without a warrant in hot
5     pursuit or stop and not go into the house on a hot pursuit
6     and have to get a warrant. You can't really.....
7  A  No.
8  Q  .....tell us that.
9  A  No.
10 Q  Okay. But I take it at the time of this incident you
11    thought that DUI was sufficiently serious crime to allow
12    you to go in a house without a warrant.
13 A  Correct.
14 Q  And is one of the reasons why you thought you were
15    entitled to go in the house on a hot pursuit on a DUI was
16    that if you wait for a warrant, the evidence might be
17    contaminated, that is the suspect might drink alcohol in
18    the house and/or that as time passes, the alcohol in the
19    suspect's body gets metabolized and thus you lose evidence
20    or it gets contaminated if you stop at the door and don't
21    go in in hot pursuit.
22 A  Correct.
23    MR. HERZ: By my clock, it's been six hours, so I don't
24 know if you want to stand by the rule you wanted to invoke
25 earlier today or if we're just going to keep going, but I

Page 201

1  mean.....
2     MR. KOZIOL: Oh, well, when I was talking about the six
3  hour rule to you, I was applying it to you.
4     MR. HERZ: Oh, of course.
5     MR. KOZIOL: And I think that's how we apply it not to the
6  other person. But anyway short answer to your question is
7  yeah, I intend to keep going on and anyway also I might point
8  out to you, Robert, that the six hours has to do with on time
9  video time, not including breaks. So we're probably not at six
10 hours anyway, if we.....
11    REPORTER: No.
12    MR. HERZ: No.
13    MR. KOZIOL: Yeah. But I'll try to bring it in when it's
14 six hours, but, no, I don't -- when I made that comment to you,
15 I think it applies to one person -- each person not -- not
16 total, right?
17    REPORTER: I think we're -- do you want the time? Not --
18 it doesn't matter. Okay.
19    MR. KOZIOL: No. All I'd be interested in is Mr. Herz's
20 time if -- okay. And I don't need that now.
21    REPORTER: Okay.
22 Q  Did you believe adding to your reasonable suspicion and
23    probable cause conclusion relating to the reckless and
24    relating to the DUI was that the man who turns out to be
25    Mr. Brown fled when you told him to stop after you got out

FRANK PETERSON  
Vol 1  
4/1/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB  

52 (Pages 202 to 205)

Page 202

1  of your vehicle and didn't stop and actually went into his
2  house?
3  A  Can you shorten that up for me?
4  Q  Yeah. Sorry.
5  A  Or break it up?
6  Q  Right. Let me get the factual predicate. You -- and I
7     guess we need to keep our chronology going then. You see
8     the gold, flatbed truck coming down Pillar Mountain while
9     you're coming up, right?
10 A  Correct.
11 Q  Then you turn around.
12 A  Correct.
13 Q  And you already had your video cam going, right?
14 A  Yes.
15 Q  All right. And then the video cam shows, does it not,
16    that you follow the vehicle and you follow them to the
17    home, correct?
18 A  Yes.
19 Q  And it shows a little bit of the vehicle pulling into
20    Mr. Brown's driveway, right?
21 A  Yes.
22 Q  Okay. And then I want to talk about what you saw at that
23    point. What did you see happen, you know, when you pulled
24    up right after the other vehicle -- the Brown vehicle
25    pulled in the driveway? What'd you see and what'd you do?

Page 203

1  A  Mr. Brown getting out of his vehicle. I got out of my
2     vehicle.
3  Q  How? Which side?
4  A  The driver's side.
5  Q  Okay.
6  A  Out of the driver's side of the vehicle, went towards
7     the -- the doorway. I was out of my vehicle running after
8     him, instructing him to stop, who I was, and he went in
9     the door and I was so close behind him that the door was
10    coming closed. I reached out for it and as a reflex
11    pulled the door closed.
12 Q  Okay. And then you opened it.
13 A  Correct.
14 Q  Okay.
15 A  And followed Mr. Brown into the residence.
16 Q  Were you close enough to Mr. Brown to have had him hear
17    your saying stop?
18 A  Yes.
19 Q  How many times did you tell him to stop?
20 A  Two or three times.
21 Q  How far were you from him when you told him to stop on
22    those occasions, two or three times?
23 A  15 feet.
24 Q  And were you saying it -- how were you saying it?
25 A  I was yelling it at him.

Page 204

1  Q  Okay. As loud as you could yell?
2  A  Yes.
3  Q  And was there any response from Mr. Brown?
4  A  No.
5  Q  Did he turn around?
6  A  No.
7  Q  Did his continuing -- did his not responding to your
8     yelling stop, did that add to your belief that you had
9     probable cause both on the reckless and DUI?
10 A  Yes.
11 Q  I want to go -- now let me continue on with some of
12    things -- topics that Mr. Herz brought up. Mr. Herz asked
13    you a series of questions about your relationship with the
14    District Attorney and Joe Slusser in particular when the
15    criminal case was going on. When that whole criminal case
16    was going on -- criminal proceedings and -- those criminal
17    proceedings lasted a long time, right?
18 A  Correct.
19 Q  I mean you were testifying in multiple grand juries and
20    then there was an evidentiary hearing and indeed there was
21    a trial. But that whole period of time lasted a
22    substantial amount of time, right?
23 A  Yes.
24 Q  Okay. During that period of time, the whole period of
25    time, were you ever concerned that Mr. Brown was going to

