**Page 238**

1  A  So it's going to depend on whether or not there was any
2     damage or -- and that -- I'm confusing myself because that
3     doesn't refer to just reckless driving, so I'm going to
4     have to back up and say no.
5  Q  Okay. And in this case, there was no report of damage to
6     property, right?
7  A  Correct.
8  Q  And there was no report regarding somebody being put in
9     fear, was there?
10 A  Correct.
11 Q  Okay. Now, Mr. Koziol asked you some questions about sort
12    of the chronology about when you had reasonable suspicion,
13    when did you have probable cause. You remember those
14    questions?
15 A  Yes.
16 Q  And he specifically at one point confined you to the
17    moment in time when you're going up Pillar Mountain Road.
18 A  Correct.
19 Q  Okay. And he asked you about probable cause at that time.
20    Remember that?
21 A  Correct.
22 Q  Okay. And he asked you did you have probable cause to
23    believe at that time that the offense of reckless driving
24    had been committed and your answer was yes.
25 A  Yes.

**Page 239**

1     MR. KOZIOL: Objection. Form. It was asked of that
2  vehicle and that vehicle's driver was the question.
3  Q  And he asked you for that moment in time whether you had
4     probable cause to believe that that driver and that
5     vehicle had committed the offense of driving under the
6     influence.
7  A  Yes.
8  Q  Okay. So you don't -- for a DUI, you don't need to have
9     that offense committed in your presence to make an arrest,
10    do you?
11 A  No.
12 Q  Okay. So is it your testimony that -- and the information
13    you had at that time when you're driving up Pillar
14    Mountain Road is you've been -- you were dispatched on a
15    reckless driving call, right?
16 A  No.
17 Q  Well, and there had been -- according to your testimony,
18    you had also been dispatched on a REDDI call, right?
19 A  Correct.
20 Q  Okay. So what you knew is somebody called in and said,
21    you know, a REDDI call and somebody had sprayed gravel on
22    somebody, right? Somebody had done a 360 in the road,
23    right?
24 A  Yes.
25 Q  Okay. And is it your testimony that you could have

**Page 240**

1     without -- at the moment you stopped the car, just gone
2     over, put the handcuffs on them, and actually arrested
3     them for driving under the influence based on that
4     information and nothing else.
5  A  Yes.
6  Q  Again I just want to be really clear here. At the -- you
7     receive a dispatch report for a REDDI.
8  A  Yes.
9  Q  You also receive information that somebody was complaining
10    about having gravel sprayed on them, right?
11 A  Yes.
12 Q  And somebody was complaining -- and also that the vehicle
13    had done a 360 in the road, right?
14 A  Correct.
15 Q  And had fishtailed.
16 A  Correct.
17 Q  Right? All right. And there was nothing else that you'd
18    been told about the driving -- the driver's conduct,
19    right?
20 A  Correct.
21 Q  All right. So it was those three things, the REDDI, the
22    rocks -- or four things -- the 360, and the fishtailing;
23    is that right?
24 A  Correct.
25 Q  All right. And so you had that information. You're

**Page 241**

1     driving towards Pillar Mountain and I'm going to ask you a
2     hypothetical, okay? Let's say that you get to Pillar
3     Mountain and you're right there and then, based on that
4     information, able to turn on your blue and red lights --
5     your red lights and actually make a stop on the vehicle.
6     Okay?
7  A  Okay.
8  Q  And the driver stays in the car and you walk up to the car
9     and you say, driver, please get out of the vehicle. The
10    driver gets out of the vehicle and without making any
11    other observations, asking any other questions, it's your
12    understanding that at that moment, you have enough
13    probable cause to put handcuffs on that person, arrest
14    them, and charge them with driving under the influence; is
15    that correct?
16 A  Yes.
17 Q  Okay. Now, you were asked about a report from a citizen,
18    assuming there's -- Mr. Koziol asked you about whether you
19    could rely on hearsay presented by a citizen, right?
20 A  Correct.
21 Q  All right. And you said so long as there's no reason not
22    to trust them and they're making -- they're reporting
23    things based on their own personal observations, right?
24 A  Based on -- can you say that again?
25 Q  He'd asked you whether you could rely on the hearsay of a

FRANK PETERSON  
Vol 1  
4/1/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

62 (Pages 242 to 245)

**Page 242**

1  citizen so long as there was no reason not to trust them
2  and so long as the report was based on their own personal
3  observations.....
4  A  Correct.
5  Q  .....right? And I'd asked you earlier this morning
6     whether as you understood it that when the first call came
7     in the caller was reporting that they had seen someone in
8     the Safeway parking lot spray gravel on another person,
9     right?
10 A  You'd asked me that, yes.
11 Q  Right. And you had indicated it was your understanding
12    that that person was reporting that event when it
13    happened, that they saw it when it happened.
14 A  Correct.
15 Q  And then -- and they followed the car out of the Safeway
16    lot, which only would have taken a minute maybe, and were
17    calling the police department saying I'm following this
18    car going up Selief and it did a 360, right?
19 A  Okay.
20 Q  Okay. Now, you would agree that if the second caller who
21    called in said I got sprayed by gravel 20 minutes ago,
22    that would tend to suggest that the first caller did not
23    personally observe that person being sprayed by gravel,
24    right?
25 A  Can you repeat that or rephrase it?

