IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

```
SCOTT BROWN,                         )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
FRANK PETERSON, Individually and     )
in his official capacity as a        )
City of Kodiak Police Officer;       )
JEFF HOLDEN, Individually and in     )
his official capacity as a City      )
of Kodiak Police Officer, CITY       )
OF KODIAK; and JOHN AND JANE         )
DOES 1 - 10,                         )
                                     )
            Defendants.              )
                                     )
```

Case No. 3:05-cv-0002 [TMB]

VIDEOTAPED DEPOSITION OF OFFICER JEFFREY H. HOLDEN

April 2, 2008

APPEARANCES:

    FOR THE PLAINTIFF:    MR. ROBERT M. HERZ
                                 Attorney at Law
                                 425 G Street, Suite 600
                                 Anchorage, Alaska  99501
                                 (907) 277-7171

    FOR THE DEFENDANTS:    MR. FRANK S. KOZIOL
                                 Attorney at Law
                                 618 Christensen Drive
                                 Anchorage, Alaska  99501
                                 (907) 258-7706

    ALSO PRESENT:          CHIEF T.C. KAMAI

Ex. J

JEFFREY HOLDEN                    4/2/2008              BROWN v. PETERSON, et al.,
Vol 1                                                   Case No. 3:05-cv-0002 TMB

2 (Pages 2 to 5)

---

**Page 2**

TABLE OF CONTENTS

Direct Examination by Mr. Herz        4
Cross Examination by Mr. Koziol      53
Redirect Examination by Mr. Herz     61

EXHIBITS MARKED:
(None marked)
BATES STAMP DOCUMENTS:
10873   456   11122

---

**Page 3**

PROCEEDINGS
(Kodiak, Alaska - 4/2/2008)
(On record)

REPORTER: My name is Salena Hile. I'm a court reporter with Computer Matrix and a Notary Public in the state of Alaska. Today is April 2nd, 2008, and the time is 9:06 a.m. This is the first tape in the videotaped deposition of Jeffrey Holden and we are at the Best Western, Kodiak, Alaska. This is in the United States District Court for the district of Alaska, Scott Brown, plaintiff, versus Frank Peterson, individually and in his official capacity as a city of Kodiak police officer, Jeff Holden, individually and in his official capacity as a city of Kodiak Police Officer, city of Kodiak, and John and Jane Does 1 through 10, defendants. The case number A05-0002 CV. This deposition is being taken on behalf of the plaintiff.

Counselors, please identify yourselves for the record and who you represent, starting with the plaintiff's attorney, please.

MR. HERZ: Robert Herz, last name's spelled H-E-R-Z, represent Scott Brown.

MR. KOZIOL: Frank Koziol for the defendants.

REPORTER: And, sir, could you state your name, please?

CHIEF KAMAI: Charles Kamai.

---

**Page 4**

REPORTER: All right. Okay. It's officer?
OFFICER HOLDEN: Officer.
REPORTER: Please raise your right hand.
(Oath administered)
OFFICER HOLDEN: I do.
REPORTER: Thank you.

OFFICER JEFFREY H. HOLDEN
having first been duly sworn under oath, testified as follows on:

DIRECT EXAMINATION

REPORTER: Please state your full name for the record and spell your last name.
A   Jeffrey Herbert Holden, H-O-L-D-E-N.
REPORTER: And a mailing address, please.
A   458 Curlew Way, Kodiak, Alaska 99615.
REPORTER: Okay. And spell the street name for me.
A   C-U-R-L-E-W, Way, W-A-Y.
REPORTER: Okay. And a daytime telephone number or a message phone where you could be contacted.
A   486-8000 is the police department.
REPORTER: Okay. Thank you. All right. Counselors, if there's no stipulations, Mr. Herz, you can begin.
MR. HERZ: Okay. Thank you. Excuse me.
BY MR. HERZ:

---

**Page 5**

Q   Officer Holden, have you ever been deposed in a civil case before?
A   Never.
Q   Okay. Do you understand you're under oath? Right?
A   Yes, sir.
Q   Same kind of oath that you would take if you were testifying in a criminal case.
A   Yes, sir.
Q   Okay. When I ask you questions, if you don't understand a question I've asked you, the expectation is you'll say I don't understand and I'll rephrase the question or ask it another way so that I impart the information to you in a way that you can understand it, okay?
A   Yes, sir.
Q   If you don't indicate that you have some problem with understanding the question, the assumption is you understood the question as it was put to you and your answer was in response to the question, okay? Fair enough?
A   Yes.
Q   Okay. You presently work for the Kodiak Police Department, right?
A   Yes.
Q   How long have you been an officer with the Kodiak Police

---

JEFFREY HOLDEN                    4/2/2008              BROWN v. PETERSON, et al.,
Vol 1                                                    Case No. 3:05-cv-0002 TMB

3 (Pages 6 to 9)

### Page 6

1  Department?
2  A  Right now? It'll be six years May 20th.
3  Q  Okay. When you said right now, does that -- should that
4     mean to me that there was another period of time when you
5     were at the Kodiak Police Department other than the last
6     six years?
7  A  No, sir.
8  Q  Okay. So it's been six years continuous or it will be six
9     years continuous as of this May.
10 A  Correct.
11 Q  And other than your experience with the Kodiak Police
12    Department, do you have any other prior law enforcement
13    experience?
14 A  I was in the Coast Guard for 20 years.
15 Q  Okay. So -- and in your capacity in the Coast Guard for
16    20 years -- my question was do you have any law
17    enforcement experience. So can you explain to me in what
18    capacity you served in the Coast Guard that would give you
19    law enforcement experience?
20 A  I was a boarding officer in the Coast Guard.
21 Q  Okay. And in the capacity as a boarding officer in the
22    Coast Guard, what laws were you enforcing?
23 A  Federal laws.
24 Q  Okay. And federal maritime law or any federal law?
25

### Page 7

1  A  Federal maritime law, but we were able to enforce customs
2     laws. The last four years in my Coast Guard career, I was
3     stationed here in Kodiak.....
4  Q  Uh-huh.
5  A  .....on the base and I was a military police officer.
6  Q  Okay. And in your capacity as a military police officer
7     at the base -- you said the last four years of your duty?
8  A  Yes, sir.
9  Q  And again you were enforcing federal military law, would
10    that be correct?
11 A  As a military police officer, we were actually -- we would
12    enforce state laws, but how that would work out on the
13    base in the area that we had jurisdiction in, if we
14    observed a violation of state law, we would make -- let's
15    say if it was a traffic stop, we would make the traffic
16    stop and let's say if it was a DUI case, we would call the
17    State Troopers. They would respond. We would tell them
18    what our probable cause for the stop was and they would
19    use that probable cause and they would conduct the rest of
20    the investigation.
21 Q  Okay. Now, when you say you would enforce state laws, in
22    your capacity working for the Coast Guard, did you have
23    training in the laws of the State of Alaska?
24 A  Yes.
25

### Page 8

1  Q  And where did you receive that training?
2  A  I went to the public safety academy in Sitka, Alaska.
3  Q  Okay. And when did you do that?
4  A  In 2000.
5  Q  Well, you've been a -- you've been with the Kodiak Police
6     Department, it'll be six years in May, so you would have
7     begun that service in about 2002?
8  A  I began -- I'd have to go back to get -- I believe it
9     was -- yes, sir.
10 Q  Okay.
11 A  Yes, sir. It was in 2002.
12 Q  And you indicated the last four years you were doing
13    military -- you were operating as a military police
14    officer on the Coast Guard base for four years. If you
15    went to the academy in 2000, does that mean that for the
16    first two years where you were enforcing state law on the
17    base, you were doing so without the benefit of being
18    trained in the laws of the State of Alaska.
19 A  Well, we had field training. We had a field training
20    program which mirrored the trooper program, three months
21    of field training.
22 Q  Okay. So you had three months where you were being
23    actively supervised by a field training officer when you
24    were on your shift?
25

### Page 9

1  A  Yes, sir.
2  Q  Okay. And then in 2000, you went to the academy and you
3     were at the academy for how long?
4  A  I don't remember how long the academy was. 16 weeks I
5     think it is. I think that's what it was.
6  Q  So.....
7  A  The full -- full academy.
8  Q  Okay.
9  A  Not the last -- it was just like what the municipal would
10    go through. I didn't stay the extra three weeks that the
11    troopers are required to do. So it was I believe 16
12    weeks.
13 Q  Okay. And after you let the Coast Guard and you came to
14    work for the Kodiak Police Department, did you have any
15    additional training or did you just begin regular patrol
16    duty?
17 A  I went through a three-month field training program
18    here.....
19 Q  So you were.....
20 A  .....with the city.
21 Q  Okay. So you went through another three months of
22    supervision.
23 A  Yes, sir.
24 Q  Okay. All right. Since that time, have you had any
25

JEFFREY HOLDEN            4/2/2008            BROWN v. PETERSON, et al.,
Vol 1                                         Case No. 3:05-cv-0002 TMB

4 (Pages 10 to 13)

Page 10

1  additional training in the area of the laws of the State
2  of Alaska, constitutional law, laws pertaining to such
3  things as reasonable suspicion, probable cause, anything
4  like that?
5  A  Yes, sir.
6  Q  And can you describe that training to me?
7  A  We went through some training with our District Attorney
8     on search and seizure -- searches and seizure and what --
9     the laws pertaining to that.
10 Q  All right. When did that happen?
11 A  I think it was a month ago.
12 Q  Okay. So anything else that you can think of?
13 A  Well, we -- during my field training, we went through
14    searches and seizures, probable cause, reasonable
15    suspicion.
16 Q  My question was.....
17 A  Oh.
18 Q  .....not including your training at the academy and your
19    period of on-the-job training under the supervision of a
20    field training officer, have you had any other training in
21    the laws of the State of Alaska pertaining to
22    constitutional issues such as probable cause, reasonable
23    suspicion, warrantless entries into houses, things of that
24    nature.
25

