IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SCOTT BROWN,                          )
                                      )
            Plaintiff,                )
                                      )
v.                                    )
                                      )
FRANK PETERSON, Individually          )
and in His official capacity as       )
a City of Kodiak Police Officer;      )
JEFF HOLDEN, Individually and in      )
His official capacity as a City       )
of Kodiak Police Officer; CITY        )
OF KODIAK; and JOHN AND JANE          )
DOES 1-10.                            )
                                      )
            Defendants.               )
_____)
Case No. A-05-0002 civil

VIDEOTAPED DEPOSITION OF SCOTT R. BROWN

January 16, 2007

APPEARANCES:

   FOR THE PLAINTIFF:        MR. ROBERT M. HERZ
                             Attorney at Law
                             425 G Street, Suite 600
                             Anchorage, AK 99501
                             (907) 277-7171

   FOR THE DEFENDANTS:       MR. FRANK S. KOZIOL, JR.
                             Attorney at Law
                             618 Christensen Drive
                             Anchorage, AK 99501
                             (907) 258-7706

Ex. S

SCOTT BROWN  
Vol. 1                                1/16/2007                BROWN v. PETERSON, et al.,  
                                                               A05-0002 Civil

2 (Pages 2 to 5)

**Page 2**

TABLE OF CONTENTS
- Direct Examination by Mr. Koziol — 04
- Cross Examination by Mr. Herz — 153
- Redirect Examination by Mr. Koziol — 182
- Recross Examination by Mr. Herz — 199
- Redirect Examination by Mr. Koziol — 203
- Recross Examination by Mr. Herz — 205

EXHIBITS MARKED:
- 1 - Drawing of Safeway parking lot and route taken — 40
- 2 - Drawing of rooms in the house — 125

**Page 3**

PROCEEDINGS

(Anchorage, Alaska - 1/16/2007)

(On record)

REPORTER: My name is Nathaniel Hile, Notary Public in and for the state of Alaska and a court reporter who represents Computer Matrix Court Reporters, whose business address is 310 K Street, Suite 200, Anchorage, Alaska. This is the first tape in the videotape deposition of Scott Brown taken pursuant to notice by the defendant.

The case is in the United States district court for the district of Alaska, Brown v. Peterson, et al. The case number is A-05-0002 civil. Today is January 16th, 2007 and the time is 9:11 a.m. We're at the offices of Computer Matrix Court Reporters.

Counselors, please identify yourself for the record, stating your representation, starting with the plaintiff's attorney.

MR. HERZ: Robert Herz, H-E-R-Z, for the plaintiff, Scott Brown.

MR. KOZIOL: Frank Koziol for the defendants.

REPORTER: Thank you. Sir, please raise your right hand and I'll swear you in.

(Oath administered)

MR. BROWN: Yes, I do.

REPORTER: Thank you.

**Page 4**

SCOTT R. BROWN
after having been first duly sworn under oath, testified as follows on:

DIRECT EXAMINATION

REPORTER: Please state your full name and spell your last name for the record.

A  Scott R. Brown, B-R-O-W-N.

REPORTER: Thank you. And a mailing address, please?

A  1219-A Purtov Street, Kodiak, Alaska 99615.

REPORTER: Thank you. And a daytime telephone or message phone, please?

A  1-907-486-1478.

REPORTER: Thank you. Counselor, if there are no stipulations, Mr. Koziol, you may proceed.

BY MR. KOZIOL:

Q  How would you like me to address you during the deposition?

A  You can just call me Scott.

Q  Okay. Thanks, Scott. This is called a deposition. Have you ever had your deposition taken before?

A  I don't know.

Q  A deposition is a proceeding where you would have been sworn under oath and the attorneys in the case would be present asking you questions but there wouldn't be any judge present. Do you ever remember doing that before?

**Page 5**

A  Yeah, I think so. I don't know.

Q  What case did you do that before?

A  It was involving the case that this civil lawsuit involves. I think it was -- but I think there was a judge. I don't know.

Q  Yeah, if there's a judge, then there wasn't really.....

A  I think it was an evidentiary hearing. I don't think I've ever done one of these.

Q  Okay. It's important that you listen to the questions then give answers to the questions if you have reasonable confidence in your answer. If you don't know the answer to the question because you'd have to speculate, then I'd request that you just say you don't know rather than speculate. Is that agreeable with you?

A  It is.

Q  Okay. And I'd like to define speculation a little bit. If you know an answer a little more than 50 percent all the way to 100 percent confidence, then we'd like to hear your answer. If you're at 50/50, flip of the coin, could be heads, could be tails, or less than 50 percent, then I consider that speculation and I'd like you just to tell me you don't know rather than speculate. Is that agreeable with you?

A  It sounds fair.

Q  Is there any reason that you can think of that you

Computer Matrix, LLC  
310 K Street, Suite 200  
Phone - 907-243-0668  
Fax       907-243-1473  
jpk@gci.net  
sahile@gci.net

Page 6

1  wouldn't be able to today give truthful and accurate
2  answers to my questions?
3  A  Is there any -- no, I can give a truthful answer.
4  Q  Okay. It was a broad question. What I mean by that
5     is.....
6  A  If I know the answer, I can say yes or no or I don't know.
7  Q  Okay. And basically what I mean by that is there aren't
8     any physical or mental impairments that you're under right
9     now that would cause you not to be able to give truthful
10    and accurate answers. Is that a true statement?
11 A  That's true.
12 Q  And also, even though this is being videotaped, the
13    parties may have it transcribed and, thus, it's a good
14    idea if maybe you wait for a pause, as you've been doing,
15    a pause so you know my question has ended and I'll try to
16    wait for a pause so I know your answer has ended so we
17    don't step on each other's words and make the reading of
18    the transcript then difficult later. All right?
19 A  Yes, sir.
20 Q  Okay.
21    MR. HERZ: Frank, do you mind if I just kind of follow up
22 on your question about physical and mental impairments for a
23 moment?
24    MR. KOZIOL: Because there's some concern? Sure. If you
25 have some concern, go ahead on that topic.

Page 7

1                 VOIR DIRE EXAMINATION
2  BY MR. HERZ:
3  Q  Scott, have you had any recent surgery?
4  A  I have. Oh, I am -- I do take a painkiller, Percocet, and
5     I did take one this morning.
6  Q  Okay. That's what I -- you know, I wasn't sure, but I
7     knew Scott had had a recent surgery and I didn't know if
8     he was currently under medication or not, but.....
9  A  I also had a tooth pulled, too, but no medication for
10    that.
11 Q  When did that happen?
12 A  Oh, about five days ago.
13 Q  What's the medication you're getting for that?
14 A  Oh, antibiotics.
15 Q  Do you know what the dosage of the Percocet is?
16 A  It's one every six hours. You know, every four to six.
17 Q  When was your last -- when was the last time you took a
18    dose?
19 A  About 7:00 o'clock.
20 Q  And do you feel the.....
21 A  They're 7.5 milligram. No, they just take the edge off.
22 Q  Do you feel like you feel the effects of the Percocet?
23 A  Well, my knee is not throbbing.
24 Q  Do you feel clear-headed?
25 A  I do.

Page 8

1     MR. HERZ: Okay.
2     MR. KOZIOL: Done?
3     MR. HERZ: Okay.
4             DIRECT EXAMINATION CONTINUED
5  BY MR. KOZIOL:
6  Q  If you or your attorney have any reason to believe you
7     can't give me accurate and truthful answers to my
8     questions, then I'm not going to go any further in this
9     deposition because I need to be able to rely and everyone
10    else needs to be able to rely on the truthfulness and the
11    accuracy of your answers. So, if you have any doubt about
12    it, we will not continue.
13 A  I have no doubt.
14 Q  Okay. All right.
15 A  Except, you know, the accuracy -- I mean we're talking
16    about something that happened years ago, so I would like
17    to rely more on my testimony back then than now because,
18    you know, I mean my memory was better about the events
19    that occurred when they happened instead of.....
20 Q  But the statement you just made has nothing to do with the
21    Percocet you're taking.....
22 A  No.
23 Q  .....for example.
24 A  No.
25 Q  Okay. All right. As you may know, there are a lot of

Page 9

1  documents been generated relating to the January 4th, 2003
2  incident. I mean I have piles of documents, some of which
3  may be your testimony or statements in some form. I don't
4  know whether I'll show you any of those documents because
5  they are what they are. So what I -- I think at least
6  initially I'm going to do is test your memory about facts
7  and I'd like you to keep in mind kind of what we said a
8  few minutes ago, that if you know a fact a little more
9  than 50 percent up to 100 percent, I'd like to hear it.
10 If you don't know, we don't want you to speculate and you
11 just say you don't know. Even if you have to give me a
12 don't know but you think it's somewhere in this mass of
13 documents, you still should tell me you don't know because
14 I'm asking you here without the aid of any documents.
15 Okay?
16 A  Okay.
17 Q  All right. So, ultimately, it's kind of simple in the
18    sense that -- and it's understood that as time goes by
19    people's memories fade and we're talking, you know, four
20    years ago or so, right?
21 A  True.
22 Q  Okay. But still in all, there may be a lot of questions
23    the answers to which is not written anywhere that I would
24    know of and I may be getting a first view of it. So let's
25    begin about the facts.

