Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 1 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

21 (Pages 78 to 81)

Page 78

1  Q  Okay. So you could have hung it on the motorcycle.....
2  A  Well, I did hang it.....
3  Q  Let me finish the question. You could have hung it on the
4     motorcycle when you left the bathroom on your way to the
5     kitchen?
6  A  Yeah.
7  Q  All right. So you leave the bathroom, you see a police
8     office, who you now know is Frank Peterson, right?
9  A  Yeah.
10 Q  Down the hall. Did you see your wife when you left the
11    bathroom?
12 A  Yeah, I think she was there.
13 Q  Did either of them say anything to you when you left the
14    bathroom?
15 A  Peterson said something. I can't remember what he said,
16    but I remember he like backed up into the kitchen. I was
17    sitting at the table.
18 Q  You were sitting at the table?
19 A  Yeah.
20 Q  Did he have a gun drawn?
21 A  No.
22 Q  He was standing.
23 A  Yeah.
24 Q  So you left the bathroom, you went to the kitchen and you
25    sat on a chair.....

Page 79

1  A  Yeah, I think.....
2  Q  .....at the table?
3  A  .....my wife said, here, sit down over here.
4  Q  And then what happened?
5  A  Then I think I started yelling and telling him to get the
6     hell out of my house.
7  Q  Did he respond?
8  A  Yeah. He said, no, I can be in your house. I said, no,
9     you can't. Yes, I can. No, you can't.
10 Q  Did he tell you you were under arrest?
11 A  I don't think so.
12 Q  Did he offer any explanation as to why he was there?
13 A  I think he -- I can't remember exactly what he said.
14 Q  When you're at the -- in the kitchen on a chair, were you
15    starting to feel more the effects of alcohol?
16 A  Can I get some water there? Actually, can we take a
17    break? It's been an hour and a half.
18 Q  Can you just answer that last question and then we'll -- I
19    usually don't have a question pending.
20 A  What?
21 Q  The last question and then we'll take a break. When you
22    were sitting on the chair in the kitchen and you're angry
23    with the officer, were you feeling the effects of the
24    alcohol more?
25 A  Yeah, it was like trying to come back on me, so I grabbed

Page 80

1     a beer.
2     MR. KOZIOL: Okay. Why don't we take a break.
3     (Off record)
4     (On record)
5  Q  All right. Scott, I think where we were is you're at the
6     kitchen table on a chair, you're angry with the police
7     officer and you wanted him to leave. I think you said he
8     didn't really give you an explanation as to why he's there
9     and then you felt like the alcohol was coming back up on
10    you. Are you with me there.....
11 A  Yeah.
12 Q  .....in terms of that moment in time? All right. So what
13    happens next?
14 A  Well, I grabbed a beer. I had some beer sitting by the
15    fridge and I just grabbed one, started drinking it. He's
16    like, put that down. I'm going, "F" you, you're in my
17    house. I'll drink whatever the hell I want.
18 Q  So he told you to put it down before you started drinking
19    it.
20 A  Yeah. I think. Yeah, he did. Put that down. I'm like
21    screw you, buddy. My house. I can drink when I want.
22 Q  Did your wife say anything before you started drinking?
23 A  I don't think so.
24 Q  So you don't remember her saying put it down, Scott?
25 A  No.

Page 81

1  Q  All right. Before you started drinking did he tell you
2     what he was going to do if you didn't put it down?
3  A  I think. Yeah, I think he said I'm going to squirt you.
4  Q  Did he say pepper-spray you?
5  A  I don't know. I said get the hell out of my house.
6  Q  If he said squirt you, did you take that to mean some type
7     of.....
8  A  Yeah.
9  Q  .....device that was going to be sprayed in your face?
10 A  Yeah, I think so.
11 Q  So you have a police officer telling you, in effect, I'm
12    going to spray you with something if you don't put that
13    beer down. Why did you drink the beer?
14 A  Because I was in my house and I thought he had no right to
15    be in my house or to tell me what to do in my house.
16 Q  Did you expect he would spray you then as he said if you
17    drank?
18 A  Not really.
19 Q  You thought he was kidding.
20 A  Well, I don't know. Maybe I was thinking maybe I would
21    have stopped him. I don't know.
22 Q  Stopped him from pepper-spraying you? Yes?
23 A  Yeah.
24 Q  All right. So you started drinking the beer. You don't
25    remember whether your wife said anything. What happened

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 2 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

22 (Pages 82 to 85)

Page 82

1 next!?
2 A  I drank a portion of it and he pepper-sprayed me.
3 Q  Did you try to stop him?
4 A  I don't think so. I just called him a name and then I
5    tried to -- then I drank some more and then he like
6    swatted it out of my hand or something.
7 Q  So he told you not to drink the beer or he'll squirt you,
8    you drank some of the beer, he pepper-sprayed you, and
9    then after being pepper-sprayed you continued to drink the
10   beer.
11 A  Uh-huh. (Affirmative)
12 Q  Why did you do that?
13 A  I don't know. That stuff is nasty, pepper spray.
14 Q  Trying to wash it down?
15 A  Wow, it was -- I don't know. I was -- after being
16   pepper-sprayed I was really P.O.'d, man. I'll tell you,
17   that stuff I don't think is made to calm you down. It
18   just lit me on fire.
19 Q  But your first response was to continue to drink the beer.
20 A  Yeah.
21 Q  How is that consistent with being P.O.'d? Because you
22   were showing him you weren't going to respond to his
23   pepper spray.
24 A  Uh-huh. (Affirmative)
25 Q  Now up to the point where you first drank the beer, to

Page 83

1    that moment in time before you started drinking the beer,
2    did the officer give you any indication that he was
3    arresting you and he was arresting you for DWI?
4 A  I don't know. I can't remember.
5 Q  If the officer advised you of that, don't drink that beer
6    because you're under arrest for DWI, would you have
7    understood why he was telling you not to drink the beer?
8    Would you have understood why he gave you that command?
9    MR. HERZ: Objection to the form of the question, vague.
10   Is your question directed to does he understand it now or would
11   he have understood it then?
12   MR. KOZIOL: Good point. I'll rephrase it.
13 Q  If you had heard him say then at that moment in time
14   before you drank the first swig of the beer you're under
15   arrest, Mr. Brown, for DWI, don't drink that beer or I'm
16   going to pepper-spray you, would you have understood why
17   he was telling you that?
18 A  No. I don't know.
19 Q  Do you understand now.....
20 A  Yeah.
21 Q  .....why he would have told you that?
22 A  Yeah, because they tried to say it was like wrecking
23   evidence or something. Yeah, then you could say -- I
24   don't know. It was, I don't know, wrecking -- ruining the
25   evidence.

Page 84

1 Q  You understand that, how it would ruin the evidence.
2 A  Yeah.
3 Q  But you didn't understand it then.
4 A  No.
5 Q  Okay. So you continued to drink the beer after he
6    pepper-sprays you. What happens next?
7 A  He swatted it out of my hand, pepper-sprayed me. He got
8    me really good that time. I was like -- I think he was
9    trying to cuff me up and I was trying to wash that shit
10   out of my eyes in the sink in the kitchen and there was
11   beer splattered all over the floor.
12 Q  Did the bottle break?
13 A  I don't think so. I know my table got broken.
14 Q  Let me ask you this. Because you were trying to wash the
15   pepper spray out of your face, were you then not
16   cooperating with him handcuffing you?
17 A  Yeah, and plus -- I mean this elbow had an operation on
18   it, too. You know, I'm a pretty big guy and it's -- you
19   know, to get my arms to go back like that is pretty hard.
20   Yeah, I think I was -- yeah, I wanted my hands to wash
21   that -- you know, wash the pepper spray out of my hands,
22   but I never got a chance. Well, I did. I was in the
23   sink, I remember, in the water and trying to spit my
24   Copenhagen out and stuff. Then we were on the floor and
25   this other officer came in there and jumped right in the

Page 85

1    middle of my back, grabbed me by the hair and squirted
2    that shit right up my nose and down my throat.
3 Q  Was it pepper spray?
4 A  I don't know if it -- it was pepper spray, I think. But,
5    I mean, that guy got me, I mean, up the nose and down the
6    throat, you know. I mean, yeah, I was lit up.
7 Q  Did you learn that officer's name was Holden?
8 A  Yeah, finally, yeah. I keep forgetting his name.
9 Q  But we can call him Holden at this point, right?
10 A  Yeah.
11 Q  The second officer then pepper-sprayed you when you were
12   on the ground.
13 A  Yeah, he illegally entered my house, too, and
14   pepper-sprayed me.
15 Q  Before the other Officer Holden pepper-sprays you, if I
16   understood you correctly, you're resisting Peterson
17   handcuffing you to the rear because you want to have your
18   face washed in the sink. You're trying to wash your face
19   in the sink, right?
20 A  I think so.
21 Q  Before you got pepper-sprayed by Officer Holden, am I
22   right, you weren't handcuffed at that point by Peterson,
23   you were still struggling?
24 A  Yeah, I think he was like struggling, trying to get the
25   handcuffs on or something and I was more interested in

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Page 86

1   getting that stuff out of my eyes. I've had five eye
2   operations.
3  Q  On which eye?
4  A  Both.
5  Q  Both?
6  A  Yeah.
7  Q  For what?
8  A  I was cross-eyed. Cross-eyed and something else with my
9   cornea. That's why my eyes are full of scar tissue. They
10  always have kind of a watery, red appearance.
11 Q  But I mean because of the five operations were you
12  concerned about your eyes?
13 A  I don't know if it was five. I think it was three
14  operations and I was five. I don't know. But I know I
15  had eye operations as a young child.
16 Q  But what's your relationship between your eye operations
17  that you're telling me and your having been pepper-sprayed
18  or are you telling me that?
19 A  It was in my eyes.
20 Q  So were you worried about your eyes because you had the
21  operations earlier in life?
22 A  My eyes are really sensitive.
23 Q  So you think maybe your eyes are more sensitive to pepper
24  spray than other people's eyes?
25 A  I don't know what other people feel like, but I know what

Page 87

1   I felt like.
2  Q  All right. So then Holden pepper-sprays you when you're
3   on the ground as Peterson is trying to handcuff you. What
4   happens after that?
5  A  I don't know. That's kind of a blur after that. Well, I
6   know that -- well, I was pretty shook up. I mean, yeah, I
7   was pissed. I was blowing snot out my nose and they
8   ripped my clothes off. They broke my table.
9  Q  Do they handcuff you to the rear when you're on the ground
10  in the kitchen?
11 A  To the rear? I think so, yeah. I had bruises all over
12  me. Yeah, they took care of me.
13 Q  Prior to them handcuffing you, do you recall ever
14  mentioning I've got a bad arm or elbow.....
15 A  Yeah.
16 Q  ......or something?
17 A  Sure.
18 Q  You remember that?
19 A  Yeah.
20 Q  Where were you when you said that?
21 A  And my wife also said it, too.
22 Q  Let's talk about you. Where in the sequence of events
23  prior to getting handcuffed did you say that to them?
24 A  I'm like -- I said -- I just said -- I don't know. I
25  can't remember where in the sequence. It's been too long.

