SCOTT BROWN
Vol. 1                                       1/16/2007                       BROWN v. PETERSON, et al.,
                                                                             A05-0002 Civil

40 (Pages 154 to 157)

Page 154

1  Q  Mr. Brown, Scott, can you tell me a little bit more about
2     your military experience, what kind of -- what branch of
3     the military you were in.
4  A  I was in the mechanized infantry units. I was a heavy
5     diesel tank and wheel vehicle mechanic. Worked on
6     everything from an M-60 tank, that's what they used to
7     call it, to a little Jeep, M1-51. Pulled guard duty, you
8     know, like gate guard. Was also -- secondary was 98
9     foxtrot. It's vehicle recovery. So you'd like pull a
10    mired tank out of mud or if it was broke down say behind
11    enemy lines you would demolish it with explosives, you
12    know, so the enemy couldn't use it.
13 Q  You served from when to when?
14 A  19, January of 1981 till January of 1985 in the regular
15    Army, then I skipped like a year and then I joined the
16    active Army Reserve where you just go like -- you go once
17    a month and then two weeks a year and that was to a
18    chemical decontamination unit in Kennewick, Washington.
19 Q  What kind of discharge did you receive?
20 A  Honorable.
21 Q  In your military experience, did you receive any kind of
22    training for defensive or offensive driving?
23 A  Yes, I did.
24 Q  Can you explain what that consisted of?
25 A  Just tactics and techniques for like, you know, escape and

Page 155

1     evasion tactics, stuff like that. How to drive in
2     different road conditions and different terrain and so
3     have you like that.
4  Q  You previously indicated you were an ASC certified master
5     mechanic, is that correct?
6  A  That is correct.
7  Q  Does part of your work experience include test driving
8     vehicles?
9  A  It does.
10 Q  Is part of your experience as a mechanic -- by the way,
11    how much of your adult life have you worked as a mechanic?
12 A  Most of my adult life.
13 Q  Is part of your experience as a mechanic making sure
14    vehicles are safe to drive?
15 A  Sure.
16 Q  Was your truck, the gold Dodge flatbed, on January 4th, in
17    your estimation, based on your training and experience,
18    safe to drive?
19 A  It was safe to drive and that's one of the first things I
20    checked, was the safety equipment on it. You know, the
21    brakes and what have you, the lights and stuff, and the
22    tires. And, you know, I mean I've driven cars before, you
23    know, the customer comes in and usually if it's like some
24    kind of a brake concern, I'll go ahead and I'll inspect
25    that car before I drive it because I've drove a car before

Page 156

1     and the tire came off the car, you know. You know, the
2     customer says this car has a vibration when you get up to
3     55 miles an hour. Well, I mean, this thing, the bearings
4     absolutely, you know, came apart while driving the car.
5     So, you know, that taught me a lesson. This was years
6     ago. Whenever it's something like that, you want to bring
7     the car in, lift it up and check it first before you drive
8     it.
9  Q  How important is it to you in your business life as well
10    as your personal life to be safe on the road?
11 A  It's real important, you know. If I don't have a license,
12    I can't work. Plus, you know, people count on me, you
13    know, when you do a brake job to a car. Say it's a
14    minivan. Well, mom and all the kids are in there, you
15    know, so you want to make sure you're doing everything
16    right. Some problems are hard to find now, you know.
17    Especially intermittent ones. They're probably the
18    hardest.
19 Q  You didn't -- at the time you were driving, you didn't
20    know exactly what kind of a problem you had, is that
21    right?
22 A  Yeah, I didn't know. You know, I wanted to check the
23    brakes because, you know, of the fact it would creep, but
24    the fronts would lock up and the rears would spin, but I
25    mean that's normal. I mean you ever been a teenager and

Page 157

1     power brake a car and get the rear tires spinning and
2     smoke 'em off.
3  Q  When that would happen, were you going very fast?
4  A  No. I was stopped.
5  Q  The vehicle was under control at the time?
6  A  Yeah. I would stop and, you know, to keep the engine
7     running have to start manipulating the foot feed and it
8     would get to a high enough RPM and the engine would quit
9     faltering and take off. Well, then the rear tires would
10    start spinning because it engaged the torque converter,
11    you know, because you had high enough RPM's and it would
12    start pushing the truck. You know, it's only a two-wheel
13    drive, so the rear tires are spinning and the rear tires
14    have got the brakes on them. It would just start, you
15    know, sliding. Then, you know, you'd turn it and the
16    truck is going to go, you know, straight ahead which way
17    it wants to.
18 Q  When you described the back of the vehicle pulling out to
19    the right a little, based on your training and experience
20    as a driver, was the vehicle still under your control when
21    that was happening?
22 A  Yes.
23 Q  And you were still in your lane you indicated?
24 A  Yes.
25 Q  How fast do you think you were going?

Computer Matrix, LLC                Phone - 907-243-0668
310 K Street, Suite 200             Fax    907-243-1473                      jpk@gci.net
                                                                             sahile@gci.net

Page 158

1  A  Probably about 20. Yeah, about 20.
2  Q  What's the difference between a throttle and an
3     accelerator?
4  A  Well, usually a throttle is something you pull on, you
5     know. It's a throttle on the dashboard on the truck, but
6     I call it either.
7  Q  Okay.
8  A  I mean, you know, foot feed, throttle, gas pedal,
9     accelerator. You know, to me it's just kind of slang
10    for.....
11 Q  Okay. When -- can you -- you indicated earlier that when
12    there was a report about -- from a citizen alleging that
13    gravel was sprayed up on them, you indicated you're not
14    sure how that could have happened. Can you explain
15    further what you mean by you're not sure how that could
16    have happened.
17 A  Yeah.
18 Q  At least in the manner that that person was describing the
19    event.
20 A  Right. Well, the lady said she was approaching the truck.
21    I guess she was coming this way, towards the front of the
22    truck, and she thought Damon like said come on by or pass
23    in front or whatever. Well, he never did. I never saw
24    the lady. She must have been in a blind spot. But
25    anyway, when I pulled out of there -- she was walking up

Page 159

1     towards the passenger side of the truck. When I pulled
2     out, I pulled out and I turned right, so, to my knowledge,
3     if she's walking up to the passenger side and I'm turning
4     right, how is she going to get sprayed with gravel anyway?
5     Because even if the truck even did spin around or
6     something, I mean it's going to be throwing gravel away
7     from her, not towards her. She was walking towards the
8     front of the truck. The only way she could have got
9     sprayed by gravel in my mind is if I would have turned
10    left. This is her, here's the truck. If I would have
11    turned left, the rear wheels would have sprayed gravel on
12    her. Now, if she's coming up to the truck this way and I
13    turn right, this is the rear of the truck, how is she
14    getting gravel on her? Plus, the thing has mud flaps,
15    you know, that are that far off the ground. If she did -- I
16    mean I don't like -- I don't want to spray some old lady
17    with gravel, you know. I'm not that type of person. I
18    never -- I never saw the lady.
19 Q  Okay. When the drawer is out in the bathroom to keep the
20    door from opening.....
21 A  Uh-huh.
22 Q  .....is the door -- can the door of the bathroom still
23    be.....
24 A  It can be opened a little.....
25 Q  .....moved inside the threshold?

Page 160

1  A  Yeah, a little bit.
2  Q  Do you recall whether -- I think you indicated earlier
3     that you thought you had the cane you were using in the
4     bathroom.
5  A  Yeah, I thought about it and I did have the cane because I
6     remember pushing on the door with the cane.
7  Q  When did that happen?
8  A  When he was on the other side of the door, I thought he
9     was going to break the door or bust the drawer or
10    something. I don't know.
11 Q  You're talking about Officer Peterson?
12 A  Yeah.
13 Q  So what did you.....
14 A  I just pushed on it enough to turn it and then the door
15    was locked, you know, with the rubber end of a cane. I
16    just kept pushing. I mean, you know, hey, if it was me
17    and I would have wanted in that bathroom, I could have got
18    in there. I would have went right through that door. I
19    mean it's one of those little -- they're hollow.
20 Q  A hollow core door?
21 A  A flimsy inside door, you know. He must not have wanted
22    in there too bad.
23 Q  You indicated that you've consumed more than
24    three-quarters of a bottle of Jack Daniels before?
25 A  Yes.