Page 205

1     sue you for violating his civil rights?
2  A  No.
3  Q  Did that even cross your mind?
4  A  No.
5  Q  Okay. You did hear Mr. Brown in the holding cell.....
6  A  Yes.
7  Q  .....say he was going to sue you?
8  A  Yes.
9  Q  But I take it you didn't take it seriously.
10 A  No.
11 Q  Didn't worry you.
12 A  No.
13 Q  Wasn't on your mind after you heard those words.
14 A  Nope.
15 Q  Was that because you thought you didn't do anything wrong?
16 A  Correct.
17 Q  Okay. So when you're working with the prosecutor in this
18    case, you were just responding to his requests, right?
19 A  Yes.
20 Q  You're not telling him how to present the case to the
21    court or the jury, right?
22 A  Correct.
23 Q  In fact you didn't tell Joe Slusser what evidence to
24    present at the evidentiary hearing, did you, where the
25    issue was whether the entry you made into the house was

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax      907-243-1473  
jpk@gci.net  
sahile@gci.net

### Page 206

1  lawful or not. You didn't tell him what evidence to
2  present.
3  A  No.
4  Q  My recollection is -- and correct me if I'm wrong. But my
5     recollection is Mr. Slusser didn't present Douglas Coyle
6     as a witness in that proceeding. Do you know whether
7     that's a -- I made a true statement?
8  A  I can't recall.
9  Q  Okay. If Doug Coyle is going to say as he has said in
10    trial testimony that he told you it was a REDDI call when
11    he called you in the patrol room, would you agree with me
12    that you would have wished Mr. Slusser had presented
13    Mr. Coyle to Judge Hopwood?
14 A  Yes.
15 Q  And it's further my recollection that Mr. Slusser did not
16    present to Judge Hopwood the card -- the REDDI card that
17    we looked at that Mr. Coyle filled out nor did Mr. Slusser
18    present to Judge Hopwood the backside of the Notice of
19    Revocation, both documents of which indicate it was a
20    REDDI call.
21 A  Correct.
22 Q  If you had control of Mr. Slusser -- if you were advising
23    Mr. Slusser, would you have asked him to present that
24    evidence?
25 A  Yes.

### Page 207

1  Q  He really didn't consult you as to what evidence he was
2     going to present at an evidentiary hearing.
3  A  No.
4  Q  All right. And so you never discussed with him any civil
5     rights claim that might be filed against you if you lose
6     the evidentiary hearing and the suppression hearing,
7     right?
8  A  Correct.
9  Q  Okay. So as far as you know, it was not in your mind and
10    you have no evidence to believe it was on his mind when he
11    was doing that opposition to the suppression hearing.
12 A  Correct.
13 Q  All right. I want to bring up a topic that Mr. Herz did
14    not bring up and -- because my alternative is just put it
15    in an affidavit and I want to give Mr. Herz an opportunity
16    to ask any questions he wants so we don't have to come
17    back again because I want to rely on this. But
18    preliminarily let me just say this to you. He showed you
19    your police report. Let me just get it. And the only one
20    I have, Mr. Herz, is 10041 to 10046. That's the one I
21    work off because that's the ones I gave you.
22    MR. HERZ: Same narrative report though, right?
23    MR. KOZIOL: Right. I believe it is. All right.
24 Q  Now, other than your acknowledged omission of putting in
25    that the Kodiak Police Department received a REDDI report,

### Page 208

1  other than that, looking at 10041 and 10046, is it your
2  belief that the information in there is accurate and
3  complete as -- let me just state -- withdraw that. Is it
4  your belief that that information obtained in that
5  document is accurate?
6  A  Correct.
7  Q  Okay. And the same question for the affidavit in support
8     of the complaint that Mr. Herz showed you. Again apart
9     from the omission of the REDDI report to dispatch, the
10    Kodiak Police Department, is the information contained in
11    there accurate?
12 A  Yes.
13 Q  Now, I had you read Mr. Ellar and Mr. Mott's expert
14    reports, right, in this case?
15 A  Correct.
16 Q  And would you agree with me that they criticized you for
17    not using on -- they criticized you a lot for a lot of
18    things, but I want to focus on just one thing; all right?
19    I'm not just trying to imply that they didn't have many
20    criticisms of you, but I just want to focus on one thing.
21 A  Okay.
22 Q  One of the things they criticized you for I believe is
23    that you used pepper spray -- at the moment you used the
24    pepper spray on Mr. Brown, you should have used hands-on
25    as opposed to pepper spray. That's my belief of what they

### Page 209

1  said or at least what Mr. Mott said. With that premise, I
2  want to ask you why at the moment of time did you use the
3  pepper spray on Mr. Brown as opposed to using hands-on?
4  A  I took a lot of things into consideration. One, that
5     Mr. Brown was intoxicated. He was being belligerent. I
6     was concerned about my conservation of evidence. I was
7     the only officer in the room at the time and there were
8     several other people besides Mr. Brown. Mr. Brown also
9     had a bottle in his hand at the time which I know from
10    past history from my experiences that it can be used as a
11    weapon. Injuries sustained by bottles can be quite
12    serious. Having taken all this into consideration, I
13    decided to go with my pepper spray versus starting first
14    with hands-on and then going to the pepper spray.
15 Q  Okay. And what distance were you from Mr. Brown when you
16    used the pepper spray?
17 A  Probably about five feet.
18 Q  Okay. So that would have kept you out of the range of him
19    swinging the bottle at you.
20 A  Correct.
21 Q  Okay. And how long a burst of pepper spray in terms of
22    seconds did you use?
23 A  Probably two or three seconds.
24 Q  Okay. And is there such a thing as a normal pepper spray
25    length of time or not?