**Page 243**

1  Q  Well, you agree that the first caller said somebody just
2     got sprayed by gravel in the Safeway parking lot and I'm
3     following, the vehicle just did a 360 in the road, right?
4     And -- remember that?
5  A  Correct.
6  Q  Okay. And your testimony earlier was the caller, as you
7     understood it, was reporting something they had just
8     observed happened in the Safeway lot.
9  A  Correct.
10 Q  Right? That's your testimony.
11 A  Correct.
12 Q  Okay. Now, I'm asking you if the second caller who calls
13    in reported that they actually got sprayed by the gravel
14    20 minutes earlier -- okay?
15 A  Okay.
16 Q  .....that would tend to suggest that the first caller
17    didn't personally observe the person getting sprayed by
18    the gravel because they're reporting that they saw the
19    person get sprayed right there and then. There's a
20    20-minute time difference between when allegedly the
21    gravel spraying occurred, isn't there?
22 A  If I can look at the time logs, when it was called in and
23    when the other person called in, I could give you a better
24    answer to that.
25 Q  Well, let me ask you if -- it's not a question of when the

**Page 244**

1  calls were made. It's a question of when the caller said
2  the event occurred.
3  A  Okay.
4  Q  Okay? So let's assume the first caller calls in and says
5     I observed a car spray gravel over a person. I followed
6     that car and now they're going up Selief and they did a
7     360 in the road. And you said that based on your
8     understanding of that report, that occurred right
9     then.....
10 A  Correct.
11 Q  .....the person observed that happen and they called it in
12    right then.
13 A  Correct.
14 Q  Okay. And what I'm asking you is if the second caller --
15    okay -- calls in afterwards and said I got sprayed by
16    gravel 20 minutes ago -- okay.....
17 A  Uh-huh. (Affirmative)
18 Q  .....even though it's the second call, the way they're
19    reporting it is the event, the spraying of the gravel,
20    occurred 20 minutes earlier not right then. Right?
21 A  Well, it depends on when they called. When did the second
22    caller call?
23 Q  Let's see if I have my radio log.
24    MR. KOZIOL: Can I borrow your radio log?
25    MR. HERZ: You'll help me, I'll help you.

**Page 245**

1  Q  I could tell you this based on.....
2     MR. KOZIOL: Well, hold on. You want -- because.....
3     MR. HERZ: Yeah.
4     MR. KOZIOL: I want to keep -- if I find it, don't ask him
5  because then I can't concentrate.
6     MR. HERZ: All right. All right.
7     MR. KOZIOL: So it's not going to take long.
8  Q  Okay.
9  A  Okay. Looking at Bates Stamp Pages 10463. Look at time
10    entry at 1700.
11 Q  Okay.
12 A  Where does it say it happened 20 minutes previous?
13 Q  Well, that's what I'm telling you. It's not in the radio
14    log.
15 A  Okay.
16 Q  I'm asking if the caller said it happened to me 20 minutes
17    ago.....
18 A  I don't know. Oh, you're asking me if it says right here?
19 Q  No.
20 A  Okay.
21 Q  That's why I didn't know why you want to see the radio
22    log. If the caller -- if the second caller tells dispatch
23    I got sprayed with gravel 20 minutes ago.....
24 A  Okay.
25 Q  .....would that not suggest to you that the first caller

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax    907-243-1473  
jpk@gci.net  
sahile@gci.net

FRANK PETERSON
Vol 1
4/1/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

63 (Pages 246 to 249)

Page 246

1  who's claiming they observed the gravel being sprayed as
2  it happened did see it happen?
3  A  Okay. And that's what I thought you asked. If the call
4     came in at 1653 and I got information at 1700, that's
5     seven minutes.
6  Q  No more than seven minutes.
7  A  Correct.
8  Q  You don't know when the second call came in. You
9     only.....
10 A  Correct.
11 Q  .....know when you got the information radioed to you.
12 A  Correct.
13 Q  So sometime in less than seven minutes.....
14 A  Correct.
15 Q  Okay -- the caller's saying 20 minutes ago I got sprayed
16    by gravel.
17 A  Correct.
18 Q  Okay? And so -- and the first caller's claiming I just
19    saw somebody get sprayed by gravel.
20 A  Uh-huh. (Affirmative)
21 Q  So -- and it doesn't take 20 minutes to get from Safeway
22    down Selief, does it?
23 A  No, it doesn't.
24 Q  All right. So doesn't that suggest that the first caller
25    did not personally observe the second caller get sprayed