Page 11

1  A  No.
2  Q  No?
3  A  No.
4  Q  Okay. Now, were you -- I take it at the academy, you were
5     trained in -- part of your training included report
6     writing -- writing up reports after you've worked on a
7     case?
8  A  Yes.
9  Q  Okay. And I take it in the course of that training, they
10    emphasize the importance of including important
11    information in your reports?
12 A  Yes, sir.
13 Q  And omitting things that weren't relevant or important,
14    right?
15 A  Could you say that again?
16 Q  In other words, to include the things that are important
17    and leave out the information that may not be important,
18    right? But it was important to be precise and
19    include.....
20 A  Yes, sir.
21 Q  .....include the critical information.
22 A  Yes, sir.
23 Q  All right. And to be precise.
24 A  Yes, sir.
25

Page 12

1  Q  And to be accurate.
2  A  Yes, sir.
3  Q  And you know that some of the reasons why you're taught to
4     do that is because your report is going to be relied upon
5     maybe by other officers, right?
6  A  Yes, sir.
7  Q  And they need to be confident that your report writing is
8     accurate and precise, right?
9  A  Yes, sir.
10 Q  And that those reports may be relied upon by District
11    Attorneys reviewing your work, right?
12 A  Yes, sir.
13 Q  And maybe judges in reviewing your work.
14 A  Yes, sir.
15 Q  And issues may come up in litigation either in criminal
16    cases or civil cases, so those are all reasons why it's
17    important to be accurate and precise, right?
18 A  Yes, sir.
19 Q  Okay. In addition to the training you received at the
20    academy regarding report writing, did you receive any
21    additional report writing experience or training in the
22    course of either -- well, in the course of your field
23    training with the Kodiak Police Department?
24 A  Yes, sir.
25

Page 13

1  Q  And can you describe that for me?
2  A  Well, we were -- through my training, through my field
3     training officers, I was taught to be very thorough and
4     meticulous on your reports.
5  Q  Okay. All right. Now, I want to direct your attention to
6     January 4th, 2003, the day that this incident involving
7     Scott Brown occurred.
8  A  Yes, sir.
9  Q  You recall that, right?
10 A  Yes, sir.
11 Q  All right. And in -- before coming here today, have you
12    had an opportunity to review the report you wrote?
13 A  Yes, sir.
14 Q  Have you reviewed other materials pertaining to this case?
15 A  Yes, sir.
16 Q  Can you describe for me what other materials you reviewed
17    prior to coming here today?
18 A  I've reviewed radio logs, jail logs. I reviewed the
19    booking room video. I reviewed my reports. I reviewed
20    our policy manual.
21 Q  Okay. Was there anything in particular in the policy
22    manual that you reviewed?
23 A  I reviewed our use of force policy. I reviewed the
24    searches and seizure portion of the manual.
25

Computer Matrix, LLC              Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473         sahile@gci.net

Page 14

1 Q Okay. Is there any reason in particular that you want to
2   review the booking room video?
3 A I wanted to refresh my memory of the incident.
4 Q Okay.
5 A It's been five years.
6 Q Sure. Have you listened to any of the audiotapes
7   associated with this case?
8 A I've looked at the transcriptions of the audiotapes and I
9   actually listened to some of the radio traffic, yes,
10  from -- well, I listened to Officer Peterson's cassette
11  tape from -- that he had.
12 Q Okay. So the cassette he had, you're pointing to your
13  pocket. Is that.....
14 A His -- from his recorder.
15 Q When he had contact with Mr. Brown?
16 A Yes, sir.
17 Q At the residence on Purtov?
18 A Yes, sir.
19 Q Okay. And you indicated you listened to radio traffic --
20  a tape regarding radio traffic. Explain that to me, what
21  kind of tape were you listening to?
22 A Actually it was Officer Peterson's cassette tape.....
23 Q So.....
24 A .....that had him -- where he would talk on the radio.
25

Page 15

1   Basically I could hear him calling my -- my badge
2   number.....
3 Q Uh-huh.
4 A .....which is my radio sign.
5 Q Right.
6 A K18.
7 Q All right. Anything else that you can think of that you
8   reviewed in preparation of coming here today?
9 A No.
10 Q Okay. But you indicate you did review the radio log kept
11  by dispatch?
12 A Yes, sir.
13 Q Okay. Did you review the dispatch handwritten notes that
14  were maintained by the individual.....
15 A No.
16 Q .....dispatcher? No?
17 A No. I saw the actual dispatch card.....
18 Q Uh-huh.
19 A .....and the actual -- I don't remember how many pages of
20  what he wrote in the radio, like three or four pages.....
21 Q Uh-huh.
22 A .....I believe, sir.
23 Q Okay. Now, on January 4th, 2003, prior to 1653, 4:53 in
24  the afternoon, were you on duty?
25

Page 16

1 A I was on duty at 4:00 o'clock in the afternoon, 1600.
2 Q Okay.
3 A I was working the swing shift from 1600 to -- well,
4   actually 4:00 to midnight shift.
5 Q Okay. And were you at the station house -- had you
6   actually gone into service and begun patrol work at --
7   between 4:00 o'clock and 1653 or were you just at the
8   station house during that period of time?
9 A I was at the station.
10 Q Okay. So from 4:00 o'clock when you came on duty to 1653,
11  you had not yet left the station house?
12 A Could I take a look at the radio log just to -- I believe
13  I was at the station the whole time.
14 Q Well, I'd love to show you a radio log that begins prior
15  to 1653, but I don't have one, so I can't help you there.
16  MR. KOZIOL: Just answer his questions.
17 A I was at the station.
18  MR. KOZIOL: If he wants to give you documents, he'll give
19  you documents.
20 A Okay.
21  MR. KOZIOL: But.....
22 A Okay. I believe I was at the station until 16- -- I'm not
23  sure what.....
24  MR. KOZIOL: But, Mr. Herz, I think the radio log traffic
25

Page 17

1   we have -- do have starts earlier than 1653. I mean I can --
2   if you have it, you can see that, or I can give it to you.
3   MR. HERZ: It begins at 1605, but I don't have anything
4   earlier than that.
5   MR. KOZIOL: No. I'm just saying that's what I have.
6   MR. HERZ: Okay.
7 Q So I mean I can show you what's been Bates Stamped as
8   10873, which I believe is the radio log. You can take a
9   look at that.
10  MR. KOZIOL: And do you know what the question is that's
11  pending? If you don't, you should ask him.....
12  MR. HERZ: Well, I'll remind him if he needs it.
13 A Can you say the question again, sir?
14 Q I asked you if you knew whether you'd left the station
15  house at any time between 4:00 o'clock and 4:53, if you'd
16  done anything other than just be at the station.....
17 A No. I was at the station.
18 Q Okay. And while I'm at least looking at the radio log, do
19  you know who 5C15 is, whose call sign that is?
20 A I know it's a trooper call sign, but I don't know who it
21  is.
22 Q Okay. All right. And do you have any recollection about
23  when Officer Peterson's shift began that day?
24 A 1600. The same as.....
25

JEFFREY HOLDEN                    4/2/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                         Case No. 3:05-cv-0002 TMB

6 (Pages 18 to 21)

Page 18

1   Q   So he was working the same swing shift as you?
2   A   Yes, sir.
3   Q   Okay. And do you have -- and did he start -- do you have
4       a recollection of seeing him at the station house at
5       4:00 o'clock when his shift began?
6   A   Yes, sir.
7   Q   Okay.
8   A   We have shift briefing at 1600.
9   Q   Okay. And do you recall whether at any time between
10      4:00 o'clock and 4:53 you saw Officer Peterson leave the
11      station house to do any patrol work of any sort?
12  A   I believe he stayed at the station also.
13  Q   Okay. So at some point, you leave the station, right?
14      You go into service?
15  A   Yes, sir.
16  Q   Okay. And was there -- under normal circumstances when
17      you come in and you get briefed at the beginning of your
18      shift, how long is it normally before you go into service?
19  A   Well, we're able to respond to calls right from 1600 after
20      we take over the shift. You know, we have other duties.
21      You know, I may go through -- I'll read the emails that I
22      have. I'll go through our complaint cards to see what --
23      go over what happened in the previous shifts.
24  Q   Uh-huh.
25

Page 19

1   A   I may have some paperwork pending that I need to go
2       through.
3   Q   Catch up on some paperwork.
4   A   Catch up.
5   Q   Uh-huh.
6   A   So I mean there's no -- or I could, you know, right as
7       soon as shift briefing's over, I could go out and get in
8       my patrol car and start patrolling.
9   Q   Okay. And I assume that if you're doing any of those
10      activities, if you get called out on something, that takes
11      priority and you would leave.....
12  A   Yes, sir.
13  Q   .....right? Okay. And were you called out on that
14      afternoon?
15  A   Yes, sir.
16  Q   On the 4th? And how did you get called out?
17  A   What happened, I was in the patrol room. The phone rang.
18      Officer Peterson answered the phone. There was a short
19      conversation with the dispatcher. Officer Peterson told
20      me that we had a REDDI call and that there was a driver
21      driving recklessly on Selief Lane headed towards Pillar
22      Mountain Road. So right after that, I think he beat me
23      out to the car. I'm not sure why he was a little bit
24      faster getting to his car and going in service than I was.
25