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473        jpk@gci.net
                                                              sahile@gci.net

Page 10

1  A  Okay.
2  Q  The incident that brings us here today, am I right, it's
3     January 4th, 2003?
4  A  Yes.
5  Q  Okay. And I'd like to start chronologically that day. Do
6     you remember when you first saw your brother Damon that
7     day, about what time?
8  A  It was in the afternoon.
9  Q  Can you be any more precise than that?
10 A  No.
11 Q  Let me test that a little bit. Can you tell me whether
12    it's early afternoon or mid afternoon, late afternoon?
13 A  I think it was like mid, I'd say.
14 Q  What had you done that morning, if you remember?
15 A  I went to work. I was working on my truck.
16 Q  And where were you working at the time?
17 A  Kodiak Auto Center.
18 Q  Are you still working there?
19 A  No.
20 Q  You say you were working on your truck, so you weren't
21    working for your employer that morning.
22 A  No.
23 Q  Was anybody else there at Kodiak Auto Center when you were
24    working on your truck?
25 A  I -- I don't know. I was in the -- I had a key to the

Page 11

1  shop, to the shop bays. It's a dealership. And I just
2  stayed in the shop bay where all my tools were.
3  Q  Am I right, you don't have any recollection of anyone else
4     being there?
5  A  No. There may well have been. I can't remember.
6  Q  So the answer is you don't have any recollection of anyone
7     else being there as you sit here now.
8  A  Yes.
9  Q  What were you -- let's identify the truck. What truck was
10    it that you were working on?
11 A  It's a '69 Dodge flatbed, D-300.
12 Q  Color?
13 A  It's gold with a black bed.
14 Q  What type of work were you doing on the truck?
15 A  I was having a problem with it. It was like -- it was a
16    running problem.
17 Q  Can you be more precise?
18 A  The engine would like -- like falter and want to quit and
19    then you'd give it gas and all of a sudden it would take
20    off and then, you know, you'd get going too fast. When
21    you put on the brakes, the front brakes would lock up
22    before the rears and it's a dual, so it would kind of like
23    -- you know, the brakes are on but it would like push the
24    truck, the front end around.
25 Q  Okay. And before you started working on it that morning,

Page 12

1  did you think there was more than one problem or did you
2  think there was one problem?
3  A  I didn't know, you know. I checked over basically the
4     carburetor linkage and the throttle linkage and I checked
5     the safety components, brakes and what have you. It was
6     like an intermittent thing. It wouldn't happen all the
7     time.
8  Q  So you checked all those items. Did you adjust them or
9     repair any of them that morning?
10 A  No. As I recall, it was just mostly inspection of the
11    items. I didn't really -- I didn't find anything to
12    repair at that time, no.
13 Q  Nor adjust?
14 A  Not to my knowledge.
15 Q  So how long did it take you to check out the truck that
16    morning?
17 A  I don't know. I'm not -- I can't remember. I know I took
18    it for several test drives just trying to make the problem
19    reoccur, but I don't know exactly how long.
20 Q  Can you put some parameters on it? The test drives and
21    the checking it physically was within two hours, three
22    hours? Can you put any parameters on it?
23 A  I don't know. It was a long time.
24 Q  So a couple hours at least?
25 A  At least.

Page 13

1  Q  Up to maybe four?
2  A  I don't know.
3  Q  All right. So the best you can do is at least a couple
4     hours.
5  A  Yeah. I mean I think it was more, but I don't know.
6  Q  And sometimes when you give me an I don't know,
7     particularly when it involves estimates of, I don't know,
8     time, distance or whatever, usually through further
9     probing an attorney can get the witness to put some
10    parameters on it; you know, it was a minimum of this,
11    maximum of that. So I might press you on those type of
12    items because we can get useful information sometimes
13    without the witness speculating even though they don't
14    know the exact amount of time.
15 A  Uh-huh.
16 Q  Okay? So I'm not challenging your statement when you say
17    you don't know, but I am trying still to obtain more
18    useful information.
19 A  Well, I know I was still like test driving it and stuff at
20    the time that I picked my brother up.....
21 Q  Okay.
22 A  .....but I also had to talk to him, too.
23 Q  All right. Prior to that day, January 4, 2004, how long
24    had you been experiencing the problem you described with
25    the truck?

Page 14

1  A  Well, it had happened, you know, a couple times. Like I
2     said, it was an intermittent thing, but it started
3     becoming, you know, more frequent.
4  Q  Okay. How much prior to this date would you say the first
5     time you noticed the problem, days, weeks, months?
6  A  Weeks.
7  Q  And when you experienced the problem when you were driving
8     as you've described it, did you ever lose control of your
9     vehicle?
10 A  No.
11 Q  Did you ever -- I take it -- let me ask you the question.
12    Did you ever move outside of your lane of travel when you
13    experienced it?
14 A  I think one time when it stalled.
15 Q  Okay. Again, the time frame is before you were working on
16    it that morning.
17 A  Oh, before?
18 Q  Yeah. I'm still talking about before.
19 A  Before I was working on it? No.
20 Q  Yes.
21 A  No. I never.....
22 Q  You never lost control and moved out of your own lane.
23 A  No.
24 Q  Did you consider this problem a safety problem?
25 A  Well, that's why I checked all the safety components. I

Page 15

1     wanted to make sure all the brakes and everything were
2     correct.
3  Q  When you test drove it that morning or even early
4     afternoon, was anybody with you?
5  A  Not until I picked my brother up.
6  Q  Where did you go to test drive it?
7  A  I went up -- well, it seemed to like do it when you'd go
8     over bumps, so I was trying to take, you know, like up
9     hills, down hills, bumpy roads. Just trying to -- I was
10    just trying to make it do it so I could try to figure out
11    what was wrong with the thing. It had seemed more to do
12    it after you'd go over a bump or something. Then the
13    engine would, you know, start running funny.
14 Q  And when you test drove it that morning, did you
15    experience the problem?
16 A  Yes, I did.
17 Q  How many times when you were test driving it did you
18    experience it?
19 A  Just once, you know, and then I checked all the linkage
20    and what have you, the brakes, down at the shop. I
21    thought maybe it could have been hanging up on a wire or
22    something. I mean I didn't know what was going on with
23    it.
24 Q  But, again, you found nothing.
25 A  I found nothing.

Page 16

1  Q  And the one time you experienced it that day, again, prior
2     to your working on it, what did you experience precisely?
3  A  Prior to my working on it?
4  Q  Well, okay. You were test driving it that day before you
5     picked up your brother. Let me put it this way. Before
6     you picked up your brother you experienced it one time,
7     correct?
8  A  Yeah.
9  Q  What did you experience that time?
10 A  I came to a stop sign and the engine would like try to
11    falter, so I'd keep it going. Well, then I'd have the
12    brake on and the gas going.....
13    MR. HERZ: We can't see the.....
14 A  .....and it would.....
15    MR. HERZ: I'm sorry. We can't see what you're doing
16    underneath the table, so you're using some body movements as
17    well as talking.
18 A  Well, I'm like trying to keep the truck going by
19    manipulating the foot feed and at the same time applying
20    the brake. Well, then the engine would start and the
21    front brakes would lock up and the rear tires would break
22    loose and it would start to like push the truck.
23 Q  So how far did you go before you'd then do something?
24 A  Well, if it was going to push me out into the lane of
25    traffic, I'd just let off the gas, you know. I mean I

Page 17

1     wouldn't get in an accident, you know.
2     MR. HERZ: By the way, I think at this point I want to
3     interpose an objection to this line of questioning as just, in
4     my view, the whole line of questioning is, I think, irrelevant
5     to the issues in this case since the issue is whether or not
6     there was a basis for a lawful, warrantless entry into
7     Mr. Brown's home and I do not believe that this line of
8     questioning is relevant to answer that question.
9     MR. KOZIOL: In terms of future objections, I would simply
10    request that you make a form objection and if I want an
11    explanation, then I would ask for it as the rules say, so I
12    don't need explanations unless I ask for them.
13 Q  So you finished checking out your vehicle and did some
14    test drives, experienced the problem one time, then you
15    went and picked up your brother, is that right?
16 A  Yeah.
17 Q  And was that pre-arranged, picking up your brother?
18 A  No.
19 Q  Where did you pick up Damon?
20 A  At my residence.
21 Q  Where was he living at the time?
22 A  With me.
23 Q  How long had he been living with you?
24 A  I can't remember.
25 Q  Days, months, years?

Computer Matrix, LLC          Phone - 907-243-0668
310 K Street, Suite 200       Fax     907-243-1473               jpk@gci.net
                                                                 sahile@gci.net

**Page 18**

1  A   Months.
2  Q   Why did you go pick him up then?
3  A   Because I wanted to talk to him.
4  Q   Why did you want to talk to him?
5  A   Well, he owed me money and.....
6  Q   You wanted to discuss that? I'm sorry, were you done?
7  A   I'm done.
8  Q   Okay. You wanted to discuss that with him, him owing you
9      money?
10 A   Yeah.
11 Q   How much did he owe you?
12 A   Just rent.
13 Q   How much was that he owed you?
14 A   I think a couple hundred bucks.
15 Q   How long had he -- how long was he late?
16 A   Just a month.
17 Q   So what was the arrangement with him in terms of monthly
18     rent?
19 A   Two hundred bucks. Just basically paying for food.
20 Q   So that would include rent and food.
21 A   No, just food. I mean basically food and telephone. He
22     had cable TV in his room. I wasn't trying to make money
23     off him, just trying to help him out.
24 Q   All right. So you went and picked him up at your house.
25     What happened next?

**Page 19**

1  A   We went riding around so I could talk to him and
2      eventually I went down to a tire shop to see about maybe
3      getting my front tires studded.
4  Q   Okay. Let me just stop you there. Tell me about your --
5      I take it you had a conversation with him about the money
6      he owed you.
7  A   Yeah.
8  Q   Tell me about that conversation.
9  A   He owed me money and I think he was spending it all at the
10     bar.
11 Q   But my question is a little more narrow than that. What
12     did you say and what did he say about the subject of him
13     owing you money?
14 A   He said he's going to pay me and I said he owed me and I
15     said I think he spends too long at the bar and I think
16     that's why he doesn't have any money.
17 Q   What did he say?
18 A   He -- I can't remember. He agreed that he owed me money
19     and he paid me.
20 Q   When did he pay you?
21 A   Later. The next pay day.
22 Q   So days after we're talking about?
23 A   Yeah, days.
24 Q   All right.
25 A   Maybe a week.

**Page 20**

1  Q   How did Damon look when you picked him up?
2  A   Like he was drunk or had been, you know, drinking the
3      night before heavily.
4  Q   I see a difference between somebody being drunk and
5      somebody.....
6  A   That had been.
7  Q   .....that had been drinking.
8  A   Yeah, he looked like he, you know, had been drinking and
9      maybe he was still a little drunk.
10 Q   So what did you see that led you to those conclusions?
11 A   Just by the way he smelled and, you know, I mean just the
12     way he looked. He wasn't, you know, his normal self like
13     when you wake up in the morning. I mean, you know, your
14     hair might be a little mess when you wake up, but he was
15     -- you know, slept in his clothes and smelled like
16     alcohol.
17 Q   Did you see him walk?
18 A   Yeah. He seemed to walk all right.
19 Q   How about talking? Did it -- did his.....
20 A   He didn't slur.
21 Q   Any facial features that you noticed that led you to think
22     he was still under the influence of alcohol?
23 A   He just looked, you know, sloppy, you know, like he hadn't
24     taken a shower. He just looked like someone that had a
25     rough one.