Page 88

1  Q  But before you were handcuffed you also remember your wife
2   saying that?
3  A  I'm like, ahh, my elbow, ahh.
4  Q  And you say you also remember your wife saying that, too?
5  A  Yeah, my wife said something about it. Something about
6   double-cuff him or something. You know, so your arms are
7   spread out a little farther apart in the back.
8  Q  She was recommending that?
9  A  (No audible response)
10 Q  Yes?
11 A  But they didn't give a shit.
12 Q  They didn't do that. They didn't double-cuff you.
13 A  No. No, they didn't.
14 Q  All right. So you're on the floor of your kitchen and you
15  are now finally handcuffed to the rear, right?
16 A  And pepper-sprayed twice.....
17 Q  Right.
18 A  .....or three times.
19 Q  Twice by Peterson, once by Holden.
20 A  Right.
21 Q  Now what's the effect, if any, of the alcohol at this
22  point?
23 A  I was pretty lit up by that pepper spray. I was -- I
24  think I was starting to feel it. I was kind of dizzy and
25  a little disoriented. I don't know if it was the alcohol

Page 89

1   or the pepper spray or the slamming around.
2  Q  Well, let me ask you the broader question then. You drank
3   three-quarters of a fifth of Jack Daniels, right?
4  A  Yeah, about.
5  Q  At any point thereafter did you consider yourself drunk?
6  A  At any point?
7  Q  Yeah.
8  A  Yeah.
9  Q  When? When would you say you think you were drunk?
10 A  I'd say, you know, it -- I mean it hits you pretty quick
11  when you drink that much. I don't know exactly how many
12  minutes.
13 Q  Well, let me ask you this way. Scott, do you think you
14  were drunk while you were in the kitchen?
15 A  Yeah, I think by the time I got up I was feeling it. I
16  was feeling alcohol. I was feeling pepper spray.
17 Q  Okay. But, again, the question was drunk. Do you feel
18  you were drunk when you were in the kitchen? Not feeling
19  alcohol. That wasn't my question. The question was
20  drunk. Do you feel you were drunk when you were in the
21  kitchen?
22 A  What do you mean, legally drunk or just -- I don't know.
23  I was.....
24 MR. HERZ: And my objection is when you say in the
25  kitchen, are we going to put a time period?

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473         jpk@gci.net
                                                                sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 4 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

24 (Pages 90 to 93)

Page 90

1 MR. KOZIOL: No.
2 MR. HERZ: At any time in the kitchen.
3 MR. KOZIOL: Yeah, that's right.
4 Q Let me ask the question again. Do you know what the word
5   drunk means?
6 A Yeah, when you start feeling alcohol or over the legal
7   limit. Is that drunk? When is drunk?
8 Q What is your definition of drunk? It's a commonly used
9   term. What is your definition of drunk?
10 A I think when you get the warm, fuzzy feeling, you know.
11 Q And part of it, it's unsafe to drive, right?
12 A Yeah. I mean, yeah.
13 Q Okay. With that definition, Scott, that warm, fuzzy
14   feeling and it's unsafe to drive, at any time you were in
15   the kitchen before they took you out of the kitchen and
16   away from your house did you feel you were drunk?
17 A Yeah.
18 Q Do you think you were drunk when you ignored the police
19   officer's statement don't drink that beer or I'll
20   pepper-spray you and then you started drinking the beer?
21   Do you think you were drunk then?
22 A I was definitely feeling it.
23 Q Warm and fuzzy?
24 A Yeah.
25 Q And it wouldn't be safe for you to have driven then,

Page 91

1   right?
2 A No. Not after drinking what I drank.
3 Q By your definition, you were drunk at that moment in time,
4   right?
5 A Yeah, yeah. But my ankle still hurt.
6 Q Let's continue the chronology of events. They get you
7   handcuffed to the rear. What happens after that?
8 A You know, I don't even think they read me my rights. I
9   don't even think they did.
10 Q Okay. So you're telling me what didn't happen. Tell me
11   what happened.
12 A Well, they tore me out of my house with my clothes falling
13   down, you know. There's people out there, neighbors and
14   stuff. I'm like, hey, my pants are falling down, my pants
15   are falling down. Then my wife says my pants are falling
16   down, so they let -- they stopped like midway down the
17   deck and I remember my wife pulling my pants back up. You
18   know, they ripped all the button holes loose. I think
19   they did that when they lifted me off the ground or
20   something. I don't know how they did it.
21 Q Okay.
22 A But they were button-fly Levis and all the holes got all
23   ripped out of them.
24 Q All right. So they're taking you out, you're on the deck,
25   they pull your pants up. Then what happens?

Page 92

1 A Well, yeah, after I said something. I mean they didn't
2   give a shit. They were just going to take me out of the
3   house in front of God and everyone with my, you know,
4   pants around my ankles.
5 Q Your pants had slid down to your ankles?
6 A Yeah, they were -- yeah, they were -- I mean, you know,
7   you could see my underwear and everything. It was pretty
8   embarrassing.
9 Q Did anybody besides the police officers and your wife and
10   you see that your pants were down.....
11 A Yeah.
12 Q .....by your ankles?
13 A It was neighbors and stuff, you know.
14 Q What neighbors saw your pants down?
15 A I don't know which ones. There was people standing out on
16   the street. Hell, there was an ambulance, paramedics, a
17   couple cop cars. I mean it was like Waco or something up
18   there. I don't know.
19 Q All right. So your pants are pulled back up. What
20   happens next?
21 A They -- he like, you know, tried to get me in the car.
22   Well, I've got a bad knee and a bad ankle, so, you know, I
23   couldn't maneuver. And, you know, my hands are behind my
24   back. I couldn't maneuver. So then they just said piss
25   on it and they just threw me in the back. I remember my

Page 93

1   head like riding in this wheel well thing all the way down
2   to the police station. They just basically threw me in
3   there like a sack of crap.
4 Q You said you were having difficulty getting into the back?
5 A Yes.
6 Q Why was that?
7 A Because my ankle was all -- you know, it was painful to
8   walk and my hands were behind my back.
9 Q Scott, you had indicated.....
10 A I'm not that flexible and kind of big, so they just -- you
11   know, I think they were pissed off having me anyway and
12   they didn't give a shit and they just threw me in there
13   like a piece of shit.
14 Q You had indicated that -- by your actions that you weren't
15   going to follow Frank Peterson's order not to drink the
16   beer, you took the pepper spray once and then you continue
17   to drink the beer and then you took the pepper spray
18   again, and then you indicated to me that you were really
19   pissed off at that, you weren't cooperating with the
20   handcuffing to the rear and then you got pepper-sprayed
21   again. Were you continuing to be non-cooperative with the
22   police after they handcuffed you as you were
23   non-cooperative before they handcuffed you? That is, were
24   you resisting what they wanted you to do?
25 A Yeah, because I felt they had no right to be even near me.

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 5 of 19

SCOTT BROWN
Vol. 1
1/16/2007
BROWN v. PETERSON, et al.,
A05-0002 Civil

25 (Pages 94 to 97)

Page 94

1  Q  So you were resisting them trying to get you.....
2  A  As much as I.....
3  Q  Let me finish the question. Resisting them trying to get
4     you in the police car, right?
5  A  No, I wasn't resisting. I wasn't resisting trying to get
6     in the police car.
7  Q  What were you doing?
8  A  I couldn't maneuver, I guess, the way they thought I
9     should be able to maneuver, so they just threw me in the
10    back.
11 Q  Were you cooperating and trying to get in the police car
12    or not?
13 A  Yeah. As I remember, I was, but, you know, I'm not that
14    flexible. I got a, you know, screwed up ankle and my
15    hands are behind my back. I mean how much balance and
16    stuff do you have. I mean, yeah, I couldn't -- I guess I
17    couldn't do what they wanted me to do.
18 Q  Can you describe for me what you think they wanted you to
19    do?
20 A  They wanted me to get in the police car.
21 Q  And so you couldn't like easily bend down?
22 A  I guess I didn't get in there fast enough for them or
23    something. I don't know.
24 Q  Were you trying to walk slowly as opposed to a normal
25    walk?

Page 95

1  A  No. I couldn't hardly walk. I mean, you know, my ankle
2     was that big around. Have you ever had a sprained ankle?
3  Q  I can't answer questions.
4  A  Well, you can't walk very good. It's painful.
5  Q  Do you remember which ankle it was, right or left?
6  A  You know, I really can't at this point.
7  Q  So you're in the police car and you say you're in kind of
8     like the -- you're not in the back seat, you're in between
9     the back seat and whatever device the back seat from the
10    front seat?
11 A  I think they -- yeah, I don't know how they did it. Maybe
12    they folded the seat down. It's like a Ford Explorer or
13    something, you know, their vehicle. It was like plastic
14    or rubber or something. I don't know. You know, it was
15    dark by that time and stuff. Hell, I couldn't see anyway
16    because I'm full of pepper spray. You know, I mean, I can
17    see a little bit, but it's all watery and blurry, you
18    know. I don't know. I know you've never been sprayed,
19    but you can't see hardly.
20 Q  Do you think that contributed to your difficulty in them
21    getting you into the squad car because you couldn't see?
22 A  Sure. I mean when you can't see, you know.
23 Q  All right. And you say.....
24 A  And, plus, I mean you're on fire. I mean my throat was on
25    fire, inside my nasals was on fire. Because that last

Page 96

1     guy, Holden, he jumped -- he reefed me back by the hair
2     and squirted that shit right down my throat. You know,
3     that's basically what I told Peterson after he squirted me
4     the first time, I think. I told him, boy, I'd like to ram
5     that shit down his throat and took another drink.
6  Q  I take it the pepper-spraying -- the pepper spray was
7     causing you pain, right?
8  A  Yeah. And that, I mean, yeah. It really -- it -- I mean
9     it lit a fire under me. I felt like -- not killing them,
10    but I felt like beating on them, you know, but I didn't.
11 Q  Was it causing your body to move in pain when you had the
12    pepper spray? I mean were you trying to somehow.....
13 A  Well, sure. I mean, you know, you want to rub it, get it
14    -- I mean it's -- I think it's a pretty normal reaction,
15    you know.
16 Q  Were you at all trying to rub your face on the police
17    officers as they walked you because they were the closest
18    to you as you were walking?
19 A  I don't know. I think I was probably trying it on my
20    shirt and stuff.
21 Q  All right. So they put you in the police car. Anything
22    happen of significance on the ride in the police car to
23    the police station?
24 A  No.
25 Q  No conversation?