Page 161

1  Q  You've done that in the bathroom?
2  A  Yeah. I've -- yeah.
3  Q  Have you done it when you've been -- have you consumed
4     that much in the bathroom while you've been using the
5     toilet to defecate before?
6  A  Probably not quite as much, but I have drank that much
7     before, but I had like this pain, man, and I just wanted
8     it to go away and I know that will take it away at least
9     for a while.
10 Q  So in this case you consumed that much because you were in
11    pain.
12 A  Yeah. It wasn't really for enjoyment purposes.
13 Q  Okay.
14 A  You know, usually when I drank, you know, I'd take a
15    pretty good pull and then I'd set her down for a while.
16    Usually I'm reading something, but this time I wasn't
17    reading.
18 Q  Okay. Mr. Koziol asked you whether you remembered one or
19    the other officer telling you when you were out by the
20    patrol car that they would help you. Given what had --
21    what you'd just gone through, did you believe that they
22    would help you?
23 A  Well, no. You know, I couldn't see. I couldn't hardly
24    walk. No, I -- you know, I think they were -- I don't
25    think they gave a shit about me. I think they were just

Page 162

1  -- they just wanted to get rid of this piece of shit.
2  Let's just get him down there and throw him in the hole,
3  you know.
4  Q  You were having trouble walking because of your ankle?
5  A  Yeah, and I was, you know, blinded by that pepper spray
6  too and I was feeling the effects of alcohol.
7  Q  Do you believe they thought you were being uncooperative
8  by not walking on your own.....
9  A  I think so.
10 Q  .....or they thought you were feigning or somehow faking
11 that you were -- you know, your problems with your
12 walking?
13 A  Yeah, I think -- you know, I think because I was walking
14 slow or whatever. I mean every step I took hurt, you
15 know. So, yeah, I think they thought I was being
16 obstinate or uncooperative. I mean I didn't want to walk
17 much further when my pants were, you know, falling down.
18 I know I pretty much stopped walking because there was a
19 bunch of people out there. I mean I couldn't -- I don't
20 really remember who all exactly it was and everything was
21 blurry, but I know there was people out there.
22 Q  You were asked a question by Mr. Koziol about -- the way
23 he phrased it was did you say that you weren't driving.
24 Do you recall if you said to Officer Peterson I wasn't
25 driving or did you say you don't know who was driving?

Page 163

1  A  That's what I said. I said I don't think you frigging
2  know who was driving. Hell, no, I wasn't driving. You
3  don't know who was driving either, you know.
4  Q  The question I want to ask, if, hypothetically, you had
5  said I wasn't driving, that would have been a lie.....
6  A  Yeah.
7  Q  .....would you agree?
8  A  Yes.
9  Q  Do you consider saying -- challenging him and saying you
10 don't know who was driving, is that a lie?
11 A  No.
12 Q  How did you -- how did you feel about the fact that your
13 own child, Joseph, was called to court and was forced to
14 testify against you, his father?
15 A  It was a very awkward situation, you know. It was
16 embarrassing, you know. And he knew he had to do it and I
17 knew he had to do it and I said, well, just get up there
18 and tell the truth, you know. It was awkward though. I
19 mean can you imagine your son testifying against you?
20 It's not a very pleasant feeling.
21 Q  Did you see the dash cam video for the first time before
22 or after the evidentiary hearing, do you recall?
23 A  I think -- I don't.....
24 Q  Or was it at the hearing?
25 A  I think it was at the hearing. I don't really remember.

Page 164

1  Q  So you don't recall seeing the dash cam video before the
2  hearing?
3  A  I think it was at that hearing. I'm not certain.
4  Q  So had your brother Damon already testified, they had --
5  and then they showed the video?
6  A  I can't remember.
7  Q  Did you first realize -- well, do you remember Officer
8  Peterson testifying at some point that he had received a
9  REDDI report? Do you know what a REDDI report is, first
10 off?
11 A  I think a report every drunk driver or something like
12 that.
13 Q  Right. Do you recall Officer Peterson testifying at some
14 point that he had received a REDDI report?
15 A  Yeah, I think so. I think the judge jumped on him on that
16 one.
17 Q  Okay. Do you believe that you were asked some questions
18 about what you thought Officer Peterson may have testified
19 falsely about, do you believe that was something that was
20 false testimony?
21 A  Yeah, it would have been. I forgot about it though.
22 Q  Other than your ankle, your knee, your elbow, the bruises
23 to your shoulders and arms, did you have any other
24 problems like with fingers or thumbs or wrists or anything
25 like that?

Page 165

1  A  Yeah, my thumb.....
2     MR. KOZIOL: Objection, form. Related to this incident,
3  caused by the incident?
4  Q  Related to the -- or caused by the officers, yes.
5  A  Yeah, my thumbs were numb from having them.....
6  Q  Do you know what that was.....
7  A  .....you know, they like pinched them too tight, the
8  cuffs.
9  Q  Do you know how they did that?
10 A  Just by wrenching them on there, man.
11 Q  How long did that -- did you have a problem with one or
12 both thumbs?
13 A  I think it was mainly one, but both of them, they were
14 like numb for a long time.
15 Q  What's a long time?
16 A  Like a week -- a week or two. It was a long time they
17 were numb and tingly.
18 Q  Did that affect your ability to work?
19 A  Yeah, a little bit.
20 Q  Did you have any other problems with anything else, wrists
21 or any other part you can think of, at least at this
22 point?
23 A  Well, I remember, like even three days after when I'd be
24 in the shower, it would like -- you know, it would still
25 burn and stuff like around my nose. You know, the

SCOTT BROWN  
Vol. 1  
1/16/2007  
BROWN v. PETERSON, et al.,  
A05-0002 Civil

43 (Pages 166 to 169)

**Page 166**

1  burning, but I remember I felt it mostly like in the
2  shower and stuff. You could feel that pepper spray still
3  three or four days later.
4  Q  You were asked if you were hurt -- if this incident
5     occurred on January 4th and you didn't go to the doctor
6     until February 11th, why it took you five weeks to go to
7     the doctor. Can you explain why there was a five week
8     delay like that.
9  A  Well, I mean, I've been in pain for, you know, years.
10 Q  When you say that, what do you mean by that?
11 A  Oh, my knees and, you know, I mean being a mechanic I get
12    nicks and scrapes and, you know, bruises and stuff like
13    that all the time, you know, so I'm always putting up with
14    a little pain. But, you know, even a little pain after a
15    while it just -- you know, it gets so aggravating that I
16    just can't stand it anymore and I've got to go.
17 Q  When you went on February 11th you described pain in your
18    ankles, your knees, the other joints in your body.
19 A  Yeah. It was like in my back.
20 Q  And Officer Holden had put knees into your back, is that
21    right?
22 A  Yes.
23 Q  So is it fair to say that you just had like body soreness,
24    body bruises from this whole incident, your body was just
25    sore?