Page 210

1  A  No.
2  Q  Okay. Why didn't you use it longer than two to three
3     seconds?
4  A  With pepper spray, it was always a concern of mine, having
5     been pepper sprayed myself and knowing the effects of it,
6     it's mainly pain compliance. You can fight through pepper
7     spray. Not knowing -- I was hoping that just the pepper
8     spray in itself would deter Mr. Brown from consuming the
9     alcohol. When it didn't, I pepper sprayed him and I know
10    it -- from personal experience, it doesn't take much for
11    the pepper spray to affect you.
12 Q  Okay. If it's going to work.
13 A  Correct.
14 Q  Okay. And you listened to the -- your scene tape?
15 A  Yes.
16 Q  Okay. And in your scene tape, did it record there that
17    you warned him that you were going to pepper spray him if
18    he drank out of the beer?
19 A  Yes.
20 Q  And did Mr. Brown actually say go ahead?
21 A  Yes.
22 Q  Basically he said go ahead and pepper spray me, right?
23 A  Yes.
24 Q  And after he said go ahead and pepper spray me, did he
25    actually then start drinking?

Page 211

1  A  He did.
2  Q  And then you pepper sprayed him for two to three seconds.
3  A  Correct.
4  Q  And did he continue to drink the beer?
5  A  He did.
6  Q  How much -- what kind of beer bottle did he have?
7  A  If I can recall correctly, it was a Bud Lite.
8  Q  Okay. And I think we had Mrs. Brown testified it was a
9     long-necked beer bottle. Was that a long-neck beer
10    bottle?
11 A  Correct.
12 Q  Okay. So how many ounces would you say it was?
13 A  What are they, 16 ounces?
14 Q  Okay.
15 A  I can't recall.
16 Q  And how much of that beer did he drink?
17 A  I'm guessing about half.....
18 Q  Okay.
19 A  .....based on the amount of time that he had the beer
20    bottle up.
21 Q  How much time did he have the beer bottle to his lisp?
22 A  He had it up for two or three seconds.
23 Q  Okay. Well, if your pepper spray was two or three
24    seconds, he had it during that period of time, right?
25 A  Yes.

Page 212

1  Q  And after you stopped pepper spraying him, was he still
2     drinking?
3  A  I can't remember.
4  Q  Okay. So was the pepper spray effective then in stopping
5     him from drinking? Do you remember that?
6  A  No.
7  Q  So then was he likely still drinking?
8  A  Probably.
9  Q  Okay. So he must have been drinking a little longer than
10    two or three seconds probably.
11 A  Yes.
12 Q  Okay. So after the pepper spray two or three seconds and
13    it didn't have any apparent effect on Mr. Brown, what did
14    you do?
15 A  I moved in -- he eventually brought the bottle down. I
16    moved in, grabbed the bottle, and threw it to the ground
17    and pushed him towards the kitchen.
18 Q  He did not hit you with the beer bottle.
19 A  Correct.
20 Q  But that was a risk that you faced when you went in there.
21 A  Correct.
22 Q  You had an alternative of not going hands-on at that point
23    in time, didn't you, like using -- did you have a baton
24    with you?
25 A  Yes.

Page 213

1  Q  You decided not to use a baton though.
2  A  Correct.
3  Q  That would have been the next level of force?
4  A  Yes. Or strikes with the elbow or with the knees or
5     different types of strikes, hand strikes, strong arm.
6  Q  Perceiving him having a potential weapon in his hand and
7     the level of force that you engaged in, the pepper spray,
8     not working, I take it you could have gone with the baton
9     under your policies, right?
10 A  Correct.
11 Q  But you decided not to.
12 A  Correct.
13 Q  Why?
14 A  The risk of -- taking everything into consideration, the
15    risk of hurting him seriously outweighed any other --
16    anything that he had done. I wasn't going to take it to
17    that level and hurt him for.....
18 Q  So you decided to not use a baton and take a -- take
19    somewhat of a risk.....
20 A  Yes.
21 Q  .....to yourself.
22 A  Yes.
23 Q  Okay. That was a judgment call you made.
24 A  Yes.
25 Q  Okay. And your decision making wherein he -- you told him