Page 247

1  by gravel?
2     MR. KOZIOL: Objection. Form.
3  A  Not necessarily. It could be that the second caller was
4     mistaken as well.
5  Q  Okay. You mean about the time.
6  A  Correct.
7  Q  Okay. But while it's possible, the two reports aren't
8     consistent with each other, are they?
9  A  Correct.
10 Q  Okay. And so that might be a reason not to trust the
11    report of the first person.
12 A  Not necessarily.
13 Q  I said it might be a reason not to trust the report of the
14    first person.
15 A  Okay.
16 Q  Okay? I didn't say it is the reason, but it might be a
17    reason not to, right? Might cause a prudent person to
18    investigate further to make some determinations, wouldn't
19    it?
20 A  Correct.
21 Q  Okay. Might cause a prudent officer to investigate
22    further to confirm whether the information that's being
23    reported by the first caller is accurate and reliable.
24    MR. KOZIOL: Objection. Form.
25 A  Yes.

Page 248

1  Q  It might be a reason to believe that the caller's
2     observations may not be as good as the officer's personal
3     observations under the circumstances, right?
4  A  I don't understand.
5     MR. KOZIOL: Objection. Form.
6  Q  I said it might be a reason for why an officer might
7     decide that his or her own personal observations as a
8     trained law enforcement officer might be more reliable
9     than the observations being called in by the caller. The
10    fact that there's this time discrepancy might lead a
11    prudent officer to rely on their own observations rather
12    than just on the observations of the caller.
13    MR. KOZIOL: Objection. Form.
14 A  For what?
15 Q  For making decisions regarding reasonable suspicion and
16    probable cause.
17    MR. KOZIOL: Objection. Form.
18 A  I don't understand.
19 Q  Well, you indicated earlier that you thought you could,
20    just based on the information in the call.....
21 A  Correct.
22 Q  .....decide that there's probable cause to make an arrest.
23 A  Correct.
24 Q  Okay. And if there's a reason to distrust the information
25    provided in the call, that might be a reason not to have

Page 249

1  probable cause to make an arrest. Yes?
2  A  Correct.
3  Q  Okay. And so the time discrepancy might be a reason why
4     an officer might want to rely on his own observations
5     rather than on the caller's observations for purposes of
6     establishing probable cause.
7     MR. KOZIOL: Objection. Form.
8  A  I still don't understand that.
9  Q  All right. Okay. Now, you didn't have any information
10    that the truck slid in the Safeway lot, right? You
11    just.....
12 A  Correct.
13 Q  Okay. Because you were asked a question whether you had
14    information that the vehicle slid in the lot, but you
15    didn't have that information the vehicle slid in the lot.
16    You had information that gravel got sprayed on somebody,
17    right?
18    MR. KOZIOL: Objection.
19 A  Correct.
20 Q  Okay. And you would agree that whatever language is used
21    about reasonable suspicion in your policy and procedures
22    manual, the legal definition as established by the courts
23    in Alaska is the definition that you have to abide by,
24    right?
25 A  Correct.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501
Phone - 907-243-0668
Fax      907-243-1473
jpk@gci.net
sahile@gci.net

Page 250

1  Q  And as a law enforcement officer enforcing the laws of the
2     State of Alaska, it's your responsibility to know what the
3     legal definition is as defined by the courts of Alaska,
4     isn't it?
5     MR. KOZIOL: Objection. Form.
6  A  Should be, yes.
7  Q  Okay. And to the extent that there is some differences
8     between what's in your policy and procedures manual and
9     what the legal definition is, you have to go with the
10    legal definition in enforcing the laws of the State of
11    Alaska not what the language in the policy and procedures
12    manual is; isn't that true?
13 A  Yes.
14 Q  Okay. And earlier when I asked you to define what
15    reasonable suspicion was, you couldn't do it.
16 A  No.
17 Q  And when I asked you to define what the legal definition
18    of probable cause was, you couldn't do that either.
19 A  Correct.
20 Q  In fact you got it confused with the legal civil standard
21    for preponderance of the evidence, right?
22 A  Correct.
23 Q  And it was only with Mr. Koziol leading you with leading
24    questions that you were able to answer questions about
25    what those things meant.