Page 20

1       The plan was he was going to head towards Selief Lane and
2       Pillar Mountain Road and I was going to patrol some of the
3       side streets that go off of Selief Lane.
4   Q   Okay.
5   A   Because once you get onto Pillar Mountain Road, there's --
6       it -- there's no -- it's only one way -- one road.
7       There's no real off ramps or anything to that.
8   Q   And my understanding is it's pretty narrow as well?
9   A   It's a narrow dirt road going up a windy mountain.
10  Q   So according to your testimony here, you received -- you
11      didn't receive any information directly from the
12      dispatcher, right?
13  A   No, sir.
14  Q   Just from Officer Peterson.
15  A   Yes, sir.
16  Q   And you went into service based on that.
17  A   Yes, sir.
18  Q   All right. And according to your testimony, Officer
19      Peterson told you both that there was a REDDI call and
20      that there was a report of a reckless driver.
21  A   Yes, sir.
22  Q   Okay. And when you went into service, you went
23      specifically to go look for -- now, for a REDDI call, just
24      so the record's clear and I -- and I know that you know
25

Page 21

1       what it is, can you tell us what a REDDI call is, what
2       that means?
3   A   Report Every Drunk Driver Immediately. Can I go back one
4       more thing. I left one thing out.
5   Q   Sure.
6   A   He told me it was a gold, flatbed truck.
7   Q   Okay.
8   A   That was the vehicle we were looking for.
9   Q   So he told you it was a REDDI call, that you were looking
10      for a gold, flatbed truck, and that it was driving
11      recklessly.
12  A   Yes, sir.
13  Q   Okay. And you received all that information from Officer
14      Peterson.
15  A   Yes, sir.
16  Q   Okay. And so when you went out in patrol, because it was
17      a REDDI call, you were -- you knew that you were possibly
18      looking for an intoxicated driver, right?
19  A   Yes, sir.
20  Q   And you were going to be doing a REDDI stop as opposed to
21      some other kind of a traffic stop, right?
22  A   Yes, sir.
23  Q   Okay. And in terms of -- well, so in your report, you --
24      in the first paragraph, you indicate that on January 4th,
25

JEFFREY HOLDEN　　　　　　　　4/2/2008　　　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

7 (Pages 22 to 25)

Page 22

```
 1    2003, at approximately 1653 hours, the Kodiak Police
 2    Department received a report of a flatbed truck driving
 3    reckless on Selief Lane and on the Pillar Mountain Road.
 4  A Yes, sir.
 5  Q Okay. You don't indicate in your report here that you had
 6    information that it was a gold, flatbed truck.
 7  A That's correct.
 8  Q And you don't indicate that the police department received
 9    a report -- a REDDI report.
10  A That's correct.
11  Q Okay. You would agree that in this case leaving out
12    information that the police department had received a
13    REDDI report was pretty critical information left out of
14    your report, isn't it?
15  A It wasn't very thorough, was it. I did a poor job.
16  Q And you then write Officer Peterson and I responded from
17    the Kodiak Police Department.
18  A Yes, sir.
19  Q Okay. In the next paragraph, you don't describe any of
20    your patrol activity after that point. You indicate in
21    the next paragraph at 1701 you heard Officer Peterson say
22    on the radio he was going into a house and I would see his
23    patrol car in the street. I didn't know what street he
24    was on and at approximately 1704, I heard Officer Peterson
25
```

Page 23

```
 1    say on the radio he was at 1219 Purtov and he needed me
 2    now. He said he needed me now again.
 3  A Yes, sir.
 4  Q Okay. That's your report.
 5  A Yes, sir.
 6  Q And then at approximately 1707, you arrived at
 7    1219 Purtov, right?
 8  A Yes, sir.
 9  Q Okay. Now.....
10     MR. KOZIOL: For our record, Mr. Herz, if you could read
11  what page you're reading from into the record. I'm not sure
12  you did that.
13     MR. HERZ: Well, I'm reading from my Bates Stamp number
14  456, but.....
15     MR. KOZIOL: That's fine. I have a different number, but
16  as long as we have one number in the record, so.....
17     MR. HERZ: All right. I was going to go back to the Bates
18  Stamp number we used yesterday just because for the court
19  reporter's purposes it'll probably -- I'm sorry. I don't have
20  that, so never mind.
21  Q So I'm reading from Bates Stamp number 456. All right.
22    So the only thing in your report up until the point where
23    you say I arrived at Purtov that indicates anything about
24    the nature of the dispatch and what patrol activity you
25
```

Page 24

```
 1    undertook in response to that is the first paragraph.
 2  A Yes, sir.
 3  Q Okay. And if you had come across this gold, flatbed
 4    pickup first, you would agree that your omission of
 5    including information regarding the fact that you were
 6    getting a REDDI call would have been pretty critical
 7    information to leave out if you were the first person
 8    making contact in pulling over a driver on a REDDI call,
 9    right?
10  A First or second. I would say it would be pretty critical,
11    yes.
12  Q Okay. Now, when -- you under -- you arrived at Purtov.
13    You didn't know at that point why Officer Peterson went
14    into the house, right?
15  A I had no idea.
16  Q Okay. But you knew he had gone into a house.
17  A Correct.
18  Q Okay. And I take it you didn't understand on what legal
19    basis he had made the decision to go to into the house.
20  A No, sir.
21  Q You didn't know if he had consent, right?
22  A I did not.
23  Q It was reasonable to assume though he didn't have a
24    warrant, right?
25
```

Page 25

```
 1  A Correct.
 2  Q Okay. But at that point, you didn't know if his entry was
 3    lawful or unlawful.
 4  A Correct.
 5  Q Okay. And is it -- and when you went into the house, I
 6    take it you saw if I recall correctly Officer Peterson on
 7    the floor with Mr. Brown trying to handcuff him; is that
 8    right?
 9  A No. No, sir.
10  Q Okay. What is the first thing that you recall seeing?
11  A First thing I recall seeing when I came through the door,
12    I saw an adult male on the ground with a teenage boy kind
13    of laying across him.
14  Q That was Damon Brown.
15  A That was Damon Brown.
16  Q Okay.
17  A Okay.
18  Q Okay. What is the first thing you recall seeing
19    pertaining to Officer Peterson?
20  A I saw Mr. Scott Brown and Officer Peterson both standing
21    inside the kitchen and Officer Peterson was -- Mr. Brown
22    was facing towards me. Officer Peterson was behind him.
23  Q Okay.
24  A And Officer Peterson had Mr. Scott Brown by the arm and
25
```

### Page 26

1  was struggling with him.
2  Q  So he was trying to handcuff him.....
3  A  Yes, sir.
4  Q  .....trying to put him under arrest.
5  A  Yes, sir.
6  Q  Okay. All right. And he asked for your assistance at
7     that point?
8  A  Yes, sir.
9  Q  Okay. And so you along with Officer Peterson then used a
10    certain amount of force in order to arrest Mr. Brown,
11    right?
12 A  Yes, sir.
13 Q  Okay. And would you -- you would agree that if Officer
14    Peterson didn't have a lawful right to enter that house
15    and didn't have a lawful right to arrest Mr. Brown then
16    you would not have had a lawful right to enter that house
17    and arrest Mr. Brown either, right? You'd agree with
18    that.
19 A  Could you say it one more time?
20 Q  Would you agree that if Officer Peterson didn't have a
21    lawful right to enter the house, you didn't have a lawful
22    right to enter the house?
23 A  Sure.
24 Q  And would you agreed that if Officer Peterson didn't have
25

### Page 27

1  a lawful right to make an arrest, you didn't have a lawful
2  right to make an arrest?
3  A  Yes.
4  Q  Okay. I mean you didn't see Mr. Brown commit a driving
5     offense before he got into his house, right?
6  A  No.
7  Q  Okay. And you didn't see Mr. Brown committing a
8     misdemeanor offense in your presence, right?
9  A  No.
10 Q  Okay. And you understand that resisting arrest requires
11    more than pulling away your arms. You have to use force
12    that creates an imminent risk of harm to an officer,
13    right?
14 A  Yes.
15 Q  So for instance, somebody passively resisting or pulling
16    their arms away wouldn't be enough.
17 A  Correct.
18 Q  Okay. So -- and so you're assisting an arrest that -- for
19    some conduct, but you don't know what the conduct is and
20    you don't know if Officer Peterson has a lawful basis to
21    make that arrest or not, right?
22 A  Correct.
23 Q  So if he doesn't have a lawful basis to use force, you
24    didn't have a lawful basis to use force, right?
25

### Page 28

1  A  Correct.
2  Q  Okay. Tell me about what kind of relationship you had
3     outside the police department with Officer Peterson.
4  A  We're friends.
5  Q  Okay. Tell me more about that.
6  A  We went to the academy together. We live about a block
7     apart from each other. I mean I've spent time with him
8     off duty and he's spent time with me. He, at one time
9     when I took -- my family took a vacation, he watched our
10    dogs for us while we were gone. But I don't regularly
11    hang out with him like every weekend or every night, no.
12    I mean I've gone to -- I've gone out with -- you know, on
13    some occasions with him and his family.
14 Q  Okay. What kinds of things have you done when you've
15    socialized together? First, what kinds of things -- when
16    it's just you and Mr. Peterson socializing, what kind of
17    things do you do?
18 A  We've -- he's been involved with the football program in
19    our town. He officiates football. I coach football.
20    We've met on social occasions where we've had potluck
21    dinners, that type of stuff.
22 Q  Uh-huh. And so I mean have you guys ever played cards
23    together?
24 A  Yes, we have.
25

### Page 29

1  Q  Okay.
2  A  We've played poker before together.
3  Q  Okay. Drank beer together?
4  A  Yes, sir.
5  Q  Do you guys ever shoot pool or darts together.....
6  A  No, sir.
7  Q  .....anything like that?
8  A  No.
9  Q  So neither one of you.....
10 A  No.
11 Q  .....engages in that particular activity.....
12 A  No, sir. Well, I don't know if he does. I don't.
13 Q  Okay. But you've -- and so you've never done that with
14    him, but.....
15 A  No. No.
16 Q  .....but you have played cards. You have had a couple
17    beers together, things like that. Your families socialize
18    together.
19 A  We have.
20 Q  Okay. All right. Do you know anything about your
21    department's policies regarding how dispatchers are
22    supposed to record information?
23 A  No, sir.
24 Q  Okay. So you don't know what kinds of information they're
25