**Page 21**

1  Q   Did that make you angry that he owed you money but
2      apparently he at least spent some of it.....
3  A   Sure.
4  Q   .....on alcohol?
5  A   Sure. Yeah. I don't think he was trying to help himself.
6  Q   Where did you drive around before going to that tire shop,
7      do you remember?
8  A   I can't remember. I know we drove around on -- tried to
9      go over like bumpy roads and stuff.
10 Q   You were trying to recreate that problem.
11 A   And we got out and we checked the truck, you know, checked
12     things. I mean I couldn't make it reoccur.
13 Q   That was my next question. Up to the point where then you
14     were with Damon and you got -- until you got to the tire
15     shop, you didn't recreate the problem.
16 A   No, except for the -- yeah, we couldn't find out what the
17     problem was.
18 Q   Okay. That's a little different question -- answer to my
19     question. Did you experience the problem again?
20 A   I only remember it happening once, that's all, so I guess
21     I don't know.
22 Q   You don't recall.
23 A   Yeah.
24 Q   All right. When you arrived at the tire shop, were you
25     still angry with Damon?

Computer Matrix, LLC          Phone - 907-243-0668
310 K Street, Suite 200       Fax     907-243-1473          jpk@gci.net
                                                            sahile@gci.net

Page 22

1  A  Yeah.
2  Q  So who was at the tire shop when you arrived?
3  A  The tire man, Wade Brenick (ph).
4  Q  For the court reporter, could you spell his last name, if
5     you know.
6  A  I don't know.
7  Q  It's Brenick, is that right?
8  A  Yeah.
9  Q  Why did you have the intention to put on studs?
10 A  Well, I wanted to keep the truck from sliding, you know,
11    but, you know, then I figured -- he told me what it would
12    cost and I figured, well, you know, that's just kind of
13    covering up the problem because, you know -- you know, I
14    mean stopping the front tires from skidding, you know,
15    really wasn't the problem. The problem was the engine was
16    creating that problem because when you'd rev up the
17    engine, you know, it didn't engage the automatic
18    transmission, then the rear tires would spin and it would
19    shove the front end. So, I mean, yeah, I checked it out,
20    then, you know, after I thought about it I figured, you
21    know, it's not really fixing the problem.
22 Q  What did he tell you it would cost to put studs on your
23    tires?
24 A  I can't remember.
25 Q  Did you describe to Mr. Brenick what the problem was you

Page 23

1     were experiencing?
2  A  No. He's the tire guy.
3  Q  So what did you say to Mr. Brenick as to why you were
4     there?
5  A  I asked if we could put studs on the front with the
6     existing tires. He said he could. He could drill them
7     out or whatever.
8  Q  Did he tell you when he could do it?
9  A  No. I don't know.
10 Q  Anyway, you decided not to do that.
11 A  I think it was close to his quitting, closing time or
12    something. I don't know. I think it was. I think it was
13    close to his closing time, so he couldn't have done it
14    that day anyway.
15 Q  But when you left him, you decided not to do it, is that
16    right?
17 A  I don't know if I decided that day or a different -- later
18    on or what. So I did -- I remember my decision was, well,
19    it's not fixing the truck, it's -- you know, it's just
20    like taking cough syrup. It's not going to fix your cold,
21    it's just going to help your cough.
22 Q  What was the name of the tire shop?
23 A  Union Tire.
24 Q  How long were you there at Union Tire?
25 A  I don't know, 20, 20 minutes, 30 minutes.

Page 24

1  Q  Do you remember what time of day that is then when you
2     were there for the 20 minutes?
3  A  I don't know. It was close to -- I think he closed at
4     5:00. I think it was like 4:30, something. I ain't sure.
5  Q  Were you arguing with your brother Damon at the Union Tire
6     Shop?
7  A  No.
8  Q  Did you ever see a statement from Mr. Brenick wherein he
9     says it looked like you two were arguing?
10    MR. HERZ: Objection.
11 A  Unh-unh. (Negative)
12 Q  You never seen such a statement?
13 A  A statement?
14 Q  A written statement.
15 A  I think it said something about slamming doors or
16    something on the pickup.
17 Q  Did that happen?
18 A  Yeah.
19 Q  Were the doors slammed in anger by either you or your
20    brother?
21 A  Yeah. I think by my brother.
22 Q  Can you tell me, if you know, what led up to him angrily
23    slamming a door?
24 A  Probably something I said. I don't know.
25 Q  Do you remember what you might have said to him to cause

Page 25

1     him.....
2  A  I don't remember.
3  Q  .....to slam the door?
4  A  I don't remember. You know, there was just a little
5     tension there is all. I mean it's an old truck, you know.
6     I tried to take care of it, you know. I didn't like my
7     doors slammed and whatever. I mean I may have been mad
8     and slammed my door. I can't remember. But I remember it
9     said something about slamming doors.
10 Q  Okay. So here's my question. I don't want you to
11    speculate. From your remembering what Mr. Brenick said in
12    his statement, does that cause you to remember somebody
13    slammed the door? Do you have a memory of that?
14 A  Yeah. It was in a statement or something.
15 Q  No, no, no. I'm not asking you now whether.....
16 A  That's what you said though. You said do you remember in
17    a written statement about Wade saying something about we
18    were arguing or something and I said I remember something
19    in the statement about slamming doors.
20 Q  Right. Okay. I understand that answer. I have a new
21    question, different question.
22 A  Okay.
23 Q  From your now remembering what Wade Brenick said in that
24    statement about slamming doors, does it cause you now to
25    remember the event of someone, either you or your brother

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473          jpk@gci.net
                                                                sahile@gci.net

Page 26

1   Damon actually slamming a door? Do you have that memory?
2 A Yeah.
3 Q Who slammed the door?
4 A I don't know. I think I did. I don't know.
5 Q Okay. You have a memory of somebody slamming the door but
6   you don't remember who.
7 A Yeah, I don't know.
8 Q Okay.
9 A There was just some tension there. Some things were being
10  done a little abrupt.
11 Q I think you told me this is about 4:30 p.m. on January
12  4th, 2003.
13 A I think so.
14 Q That's about when you left the Union Tire?
15 A It's -- you know, it's whatever I said back in whenever,
16  2003, 2004 or whatever.
17 Q Again, I'm not trying to.....
18 A I can't remember.
19 Q .....test your memory.....
20 A I don't know.
21 Q .....as to what was in the documents.
22 A I don't know. I don't know exactly what time it was. I
23  know it was close to his closing time.
24 Q You did say like a minute ago about 4:30. Is that still a
25  good answer?

Page 27

1 A Yeah, because I think they close at 5:00, yeah.
2 Q Okay. All right. When you left the Union Tire Shop in
3   and around 4:30 p.m., had you 24 hours before that
4   ingested any alcohol or any type of drug?
5   MR. HERZ: Objection to the form of the question.
6 A Twenty-four hours.
7   MR. HERZ: Vague.
8 Q If you never -- if you ever don't understand a question
9   I've asked, tell me and I'll rephrase it, but if you're
10  answering my questions, I'll assume you understand the
11  words in the question, okay?
12 A Uh-huh. (Affirmative)
13 Q So do you remember the question I asked you?
14 A I know I was under a doctor's care. I had like a twisted
15  ankle. I can't remember which one. But I also had
16  Percocet for that one, too, because my ankle was like that
17  big around.
18 Q We have it on video, but you're indicating a swollen ankle
19  with your hands.
20 A Yeah. I don't know. It was bigger than normal.
21 Q So are you likely telling me you had.....
22 A I.....
23 Q Let me finish my question because it's going to read.....
24 A Yeah, 24 hours. I mean 24 hours.
25 Q Yeah. So 24 hours back from 4:30 p.m. on January 4th,

Page 28

1   2003, it's likely you took some Percocet.
2 A Uh-huh. (Affirmative)
3 Q Do you remember how much Percocet you'd have taken?
4 A Probably one. Probably one every so many hours. Like
5   four to six hours. Usually that's what the dosage is.
6 Q So if you were following that regime, then you might have
7   taken three or four or maybe five.
8 A Well, what happened is, you know, I lost my pills. That
9   day I couldn't find my pills on January 4th. I couldn't
10  find my Percocet. I lost them, I misplaced them, I don't
11  know.
12 Q So it's likely then you didn't have any Percocet on
13  January 4th, 2003.
14 A No. It is. I know I didn't have any on the 4th.
15 Q Is it likely you may have had some Percocet.....
16 A On the 3rd.
17 Q .....on the 3rd, after 4:30 p.m.?
18 A Well, yeah, I think so.
19 Q Okay. Any Percocet that you would have taken on the 3rd
20  after 4:30 p.m., would it have been affecting your
21  behavior at 4:30 the next day, January 4th?
22 A No.
23 Q Did you have any other -- did you take any other drugs or
24  alcohol within that same 24-hour period of time?
25 A No.

Page 29

1 Q More precisely.....
2 A No. When you -- when you use Percocet, you don't use
3   alcohol. You're not supposed to.
4 Q Did you read that on the label?
5 A Yeah.
6 Q Did the doctor also tell you that?
7 A I don't know. I think I just read it.
8 Q Who was the doctor that was treating you for your ankle
9   problem?
10 A I think it was Dr. Creelman.
11 Q All right. Oh, by the way, you and Wade Brenick were
12  friends, is that right?
13 A Well, yeah, sure.
14 Q In fact, grew up in the same town together?
15 A Well, we didn't grow up -- I mean he never went to the
16  same school as I did or anything. We met later in life as
17  young adults.
18 Q Did you know him in your home town?
19 A I knew him from Loomis, Washington, yeah.
20 Q When you were young adults.
21 A Yes. Yeah, before I came here. Or before I moved to
22  Kodiak I'd known Wade in Loomis.
23 Q So what years did you know him in Loomis?
24 A I've known him for, I don't know, 12, 15 years, something
25  like that.