Page 97

1  A  No.
2  Q  Do you know who drove you there, which officers?
3  A  No.
4  Q  All right. So you get to the police station and then what
5     happens?
6  A  They.....
7     MR. HERZ: Continuing objection to relevance.
8  A  .....hauled me out of the car, brought me into this little
9     room.
10 Q  Who was it, do you remember? Was it more than one
11    officer?
12 A  Yeah.
13 Q  Was it the same two officers, Holden and Peterson?
14 A  I don't know.
15 Q  And they put you in the.....
16 A  You know, I couldn't see very good and they -- yeah, they
17    put me up against a wall and took the handcuffs off.
18 Q  And you're in this interview room or holding cell, right?
19 A  Yeah, and I don't remember bars being in there. I just
20    remember like a chair and a trash can and a breathalizer
21    thing.
22 Q  And this is the room that you saw the videotape of.
23 A  Yeah.
24 Q  Okay. Remember how long that videotape lasted and how
25    long you were in that room?

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax     907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 6 of 19

SCOTT BROWN
Vol. 1
1/16/2007
BROWN v. PETERSON, et al.,
A05-0002 Civil

26 (Pages 98 to 101)

Page 98

1  A   No.
2  Q   What did you think of yourself on the videotape?
3  A   What did I think of myself?
4  Q   Let me withdraw that question. It was a bad question.
5      All right. What happened after you were in that interview
6      room holding cell? I don't know what the right label is,
7      so I'll just call it both.
8  A   I told them pretty much at that point, I just go, hey,
9      boys, take me home, I'll forget all about 'er. Probably
10     10 times. You know, I told them, hey, these guys broke
11     into my house. There was a state policeman there.
12 Q   Are we still.....
13 A   Well, I think the first thing I wanted was to talk to a
14     lawyer.
15 Q   And they describe what's happening on the videotape?
16 A   As far as I can remember. I mean it's been a long time
17     since I've seen the video.
18 Q   Right.
19 A   I looked pretty pissed off in that video though.
20 Q   Do you think you look drunk too in the video?
21 A   I think I looked really mad.
22 Q   That wasn't my question. Do you think you looked drunk
23     too or not?
24 A   Well, yeah, drunk and pissed and squirted with pepper
25     spray.

Page 99

1  Q   Did the police officers assist you in washing your face
2      off?
3  A   Yeah. They gave me like a -- they had squirted me in the
4      face with a bottle, then I had a shirt that was all
5      covered with pepper spray already to wipe my face off on
6      my own shirt, I think.
7  Q   So you put more pepper spray on your face with that shirt?
8  A   Yeah, basically.
9  Q   When did that happen in our sequence of events that they
10     gave -- that they were spraying your face?
11 A   After that. You know, at first I was -- you know, I was
12     -- well, it was after I had calmed down a little bit.
13 Q   I guess my question was, did they wash your face before
14     you got into that room with the videotape going?
15 A   No.
16 Q   Was it afterwards then?
17 A   Yeah, I think so, after they -- I think it was after they
18     uncuffed me.
19 Q   Were you cuffed in the video room, on the videotape, do
20     you remember?
21 A   I think they uncuffed me and then sat me down in a chair
22     or something.
23 Q   Okay. So your face had been washed at that point even
24     though you say it was somewhat ineffective because you
25     were still wiping with your shirt.

Page 100

1  A   Well, yeah, I still couldn't -- it was all blurry. Every
2      breath was burning, my nose was burning, I was belching
3      that stuff up, that pepper spray, because it, you know,
4      went right down my throat and everything.
5  Q   Did they want you to do -- breathe in their breathalizer
6      machine?
7  A   Yeah.
8  Q   And did you refuse at first? Do you remember that?
9  A   I blew in that thing like I don't know how many times. A
10     bunch of times.
11 Q   You don't remember refusing at first to blow?
12 A   Well, I wanted to talk to an attorney, I remember. I
13     didn't like refuse.
14 Q   At any point in time before you got to the police station
15     were you told that you were under arrest and for what?
16 A   I can't remember. And I can't remember them ever reading
17     me my rights either.
18 Q   All right. So did you get moved from this holding cell
19     interview room at some point?
20 A   Yeah.
21 Q   Where did you go?
22 A   To a little cell.
23 Q   How long were you there?
24 A   Like till the next morning.
25 Q   Then what happened?

Page 101

1  A   They released me. I wanted to see the judge, but they
2      released me without paying bail or anything.
3  Q   Okay.
4  A   And they gave me a Percocet, too.
5  Q   When?
6  A   After they booked me in because, you know, my ankle, it
7      was just -- it was still terrible pain.
8  Q   Did you tell them you needed the Percocet?
9  A   Yes.
10 Q   Do you know, did an officer go to a physician and get the
11     Percocet for you?
12 A   Yeah.
13 Q   Do you know who that was?
14 A   I don't know who it was. But they did -- I believe they
15     brought me like six pills and I took them two at a time. I
16     believe when I left I had two left. You know, I couldn't
17     -- if I was so drunk, why were they giving me Percocet or
18     allowing me to have Percocet, you know, after I thought
19     about that. I figured maybe they didn't care if I lived
20     or died.
21 Q   I'm going to shift the topic, Scott, to your damages in
22     this case, okay. I might return to some of these facts
23     we've gone over, but I just want to move the topic away
24     from the events of that particular day. Your attorney
25     gave me some initial disclosures and under categories of

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 7 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

27 (Pages 102 to 105)

Page 102

1  damages one of the categories he listed that you're
2  claiming is non-economic damages, pain and suffering,
3  humiliation. Okay. I want to understand those
4  non-economic damages. We'll get into the economic
5  damages, which means, you know, the money you paid the law
6  firm to do the criminal case.....
7  A  Right.
8  Q  .....and any other type of out-of-pocket losses, but I
9  want to start with the non-economic damages. He's
10 asserting that you're asserting pain and suffering and
11 humiliation. So let me ask you some questions about that.
12 Your position, as I understand it, is the police officer
13 never should have entered your house, right?
14 A  Yeah. I feel he had no right to be there.
15 Q  Can you describe for me in your own words the pain and
16 suffering and humiliation you felt after he entered the
17 house all the way up to the present even. I'd like you to
18 summarize your pain and suffering and humiliation claim.
19 A  Well, of course, I mean my knee -- or my ankle was already
20 hurt. I was under a physician's care for that. I had
21 already had numerous surgeries on my right knee, which was
22 painful and, you know, I mean they hurt both my knee and
23 my ankle, you know, wrestling me around and rough-housing
24 me. Then, you know, it was in front of my son and in
25 front of my wife in the house. You know, it was just kind

Page 103

1  of an ugly scene, you know. And then bringing me out of
2  the house with my clothes falling off. I mean when they
3  cuffed me up, you know, they -- I mean they showed no
4  mercy at all with that pepper spray and the way they
5  cuffed me up. I mean I had bruises on both shoulders, the
6  backs of my arms. They certainly didn't do my ankle or my
7  right knee any good. And then, you know, just the whole
8  thing of being in jail and being strip-searched. I mean
9  all that is really intimidating. And then, you know, it's
10 a small town. Everyone knows. I mean, you know, by the
11 next day everyone knows and you've got to explain it 100
12 times. You know, and then the court, the stress of going
13 to court after the DWI was thrown out because it was a
14 violation of my rights. And then come -- I mean I'm 40
15 years old, knowing I didn't do anything wrong. Now they
16 bring me to court. I'm facing two felonies and a
17 misdemeanor and this stuff is dragging on for a year, you
18 know. You know, I'm 40 year -- I was 40 years old and I
19 know I never did anything wrong and, shit, they're trying
20 to give me a felony. Well, you know, I'm thinking of, you
21 know, what if, you know, they prove me guilty or whatever.
22 I mean it was very, you know, stressful and it cost me a
23 lot of money with the lawyer. A lot of time off from
24 work. And it continues to this day. I mean I got hurt at
25 work October 15th. Tore the cartilage in my left knee.

Page 104

1  Well, you know, Workman's Comp doesn't pay that good, but
2  yet I continue to pay this law firm because they have a
3  lien on my truck. So far they haven't charged me any
4  interest because, you know, I kept paying them. At first
5  I was paying them 500 a month, but we dropped it down to
6  half that, 250 a month. You know, they're putting a
7  strain on my finances. I mean, you know, that happened
8  from the very first time I had to give Mr. Schmitt 500
9  bucks, you know. As soon as it turned into a felony
10 thing, he wanted $10,000. So then I had to give him the
11 title to my truck. He filed -- they still hold the lien
12 on my truck.
13 Q  Which truck?
14 A  The gold flatbed.
15 Q  I didn't mean to interrupt you. Go ahead, keep going in
16 terms of your damages.
17 A  I mean even like now, you know, it's kind of stressful,
18 you know. I've got to be away from home, got to be here
19 under the whole heat lamp, you know, answering questions
20 and stuff, you know. Still got another whole bunch of
21 court or whatever to go through. It is. It's just --
22 it's a real -- it's a stressful thing to me. And, you
23 know -- I mean they hurt me and not only -- and I think I
24 know -- I knew they were wrong because why didn't they
25 print it in the newspaper and why wouldn't they let me see

Page 105

1  a magistrate? Why did they let me out of jail without
2  posting bail? They didn't want me near a judge is what I
3  think because I think they knew they were wrong. Well, in
4  the same trial my brother, the one for the DWI, I never --
5  you know, I was acquitted. My brother got perjury against
6  him. I mean he was stupid. He was -- you know, he was --
7  I don't know. He said he never took nothing out of the
8  truck, but he did. He took that, you know, the beer out
9  of the truck. Yeah, he perjured himself, but so did the
10 police and so did the D.A. And, you know, I think they
11 kind of took it out on my brother, you know. It's like,
12 well, we couldn't get him on that one, so we'll just get
13 his brother.
14 Q  Anything else?
15 A  Well, you know, yeah. I feel that I had to have a surgery
16 on my knee. I had it later, January, February. I think
17 they damaged my knee. The last time I had it worked on --
18 Workman's Comp won't do anything else with my knee because
19 it was 10 percent disabled in the military and I think
20 it's had five surgeries on it. I've lost track. But the
21 last one they did they got a cadaver, a piece out of a
22 cadaver and kind of screwed it in that knee. I think they
23 helped damage that knee beyond repair. It's never going
24 to get better. It's only going to get worse. Eventually
25 I'm going to have to have this knee replaced. I believe

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

Page 106

1    with their, you know, rough handling of me they helped
2    damage that knee.
3  Q  Anything else or have we covered it?
4  A  That's all I can think of right now.
5  Q  You indicated when you were in jail you felt you were
6    intimidated and humiliated, is that right?
7  A  Yes.
8  Q  Was that the entire time you were in jail?
9  A  Yeah. Well, they had a camera right on me and everything,
10   you know.
11 Q  Does that show that you were -- you were feeling
12   intimidated and humiliated when they had the camera on
13   you?
14 A  Yeah. I mean -- yeah, I mean, you know, they're watching
15   every move. You go to the bathroom, there's the old
16   camera and it's a female jailer out there. You know,
17   yeah, it was intimidating.
18   MR. HERZ: I'm going to interpose an objection regarding
19   the use of the term jail as being vague and there's no time
20   frame here. As opposed to the interview holding room. I
21   mean.....
22 Q  Do you understand what jail means?
23 A  Yeah. The one with the bars, the little cubicle. Well,
24   the whole thing is a jail. I mean it's the police
25   station.