**Page 167**

1  A  Yeah, and -- well, another thing that I have is gout.
2     It's kind of like -- it's like a form of arthritis. If
3     you injure like a joint, this stuff will go right there.
4     It's uric acid crystals in your blood. Everyone has a
5     certain amount, but my body makes too much and so when you
6     get hurt or damage or injure a joint, like say twist an
7     ankle or something, that gout will go there because blood
8     brings it. Because when you get hurt, it increases the
9     blood flow to the damaged or injured area and the blood
10    carries these crystals with it. You know it will start
11    out small, but I mean if you don't treat it or do
12    something with it. Hey, man, I've had my toe huge, big
13    around before. I've had gout in my knees, in my back, but
14    usually it's after you injury yourself. Like if I get way
15    down on my toes, if I'm on my toes a lot, the next thing I
16    know I'm having a gouty attack like in my toes.
17 Q  So I take it just because you're in pain you don't run off
18    to the doctor for every.....
19 A  No.
20 Q  .....ache and pain.
21 A  No.
22 Q  So by February 11th this was pain you weren't willing to
23    deal with anymore?
24 A  Yeah, I had enough of it. Yeah, I just had enough.
25 Q  Can you -- when you were -- as indicated in defense

**Page 168**

1     exhibit 2 where you've written table and you've drawn this
2     bench, what you referred to as a chair, when you were
3     there were you able to observe Officer Peterson?
4  A  Yeah, he was -- he was standing like back here.
5  Q  You're indicating -- I take it this is a counter area.
6  A  Yeah, that's the kitchen counter, yeah.
7  Q  And that's perpendicular to where the sinks are.
8  A  Right.
9  Q  So he was standing next to the counter there?
10 A  Uh-huh. (Affirmative)
11 Q  Okay. And when you approached from the bench, where did
12    you -- where were you able to grab the beer from, where
13    was that?
14 A  There's a fridge and a freezer right here.
15 Q  Uh-huh. Okay.
16 A  And I think the beer was right there.
17 Q  When you got up from the bench to go there, do you recall
18    Officer Peterson saying or doing anything?
19 A  He might have told me to sit down or something, I don't
20    know, but I wasn't listening to him. I remember that
21    much. I was pretty much just yelling at them, telling him
22    to get the hell out of my house and I grabbed a beer.
23 Q  You indicated that you felt instead of pepper-spraying you
24    he should have just tried to take the beer away from you,
25    is that right?

**Page 169**

1  A  Yeah.
2  Q  Based on your observations while you were at the table and
3     as you went to get the beer and as you were telling them
4     to get out of your house, based on your observations, what
5     kind of reaction was Officer Peterson having towards you?
6  A  He looked like a scared little boy ready to pee his pants
7     to me. I think I told him that, too. So I think he was
8     scared that I was going to do something to him.
9  Q  Did you ever raise a fist to him?
10 A  No.
11 Q  Did you ever threaten him physically in any way
12    whatsoever?
13 A  I think I did one time. I think it was at the station. I
14    said I'd like to meet him out on a country road and squirt
15    a bottle of that shit down his throat.
16 Q  Well, I don't mean verbally. I mean -- and we'll confine
17    it to the house. Did you ever -- did you ever while at
18    the house in any way physically.....
19 A  No.
20 Q  .....do anything that was threatening to Officer Peterson?
21 A  No.
22 Q  And then other than verbally saying you'd like to squirt
23    that stuff down his throat, did you ever physically
24    threaten Officer Peterson or Officer Holden down.....
25 A  No.

Computer Matrix, LLC  
310 K Street, Suite 200  
Phone - 907-243-0668  
Fax      907-243-1473  
jpk@gci.net  
sahile@gci.net

Page 170

1  Q  .....at the station house?
2  A  No. But I stood up once and I think Officer Holden took
3     that as like a threat or something. But I just stood up
4     and I remember he came like running at me.
5  Q  You're talking about the station house now?
6  A  Yeah, at the station house.
7  Q  But he didn't react like that in your house in the kitchen
8     when you stood up from the bench that you recall?
9  A  No.
10 Q  The bills from Mr. Schmitt, do you know if they're 32,000,
11    36,000, 42,000? Do you have any idea what the actual
12    lawyer bills have been?
13 A  You know, I kind of lost track and my wife pays all the
14    bills. I thought it was like 36,000.
15 Q  Okay. I mean you indicated at one point that whatever the
16    medical bills reflect as far as doctor visits you'll let
17    the medical bills sort of be decisive. In this case,
18    whatever Alan Schmitt, if he were called to testify or
19    whatever his bills reflect, you would agree with whatever
20    those bills are?
21 A  Yeah.
22 Q  Is it in your mind possible it could even be more than
23    36,000?
24 A  It could be.
25 Q  You don't know?

Page 171

1  A  I don't know for sure. It did seem excessive, but you
2     guys cost a lot of money.
3  Q  Do you recall seeing Dr. Creelman about your ankle in
4     February?
5     MR. KOZIOL: Of what year?
6  Q  I'm sorry. Of '03, after this incident.
7  A  Yeah, I recall going in there, but it was like multiple
8     joints aching, I think. And I only remember that because
9     of what he said. Now I remember he referred me to
10    Dr. Panzarella because he figured it was because of an
11    uneven gait because of my bad right knee. He thought it
12    could have been causing the back pain and the joint pain.
13 Q  How would you describe -- and I don't know if the court
14    reporter can get more of a close up of Mr. Brown's eyes,
15    but can you describe what you think your eyes look like
16    right now if somebody were to look at you.
17 A  Well, I suffered with this all through the military.
18    Every time we'd get a new officer or a new NCO that was
19    over me, they all thought I was stoned or drunk or
20    something because of the way my eyes are. It's scar
21    tissue is what it is. You know, they're really -- my eyes
22    are sensitive. They just are. I mean they're sensitive
23    to sunlight, dust.
24 Q  Are your eyes.....
25 A  I mean right now my eyes.....

Page 172

1  Q  .....red and bloodshot.....
2  A  Yes.
3  Q  .....right now?
4  A  Yeah, and they're kind of watery now for some reason. I
5     don't know why. And I don't know if you guys noticed, but
6     I have like a wandering eye, they call it, like a lazy
7     eye. Some people always think I'm not looking at them
8     when they're talking to me, but I am.
9  Q  Has anybody ever commented on your speech at all?
10 A  Yeah, at the DOT (sic) hearing, the woman there asked me
11    if I had some kind of a speech impediment. I said, well
12    -- you know, it's happened before. People always ask me
13    where I'm from because they think I have some kind of
14    accent or something. I don't know. I just talk kind of
15    slow and probably don't pronounce words with their proper
16    pronunciation the way I should.
17 Q  I just want to clarify something. You've said a number of
18    times DOT, which, for most people, usually means
19    Department of Transportation. Are you referring to the
20    Department of Motor Vehicles hearing on whether your
21    license.....
22 A  Yeah, right. Yeah.
23 Q  I just wanted to make sure that was clear. Do you know
24    which side of the vehicle you got into when they arrested
25    you? Do you know if you actually got in on the driver's

Page 173

1     side or the passenger's side?
2  A  I'm pretty sure it was the driver's side.
3  Q  Okay.
4  A  Because, I don't know, that's my memory of it.
5  Q  Okay. That may or may not be correct?
6  A  Yeah.
7  Q  If you got in on the passenger side, would you make the
8     same assumption that you actually first got in with your
9     left foot and you would have then been putting all the
10    weight on your right foot?
11 A  Yeah.
12 Q  So it just depends on which side of the vehicle you got
13    in.
14 A  Uh-huh. (Affirmative)
15 Q  I take it that again you would defer to the -- you've
16    expressed some doubt about which ankle was involved here.
17    I take it you would defer to the medical reports
18    again.....
19 A  I would.
20 Q  .....with regard to that?
21 A  Uh-huh. (Affirmative) Which one was it, by the way? It
22    happened on the 31st when I went there. I don't know what
23    day of the week the 31st is, so I may have well sprained
24    it actually -- you know, a lot of times I'll sprain an
25    ankle or something. I won't go to the doctor until like

Page 174

1   the very next day or something. I won't go until I can,
2   you know. If it's not getting better, I can't handle it
3   no more, then I'll go. So if it would have maybe happened
4   on a Saturday or something, I might not have actually went
5   to the doctor until Monday.
6 Q You were asked the question if you thought you were still
7   resisting after you were cuffed and you indicated yes.
8   You were asked if you were still resisting when you were
9   getting into the police car and you said no. My question
10  is for what amount of time after immediately being cuffed
11  would you say you resisted?
12 A After being cuffed. I think pretty much I quit resisting,
13  I think, after I was cuffed except for when my pants fell
14  down and I kind of resisted them walking me, you know,
15  farther towards the street with my pants down.
16 Q So any -- so after being cuffed you don't feel you were
17  resisting other than trying to stop walking through the
18  front door.....
19 A Yeah.
20 Q .....while your pants are going down.
21 A And other than verbally, you know, assaulting them.
22 Q You weren't physically struggling against them?
23 A No.
24 Q But, as you describe it, you were trying to do something
25  to prevent the pain in your eyes from the pepper spray?