Page 214

1  not to pick up the bottle of beer, right? Or you told him
2  to put the beer down after he picked it up.
3  A  Yes.
4  Q  He didn't do that.
5  A  Correct.
6  Q  And you warned him not to drink it and he says go ahead.
7  A  Yes.
8  Q  I'm going to -- use pepper spray, you warned him about it,
9     and he says go ahead.
10 A  Yes.
11 Q  How much time -- and I guess the scene tape can really pin
12    this down, but how much time did you have to make a
13    decision between the time he picks up the beer bottle and
14    when you actually pepper sprayed him?
15 A  Was it -- I think it was between six and ten seconds.
16 Q  Okay. So you had to make a fairly quick decision.
17 A  Correct.
18    MR. KOZIOL: Okay. Now, in the interest of disclosure to
19 Mr. Herz, my understanding from reading your expert reports
20 that the complaint about excessive use of force is limited to
21 use of the pepper spray. I didn't see anything else in there.
22 I'm not talking about, you know, failure to render medical
23 assistance, but I didn't see anything else in there regarding
24 an allegation of excessive use of force that you guys are
25 claiming and if you're willing to tell me you're wrong about

Page 215

1  that, Frank, and there are other allegations, then I'm going
2  into those other allegations with this witness. Otherwise I'm
3  left with simply using an affidavit later if something else
4  surfaces. So if you're willing to tell me what -- if there are
5  any other claims of excessive force, then I'd be happy to
6  examine this witness and then we'll have it on the record and
7  you can cross examine him on it. Otherwise you're just going
8  to be faced with an affidavit on it.
9     MR. HERZ: Well, I think they would say that if there was
10 an unlawful entry and therefore no right to arrest, any force
11 used to effect an unlawful arrest amounts to excessive use of
12 force.
13    MR. KOZIOL: And I understand that and.....
14    MR. HERZ: So.....
15    MR. KOZIOL: .....and so there's no need for me to go into
16 that. I'm just talking about assuming -- when I question them,
17 assuming that it was a lawful entry and that.....
18    MR. HERZ: Well, so I mean.....
19    MR. KOZIOL: .....the force used.....
20    MR. HERZ: .....and therefore anything that was done to
21 effectuate the arrest would -- so I mean that -- all actions
22 taken would constitute excessive force whatever they might be.
23    MR. KOZIOL: I agree. No, I agree.
24    MR. HERZ: So.....
25    MR. KOZIOL: And I understand that theory and that's fine.

Page 216

1  But what I'm asking you is the reverse question. Assuming a
2  Court or a jury might decide it was a lawful entry and thus the
3  officer -- this officer and Officer Holden are entitled to use
4  reasonable force to effectuate an arrest, my question to you is
5  the only thing I saw in your expert's reports that asserted
6  excessive force, beyond reasonable force, entitled lawful
7  force, assuming they could go in there lawfully was the pepper
8  spray. I saw nothing else. If I'm missing something, I want
9  to go into it with this witness. If I'm not missing something,
10 then I'm going to leave it.
11    MR. HERZ: I don't think you're missing anything.
12    MR. KOZIOL: Okay. Thank you. There was another
13 allegation though I want to go into with him that I think your
14 experts are making against this witness and that is the failure
15 to render appropriate medical care. Do I have that right or is
16 that -- there was -- if not, I won't go into it. But I read
17 them criticizing him for, you know, not giving him the medical
18 care he needed, but if that's really not an allegation, then
19 I'm not going to worry about it. I won't go into it with this
20 witness, but if it is, then I'll go into it.
21    MR. HERZ: Well, Mr. Brown is alleging that his
22 preexisting ankle injury was reinjured. So you can pursue that
23 if you want, so.....
24    MR. KOZIOL: Okay.
25    MR. HERZ: I mean I don't think there's any question he

Page 217

1  was complaining about the fact that it -- his ankle was hurting
2  him, so.....
3     MR. KOZIOL: And again what I'm not -- I'm not questioning
4  his assertion that he says it wasn't injured. I'm not going to
5  have this witness say he wasn't feeling pain or was feeling
6  pain. All I'm talking about is if there's an allegation that
7  the medical treatment for his claimed injury was not
8  sufficient, I want to go into that with this witness. And your
9  experts seem to be saying something like that, but I don't
10 really know. So if they are -- if you think they are, then I
11 want to go into it.
12    MR. HERZ: Why don't you go into it.
13    MR. KOZIOL: Okay. Thank you.
14 Q  When -- as I remember -- now some of our -- the things
15    that have been said to you by Mr. Brown has been basically
16    recorded, right? I mean it's either in your on-scene tape
17    or it's in the holding room tape, right?
18 A  Yes.
19 Q  It appears you continuously recorded him from the moment
20    you got into the house to after he was processed, after he
21    had blown into the DataMaster, right?
22 A  Yes.
23 Q  Continuous recording we have.
24 A  Yes.
25 Q  Okay. So the facts are kind of frozen at least in terms

Page 218

1  of what was said, right?
2  A  Yes.
3  Q  All right. So I just want to -- and of course that's the
4     best evidence of what it says on the tape, but my
5     recollection -- and correct me if I'm wrong, at some point
6     prior to being in the holding cell with the DataMaster, am
7     I right Mr. Brown told you that he had an injury to his
8     right ankle?
9  A  Correct.
10 Q  Okay. And then when you were in the holding cell, did he
11    complain about a left ankle injury?
12 A  Yes.
13 Q  So I take it you were a little confused as to what ankle
14    he had injured.
15 A  Correct.
16 Q  Because he never complained about both ankles at the same
17    time, did he?
18 A  Correct. No, he did not.
19 Q  And in the holding cell video -- you reviewed that, right?
20 A  Yes.
21 Q  Recently.
22 A  Yes.
23 Q  Okay. In the holding cell video, it appears he's
24    complaining about his left ankle, correct?
25 A  Yes.