Page 251

1     MR. KOZIOL: Objection. Form.
2  A  No.
3  Q  Isn't that right?
4  A  No.
5  Q  Okay. Now, with regard to the Notice of Revocation form,
6     the backside, Page 10051, the -- who notarized that?
7  A  Karen Viall if I remember correctly.
8  Q  And who is that?
9  A  She was a dispatcher at the police department at the time.
10 Q  And so it's your testimony that a notary would -- it was
11    common practice in the police department for a dispatcher
12    to notarize the signature on a date different from when
13    the signature actually got -- was -- when the document was
14    actually signed?
15 A  I don't know.
16 Q  Are you aware that such a practice would violate the
17    notary laws as well as the oath that the notary takes when
18    they're given a commission as a notary for the State of
19    Alaska.....
20 A  No.
21 Q  .....for them to do that?
22 A  No.
23 Q  Okay. Knowing that, do you think a notary would knowingly
24    violate their oath and violate the laws of Alaska and
25    notarize and date a signature on a date different from

Page 252

1     when it was signed?
2  A  No.
3  Q  Okay. And so given the fact that the notary date on here
4     is January 7th, would it not be reasonable to believe that
5     the date the notary put on for when you personally
6     appeared before her to sign the document is the date in
7     fact that you signed the document?
8  A  Could be.
9  Q  Okay. Now, you were asked whether the complaint card that
10    you looked at which was Bates Stamp 10082 provides support
11    that in fact Doug Coyle told you that this involved a
12    REDDI call, right?
13 A  Correct.
14 Q  Do you remember that? Okay. Now, you indicated that
15    Coyle would have filled that out -- that complaint card
16    out by the end of his shift under normal circumstances,
17    right?
18 A  Yes.
19 Q  So that would not have been filled out at the same time as
20    when he's making the dispatch -- when he dispatched you.
21    MR. KOZIOL: Objection. Form.
22 Q  Right?
23 A  Correct.
24 Q  Okay. And there's nothing in that complaint card that
25    says that Doug Coyle told you that he had received a REDDI

Page 253

1     call, right?
2  A  Correct.
3  Q  What that complaint card does at most is provide proof
4     that the police department received a report of a REDDI
5     call. Do you understand the difference?
6  A  I do and it should say that it was assigned to me if I
7     remember correctly, if I can look at the report -- the
8     card again.
9  Q  Well, I'm sure the card says that you were dispatched.
10 A  Okay.
11 Q  Okay? But what I'm saying is there's a difference between
12    Coyle saying the police department received a call from
13    somebody reporting an intoxicated driver, a REDDI call,
14    all right?
15 A  Okay.
16 Q  And -- there's a difference between that and something
17    that says Coyle told Peterson that there was a REDDI call.
18    There is a different between those two things, right?
19 A  Correct.
20 Q  Okay. When the complaint card says citizen complaint
21    REDDI call, what that card shows is that he, Coyle,
22    received a call complaining of a possibly intoxicated
23    driver.
24 A  Yes.
25 Q  Isn't that right?

### Page 254

1  A  Yes.
2  Q  Okay. But the card itself doesn't tell us whether Coyle
3     passed that information on to you, does it?
4  A  Correct.
5  Q  Okay. Okay. Now, you were asked about some of the
6     documents that we went through earlier this morning. And
7     I want to go back to a couple of them. The affidavit in
8     the Warnecke case and the narrative report in that case
9     which I believe counsel for the defendants indicated was
10    12690, 12676. All right. All right. Now, I'm going to
11    ask you to look at paragraph 1 again in the Warnecke
12    affidavit. That's at 12690.
13 A  Okay.
14 Q  All right. Mr. Koziol asked you whether -- and what that
15    says here, paragraph 1, is State Troopers request our
16    assistance with a person who -- and I'm going to
17    emphasize -- had been driving and was intoxicated, right?
18 A  Correct.
19 Q  Okay. The affidavit doesn't say you'd requested
20    assistance with somebody who is driving or was driving but
21    somebody who had been driving.
22    MR. KOZIOL: Objection. It says had. It's the same as
23 was, so I object to misleading the witness.
24    MR. HERZ: All right.
25 A  Correct.

### Page 255

1  Q  It says had been, right?
2  A  Correct.
3  Q  Okay. Now, in looking at 1276 [sic], you wrote Trooper
4     Dunn stated he was working a case that involved a dead
5     body and had called the mortician. You said that when the
6     mortician arrived, you could smell the odor of alcohol on
7     his breath. Trooper Dunn requested our assistance in
8     identifying Warnecke and whether if Warnecke was in fact
9     intoxicated. Right?
10 A  Correct.
11 Q  So the information was that Warnecke came to the trooper
12    post to assist with an investigation.
13 A  Correct.
14 Q  Which suggested he had been driving? Right?
15    MR. KOZIOL: Objection. Form.
16 A  Suggested but I could have improved upon my supplemental
17    report by including that as well.
18 Q  Okay. But the reasonable suspicion -- remember, I was
19    asking you not about whether there were some facts in and
20    some facts out. I was asking you about what was the
21    reasonable suspicion that you had indicated in your
22    affidavit and what was the reasonable suspicion provided
23    in the narrative, right?
24 A  Correct.
25 Q  And the reasonable suspicion in the affidavit was that you