### Page 30

1  supposed to include in their radio logs and what they're
2  not supposed to include?
3  A  No.
4  Q  All right. And do you have any information about what
5     kinds of information dispatchers would normally record in
6     their handwritten notes?
7  A  No, sir.
8  Q  Okay. Do you have any information about what policies and
9     procedures there are for dispatchers filling out complaint
10    cards?
11 A  No, sir. I mean I would think they would be as thorough
12    as possible. I mean of course taking down the initial
13    information of the call and to find out what's going on so
14    they can relay that information to us. But I don't know
15    the exact policy on that.
16 Q  Do you have any information about whether all the
17    information on a complaint card is written down at one
18    time or is added to over.....
19 A  Well, I.....
20 Q  .....over the course of time?
21 A  I know it has to be completed by the end of the
22    dispatcher's shift.
23 Q  Okay.
24 A  But I don't know if he -- you know, a dispatcher could --
25

### Page 31

1     I would think could write -- or type the information as
2     it's happening. That's -- but I don't know that. I just
3     know that it has been done by the end of the shift.
4  Q  Well, for instance, if there's an arrest, that would be
5     indicated on the complaint card, right?
6  A  Correct.
7  Q  Okay. But that information doesn't become known until
8     later.
9  A  Until the -- I mean usually the officer will call dispatch
10    and tell them that we've made an arrest so that can give
11    the jail a heads-up that a prisoner's coming.
12 Q  Right. And, you know, if they -- if the -- but what I'm
13    saying is when that appears in the narrative that a
14    specific person's arrested that obviously didn't -- that
15    information didn't come in at the time the initial
16    complaint's made. That information's added in the
17    narrative later.
18 A  That's true.
19 Q  All right. And when the narrative is written in the past
20    tense like a specific vehicle is located as opposed to a
21    vehicle is located, that would suggest that that
22    information was written after the fact, right? Doesn't
23    it.....
24 A  If I understand your -- or your question, that's correct,
25

### Page 32

1     but I know that like in the case when we make an arrest
2     and there's information on the card, the card has to be
3     completed by the end of the shift.
4  Q  Right. But you don't know when all the information -- I
5     mean that's when it has to be completed and I'm getting
6     more to that could mean that the narrative portion in the
7     dispatch notes that are typed in.....
8  A  Uh-huh. (Affirmative)
9  Q  Okay. That could be typed in at the end of the shift when
10    the card's being completed, right?
11 A  Or at that time of the call.
12 Q  Right. There's.....
13 A  I don't know.
14 Q  You don't know. Okay. All right. And is the document
15    called a dispatch log and I'm going to refer to Bates
16    Stamp 111 -- or 11122, just for accuracy. 11122. Is that
17    the same as a complaint card? Is that what we're talking
18    about? Showing you this document.
19    MR. KOZIOL: I can't see it. My eyes aren't that good.
20 Q  Is the document titled here Dispatch Log, Kodiak Police
21    Department, is that what a complaint card is?
22 A  Yes, sir.
23 Q  Okay. I just want to make sure we're talking about the
24    same thing. Okay.
25

### Page 33

1  A  As you can see, that -- that complaint card is different
2     than the one in 2003. We went to a new system.
3  Q  What do you mean it's different than the one in 2003?
4  A  It's a new -- it's a different computer program.
5     MR. KOZIOL: Mr. Holden, just answer his questions that
6     are pending.
7  A  Yes, sir. Yes, sir.
8     MR. KOZIOL: And.....
9  Q  So let me ask you. You're saying that this complaint card
10    is not a 2003 complaint card? Or are you saying the
11    complaint card today is different than those?
12 A  No. It's the same.
13 Q  So.....
14 A  What I'm saying is that we went to a new system at some
15    point and these are complaint cards, yes.
16 Q  What did you mean by your comment that the complaint cards
17    in 2003 are different?
18 A  It was a different system. We did -- they took the
19    complaints the same way, but we just went to a different
20    system at some point. I don't remember what year we went
21    to -- the complaint cards are the same.
22 Q  You mean they look the same? What do you mean that they
23    are the same? What's different and what's the same?
24 A  They were -- is it -- all I'm saying is that it's a
25

Page 34

1    different computer program that -- the same information is
2    on these cards.
3  Q  Uh-huh.
4  A  Okay. I -- say your question again.
5  Q  Well, I'm asking -- you indicated that there was some
6    difference in the complaint cards in 2003 and I want to
7    know what's different.
8  A  It's just the -- the -- what's different was the -- it was
9    a different program at that -- in 2003 than it is now.
10 Q  Okay. And what is the.....
11 A  It's the same -- it's the same information on this.
12 Q  Okay. And what is there -- what's different about the
13   program, do you know?
14 A  What's different is that -- that the dispatchers type in
15   the first initial information and then the officers can
16   type in what actually happened.
17 Q  Okay.
18 A  That's the difference.
19 Q  All right. And when the officers type in what happened,
20   do they do that at the dispatch center -- at the call
21   center?
22 A  No, sir.
23 Q  Where do they do that from?
24 A  They can do it from the officers room.
25

Page 35

1  Q  From the -- oh, okay. So.....
2  A  Yes, sir, but it's still.....
3  Q  .....it's all -- the computer system's all tied.....
4  A  Yes, sir.
5  Q  .....in together.
6  A  Yes, sir.
7  Q  All right.
8  A  Yes, sir.
9  Q  And you don't know if that system went into effect.....
10 A  It was after 2003.
11 Q  Okay. So.....
12 A  But the -- the information was carried over into the new
13   program.
14 Q  When you say the information was carried over into the new
15   program, what information?
16 A  Well, when they upgraded -- what I believe -- okay. What
17   I believe is when we upgraded to the new system, they
18   took -- they went back so far -- so many years back and
19   transferred that information to the new system.
20 Q  Okay. So they maintained existing data?
21 A  Absolutely.
22 Q  Okay. And you're saying that now this category in the
23   complaint card called dispatch notes can actually be
24   written by the officers rather than the dispatchers.
25

Page 36

1  A  Correct.
2  Q  And so the dispatch notes are being written after the fact
3    not as they're occurring, by the officers.
4  A  Well, the -- yes.
5  Q  Okay. All right. Now, you were present yesterday during
6    Officer Peterson's deposition, right?
7  A  Part of it, yes, sir.
8  Q  Okay. You were present when he asked the question
9    whether -- if he had received information from dispatch
10   that a driver had been driving recklessly and was -- he
11   had received a REDDI call, that the driver was driving
12   recklessly, spun a 360 in the road, and fishtailed and had
13   no other information and located that vehicle at Pillar
14   Mountain Road and stopped it at that point and not having
15   any other information whether that would be sufficient
16   information where he'd have probable cause to make an
17   arrest. Do you remember that hypothetical that was posed
18   to him? Did you hear that?
19 A  Yes, sir.
20 Q  Okay. And he indicated that that would be sufficient
21   probable cause to make an arrest.
22 A  Yes, sir.
23 Q  Okay. Do you agree with that?
24 A  Yes, sir.
25

Page 37

1  Q  Okay. And he indicated that if he had made the stop and
2    asked the driver to get out of the vehicle and the driver
3    refused and the driver refused to do field sobriety tests
4    that that would be sufficient probable cause to make an
5    arrest. Do you remember that answer?
6  A  Yes, sir.
7  Q  And do you agree with that?
8  A  Yes, sir.
9  Q  Now, would you agree that in that scenario that the only
10   information you have about whether the driver's actually
11   under the influence -- and when I ask you whether there
12   was PC to make an arrest, it was an arrest for driving
13   under the influence. Did you understand that as.....
14 A  Correct.
15 Q  .....being the question? So in that hypothetical, the
16   only information that the driver is intoxicated is the
17   fact that there's a REDDI call, right?
18 A  Can you say that again?
19 Q  The only information in that hypothetical that the
20   driver's actually under the influence is the fact that the
21   department received a REDDI call, right?
22 A  Correct.
23 Q  But there's no information that suggests that the caller
24   actually knows the person's intoxicated, either smelled
25

**Page 38**

1 alcohol on their breath, saw them drinking, saw them leave
2 a bar, or anything like that, right? There's -- you don't
3 have that information. You just have a call that
4 there's.....
5 A I did not have that information.
6 Q Well, and in that hypothetical, you don't have any of that
7 information, right?
8 A Correct.
9 Q So if you don't have any specific information that tells
10 you that the driver's actually under the influence,
11 where's the probable cause to make an arrest for driving
12 under the influence?
13 A Because a citizen reported it and.....
14 Q And so just because somebody says -- let me give a
15 specific statement as opposed to you getting information
16 that it's a REDDI call because that's -- you don't even
17 know what the caller said. Let's say the caller -- and
18 let's say you know this. The caller says the driver may
19 be intoxicated. Okay? And then you've got all the
20 information: driving recklessly, a 360 in the road, and
21 fishtailing, okay?
22 A Uh-huh. (Affirmative)
23 Q Does the information the driver may be intoxicated
24 establish whether the driver actually has consumed
25