Page 30

1  Q  My question is a little more precise. What years in
2     Loomis did you know him?
3  A  I don't know. Count back 12, 15 years.
4  Q  Okay. So the 12, 15 years was in Kodiak and then we count
5     back before that for Loomis when you knew him?
6  A  No. Let's see. I knew him in the '90s.
7  Q  Were you friends then in the '90s with him?
8  A  Yeah.
9  Q  Socializing?
10 A  We also worked together.
11 Q  In Loomis?
12 A  Yes.
13 Q  What did you do there?
14 A  I had an apple orchard. He had a fire extinguisher, fire
15    suppression business. He used to work with me and I'd pay
16    him and I'd work with him and he'd pay me. Yeah, we went
17    hunting and fishing together.
18 Q  Did you help him get up to Kodiak in any manner?
19 A  No.
20 Q  Tell him about any job openings in Kodiak?
21 A  Yeah. Yeah, I did.
22 Q  Isn't that help?
23 A  Yeah, but I didn't help him come to Kodiak.
24 Q  So how did you help him getting a job?
25 A  I just told him there was a job opening. They were

Page 31

1     looking for a tire shop manager.
2  Q  And did he get that job?
3  A  He did.
4  Q  Is that what he's doing now?
5  A  He owns it.
6  Q  So he became manager and then he ultimately owned it,
7     became owner?
8  A  Yes.
9  Q  When did he become owner?
10 A  I don't know. A few years ago.
11 Q  Okay, thanks.
12 A  Like three. I don't know. I don't know.
13 Q  All right. So let's go back to our chronology. About
14    4:30 p.m. on January 4, 2003 you and Damon leave the Union
15    Tire Shop, is that right?
16 A  Uh-huh. (Affirmative)
17 Q  You might want to say yes rather than uh-huh.
18 A  Yes.
19 Q  Thanks. Everybody does that and I'll remind you just so
20    that he doesn't have to interpret the sound when he types
21    it up, okay. Had you been driving all the way up to that
22    point in time, your vehicle?
23 A  Yes.
24 Q  And then when you left the Union Tire Shop you were
25    driving, not your brother.

Page 32

1  A  No.
2  Q  By the way, was your brother -- do you know whether your
3     brother had a driver's license allowing him to lawfully
4     drive?
5  A  I don't know.
6  Q  Had you ever heard that his license was suspended up to
7     that point in time?
8  A  I knew he'd been in trouble for them before.
9  Q  Did you know it was suspended at some point in time?
10 A  No. I just knew he'd gotten in trouble before.
11 Q  At the point in time when you were at the Union Tire Shop,
12    did you think, if you handed him the keys, he could
13    lawfully drive?
14 A  No. He smelled like beer and crap.
15 Q  All right. So apart from whether he had a license or not,
16    in your view, it wouldn't have been safe for him to be --
17    for you to hand him the keys to drive your vehicle.
18 A  I wouldn't let him drive my truck, not like that.
19 Q  And you simply -- your testimony is you simply didn't know
20    whether he had a license or not, driver's license.
21 A  Yeah, I don't know.
22 Q  All right. So where did you go after leaving Union Tire
23    Shop?
24 A  We went up to Safeway.
25 Q  Did you discuss with Damon going there before arriving?

Page 33

1  A  Yeah, before arriving. That's when we talked, was before
2     we got to Union Tire.
3  Q  You talked about what?
4  A  Him.
5  Q  And him owing you money.
6  A  Yeah.
7  Q  But my question is after you left Union Tire did you and
8     he have a discussion about going to Safeway before you got
9     to Safeway?
10 A  I don't know. I mean did you say, hey -- I mean I don't
11    know.
12 Q  That's all right.
13 A  He got in the truck and we went to Safeway.
14 Q  Okay. I wasn't there, so I ask you questions. If you
15    don't know, you just tell me you don't know.
16 A  He got in the truck, we left and we went to Safeway.
17 Q  Why did you drive to Safeway?
18 A  I needed Copenhagen.
19 Q  Do you know whether he needed anything? Did he tell you
20    he needed anything at Safeway?
21 A  I think he got Copenhagen, too, and he got some beer, too.
22 Q  It was a different question. Did he tell you he needed
23    anything before you arrived there?
24 A  I don't know.
25 Q  All right. So then you went to Safeway and you got your

Page 34

1   Copenhagen?
2  A  Yeah.
3  Q  And he got Copenhagen?
4  A  Yeah.
5  Q  And he got beer?
6  A  Yeah.
7  Q  What kind of beer did he buy?
8  A  Budweiser.
9  Q  In what form?
10 A  It was a 12-pack. I think it was bottles. It was
11    bottles.
12 Q  How many ounces?
13 A  Twelve. I think that's all they make.
14 Q  Who paid for the beer and Copenhagen that he bought?
15 A  I paid for mine. He paid for his.
16    MR. HERZ: Continuing relevance objection. Just so you
17    know, I'm going to have a continuing relevance objection to
18    much of this.
19    MR. KOZIOL: Okay.
20 Q  How did you pay for your Copenhagen?
21 A  I don't know.
22 Q  Could you have paid by credit card?
23 A  I could have.
24 Q  Do you know how your brother paid for his Copenhagen and
25    beer?

Page 35

1  A  I don't know.
2  Q  Did he have a credit card at the time, do you know?
3  A  I don't know.
4  Q  Did he tell you why he wanted the beer?
5  A  No. I can pretty much figure it out myself. I mean why
6     does someone want beer.
7  Q  I understand. Again, I'm not asking -- for a question
8     like that, I'm not asking your thought process, I'm asking
9     you whether he told you why he wanted the beer. He
10    didn't, right?
11 A  No.
12 Q  Now did that make you angry?
13 A  What?
14 Q  That he bought beer when you just had an argument with him
15    about him having gotten drunk the night before and
16    spending money getting drunk as opposed to paying you his
17    debt?
18 A  Well, I told him if he wants to drink beer to stay home
19    and drink it. It doesn't cost $5 a glass.
20 Q  But my question was, did you become angrier.....
21 A  No.
22 Q  .....when he bought that beer?
23 A  No. I had beer at home. I didn't want him drinking mine
24    because I ain't paying for his habit.
25 Q  So the subject never came up, hey, why did you buy that

Page 36

1     beer, why don't you give me some of the money you owe me
2     that you're about to spend on that beer. That never
3     happened.
4  A  No. He didn't have enough money to pay rent. He said
5     I'll pay you later.
6  Q  Where were you parked at the Safeway?
7  A  In front of the store, near the liquor store. All I
8     needed was Copenhagen. They sell it right there.
9  Q  Was there a designated parking spot that you parked in?
10 A  I don't know. They were all covered with snow. You know,
11    the lines of the parking lot and what have you.
12 Q  Did you know from having been there before whether you
13    were actually parking in the designated spot or not?
14 A  Yeah, I think so.
15 Q  When you went in, was your vehicle running or did you turn
16    it off?
17 A  Shut it off.
18 Q  When you got out, you, again, were driving, right?
19 A  (No audible response)
20 Q  Did you almost hit somebody when you left the parking lot?
21 A  No.
22 Q  You've heard or read, have you not, that your brother said
23    -- sorry. You've heard or read, have you not, that a
24    woman said that your brother, who was a passenger in your
25    vehicle, had motioned her to come in front of your

Page 37

1     vehicle.....
2  A  Yeah.
3  Q  .....and you almost ran her over and then you sprayed her
4     as you left the parking lot. You've heard that assertion?
5     MR. HERZ: Objection to the form of the question.
6     Misstates evidence.
7  Q  Have you heard that, Scott?
8  A  I think I've read it.
9  Q  Okay. Did you observe your brother motioning to a woman
10    before you moved your vehicle from the parking space in
11    Safeway?
12 A  No.
13 Q  Do you have any explanation as to why you wouldn't have
14    seen her before you moved your vehicle?
15 A  Why I wouldn't have seen her?
16 Q  Yes.
17 A  Maybe she was in the blind spot.
18 Q  And where is your blind spot in that vehicle?
19 A  Well, of course, the passenger sitting in the window. He
20    could be a blind spot. Or it's got big mirrors on it.
21    That could be a blind spot. It could be the A-pillar by
22    the windshield. That could be a blind spot.
23 Q  Okay. How did you -- in what manner did your vehicle
24    leave the parking space? I'm interested in acceleration
25    speed?

Computer Matrix, LLC            Phone - 907-243-0668
310 K Street, Suite 200         Fax     907-243-1473            jpk@gci.net
                                                                sahile@gci.net

Page 38

1  A  Just normally.
2  Q  Do you remember your tires spinning?
3  A  I don't. You know, I mean, they may have. There was ice
4     and gravel on top of the ice. I mean, sure, they could
5     have spun. I never could see the sense in this woman's
6     story anyway.
7  Q  And I'm not asking you whether it could have happened.
8     I'm just asking whether you have a memory of your tires
9     spinning and not getting good traction as you were leaving
10    the parking space.
11 A  I don't remember exactly, no.
12 Q  Did you say that you left the parking lot at a normal rate
13    of speed for you?
14 A  Yes.
15 Q  What speed would that be?
16 A  Probably five, 10 miles an hour.
17 Q  Did you have any discussion with your brother Damon
18    regarding this pedestrian that was outside your vehicle?
19    MR. HERZ: Objection to form of the question, vague.
20 A  No.
21 Q  Did you ever later talk to Damon about whether or not he
22    motioned this woman to walk in front of your vehicle and
23    then you proceeded ahead? Did you ever talk to him about
24    that?
25 A  No. I can't remember. I don't know.

Page 39

1  Q  You have no recollection of talking to him about that
2     subject?
3  A  Did I ever talk about it?
4  Q  Yes.
5  A  What, to -- only to Damon?
6  Q  I didn't say only. I said did you talk to Damon about
7     whether or not he saw that woman and motioned her to move
8     in front of your vehicle.
9  A  Yeah, I remember. We never saw -- we never saw a woman.
10    I never saw a woman.
11 Q  So Damon said to you he never.....
12 A  I don't know. I don't know. I don't know if we discussed
13    it or not.
14 Q  You might want to let me finish my question because it's
15    not going to read real well.
16 A  Okay.
17 Q  I'd asked you whether you and Damon ever talked about
18    whether he saw the woman who was trying to walk in front
19    of your vehicle and you gave me a number of answers. You
20    said he told you he never saw her and then you said you
21    don't know and then you said you don't remember. What is
22    your answer?
23 A  I never saw her.
24 Q  That was not.....
25 A  We never talked about -- I don't -- I don't know. I don't

Page 40

1     know. That's my answer.
2  Q  Your answer is you don't know.
3  A  I don't know.
4  Q  Are you able to draw for me from a bird's eye view the
5     Safeway, where the building would be, where you were
6     parked in relationship to the building, and the route you
7     took to exit the parking lot? Are you able to do that in
8     the drawing?
9  A  Yeah.
10 Q  Okay. Why don't we go off the record. I'd like you to do
11    that.
12    (Off record)
13            (Deposition Exhibit 1 marked)
14    (On record)
15 Q  Scott, while we were off the record you did a drawing and
16    you've labeled, it looks like a box to me, Safeway and
17    then another box truck.
18 A  Uh-huh. (Affirmative)
19 Q  That truck that you've labeled, that's your truck and how
20    it was parked.
21 A  Yes.
22 Q  And the Safeway box, that's the building.
23 A  Right.
24 Q  And then can you label -- did you draw the parking lot?
25 A  Yeah. This is like the parking lot.