Page 107

1  Q  From the moment you arrived at the police station until
2    the moment you left and you were a free man.....
3  A  Yeah.
4  Q  .....you're claiming you were humiliated and intimidated
5    during that entire time period, is that true?
6    MR. HERZ: Objection to the compound nature of the
7  question.
8  A  Yeah, I think to begin with the whole thing was wrong from
9    the very start.
10 Q  So you were humiliated and intimidated from the very entry
11   of the police officer into your home all the way to when
12   you were released from custody, is that what you're
13   saying?
14 A  Yeah. And, you know, still kind of intimidated. I mean
15   they've given me several parking tickets and stuff. I
16   mean I can't even park my truck in front of my house. I
17   have to park it like off the road. I had a camper. You
18   know, they've been kind of like harassing me with parking
19   tickets and stuff. There's a police officer that moved in
20   right across the street. That's kind of when all the
21   parking ticket thing started.
22 Q  I want to talk about the damage -- your damaged right
23   knee. Now, how many surgeries on that right knee did you
24   have before January 4th, 2003?
25 A  I want to say three, I think.

Page 108

1  Q  How many after?
2  A  Two.
3  Q  Did you just have a recent surgery on your right knee?
4  A  No, left one.
5  Q  Left one. Let's stay with the right knee. I take it,
6    Scott, you're not -- correct me if I'm wrong. You're not
7    in a position because you're not qualified to state
8    whether there was any permanent damage to your right knee
9    as a result of this arrest and this incident with these
10   two police officers. You don't know that because you're
11   not qualified to say that. Is that a correct statement?
12 A  I know it hurt after that. So I feel they damaged it
13   somehow.
14 Q  You felt pain.
15 A  Yes.
16 Q  But whether there was any mechanical damage to the right
17   knee, something.....
18 A  Well, I'm not a doctor, but I feel the pain.
19 Q  I understand. Now my question to you is have you ever
20   talked -- have you ever stated to any health care
21   provider, any health care provider, that you think your
22   right knee was damaged as a result of this incident with
23   the police? Ever made that statement to any of them?
24 A  I don't think so.
25 Q  Do you believe that your right knee was mechanically

Page 109

1    damaged, permanently damaged as a result of this incident?
2  A  I think it did sustain some damage because I felt pain in
3    it.
4  Q  If you believed that or felt that, why didn't you ever
5    mention that to one of your physicians in order to see
6    what they thought?
7  A  Because it was kind of -- you know, I don't like going
8    around saying I was arrested and slammed around by cops
9    and stuff because it's embarrassing to me.
10 Q  But this lawsuit is quite public, isn't it?
11 A  Yeah, it's -- yeah, it is, but how else am I going to get
12   my money back?
13 Q  Well, if this lawsuit is public, why would you not want to
14   talk to your physicians and mention the lawsuit and
15   mention your theory that your right knee was permanently
16   worsened as a result of this incident?
17 A  I thought I already answered that.
18 Q  All right. And your answer is the same, that it was too
19   embarrassing.
20 A  Yeah, it's embarrassing. I mean being in trouble and
21   wrestling around with cops is a bad thing, yes? I mean
22   that's how I was -- that's how I was grown up to believe.
23 Q  Why is it a bad thing if you're innocent?
24 A  Well, it's still embarrassing.
25 Q  So am I right, no physician that you know of has ever told

Computer Matrix, LLC                Phone - 907-243-0668
310 K Street, Suite 200             Fax     907-243-1473           jpk@gci.net
                                                                   sahile@gci.net

**Page 110**

1  you that as a result of this.....
2  A  No, because I never told them.
3  Q  Let me just finish the question. Has told you that as a
4     result of this incident there's been some damage to your
5     right knee? Is that a true statement? No physician or
6     other health care provider told you that.
7  A  No, because I never told them.
8  Q  And you never read it anywhere either, right?
9  A  I never wrote it down.
10 Q  The other part of your body that you said was hurting was
11    your ankle?
12 A  Yeah, ankle and my elbow, too.
13 Q  Let's stay with your ankle. I think you told me you don't
14    remember which ankle, right? It was hurting at the time
15    of this incident.
16 A  Yeah.
17 Q  I take it there was no permanent damage to that ankle that
18    you're asserting in this lawsuit because you don't even
19    know which ankle.
20 A  I don't know. Well, I've had -- I've twisted both ankles,
21    but that particular one I remember the doctor saying it
22    looks like you've got a hairline fracture there or
23    something in that ankle. You know, it seemed like I knew
24    which ankle it was a month ago. It's like trying to bring
25    up a name that's on the tip of your tongue, but I can't

**Page 111**

1  remember for sure.
2  Q  When did some doctor tell you you had a hairline fracture
3     of one of your ankles?
4  A  Well, in an x-ray.
5  Q  Before or after this incident?
6  A  It was before.
7  Q  So let's talk about that. That was Dr. Creelman?
8  A  Yeah.
9  Q  How much prior to this incident, January 4th, '03, did you
10    see Creelman where he told you you had a hairline fracture
11    of your ankle?
12 A  I think it was -- I think it was like Christmas Eve or
13    something when I did it, when I twisted it.
14 Q  How did you do it Christmas Eve?
15 A  I stepped like in a hole, in a hole under the -- you know,
16    there was like a hole under the snow and I stepped in it.
17 Q  Did you file a Work Comp claim over that injury?
18 A  No.
19 Q  You weren't working at the time?
20 A  I don't know. No.
21 Q  All right.
22 A  But I did miss work.
23 Q  Did you see Dr. Creelman for this ankle problem after the
24    incident?
25 A  I don't know. I don't know.

**Page 112**

1  Q  I take it you don't remember seeing anyone even beyond
2     Dr. Creelman for this ankle problem after this incident
3     with the police.
4  A  Well, I've been there because of an ankle, but I don't
5     know if it was the same ankle that I injured, but I've
6     hurt my ankle since then. You know, when you twist an
7     ankle, they take a while to get over. They're really weak
8     and real susceptible to being twisted again.
9  Q  Has this ankle, whichever ankle it was that you said got
10    aggravated as a result of the police incident, has that
11    healed?
12 A  Yeah, I think it's healed. I mean, you know, I've twisted
13    it since then. I mean I don't know because I've twisted
14    both ankles. I can't remember which one it was exactly.
15 Q  Did you say you hurt your elbow as a result of this police
16    incident?
17 A  Yes.
18 Q  Had you had surgery prior to this incident on your elbow?
19 A  Yes.
20 Q  How many surgeries?
21 A  Just one.
22 Q  How much prior to the incident?
23 A  What do you mean?
24 Q  The surgery, how much prior to the incident, before the
25    incident?

**Page 113**

1  A  I don't remember how much prior. But what they did, I had
2     the bursa, it's like a cushion on your elbow, I ruptured
3     that. That was a Workman's Comp. A wrench broke and my
4     elbow hit the rack or something.
5  Q  Have you had any surgeries to your elbow after the
6     incident?
7  A  No.
8  Q  Do you recall going and getting any medical treatment
9     after this incident of January 3rd, 2004 at all for any
10    injury related to the incident?
11 A  Yeah, for my knee. For my knee.
12 Q  Who did you go see and when?
13 A  Dr. Panzarella. I can't remember the exact dates and all
14    that.
15 Q  Was it.....
16 A  It was after.
17 Q  Was it days, weeks or months after?
18 A  I don't -- I can't remember.
19 Q  And that was for the right knee.
20 A  Yeah.
21 Q  But you didn't tell Dr. Panzarella that you think it's
22    related to this police incident, true?
23 A  True, because I think what happened -- well, yeah, I felt
24    pain in it after, you know, what happened with the police
25    and stuff. But then later I think -- I believe I was

Computer Matrix, LLC　　　　　　　Phone - 907-243-0668
310 K Street, Suite 200　　　　　　Fax　　907-243-1473　　　　　jpk@gci.net
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 10 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

30 (Pages 114 to 117)

**Page 114**

1 pushing in a car or something and something popped in it.
2 So then it was a Workman's Comp thing. Anyway, the last
3 surgery -- Workman's Comp, they won't pay for this knee no
4 more because they said it was all due to the wear and tear
5 on it and stuff because it was damaged when I was in the
6 military and they cut out my ACL. I tore the ligament and
7 back then they didn't repair them. They just cut it out.
8 Q From what you've just told me, am I right, you said after
9 this police incident you had some pain in your right knee
10 but you never went to see Dr. Panzarella or.....
11 A Well, I.....
12 Q Let me finish the question. Never went to see
13 Dr. Panzarella or anyone else until you injured that right
14 knee by pushing that vehicle, is that right, and heard
15 something pop. Did I make a true statement?
16 A I'm not sure. I may have because Dr. Panzarella, I think
17 he operated on this knee like three times, so I was seeing
18 him like, you know, a lot. I don't know if I seen him
19 before the last -- you know, when I hurt it at work or
20 not, but probably I did.
21 Q Okay.
22 A Most likely.
23    MR. HERZ: You did see him is what you're saying?
24 A Yeah.
25 Q But.....