Page 175

1 A Yes. And I mean, you know, my elbow -- my arms don't want
2   to bend, so, yeah, I was struggling a little bit. But,
3   hey, they got them bent back there and cuffed up.
4 Q So that would have occurred before you were cuffed then.
5   MR. KOZIOL: Objection. Form.
6 A Yeah, like during cuffing.
7 Q When you drink, do you often have Copenhagen in your
8   mouth?
9 A Yes.
10 Q When you drank the Jack Daniels, did you have Copenhagen
11  in your mouth?
12 A I don't know if I took a chew. I can't really remember
13  that. But I can do it either way.
14 Q Well, I'm just -- you indicated that after you got
15  pepper-sprayed you were trying to spit the Copenhagen out
16  of your mouth. I'm just wondering if you know at what
17  point you put the Copenhagen in your mouth.
18 A I don't know. You know, it's like I'm chewing right now.
19 Q Sure. Do you think you had -- when you drank the beer,
20  did you have Copenhagen in your mouth?
21 A Yeah.
22 Q Okay. You don't know or you think you may have had
23  Copenhagen in your mouth.....
24 A Probably had it in.
25 Q .....when you drank the Jack? It may have been?

Page 176

1 A Yeah.
2 Q Do you know if you got all the Copenhagen out of your
3   mouth when you were trying to spit it out?
4 A You never really get all of it out unless you rinse your
5   mouth out.
6 Q Do you recall whether Officer Holden or Officer Peterson
7   made an effort to visually inspect your mouth to make sure
8   you didn't have any more Copenhagen in your mouth?
9 A No, I don't think they did.
10 Q Now, you were asked if you recall Officer Peterson saying
11  anything to you before you drank the beer in the kitchen
12  and you indicated you're not sure but he may have said I'm
13  going to use pepper spray. Do you know with any certainty
14  whether he said that or not?
15  MR. KOZIOL: Objection. Form.
16 Q Do you recall -- do you have a recollection whether he
17  said that or not?
18 A Yeah, he's like -- I picked it up and he goes you drink
19  that, I'm going to spray you.
20 Q So you do recall that.
21 A I just went, screw you, you're in my house, buddy, I drink
22  when I want.
23 Q Okay. You indicated that when you first were in the
24  bathroom there's a knock on the door and someone said
25  Kodiak Police and your first thought it was your brother

Page 177

1   playing a joke.
2 A Yeah.
3 Q At what point did you realize it wasn't your brother and
4   it wasn't a joke?
5 A When he started kicking and beating on the door really
6   hard and kept doing it. I think I heard a radio or
7   something. I don't know. And my wife -- I don't know.
8   But I realized it though and I said, damn, there really is
9   the police there.
10 Q But at that point you were not done in terms of using the
11  facilities, in terms of finishing with your bowel
12  movement?
13 A Yeah. I mean I wasn't going to come out until I wanted
14  to.
15 Q Until you were done?
16 A Yeah.
17 Q What is the -- if you know. Do you know what the mileage
18  or distance is from the parking lot at Safeway to this
19  location of the intersection to Purtov and going up Pillar
20  Mountain Road?
21 A Up to where I went?
22 Q Yeah.
23 A Not really. I'd have to guess. I'd say it's -- I really
24  don't know. I never -- I never checked it.
25 Q What would be a normal driving speed on the roads going

Page 178

1   from Safeway to that location?
2 A Like 15 to 20. Going up Pillar, probably slower.
3 Q But like Selief and these roads here.....
4 A They're 20 miles per hour.
5 Q Are they posted speed limits?
6 A Yeah. And they used to be gravel, but now it's all paved
7   and widened and everything. It used to be a skinny little
8   dirt road, but now it's.....
9 Q So back on January 4th of '03 were they gravel then?
10 A Yeah.
11 Q And they were narrower than they are today?
12 A Yes.
13 Q And the posted speed limit is, at least as far as you
14   know, about 20 miles an hour?
15 A Yeah, that hasn't changed.
16 Q And the driving time, going at that speed, you think is
17   what from Safeway to that location at Pillar Mountain
18   Road?
19 A Up to where I turned around on Pillar?
20 Q Well, to this intersection where Purtov is.
21 A Maybe 10 minutes. Yeah, something like that.
22 Q Could be less?
23 A Could be.
24 Q Do you think it would be or do you think it's more?
25 A I think I'm thinking to my house, you know, more. I

Page 179

1   really don't know. I never timed it. I know to where I
2   worked it was almost exactly a mile from my house to my
3   work.
4 Q Same speed limit?
5 A Yeah.
6 Q How long would it take to get from your house to work?
7 A I never really checked. But if it's 20 miles an hour and
8   it's one mile -- if I had a calculator, I could figure it
9   out, I suppose.
10 Q Okay. Do you remember approximately how much a can of
11   Copenhagen cost back in January of '03?
12 A Probably like six bucks, seven bucks. Now it's like nine
13   bucks. I've got to quit.
14 Q You were asked whether you used a credit card to make that
15   purchase and you indicated you don't know but you could
16   have. How likely do you think it is? Is it more likely
17   than not you used a credit card or more likely than not
18   that you used cash?
19 A Probably cash.
20 Q How likely do you think it is that you may have used a
21   credit card?
22 A Probably not very likely.
23 Q I just want to clarify something about Damon and you in
24   terms of how you were behaving at the Union Tire store in
25   front of Wade Brenick. Did you and Damon argue when you

Page 180

1   were there?
2 A I don't think we -- I don't think we argued.
3 Q So it wouldn't be fair to say you were arguing.
4 A No.
5 Q But you think Mr. Brenick might have observed tension
6   between you and Damon?
7 A I think so.
8 Q To your recollection, the only overt conduct that he would
9   have observed would have been the door slamming by one of
10   you?
11 A I think so because I remember them saying something about
12   that. He was right because he knew I was like anal about
13   this truck because it's really old and in really good
14   condition, but it's not anymore. Well, it's still in
15   pretty good condition, but Kodiak has taken hold of it.
16 Q Sure. The intermittent condition you were experiencing
17   back then, did it occur under all weather conditions or
18   just under certain weather conditions or under certain
19   road conditions?
20 A You know, I was trying to pin that down too. You know, it
21   seemed -- well, it didn't happen until it got colder, you
22   know, like it didn't happen in that fall. It happened,
23   you know, like cold and it seemed to happen over bumps,
24   you know, right after you'd go over a bump or something.
25   Then the engine would kind of -- but now that I think

Page 181

1   about it, I think -- you know, because on the way to work
2   there was these big frost heaves and stuff. Well, you let
3   off on the throttle, right, when you see bumps, at least I
4   do in this old truck, big old truck. Then, when you go to
5   get back on the gas, it would like want to -- it wouldn't
6   just accelerate, it would like falter and chug and, you
7   know, do everything but run the way it should. Then all
8   of a sudden it would catch and go.
9 Q What do you mean by it would happen when it was colder?
10 A It just seemed.....
11 Q Does that mean below freezing, above freezing, 50's, 60's,
12   40's, 30's?
13 A No, like in the 30's, you know. Like in the 30 degrees.
14   See, it never did it before it started getting colder on
15   Kodiak. You know, cold there is zero. That's freezing.
16   It doesn't get that cold there except for this year it has
17   a little bit.
18 Q Well, freezing is 32.
19 A Right.
20 Q Do you mean zero or freezing, 32?
21 A Like 32, something like that. It seemed to have -- that's
22   when the problems seemed to be more prevalent or frequent
23   and also going over bumps. That's just what I noticed,
24   kind of like symptoms of when it would happen.
25   MR. HERZ: I don't have any questions.