Page 219

1  Q  And in fact at various times he moans and groans about his
2     left ankle.
3  A  Yes.
4  Q  Appearing to be in pain.
5  A  Yes.
6  Q  And as the holding cell video went on, did it appear to
7     you that he really -- his pain was subsiding and he wasn't
8     having significant problems with his left ankle anymore?
9  A  That's what it appeared, yes.
10 Q  By the end?
11 A  Yes.
12 Q  Okay. By the end, he was standing on it without apparent
13    discomfort?
14 A  Yes.
15 Q  Walking on it without apparent discomfort?
16 A  Yes.
17 Q  Okay. And are you aware whether or not ultimately the
18    EMTs were called to look at him while he was in the jail?
19 A  I think they were.
20 Q  Okay. Were you there for that?
21 A  No. Not that I can recall.
22 Q  Okay. Did you know who called the EMTs?
23 A  No.
24 Q  And are you aware of it from looking at the dispatch log?
25 A  Yes. I believe so.

Page 220

1  Q  Okay. And again it's 10463 to 10465. And where in those
2     documents is it indicated that an ambulance was called for
3     Mr. Brown?
4  A  It's not in here.
5  Q  Take a look at the second page there. Let me have that.
6  A  Okay.
7     MR. HERZ: Which Brown? Scott Brown or Damon Brown?
8     MR. KOZIOL: Right. Good point. I may have.....
9  Q  On 10464, that ambulance has to do at Purtov Street.
10 A  Correct.
11 Q  Okay.
12 A  I do think, however, that.....
13 Q  Go -- let me show you 10464. Is there anything on 10464
14    that would indicate some medical assistance was given?
15    10465 rather. Sorry.
16 A  Okay.
17 Q  Thank you.
18 A  It says Medic 3's en route to the hospital.
19 Q  And now let me show you another document.
20    MR. HERZ: What was the time of that entry?
21 A  Thank you. One more. En route to the hospital, it was
22    1728. That was from Purtov.
23 Q  And.....
24    MR. HERZ: Okay.
25 Q  Okay. I'm going to hand you what's been marked 11526.

Page 221

1     Okay. And I'll represent to you this is part of a jail
2     log. Does that document indicate whether or not medics
3     were called to assist Mr. Brown?
4  A  Yes.
5  Q  And what time was that?
6  A  2100 hours. Scott Brown requests medics to look at
7     injured ankle.
8  Q  Okay.
9  A  2105 was when they responded.
10 Q  And what did the medics do according to that note?
11 A  Medics and 1K7 in jail to felony one to see Brown and then
12    2108, Medics and 1K7 out of jail. Medics state Brown,
13    Scott should not require medical attention at this time,
14    suggested attempt to get meds that have already been
15    prescribed by Brown's -- Scott Brown's doctor brought in
16    and verified by doctor.
17 Q  And does that note that somebody from -- on behalf of the
18    police department went and got his meds or that they're
19    supposed?
20 A  That they were suggested that -- that they do that.
21 Q  You didn't play any role in calling for the medics at
22    2108, right?
23 A  Correct.
24 Q  And in fact based on your recollection and your viewing
25    the holding cell, at the -- when the tape ends and you

Page 222

1  guys are leaving the holding room, did it appear to you at
2  all that Mr. Brown needed any medical attention for his
3  left ankle?
4  A  No.
5  Q  Okay. And do you know whether anyone from the police
6     department went to the hospital and got medication for
7     him?
8  A  Yes.
9  Q  And how do you know that?
10 A  I saw some documents, whether they were from the jail or
11    from some place, indicating somebody had taken medications
12    from the hospital. Dr. Creoman (ph).
13 Q  Okay.
14    MR. KOZIOL: All right. So, Mr. Herz, I don't have any
15 more questions on that topic. So just in regards to
16 mistreatment by this officer and -- well, any other officer
17 that he might know about, you know, the entry, the use of the
18 pepper spray, and then the failure to render to medical
19 attention, I don't know of any other topics that fall within
20 the complaints of your experts that I should go into unless you
21 notify me.
22    MR. HERZ: Well, you're notified because you've got the
23 report, so you would know. I mean you're welcome to question
24 on anything that you feel is necessary based on what's in those
25 reports.