### Page 256

1     had gotten a call about somebody who had been driving,
2     right?
3  A  Correct.
4  Q  Okay. The reasonable suspicion listed wasn't that there
5     was a vehicle in the ditch, right?
6  A  Correct.
7  Q  There wasn't an excessive speed claim, right?
8  A  Correct.
9  Q  There wasn't a traffic infraction claim, right?
10 A  Correct.
11 Q  There was a report that somebody had been driving, right?
12 A  Correct.
13 Q  Okay. And that they might be intoxicated.
14 A  Correct.
15 Q  Right? And that was the same reasonable suspicion that
16    you were talking about in your narrative report. There
17    wasn't some other reasonable suspicion given in the
18    narrative, was there?
19 A  I'm just saying that I could have improved upon this by
20    saying that Trooper Dunn told me he was driving.
21 Q  Okay. Understood. But the point is that the basis for
22    the stop was based on a reasonable suspicion that somebody
23    had been driving while they were intoxicated.
24 A  Correct.
25 Q  There wasn't two different kinds of reasonable suspicion,

### Page 257

1     one in the narrative report like it was a traffic
2     infraction and a different one in the affidavit. They
3     were the same, weren't they?
4  A  Correct.
5  Q  Okay. So it could have been clearer, but the information
6     related to the same form of reasonable suspicion, didn't
7     it?
8  A  Yes.
9  Q  Okay. All right. And so it would have been clearer, but
10    it wasn't a mistake. Not like when you wrote in Reutov,
11    the lights were on in the -- the lights were off in the
12    affidavit and the lights were on in the narrative. That
13    as a mistake.
14 A  I think this was a mistake too.
15 Q  Okay. Now, in the other matter, Jauregui or Jauregui,
16    that affidavit's at 12730 and 12714 is the narrative. All
17    right. Now let me just back up. You indicated you still
18    think that's a mistake because it could have been clearer.
19 A  Yes.
20 Q  Okay. But -- go ahead.
21 A  It was pertinent information that should have been
22    included in the supplement report as well.
23 Q  Okay. So it could have been clearer, but it's still not a
24    different form of reasonable suspicion.
25    MR. KOZIOL: Objection. Asked and answered.....

Case 3:05-cv-00002-TMB   Document 89-14   Filed 05/27/2008   Page 6 of 9

FRANK PETERSON
Vol 1

4/1/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

66 (Pages 258 to 261)

Page 258

1  Q  Right?
2  MR. KOZIOL: .....several times at this point.
3  A  No.
4  Q  Okay. Now, in Jauregui, read the first paragraph in the
5     affidavit again.
6  A  Okay.
7  Q  Okay. And that you indicated that the Kodiak Police
8     Department received a telephone call from Nelson reporting
9     a dark green, 1979 model pickup truck bearing the license
10    plate 1970CT ran him off the road along with several other
11    vehicles. Right?
12 A  Correct.
13 Q  Okay. And you indicated previously when you testified
14    this morning that the reasonable suspicion that you're
15    indicating there in the affidavit was reckless driving,
16    right?
17 A  Correct.
18 Q  Okay. And in paragraph 1 of your narrative report on
19    12714, you say Nelson reported that a vehicle ran him off
20    the road with several other -- along with several other
21    vehicles. Vehicle was a green 1979 model pickup truck
22    bearing license 1970CT, right? First paragraph.
23 A  Yes.
24 Q  Same exact basis for making the stop, reasonable suspicion
25    of reckless driving, right?

Page 259

1  A  Correct.
2  Q  Okay. So you were then asked you didn't include in the
3     affidavit that there was information about the vehicle
4     passing him at a high rate of speed and almost hitting him
5     and other vehicles in front of him, right?
6  A  Correct.
7  Q  But that doesn't change the fact that the reasonable
8     suspicion as stated in the affidavit and the reasonable
9     suspicion as stated in the report is still the same,
10    reckless driving.
11 A  Correct.
12 Q  Okay. All right. So you've listed the same reasonable
13    suspicion in both documents. You haven't made a mistake,
14    have you?
15 A  Yes.
16 Q  You have? Well, you didn't make a mistake by saying in
17    the narrative report the reasonable suspicion was a
18    different kind that it was like a traffic infraction or a
19    vehicle in the ditch, right?
20 A  Correct.
21 Q  All right. And it was -- the information that was
22    included in that additional paragraph simply expanded upon
23    the way in which the reckless driving occurred, right?
24 A  Yes.
25 Q  When somebody almost gets run off the road, they're almost