**Page 39**

1 alcohol?
2 A Well, it gives me the right to stop that vehicle.
3 Q Different question. I -- okay. Different question. I'm
4 not asking about whether you have reasonable suspicion to
5 stop. Okay? The question was do you have probable cause
6 to arrest for driving under the influence.
7 A Yes.
8 Q Okay. And what is the information that you're relying on
9 that says the driver's actually under the influence of
10 alcohol?
11 A From the citizen.
12 Q That said possibly intoxicated?
13 A Uh-huh. (Affirmative)
14 Q But you don't have -- you agree that that doesn't tell you
15 whether the caller smelled alcohol on the breath, right?
16 A True.
17 Q Doesn't say that the caller saw the person drink, right?
18 A Right.
19 Q Doesn't say the caller saw the person leave a bar, right?
20 A Right.
21 Q Okay. So if all the caller sees is somebody driving
22 recklessly and then says possibly intoxicated, you're
23 saying you have probable cause to believe that the driver
24 actually has consumed alcohol? That those facts give you
25

**Page 40**

1 sufficient information to conclude that the person
2 consumed because you do agree that to actually charge
3 somebody with driving under the influence, they have to
4 have consumed alcohol, right?
5 MR. KOZIOL: I'm going object. You got a couple questions
6 in there.
7 A Could you say the question again?
8 Q Sure. You do agree that in order to charge somebody with
9 driving under the influence, the person actually has to
10 have consumed alcohol?
11 A Correct.
12 Q Okay. And so without any of that additional information,
13 the smell of alcohol, somebody seeing consumption,
14 somebody seeing them leave a bar, something like that, if
15 all they've seen is somebody drive recklessly and then
16 they go, oh, possibly intoxicated, what are the -- what's
17 the proof? What are the facts that the person actually
18 consumed alcohol?
19 A Can you say -- I'm sorry. Can you say it one more time?
20 Q Yeah.
21 A Okay.
22 Q What are the facts -- you understand the.....
23 A I understand.....
24 Q Okay. What are the facts that you have that says the
25

**Page 41**

1 person actually consumed alcohol that allows you to arrest
2 them for DUI?
3 A Well, the citizen reported it. You're saying -- can
4 you -- I'm sorry. I don't.....
5 Q All right. Okay. Let's back up for a second. You
6 understand there's a difference between the amount of
7 information that you have that allows you to stop a car to
8 investigate, right?
9 A Uh-huh. (Affirmative)
10 Q And the amount of information you need to actually make an
11 arrest.
12 A Correct.
13 Q You need more information to make an arrest than you do to
14 just stop a car to investigate, right?
15 A Correct.
16 Q Okay. Now I'm asking about the information you need to
17 make an arrest. Okay?
18 A Correct.
19 Q For DUI.
20 A Correct.
21 Q For driving under the influence; all right?
22 A Correct.
23 Q And you understand that in order to do that there has to
24 be some proof -- some facts that the person actually
25

Page 42

1      consumed alcohol.
2   A  Correct.
3   Q  Okay. Now, here are the facts that we're working with.
4      Caller calls up and says I saw a car do a 360 in the road.
5      I saw a car spray gravel on somebody. I saw a car
6      fishtail in the road.
7   A  Uh-huh. (Affirmative)
8   Q  Driver's possibly intoxicated. That's all they say.
9   A  Uh-huh. (Affirmative)
10  Q  What are the facts based on those facts that allow you to
11     say I've got enough proof that the person that I'm
12     stopping has actually consumed alcohol, if you don't have
13     anything else?
14  A  Well, the citizen reported it as a REDDI, okay? That --
15     in your scenario that you're giving me, I -- I have
16     probable cause to stop that vehicle to make the arrest.
17  Q  Probable cause to stop the vehicle to make an arrest. I'm
18     not asking whether you can stop the vehicle. Do you
19     have -- are you saying that when all you have is somebody
20     saying I've seen fishtailing, a 360, and spraying gravel
21     and then the caller says that driver may be intoxicated,
22     the statement that they may be intoxicated is -- are
23     sufficient facts that allows you to conclude that the
24     person actually consumed alcohol? Is that your testimony?
25

Page 43

1   A  What I'm saying is that when the citizen is reporting it
2      as a REDDI call, that the driver may be intoxicated by the
3      driving actions that they're observing, and they report
4      it, then that gives me probable cause for the -- the
5      arrest on a REDDI.
6   Q  Okay. So you're saying you don't need any other facts
7      that are indicative of consumption. You don't actually
8      need to have facts -- personal facts or other facts that
9      says the person actually has consumed alcohol. Just the
10     REDDI call alone, person's possibly intoxicated, you can
11     go make an arrest; is that your testimony?
12  A  There's more to it.
13  Q  I understand there can be more to it, but I asked you.....
14  A  So.....
15  Q  .....if you agreed with Officer Peterson's statement that
16     there's -- that that is -- those facts alone gave him
17     probable cause to make an arrest.
18  A  Yes.
19  Q  You said you agreed with it.
20  A  Yes.
21  Q  And you said that you -- that that's your opinion.
22  A  Yes.
23  Q  And so I'm now asking you whether -- what of those
24     facts -- and you did indicate that you did have to have
25

Page 44

1      some proof that the person consumed. So what's the proof
2      they actually consumed alcohol?
3      MR. KOZIOL: You've already asked him this now several
4      times and he's answered you. I mean at some point you should
5      ask him a new question. He has answered your questions on this
6      point. I don't know what else more you need.
7   Q  Let me pose a different hypothetical to you. Let's say
8      you don't have any hearsay report from a REDDI caller,
9      okay? Let's say you actually are following a driver and
10     you see them cross the centerline, okay? And you see them
11     almost cross the centerline and you then pull them over.
12     Okay?
13  A  Yes, sir.
14  Q  You make contact with the driver. The driver -- when you
15     make contact with the driver, you actually smell alcohol
16     on their breath. Okay?
17  A  Yes, sir.
18  Q  And the driver actually admits to consuming beer.
19  A  Yes, sir.
20  Q  Okay? You ask the driver to give you a portable breath
21     test, you know, to submit to a portable breath test and
22     they refuse.
23  A  Yes, sir.
24  Q  And you ask the driver to submit to field sobriety testing
25

Page 45

1      and they refuse.
2   A  Yes, sir.
3   Q  Okay. And you have no other facts.
4   A  Yes, sir.
5   Q  You make no other observations.
6   A  Yes, sir.
7   Q  Okay? Do you have probable cause to make an arrest for
8      DWI?
9   A  Yes, sir.
10  Q  Okay. Are you familiar with the case of Saltz vs. State?
11  A  No.
12  Q  Okay. Would it surprise you to find out that the courts
13     of the State of Alaska have said that that's insufficient
14     probable cause to make an arrest for DUI?
15  A  I don't know, sir.
16  Q  And would you agree that the odor of alcohol that you've
17     personally observed under those circumstances and the
18     person admitting to consuming beer is much more proof of
19     the fact that somebody's actually consumed alcohol than in
20     the facts in the previous hypothetical where all you've
21     got is information about the car fishtailing, doing a 360,
22     spraying gravel, and the caller saying the driver may be
23     intoxicated? You've got much more data concerning whether
24     somebody's actually consumed alcohol in the Saltz
25

Page 46

1  situation than you do in the first hypothetical?
2     MR. KOZIOL: Objection. Form.
3  A  Can you rephrase the question or can you say the question
4     again?
5  Q  In the Saltz hypothetical, there's actual evidence of
6     consumption. The officer smells alcohol, right?
7  A  Uh-huh. (Affirmative)
8  Q  And the person admitted to consume it?
9  A  Yes.
10 Q  And you would agree that you've got much more proof --
11    much more facts of actual consumption in Saltz -- in that
12    hypothetical than you do in the first hypothetical like
13    from this case where all the REDDI caller has said is I
14    saw a 360, I saw fishtailing, and somebody sprayed gravel
15    on somebody and they may be intoxicated. You've got far
16    less information about actual consumption of alcohol in
17    that first hypothetical, don't you?
18 A  Yes.
19 Q  Okay. And so in light of the fact in the law of the Sate
20    of Alaska there's no probable cause in the case of Saltz,
21    is it still your position that you have probable cause to
22    make an arrest in the first hypothetical?
23    MR. KOZIOL: Objection. Form.
24 A  Can you say that again?
25

Page 47

1  Q  Given that in Saltz vs. State there was no probable cause
2     to make an arrest under those circumstances, even where
3     the officer had seen the driver cross the centerline,
4     smelled alcohol, the driver admitted to drinking beer,
5     given the fact that under those circumstances the courts
6     have ruled that's not sufficient probable cause.....
7  A  I told you I'm not familiar with that case.
8  Q  I know that.
9  A  Okay.
10 Q  I'm asking you given the fact that there's no probable
11    cause under that situation, are you still saying -- are
12    you still maintaining your testimony that in the case of
13    the first hypothetical where there's the REDDI call that
14    we've talked about that.....
15 A  Yes, there was probable cause for the arrest.
16 Q  Okay.
17    MR. KOZIOL: We've been going about an hour. I kind of
18 like to stretch after each hour. When you're moving onto a new
19 topic maybe, then we can.....
20    MR. HERZ: I'm almost done, so.....
21 Q  Do you know what the definition of probable cause is?
22 A  Yes.
23 Q  Can you define it?
24 A  Probable cause is when you have facts that would lead a
25

Page 48

1  reasonable person to believe that a crime has been
2  committed or is being committed.
3  Q  When the officer.....
4  A  When you have reliable information.
5  Q  Right. The facts would have to be based on reasonable and
6     trustworthy information, right?
7  A  Yes, sir.
8  Q  Sufficient in themselves to warrant the belief that the
9     crime's been committed, right?
10 A  Yes, sir.
11 Q  Okay. And did you have to do any research in order to
12    come up with that definition or -- between like last night
13    and today or.....
14 A  I looked -- I went over -- looked -- our policy
15    manual.....
16 Q  Uh-huh.
17 A  .....and refreshed my memory on probable cause.
18 Q  And when did you do that?
19 A  I did it when we reviewed -- I reviewed the information --
20    when we went over all the information with -- I'm sorry --
21    with.....
22    MR. KOZIOL: Frank Koziol.
23 A  .....Frank Koziol. I'm sorry. When I went home that
24    night, I -- as I said, I went through my policy manual and
25