Page 41

1  Q  Could you.....
2  A  It's actually bigger than that.
3  Q  And I realize this isn't to scale.
4  A  Yeah.
5  Q  Could you just write in where the parking lot is. Put the
6     words parking lot.
7  A  Yeah, actually it's like far out there. This building is
8     bigger, too. But, yeah, this is all parking lot.
9  Q  Can you label and write the word exit where you actually
10    left the parking lot.
11 A  Here.
12 Q  You've marked an X.
13 A  That's an X.
14 Q  What is the street where the X is? What's the name of
15    that street?
16 A  I don't know. There's like a gas station on this side.
17 Q  So put gas station there.
18 A  Now there's a video store like here.
19 Q  Write video in there.
20 A  I don't know if it was there then.
21 Q  V-I-D-E-O. Thanks. So you've labeled gas for gas station
22    and video for video.
23 A  Yeah.
24 Q  Okay. When you got to where the X is, which way did you
25    turn?

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473          jpk@gci.net
                                                                sahile@gci.net

Page 42

1  A   This way.
2  Q   You made a right-hand turn out of the parking lot.
3  A   Right, right, right, right. Yeah.
4  Q   All right. I think you indicated a little bit to me, but
5      what was the condition -- just tell me what the condition
6      of the parking lot was at the time you drove out.
7  A   It had like ice with gravel on top of it.
8  Q   How about the road conditions? What was the road
9      conditions like when you -- let's say you drove from the
10     Union Tire Shop to the Safeway?
11 A   Certain roads it was bare, but certain other spots were
12     icy, compact snow, ice, mud.
13 Q   Do you remember what the temperature was?
14 A   No.
15 Q   Do you know whether it was below freezing or not?
16 A   I don't know.
17 Q   And there was no precipitation, there was no rain or snow
18     coming down or was there?
19 A   No. I don't know. I don't know.
20 Q   How long were you in Safeway? Can you estimate that?
21 A   I don't know.
22     MR. HERZ: Objection. Mischaracterizes the evidence.
23     MR. KOZIOL: I'll withdraw the question.
24 Q   You were in Safeway, is that right?
25 A   Yeah.

Page 43

1  Q   How long were you in Safeway?
2  A   I don't know.
3  Q   Can you give me some parameters on it? More than five
4      minutes, less than 10.
5  A   I'd be guessing.
6  Q   We can probably put some parameters on it, right? I mean
7      it was.....
8  A   Well, you can if you want.
9  Q   Okay. Let me ask you questions.
10 A   Okay.
11 Q   Were you in there more than an hour?
12 A   No.
13 Q   Okay. Were you in there more than a half an hour?
14 A   No.
15 Q   Were you in there more than one minute?
16 A   Yeah.
17 Q   So, see, we've limited it through that from one minute to
18     30 minutes. Can you narrow it any more than that?
19 A   I don't know. No. I don't know. I don't know.
20     Sometimes there's a long line in there. I don't know. I
21     can't remember.
22 Q   Fair enough. So the best we can do in parameters is one
23     minute to 30 minutes, right?
24 A   Yeah. It probably wasn't 30 minutes, but I don't know.
25 Q   Fifteen minutes?

Page 44

1  A   I don't know.
2  Q   All right. Well, we're going to leave it then at one to
3      30 minutes.....
4  A   Okay.
5  Q   .....because you can't do any better than that. All
6      right. Did you experience any problems with your truck on
7      the way from Union Tire Shop to the Safeway?
8      MR. HERZ: Asked and answered.
9  Q   I'm sorry if I did. I thought I did not ask you that
10     question.
11 A   I don't know.
12 Q   Bear with me. Do you remember?
13 A   To Safeway?
14 Q   Yeah.
15 A   I can't remember. I don't know.
16 Q   Where did you go when you left Safeway?
17 A   I was going to head home, but I went to this -- I don't
18     know, this stop sign. See, I don't know the names of the
19     streets out there. I went to stop and it did its thing.
20     Anyway, the truck slid, so instead of making a left I took
21     a right and went up Pillar, kind of. I was near my house,
22     but I kind of went the opposite way. Because when the
23     truck slid, it was like pointing, you know, up the hill
24     and it's a big, long truck. I wouldn't have been able to
25     make the turn, you know.

Page 45

1  Q   Can you describe the route you took to getting to that
2      particular stop sign?
3  A   Yeah. I need more paper.
4  Q   All right.
5  A   Well, it would continue on from this one.
6      MR. HERZ: And I'll just reiterate my continuing relevance
7      objection.
8  A   This is -- yeah, I think there was a stop sign right
9      there.
10 Q   Can you put SS there.
11 A   (Complies) And then this is an intersection.
12 Q   Do you know the names of either of those two streets?
13 A   I think this is Mill Bay Road.
14 Q   Mill Bay Road?
15 A   Yeah, I think this is Mill Bay.
16 Q   So are you saying Mill Bay Road runs in front of the
17     Safeway?
18 A   No. It runs in front of this gas station actually.
19     There's an intersection there and then you go up here and
20     another intersection here. Keep going down this way.
21     There's a -- let's see here. There's a road that goes off
22     this way. This keeps going. There's a stop sign right
23     here. This keeps going, kind of curves around. There's
24     another road that comes off here. There's no stop sign on
25     this road. There's a stop sign here. That's an

Case 3:05-cv-00002-TMB   Document 89-24   Filed 05/27/2008   Page 13 of 20

SCOTT BROWN
Vol. 1
1/16/2007
BROWN v. PETERSON, et al.,
A05-0002 Civil

13 (Pages 46 to 49)

Page 46

1  intersection. This goes up Pillar.
2  Q  Is that called Pillar Road?
3  A  Pillar Mountain Road. I don't know. It goes up Pillar
4     Mountain.
5  Q  Okay. So why don't we stop, have you mark the stop sign
6     where you intended to go left but your vehicle was
7     pointing right.
8  A  Yeah, it's this one. It's this one. This is kind of a
9     weird intersection. It's got a road that comes in like
10    this and one that comes in like this.
11 Q  There are four roads that join there? I'm sorry, three.
12 A  Yeah.
13 Q  Do you remember the names of any of those roads other than
14    Pillar Mountain Road?
15 A  The one I live on is Purtov.
16 Q  Could you mark that one, where that is.
17 A  I think it's this one.
18 Q  Okay. And the road you were on that brought you to the
19    stop sign.....
20 A  It's Selief.
21 Q  .....you don't know the name of that road?
22 A  That's Selief.
23 Q  Could you mark that there.
24 A  (Complies) I don't know how to spell them.
25    MR. KOZIOL: Maybe what we can do, if it's all right with

Page 47

1  you, Robert, is have the court reporter tape these two pieces
2  of paper together and just continue it as part of Exhibit 1.
3  Is that agreeable?
4     MR. HERZ: That's fine.
5  A  I mean it's got all the roads there, but it's not like
6     shaped right. I don't know. I'm not a very good artist.
7  Q  How long do you think it took you to drive from the
8     Safeway to that intersection where your vehicle acted up
9     again?
10 A  I don't know. Ten, 15 minutes.
11 Q  And you went directly there from Safeway?
12 A  Where? To that stop sign?
13 Q  Yeah.
14 A  Yeah.
15 Q  Can you describe for me what problems your vehicle had at
16    that point?
17 A  It's like it started to falter and I, you know, revved it
18    up. It's in drive, had the brake on at the same time and
19    then the rear wheels would drive and like push the front
20    end. So, when it did that, it kind of went and it was
21    pointing the wrong way. I was going to make a left and
22    then the truck was pointing right, so I just -- I went up
23    Pillar Mountain.
24 Q  You had intended to make a left and go home?
25 A  Yeah.

Page 48

1  Q  Can we describe the problem you were having with your
2     truck as a throttle intermittently sticking? Is that a
3     fair characterization or not?
4  A  What it ended up being was the distributor. That's what I
5     remember. I think at trial I told him that.
6  Q  What was the problem with the distributor?
7  A  The centrifugal advance for the timing was rusted up and
8     stuck. It had an old mechanical type distributor with
9     points and everything. The centrifugal advance on the
10    timing was rusted up. Everything rusts in Kodiak. I mean
11    even this truck. It was beautiful when I brought it up
12    there. Now the thing is a pile of junk.
13 Q  How long after this incident did you discover that it was
14    the distributor that was the problem?
15 A  I can't remember.
16 Q  How did you identify there was a distributor problem?
17 A  Just kept working at it in my spare time.
18 Q  But I mean how did you -- did you examine it.....
19 A  Yeah.
20 Q  .....and see that it was rusted?
21 A  Yeah. Well, I pulled it out and, you know, I knew how the
22    old ones were supposed to work. You know, it was a
23    centrifugal advance and it had springs on it, little
24    springs that bring it back to center for like when you
25    start the vehicle. And as it increases in RPM it moves

Page 49

1  the timing. And that was seizing, you know,
2  intermittently. So it was the distributor ultimately was
3  the problem.
4  Q  All right. Now, all right. So, as a result of this
5     problem, your vehicle was pointed up Pillar Road, so you
6     just decided to go that route.
7  A  Yeah.
8  Q  Why not just turn around at your first opportunity and go
9     back to home where that was your intention?
10 A  I did pretty much, but, you know, got up there and I think
11    -- I think we inspected something else on the truck. We
12    were looking under the dash or something. I don't know.
13    Because we put in a bunch of switches and stuff a couple
14    weeks earlier. My brother was thinking maybe they were
15    rubbing on the linkage on the inside of the truck, not the
16    outside. So I think we looked at that. Then I had to go
17    to the bathroom really bad, so we turned around, headed
18    down the mountain, headed for home.
19 Q  How far up Pillar Mountain did you go?
20 A  Not very far.
21 Q  Can you describe -- you pulled off the road to examine the
22    vehicle?
23 A  Yeah. There was like a wide spot.
24 Q  Can you describe where you pulled off?
25 A  A wide spot.