**Page 115**

1 A Can I -- but, you know, it's.....
2 Q Go ahead. Whatever his records say you likely won't
3 disagree with.
4 A Whatever my records, medical records say, I'm not going to
5 dispute because that means I was there.
6    MR. KOZIOL: Robert, let me hand you this document with my
7 little scribblings on it. I want to talk to your client about
8 that document.
9 Q Your attorney gave me some documents from your criminal
10 defense law firm because I'm trying to find out how much
11 legal expense, including costs, you incurred in your --
12 defending your criminal case.....
13 A Uh-huh.
14 Q .....or cases rather. I was looking at -- it's Bates
15 stamped by your attorney 792 and I added up the fees and
16 costs and the date on this thing is May 31st, 2006, so
17 last May, and they have a total fee cost billed, if my
18 addition is correct, of $32,932.57. They are indicating
19 you paid them $9,481.20 and you owe them $23,451.37. At
20 least that's how I do the math.
21 A Uh-huh.
22 Q Does that sound correct to you as of May 31st, 2006?
23 A Yeah. I thought when it was all said and done, you know,
24 including what I paid them and everything, the retainers
25 and all that, I thought it was like around 36,000 or

**Page 116**

1 something.
2 Q But you don't have any documents.....
3 A I don't.
4 Q .....to contradict this.
5 A No, no.
6 Q They indicate you paid about -- well, you paid exactly
7 $9,481.20 as of May 31st, 2006. Have you made any more
8 payments since then?
9 A Yeah. Every month.
10 Q That's 250 a month?
11 A Yeah, it was 500 and then I dropped it, cut it in half and
12 then I've been paying them 250 a month. Because I work at
13 a different place, I don't make what I was making.
14 Q But as far as you know they're not charging you any
15 interest.
16 A I don't think so because we're making payments. If we
17 miss them, then they're going to start. But, I mean,
18 still, that money is worth interest, I mean the money I
19 paid. You know what I mean. Because if I had that 10
20 grand sitting in the bank or paying off something else I'm
21 being charged interest for, that money is still worth
22 interest, the money I paid.
23 Q Now also in the category of damages that your attorney
24 filed on your behalf, you mentioned the attorney's fees
25 and costs and I think we've gone over those numbers. He

**Page 117**

1 also says lost wages you're claiming.
2 A Sure.
3 Q Are you claiming lost wages in this case?
4 A Yeah.
5 Q I have received a voluminous amount of documents and I've
6 read virtually all of it, but I couldn't identify from
7 looking at those documents what your lost wage claim is,
8 so can you tell me?
9 A Well, it's basically every hour that I missed, you know,
10 being at court, being at DOT (sic) hearing, conferring
11 with my lawyer. I mean every hour that I lost during a
12 work day is time loss and I'm an ASC certified master
13 technician. I made at the time 34.80 an hour and I flat-
14 rated my average was about 12.6 hours a day. So, you
15 know, I was making pretty good money. I mean my time was
16 valuable, you know.
17 Q So the way we calculate your lost wages would be to try to
18 determine all the days you lost work when you were
19 participating in the preparation of your defense relating
20 to the criminal or administrative proceedings, correct?
21 A Yeah. And every time I went to a DOT (sic) hearing, you
22 know. I don't know how many of those. There was a few of
23 them.
24 Q Besides that category of calculating lost wages, are you
25 claiming you lost any time from work as a result of any

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

SCOTT BROWN  
Vol. 1                          1/16/2007                    BROWN v. PETERSON, et al.,  
                                                                    A05-0002 Civil

31 (Pages 118 to 121)

**Page 118**

1  injuries you sustained in this police incident?
2  A  I did. When I had that ankle -- you know, when they
3     messed it up again. I mean it was already messed up, but
4     they didn't help it any, you know. I mean they
5     re-aggravated it. I remember because I had a customer's
6     car tore apart, all the heads and everything, and I called
7     up the service manager, you know, my immediate supervisor,
8     and, of course, I think he already knew, you know, a story
9     from someone else, but he asked me to come in, and I did.
10    I came in and put that customer's car back together. It
11    was a cylinder head job I remember.
12 Q  Was this the day of -- after you -- the day of your
13    release from jail?
14 A  Not the day of release, but the next day, Monday.
15 Q  All right. So you did some work Monday.
16 A  Yeah. But only like half a day I went there and put this
17    customer -- and, you know, I was in serious pain. I went
18    there and put this customer's car together and then I
19    left. I took a few days off after that. You know, I
20    can't remember how many.
21 Q  A few days off that week?
22 A  Yeah.
23 Q  So that's your lost wage claim for your injuries, related
24    to your injuries.
25 A  Yes. And then just, you know, like every court appearance

**Page 119**

1     and, you know, I mean there was a bunch of them. I don't
2     know exactly how many, but I mean every one of them was at
3     least an hour, if not more.
4  Q  Has anyone asked you to obtain -- either calculate for
5     yourself or obtain records to show how much lost wages you
6     have?
7  A  No, no one has asked me. Well, yeah, I think you did ask
8     me.
9  Q  Are you going to do that at some point?
10 A  Well, I guess I'll have to estimate it, but I mean it
11    would be easier if I knew every court date and every
12    DOT (sic) hearing date and every time I had to go to
13    court. I mean there was so many of them that I -- you
14    know, I can't remember them and I don't have records of
15    it.
16 Q  Your attorney bills has records of events like that,
17    doesn't it?
18 A  Yeah, but I don't have any bills. He doesn't have them --
19    I mean it's not all like logged out like that. It's like
20    this case is $12,000 and this one is that much.
21 Q  You've never seen his hourly entries in his billing?
22 A  Unh-unh. (Negative)
23 Q  Anyway. I have such records. Presumably your attorney
24    has such records. So, have you ever seen any employment
25    records indicating what part of that first week you didn't

**Page 120**

1     work?
2  A  Well, I had time cards. See, I'm flat rate. I'm worked
3     on -- I work on commission. I don't like punch in on a
4     time clock and work eight hours and I get paid by the time
5     that I'm there. I only get paid for what I do.
6  Q  Are you considered an employee?
7  A  Yeah. I'm considered an employee, but I'm paid by
8     commission. Say the shop rate is $65 an hour. Well, they
9     have a book and every job is in there, nearly every job.
10    Say it says remove and replace alternator on a 1998 Ford
11    Aerostar van with a 3.8 in it. It will pay 1.8 hours.
12    Okay, well, that's what it pays. The customer gets
13    charged $65 an hour for 1.8 hours. What I would make is
14    1.8. But if I can do that in 20 minutes, I still get paid
15    1.8. I was pretty fast, like I told you. My average is
16    -- you know, in an eight-hour day, I'd flat rate about
17    12.6 hours a day.
18 Q  What was your hourly rate back in 2003?
19 A  It was 34.80.
20 Q  So if you -- for example, if you in eight hours did 12.6
21    according to the book, what would you get paid? How much
22    would you get paid for that?
23 A  34.80 times 12.6. What is it? I don't know.
24 Q  What would your employer keep? You don't get it all, do
25    you?

**Page 121**

1  A  No. I get 30.80 an hour and say it was 1.8 and say the
2     shop rate is 65, he gets.....
3  Q  Oh, I see. The customer doesn't get charged at 34.80.....
4  A  No, he gets charged 65 or 80 or whatever it is. I believe
5     that shop was 85 or 90 an hour, the dealership.
6  Q  But there are employment records showing what you actually
7     worked.....
8  A  Yeah.
9  Q  .....that week afterwards.
10 A  Yeah. They have them.
11 Q  And there are employment records before that showing how
12    much you were working per week, right?
13 A  Yeah. Yeah, there's a way to figure it out.
14 Q  And your attorney is also asserting that there are medical
15    bills and expenses that you're claiming in this lawsuit
16    for reimbursement for in this document he gave me. So
17    what medical bills and expenses are you claiming that are
18    related to this incident and how much are they?
19 A  Well, I don't know exactly how much because how much is a
20    knee worth that they helped damage.
21 Q  I'm asking for the identification of medical bills and
22    expenses, so it's not -- this is not non-economic damages.
23    Economic damages. Do you know what medical bills and
24    expenses you're asserting are compensable in this case?
25 A  Do I know? Well, there are some, but I don't know the

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473          jpk@gci.net
                                                                sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 12 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

32 (Pages 122 to 125)

Page 122

1 exact amount or anything.
2 Q What are they related to?
3 A To them.....
4 Q No, what part of your body, what treatment?
5 A My knee and my ankle.
6 Q Have you ever seen them, the documents that show how much
7   you're claiming?
8 A No.
9 Q Is Dr. Creelman at North Pacific Medical Center?
10 A Yes.
11 Q I've summarized some medical records in my notes. I've
12   got, from North Pacific Medical Center, a date of December
13   31, 2002 where you reported painful swollen left ankle,
14   slipped on ice six days ago and Bates stamp number 665.
15   Do you think that's the time -- do you think you slipped
16   around Christmas Eve but then you went and got treatment
17   about December 31st, 2002?
18 A No, that had to be like the day after. I guess I was
19   wrong.
20 Q And then the next.....
21 A Well, what day of the week is.....
22 Q 12/31/02? I don't know.
23 A Yeah, see, I don't know because -- see, if it was on like
24   a weekend or something, I'm not going to go to the
25   emergency room, you know, and spend $400. I'd just buy a

Page 123

1 bottle of whiskey.
2 Q And self-medicate, right?
3 A Yeah.
4 Q All right. I have you going to North Pacific Medical
5   Center the next time on February 11th, 2003 and that's
6   Bates stamped 664. That's like over a month after this
7   police incident and then you're talking about pain in
8   joints, knees, ankles and low back for the past four days.
9   Do you remember that visit?
10 A Yeah. And then, yeah, I remember that.
11 Q So what happened within the past four days of February 11,
12   2003 that caused you to go to them?
13 A It was just an uneven gait, I think is what the doctor
14   came up with. You know, I just felt like I was 80 years
15   old, you know. My joints hurt and everything. I think
16   what they did, they did rheumatoid -- they took blood
17   samples and stuff and checked to make sure I didn't have
18   rheumatoid arthritis or something. And what it came down
19   to was he recommended me to go see Dr. Panzarella because
20   he figured it was due to an uneven gait, the way I was
21   walking because of my knee.
22 Q Did you believe at the time you went there on February
23   11th, 2003 that you had any injury related to the police
24   incident because, again, it wasn't specified in the
25   medical record that you think it was related to this

Page 124

1 incident?
2 A Well, I think it was because, I mean, you know, that's the
3   last time I got hurt.
4 Q Then why would these symptoms have developed four days
5   earlier?
6 A What do you mean?
7 Q Because it says for the past four days this pain you
8   experienced.
9 A I didn't go to the doctor right away.
10 Q So you're saying you had -- what pain are you saying that
11   you had as a result of this incident that you didn't go
12   see any medical attention until.....
13 A I guess.....
14 Q .....you went February 11th, 2003? What physical pain are
15   you saying you had?
16 A January, February. Okay. So what are you saying, that a
17   month -- I mean it happened January 4th, right?
18 Q Right. And then I have a medical record of February 11th,
19   2003 that you went to North Pacific Medical Center.
20 A Uh-huh. (Affirmative)
21 Q So are you saying you had pain related to this police
22   incident for five weeks but you waited for five weeks to
23   go and then, when you went, you told them that you have
24   pain in your joints, knees and ankles and low back for the
25   past four days and don't mention the police incident but

Page 125

1 you really believed it was related to the police incident?
2   Is that your view?
3 A Well, the last time I injured myself was with the police,
4   you know, with the police incident. That's all I'm
5   saying. Finally I got fed up enough and I went to the
6   doctor. That's how pain is with me. I mean, you know, I
7   can stand some pain, but after a while, even if it's a
8   little pain it gets to be enough -- I mean it's just
9   really irritating and hard to put up with, you know. So
10   then finally I go.
11     MR. HERZ: It's been an hour and a half. Do you think you
12 have a lot more?
13     MR. KOZIOL: Why don't we go off record and we'll talk
14 about what we're going to do.
15     (Off record)
16           (Deposition Exhibit 2 marked)
17     (On record)
18     REPORTER: On record. The time is 1:51 p.m. Counselor,
19 you may proceed.
20 Q Scott, could you draw me a bird's eye view of your house,
21   showing me where the entryway is that you entered the
22   house on the day of the incident and drawing in your
23   bathroom, the kitchen and then that hallway.
24 A Yeah.
25 Q Thanks.