Computer Matrix, LLC              Phone - 907-243-0668
310 K Street, Suite 200           Fax     907-243-1473        jpk@gci.net
                                                              sahile@gci.net

Page 182

1     SCOTT R. BROWN
2  testified as follows on:
3     REDIRECT EXAMINATION
4  BY MR. KOZIOL:
5  Q  Scott, you said that one of your accusations against Frank
6     Peterson of falsely testifying under oath was that he
7     testified he received a REDDI report and you asserted that
8     was false testimony, right?
9  A  Yeah.
10 Q  Have you ever listened to or read the dispatch call from
11    Laura Kronberg (ph) to the dispatcher in terms of what she
12    said about you?
13 A  I think they played it.
14 Q  All right. Do you remember when they played it her saying
15    that you were possibly intoxicated?
16 A  The call to the dispatcher?
17 Q  Yeah, from Laura Kronberg.
18 A  I think I heard it played, but I can't remember exactly.
19 Q  But do you remember when it was played that she said.....
20 A  I don't remember when.
21 Q  You don't remember when. It's not a when question. Did
22    you hear that when it was played that she said you were
23    possibly -- that the driver was possibly intoxicated?
24 A  I remember the dispatch going, oh, slipping and sliding
25    and stuff like that. I don't know. I don't remember it.

Page 183

1  Q  All right. Do you remember Officer Douglas Croyle
2     testifying at the criminal trial? He was the dispatcher.
3  A  Yeah.
4  Q  Do you remember him testifying that he.....
5  A  I remember him testifying.
6  Q  That's what I asked you. Do you remember him testifying
7     that he told Frank Peterson he received a REDDI call about
8     this truck?
9  A  No, I don't remember.
10 Q  If all that's true.....
11 A  I don't remember what Officer Croyle said.
12 Q  This is all easily provable. I mean I can -- if the tape
13    shows Laurie Kronberg said possibly intoxicated driver and
14    if the dispatcher told Frank Peterson that the dispatcher
15    received a REDDI report, then would you agree with me, if
16    all that's true, Officer Peterson didn't testify falsely
17    when he said he received a REDDI report?
18 A  Well, I think the judge.....
19    MR. HERZ: Hold on. I've got to object because there are
20    -- it's a hypothetical and in my opinion there are facts,
21    critical material facts being omitted from the hypothetical.
22    MR. KOZIOL: Okay. All right.
23 Q  With that objection, if what I've said is true, would you
24    agree that he didn't testify falsely?
25 A  Well, I guess if he told the truth, then he told the

Page 184

1     truth, but I don't think he told the truth.
2  Q  You testified that it was difficult for you to hear your
3     son Joseph Brown testifying against you, right? Those are
4     your words?
5  A  Yeah.
6  Q  He was just telling the truth, wasn't he?
7  A  Yeah.
8  Q  How is the truth against you if he was just telling the
9     truth?
10 A  Well, he was a witness for the prosecution.
11 Q  But if he was telling the truth, it didn't harm you, did
12    it?
13 A  No. But, still.
14 Q  All he testified was that he re-parked the crooked job you
15    did with the truck.
16 A  Right.
17 Q  So why was that upsetting to you, that he was testifying
18    to something that was truthful and that is he re-parked
19    the vehicle?
20 A  Because he had to testify against his father, that's why.
21 Q  How did that testimony harm you, if at all?
22 A  I didn't say it harmed me, but it -- I didn't like it and
23    I know my son didn't like it.
24 Q  So what you didn't like is that he was called by the
25    district attorney to testify, not as to what he testified,

Page 185

1     is that right?
2  A  Yeah. I mean, you know, it's like pitting son against
3     father or father against son. He was on the -- you know,
4     he was on the wrong team.
5  Q  But you didn't dispute anything he said, right?
6  A  No, because he told the truth.
7  Q  Right. So what you didn't like is that it was the
8     district attorney that called him to the stand rather than
9     your own attorney.
10 A  I just didn't like the fact that my son had to testify
11    against me even though, yeah, his testimony didn't hurt
12    me.
13 Q  Okay. The truck you were driving, it had a throttle that
14    pulled out, right?
15 A  Yeah, I installed one.
16 Q  On this day, the incident we're talking about, it had a
17    throttle that pulled out.
18 A  Yeah.
19 Q  Would you adjust the throttle -- did you adjust the
20    throttle to try to remedy the problem you were
21    experiencing?
22 A  It would run way too high.
23 Q  But you tried it?
24 A  Yeah, I really can't remember.
25 Q  All right. I think you said, correct me if I'm wrong, I'm

Page 186

1   back in the Safeway parking lot, did you say to your
2   attorney just a few minutes ago that Damon did not motion
3   the woman to move in front? Did you say that?
4 A Well, I never saw a woman to begin with and he never saw a
5   woman. So, I mean, if there's not a woman there, how
6   would he motion anyone?
7 Q How do you know he never saw a woman?
8 A I don't know.
9 Q Well, there's two ways. One is you were looking at him
10  and you could tell that he never saw a woman from what he
11  looked like.
12 A I think he said he never saw a woman.
13 Q Okay. He told you that.
14 A I think he said that in court or something. I don't know.
15  We never saw a woman. I know that much. I mean after all
16  this was said and done, did me and my brother talk about
17  it? Yeah, we talked about it. But I'm like did you see a
18  woman? I forget her name, but she's the Red Cross lady.
19 Q Right.
20 A Hey, I have nothing against the lady. I think she does a
21  great job, you know. I even worked on her car before and
22  I've worked on it since. I don't know if she knows that
23  or not.
24 Q Scott, a simple question. Did your brother tell you he
25  never saw the woman either?

Page 187

1 A I think so, yeah.
2 Q At any point after you knew there was a police officer in
3   your house up to the point where you were put in the squad
4   car, that period of time, did you ever ask any of the
5   police officers either why are you in my house or why are
6   you arresting me? Did you ever ask that question?
7 A I don't know. I can't remember. I was pissed. I knew
8   that much. I knew they didn't have a right to be there.
9 Q I was a little unclear on this, so that why I'm going to
10  ask you a question. After your pants were pulled up by
11  your wife on the way to the police vehicle, were you still
12  struggling because you had your arms cuffed to the rear?
13 A Well, yeah.....
14 Q Were you still struggling because of that?
15 A .....it was hurting, you know. And I couldn't see and I
16  had a sprained ankle.
17 Q When you were blowing in the machine at the station, when
18  you were asked to blow and you were blowing, did you have
19  any Copenhagen in your mouth?
20 A I don't know.
21 Q You indicated that you were in a great deal of pain and
22  that's why you self-medicated with -- in part, that's why
23  you self-medicated with the Jack Daniels in the bathroom,
24  right?
25 A Yes.

Page 188

1 Q When did you start feeling this great pain?
2 A When did I start feeling it?
3 Q Yeah, that day.
4 A Kind of -- kind of like all day, you know. It was there,
5   a steady throb, and the longer I was on my foot the
6   greater the pain became.
7 Q So when did you wake up that day?
8 A I don't know. Probably like 8:00 or something. It was
9   Saturday.
10 Q And you were in pain then.
11 A Yeah, a little bit, but, you know, I was sleeping, I
12  wasn't on my foot. So, you know, I was in pain but not
13  huge pain.
14 Q But as the day wore on, the pain got worse.
15 A Yeah. And I couldn't find my medicine, my pain medicine.
16 Q When did you first look for that medicine?
17 A When I woke up, right before I went to work. I couldn't
18  find it. I thought possibly I left it at work or
19  something.
20 Q When you went to work to work on your own vehicle you
21  mean.
22 A Uh-huh. (Affirmative)
23 Q So prior to going to your place of work to work on your
24  own vehicle, that's when you looked for the Percocet and
25  couldn't find it.