Page 223

1     MR. KOZIOL: Okay. That's your answer?
2     MR. HERZ: Yeah.
3     MR. KOZIOL: Okay. I don't have any other questions.
4     MR. HERZ: At all. I mean you're done with your exam.
5     MR. KOZIOL: Yeah.
6     MR. HERZ: Okay. I'd like to take a break.
7     MR. KOZIOL: Okay.
8     (Off record)
9     (On record)
10    REPORTER: All right. We're back on record and I want to
11 make a note that I changed the tapes. This is tape 4 of the
12 videotaped deposition of Officer Peterson.
13    MR. HERZ: Okay.
14        OFFICER FRANK R. PETERSON, JR.
15 testified as follows on:
16        REDIRECT EXAMINATION
17 BY MR. HERZ:
18 Q  Officer Peterson, I'm going to go in reverse order
19    covering the topics that -- some of the topics that
20    Mr. Koziol asked you about, okay? So we'll take about
21    medical care first. In looking at document Bates Stamp
22    number 11526, the jail log, you noted that medics were
23    called at 2100 hours which if my math's good,
24    9:00 o'clock, right?
25 A  Correct.

Page 224

1  Q  9:00 o'clock p.m. And they responded and they made a
2     recommendation that prescription medicine that was
3     prescribed by his -- by Mr. Brown's -- Scott Brown's
4     doctor, Dr. Creoman be obtained from the hospital or from
5     the doctor, right?
6  A  Be obtained, yes.
7  Q  So medics aren't going to recommend that medicine be given
8     to an inmate unless there's a medical reason that
9     justifies it, right?
10 A  I'm not sure if there's a situation when the medics can
11    recommend medication period.
12 Q  Well, they suggested that Mr. Scott Brown's prescribed
13    medication that was prescribed by his doctor, Dr. Creoman,
14    be obtained.....
15 A  Yes.
16 Q  .....right?
17 A  Yes.
18 Q  And they're not going to recommend that his prescribed
19    medication be obtained unless they felt there was a reason
20    that he needed it, right?
21 A  Yes.
22 Q  Okay. And in fact someone went and got that medication
23    for him, right?
24 A  Yes.
25 Q  And no one's going to do that and waste their time if it

Page 225

1     wasn't necessary, is it?
2  A  Correct.
3  Q  All right. Now, the document -- you were looking at 10465
4     which was the radio log. You made a note that at 1728 an
5     ambulance left from Purtov, right?
6  A  Right.
7  Q  That wasn't for Mr. Scott Brown though. That was for
8     Mr. Damon Brown, right?
9  A  Correct.
10 Q  Okay. I just wanted to clarify that, make sure the record
11    was clear. All right. Now, when Mr. Brown is in the
12    holding cell, was that after you were done processing him,
13    you know, having done the DataMaster and all that?
14 A  No. That is the DataMaster or Intoximeter.....
15 Q  So that's occurring -- that's not occurring in a cell.
16    That's occurring in the processing room, right?
17 A  Correct.
18 Q  Okay. But you were asked a question about whether you
19    looked at the video of him in a holding cell. Is there a
20    video of him in a holding cell?
21 A  The booking room?
22 Q  A holding cell.
23    MR. KOZIOL: Mr. Herz, I was using the term -- I thought I
24 said holding room. If I said holding cell, I meant the
25 processing room. It's the one where we have like the two or

Page 226

1  three-hour tape.
2     MR. HERZ: Okay.
3     MR. KOZIOL: That's what I was asking about.
4  Q  All right. Now, so this is -- when you were answering
5     questions about that, you were answering questions about
6     being in the booking room?
7  A  Correct.
8  Q  Okay. Where he's being processed, right?
9  A  Correct.
10 Q  All right. And so you were asked questions about his --
11    when Mr. Brown said it's my right ankle, it's my left
12    ankle, you indicated you were confused.
13 A  Correct.
14 Q  Right? So what'd you do to clarify your confusion?
15 A  Asked him -- or I told him I thought you told me it was
16    your left ankle.
17 Q  Yes. And then what?
18 A  Or your right ankle.
19 Q  Sure. Okay. And then what?
20 A  That was it.
21 Q  That was it?
22 A  As far as what?
23 Q  As clarifying whether he had a hurt ankle or not?
24 A  Correct.
25 Q  So you didn't pursue whether or not he had a hurt ankle.

Page 227

1     You only were confused about which ankle was hurting.
2  A  Correct.
3  Q  Okay. But in finding out whether his ankle was hurt and
4     whether he needed medical attention and what needed to be
5     done, you didn't pursue it any further than trying to
6     figure out whether it was the right ankle or the left
7     ankle.
8  A  No.
9  Q  Okay.
10 A  I used.....
11    MR. KOZIOL: Go ahead. You can finished your answer.
12 A  I used my own observations of him, watching him while he
13    walked into the booking room. I watched him while he was
14    on the chair. There wasn't anything that led me to
15    believe he needed immediate attention.
16 Q  You mean that it was -- an immediate attention, you mean
17    like it was a broken ankle where he needed emergency
18    treatment and surgery as opposed to he needed some kind of
19    treatment? Is that what you mean by immediate?
20 A  Yes.
21 Q  Okay. So when you were done processing him and you'd got
22    the DataMaster result, what prevented you from then
23    providing medical attention for his hurt ankle?
24 A  He'd gotten even better about not complaining about his
25    ankle. There wasn't as much pain as before.