Page 260

1     being hit, aren't they?
2  MR. KOZIOL: Objection. Form.
3  A  I don't know.
4  Q  Okay. When Nelson reported a vehicle ran him off the road
5     along with several other vehicles and also said a vehicle
6     almost hit him and other vehicles in front of him, pretty
7     similar stuff, isn't it?
8  MR. KOZIOL: Objection. Form.
9  A  Is that what I wrote?
10 Q  In one paragraph, you said Kodiak Police Department
11    received a call. Nelson reported vehicle ran -- that a
12    vehicle ran him off the road along with several other
13    vehicles. In the next paragraph, you said Nelson said the
14    vehicle almost hit him and other vehicles in front of him.
15    Almost identical, isn't it?
16 A  But different.
17 Q  But different.
18 A  Correct.
19 Q  Okay. In your.....
20 MR. KOZIOL: You also left out that passed him at a high
21 rate of speed.....
22 MR. HERZ: At a high rate of speed.
23 MR. KOZIOL: .....in the same sentence. So I object to
24 your altering sentences.
25 MR. HERZ: Okay.

Page 261

1  Q  And driving at a high rate of speed is -- would be
2     reckless driving, right?
3  A  Correct.
4  Q  And almost hitting somebody is reckless driving.
5  A  Correct.
6  Q  And almost hitting other vehicles is reckless driving,
7     right?
8  A  Correct.
9  Q  All right. And being run off the road by somebody is
10    reckless driving, right?
11 A  Correct.
12 Q  And running other people off the road would be reckless
13    driving, right?
14 A  Running somebody off the road, not necessarily reckless
15    driving. It depends on the situation, depends on their
16    intent too, if they were driving recklessly or not. I can
17    see situations where somebody might be avoiding say a
18    pedestrian or something like that, but so.....
19 Q  But that wasn't reported.
20 A  Correct.
21 Q  Okay.
22 A  I'm just saying.
23 Q  And based on your affidavit -- based on this statement,
24    you indicated that that affidavit provided reasonable
25    suspicion that reckless driving occurred.

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Page 262

1  A  Correct.
2  Q  Okay. So the differences that we're seeing here are
3     differences in the sort of specific facts that were
4     included or not included pertaining to the reasonable
5     suspicion that was being written about in your affidavit
6     or being written about in your narrative, right?
7  A  Supporting material that would have assisted the
8     affidavit.....
9  Q  Right.
10 A  .....the supplement.
11 Q  Right.
12 A  Correct.
13 Q  But none of those cases did you leave out information
14    about whether you had been dispatched or provided
15    information about reasonable suspicion itself.
16 A  Correct.
17 Q  Okay. In none of those cases did you omit from your
18    affidavits that there was another form of reasonable
19    suspicion that you'd been informed about, but you didn't
20    include it in the affidavit.
21 A  Define omit for me.
22 Q  Not write it.
23 A  Okay. Correct.
24 Q  Okay. And in none of these situations are you saying that
25    you were informed of another form of reasonable suspicion

Page 263

1     and forgot to write about it in your narrative report.
2  A  Correct.
3  Q  Right? Okay. And so these things that you're being asked
4     about here, the kinds of things you left out, are very
5     different than what happened in the Brown case where you
6     completely omitted a form of reasonable suspicion from
7     your affidavit because you didn't include supposedly
8     information that you received that you got a REDDI report.
9  A  Can you shorten it up for me?
10 Q  These situations that are described here are different
11    from the Brown case, aren't they?
12 A  Correct.
13 Q  Because in Brown, you didn't leave out just a fact that
14    was similar to the other facts that you'd already written.
15    You left out a complete form of reasonable suspicion that
16    you'd been told about, but you didn't write it in your
17    affidavit.
18    MR. KOZIOL: Objection. Form.
19 A  Correct.
20 Q  And you didn't write it in your narrative report.
21 A  Correct.
22 Q  Okay. And so in the Warnecke case and the Jauregui case,
23    what you left out were some additional facts, right, that
24    might have been interesting, right, to know?
25    MR. KOZIOL: Objection. Form.