Page 49

1   I read all of that.
2  Q  Okay.
3     MR. HERZ: All right. I don't have any further questions.
4     MR. KOZIOL: Mr. Herz, it'll help me decide if I have any
5  questions if you could tell me whether you're making any
6  allegations of excessive force against this officer. And the
7  reason I have a question about that is I've read your experts'
8  reports, both Mr. Ellar and Mr. Mott, and I must say I really
9  can't tell with any degree of confidence that they're alleging
10 that this officer used excessive force. And so if you could
11 help me out and tell me is that in play in this lawsuit, an
12 allegation of excessive force or neglect to give medical
13 treatment against this officer? If you say no, then I don't --
14 you know, that's going to affect whether I ask him questions.
15 If you say yes, then I might ask him questions to give you an
16 opportunity to cross examine because otherwise I'll have to do
17 it by affidavit.
18    MR. HERZ: Well, you do understand that the allegations
19 regarding the application of force in this case are that, you
20 know, based on the fact that there was an unlawful entry, no
21 amount of force was -- could be lawfully administered to make
22 an unlawful arrest.
23    MR. KOZIOL: I do understand that.
24    MR. HERZ: Okay.
25

### Page 50

1  MR. KOZIOL: My question is similar to Peterson -- the
2  question I gave you with Peterson, that is assuming it is
3  determined that this officer was allowed to use reasonable
4  force, is it your contention in this lawsuit that he used
5  excessive force, beyond reasonable?
6  MR. HERZ: I would say that I can't answer your question.
7  I don't recall reading anything from Ellar concerning Officer
8  Holden and it's unclear to me whether Mott's criticism of the
9  use of OC spray in the closed confinement of the house -- I
10 mean it seems to me that that may pertain to Officer Holden as
11 well as Officer Peterson.
12 MR. KOZIOL: Okay.
13 MR. HERZ: And so you may want to inquire on that.
14 MR. KOZIOL: Okay.
15 MR. HERZ: Whether we need to talk about medical
16 treatment, let me just reopen my direct here briefly.
17 Q  After Mr. Brown was taken to the station house -- left
18    Purtov Street, who transported him?
19 A  Officer Peterson.
20 Q  Okay. And did you go down to the station house with
21    Officer Peterson to process Mr. Brown?
22 A  No, sir.
23 Q  Did you have contact with Mr. Brown during the two hours
24    that he was down there being processed?
25

### Page 51

1  A  Yes, I did.
2  Q  Okay. And what was -- explain the nature of your contact
3     with him.
4  A  I believe it was about at least three-quarters of the way
5     through the booking process that I came into the booking
6     room. The trooper that was backing Officer Peterson left
7     and I took over his spot.
8  Q  And when you say backing, what do you mean by that?
9  A  Well, usually when we have a person that is acting
10    aggressively, we have two officers.....
11 Q  Okay.
12 A  .....in the booking room.
13 Q  And once he was booked, once that process was completed,
14    did you have any further contact with him?
15 A  No, sir.
16 Q  Okay. And how shortly after -- you indicated you saw the
17    video of the booking process.
18 A  Yes.
19 Q  How shortly after that video ends does Mr. Brown -- is --
20    just sort of explain to me logistics here in Kodiak. Is
21    the jail in the same building as where the
22    booking/processing room is?
23 A  Yes, sir. If you look at the video, the booking room
24    where the camera was positioned, you can see all the way
25

### Page 52

1     back to the door that leads into the jail.
2  Q  Uh-huh.
3  A  Once you've done the process in the booking room, you're
4     taking -- there's two doors down to the left.....
5  Q  Uh-huh.
6  A  .....there is a change-out room. So the prisoner would
7     leave the booking room, go out the door, make a left, and
8     on the second door on the right is the change-out room
9     where they take off their street clothes and they put on
10    the jail clothes and then they come back down the hallway
11    and make a left and go straight into the jail.
12 Q  All right. And is.....
13 A  Then.....
14 Q  Is it Officer Peterson's job along with in this case
15    whoever's backing him up to escort the suspect -- the
16    accused to the change-out room and back again and deliver
17    them to the jail or are the jailers involved in that
18    process?
19 A  The jailers are normally involved in that process.
20 Q  Okay.
21 A  Normally they'll come into the booking room when we're
22    doing and take over the process to bring them.....
23 Q  Okay.
24 A  .....into the change-out room. They usually change them
25

### Page 53

1     out, but sometimes logistically they may be busy and we --
2     the officers would change them out.
3  Q  What happened in this case?
4  A  I.....
5  Q  Did the jailers take over or did you guys do it?
6  A  I believe we did it.
7  Q  All right. And how long did that process take?
8  A  It was a short process.
9  Q  All right.
10 A  I mean I believe about five minutes.
11 Q  Okay. And how many minutes would you say you were there
12    backing up after -- backing up Officer Peterson in the
13    booking process after the trooper left?
14 A  I didn't time it or anything like that. I believe it
15    about approximately 30 minutes.
16 Q  Okay. So 30 -- approximately 30 minutes of that plus
17    5 minutes of getting him from booking into the jail,
18    right?
19 A  Yes, sir.
20 Q  During that period of time, did you hear Mr. Brown
21    complain about any injuries?
22 A  No.
23 Q  Okay. And were you aware of any injuries that he had
24    complained of?
25

## Page 54

1  A  I believe.....
2  Q  Not after the fact.
3  A  No, no. When we were putting him -- I believe when we
4     were going to put him in the car, he was complaining about
5     his ankle, that he said -- I believe he sprained his ankle
6     prior and his ankle was hurting.
7  Q  Okay. And when you got to the -- when you got to the
8     booking room to back up Officer Peterson, did you make any
9     inquiries with Officer Peterson or anybody else to see if
10    Mr. Brown had received any medical attention for.....
11 A  No.
12 Q  .....his injury complaint that he had made at the time he
13    was being brought into the patrol car?
14 A  No, sir, I didn't. But I did see that he had a water
15    spray bottle that was laying in front of him and
16    periodically he used to decontaminate himself from the
17    pepper spray.
18 Q  Okay. So he had been provided a water bottle to
19    decontaminate himself from the pepper spray.
20 A  Yes, sir.
21 Q  Okay. But with regard to his complaint of having hurt his
22    ankle, you didn't have any -- you didn't do any follow up
23    regarding that.
24 A  No, sir.
25

## Page 55

1  Q  Okay.
2  A  Because he didn't complain about -- he didn't say anything
3     to me about it.
4  Q  Not to you.
5  A  No, sir.
6  Q  But you were aware of it and you didn't make any inquiries
7     to see if anybody else had dealt with it.
8  A  No, sir.
9  Q  Okay.
10    MR. HERZ: I don't have any further questions on that
11 issue.
12    MR. KOZIOL: Okay. And I agree with you that I'm --
13 you're uncertain about whether Mr. Mott is making an allegation
14 against this officer as I am uncertain and let's take a break
15 and I think I'm probably going to go into the incident then
16 since we're uncertain about it. Because if he does say it,
17 then I want to have a record here and give you an opportunity
18 to cross examine the witness on that.
19    MR. HERZ: Sure.
20    MR. KOZIOL: Okay.
21    REPORTER: Okay. Off record.
22    (Off record)
23    (On record)
24    REPORTER: Okay, we're back on record.
25

## Page 56

1     OFFICER JEFFREY H. HOLDEN
2  testified as follows on:
3         CROSS EXAMINATION
4  BY MR. KOZIOL:
5  Q  All right. Officer Holden, I want to kind of stay on the
6     most recent topic that was brought up by Mr. Herz and that
7     has to do with your presence in the booking room with
8     Mr. Brown and Officer Peterson. You were there you say
9     approximately a half hour with both of them?
10 A  Yes, sir.
11 Q  Okay. And you had a chance to refresh yourself by looking
12    at the booking room tape.....
13 A  Yes.
14 Q  .....recently? Okay.
15 A  Yes, sir.
16 Q  During the time you were there, did it appear to you that
17    Mr. Brown needed any medical attention for his ankle?
18 A  No, sir.
19 Q  Okay. And I guess even beyond the ankle, did he need any
20    medical attention at all period to your observation?
21 A  No, sir.
22 Q  Okay. And when you took him out of the room and took him
23    to the change room and then escorted him back to the cell,
24    did he appear to have any injury to his left ankle when
25

## Page 57

1     you did that?
2  A  No, sir.
3  Q  Okay. I think Mr. Herz in the chronology events relating
4     to this incident took you up to the point in time where
5     you entered the room, you saw a teenager on top of an
6     individual who turned out to be Damon Brown, the brother
7     of Scott Brown, and then you looked at Officer Peterson
8     and Mr. Brown and I think you told us that they both were
9     kind of facing you, but Officer Peterson was behind Scott
10    Brown and he was holding his arm. Do I recall that
11    accurately?
12 A  Yes, sir.
13 Q  Okay. Why don't you tell us then what happened after that
14    in terms of your participation in the handcuffing of
15    Mr. Brown and then stop there and then I'll ask you some
16    more questions.
17 A  Yes, sir.
18 Q  So take me through whatever force you used to effectuate
19    the handcuffing of Mr. Brown.
20 A  Yes, sir. I saw Officer Peterson behind Mr. Scott Brown.
21    Officer Peterson had one of his arms trying to --
22    basically he was struggling with Mr. Brown. Mr. Brown
23    kept pulling away. Officer Peterson asked for my
24    assistance. I stepped forward. I went to grab ahold of
25

**Page 58**

1. Mr. Brown's arm. He jerked it away from me. I had my
2. pepper spray out all ready and I gave him a short blast in
3. the face approximately one to two seconds. He yelled out
4. at that moment, closed his eyes. I secured my pepper
5. spray and was able to grab his arm with both hands and
6. hold it and Officer Peterson was able to place him into
7. handcuffs.
8. Q  Okay. Did it appear to you that the use of the pepper
9.    spray for one to two seconds helped in effectuating the
10.   handcuffing?
11. A  Absolutely.
12. Q  And how did it help? Can you describe that to us?
13. A  Well, it basically took the fight out of him because if we
14.   got into a struggle, we would have probably went to the
15.   ground and Mr. Brown could have been hurt or one of us --
16.   one of the officers could have been hurt by more of a
17.   struggle. I've been trained to if you're going hands-on
18.   someone and that's not working, go to the next level of
19.   force. If we fight equal, I lose. So you go up one more
20.   step.....
21. Q  Okay.
22. A  .....than what the suspect is presenting.
23. Q  Okay. So that's why you thought it was reasonable to use
24.   the pepper spray under those circumstances and that's what
25.