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

SCOTT BROWN   1/16/2007   BROWN v. PETERSON, et al.,
Vol. 1                                    A05-0002 Civil

14 (Pages 50 to 53)

Page 50

1  Q  It wasn't a gravel pit?
2  A  No.
3  Q  You didn't go that far?
4  A  No.
5  Q  Did either of you get out of the vehicle when you pulled
6     off in the wide spot?
7  A  I can't remember. May have to look under the dash. I
8     think my brother was the one doing the looking.
9  Q  Did either of you discover any problem?
10 A  No. He said he thought it was some wires, but it wasn't.
11 Q  Was any of the beer drunk?
12 A  No.
13 Q  So the 12 pack he bought was unopened at the time you then
14    started heading back to your house?
15 A  Yeah.
16 Q  When you left the Safeway parking lot, did you have any
17    concern that you might have upset a citizen of Kodiak.....
18 A  I had no idea.
19 Q  .....as you departed? You had no idea.
20 A  No.
21 Q  When you were coming down Pillar Mountain, did you see a
22    police vehicle going the opposite direction?
23 A  Yeah.
24 Q  Prior to seeing a police vehicle, did any -- to your
25    perception, did any of your driving -- did you think it

Page 51

1     would cause concern of any citizen -- by any citizen of
2     Kodiak?
3  A  No.
4  Q  You have heard, I take it, from, you know, the criminal
5     case that a woman says that you went through a stop sign
6     and went out of control as you went past her and then did
7     a 360 turn.
8     MR. HERZ: Objection. Mischaracterizes the testimony.
9  Q  Have you heard that?
10 A  I have.
11 Q  From your drawing here, did you determine where she said
12    she was and you were when that happened? I realize you're
13    disputing that that happened, but are you able to place in
14    your journey up to.....
15 A  I think it was right here, the truck, after this stop sign
16    right here.
17 Q  Okay.
18 A  I took off this way and it started going too fast. You
19    know, I was -- it was -- I was going too fast, so I let
20    off on the gas and the truck stalled. So then when I
21    stopped the truck was kind of like that in the lane.
22 Q  Can you label that truck.
23 A  Stalled?
24 Q  Stalled truck.
25 A  (Complies)

Page 52

1  Q  Did you see a woman coming in the opposite direction when
2     that happened or a vehicle coming in the opposite
3     direction?
4  A  No.
5  Q  Prior to your vehicle becoming stalled, did it fishtail?
6  A  No.
7  Q  So.....
8  A  It just kind of went -- you know, it stalled, I stopped,
9     it kind of went shhhh.
10 Q  So it went in a straight line.
11 A  Well, kind of went like -- it kind of went like that.
12 Q  The way you're motioning is a -- it looked like to me the
13    rear of it was going.....
14 A  A fishtail is like this, right. No, it didn't do that.
15 Q  If we define a fishtail as going -- the rear going back to
16    one side and then another, that's a full fishtail. Did
17    yours do a half fishtail going to the right?
18 A  No, because I don't define that as a fishtail.
19 Q  Then let's leave that char.....
20 A  I was still -- yeah, I was still in my lane anyway.
21 Q  Let's leave that characterization aside then, fishtail.
22    Did your rear end of your vehicle go to the right as you
23    were having problems and then it stalled?
24 A  I wasn't having problems. It stalled and then I stopped
25    and then I restarted.

Page 53

1  Q  And when it stalled, did the rear of the vehicle go to the
2     right?
3  A  Yeah, because I put the brakes on.
4  Q  But it still was in your lane.
5  A  Yeah.
6  Q  Do you know either of those two roads where the stop sign
7     was before your vehicle stalled? Do you know the names of
8     those roads?
9  A  It's Selief.
10 Q  It's still Selief. Okay.
11 A  It's Selief. I don't know what this one was.
12 Q  Could you label Selief where that -- where you've writ SS,
13    the stop sign.
14 A  Well.....
15 Q  Yeah, but we don't know that it continues there, so if you
16    could just label it Selief too.
17 A  (Complies)
18 Q  All right. You have told me, I think, you did stop at
19    that stop sign at Selief and the intersection that you
20    don't know the name of, correct?
21 A  Uh-huh. (Affirmative)
22 Q  So do you have any explanation as to why the woman would
23    have said you did not stop at that stop sign and you blew
24    it?
25    MR. HERZ: Objection. Calls for speculation.

Computer Matrix, LLC          Phone - 907-243-0668          jpk@gci.net
310 K Street, Suite 200       Fax     907-243-1473          sahile@gci.net

Page 54

1  A   I don't know.
2  Q   Do you have any explanation as to why she said you did a
3      360 after you passed her?
4  A   No.
5  Q   Do you have any reason to believe she's lying?
6  A   Yeah.
7  Q   Why would she lie?
8  A   I don't know. Maybe because I sprayed her mother with
9      gravel. I don't know.
10 Q   Okay.
11 A   I tried to -- I wondered about that forever.
12 Q   All right. So you're coming -- how long were you stopped
13     at some turn off up Pillar Road before you then started
14     back down Pillar Road?
15 A   I don't know.
16 Q   More than a minute, less than 10?
17 A   Less than 10, I think.
18 Q   More than a minute?
19 A   Yeah.
20 Q   The police officer passes you in the opposite direction,
21     correct? As you're coming down.....
22 A   Yeah.
23 Q   .....Pillar Road Mountain.....
24 A   Yeah.
25 Q   .....he's going up.

Page 55

1  A   Yeah.
2  Q   Did you.....
3  A   I think we met like in some water tower or something.
4  Q   You mean there's a water tower adjacent to where you
5      passed each other?
6  A   Yeah, I think so.
7  Q   Did you recognize who that police officer was when you
8      passed him?
9  A   Unh-unh. (Negative)
10 Q   Did you know Frank Peterson before this incident?
11 A   No.
12 Q   You never had any contact with him?
13 A   (No audible response)
14 Q   No? You have to answer audibly so he'll know how to type
15     it.
16 A   Oh. No.
17 Q   As he passed you and you passed him in opposite
18     directions, did you have any concern that he might want to
19     talk to you or stop you?
20 A   No.
21 Q   So then where did you go after he passed you?
22 A   I went home.
23 Q   And that's on.....
24 A   Purtov.
25 Q   Purtov. Okay. And you're living at the same place

Page 56

1      currently, right?
2  A   Uh-huh. (Affirmative)
3  Q   Did you notice the police officer was behind you at any
4      point before you stopped your vehicle in the driveway of
5      your house?
6      MR. HERZ: Objection. Form of the question, vague.
7  A   Re-say the question.
8  Q   Okay. Did you notice either by sound or sight that the
9      police officer was behind you at any point before you
10     brought your vehicle to a stop in the driveway at your
11     house?
12 A   No.
13 Q   You indicated you had to go to the bathroom, is that
14     right?
15 A   That's true.
16 Q   Did you have to urinate, defecate or both?
17 A   Both.
18 Q   When you exited your vehicle, did you see that there was a
19     police vehicle near your vehicle?
20 A   No.
21 Q   Before you entered your house, did you appreciate either
22     through sight or sound that there was a police vehicle
23     with a police officer at your house?
24 A   No.
25 Q   Did you have any conversation with your brother Damon

Page 57

1      after you passed the vehicle, the police vehicle, up to
2      the point where you exited your vehicle, when you parked
3      it? Did you talk to him?
4  A   I don't know.
5  Q   Don't remember any conversation.
6  A   I said I got to go to the bathroom. Let's go home. We
7      went home.
8  Q   You don't remember him saying anything else?
9  A   He didn't. I don't remember. He didn't say anything.
10 Q   Okay. Did you hear the police officer say at least once
11     if not more than once stop?
12 A   No.
13 Q   So you went into your house and you had no idea there was
14     a police officer behind you with his squad car.
15 A   No.
16 Q   Did you ever look at the videotape, the police videocam
17     tape?
18 A   Yeah, I think I did see that.
19     MR. HERZ: I'm sorry, I didn't hear that. Is that yes or
20     no?
21 A   He asked if I'd ever saw a police videocam tape.
22     MR. HERZ: I heard his question. I didn't hear your
23     answer.
24 A   I said yeah.
25     MR. HERZ: Yes?

Computer Matrix, LLC                Phone - 907-243-0668
310 K Street, Suite 200             Fax     907-243-1473         jpk@gci.net
                                                                 sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-24   Filed 05/27/2008   Page 16 of 20

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

16 (Pages 58 to 61)

Page 58

1  A   I said yeah.
2      MR. HERZ: Okay. Gotcha.
3  Q   Did you see on that police videocam tape -- did you see
4      that the driver's door opened on the tape?
5      MR. HERZ: Objection to the form of the question, vague.
6  A   No, I didn't see it open.
7  Q   Okay.
8  A   It's an old truck. I remember the D.A. saying, see, you
9      can see the truck move right there, the door. Well, the
10     door, you had to like lift it up to shut it because it
11     would just catch on the first catch. Then the door, it
12     isn't all the way closed. It will sit there and rattle
13     around. And the reason why it's rattling around is my
14     brother is in the front of the truck moving around, so the
15     door is wiggling. My door is shut, but it's only on like
16     the first click. It's not all the way shut. You know how
17     a door will like go click and it won't -- you can't open
18     it, but it's not shut all the way. Well, that's how that
19     door will be unless you lift up on it a little bit because
20     the hinges are worn out.
21 Q   So are you saying that even though you had to urinate and
22     defecate, when you exited your vehicle you took the time
23     to shut the door properly?
24 A   No, I just shut it and it only hit on the -- it only went
25     to the first -- like it was closed but only on the first

Page 59

1      latch. It wasn't fully closed. It was like half closed.
2      It was -- you know, the latch was latched. You probably
3      couldn't have pulled it open without pushing the button,
4      but you could have also pushed on the door, lifted it up
5      and pushed it and it would have shut.
6  Q   Was the reason why you didn't shut it completely because
7      you were in a rush to get into the house to go to the
8      bathroom?
9  A   Yeah. I had to go to the bathroom.
10 Q   Scott, what I don't understand is what is how the door
11     normally gets shut or how it got shut on this
12     occasion.....
13 A   Well, because I'm.....
14 Q   Let me finish the question. What does that have to do
15     with whether you saw the door being shut on the police
16     videocamera tape?
17 A   Because I remember the D.A. going, see, see the door,
18     look, the door, he's just shutting the door, whatever.
19     Well, you can see the door, it's like wiggling and it's
20     with Damon's movements in the rig. I'm already -- I'm in
21     the house when this is -- you know, and that's all I'm
22     saying.
23 Q   Okay.
24 A   Is I never -- I never knew there was any police until they
25     were in my house kicking on the bathroom door and stuff.