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

Page 126

1  A   You just wanted like the house and the entryway.
2  Q   House, entryway, the bathroom and the kitchen area. If
3      you could put all those in.
4  A   This is all deck. Here's the front door. This is like
5      one big room, the living room and the kitchen is all like
6      one big room, and then back here -- see, there's a bedroom
7      there. So like right here is the bathroom. There's a
8      bedroom here and a bedroom here. This actually -- there's
9      a refrigerator there and a freezer, but actually it would
10     be open, but that creates like a wall, the fridge and the
11     freezer. It's a really screwy house. I hate it. It's
12     like a horseshoe fashion.
13 Q   So could you label the bathroom that you were in.
14 A   Right here.
15 Q   And then can you label the chair and the table that you
16     were sitting at before you walked over to the sink, where
17     that was located.
18 A   Right here.
19 Q   And then where was the chair in relationship to the table?
20 A   Right here. It's like a bench thing.
21 Q   Okay. And then where is the kitchen sink that you were
22     trying to wash yourself in?
23 A   Here's the -- right here is the kitchen sink.
24 Q   And you've drawn a couple circles.
25 A   Yeah. That's the sink.

Page 127

1  Q   Could you just write sink in.
2  A   (Complies)
3  Q   So when you entered, you entered through this -- through
4      the front door and then you went right to the bathroom, is
5      that right?
6  A   Uh-huh. (Affirmative)
7  Q   Okay.
8  A   And there's kind of like -- see, I'm not a very good
9      artist but there's a bedroom, this is a bedroom, this is a
10     bedroom and there's.....
11     MR. HERZ: Which you've marked with X's.
12 A   Yeah, and there's like a little hallway here. And then
13     there's like a doorway. You know, it's just a doorway.
14     And then you just go around the corner and you're in the
15     bathroom.
16 Q   What was your route to get to the bathroom?
17 A   I just went right through the door, like here.
18 Q   Okay. You've drawn some dotted lines to it.
19 A   Yeah. There was like a motor -- the motorcycle was like
20     right here. There's a wall there somewhere, too. I ain't
21     very good at.....
22 Q   Now I'm trying to -- trying to understand all that you
23     think the police did wrong. I think I know a lot of your
24     opinion, but I want to make absolutely sure. First of
25     all, you don't think the police had any right to enter

Page 128

1      your house, correct?
2  A   Correct.
3  Q   So let's put that aside for the moment. I assume you
4      don't believe they had any right to tell you you were
5      under arrest.
6  A   No.
7  Q   If they did tell you that and arrest you, you don't think
8      they had any right to do that.....
9  A   No.
10 Q   .....correct? You disobeyed an order from the police
11     officer to not drink out of the beer bottle, right?
12 A   Yeah, he was telling me don't. I said to hell with you.
13 Q   Okay. Do you think the police officer was at fault in
14     trying to prevent you from drinking that beer by pepper
15     spraying you?
16 A   Yeah.
17 Q   Why?
18 A   Because he was in my house. He didn't have a right to be
19     there in the first place. I mean how would he like it if
20     I came to his house and pepper-sprayed him for drinking
21     his coffee or whatever.
22 Q   But let's assume, Scott, somebody disagrees with you and
23     said that the officer was lawfully in your house, lawfully
24     giving you an order, okay, to not drink that beer. It's a
25     hypothetical, but let's just assume that that's true. Do

Page 129

1      you agree that the officer was reasonable then in using
2      the pepper spray to stop you from.....
3  A   No.
4  Q   .....using the beer?
5  A   Why didn't he just take the beer then?
6  Q   All right. You said you were trying to wash your face
7      when Frank Peterson was trying to handcuff you, correct?
8  A   Yes, as best as I can remember. I mean plus my arms don't
9      want to go back that far. I kept asking them to double
10     cuff me.
11 Q   Did Frank Peterson allow you to wash your face prior to
12     handcuffing you? Did that happen?
13 A   I -- you know, I don't know. I remember being over by the
14     sink and running water. I don't know if he was letting me
15     or I was just doing it or what, you know.
16 Q   All right. But were you -- did you, in fact, wash your
17     face a little bit before then?
18 A   I think I did. I think I ran water on my face a little.
19 Q   Then did he tell you that he wanted to cuff you after you
20     ran water on your face?
21 A   I can't remember.
22 Q   But then he started to handcuff you.
23 A   Yeah. I think so, yeah. I remember being by the sink and
24     running water. Of course, you know, after that pepper
25     spray and stuff, I mean shit happened kind of fast.

Computer Matrix, LLC                Phone - 907-243-0668
310 K Street, Suite 200             Fax    907-243-1473                jpk@gci.net
                                                                       sahile@gci.net

Page 130

1  Q  Right, right. Neither officer, am I correct, hit you,
2     punched you?
3  A  No, they didn't punch me. They were like -- see, I was in
4     the Army before. They were using, I mean, force and they
5     were using like tactical moves on me and stuff. I did get
6     bruised up and, you know, kind of scratched up and stuff.
7  Q  I understand you don't think it was reasonable for them to
8     try to arrest you, okay.....
9  A  No.
10 Q  .....and handcuff you. But putting that aside for the
11    moment, in your view, did they use reasonable force in
12    trying to cuff you and arrest you even though you think it
13    was unlawful?
14 A  No, I think it was excessive.
15 Q  And what was excessive? What did they do that you
16    considered was excessive force?
17 A  Well, I think the use of pepper spray right there was
18    excessive. I think them pulling my hair was excessive.
19 Q  And that was Holden pulling your hair to pepper spray you
20    in the face.
21 A  Yeah.
22 Q  Okay.
23 A  I think -- you know, they just kind of -- they dove on me,
24    you know, with their knees in my back and everything else,
25    you know. I mean, yeah, I think it was excessive. And

Page 131

1     them, you know, ripping my clothes off and stuff. I mean,
2     yeah, I think it was excessive.
3  Q  Now, when you say ripped your clothes off, you're talking
4     about the buttons of your trousers being ripped.....
5  A  Yeah.
6  Q  .....during the struggle?
7  A  Yeah. And my shirt too. It was, you know, ripped too.
8  Q  But are you saying that occurred during the struggle or
9     are you saying that you know they intentionally ripped
10    your clothes during the struggle? Can you distinguish the
11    two?
12 A  I don't know. I don't know.
13 Q  What you do know is your clothes got ripped during the
14    struggle.
15 A  Yeah.
16 Q  Any other examples of excessive force?
17 A  I think when they threw me in the back of the truck, you
18    know, I don't think was right.
19 Q  Do you know -- you've sued two police officers, right,
20    Peterson and Holden?
21 A  Right.
22 Q  Do you know who, quote, threw you in the back of the
23    vehicle?
24 A  I don't know. I couldn't see very well. There was a
25    bunch of them standing around there.

Page 132

1  Q  Are we talking about you were pushed into the vehicle?
2  A  Yeah, they kind of -- they like -- I don't know. They
3     like threw -- you know, threw me in there.....
4  Q  So where.....
5  A  .....face down, face first. You know, I couldn't see real
6     good, but I remember my head was like laying in some kind
7     of a hole like where a spare tire would be in the back of
8     that thing or something. I don't know.
9  Q  Do you know how you were grabbed to be thrown into the
10    back?
11 A  I think -- I think they just like bent me over and grabbed
12    an arm and a leg or something and threw me in there. I
13    mean I think so.
14 Q  Any other examples of what you consider excessive force or
15    have you summarized them all?
16 A  No, once in that thing where they had the breathalizer
17    thing, I remember I had my foot -- my shoe off and that
18    was the ankle that was bugging me. I had my shoe off. I
19    don't know what I did, but that Holden guy came running at
20    me and I don't know if he kicked me in the ankle or what,
21    but he was like -- yeah, he wanted to -- I don't know, he
22    wanted to slam me around it looked like to me. But he
23    like ran at me and I had to like jump out of the way. I
24    don't know. It was something like that. It's been years
25    ago.

Page 133

1  Q  So you had some.....
2  A  But he acted kind of aggressive. And then they kept
3     trying to fail me on the thing like it was a refusal, you
4     know. They'd say, uh, I seen -- he burped or he farted,
5     he did something. I'm like I didn't do anything. Oh,
6     another 15 minutes. One more time we're going to refuse
7     you. You know, then you lose your license and everything.
8     Hell, I would have lost my job.
9  Q  So did that cause you anxiety?
10 A  Yeah. I would have lost my job, you know, if I can't
11    drive a car, I'm an automobile technician, I'm losing my
12    job.
13 Q  Did you consider that humiliation and intimidation?
14 A  Well, intimidation, yeah, because, I mean, you know,
15    they're trying to make it seem like I was trying to refuse
16    and, you know, I know refusal is automatic like suspension
17    or something. They take your license.
18 Q  Are you seeking compensation in this lawsuit for those
19    threats about having you not comply with the breathalizer
20    test?
21 A  I don't know. Does it say I was?
22 Q  I'm asking you.
23 A  I'm doing it over there -- you know, I mean, yeah, they
24    hurt me, they -- that's why I'm doing it.
25 Q  Well, you're suing for their intimidation of you, right?