Page 189

1 A Yeah.
2 Q So if you had found the Percocet, you would have taken
3   some right then.
4 A Yeah.
5 Q So if that's when you wanted the Percocet, before you even
6   worked on your vehicle that day, why didn't you try to get
7   more Percocet?
8 A It was a Saturday. I can't find it, how am I going to get
9   a hold of the doctor, you know.
10 Q Do you know if he was on call?
11 A I had no idea. It just -- I guess they rotate through. He
12  just happened to be on call in the emergency room that
13  day.
14 Q Why didn't you go to the emergency room then and tell them
15  about your problem?
16 A Because I didn't want to pay $300. I avoid the emergency
17  room. I mean I've been there, you know, several times,
18  but I try to avoid it.
19 Q So it's too expensive going to the emergency room to get
20  more Percocet, right?
21 A Right. It's a Saturday, so if you call down to Kodiak
22  Island Medical, the phone is unanswered.
23 Q So they don't work on Saturday, Kodiak Island Medical?
24  They weren't working on January 4th, 2003, a Saturday?
25 A I don't think so.

### Page 190

1  Q  Do you know whether they work on Saturdays?
2  A  Not for sure. I don't think they do because I think I've
3     called there before.
4  Q  At what point before -- at what point did you say to
5     yourself I'm going to drink some Jack Daniels to
6     self-medicate? Was it once you entered the bathroom or
7     was it before you entered the bathroom? When did you make
8     the decision I've got to relieve this pain by drinking
9     Jack Daniels?
10 A  Well, it was -- I was thinking of it when I picked my
11    brother up, but I had to take him out of the house to talk
12    to him and then check with Wade, run by Safeway, get some
13    Copenhagen, then I was done for what I was going to do for
14    the day and then I was going to get on the pain thing.
15 Q  I think you indicated that it would have severe business
16    ramifications for you if you were ever convicted of a DUI,
17    right?
18 A  Yeah, it could very well. Of course, I've seen the
19    service manager get a DUI and they didn't fire him. And I
20    was a pretty good mechanic and they liked me. They may
21    have kept me on, but.....
22 Q  They may have fired you.
23 A  They may have.
24 Q  And part of the.....
25 A  They.....

### Page 191

1  Q  Part of the reason they may have fired you is you could no
2     longer do test drives.
3  A  Right.
4  Q  So that would severely limit your ability to work for
5     them.
6  A  Right. I would have had to have someone else do all the
7     driving.
8  Q  There's been a lot of talk of these meds and I've made
9     some representations to you about the meds and I think I
10    need to show them to you just so that there's no
11    confusion. I'll show your attorney first. I'm going to
12    show you 1340 and 1337.
13 A  Can I get a little more of that water?
14 Q  Sure.
15 A  Thank you.
16    MR. KOZIOL: While we're at it, why don't I show you also
17 665. I'm going to show him that, too.
18 Q  Scott, you're going to be reading 1337 and 1340 to
19    yourself and let me know when you're done and I'm going to
20    show you 665, I think.
21 A  Yeah, I remember that.
22 Q  Okay. Let me show you -- take a look at 665.
23 A  Slipped on ice six days ago. December 31st. Six days ago
24    would have been -- wasn't that Christmas Eve?
25 Q  It would be the 25th of December, I believe, yeah, if you

### Page 192

1     subtract six from 31.
2  A  So, see, I kind of put up with it for a while.
3     Endomyacin, that's gout medication.
4  Q  When you're done, I'm going to ask you some questions
5     about those three pieces of paper.
6  A  Okay.
7  Q  So let's do it chronologically. The first one is December
8     4th, 2002 and that's with Dr. Panzarella and it looks like
9     you're seeing him for your knee. Would that be your right
10    knee?
11 A  Yes.
12 Q  And then he basically says you improved with your right
13    knee and that you're medically stable and that you can
14    work without restrict, right?
15 A  Right.
16 Q  Were you still having some symptoms in your right knee
17    though at this point?
18 A  Yeah.
19 Q  Pain, still had some pain?
20 A  Yeah, some pain, yeah.
21 Q  And then we go to December 31st, 2002 and this is with the
22    North Pacific Medical Center. I can't read who signed it.
23    It's unreadable, but do you think that's Dr. Creelman you
24    would have seen?
25 A  I'm pretty sure it was.

### Page 193

1  Q  Okay. Why.....
2  A  But, see, it says six days ago.
3  Q  I understand. But why did you go to see Creelman for your
4     left ankle problem when you had been seeing Dr. Panzarella
5     for your right knee? Is there some reason why you didn't
6     go to Panzarella at this point?
7  A  I don't know.
8  Q  Anyway.....
9  A  Probably, you know, because maybe he could get me in.
10    Sometimes, you know, this guy is all booked up, so go to
11    that one.
12 Q  Okay. So it looks like you injured your left ankle as you
13    told us at or around Christmas Eve, 2002.
14 A  Yeah. Uh-huh.
15 Q  And six days later you go see Dr. Creelman for this left
16    ankle problem, right?
17 A  Yeah.
18 Q  So this helps refresh you it was a left ankle that you
19    were dealing with, correct?
20 A  Yeah, it was this one. And that makes sense because of
21    the way they were trying to put me in the car.
22 Q  Okay. Then, and I'll represent to you that I didn't see
23    any other medical records between December 31 and February
24    12, '03. Okay?
25 A  Yeah.

Page 194

1  Q  I mean I've got a bunch of them and.....
2  A  I think what happened there, I was putting a car up on a
3     rack and I think it was like on a Friday or something and
4     I knelt down. It was on a sharp piece of rock or
5     something. You know, it was something. I can't remember
6     what it was. Well, it happened on a Friday and I remember
7     I borrowed a four-wheeler from where we work and my son
8     was all excited about -- you know, we had plans on going
9     camping and all this stuff. Well, I took him camping, but
10    ended up coming back the next day and, man, my leg was
11    just -- and my knee was huge. I went to the emergency
12    room that time, so there should be an ER record.
13 Q  Now this incident you're talking about, is this -- are you
14    saying that's what led you to go to see the doctor on
15    February 12th, 2003?
16 A  Is this the time I knelt on something?
17 Q  If this was the time you knelt on something, wouldn't you
18    expect it to be in the medical records?
19 A  Yeah, I don't think this was the time.
20 Q  Okay. In fact, I can show you another medical record
21    where it's you're kneeling on a metal bolt at work.
22 A  Oh, okay.
23 Q  So I don't think this is it.
24 A  I've been there so many times.
25 Q  Let's just take this event, February 12th, 2003. It says

Page 195

1     since this past weekend you've experienced pain in your
2     right knee and a couple days had popping and catching of
3     the knee about six times. He has had no unusual activity
4     but was kneeling down and squatting, putting something
5     together at floor level.
6  A  Yeah.
7  Q  Do you remember that happening?
8  A  I don't -- you know, I don't really remember that certain
9     incident. I mean this knee has given me, you know, so
10    many problems that I can't remember every time I've been
11    to the doctor for it.
12 Q  The doctor goes on to say his elbow is doing well. Would
13    that be a true statement on this date?
14 A  Yeah, I think so. It must have been.
15 Q  Then also the doctor says, quote, also in this period,
16    about six, seven weeks ago, he had a significant inversion
17    sprain of his left ankle with ecchymosis and swelling. He
18    had an air cast for a few days and then weaned away from
19    it. He's been progressively improving but still has some
20    pain in the ankle, mainly medially, end quote. Did you
21    tell the doctor that history of your ankle?
22 A  Yeah.
23 Q  Okay. Now there's no -- there's no mention in here.....
24 A  Yeah, I didn't -- I didn't tell him the police did it.
25 Q  .....of the incident with the police.