Page 228

1  Q  When you say there was.....
2     MR. KOZIOL: Let him finish. Let him finish.
3  A  He hadn't been complaining as much. I saw him walking
4     around. We had gone to the bathroom. He wasn't limping.
5     He was walking on his ankle. Didn't appear that he needed
6     attention.
7  Q  He wasn't complaining about it as much, but he still
8     complained about it.
9  A  Correct.
10 Q  And so you didn't pursue it further.
11 A  Correct.
12 Q  Okay. And did it ever occur to you that maybe he stopped
13    complaining about it so much because he had complained
14    about it so much before and you had done nothing about it
15    and so maybe he felt like it's not worth complaining too
16    much about it because I'm not getting the help I need
17    anyway? Did that ever occur to you?
18 A  Can you shorten that up?
19 Q  Yeah. Well, he had complained about it and you did
20    nothing about it, so maybe he just felt like complaining
21    to you wasn't going to do him any good. Did that ever
22    occur to you that maybe that's the way he felt about it?
23 A  No.
24 Q  Okay. Now, I want to go back to your narrative report
25    where you are engaged with Mr. Brown in the kitchen and

Page 229

1     I'm going to refer to the pages, the Bates Stamped pages
2     that I had referenced earlier which is I'm working with
3     13160 through 13165 and in particular 13161.
4     MR. KOZIOL: And, Mr. Herz, if you refer to a particular
5     page, if you'd just give me the page number in the narrative
6     report, then.....
7     MR. HERZ: Sure.
8     MR. KOZIOL: .....I'll be able to find it.
9     MR. HERZ: 13161.
10    MR. KOZIOL: No, no. I mean -- that doesn't do it. I'm
11    working off of different Bates Stamp numbers. You know what
12    I'm talking about, the.....
13    MR. HERZ: Sure. Page 2 of the narrative.
14    MR. KOZIOL: Thank you.
15    MR. HERZ: As numbered by Mr. Peterson.
16    MR. KOZIOL: Thank you.
17    MR. HERZ: Okay.
18 Q  Now, I just want to clarify something. When Mr. Brown had
19    gotten the beer -- right?
20 A  Correct.
21 Q  .....you told him to put the beer down, right?
22 A  Correct.
23 Q  Okay. And he said no.
24 A  Correct.
25 Q  And you told him that you were going to pepper spray him

Page 230

1   if he did not comply, right?
2 A Can I see my report?
3 Q Second full paragraph.
4 A Okay. Thank you.
5 Q So right here.
6 A So just to clarify, I said put the beer down and he'd
7   better not drink it.
8 Q Right. But my question is he said no and you said I'm
9   going to pepper spray you if you don't comply.
10 A Correct.
11 Q Right? Okay. And so at that point, you indicate that as
12   he brought the beer to his lips, you sprayed him.
13 A Correct.
14 Q Okay. And you step back at that point thinking that he
15   was going to drop the bottle.
16 A Correct.
17 Q Okay. But you sprayed him before he actually took the
18   drink.....
19 A Correct.
20 Q .....right? Okay. And he didn't drop the bottle, right?
21 A Correct.
22 Q And it.....
23   MR. KOZIOL: I'm going to object as to misstates. The
24 sentence is Brown brought the bottle to his lips and I sprayed
25 him in the face. So that sentence is not clear and I don't

Page 231

1 know how the witness interprets that sentence, but you said it
2 was before, so -- I think it misrepresents what's in this
3 document.
4 Q Well, and then you write I stepped back thinking Brown
5   would drop the bottle and then you write he did not and
6   proceeded to drink the beer. So it was after you sprayed
7   him that he proceeded to drink the beer.
8   MR. KOZIOL: Objection. Form. Request you show the.....
9 Q Is that what you wrote?
10   MR. KOZIOL: Request you show the witness the document.
11 A Can I see it?
12 Q Yep.
13 A Okay.
14   MR. HERZ: If he asks for it, I'll show it to him.
15 A Thank you. Okay. So what's your question?
16 Q So what you wrote is he brought the bottle to his lips and
17   then I sprayed him. So you don't write he brought the
18   bottle to his lips and drank from it and I sprayed him.
19 A Correct.
20 Q All right? And it was after you sprayed him that he drank
21   from the bottle, right?
22 A Not necessarily.
23 Q You write he did not drop the bottle and proceeded to
24   drink from the beer.
25 A Correct.

Page 232

1 Q So it was after you sprayed him that he proceeded to drink
2   from the beer.
3 A Not necessarily.
4 Q So your report is that he drank from the beer before you
5   sprayed him. Is that.....
6 A He was bringing his bottle to his lips -- the bottle to
7   his lips.....
8 Q Right.
9 A .....and I sprayed him.
10 Q Okay.
11 A Whether or not any fluid had passed through the bottle at
12   the time, I don't know.
13 Q Okay.
14 A So it's not necessarily, but that's the sequence of
15   events.
16 Q Okay. And so -- and you don't know if he in the two to
17   three seconds that you sprayed him whether he drank any.
18 A He had the bottle to his lips and it looked like he was
19   drinking after he had started drinking.
20 Q It looked like he was drinking after he started drinking?
21 A Consuming liquid.....
22 Q Yes.
23 A .....versus just having the bottle up and holding the
24   liquid into the bottle.
25 Q Okay. So is it your testimony that as he brought the