Page 264

1  A  No. No.
2  Q  Well, they didn't -- you didn't need to list them in order
3     to establish that you had reasonable suspicion to make
4     your stop because you had already listed facts that
5     established that, didn't you?
6  A  Correct.
7  Q  Okay. But that's -- but those cases, what was left out of
8     the report were a couple of facts, right?
9  A  Correct.
10 Q  And what was left out of Brown was actual information
11    regarding reasonable suspicion.
12 A  Correct.
13 Q  Okay. And you would agree that the information about
14    reasonable suspicion for a REDDI call is important
15    information, right?
16 A  Correct.
17 Q  Because when you make a warrantless entry into somebody's
18    house, that's important information to include in your
19    affidavit, right?
20 A  Correct.
21 Q  And you want to be able to provide enough facts so that
22    you can establish that you warrantless entry was on a
23    lawful basis, right?
24 A  Correct.
25 Q  And making a warrantless entry because you received a

Page 265

1     REDDI call, that's supported in the law, isn't it?
2  A  Yes.
3  Q  Okay. But making a warrantless entry when all you've
4     received is information that gives you reasonable
5     suspicion for reckless driving, that's not supported by
6     the law, is it?
7  A  Correct.
8     MR. KOZIOL: Objection. Form.
9     MR. HERZ: No further questions.
10    MR. KOZIOL: Let's go off the record for a moment.
11    (Off record)
12    (On record)
13    REPORTER: Okay, we're back on record.
14            OFFICER FRANK R. PETERSON, JR.
15 testified as follows on:
16            RECROSS EXAMINATION
17 BY MR. KOZIOL:
18 Q  Officer Peterson, Mr. Herz asked you about whether
19    basically Mr. Brown was a complainer and that isn't it
20    possible that he was complaining initially about his left
21    ankle in the booking room, but then when you didn't
22    respond to him, he stopped complaining. Do you remember
23    him asking you about that theory?
24 A  Yes.
25 Q  But do you remember in the booking room tape that there

**Page 266**

1   was rather a consistent complaining by Mr. Brown about
2   being, quote, ripped from his home, end quote, by you in
3   an unlawful entry and seizure. Remember that?
4 A Yes.
5 Q And he kept complaining of that all the way through that
6   tape, right?
7 A Correct.
8 Q So on a more probably than not basis, it doesn't seem
9   reasonable, does it, that Mr. Brown became a noncomplainer
10  about his left ankle.....
11   MR. HERZ: And I object to the use.....
12   MR. KOZIOL: Well, let me finish the question and
13  then.....
14   MR. HERZ: Well, I'm going to object to the use of the
15  term complainer in the pejorative way it's being used.
16   MR. KOZIOL: Mr. Herz, I really try never to interrupt you
17  in the middle of a question because it gets us nowhere. You
18  will have an opportunity to object after the question, but if
19  we interrupt each other, then we really get nowhere. So I
20  would request that you at least let me finish the question.
21 Q Would you agree that if Mr. Brown continued to complain
22  about your ripping him from his home that it's likely if
23  his ankle continued to still bother him by the end of the
24  tape, he would have continued to complain about that?
25   MR. HERZ: Objection. Speculation.

**Page 267**

1 A I agree.
2 Q Okay. The report you got from Coyle about this vehicle
3   doing a 360 and also fishtailing, you labeled that
4   reckless driving, correct?
5 A Correct.
6 Q And would a reasonable police officer infer from that that
7   there might be -- that any individuals around this vehicle
8   that was engaging in such a maneuver might reasonably be
9   in fear of bodily harm?
10 A Correct.
11 Q Okay. I want to take you to the hypothetical that
12  Mr. Herz asked you wherein we have your state of knowledge
13  from what Coyle told you in the patrol room and then your
14  going up Pillar Mountain and you see the Brown vehicle,
15  the gold flatbed, coming the other way and then I think he
16  told you -- you turn around and then he wanted you to
17  assume that Mr. Brown stopped. Okay?
18 A Okay.
19 Q Now I think you've told us that you believe you had
20  probable cause to arrest him.
21 A Correct.
22 Q Okay. If in that hypothetical Mr. Brown had gotten out of
23  his vehicle, even though you had probable cause to arrest
24  him, is it likely you wouldn't have arrested him at that
25  moment?

**Page 268**

1 A Correct.
2 Q Okay. What would you have done?
3 A I would have gone through the process that we usually go
4   through when we stop a vehicle we suspect of DWI, field
5   sobriety tests, a PBT.
6 Q Okay. So you'd have been looking for information either
7   to add to or subtract from your probable cause.
8 A Correct.
9 Q Okay. And, however, in the hypothetical, if Mr. Brown had
10  said to you -- he stopped but he said to you I ain't
11  getting out of the vehicle, I ain't doing the field
12  sobriety tests, I ain't doing what you want, would you
13  have arrested him?
14 A Yes.
15 Q For DUI.
16 A Yes.
17 Q Okay. I want to go back to that -- the flip side of the
18  Notice of Revocation and I'm a little confused by your
19  testimony. We have your signature on that second page and
20  this is where the REDDI information appears. You remember
21  the document.
22 A Yes.
23 Q Okay. And we have your signature on that second page, but
24  we don't have a date attached to your signature, right?
25 A Right.