**Page 59**

1.    you did.
2. A  Absolutely.
3. Q  And when you gave him the short burst of one to two
4.    seconds of the pepper spray, you said the fight went out
5.    of him. What do you mean by that? Did he go limp or
6.    what.....
7. A  He.....
8. Q  How did -- what was his bodily reaction to the pepper
9.    spray such that it helped you guys handcuff him?
10. A  He paused. He like kind of froze instead of trying to
11.   pull away or anything. He like sucked in his breath and
12.   his eyes clenched shut.....
13. Q  Okay.
14. A  .....and he paused which gave us -- gave me a moment to
15.   grab onto him real quick and Officer Peterson was able to
16.   place him into handcuffs.
17. Q  Okay. All right.
18. A  While we both were -- we never went to the ground. We
19.   were standing.
20. Q  And the arm that you held was -- and you said Officer
21.   Peterson had one arm. Did you hold the other arm then or
22.   were you both holding the same arm?
23. A  At that point, I believe Officer Peterson didn't have
24.   any -- I believe he lost the other arm. I just stepped
25.

**Page 60**

1.    up, grabbed the one arm. Officer Peterson was able to
2.    handcuff it and then grab the other arm and cuff him.
3. Q  I see. So when.....
4. A  I believe.
5. Q  .....you actually pepper sprayed Mr. Brown, do you think
6.    that Officer Peterson had ahold of one of Mr. Brown's
7.    arms.....
8. A  No.
9. Q  .....or not?
10. A  No.
11. Q  Because he had struggled free from the grasp of.....
12. A  Yes.
13. Q  .....Officer Peterson.
14. A  Yes.
15. Q  Okay. All right. So what happened after he was
16.   handcuffed? Describe the process taking us all the way to
17.   Mr. Brown being put in the police car.
18. A  Once we placed him in the handcuffs, we led him out. We
19.   walked from the kitchen out the front door and to Officer
20.   Peterson's patrol vehicle which is just off of the
21.   driveway.....
22. Q  Okay.
23. A  .....on Purlov Street.....
24. Q  Okay.
25.

**Page 61**

1. A  .....and we placed Mr. Brown -- Scott Brown into the back
2.    of Officer Peterson's patrol vehicle.
3. Q  And did you have any difficulty moving Mr. Brown from
4.    inside the house to Officer Peterson's patrol vehicle?
5. A  No, sir.
6. Q  Okay. Was Mr. Brown cooperative in the movement from the
7.    house to the patrol car?
8. A  He was rather boisterous, but he was compliant. There was
9.    one -- we basically had to help him up into the patrol
10.   vehicle. At that point, he was complaining about he had a
11.   prior injury about his ankle, so we had to actually assist
12.   him up into the vehicle.....
13. Q  Okay.
14. A  .....for him to step up because there's a step up into
15.   our -- we have Ford Expeditions.
16. Q  Okay.
17. A  And there's a little step up that you have to.....
18. Q  All right. Do you remember any problem with his pants
19.   falling down as you move from the house to the patrol
20.   vehicle?
21. A  As we went -- refreshing my memory when we looked at the
22.   patrol vehicle video cam, when -- just that refreshed my
23.   memory. When we went past the front of the vehicle, his
24.   pants were up. I remember him complaining that his pants
25.

JEFFREY HOLDEN　　　　　　4/2/2008　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

17 (Pages 62 to 65)

Page 62

1　　were falling down and we pulled his pants up. They never
2　　fell down to his ankles, no.
3　Q　Okay. Do you remember when -- where in the sequence from
4　　the house to the patrol vehicle that he complained that
5　　his pants were falling down?
6　A　I believe it was when we were putting him into the -- just
7　　before we put him into the back of the police vehicle.
8　Q　Okay. Do you remember the -- Officer Peterson's scene
9　　tape, there was some mention about pants falling down and
10　　Mrs. Brown says something about let me get them up or
11　　something and then there was I'll do it or whatever? Do
12　　you remember anything like that?
13　A　I remember that. I'm trying to remember if that happened
14　　before we actually walked out of the front -- front of
15　　the -- out of the house.
16　Q　Right.
17　A　That -- I believe that happened prior to going outside.
18　Q　And so tell me about that. What do you -- do you remember
19　　about what the state of his pants was when Mrs. Brown was
20　　talking about pulling them up?
21　A　I believe that his pants were just slightly falling down.
22　　They never went down around his ankles, but I believe it
23　　was showing like the top of -- like the crack of his butt.
24　Q　And were they pulled up then at that time?
25

Page 63

1　A　Yes, sir.
2　Q　And who do you remember pulled them up if we're still in
3　　the house at that point?
4　A　I don't remember if we allowed Mrs. Brown to hike them up
5　　or if it was one of us.
6　Q　Okay. And then you said you saw the -- Officer Peterson's
7　　videotape from his vehicle, right?
8　A　Yes, sir.
9　Q　And you and Officer Peterson and Mr. Brown passed in front
10　　of the vehicle, correct?
11　A　Yes, sir.
12　Q　And did it appear to you -- what state were his pants when
13　　you saw the three of you going in front of the vehicle?
14　A　His pants were up.
15　Q　Okay.
16　A　In the proper position.
17　Q　All right. All right. And then you placed -- you and
18　　Officer Peterson placed Mr. Brown in the vehicle and then
19　　they left the scene.....
20　A　Yes, sir.
21　Q　.....Officer Peterson and Mr. Brown did. And then you did
22　　some investigation in the house.
23　A　Yes, sir. I went to check on Mr. Damon Brown's status.
24　Q　Okay.
25

Page 64

1　　MR. KOZIOL: All right. That's all the questions I have.
2　　MR. HERZ: Okay.
3　　　　OFFICER JEFFREY H. HOLDEN
4　　testified as follows on:
5　　　　REDIRECT EXAMINATION
6　BY MR. HERZ:
7　Q　Okay. What's your understanding of what it means to go,
8　　quote/unquote, hands-on with somebody you're trying to
9　　arrest?
10　A　If I place hands on someone.
11　Q　Okay. Does it ever -- I mean does it ever suggest
12　　something more than that? Can hands-on mean more than
13　　just putting your hands on them but something less than,
14　　you know, strikes.....
15　A　Yes, sir.
16　Q　.....kicks? Okay. So.....
17　A　Yes, sir. Soft empty hands.
18　Q　All right. So hands-on means also soft empty hands. So
19　　explain what that means, soft empty hands when you go
20　　hands-on with somebody.
21　A　If you're placing someone in handcuffs.....
22　Q　Uh-huh.
23　A　.....you can talk them through it and you place your hands
24　　on them and they're compliant and you place them into
25

Page 65

1　　handcuffs.
2　Q　Okay. It can -- can going hands-on include using more
3　　force than just trying to put them -- just putting your
4　　hands on them to put their hands in handcuffs but
5　　something less than strikes, fists, and kicks?
6　A　Yes.
7　Q　So what can that include?
8　A　So you're -- okay.
9　Q　What force is -- fits the definition of going hands-on
10　　that's more than just simply trying to get somebody's hand
11　　into a pair of handcuffs, okay, but is less than strikes,
12　　hitting with a closed fist, punches, and kicks?
13　A　You could use pressure points.
14　Q　Okay.
15　A　For them to use the minimum amount of force necessary.
16　So.....
17　Q　What else can you use?
18　A　May -- I don't understand the question.
19　Q　I'm asking you what kind of techniques can you use that
20　　don't -- that would not be considered striking, punching,
21　　kicking, that would include being hands-on, that would,
22　　you know, be considered use of force?
23　A　You could put them in the escort position.
24　Q　What's that?
25

Computer Matrix, LLC　　　　　　Phone - 907-243-0668　　　　　　　jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501　　Fax　　907-243-1473　　　sahile@gci.net

Page 66

1  A  An escort position is when you place your hand above the
2     elbow and on the wrist.
3  Q  Uh-huh.
4  A  If you wanted to walk somebody out or to gain control of
5     the person by getting them in the escort position. You're
6     approximately at a 45 degree angle and behind the person.
7  Q  Okay. What other kinds of techniques? You mentioned
8     pressure points in order to gain compliance. What other
9     techniques can you use to gain compliance short of
10    punching, striking, kicking?
11 A  Well, I guess I don't -- I don't understand your question.
12    MR. KOZIOL: I guess he's asking is there anything else.
13 Q  If there's.....
14 A  Oh.
15 Q  Is there anything else?
16 A  That's it.
17 Q  That's all you can think of.
18 A  I guess that's it, yeah.
19 Q  And now you indicated that if you had to take an arrestee
20    to the ground -- well, let me back up. My understanding
21    is the Kodiak Police Department policy is that use of OC
22    spray is considered an intermediate use of force, right?
23 A  Yes.
24 Q  And going hands-on and using soft tactics is sort of the
25