Page 60

1      That's when I first knew there was police.
2  Q   Just so we understand each other, you're acknowledging
3      that the driver's door on the videotape moves, but it's
4      not a result of your shutting it, it's a result of Damon
5      moving around.....
6  A   Yeah.
7  Q   .....in the interior of the vehicle, right?
8  A   Yeah. And the door is not -- because the hinges are worn
9      out, it's only partially latched. So the door is like,
10     you know, wiggling. It's not totally shut and it's just
11     kind of rocking on the hinges there with his movements in
12     the cab, whatever he was doing.
13 Q   Now you heard, am I right, the police officer, Frank
14     Peterson, say that he saw you get out of the vehicle, he
15     saw you moving toward your house, he yelled several times
16     to stop and that you were in hearing distance of him, but
17     you ignored him and went into the house. You heard him
18     testify to that, right?
19 A   I know that's what he said, but it's not true.
20 Q   He's lying?
21 A   Certainly.
22 Q   All right. Before you entered the house -- this is a
23     knowledge question. It's not a fact question, all right.
24     It's a knowledge and belief question. Before you entered
25     that house that day, your own house that day, did you

Page 61

1      believe that a police officer had to have a warrant before
2      they could enter your house and arrest you?
3  A   What do you mean was it a belief? I don't know. I don't
4      know.
5  Q   You didn't have such a belief.
6  A   Well, I know that, you know, your home is protected. You
7      have certain rights in your home. I mean I'm not a lawyer
8      or anything.
9  Q   All right. Did you believe, again, at that moment in time
10     before you entered your house.....
11 A   Before?
12 Q   Before you entered your house.
13 A   No.
14 Q   Let me finish the question. Did you believe that one of
15     the protections you had when you were in your house was
16     police officers can't enter without a warrant? Did you
17     have that belief?
18     MR. HERZ: Again, objection to the form of the question,
19     vague. Also calls for a legal conclusion. Also not relevant.
20 Q   Can you answer the question?
21 A   Well, I don't know. When the guy was in there, I didn't
22     feel he had a right to be in my house. I didn't invite
23     him in. I was in the bathroom, you know.
24 Q   And is that because he didn't have a warrant?
25 A   I don't know. I don't know if it's because he didn't have

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Page 62

1  a warrant. I mean people just can't walk in your house,
2  you know.
3  Q  Let me ask the question in another way. Did you believe
4     if you got into your house that you had more protection
5     from the police than if you were outside your house?
6  A  No, not if you're breaking the law or something.
7  Q  Okay. Who was in the house when you went in your house?
8  A  My wife and I think my older son was there, too.
9  Q  What's his name?
10 A  Joe.
11 Q  Sorry?
12 A  Joseph.
13 Q  How old was Joseph at the time? This was 2003
14 A  I think 19, 18, something. I don't know.
15 Q  Is Beverly Joseph's mother?
16 A  Yes.
17 Q  All right. So tell me what happened when you went into
18    the house.
19 A  I went into the house, I went to the bathroom and then I
20    was going to the bathroom and drinking some whiskey.
21 Q  Did you have to unlock the door to get into your house?
22 A  No.
23 Q  So it was open.
24 A  Yeah.
25 Q  And then you went into the bathroom. You went directly to

Page 63

1     the bathroom.
2  A  Yeah.
3  Q  Did you talk to anybody before you went to the bathroom?
4  A  I think I told my wife I've got to go to the bathroom.
5  Q  Did she say anything in response?
6  A  I don't know.
7  Q  That was the extent of the conversation with your wife?
8  A  Yeah.
9  Q  You didn't talk to Joseph before you went into the
10    bathroom?
11 A  No.
12 Q  All right. So you go into the bathroom and then.....
13    MR. HERZ: I'm going to continue to -- continuing
14 objection to relevance.
15 Q  All right. You went into the bathroom and then what
16    happened? What happened in the bathroom?
17 A  I got in the cupboard, grabbed my whiskey, started
18    drinking whiskey and going to the bathroom. Then Frank
19    Peterson was -- I mean I didn't know it was Frank
20    Peterson. He was saying something, Kodiak Police, open
21    the door. I don't know what. I can't remember exactly.
22 Q  Something to that effect you remember, Kodiak Police, open
23    the door.
24 A  Yeah. At first -- I mean at first I kind of thought it
25    was my brother or something playing some crap. I didn't

Page 64

1     know.
2  Q  So was that the first thing you hear from the police
3     officer, Kodiak Police, open the door?
4  A  That's the first time I knew of any police was when I was
5     in the bathroom.
6  Q  How long were you in the bathroom before you heard the
7     words Kodiak Police, open the door?
8  A  I don't know, maybe 30 seconds, something.
9  Q  What were you able -- if it was 30 seconds, what were you
10    able to do in that 30 seconds prior to hearing those
11    words, Kodiak Police, open the door?
12 A  Went into the bathroom, locked the door, had my pants
13    down. I mean I had to go, man. So I'm going. I just
14    reached over, opened up the cabinet, grabbed my whiskey
15    and was drinking.
16 Q  Did you start drinking the whiskey before you heard the
17    words Kodiak Police, open the door, or after?
18 A  I don't know.
19 Q  Could be either?
20 A  Yeah, I don't -- I can't remember.
21 Q  Did you perceive that somebody was trying to open the
22    door, the bathroom door, either before or after the words
23    Kodiak Police, open the door?
24 A  I don't know. I just -- I know that's the first time I
25    knew there was a cop in my house was when I was in the

Page 65

1     bathroom.
2  Q  Let me ask the question again because I don't know what
3     your answer is. Did somebody try to open the bathroom
4     door?
5  A  What, before I knew it was the police?
6  Q  Yes.
7  A  I don't know.
8  Q  Did somebody try to open the bathroom door after you knew
9     it was the police?
10 A  Yeah.
11 Q  What did he do? What could you see?
12 A  He couldn't.
13 Q  What did you see, the handle move?
14 A  Yeah, the handle moving, like the door flexing and stuff.
15 Q  Now when you first went into the bathroom you locked the
16    door?
17 A  I pulled the drawer open. There's a drawer right by the
18    door. That's how I lock the door. If you pull the drawer
19    open, then the door can't open.
20 Q  Okay. There's no -- is there.....
21 A  There is a lock on it.
22 Q  There is a lock on the handle?
23 A  Uh-huh. (Affirmative)
24 Q  Is there also a deadbolt lock?
25 A  No.

Computer Matrix, LLC          Phone - 907-243-0668
310 K Street, Suite 200       Fax     907-243-1473          jpk@gci.net
                                                            sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-24   Filed 05/27/2008   Page 18 of 20

SCOTT BROWN
Vol. 1
1/16/2007
BROWN v. PETERSON, et al.,
A05-0002 Civil

18 (Pages 66 to 69)

Page 66

1  Q  But you didn't lock the handle lock.
2  A  Not at first.
3  Q  Why did you pull the drawer open?
4  A  I just -- that's how I always lock the door.
5  Q  Do you do that every time you go to the bathroom in your
6     house?
7  A  Pretty much, yeah.
8  Q  You pull the drawer open.
9  A  Yeah.
10 Q  Why do you feel in your own home you need to pull the
11    drawer open when you're going to the bathroom?
12 A  So that people don't open the door while you're going to
13    the bathroom.
14 Q  And in your house are there occasions where the door is
15    shut, the bathroom door is shut, but nobody is in the
16    bathroom?
17 A  Yeah.
18 Q  Why is that? Why would you have the door shut to the
19    bathroom if nobody is in it?
20 A  Well, this house, if you don't put a door stop in front of
21    that door, it will shut because the house is like crooked.
22    You know, the door will just shut by itself.
23 Q  So it's.....
24 A  So we always leave like a bottle of shampoo. There used
25    to be a door stop there, but there isn't anymore. I don't

Page 67

1     know.
2  Q  So at the time -- when you went to the bathroom door, when
3     you entered, was the door open or shut?
4  A  I can't remember.
5  Q  But you had been using a door stop up to that point in
6     time.
7  A  Well, it had like a little wedge thing. Sometimes there
8     was a bottle of -- like a heavy bottle of shampoo to keep
9     the door open or sometimes the door was like almost, you
10    know, closed. It wasn't latched, but it would be like
11    closed, almost latched. It will just do it by itself
12    because the house is sinking.
13 Q  But when there is no shampoo bottle or door stop, does the
14    door actually close or is it still ajar?
15 A  It will be ajar a little bit or I don't know. It could
16    close.
17 Q  You don't know? You've given me like three answers to
18    that one.
19 A  Well, it could. It will almost close. I've seen it
20    closed before. I don't know if it did it by itself or not
21    or if someone -- but I know if you don't have something
22    blocking that door it will close.
23 Q  All right. So you say you're in the bathroom about 30
24    seconds, you hear the.....
25 A  It could be longer. I don't know.

Page 68

1  Q  I'm just going by what you told me.
2  A  Yeah.
3  Q  You're in the bathroom about 30 seconds, you hear the
4     police officer say, Kodiak Police, open the door, and then
5     he tries to get in and either before he says those words
6     or after he says those words you reach in some cupboard
7     and get some whiskey, is that right?
8  A  Yeah.
9  Q  And where was the whiskey in terms of a cupboard?
10 A  Right under the sink.
11 Q  What kind of whiskey was there?
12 A  Jack.
13 Q  Otherwise, full name is Jack Daniels.
14 A  Yeah.
15 Q  What was it, a fifth?
16 A  I believe so.
17 Q  And was there any further specification of Jack Daniels,
18    premium, any other way of describing the Jack Daniels?
19 A  I think it was Old No. 7 or something.
20 Q  Was it full, partially empty?
21 A  Yeah, it was full. It was.
22 Q  So did you have to open it? I mean it was still sealed?
23 A  It was full.
24 Q  Was it still sealed?
25 A  I don't know.