Computer Matrix, LLC            Phone - 907-243-0668
310 K Street, Suite 200         Fax     907-243-1473              jpk@gci.net
                                                                  sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 15 of 19

SCOTT BROWN
Vol. 1

1/16/2007

BROWN v. PETERSON, et al.,
A05-0002 Civil

35 (Pages 134 to 137)

Page 134

1  A  Well, I'm suing because I want my defense costs back. You
2     know, I'm suing for a lot of reasons, I guess, but one
3     could be intimidation and embarrassment. I mean I know I
4     wasn't very nice to them guys either, but it was all just
5     verbal.
6  Q  You've asserted in your complaint that your attorney filed
7     on your behalf that Officer Peterson gave false testimony
8     before the grand jury. Are you aware of that allegation?
9  A  Yeah.
10 Q  What false testimony are you alleging he gave in front of
11    the grand jury?
12 A  I can't remember if it was the grand jury or the DOT (sic)
13    thing, but he said that he searched the bathroom and he
14    didn't because if he would have, he would have found the
15    whiskey under the sink. He also would have found my
16    wallet and that's it.
17 Q  So, as far as you know, it's that testimony about
18    searching the bathroom.
19 A  Yeah, it was -- you know, it was something else. And
20    possibly it could have been about -- because I remember
21    hearing something or reading one of the grand jurors go,
22    well, were you -- did you have the right to even be in
23    this guy's house and they're like saying, uh, well, yeah,
24    well, that's a matter for the courts to decide. This,
25    that, the other thing. Well, it had already been decided

Page 135

1     that it was unlawful. I don't know if I'm talking about
2     the right case or not. I mean the thing started out as a
3     simple DWI thing, right? Allegedly, I guess. Then it
4     blew up into two felonies and a misdemeanor and I'm kind
5     of confused on which case is what. To me, it's all just
6     one big mess.
7  Q  Stay on point. I asked you if you knew if you were
8     alleging in this lawsuit that Frank Peterson gave
9     false.....
10 A  Yeah, he lied.
11 Q  .....testimony before the grand jury. So, from what
12    you've told me, it had to do with him saying to the grand
13    jury he searched the bathroom and you're asserting that
14    that was false.
15 A  Well, I don't know if it was to the grand jury or not, so
16    I guess I'd have to say I don't know, but I know he lied
17    once because he said -- at one time he said he searched
18    the bathroom and the next time he was asked the same
19    question he said, no, he didn't. So he lied.
20 Q  Do you know of any other lies that Frank Peterson told to
21    anyone or is that it?
22 A  No, I don't know of any other ones. Well, I guess when he
23    says that I ran from my truck and all that stuff. That's
24    all lies.
25 Q  Right. That he told you to stop and you were within

Page 136

1     hearing distance.
2  A  Yeah. That's lies.
3  Q  Thank you. Anything else?
4  A  I don't know. Nothing that I can remember right now.
5  Q  Did you ever tell Frank Peterson that you drank some
6     aftershave lotion in the bathroom?
7  A  Yeah.
8  Q  That was a lie?
9  A  Well, what I meant by it is sometimes I used to like hide
10    whiskey in lotion bottles and shaving -- you know, rinse
11    them out and hide it in there so my wife wouldn't find it.
12 Q  But I mean if you were saying that's what you drank from
13    in the bathroom. Did you tell him that's what you drank
14    from the bathroom?
15 A  I told him -- I go, oh, yeah, in there I drank my fucking
16    aftershave and my goddamn lotion and my Jack Daniels and
17    everything. That's what I said.
18 Q  But all of that was lies except the Jack Daniels.
19 A  Yeah.
20 Q  So why did you lie to him?
21 A  I was pissed off. I don't know. I was just filling him
22    full of shit.
23 Q  Did you see your brother when they were trying to arrest
24    you? Did he come into the house? Did you ever see him?
25 A  I seen him once. He was over on the floor flopping around

Page 137

1     like a fish. Had some kind of a reaction to that pepper
2     spray or something.
3  Q  Did you ever talk to him before they took you out of the
4     house in the house?
5  A  No. Not -- no.
6  Q  When you were traveling down Selief prior to your vehicle
7     stalling, how fast were you going?
8  A  Probably 20.
9  Q  Did you ever get up to 45, 50 miles an hour on Selief?
10 A  No.
11 Q  Your allegations against Officer Holden is he shouldn't
12    have entered your house and he shouldn't have
13    pepper-sprayed you when you were on the floor. Do I have
14    that right, those two things?
15 A  Yeah. Especially in the way he did it. I mean squirting
16    the stuff, you know, down my throat and up my nose.
17 Q  Are you alleging.....
18 A  And he's the one that -- you know, I mean, yeah, that guy
19    hurt me. I don't think it was Peterson. He's the one
20    that dove on me with his knees and stuff.
21 Q  When they were trying to handcuff you.
22 A  Well, I think it was all pretty much in one action, wasn't
23    it? They were trying to handcuff me, they squirted me
24    with pepper spray, pulled my hair and stomped on me in the
25    same time or jumped on me with his knees. I think that

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax     907-243-1473

jpk@gci.net
sahile@gci.net

SCOTT BROWN  
Vol. 1  
1/16/2007  
BROWN v. PETERSON, et al.,  
A05-0002 Civil  

36 (Pages 138 to 141)

**Page 138**

1 was all kind of basically -- it was in a very short span
2 of time. Not all at the same time. And then, you know,
3 down at the jail he was like taunting me, like kind of --
4 like, you know, wanting me to make a move so he could hit
5 me with something or maybe some more pepper spray or
6 something. I don't know.
7 Q When you pulled up to your driveway before you entered
8 your house that day, did you park the car crooked in the
9 driveway -- park the truck crooked in the driveway?
10 A Yeah, on an angle. See, it's a long -- it's a long truck.
11 Out here is our parking. Yeah, to park straight, because
12 there's cars parked across the street, you'd have to pull
13 in, back up and then re-pull in again to get it perfectly
14 straight. So, I mean, I did it -- it happened frequently,
15 you know. I'd just come in, whip in. My truck would be
16 parked crooked and my wife didn't like it, but I used to
17 do it anyway.
18 Q All right. How often would you park it straight as
19 opposed to crooked?
20 A I don't know, once in a while. If there was other cars
21 parked there, then I'd have to in order to pull in, you
22 know. But if I can get it in there without, you know,
23 jockeying it around, then I'd just pull in and it would be
24 on a little slant.
25 Q Why did your wife not like that? Did she tell you?

**Page 139**

1 A Yeah.
2 Q What did she say?
3 A I think it's, you know, because of other people that park
4 there, then it's hard for them to get out, you know. The
5 guy that's on the inside of the angle of this guy, it's
6 hard for him to get out if he's parked straight, you know,
7 and my truck is out here.
8 Q And why on this occasion did you park it crooked or leave
9 it crooked as opposed to straightening it?
10 A Because I was in a hurry because I had to go to the
11 bathroom.
12 Q And if you weren't in a hurry, you would have parked it
13 correctly?
14 A No, not necessarily.
15 Q You're not sure what you would have done.
16 A I used to -- like I said, I parked it a lot of times
17 crooked. My wife would always get mad. Sometimes I'd go
18 move it, sometimes I wouldn't.
19 Q Did you hear during the course of events in your house
20 that your wife asked the police officer whether Joseph
21 could park the car correctly and permission was given?
22 Did you hear any of that?
23 A I'm sure. I think I read it somewhere though.
24 Q I'm not asking about that. I'm asking about whether you
25 remember it as part of your experience.

**Page 140**

1 A I don't really remember it.
2 Q Okay.
3 A I think he testified that he did or something. Yeah, and
4 they made my own kid testify against me, too.
5 Q Did you ever talk -- you told me, I think, that Damon
6 committed perjury by stating he never took anything out of
7 the vehicle.
8 A Yeah, I saw the video. I mean I can plainly see that he
9 did.
10 Q Right. You actually witnessed his perjury at the
11 evidentiary hearing when he testified that way?
12 A Yeah, I think I seen it on a video or something.
13 Q I know you saw in the video him taking the beer out of the
14 truck, right?
15 A Uh-huh. (Affirmative)
16 Q What I'm talking about, did you hear him deny taking
17 anything out of the truck in an evidentiary hearing where
18 you were sitting in the court watching him?
19 A I think so. I think he said he took something else out of
20 there.
21 Q Do you remember him saying I took nothing out of there,
22 nothing out of the vehicle.....
23 A I thought he said.....
24 Q .....at the evidentiary hearing?
25 A .....his glove or something. I don't know. I don't know

**Page 141**

1 what he said.
2 Q Did you ever talk to him about that perjured testimony,
3 why he did it?
4 A What now?
5 Q Did you ever talk to Damon about why he committed perjury?
6 A Oh, yeah. After the fact?
7 Q Yeah.
8 A Yeah. I'm like why did you do that and he was like I
9 don't know. I guess he was trying to protect me, I
10 guess.
11 Q Did he say that?
12 A No.
13 Q You asked him why he did it. What did he say in response
14 to that question?
15 A He didn't know what he did. He was drunk, I guess. He
16 doesn't know what he did. He doesn't know.
17 Q He told you that, I don't know what I did? I'm asking you
18 -- you asked him why he committed perjury. My question to
19 you is what did he say to you in response to that
20 question?
21 A I don't know. I don't know.
22 MR. HERZ: I'm confused. Are you saying you don't know
23 what he said or are you saying his response was I don't know
24 why I did that?
25 A Yeah. He said I don't know.

Computer Matrix, LLC  
310 K Street, Suite 200  
Phone - 907-243-0668  
Fax    907-243-1473  
jpk@gci.net  
sahile@gci.net

Case 3:05-cv-00002-TMB   Document 89-25   Filed 05/27/2008   Page 17 of 19

SCOTT BROWN
Vol. 1
1/16/2007
BROWN v. PETERSON, et al.,
A05-0002 Civil

37 (Pages 142 to 145)

Page 142

1  Q  He said I don't know.
2     MR. HERZ: He said I don't know. Okay.
3
4  Q  All right. Thanks.
5  A  But I think.....
6     MR. HERZ: You haven't been asked that question yet. He
7  might ask you that question, but I don't think he has yet.
8  Q  Sure. Tell me what you think. Go ahead.
9  A  Forget it.
10 Q  Do you remember saying when you were in the bathroom and
11    Peterson was trying to have you come out that you've got
12    to get a search warrant? Do you remember saying that?
13 A  No.
14 Q  Did you tell Peterson that you weren't driving the
15    vehicle?
16 A  Yeah.
17 Q  That was a lie, of course.
18 A  Yeah. I think I -- I go I don't think you know who in the
19    hell was driving that vehicle. I think you're an idiot.
20    Get out of my house or something.
21 Q  My question was did you tell him you weren't driving and
22    you just answered me yes, is that true?
23 A  Yeah, I think I did tell him that at first because I
24    didn't think he knew -- you know, I don't think he knew
25    who was driving.

Page 143

1  Q  So why did you lie to him?
2  A  Why?
3  Q  Yeah.
4  A  I don't know. Just to -- I don't know. I was angry, you
5     know.
6  Q  Have you ever tried to kill yourself?
7  A  No.
8  Q  The reason I ask you that, Scott, is I saw some medical
9     records where there's -- Dr. Halter was called by your mom
10    and she said that you've took pills again and she doesn't
11    know how many you took. Do you know anything about that
12    incident?
13 A  Oh, yeah.
14 Q  It was February of '04.
15 A  Yeah, I.....
16 Q  What was that about?
17 A  Well, I forgot I took some medication and I
18    over-medicated.
19 Q  Percocet?
20 A  It was something else.
21 Q  But this was not an attempt.....
22 A  No.
23 Q  .....by you to kill yourself.
24 A  No.
25 Q  Do you think you have an alcohol problem?