Page 196

1  A  I know.
2  Q  And is that because when you were talking to the doctor
3     you did not believe the police incident caused you any
4     physical problems?
5  A  No, that isn't why I didn't tell him. I just didn't tell
6     him about police because, to me, it's embarrassing.
7  Q  So, Scott, if you were going to tell him the full truth on
8     February 12th, 2003 and not.....
9  A  I'd say.....
10 Q  .....and not been embarrassed by this whole police
11    incident, what would you have additionally told him that
12    he would have recorded here?
13 A  Well, I would have said, yeah, it got re -- you know, my
14    ankle got re-injured on the night of the police thing
15    January 4th.
16 Q  Would you have said anything else?
17 A  Yeah, I would have said my knee got hurt and, you know, I
18    had bruises and this and that, they were kneeling in my
19    back. I mean I could have, you know, told him the whole
20    ugly story, but I didn't.
21 Q  Now you already told me it was already all over town,
22    right?
23 A  Yeah, pretty -- well everyone at work knew.
24 Q  So why, if you're saying it to me accurately now, why
25    would you be embarrassed about telling your physician if

Page 197

1     it was already all over town?
2  A  I don't know. I'm just embarrassed about it.
3  Q  And it's not -- it's not likely that it was because you
4     didn't make the link between any worsening of your
5     injuries and the police incident and that's why you didn't
6     tell him?
7  A  I didn't -- what do you mean I didn't make the link?
8  Q  Is it because at the time you saw this physician,
9     Dr. Panzarella, on February 12th, 2003 you didn't believe
10    the police had injured you and your ankle and your elbow
11    and your knee?
12 A  Well, no, I know that they -- you know, because it was
13    painful. It was more painful after they got done with me
14    than it was before, so for sure they did something to me.
15    I mean, you know, they hurt me.
16 Q  When did the pain return to its pre-police contact state?
17    How long after the incident? Let's take your elbow. How
18    long after the incident did it return to your pre-police
19    contact state?
20 A  I don't know. I can't remember.
21 Q  Days, weeks, months, years?
22 A  Not years, but.....
23 Q  Can you say?
24 A  You know, it's going to be a speculation thing. I can't
25    remember.

Page 198

1  Q  Can't answer?
2  A  I can't.
3  Q  How about your knee, right knee, when did it return to its
4     pre-police contact state?
5  A  My knee never really did. My knee got progressively worse
6     until I had the -- that bone in bone -- they got a cadaver
7     and they took a piece out of his leg and they put it in
8     me.
9  Q  And that improved your condition?
10 A  Well, it, yeah, improved the stability. However, if you
11    -- I mean I saw an x-ray just yesterday. I mean the
12    cartilage is like paper thin on this one and there's a big
13    like lump where it should be smooth. I mean this knee is
14    in terrible shape.
15 Q  The right knee.
16 A  The left knee is better, but not much. I mean it has all
17    the ligaments intact and everything.
18 Q  All right. When after the police contact did your left
19    ankle get back to what it was before the police contact?
20 A  I think what the police contact did, it just prolonged the
21    healing of the knee -- of the ankle, I mean. The knee, it
22    just got progressively worse, you know. It's getting
23    worse, you know. Some day I'll have to have one of those
24    prosthetic ones put in, I'm sure. But they won't do it
25    for me because they say I'm too young.

Page 199

1  Q  How long do you think your left ankle got prolonged as a
2     result of the police contact, the healing?
3  A  I can't say how long because -- you know, a sprained
4     ankle, it's something that's pretty hard -- I mean it's
5     hard to get over. They're really weak and easy to
6     re-sprain and, you know, stuff like that. I can't
7     really.....
8  Q  Just some final questions. Exhibit 1, the two pages, is
9     the drawing you drew of the Safeway parking lot and then
10    your route to Pillar Mountain, right?
11 A  Yeah.
12 Q  And then Exhibit 2 is the drawing you made of your house.
13 A  Yeah.
14    MR. KOZIOL: That's all I have.
15              SCOTT R. BROWN
16 testified as follows on:
17              RECROSS EXAMINATION
18 BY MR. HERZ:
19 Q  Some quick follow up and then we should be done, Scott.
20    You said you indicated you were thinking about -- you were
21    at least thinking about drinking some Jack Daniel to kill
22    the ankle pain when you picked your brother up, right?
23 A  Uh-huh. (Affirmative)
24 Q  But you had things to do, places to go?
25 A  Yeah.

Page 200

1  Q  So why was it that you waited until you got home?
2  A  Well, I waited until I didn't have to, you know, drive
3     anymore. I was going to take care of it in a little more
4     -- you know, without being illegal. I was going to take
5     care of it at home, but I'm not saying -- I think I would
6     have guzzled the whiskey just as fast.
7  Q  You were asked if you thought you would suffer
8     quote/unquote severe consequences if you had a DWI
9     conviction?
10 A  Yeah, I would have lost my license.
11 Q  Well, and you would have gone to jail, right?
12 A  Yeah, eventually.
13 Q  Do you agree or disagree that most people would consider
14    getting a DWI to carry severe consequences?
15 A  Yeah, I do. I think, you know, it's -- I think it's a
16    pretty severe thing. In fact, I had one way back when in
17    1983 or something. It wasn't actually a DWI thing, it was
18    an OUI.
19 Q  What's an OUI?
20 A  Operating under the influence. It was in Louisiana when I
21    was in the military. Got in big trouble. Got in trouble
22    by them and in trouble by the military. I was in trouble.
23 Q  Okay. Now how did you handle that incident in the
24    military in Louisiana?
25 A  Did everything they told me to do.

Page 201

1  Q  Did you admit to it?
2  A  Actually, I went to court on it. I didn't -- you know, I
3     didn't plea out or whatever.
4  Q  So if you're in the military, there was, what, some sort
5     of military hearing?
6  A  Yeah, they take your -- cut a little piece out of your
7     decal on your bumper, then you can't drive your car on
8     post.
9  Q  Okay. Now, are the consequences of a DWI so serious that
10    you would lie in court under oath about what happened?
11 A  No, I wouldn't. I mean lying is just going to make it
12    worse.
13 Q  But you are, what, willing to do whatever is within the
14    law to defend yourself?
15 A  Sure. Certainly. I mean, yeah, whatever is within the
16    law.
17 Q  Did you have right knee surgery in April '03?
18 A  I can't remember the exact dates of those surgeries.
19    There's been so many that I just can't remember.
20    MR. HERZ: Let me ask you this. I mean would you
21 stipulate there was a surgery in April of '03, Mr. Koziol?
22    MR. KOZIOL: Yeah, I've got -- I read some records
23 indicating arthroscopy right knee in or about April 23rd of
24 '03. For our records, so we can all double check it, it's
25 Bates stamped 1053, 1054.

### Page 202

1  Q   Did Dr. Panzarella do that one?
2      MR. KOZIOL: I'd have to look it up. Specifically, it was
3      right knee with partial synovectomy and chondral shaving of
4      defects in the patella and medial femoral chondoli.
5  A   Yeah, that was Panzarella because the only time my knee
6      has ever been operated on where they didn't cut something
7      out, they put something in was the last time and that was
8      done here in Anchorage by Dr. Bret Mason.
9  Q   So here's my question. And we have these medical records
10     that you just looked over. In December of '02 you have a
11     medical record that says your right knee is improved and
12     it's medically stable. Within four months you're having
13     knee surgery. Other than the trauma with the incident
14     with the police on January 4th, was there any other
15     traumatic event that you can recall in that four-month
16     period leading up to the surgery on your right knee after
17     being medically stable?
18 A   I don't know. Not unless it was the time I knelt down on
19     that thing. See, I can't remember. I mean this knee, it
20     would just start popping, locking up, giving out. You
21     know, and it's been so many times I can't -- I can't
22     remember.
23 Q   Okay.
24 A   It's all kind of a jumbled up mess. I can't remember if
25     it was operated on because I knelt on that sharp thing or