Page 233

1   bottle to his lips and you sprayed him that he was
2   drinking beer during the two to three seconds that you
3   were actually discharging your OC spray?
4 A Yes.
5 Q Okay. So you didn't write though he brought the bottle to
6   his lips and as he drank, I sprayed him. You didn't write
7   that.
8 A Correct.
9 Q All right. What you wrote is he didn't drop the bottle
10   and then he proceeded to drink.
11 A All right.
12 Q So the way you wrote it is it appears as though he only
13   started to drink after you sprayed him.
14   MR. KOZIOL: Objection. Form.
15 Q You do agree that's the way this reads.
16   MR. KOZIOL: Objection. Form.
17 A No.
18 Q All right. Now, after you sprayed him that one time, you
19   didn't spray him again, right? I mean I want to clarify
20   your testimony because it sounded like you sprayed him a
21   couple of times.
22 A Can I see it.
23   MR. KOZIOL: Objection. Form. There's no testimony like
24 that.
25   MR. HERZ: Well, based on your questions, that's the way

Computer Matrix, LLC              Phone - 907-243-0668
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473         jpk@gci.net
                                                                    sahile@gci.net

### Page 234

1  it sounded, so I'm going to clarify to make sure we're real
2  clear on this.
3  A  No. I didn't spray him more than once.
4  Q  Right. So it was just that one time, right?
5  A  Correct.
6  Q  And it was after he proceeded to drink the beer you say I
7     took the bottle from Brown and dropped it on the floor,
8     right? So how did you take the bottle from him? Last
9     line.
10 A  I don't know. I can't remember. I imagine -- I can guess
11    for you.
12 Q  I don't want you to guess.
13    MR. KOZIOL: Don't guess.
14 A  Okay.
15 Q  Please don't guess. All right. And so do you recall
16    whether you took the beer from him while he was still
17    drinking?
18 A  No.
19 Q  Okay. So your testimony is he put the bottle to his lips
20    and he drank for a period of anywhere from two to three
21    seconds to what, five to six seconds?
22 A  I can't remember.
23 Q  Okay. Do you recall whether you took the bottle from him
24    while he was in the process of drinking?
25 A  I think it was when it was down.

### Page 235

1  Q  Okay. So it was to his lips, he was drinking, and then he
2     took a pause, right?
3  A  Correct.
4  Q  All right. And you estimate that in the period of
5     three -- two to three seconds, as much as five to six
6     seconds, he drank at least half of that beer, right?
7  A  I think so.
8  Q  So he chugged it.
9  A  Yes.
10 Q  Okay. All right. All right. Now, doesn't your -- now,
11    you were asked a question whether there's any sort of
12    normal length of time to spray. Your answer was no; is
13    that right?
14 A  Correct.
15 Q  Okay. And that's based on your training and experience?
16 A  Correct.
17 Q  And you've reviewed your -- the policy and procedures
18    manual on use of OC spray?
19 A  Not recently, no.
20 Q  Okay. Excuse me. So is there too long a period of time
21    to do an OC discharge?
22 A  In my opinion, yes.
23 Q  Okay. And that's based on what considerations?
24 A  Each situation's going dictate. If you're outside, if
25    there are a larger number of people, if it's having an

### Page 236

1     effect, if it's not having an effect.
2  Q  And you're saying it's having an effect or it's not having
3     an effect, that's while you're engaged in the discharge as
4     opposed to waiting to see what happens after the
5     discharge?
6  A  Correct.
7  Q  Okay. All right. Okay. Mr. Koziol asked you questions
8     about hot pursuit and whether you'd been trained on the
9     issue of whether you could pursue for a serious offense
10    but not a minor offense, right?
11 A  I think so.
12 Q  All right. And you had indicated you had received
13    training about that distinction about whether you could
14    pursue in serious cases versus only in minor offenses,
15    right?
16 A  Right.
17 Q  Okay. And he asked you whether DWI was sufficiently
18    serious enough to go in and you indicated yes. Right?
19 A  Correct.
20 Q  And based on your -- on the training you were given, were
21    you ever given training about whether you could go in for
22    a misdemeanor like reckless driving?
23 A  Yes.
24 Q  You've been given training on that.
25 A  Specifically reckless driving?

### Page 237

1  Q  Right. That's the question.
2     MR. KOZIOL: You got to remember that question.
3  A  Yes.
4  Q  Your answer is yes, you have received training on that.
5  A  Yes.
6  Q  And where did that training occur?
7  A  The academy.
8  Q  And do you recall who the instructor was that gave you
9     training on that issue?
10 A  No.
11 Q  And is it your testimony that based on your training at
12    the academy that you can pursue in a hot pursuit case for
13    an offense such as reckless driving?
14 A  If the situation's correct, yes.
15 Q  Well, explain what that means if the situation's correct.
16 A  How much damage they've caused for reckless driving, if
17    they've caused a serious amount of fear I imagine. Well,
18    let me back up. Let me think about that. Can you ask me
19    the question again?
20 Q  Well, I asked you -- the first question was were you
21    trained that reckless driving was sufficiently serious an
22    offense that you could enter somebody's home in hot
23    pursuit and you said yes.
24 A  Okay.
25 Q  It depends and my question is what does it depend on.