**Page 269**

1 Q What we have is a date attached to the notary's signature.
2 A Correct.
3 Q Who happens to be a dispatcher, right?
4 A Correct.
5 Q And I think you testified when I was questioning you that
6   you're aware of a practice of the Kodiak Police Department
7   notary publics that a police officer can sign their name
8   to such a document and it might not get notarized the next
9   day, but -- it might not get notarized right then in your
10  presence when you've signed it because the notary publics
11  are familiar with the signature and they can and do
12  notarize it a day or two later.
13 A That's correct.
14 Q You've seen that happen.
15 A Yes.
16 Q And thus I think your earlier testimony when I was asking
17  you questions was, well, you know, it could have -- I
18  could have signed it on the 7th. I could have signed it
19  somewhere between the 4th and the 7th, but I think I more
20  likely signed it on the 4th and it just took them a few
21  days to notarize it. You remember that testimony?
22 A Correct.
23 Q Okay. And I was a little confused about your testimony in
24  that same topic with Mr. Herz where it sounded like you're
25  saying that, well, no, maybe it's more likely it was done

Page 270

1   on the 7th rather than the 4th. So I want to ask you
2   this. Knowing about the habit and custom and not knowing
3   exactly when you signed it, based upon the habit and
4   custom and the practice of notary publics that you've
5   seen, can you tell us when it was most likely that you
6   signed it, on the 4th, on the 7th, or somewhere in
7   between.
8 A On the 4th. Yeah. I wanted to say that, you know, I
9   don't understand the laws when it comes down to notaries.
10  I just want to confirm that I don't think the notaries
11  would be doing anything against the law or illegal.
12 Q Okay.
13 A So.....
14 Q Okay. And why do you think it was more likely on the 4th
15  that you signed it rather than the 7th?
16 A It's my common practice. I usually take care of that
17  right away.
18 Q Okay. That's your practice of filling out.....
19 A Yes.
20 Q .....that second page.
21 A Yes.
22 Q Okay. All right. And whatever the notary practices are,
23  you're more familiar with your practice.
24 A Correct.
25 Q Okay. All right. And that dispatch card that was filled

Page 271

1   out by Mr. Coyle, I think you've testified that it was
2   your belief that his practice was to have at least filled
3   that out by the end of his shift that day. I think you
4   said something like that.
5 A Well, that's -- it's what's required of them by.....
6 Q Okay.
7 A .....management is to have the card complete by the end of
8   their shift.
9 Q But you don't know in terms of his particular habit and
10  custom when exactly he fills it out, whether he fills it
11  out when the call's coming in or shortly thereafter or at
12  the end of his shift.
13 A Correct.
14 Q You just don't know.
15 A Correct.
16 Q All right. Okay.
17  MR. KOZIOL: That's all I have.
18  MR. HERZ: We're done.
19  REPORTER: We're done?
20  MR. KOZIOL: All right.
21  REPORTER: All right. So this concludes the videotaped
22  deposition of Officer Peterson. The time is 6:03 p.m.,
23  April 1st, 2008, off record.
24              (Appendix 1 attached)
25          (END OF PROCEEDINGS)

Page 272

1                  CERTIFICATE
2   UNITED STATES OF AMERICA   )
                               )ss
3   STATE OF ALASKA            )
4       I, Joseph P. Kolasinski, Notary Public in and for the
5   state of Alaska, residing in Anchorage in said state, do hereby
6   certify that the deponent in the foregoing matter was duly
7   sworn to testify to the truth, and nothing but the truth;
8       That said testimony was taken at the time and place
9   therein stated;
10      That the testimony of said witness was recorded
11  electronically and thereafter transcribed under my direction
12  and reduced to print;
13      That the foregoing is a full, complete, and true record of
14  said testimony.
15      I further certify that I am not a relative, nor employee,
16  nor attorney, nor of counsel of any of the parties to the
17  foregoing matter, nor in any way interested in the outcome of
18  the matter therein named.
19      IN WITNESS WHEREOF I have hereunto set my hand and affixed
20  my seal this 21st day of April 2008.

23              Joseph P. Kolasinski, Notary Public
                in and for the State of Alaska.
                My Commission Expires: 03/12/2012

Page 273

1                    WITNESS CERTIFICATE
2   RE: BROWN v. PETERSON, et al.,
    CASE NUMBER: 3:05-cv-0002 [TMB]
3   DEPOSITION OF: FRANK R. PETERSON, JR.
    DATE TAKEN: APRIL 1, 2008

    I hereby certify that I have read the foregoing deposition
5   and accept it as true and correct, with the following
    exceptions:

    Page   Line        Description

    _____

    If additional paper is needed, please sign and date each sheet.

    FRANK R. PETERSON, JR.   DATE