Page 67

1     first level of use of force, right?
2  A  No.
3  Q  No, that's not your understanding?
4  A  Officer presence, verbal commands.....
5  Q  Uh-huh.
6  A  .....you know, and then you get higher up the -- but you
7     can go from one to the other without using -- you don't
8     have to go through every step -- every level of force
9     to.....
10 Q  I understand. But one of the rationales you used here was
11    if you went to ground, he could be hurt or you could be
12    hurt, right?
13 A  Correct.
14 Q  But that's true anytime you have to take an arrestee to
15    the ground, right? I mean anytime.....
16 A  Sure. Sure.
17 Q  So does that mean that instead of taking an arrestee to
18    the ground, you should always be able to use OC spray
19    because every time you take an arrestee to the ground, you
20    could get hurt or they could get hurt?
21 A  Every situation is different.
22 Q  But.....
23 A  Officer Peterson already had hands-on. I tried hands-on
24    and he pulled away. That's why I used pepper spray on
25

Page 68

1     him. But you take everything into effect. You have a
2     matter of seconds to decide what you're going to do.
3     Mr. Brown wasn't obeying verbal commands from Officer
4     Peterson. When I tried to -- when I put my hand on his
5     arm, he pulled away from me. I went to the next level and
6     pepper sprayed him.
7  Q  Did you use any verbal commands on Mr. Brown?
8  A  I don't recall if I did or not. Officer Peterson was
9     telling him to stop resisting. I don't know if I did or
10    not.
11 Q  And you only tried to grab his arm one time, right?
12 A  Yes, sir.
13 Q  Okay. And in any of your training and reading regarding
14    OC spray, were there any cautions about discharging OC
15    spray in a closed environment?
16 A  In our use of force policy, it says -- I can't quote it,
17    but it says not to use it in a confined spot -- place. I
18    do not -- in my opinion, a house is not an enclosed space.
19 Q  Okay. All right. It sounds like with regard to the pants
20    falling down issue that you didn't have an independent
21    recollection of the state of Mr. Brown's pants at the time
22    he's being led out to the patrol car and passing in front
23    of the dash camera. And your recollection of that was
24    only refreshed after you looked at the camera -- video.
25

Page 69

1  A  Sir, I would -- on all the arrests that I have made, I
2     would not let someone's pants fall down as we're talking
3     them to the police car. I can -- I would not let that
4     happen. If a person's pants are falling down, I would
5     pull them up or have him hold his pants up in the process
6     of going to the patrol car.
7  Q  All right. And why is that?
8  A  Because I have respect for people.
9  Q  Well, why would you not.....
10 A  I would not want him to be embarrassed or hurt.
11 Q  Okay. And your recollection is at least at this time that
12    you don't remember whether Mrs. Brown hiked up Mr. Brown's
13    pants or whether one of the officers did that?
14 A  I don't remember.
15 Q  Okay.
16 A  I remember hearing it. I just don't remember who pulled
17    up his pants before we went outside.
18 Q  Okay. And you remember hearing that only because you
19    listened to the tape, right.....
20 A  Yes, sir.
21 Q  And in your description of his pants was that they were
22    never down around his ankles, but they may have -- his --
23    you said his butt crack may have been showing?
24 A  Yes, sir.
25

Page 70

1  Q  Okay. Now, I want to go back to this -- just real briefly
2     this issue of getting hearsay reports from REDDI callers.
3     MR. KOZIOL: Let me object beyond the scope. I didn't
4     bring this topic up.
5     MR. HERZ: That's fine. I mean I think, you know, I'm
6     entitled to explore.....
7     MR. KOZIOL: Good objection, but I'm not going to tell him
8     not to answer.
9     MR. HERZ: Okay.
10 Q  On -- when you get a hearsay report like, you know, a
11    REDDI call, you agree that there has to be some indication
12    that the information is based on personal observation,
13    right? In other -- I mean what allows you to rely on the
14    call is that there has to be some indication that the
15    information that's being imparted is reliable, right?
16 A  True.
17 Q  Okay. I mean it's not just the fact that it's a REDDI
18    call. It's the fact that the information in the REDDI
19    call has some indicia -- some indication that it's
20    reliable information, right?
21 A  Correct.
22 Q  Okay. And so there has to be some indication that the
23    caller has personal information regarding the facts
24    they're relating, right?
25

Page 71

1  A  Correct.
2  Q  Okay. So when a caller indicates that they personally
3     observed certain driving behavior, you know, I saw him do
4     a 360, that's personal observation, right?
5  A  True.
6  Q  Okay. When the caller says the driver may be intoxicated,
7     what's the personal observation that tells you that the
8     driver has some personal information that the driver has
9     consumed alcohol?
10 A  Well, they could have saw the person drinking alcohol.
11 Q  Right.
12 A  They could have saw the passenger with a beer bottle
13    drinking and believe that the actions of the driver, his
14    reckless driving, the 360, he could -- the caller could
15    believe that the person had been drinking.
16 Q  If all the caller says is the driver may be intoxicated,
17    if they don't impart that more specific information, I saw
18    the driver drinking, what is the information that's been
19    imparted that tells you the caller has personal
20    information the driver has consumed?
21 A  Can you say that again?
22 Q  All right. What is -- if the caller says the driver may
23    be intoxicated. Okay? That's what the caller says. They
24    saw a 360. They say it fishtailing......
25

Page 72

1  A  Uh-huh. (Affirmative)
2  Q  .....okay? The driver may be intoxicated.
3  A  Uh-huh. (Affirmative)
4  Q  What is the -- what is in that statement, the driver may
5     be intoxicated, that tells you that the caller has
6     personal information -- reliable information that the
7     driver has actually consumed alcohol?
8     MR. KOZIOL: My recollection is this question actually has
9     been asked and answered numerous times and we're just going
10    back.
11    MR. HERZ: Well, your objection's noted, but my question
12    is predicated on making sure the officer understood that it
13    wasn't just a REDDI call, that the REDDI call only can be
14    relied on if the information being imparted is based on
15    personal information known to the caller.
16 Q  And I'm asking when the caller says -- so that's the basis
17    of the call. When the caller says the driver may be
18    intoxicated, what is it that the caller has imparted to
19    you that tells you that the caller has reliable
20    information that the driver has consumed alcohol?
21    MR. KOZIOL: I'm going to object. Asked and answered.
22    MR. HERZ: Okay.
23    MR. KOZIOL: Go ahead.
24 Q  Go ahead and answer the question.
25

Page 73

1  A  I didn't speak to the caller. The dispatcher can tell you
2     what the caller said. The information that I got from
3     Officer Peterson, it was a REDDI call and the driver was
4     driving recklessly. That's the information I was going
5     on.
6  Q  All right. And in the context -- right. And in the
7     context though of the question of do you have trustworthy
8     and reliable facts in order to make an arrest for DUI, you
9     said that you could just simply rely on a caller making a
10    REDDI call. And so what are the reliable and trustworthy
11    facts that tells you that the hearsay that you're relying
12    on is based on personal information that the driver has
13    consumed alcohol?
14 A  The citizen reported that and that's what.....
15 Q  No. The citizen reported the driver may be intoxicated.
16    What did the citizen report that told you they had
17    personal information the driver actually consumed?
18    MR. KOZIOL: Objection. Asked and answered.
19 A  I believe I answered that, sir. I don't know what more
20    you want.
21 Q  Okay. So -- well, you're saying that by simply claiming
22    that the driver may be intoxicated that is the same as the
23    caller saying they have personal information the driver
24    consumed alcohol? Those two things are the same.
25

Page 74

1   MR. KOZIOL: Objection. Form. Argumentative.
2  A  I don't understand, sir. Say -- ask me the question
3   again. Because it sounds -- you.....
4  Q  Are you saying that when a caller says the driver may be
5   intoxicated, that's the equivalent information -- that's
6   the same as saying I personally saw the driver consume
7   alcohol?
8   MR. KOZIOL: Objection. Argumentative. Form.
9  A  Yes.
10  MR. HERZ: Okay. No further questions.
11  MR. KOZIOL: Let's go off the record for a moment.
12  REPORTER: Off record.
13  (Off record)
14  (On record)
15  REPORTER: Back on record.
16  MR. KOZIOL: No further questions.
17  REPORTER: And you're done?
18  MR. HERZ: And I'm done, yes.
19  REPORTER: All right. So this concludes the videotaped
20 deposition of Officer Holden at 10:51 a.m. on April 2, 2008,
21 and we're off record.
22  (Off record)
23      (END OF PROCEEDINGS)
24
25

Page 75

1        CERTIFICATE
2  UNITED STATES OF AMERICA  )
                             )ss
3  STATE OF ALASKA           )
4    I, Joseph P. Kolasinski, Notary Public in and for the
5  state of Alaska, residing in Anchorage in said state, do hereby
6  certify that the deponent in the foregoing matter was duly
7  sworn to testify to the truth, and nothing but the truth;
8    That said testimony was taken at the time and place
9  therein stated;
10    That the testimony of said witness was recorded
11 electronically and thereafter transcribed under my direction
12 and reduced to print;
13    That the foregoing is a full, complete, and true record of
14 said testimony.
15    I further certify that I am not a relative, nor employee,
16 nor attorney, nor of counsel of any of the parties to the
17 foregoing matter, nor in any way interested in the outcome of
18 the matter therein named.
19    IN WITNESS WHEREOF I have hereunto set my hand and affixed
20 my seal this 21st day of April 2008.
21
22
        _____
        Joseph P. Kolasinski, Notary Public
23      in and for the State of Alaska.
        My Commission Expires: 03/12/2012
24
25