Page 69

1  Q  Can you explain to me why you went to the bathroom and
2     then started drinking Jack Daniels when you were in the
3     bathroom?
4  A  Well, I had to go to the bathroom, I was stressed out, my
5     ankle hurt, I couldn't find my pills. My wife doesn't
6     like hard alcohol in the house, so that's why I used to
7     hide it in the bathroom.
8  Q  She doesn't mind beer?
9  A  No.
10 Q  And did she ever explain to you why she makes the
11    distinction between not liking hard alcohol but beer is
12    okay?
13 A  Well, because it makes me -- she doesn't like me when I
14    drink whiskey.
15 Q  Do you get drunk when you drink whiskey?
16 A  Yeah.
17 Q  And when you drink beer you're not as likely to get drunk?
18 A  Well, it's way -- yeah.
19 Q  When did she tell you that, that she disapproves of your
20    drinking whiskey?
21 A  Oh, years. Years ago.
22 Q  So had you been hiding the whiskey for years prior to this
23    incident?
24 A  No, not in the same place because we hadn't lived there
25    for years. Yeah, I've hid it in the bathroom and also

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-24   Filed 05/27/2008   Page 19 of 20

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

19 (Pages 70 to 73)

Page 70

1 right outside the bathroom window I used to hide it, too.
2 Q All right. So you drink the -- started drinking the Jack
3   Daniels because -- you'd already told me you couldn't find
4   your Percocet pills, right?
5 A Right.
6 Q And your ankle hurt.....
7 A Right.
8 Q .....right? And you said you were stressed. Why were you
9   stressed?
10 A Oh, just my brother.
11 Q Stressed over that argument.....
12 A Yeah.
13 Q .....you had with him.
14 A Yeah.
15 Q If you felt you needed alcohol to kind of relieve these
16   symptoms you just told me, why didn't you drink the beer
17   that was in your vehicle that your brother bought rather
18   than go to your house and drink whiskey in the bathroom?
19 A It takes too long. I mean I was in serious pain, you
20   know. I mean alcohol is probably one of the oldest forms
21   of pain reliever.
22 Q So you were, in your view, self-medicating with that Jack
23   Daniels?
24 A Yeah.
25 Q If you started drinking before you heard the words Kodiak

Page 71

1   Police, open the door, and I realize you don't know
2   whether it was before or after, am I right, if it was
3   before, you hadn't drunk very much of the Jack Daniels
4   before you hear the police officer saying, Kodiak Police,
5   open the door? Is that a correct statement?
6 A I probably had a pretty good chug off it. But, yeah, I
7   mean -- yeah, I didn't -- hadn't drank as much as I drank.
8   Yeah, he was beating on the door. I didn't care. I told
9   him to get the hell out of my house.
10 Q And you continued to drink the Jack Daniels.
11 A Yeah.
12 Q And you did that for the -- why wouldn't that have caused
13   you to stop drinking the Jack Daniels and see what the man
14   wanted?
15 A I didn't do nothing wrong. I didn't -- I mean I just
16   wanted him out of my house. I don't think he had any
17   business in my home.
18 Q Do you remember, did your wife tell you to come out of the
19   bathroom?
20 A I think finally she did. I think so. I think that's who
21   I came out for.
22 Q Did you respond to her the first time she told you to get
23   out, come out, or did she have to repeat it?
24 A I think I was still going to the bathroom. I don't know
25   if I came out first, second, third, whatever. But I

Page 72

1   remember like he moved away from the door or something and
2   then she was at the door saying come out, it's -- they
3   want to talk to you or something. I don't know. I can't
4   remember. But I remember it was on her beckon is the
5   reason why I came out of the bathroom.
6 Q Not because of the police officer.
7 A After I was done going to the bathroom, I came out. Put
8   the whiskey back in the cupboard and I came out.
9 Q And you came out because your wife wanted you to come out,
10   not because of the police officer.
11 A Right.
12 Q Okay. How much of the Jack Daniels full fifth had you
13   drunk prior to leaving the bathroom? How much was left?
14 A I think there was only about a quarter of a bottle left or
15   so. So I -- yeah, I chugged her down pretty good.
16 Q You drank about three-quarters of a bottle of Jack Daniels
17   in the bathroom.
18 A I'd say.
19 Q Do you know how long you were in the bathroom before you
20   left?
21 A I don't know. Eight, 10 minutes, something like that. I
22   don't know.
23 Q What documents have you reviewed in preparation for this
24   deposition?
25 A I don't think -- I haven't reviewed any.

Page 73

1 Q So your answer is none.
2 A Yeah.
3 Q Had you reviewed documents during the course of your
4   criminal trial?
5 A Had I?
6 Q Had you.
7 A Yeah. I mean Mr. Schmitt had given me a copy of, you
8   know, whatever was going down and they served me with
9   papers. And I think I did -- I requested the whole like
10   police report thing from the D.A.'s office.
11 Q Had you ever -- besides the police videocam from the
12   police car, you said you reviewed that, have you ever
13   watched or listened to any other tapes?
14 A Yeah.
15 Q What other tapes have you.....
16 A I watched.....
17 Q .....listened to or watched?
18 A .....the one of in the jail.
19 Q Were you in the holding cell?
20 A I don't know what they call it. It's where they like
21   bring you in. It's kind of a big room. It's -- I don't
22   think there's -- there's no bars in there. There's just
23   mainly a garbage can, I think, and a chair and a.....
24 Q When was the last time you watched that?
25 A A long time ago.

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 74

1  Q  Have you listened to or watched any other tapes besides
2     the two now you've mentioned to me?
3  A  No.
4  Q  Have you ever -- have you read any transcripts of either
5     videotapes or other types of tapes?
6  A  Transcript.
7  Q  Where somebody typed up what was on the videotape.
8  A  Oh, yeah. Have I ever?
9  Q  Yeah.
10 A  Yeah.
11 Q  What did you -- what did you review?
12 A  I can't remember. It was before I went to trial.
13 Q  All right. So we're at that point in time where you then
14    come out of the bathroom, correct? I'd like to bring you
15    to that moment in time.
16 A  Yeah.
17 Q  You decide to come out of the bathroom.
18 A  Uh-huh. (Affirmative)
19 Q  You already put the whiskey back in the cupboard, right?
20 A  Yeah.
21 Q  And then you shut the door -- the drawer and then you
22    opened the bathroom door, right?
23 A  Yeah.
24 Q  And what do you see?
25 A  I think Peterson was like back down the hallway or

Page 75

1     something and I just walked around into like the living
2     room.
3  Q  Now at this moment in time when you're leaving the
4     bathroom.....
5  A  Yeah.
6  Q  .....do you feel any of the effects of the alcohol you
7     just drank or not?
8  A  Well, it's just kind of -- kind of like heartburn, you
9     know, because I didn't have any chaser or nothing.
10 Q  So heartburn means kind of like you had a stomach problem
11    then?
12 A  No. It was kind of like -- you know, I was kind of like
13    burping or something. You know, like belching or
14    something because I didn't have -- you know, I was
15    drinking her straight.
16 Q  What I meant by that question was were you feeling the
17    effects of alcohol in terms of your ability to walk, talk,
18    think or in any other manner. At the moment you walked
19    out of the bathroom.
20 A  At the very moment?
21 Q  Yes.
22 A  I just felt -- well, I felt warm inside and I was pissed
23    off.
24 Q  But you weren't pissed off because of the alcohol.
25 A  No. I was pissed at that guy being in my house.

Page 76

1  Q  So my question -- stay with the alcohol effects. So you
2     had heartburn.....
3  A  Yeah, I was kind of -- yeah, kind of.....
4  Q  Warm.
5  A  .....had heartburn, but I grabbed a beer and tried to
6     drink that and then he pepper-sprayed me.
7  Q  We'll get to that in a moment. From what you've told me
8     -- and if I'm wrong, tell me I'm wrong.
9  A  Okay.
10 Q  From what you've told me, you emerged from the bathroom
11    and you're not feeling the effects of alcohol in terms of
12    thinking, walking and your judgment. What you're feeling
13    is you're burping and you feel warm. Is that a true
14    statement I just made?
15 A  Yeah, but I think that's kind of the effect of alcohol.
16 Q  The feeling warm and burping.
17 A  Yeah.
18 Q  Okay. I understand that and I've listed those as effects,
19    but your judgment wasn't impaired, your thinking wasn't
20    impaired and you were able to walk all right at that point
21    when you left the bathroom, is that true?
22 A  I could walk as good as I could walk with an ankle about
23    -- you know, all swelled up. I mean.....
24 Q  Right.
25 A  .....as good as I could walk like that.

Page 77

1  Q  But if you were having trouble walking, it was due to your
2     ankle, not due to the alcohol you had just consumed.
3  A  Right.
4  Q  Speaking about how you were walking, when you were walking
5     that day at the Union Tire Shop and at Safeway and then
6     when you went from your vehicle to your house, did you
7     have any assistance in walking?
8  A  Yeah, I had a cane.
9  Q  And you used the cane the entire time I've just described?
10 A  Yeah, I think I did, yeah.
11 Q  And more specifically, so we understand each other, you
12    used the cane when you went from your truck to your house.
13 A  Yeah.
14 Q  And then was the cane with you in the bathroom?
15 A  Yeah.
16 Q  When you left the bathroom, were you using a cane?
17 A  Yeah. I had a motorcycle in my house. I used to have an
18    old motorcycle. I didn't want to leave it parked outside,
19    so I like hung it on the motorcycle.
20 Q  When you entered the house?
21 A  Yeah, I think so.
22 Q  Okay. So it wasn't with you in the bathroom.
23 A  I don't know. I can't remember. I remember hanging it on
24    the motorcycle. I can't remember if it was -- I had it in
25    there or not. I don't know. I think I had it in there.

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473        jpk@gci.net
                                                              sahile@gci.net