Page 144

1  A  No.
2  Q  Never have had an alcohol problem?
3  A  No.
4  Q  Does your wife think you have an alcohol problem?
5  A  My wife doesn't like alcohol.
6  Q  All right. But did she ever tell you she thinks you have
7     an alcohol problem?
8     MR. HERZ: I'm going to reiterate my continuing objection
9     to relevance.
10 A  My wife doesn't like drinking period, but beer -- I mean,
11    hey, she'll let me bring it in the house.
12 Q  Here's another entry I saw a year later, February of '05,
13    where it was reported you took 30 Darvocets and were
14    hallucinating. Do you remember that?
15 A  No. Thirty Darvocets?
16 Q  That doesn't sound like you took that many? Do you think
17    you'd be here if you took 30?
18 A  No.
19 Q  All right.
20    MR. HERZ: What was -- who made the report?
21    MR. KOZIOL: It's 953, is the Bates stamp number.
22 Dr. Halter.
23    MR. HERZ: My question is, is this the same report.....
24    MR. KOZIOL: No.
25    MR. HERZ: .....from February '04?

Page 145

1     MR. KOZIOL: No. I'm sorry. I'll give you the February
2  '04 one. That is 952, February 23rd, '04. 952. 953 is
3  February 22nd, '05.
4  Q  We talked a little bit about your pants falling down. Did
5     the officers allow your wife to pull up your pants?
6  A  Yes.
7  Q  Do you remember Officer Holden saying he'd pull up your
8     pants but then your wife intervened and said I'll do it,
9     do you remember that?
10 A  I don't think they were going to pull them up.
11 Q  So you do not remember Officer Holden stating that he'll
12    do it himself? That is, pull your pants up.
13 A  Yeah, they probably would have pulled them up after they
14    got me up by the car or something.
15 Q  No, no. I'm asking whether you remember the words being
16    said.
17 A  No, I don't remember. Yeah, after I got pepper-sprayed.
18    Now it's all kind of blurry a little.
19 Q  Do you have a difficult time remembering what exactly
20    happened after you got pepper-sprayed?
21 A  Well, kind of. I mean, you know, I think the alcohol was
22    hitting me and the pepper spray was hitting me and the
23    pain was hitting me. I mean, you know, I remember the
24    main stuff. I think I do anyway.
25 Q  Do you remember one of the officers saying you needed to

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

Page 146

1  enter the vehicle, the police vehicle, and you said in
2  response, fuck you, I can't even see? Did that happen?
3  A  Yeah. I mean I couldn't see.
4  Q  Do you remember one of the officers guiding you to the
5     entrance of the vehicle and telling you you just needed to
6     step in and that they would help you but you did not
7     cooperate and did not attempt to get in?
8  A  You know, when you've got a sprained ankle, how are you
9     going to get in? Lift one foot and leave all the pressure
10    on your sprained ankle? I mean, you know, and your hands
11    are behind your back. I mean how are you going to get in?
12 Q  But you could have stepped with your sprained ankle in and
13    not be standing on it, couldn't you?
14 A  I don't think so, not the way they had me turned. So it
15    must have been this ankle that was bad or something.
16 Q  Which ankle?
17 A  I think it was the left one, I think.
18 Q  Why do you think it's the left one now?
19 A  Because of the way you'd get into the back of a car.
20 Q  So explain that to me. How would you get in?
21 A  Because you'd lift this foot upright to put in the
22    car.....
23 Q  The right foot?
24 A  Yeah, and then all the pressure would be on the left.
25 Q  Which side were they putting you in the squad vehicle.....

Page 147

1  A  I think it was on the.....
2  Q  .....the passenger side or the driver's side?
3  A  I think it was the driver's side.
4  Q  So then you'd be starting with your left foot, is that
5     what you're saying, or your right foot?
6  A  You'd be stepping in with your.....
7  Q  Right foot.
8  A  Yeah. I think. You know, and I couldn't see.
9  Q  Let me ask you, do you remember one of the police officers
10    saying when they got you to the vehicle that you just
11    needed to step up and get in and that they would help you?
12    Do you remember that statement being made?
13 A  No, not really. But what I'm saying is I probably
14    attempted to step, but I couldn't because of the pain, you
15    know.
16 Q  So you tried to get in, you couldn't and then what
17    happened?
18 A  Then they just threw me in. I think they were sick of
19    dealing with me anyway.
20 Q  Did you become belligerent at that point?
21 A  I think I was belligerent the whole time kind of. But I
22    wasn't -- I mean I wasn't violent. I was just verbally
23    abusive towards them.
24 Q  Did anybody ever -- did you ever see that bottle of Jack
25    Daniels again later?

Page 148

1  A  Did I?
2  Q  Yeah.
3  A  I can't remember. I know I didn't touch alcohol for a
4     little while after that. Well, the next day was our
5     anniversary, my wife's and I, and it was pretty thorny.
6     So I laid off the old sauce for a while. I can't
7     remember.
8  Q  But in answer to my question you don't recall whether you
9     ever saw that bottle of Jack Daniels again.
10 A  I don't know.
11 Q  Did you ever talk to your wife about that bottle of Jack
12    Daniels, its existence?
13 A  I don't know.
14 Q  She never told you that she found it?
15 A  No. But if she would have, she would have dumped it out.
16 Q  She never told you she found it.
17 A  No. But she's found a lot of my liquor before and never
18    told me and just dumped it out anyway.
19 Q  Did I understand you correctly you put your wallet -- you
20    left your wallet in the bathroom when you exited?
21 A  Yeah, because, you know, when you pull your pants down,
22    usually I put my wallet on the counter because I've had it
23    fall in the toilet before and that's not very good.
24 Q  Right.
25 A  So I usually take it out of my pocket and put it on the

Page 149

1     counter in there when I use the bathroom.
2  Q  And you recall not putting it back in your pocket when you
3     left?
4  A  Yeah. When I got down there, I didn't have a driver's
5     license or nothing on me.
6  Q  Did you do that intentionally, leaving it in the bathroom,
7     or not?
8  A  No. I just forgot to put it back.
9  Q  The bottle of Jack Daniels, that was underneath the sink?
10 A  Yeah.
11 Q  What else was down there besides.....
12 A  There was a bunch of other bottles of shampoo and tub and
13    tile cleaner. You know, the normal stuff.
14 Q  Who cleans the bathroom?
15 A  Sometimes I do, sometimes one of the kids, sometimes my
16    wife.
17 Q  Who does it -- is there somebody that does it mostly,
18    responsible for cleaning the bathroom?
19 A  Not really. Not in my house.
20 Q  Weren't you worried that your wife or your kids would find
21    the bottle of Jack Daniels.....
22 A  I wasn't worried.....
23 Q  .....if you put it right underneath the sink?
24 A  .....about my kids.
25 Q  Sorry?

Page 150

1  A  I wasn't worried about my kids finding it.
2  Q  They wouldn't tell your wife?
3  A  No.
4  Q  But weren't you worried about your wife maybe cleaning the
5     bathroom and finding the Jack Daniels?
6  A  Not really. It was like stuck behind a couple bottles
7     back.
8  Q  When did you buy that bottle of Jack Daniels in
9     relationship to this day?
10 A  I don't know. Prior. I usually don't drink a lot of
11    whiskey, but it was getting -- you know, it was the
12    holidays, so I had some.
13 Q  So you don't remember when you bought it?
14 A  No.
15 Q  Do you remember where you bought it from?
16 A  One of the Safeway liquor stores.
17 Q  Did you have any on that day, this incident, the day of
18    the incident, did you have liquor hid anywhere else?
19 A  I don't know hidden. I think there was a couple beers and
20    stuff outside the bathroom window.
21 Q  But you weren't hiding beer.
22 A  Well, yeah, I used to hide beer too in these tires because
23    it kept cold there. My wife.....
24 Q  Go ahead.
25 A  She wouldn't let it in the refrigerator.

Page 151

1  Q  Oh, the beer? Oh, okay.
2  A  So like when I grabbed the Budweiser, I didn't open the
3     fridge and grab it, it was on the floor.
4  Q  Did she explain why she didn't want the beer in the
5     refrigerator?
6  A  She doesn't like alcohol.
7  Q  But she allows you to have it in the house but not in the
8     refrigerator.
9  A  Yeah. You know, even sometimes then, you know. I'll open
10    a beer, she'll come by and grab it and dump it out.
11 Q  So on this occasion you had hidden some beer also in the
12    tires on that day?
13 A  No, not on that day. What do you mean on that day? I
14    didn't hide the liquor on that day either. I just set it
15    back under.
16 Q  It was hidden from your wife.
17 A  Yeah.
18 Q  That's what I mean by hide. Had you hidden any other
19    liquor or beer from your wife that day?
20 A  No. No, just that. I just sat it back under the sink and
21    then walked out to the police and my wife and stuff.
22 Q  Have you ever prior to that -- ever prior to that drank
23    liquor while you're on the toilet in your house?
24 A  Oh, yeah.
25 Q  How often?

Page 152

1  A  I don't know how often, but that's where I'd keep it.
2     That's where I'd drink it. Go in there, take a couple
3     quick pulls and slip it back underneath the sink and go
4     back out and watch TV with the wife, you know.
5  Q  Can you give me some idea how long you'd been doing that
6     prior to this incident? I mean days, weeks, months,
7     years.
8  A  I don't know, probably years. She's found it hid in there
9     before.
10 Q  Underneath the sink.
11 A  Yeah, or back of the toilet. Yeah, she's found it. I
12    don't know if she found it under the sink or what.
13 Q  Had you ever before drank three-quarters of a bottle of
14    Jack Daniels.....
15 A  Oh, I've drank more than that before.
16 Q  When you're on the toilet?
17 A  I don't know. Depends on how I was.
18 Q  So you might have?
19 A  Yeah. Sometimes take a bath, you know. Sit in there and
20    drink and read the newspaper.
21 Q  Do you in part pull that drawer out so people can't come
22    in and see you drinking?
23 A  Yeah. See, you can unlock the door from the outside.
24    You've got to like push in on -- you know how those doors
25    work. You know, there's a quasi lock on them, but it's

Page 153

1     not really a lock. Sometimes you can push in with a
2     matchstick or something.....
3  Q  Right.
4  A  .....and open it up.
5  Q  I take it your wife has been in the bathroom with you when
6     you're urinating or defecating.
7  A  Sure.
8  Q  So you have that type of relationship where that's okay.
9  A  Yeah.
10 Q  So doesn't she figure out when you have the -- when you
11    have the door locked.....
12 A  Oh, yeah.
13 Q  .....by having the drawer out.....
14 A  What's the drawer open for.
15 Q  .....that you're probably drinking?
16 A  Yeah.
17 Q  So she figures you're drinking.
18 A  Yeah.
19 Q  Doesn't that result in arguments with her?
20 A  Yeah, it has.
21    MR. KOZIOL: That's all the questions I have.
22            SCOTT R. BROWN
23 testified as follows on:
24           CROSS EXAMINATION
25 BY MR. HERZ:

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473              jpk@gci.net
                                                                    sahile@gci.net