### Page 203

1      it was operated on because it was just a continual, you
2      know, pain and locking up and giving out and its
3      miserableness.
4  Q   Okay. Then in terms of your left ankle you were asked
5      about when it returned -- if I understand correctly, the
6      injury occurred December 25th, you saw a doctor on
7      December 31st.
8  A   Right.
9  Q   And four days later you have this incident with the police
10     where there's more trauma to your ankle.
11 A   Right.
12 Q   The injury never was healed, is that fair to say?
13 A   Yeah, it wasn't all the way healed. Yeah, for sure. And,
14     you know, like I did it Christmas Eve. Well, you know
15     everyone is off on Christmas, right, except for the
16     emergency room.
17 Q   And then you're seen by the doctor and six to seven weeks
18     after the event you're still experiencing pain in your
19     ankle?
20 A   Yeah, pain in my ankles, knees, back.
21     MR. HERZ: No further questions.
22         SCOTT R. BROWN
23 testified as follows on:
24     REDIRECT EXAMINATION
25 BY MR. KOZIOL:

### Page 204

1  Q   Let me read for you from 1052, which is the April 23rd,
2      2003 document. History and physical exam by
3      Dr. Panzarella. He says -- I'll just read the entire
4      history to you. Patient is a 39-year-old man with pain,
5      popping and giving way of his right knee. The patient
6      developed pain and synovitis in July 2002 following
7      kneeling on a metal bolt at work. Ultimately, because of
8      persistence of symptoms, he underwent an arthroscopy of
9      the right knee on September 5, 2002 where hydrotropic
10     synovitis with localized chondral defect of the patella
11     and the medial femoral chondoli and lateral tibial plateau
12     were found. Chondral shaving and partial synovectomy was
13     performed. Post-operatively the patient is improved --
14     was improved but continued with intermittent pain in the
15     knee. Over the ensuing months he developed increased pain
16     and episodes of catching and giving way of the knee.
17     Despite treatment with anti-inflammatory medications and
18     rest, his symptoms have not resolved. Accordingly, a
19     diagnostic arthroscopy of the knee is planned with
20     possible partial meniscectomy. So, did you tell
21     Dr. Panzarella on April 23rd, 2003 after the September 5,
22     2002 surgery that you were improved but you continue to
23     have intermittent pain in the knee during that time frame?
24 A   Yeah, it's whatever it said is what I told him.
25 Q   Okay. So, from what I read to you, and apparently you're

### Page 205

1      conceding what you told him, it just -- you continued to
2      have this intermittent pain and you continued to
3      experience or you began experiencing catching and giving
4      way of the knee and the treatment didn't resolve the
5      symptoms. That's apparently what you told him, right?
6  A   Yeah, it's whatever it says right there.
7  Q   And that's accurate.
8  A   Yes.
9  Q   Again, you didn't even tell him anything about this
10     incident with the police.
11 A   No, I didn't. You know, to me it's embarrassing. I know
12     better now.
13     MR. KOZIOL: That's all I have.
14         SCOTT R. BROWN
15 testified as follows on:
16     RECROSS EXAMINATION
17 BY MR. HERZ:
18 Q   Did you have any knowledge about whether Panzarella or
19     Creelman knew about your incident with the police?
20 A   I don't think they did. Creelman may have because he was
21     -- you know, they admitted my brother on the same night
22     because I think he had back pain or something and Creelman
23     was on staff for the ER doctors, so he may have knew
24     something about it.
25 Q   But you don't know for sure if he did or not?

Page 206

```
 1  A   No, I don't know.
 2  Q   So while -- is it fair to say while there may have been
 3      some people in town who knew about this.....
 4  A   Yeah, when.....
 5  Q   .....the fewer people who knew the better?
 6  A   Yeah.
 7  Q   Why spread it around more.
 8  A   Exactly. I mean I know that a lot of people on Purtov
 9      where I live, there's a great, big apartment complex kind
10      of kitty-corner to my house and lots of windows. I mean
11      the place was lit up like Los Angeles.
12  Q   Okay. Now.....
13  A   Everyone at my work knew. And, yeah, I mean.....
14  Q   That was bad enough.
15  A   Yeah, that's bad enough.
16  Q   Okay. From the history that was read from that medical
17      report from Bates stamp 1052, it sounded like you knelt on
18      a bolt in July of '02. So, since that gave us the date
19      for when you knelt on the bolt -- I'll ask my question
20      again. From the time where you were medically stable in
21      December of '02 until April of '03 when you had the
22      surgery, was there any other trauma that you can recall
23      occurring to your knee other than the trauma that was
24      involved with the arrest that was done by Officer Peterson
25      and Officer Holden?
```

Page 207

```
 1  A   No. You know, I mean no accidents or anything like that.
 2      MR. HERZ: Okay. No further questions.
 3      MR. KOZIOL: I think we're done.
 4      REPORTER: This concludes the deposition. The time is
 5  4:12 p.m.
 6      (Off record)
 7            (END OF PROCEEDINGS)
```

Page 208

CERTIFICATE

UNITED STATES OF AMERICA   )
                           )ss
STATE OF ALASKA            )

I, Joseph P. Kolasinski, Notary Public in and for the state of Alaska, residing in Anchorage in said state, do hereby certify that the deponent in the foregoing matter was duly sworn to testify to the truth, and nothing but the truth;

That said testimony was taken at the time and place therein stated;

That the testimony of said witness was recorded electronically and thereafter transcribed under my direction and reduced to print;

That the foregoing is a full, complete, and true record of said testimony.

I further certify that I am not a relative, nor employee, nor attorney, nor of counsel of any of the parties to the foregoing matter, nor in any way interested in the outcome of the matter therein named.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my seal this 29th day of January, 2007.

_____
Joseph P. Kolasinski, Notary Public
in and for the State of Alaska.
My Commission Expires: 03/12/2009

Page 209

WITNESS CERTIFICATE

RE:            BROWN VS. PETERSON, ET AL
CASE NUMBER:   A05-0002 CIVIL
DEPOSITION OF: SCOTT R. BROWN
DATE TAKEN:    JANUARY 16, 2007

I hereby certify that I have read the foregoing deposition and accept it as true and correct, with the following exceptions:

Page   Line       Description
____   ____   _____
____   ____   _____
____   ____   _____
(additional blank lines)

If additional paper is needed, please sign and date each sheet.

_____
SCOTT R. BROWN        DATE

# Computer Matrix Court Reporters, LLC

700 W. 2nd Avenue
Anchorage, Alaska 99501
Phone (907) 243-0668, Fax (907) 243-1473
jpk@gci.net - sahile@gci.net

*P 2 RB*
APR 2 5 2007

April 25, 2007

Mr. Frank S. Koziol
Attorney at Law
618 Christensen Drive
Anchorage, AK 99501

RE:  **Brown v. Peterson, et al.,**
     **A05-0002 Civil**

Attached is the Witness Certificate for the **Scott Brown** transcript in the above-mentioned case.

Please substitute the Witness Certificate page in the copy of the aforementioned transcript which you have. Also attached is the original signed and sealed transcript.

Thanks,

COMPUTER MATRIX COURT REPORTERS, LLC

Page 209

1                        WITNESS CERTIFICATE

2    RE:               BROWN VS. PETERSON, ET AL
3    CASE NUMBER:      A05-0002 CIVIL
     DEPOSITION OF:    SCOTT R. BROWN
4    DATE TAKEN:       JANUARY 16, 2007

5        I hereby certify that I have read the foregoing deposition
     and accept it as true and correct, with the following
6    exceptions:

7    Page      Line              Description

8
     143       9         Wife - not mom
9
     143       10        only took pills once - NOT again
10
     22        7         Spelled Brennick
11
     144       13        Never reported he took 30 pills, only that
12
                         was how many prescribed.
13
     182       17        Skonberg
14

15

16

17

18

19

20

21

22

23   If additional paper is needed, please sign and date each sheet.
24
                                        SCOTT R. BROWN    2/18/07  DATE
25

Computer Matrix, LLC          Phone - 907-243-0668          jpk@gci.net
310 K Street, Suite 200       Fax    907-243-1473           sahile@gci.net