IN The SUPERIOR COURT FOR The STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT KODIAK

| | |
|---|---|
| STATE OF ALASKA, | ) |
| Plaintiff, | ) |
| v. | ) |
| SCOTT R. BROWN, | ) |
| Defendant. | ) |
| Case No. 3KO-03-12 CR | |

P 2 — RB
NOV 2 2 2006

VOLUME I

TRANSCRIPT OF PROCEEDINGS (EXCERPT)

April 3, 2003 - Page 01 through Page 85

Ex. Y

TRANSCRIPT OF PROCEEDINGS          4/3/2003          STATE OF AK v. BROWN
Vol. 1                                                3KO-S03-012 CR

2 (Pages 2 to 5)

### Page 2

```
 1            TABLE OF CONTENTS
 2  WITNESSES:       VOL  DIRECT  CROSS  REDIRECT  RECROSS
 3  FOR THE PLAINTIFF:
 4  Damon Brown          I    08      17
 5  Beverly J. Brown     I    20      27       31
 6  Frank R. Peterson, Jr. I  33      45       51
 7  EXHIBITS:                            ADMITTED
 8  FOR THE DEFENDANT:
 9  A - Diagram                          30
10  COURT QUESTIONS TO PLAINTIFF:        PAGE 56
11  COURT QUESTIONS TO DEFENDANT:        PAGE 71
12  CLOSING ARGUMENT BY PLAINTIFF:       PAGE 79
```

### Page 3

```
         EVIDENTIARY HEARING ON MOTION TO SUPPRESS

         BEFORE The HONORABLE DONALD D. HOPWOOD
                     Superior Court Judge
                       Kodiak, Alaska
                       April 10, 2003
                         9:30 a.m.
APPEARANCES:
  FOR The Plaintiff:    MR. JOSEPH S. SLUSSER
                        Assistant District Attorney
                        424 Marine Way, Suite 202
                        Kodiak, Alaska 99615

  FOR The DEFENDANT:    MR. ALAN L. SCHMITT
                        Jamin, Ebell, Schmitt & Mason
                        Attorneys at Law
                        323 Carolyn Street
                        Kodiak, Alaska 99615
```

### Page 4

PROCEEDINGS

Media 3KOA03-52
9:31:39

THE CLERK: The superior court for the state of Alaska is now is session, the Honorable Donald D. Hopwood presiding.

THE COURT: Please be seated. Good morning.

We have an evidentiary hearing set in State versus Scott Brown, 3KO-03-12 criminal. Mr. Slusser is here for the state. Mr. Schmitt, and your client is here?

MR. SCHMITT: Yes, that's correct, Your Honor.

THE COURT: Okay. And this is a motion to suppress regarding the misdemeanor DUI in the file. And so we'll start on that in a moment.

Since then, the grand jury has returned an indictment filed under this case number, and the summons hasn't gone out yet. We might as well arraign Mr. Brown on that. Do you have a copy of the indictment?

MR. SCHMITT: I do, but I haven't actually shown it to Mr. Brown yet. I did tell him about it.

THE COURT: Well, let's do it and then we won't have to have a separate proceeding or serve the summons. I've got extra copies of the indictment if you need them.

MR. SCHMITT: Thank you, Your Honor. Yes, Your Honor, please.

THE COURT: Here are a couple of copies. This was

### Page 5

returned and filed March 27. And there are two counts. Count I, assault in the third degree, Count II, tampering with physical evidence.

Mr. Brown, is your name spelled correctly there?

MR. BROWN: Yes, sir.

THE COURT: Okay. And the date of birth correct?

MR. BROWN: Yes, Your Honor.

THE COURT: And two -- three lines below your birth date is a social security number. Is that right?

MR. BROWN: That is correct, Sir.

THE COURT: Okay. And, Mr. Schmitt, are you waiving further readings and advisements?

MR. SCHMITT: That's correct, Your Honor.

THE COURT: Okay. And the pleas are not guilty?

MR. SCHMITT: That's correct, Your Honor.

THE COURT: All right. Pleas of not guilty are entered to both counts in the indictment.

These are two new charges. They weren't charged in the felony complaint. And I'm looking here, it looks like they arise out of -- well, either the same or related incident, or at least on the same day. So there hasn't been a Rule 45 calculation here for these two new charges. For the misdemeanor, it is May 24. Any thoughts on Rule 45 calculation, when the start date is?

MR. SLUSSER: Your Honor, I think it would coincide with

Page 6

1  the misdemeanor that's been filed.
2      THE COURT: Okay.
3      MR. SCHMITT: I have not had an opportunity to.....
4      THE COURT: Okay.
5      MR. SCHMITT: .....review that issue, Your Honor.
6      THE COURT: All right. I'll go ahead and assume it's May
7  24, and let me look at the calendar when we already did.....
8      MR. SLUSSER: It arises out of the same facts, Your Honor,
9  for purpose of calendar.
10     THE COURT: Okay. All right. Let's see here. The trial
11 on the misdemeanor was calendared earlier for the week of May
12 -- excuse me April 21, and so I think I'll just calendar the
13 felony charges for the same time in the same trial, the week of
14 April 21. Calendar call is April 16 at 3:30. The case remains
15 assigned to me for all purposes.
16     And I think I'm going to set an omnibus hearing -- how
17 does the 15th look? We had time yesterday for that. Okay.
18 Set the omnibus hearing for April 15 at 3:30. 12(b) motions
19 due the same date. And we'll enter the usual felony pretrial
20 order with that information on it.
21     Anything else regarding the arraignment before we move on
22 to the evidentiary hearing?
23     MR. SLUSSER: Nothing else, Your Honor.
24     MR. SCHMITT: Not from the defense, Your Honor.
25     THE COURT: Okay. As to the motion to suppress, I've

Page 7

1  reviewed all of the pleadings, affidavits, attendant papers on
2  the motion, the opposition, and the reply. And the calendaring
3  order limited this hearing, the evidentiary portion of it, to
4  addressing matters that aren't in evidence by affidavit, that
5  is, new information or cross examination regarding the
6  affidavits, so try not to get repetitive.
7      The law as I understand it, and which I think the parties
8  don't disagree on is that for warrantless searches or entries,
9  the state has the burden of proving some authority to do so by
10 the preponderance of the evidence. I think normally that would
11 mean the state would go first. Do you have your evidence you
12 want to.....
13     MR. SLUSSER: I do.
14     THE COURT: .....start presenting?
15     MR. SLUSSER: I agree with that, and I think I should go
16 first also, because I was the one that requested the hearing,
17 and the fact that the hearing was opposed, so I'm the one who
18 wants to put on some evidence.
19     THE COURT: Okay. We'll do that, and then, Mr. Schmitt,
20 the defendant may present evidence when the state rests. You
21 can call your first witness.
22     MR. SLUSSER: Thank you, Your Honor. Mr. Brown.
23     THE COURT: Sir, would you come up and have a -- just
24 stand besides this chair at the witness stand, and raise your
25 right hand for an oath.

Page 8

1      (Oath administered)
2      MR. BROWN: I do.
3             DAMON D. BROWN
4  called as a witness on behalf of the plaintiff, testified as
5  follows on:
6             DIRECT EXAMINATION
7      THE CLERK: You may be seated. For the record, would you
8  state your full name, spelling both your first and last name,
9  please.
10 A  Damon D. Brown. D-A-M-O-N B-R-O-W-N.
11     THE COURT: Okay. You may proceed, Mr. Slusser.
12     MR. SLUSSER: Okay. Thank you, Your Honor.
13 BY MR. SLUSSER:
14 Q  Mr. Brown, I'd like to direct your attention to last
15 January 4th in the late afternoon. Do you recall being in
16 the company of Scott Brown while you were driving, or
17 while you were inside a pickup truck, that being a gold
18 colored cab with a flatbed?
19 A  Yes.
20 Q  On that day were either of you drinking any alcohol?
21 A  No.
22 Q  Neither of you had any alcohol whatsoever?
23 A  I'd had some the night before. In fact I'd -- I had a
24 pretty hellacious hang-over, but no alcohol that day.
25 Q  So you had not had any alcohol as of -- and certainly --

Page 9

1  well, when did you stop drinking alcohol?
2  A  It was about 3:00 a.m.
3  Q  On the night before?
4  A  Correct.
5  Q  So when you say 3:00 a.m., you're not talking about 3:00
6     a.m. on the 4th, but 3:00 a.m. on the 3rd?
7  A  Well, it would be the 4th, 3:00 o'clock in the morning on
8     the 4th.
9  Q  All right. So you had been drinking alcohol that same
10    day, very early in the morning?
11 A  Correct.
12 Q  At 3:00 a.m.?
13 A  Correct.
14 Q  And.....
15     MR. SCHMITT: Your Honor, I just have to object to
16 relevance on this line of questioning.
17     THE COURT: Okay. And the relevance?
18     MR. SLUSSER: Your Honor, if these gentlemen were in each
19 other's company, if they had been partying together, that would
20 seem to indicate that in fact Mr. Brown, Scott Brown, the
21 defendant, was fleeing the officer despite his denials in his
22 affidavit, and in fact it was a hot pursuit condition --
23 situation. So if he was.....
24     THE COURT: But we -- but the witness hasn't testified
25 about that. He's talking about his own condition. I think the

Page 10

1. objection goes to the testimony about Damon Brown's condition.
2. MR. SLUSSER: Yes. Well, they were in each other's
3. company, and so I think I'm allowed a little leeway in asking
4. since they were in each other's company whether they were
5. drinking.....
6. THE COURT: Okay.
7. MR. SLUSSER: .....and this all goes to the issue as to
8. whether Scott Brown was drinking such that he was fleeing.....
9. THE COURT: Okay. and there was a hot pursuit situation
10. when.....
11. THE COURT: Okay.
12. MR. SLUSSER: .....the officer got.....
13. THE COURT: I'll hear it. The objection's overruled. Go
14. ahead.
15. Q  So, sir, you were drinking -- the last time you'd had
16.    anything to drink was 3:00 o'clock a.m. that same morning,
17.    is that right?
18. A  Correct.
19. Q  You recall the time when the officer entered your
20.    brother's house, don't you?
21. A  Yes.
22. Q  And that was on what street?
23. A  Purtov.
24. Q  At that time, had you -- did you guys have any alcohol in
25.    the car?

Page 11

1. A  No.
2. Q  Have any empties in the car?
3. A  No.
4. Q  Who got out of the vehicle first?
5. A  My brother.
6. Q  And who had been driving?
7. A  My brother.
8. Q  Do you recall -- or when did you first know there was an
9.    officer that was following your vehicle?
10. A  About the time we turned off of Madson onto Purtov.
11. Q  What discussion did you have with your brother about that?
12. A  None.
13. Q  How did you know an officer was following you?
14. A  Well, all I saw was the officer -- we went down and up the
15.    hill up Madson, and I saw an officer coming up that same
16.    street. I had no idea that he was after us, or if he was
17.    just going to the -- the Spruce Apartments which is down
18.    the street, which has officers there quite often.
19. Q  When did you first believe -- I guess I asked you before,
20.    when did you first believe an officer was following your
21.    vehicle?
22. A  About the time that he pulled up next to the dumpster.
23. Q  And where was that dumpster?
24. A  It's between 1219 and 1217 Purtov.
25. Q  And how far is that from your brother's house?

Page 12

1. A  Twenty feet. Thirty feet.
2. Q  And you claim there was no discussion then between you and
3.    your brother?
4. A  No. My brother had to go to the bathroom, he was already
5.    out of the vehicle.
6. Q  So neither you nor your brother remarked on that fact?
7. A  Correct.
8. Q  Now, when your brother got out of the vehicle, did he go
9.    -- get out quickly or did he get out slowly?
10. A  Well, he had to go to the bathroom, he got out kind of
11.    quickly.
12. Q  How many seconds after coming to a complete stop was it
13.    that your brother opened the door to leave the vehicle?
14. A  Well, maybe five.
15. Q  And how many seconds after coming to a complete stop was
16.    it that you opened the door to the passenger's side of the
17.    vehicle?
18. A  Maybe 30.
19. Q  Why the difference?
20. A  I was looking for a pair of leather gloves.
21. Q  Did you find your gloves?
22. A  I found one of them. I didn't find the other one.
23. Q  Did you remove that from the car?
24. A  No, I left it laying right on the seat.
25. Q  I'm sorry, when I say car, I mean truck, cab of the truck.

Page 13

1.    Did you remove anything else from the cab of the truck?
2. A  No.
3. Q  Now, why did you go up Pillar Mountain Road?
4. A  Well, the throttle was sticking on the truck, and went to
5.    apply the brakes, and it started sliding, so we went
6.    uphill.
7. Q  Well, why did you go up Pillar Mountain Road to begin
8.    with? Why were you headed up that road, up that direction
9.    to begin with?
10. A  When we were approaching the end of Selief we stepped on
11.    the brakes and the vehicle kept going forward. And
12.    instead of turning down, we turned up to slow the vehicle,
13.    and we went up Pillar instead of.....
14. Q  How.....
15. A  .....instead of turning the other way and then getting
16.    onto Madson.
17. Q  How far did you go up Pillar Mountain Road?
18. A  Up to the gravel pit.
19. Q  What did you do at the gravel pit?
20. A  Stopped and tried to remedy the problem.
21. Q  Who raised the hood? Was the hood raised?
22. A  No.
23. Q  You never -- did you get out.....
24. A  I.....
25. Q  .....of the vehicle?

Page 14

1  A  I don't -- I don't recall raising the hood.
2  Q  Well, you were there?
3  A  Yes.
4  Q  Was the hood raised?
5  A  Not to my knowledge.
6  Q  What attempts were made to remedy the situation on the
7     vehicle?
8  A  Well, I found some wires that were hanging down underneath
9     the dash around the -- the linkage, and I was underneath
10    there moving wires up, putting them back up in a clip.
11 Q  Now when did you first notice a problem with the truck
12    that day?
13 A  When we were going down Selief.
14 Q  You didn't have any problem before that then?
15 A  Not much.
16 Q  Well, sir, either you did or you did not.
17    MR. SCHMITT: Your Honor, again I have to object to the
18 relevance. I think this is -- we're getting into the fishing
19 expedition that I objected to in my opposition. The real issue
20 here is what Officer Peterson knew when he was pursuing, and
21 we're going all over the place with this line, Your Honor. We
22 only have a short period of time to address the true issues.
23    THE COURT: Mr. Slusser.
24    MR. SLUSSER: You know, Your Honor, I've never seen a
25 case, the court can take it for what it's worth, this doesn't

Page 15

1  mean much, but it's more rife in my opinion with perjury. It
2  -- this is important because there's an alibi here that the
3  reckless driving on that particular day was due to the fact of
4  a throttle problem with the vehicle. In fact, the state's
5  theory is that Mr. Scott Brown was intoxicated on that day.
6  That why there was a chase, that's why he was actually running,
7  not just going pooh-pooh, and that's why there was hot pursuit,
8  and it goes to the issue that we're trying to address here.
9     THE COURT: But isn't it the information the officer had
10 that's pertinent to the inquiry and the analysis here?
11    MR. SLUSSER: Your Honor, in order to assess what was
12 going on and who to believe in this case, the court's going to
13 have to figure out what was really going on. They're telling
14 the court, nobody was drinking. They're telling the court that
15 there was not a hot pursuit. They're saying nobody was running
16 from the police. I'm saying this is not true. In fact, people
17 were drinking on that day. In fact, that's why they were
18 driving recklessly, not because of the problem with the
19 vehicle.
20    THE COURT: Yeah. Okay. Well, I guess I'll allow it, but
21 we're going to -- we have to stop at 10:30.
22    MR. SLUSSER: I'll proceed quickly, Your Honor. I just
23 want to get a few things out. I promise I'll proceed as
24 quickly as I can.
25    THE COURT: Okay. I have other proceedings at 10:30 and

Page 16

1  I'm not going to let this go on and drag on and on, so.....
2     MR. SLUSSER: All right. Very good, Your Honor.
3     THE COURT: Go ahead.
4           DIRECT EXAMINATION CONTINUED
5  BY MR. SLUSSER:
6  Q  Sir, when did you first notice a problem with the throttle
7     on that day?
8  A  When my brother informed me when we were going down
9     Selief. Now, I wasn't driving, so I have no idea if there
10    was a problem prior to that.
11 Q  When did he pick you up on that day?
12 A  When he picked me up at the house about 10:00 o'clock
13    after I'd slept.
14 Q  10:00 o'clock a.m.?
15 A  Yes.
16 Q  So you were with him the whole day?
17 A  Pretty much, yes.
18 Q  And when you say the first time he said -- he mentioned
19    the problem was on Selief, you're talking about shortly
20    before you were pulled over by police?
21 A  Yeah.
22 Q  Now, did you buy any alcohol on that day?
23 A  No.
24 Q  Why were you parked in front of the Safeway store in the
25    vicinity of the liquor area?

Page 17

1  A  Went in and got some Copenhagen. It's faster to get it
2     there than it is to go in through the store.
3  Q  So you were buying alcohol on that day?
4  A  No, I bought a can of Copenhagen.
5  Q  Now, what kind of alcohol do you drink when you do drink?
6     Or do you drink?
7  A  Yes, I do.
8  Q  What kind of alcohol do you drink?
9  A  I prefer beer.
10 Q  What kind?
11 A  Budweiser.
12    MR. SLUSSER: I think that's it, if I may just have a
13 second, Your Honor.
14    (Pause)
15    MR. SLUSSER: Your Honor, that's all I have from this
16 witness.
17    THE COURT: All right. Cross examination, Mr. Schmitt?
18           DAMON BROWN
19 testified as follows on:
20           CROSS EXAMINATION
21 BY MR. SCHMITT:
22 Q  Mr. Brown, I believe you testified that, is it Spruce
23    Manor Apartments that are in the neighborhood?
24 A  Yes.
25 Q  How long have you lived on Purtov?

Page 18

1   A  Since October 25th of 2002.
2   Q  Since you've been there, how many times have the police
3      responded to the Spruce Manor Apartments?
4   A  Oh, I've seen probably 10, 12, and.....
5   Q  And if -- and .....
6   A  .....that was -- that was up -- up to January, and since
7      then I've seen, well, probably five or six more.
8   Q  So in your mind, the police coming down the street you're
9      on more likely than not would be going to the apartment
10     complex?
11  A  Correct.
12  Q  Did you hear a siren that day?
13  A  No.
14  Q  Did you hear the officer saying anything before he went
15     into the house?
16  A  Nothing.
17  Q  If he had shouted at your brother to stop, would you have
18     heard it?
19  A  Yes.
20  Q  Did you hear it?
21  A  No.
22     (Pause)
23  Q  Did you hear the officer saying anything as he -- well,
24     let me back up.  Did you see the officer getting out of
25     his vehicle?

Page 19

1   A  No, I didn't see the officer getting out of his vehicle.
2      I saw the officer running down the -- the walkway to the
3      house.
4   Q  Okay.  Were any of the doors open to your vehicle at that
5      point?
6   A  I was -- I had the passenger door open.
7   Q  Okay.  So was the engine running on the truck?
8   A  No.
9   Q  Was there any other outside noise that would have kept you
10     from hearing if the officer was saying anything?
11  A  No.
12  Q  Okay.
13     MR. SCHMITT:  And those are all the questions that I had,
14  Your Honor.
15     THE COURT:  Any redirect?
16     MR. SLUSSER:  (No audible answer)
17     THE COURT:  All right.  Sir, you may step down.  You're
18  excused.
19     MR. SLUSSER:  We'll -- just -- Your Honor, this would
20  probably be a very quick witness, but just call Mrs. Brown,
21  Your Honor.
22     THE COURT:  All right.
23     (Witness summoned)
24     THE COURT:  Ma'am, you can come up here to the witness
25  stand.  Just remain standing by that chair, please.  Would you

Page 20

1   raise your right hand for a witness oath.
2   (Oath administered)
3   MS. BROWN:  I do.
4              BEVERLY J. BROWN
5   called as a witness on behalf of the plaintiff, testified as
6   follows on:
7              DIRECT EXAMINATION
8   THE CLERK:  You may be seated.  For the record would you
9   state your full name, spelling both your first and last name,
10  please?
11  A  Beverly Jeannette Brown.  B-E-V-E-R-L-Y B-R-O-W-N.
12     THE COURT:  Go ahead.
13     MR. SLUSSER:  Thank you.
14  BY MR. SLUSSER:
15  Q  Ms. Brown, you're married to whom, ma'am?
16  A  Scott Brown.
17  Q  And do you recall the events of January 4th of this year
18     in late afternoon when an officer entered your house?
19  A  Yes.
20  Q  Now, ma'am, since you're married to Mr. Brown, I gather
21     you're waiving your marital privilege as to the events
22     that happened on that day while the officer was in the
23     house?
24  A  I.....
25  Q  What you testified in your affidavit?

Page 21

1   A  I don't understand what you mean, I'm waiving what right?
2   Q  Did anybody discussed your marital privilege with you?
3   A  I don't know what you're talking about.
4   Q  Well, ma'am, and maybe you could be instructed -- may be
5      instructed accordingly, I don't know, but you have a right
6      not to testify, except that you've done an affidavit.
7   A  Uh-huh.
8   Q  I was just wondering if you understood you were waiving
9      that.  If you didn't understand that, that's fine, I'll
10     move on, but.....
11  A  Oh, I knew what I was signing.
12  Q  Did you know you were waiving your privilege?
13  A  I -- yeah.
14  Q  Okay.  Now, ma'am, does your husband on occasion drink
15     alcohol?
16  A  Yes.
17  Q  Had he been drinking any alcohol on that day?
18  A  He did in the kitchen, he drank a beer.
19  Q  Prior to that time did -- had he been drinking any?
20  A  I couldn't tell you.
21  Q  Did he appear -- you know what he's like when he's been
22     drinking alcohol, right?
23  A  Yes, I do.
24  Q  Did he appear to you that he had been drinking anything.
25  A  Not really, no.

### Page 22

1  Q  Now, Ms. Brown, what do you recall about the -- whether
2     your husband came into the house quickly or slowly?
3  A  Well, he kind of limped through. I didn't really pay
4     attention to how fast he was going. He.....
5  Q  So you don't know.....
6  A  .....said he had to.....
7  Q  You don't know how fast he was going?
8  A  I would say faster than a normal walk.
9  Q  Did he appear to be in a hurry or not?
10 A  Not an absolute hurry.
11 Q  Ma'am I don't know what an ab -- not an absolute hurry
12    means.
13 A  He said he had to use the bathroom, so, you know, normally
14    if I have to use the bathroom, I'm kind of hurrying, but
15    not racing.
16 Q  When did he say he had to use the bathroom?
17 A  Do you want a location or -- because he had come in the
18    house, and I'd come by our hall and he said he had to go
19    to the bathroom.
20 Q  And did he say anything else?
21 A  No.
22 Q  And you said he was going I guess in a normal manner as a
23    person would who usually goes.....
24 A  Well, just a little faster than a normal walk.
25 Q  And did an officer -- did you see an officer at some point

### Page 23

1     after your husband entered your house?
2  A  Yes, I did.
3  Q  And how many seconds elapsed before the officer came in?
4  A  I don't know.
5  Q  Ma'am, I was not there, so I've got to, you know, ask
6     these questions to sort of get the evidence.
7  A  Well, let's see. It's about -- from where I was standing
8     when Scott came in, I was anywhere from 7 to maybe 10 feet
9     from the door, and after he passed me, I kind of watched
10    Scott walk by, and then I walked towards the door, just to
11    get to the door, you know, and then the officer came
12    through, so.....
13 Q  Ma'am, my question was very simple. How many seconds
14    after your husband entered did the.....
15 A  Seconds.
16 Q  .....officer enter?
17 A  Let's see. Well, I don't know, I'm going to way about 25,
18    30, I.....
19 Q  About half.....
20 A  .....don't know.
21 Q  .....a minute?
22 A  I'm assuming, yeah. I.....
23 Q  Well, are you assuming or did you see the two entries?
24 A  I didn't put a time on it. I wasn't watching the clock.
25    I couldn't really tell you.

### Page 24

1  Q  Your best estimate is 30 seconds?
2  A  Yeah, somewhere in there.
3  Q  Now, did your husband close the door tightly behind him
4     when he entered?
5  A  He closed it and it was just fixing to click, it was just
6     about closed, and I got to the door and it was clicking
7     and the officer came through.
8  Q  Now, ma'am, do you usually assist your husband in closing
9     the door when he enters the house?
10 A  I usually assist my kids and my husband if they leave the
11    door open.
12 Q  So, ma'am, your testimony now is that he left the door
13    open when he came in, isn't that right?
14 A  No.
15 Q  Well, ma'am, why did you assist your husband in closing
16    the door when he came in?
17 A  I didn't assist him. He had pushed the door and it was
18    definitely closing, and I got to the door, I touched the
19    door knob, wham, the door come open.
20 Q  Uh-huh. Ma'am, do you -- why did you feel the need to
21    help close the door? Apparently it wasn't going to close
22    on its own without your assistance?
23 A  It would have closed on its own.
24 Q  Why did you feel the need then to assist it?
25 A  I was heading towards the kitchen, so I just checked the

### Page 25

1     door.
2  Q  And, ma'am, when you say, wham, the door opened, I guess
3     it took you some 30 seconds to get from your position to
4     the door?
5  A  It's possible, yeah, because I stood there for a minute
6     and just watched and didn't think anything about it, and
7     then walked towards the door.
8  Q  Well, ma'am, if it took 30 seconds for you to get there,
9     evidently the door was finished closing of its own
10    momentum, wasn't it?
11 A  The way -- my house is uneven, so the door can get right
12    there, almost closed, and then stick.
13 Q  So basically your husband came in in such a hurry he
14    didn't close the door, did he?
15 A  In such a hurry? I wouldn't say he was really hurrying.
16 Q  He didn't close the door tightly when he came in, did he?
17 A  No.
18 Q  You closed it -- you had to try to close it for him?
19 A  I didn't have to try to close it. It would have went,
20    but.....
21 Q  When your husband drinks alcohol, what kind does he drink?
22 A  There's different kinds.
23 Q  Ma'am, I know there's different kinds of alcohol, that's
24    why I asked.....
25 A  Okay.

Page 26

1  Q  .....the question.
2  A  Crown Royal, vodka, Budweiser, that's the ones I have
3     seen.
4  Q  Okay. Budweiser, that being a beer?
5  A  Yes, sir.
6  Q  The other being hard liquor?
7  A  Yes, sir.
8  Q  So Budweiser is Mr. Brown's beer of choice?
9  A  Yes.
10 Q  How long was Mr. Brown in the bathroom?
11    MR. SCHMITT: I guess I object to this, Your Honor. It's
12 well after the officer came into the house. It can't be
13 relevant for purposes of the hearing today.
14    THE COURT: Relevance?
15    MR. SLUSSER: Your Honor, if in fact the officer was on
16 one side of the door pushing in while Mr. Brown was on the
17 other side of the door pushing out, he wasn't going to the
18 bathroom perhaps as alleged, but more importantly he was in
19 fact still engaged in his attempt to flee the officer. It goes
20 to whether there was a hot pursuit or not.
21    THE COURT: I'm going to sustain the objection.....
22    MR. SLUSSER: All right. I'm -- I.....
23    THE COURT: .....I don't see that it fits in the analysis.
24    MR. SLUSSER: I'm finished. Thank you very much, Your
25 Honor.

Page 27

1     THE COURT: Cross examination.
2            BEVERLY J. BROWN
3  testified as follows on:
4            CROSS EXAMINATION
5  BY MR. SCHMITT:
6  Q  Ms. Brown, I don't expect you to be an artist, but I think
7     it might be helpful if you could perhaps sketch a little
8     bit just the location of the door, location of the
9     bathroom, where you were when Scott first came through.
10    Do you think you could.....
11 A  I can.....
12 Q  .....do that?
13 A  .....try.
14    MR. SCHMITT: Could I approach, Your Honor, to.....
15    THE COURT: You may.
16 Q  Just -- if you want to choose your color, but.....
17 A  Okay.
18    THE COURT: Well.....
19 A  Let's see.
20    THE COURT: If she's going to be testifying from there,
21 you need to get a microphone up close. Or if she draw and.....
22 A  I have a very loud voice.
23    THE COURT: .....then -- if she draws and then returns to
24 the seat, that's all right. It's long enough to drape that
25 over the easel, just let the.....

Page 28

1     MR. SCHMITT: If I may stand by her, Your Honor.
2     (Indiscernible)
3  A  I need to draw.....
4  Q  Perhaps you could just draw first and then explain after
5     you've drawn.
6  A  Okay. How about if I stand this way. Would this be
7     better? Okay. Say my door about right here, so my
8     kitchen is here.
9  Q  Put a -- just put a K there perhaps so we'll.....
10 A  Okay.
11 Q  .....all know where the kitchen is.
12 A  Kitchen here. Table over here. I was standing more like
13    right here. Motorcycle's here. There's a wall. Right
14    back here it's a hallway. Bedroom. It goes back down,
15    right here is the bathroom.
16 Q  Okay. Why don't you put a B-A-T.
17 A  Okay. And these are bedrooms here. So I was.....
18 Q  Would you put an X where you were standing when.....
19 A  When he came in the door?
20 Q  Correct.
21 A  Okay. Well, I had walked down the hallway, and as he had
22    already come through the door, I stopped right here.
23 Q  Okay.
24 A  And that's when he went by me this way, and then I walked
25    over here to the door to finish closing it, and the

Page 29

1     officer came in, and went this way and I followed.
2  Q  Okay.
3     THE COURT: Okay. Now, we've got to identify some things.
4  I want you.....
5  A  I'm sorry.
6     THE COURT: .....to identify the door.
7  A  Right here is the front door.
8     THE COURT: Uh-huh.
9  Q  Put a D there.....
10 A  Oh, sorry.
11 Q  .....for door.
12    THE COURT: And the hallway? I want you to draw an arrow
13 showing your husband's walking path.
14 A  Oh, okay.
15    THE COURT: Okay. Go ahead.
16    MR. SCHMITT: Those are the questions.....
17 A  Okay.
18    MR. SCHMITT: .....I had. I guess.....
19    THE COURT: All right.
20    MR. SCHMITT: .....I'd like to have this marked as an
21 exhibit, Your Honor.
22    THE COURT: Mark that as defendant's A.
23    MR. SCHMITT: And I'd move it into evidence, Your Honor.
24    THE COURT: Any objection?
25    MR. SLUSSER: No objection.

Page 30

1  THE COURT: A is admitted.
2  (Exhibit A admitted)
3  Q  Ms. Brown, did you hear the officer saying anything?
4  A  When he was about to go around the corner in the hallway
5     to the bathroom, I heard him say police officer or Kodiak
6     police. I don't remember exactly, but.....
7  Q  Okay. Is that the first time you heard him say anything?
8  A  Yes.
9  Q  Okay. All right. Could you go back and with a red pen
10    mark where you saw the officer standing when he first --
11    you first heard him say something?
12 A  (Witness complies)
13 Q  Okay. Thank you. Now, you seem to be having a difficult
14    time estimating the time? Mr. Slusser was really trying
15    to pin you down.
16 A  Yeah, I mean, I -- I wasn't looking at a clock. I didn't
17    know anything was going on, so, you know, I'm not counting
18    any kind of time or anything. I just know I walked here,
19    walked there, and I don't know how long it takes me to
20    walk.
21 Q  Okay. What was the -- how are you on estimating
22    distances?
23 A  About as well as the time.
24 Q  Okay. Well, from where you're sitting and where I'm
25    standing now, is that close to what the distance was when

Page 31

1     -- from you and the.....
2  MR. SLUSSER: Objection, leading.
3  Q  .....front door?
4  A  Yeah, I'd say about pretty close.
5  Q  Okay. So you would have needed to walk that distance to
6     come over here to the door to shut it?
7  A  Yes.
8  Q  Could you get up and do that now and count as you come?
9  A  Well, seven or eight.
10 Q  Okay. So you think it could have been well less than 30
11    seconds?
12 A  Yes.
13 MR. SLUSSER: Objection, leading.
14 A  Definitely.
15 THE COURT: Overruled.
16 MR. SCHMITT: Those are all the questions that I have,
17 Your Honor.
18 THE COURT: And redirect?
19 MR. SLUSSER: Yes, Your Honor.
20                BEVERLY J. BROWN
21 testified as follows on:
22              REDIRECT EXAMINATION
23 BY MR. SLUSSER:
24 Q  Ma'am, you drew some bedrooms and.....
25 A  Yes, sir.

Page 32

1  Q  .....an ordinary domicile it appears to me. Does
2     everybody that lives on that property live in the house?
3  A  In our house, my husband and children.
4  Q  Yeah. I noticed -- I believe you have a trailer on your
5     property, don't you?
6  A  A little camp trailer.
7  Q  And nobody lives in it?
8  A  No.
9  Q  Okay. Nobody uses that except when you're camping?
10 A  Yes.
11 MR. SLUSSER: That's all I have, Your Honor.
12 MR. SCHMITT: Nothing further, Your Honor.
13 THE COURT: All right. You may step down. You're
14 excused. Other witnesses?
15 MR. SLUSSER: Thank you. Officer Peterson.
16 THE COURT: Uh-huh.
17 (Witness summoned)
18 THE COURT: Officer, you can come up here to the witness
19 stand, please. Just remain standing by the chair and raise
20 your right hand.
21 (Oath administered)
22 MR. PETERSON: I do.
23        FRANK R. PETERSON, JR.
24 called as a witness on behalf of the plaintiff, testified as
25 follows on:

Page 33

1             DIRECT EXAMINATION
2  THE CLERK: You may be seated.
3  A  Thank you.
4  The CLERK: For the record, would you state your full
5  name, spelling both your first and last name, please?
6  A  Frank Robert Peterson, Jr. First name F-R-A-N-K. The
7     last name is P-E-T-E-R-S-O-N.
8  THE COURT: Go ahead.
9  MR. SLUSSER: Thank you, Your Honor.
10 BY MR. SLUSSER:
11 Q  Officer Peterson, I'd like to direct your attention to
12    January 4th of this year in the late afternoon. Do you
13    recall being notified by dispatch of a possible problem
14    involving a gold cab vehicle with a flatbed?
15 A  Yes, I do.
16 Q  When did you first receive some kind of notification of a
17    problem?
18 A  I think I was at the station when I first received
19    notification.
20 Q  And what were you told?
21 A  I was told there was a gold color flatbed pickup truck in
22    the Safeway parking lot. It had sprayed gravel onto a
23    lady and was heading on Selief.
24 Q  Did it say where in the vicinity of the Safeway party
25    truck [sic]-- Safeway parking lot the truck was parked?

Page 34

1  A   No, not that I can recall.
2  Q   And who told you this information?
3  A   The dispatcher. I'm not sure who was dispatching at the
4      time.
5  Q   And what action did you take?
6  A   I responded towards the area. I went -- I'd heard they
7      were on Selief, so I went back towards -- on Thorsheim
8      towards Selief.
9  Q   And, sir, why did you make this type of response? Why did
10     you believe that was appropriate?
11 A   We had received the report that the driver of the vehicle
12     was possibly intoxicated and I respond to every report of
13     a possible drunk driver in that manner.
14 Q   Now, sir -- and who told you that information?
15 A   The dispatcher as well.
16 Q   Now, at some point did you receive further information
17     about.....
18 A   Yes.
19 Q   .....the vehicle?
20 A   I believe it was while I was in route to -- to Selief
21     area, I received another call from -- or the dispatcher
22     told me that she received another call from a lady saying
23     she had followed the vehicle, and the vehicle had lost
24     control on the road doing -- or spinning in a circle.
25 Q   And from your experience, what would such a maneuver

Page 35

1      indicate to you as a police officer?
2  A   That the operator of the vehicle had lost control possibly
3      because they were intoxicated.
4  Q   And did you receive a good description of the vehicle?
5  A   Of the vehicle, yes. It was gold in color, a flatbed
6      pickup truck.
7  Q   Did you get any portion of the license number or any --
8      was there anything more than that?
9  A   Not that I can recall.
10 Q   Now, sir, did you -- according to the last report you got,
11     was this vehicle anywhere in the vicinity of Pillar
12     Mountain Road?
13 A   Yes. According to the last vehicle, they said the -- the
14     vehicle was heading up Pillar. Yes.
15 Q   What action did you take when you heard that?
16 A   I went up Pillar Mountain Road. As I was going up Pillar
17     Mountain Road, I thought I saw my partner behind me on
18     Thorsheim entering Maple Street. I observed two vehicles
19     coming down the road, Pillar Mountain Road, the second
20     vehicle being a gold color flatbed pickup truck. I pulled
21     off -- or backed up into the -- the water treatment or
22     water storage place, wherever that is, whatever that place
23     is, and contacted my partner over the radio, and told him
24     there was a gold color pickup truck coming down the road
25     and for him to stop it. I turned, followed the gold color

Page 36

1      pickup truck. As soon as I turned onto Maple Street from
2      Pillar Mountain Road, I observed that my partner wasn't in
3      the area, so I turned on my lights and proceeded to try
4      and stop the -- the gold colored pickup truck.
5  Q   And when you say you turned on your lights, are you
6      talking about your headlights?
7  A   My overhead lights, the red and blues that are used to --
8      to conduct traffic stops.
9  Q   And are they -- do they shine continuously or are they
10     flashing?
11 A   They're continuously shining, they go -- rotate in
12     circles.
13 Q   When the -- you know, what happened at that point?
14 A   I followed the vehicle, I observed it turn onto Madson,
15     followed it onto Madson, observed it turn up Purtov, and I
16     followed it onto Purtov, and when it pulled into the
17     residence at 1219.
18 Q   Now, when it pulled into a residence at 1219 Purtov, did
19     it pull into the residence in a normal manner as a vehicle
20     usually would, and that is in an orderly manner, or was
21     there something different about that?
22 A   Yeah, it was -- it was sort of parked in -- in a different
23     angle. Actually the -- Mr. Brown's wife later asked me if
24     her son could park it properly, and I told her that he
25     could.

Page 37

1  Q   Did you see anybody leave the vehicle?
2  A   Yes, I did.
3  Q   Who did you see leave?
4  A   I observed Mr. Brown exit the pas -- the driver's side of
5      the vehicle and walk towards the house.
6  Q   How many seconds elapsed, if any, between the time the
7      vehicle came to a stop, that is his vehicle, and the time
8      he opened the door?
9  A   Probably one to two seconds. I was going pretty fast at
10     the time, so I can't really give you an accurate amount of
11     time.
12 Q   Did you see him make his way to his house?
13 A   Yes, I did.
14 Q   How did he proceed in terms of whether it was slow or
15     fast?
16 A   He was walking a rapid space -- a rapid pace.
17 Q   Did you say anything or direct his attention to yourself?
18 A   Yes. I instructed Mr. Brown to stop. He didn't stop, and
19     proceeded.....
20 Q   When you said that, did you say this in a soft voice?
21 A   No, I yelled it.
22 Q   And is there any reason you could observe why Mr. Brown
23     wouldn't have been to hear you?
24 A   Not that I can think of, no.
25 Q   And did you yell -- how many times did you have a chance

Page 38

1   to yell it before he entered his house?
2 A At least twice, possibly three times.
3 Q What did he do when he got to the house?
4 A He entered the residence.
5 Q What did you do?
6 A I entered the residence behind him.
7 Q How many seconds behind him were you?
8 A He had just -- when he entered the residence, he tried to
9   shut the door and I actually grabbed the handle before it
10  was shut and as a reflex shut the door, and then I
11  entered, and I was probably two seconds behind him.
12 Q Okay. Were you behind him quick -- or were you behind him
13  close enough that you could observe where he went inside
14  the house?
15 A Yes. As soon as he shut the door, I observed him -- I
16  think there's a glass part of the door. For some reason I
17  could see him. I opened the door, went through, followed
18  him. He went -- it's sort of a horseshoe type of thing.
19  There's the kitchen immediately to the left upon entering
20  the residence, and then it horseshoes around, and he went
21  around to -- to the bathroom, which is on the other side.
22 Q Did you say anything to him while you were in the house?
23 A He'd gone into the bathroom. I'm not sure if I had said
24  anything to him between entering the residence and going
25  -- him going into the bathroom, but as soon as he entered

Page 39

1   the bathroom, I was telling him to come out.
2 Q And how was he responding?
3 A He was cussing at me. He.....
4   MR. SCHMITT: Objection, Your Honor. Again we're beyond
5   the point of the entry.
6   MR. SLUSSER: Your Honor, the flight was a continuous
7   flight, including that flight into the bathroom. We're trying
8   to determine whether it was hot pursuit situation, so I'd ask I
9   be able to finish up and.....
10  THE COURT: I'll allow some limited inquiry, but the point
11  seems to be -- the key is the entry into the residence.....
12  MR. SLUSSER: I agree, but.....
13  THE COURT: .....at the front door, isn't it?
14  MR. SLUSSER: Yes, Your Honor, but in order to determine
15  whether indeed that was a hot pursuit situation, the entire
16  ambit of circumstances is relevant. That is, if.....
17  THE COURT: Uh-huh.
18  MR. SLUSSER: .....he was still fleeing and if it was a
19  continual flight, what he was -- what he was doing inside the
20  house bears circumstantially on what happened just immediately
21  before.
22  THE COURT: Okay.
23  MR. SLUSSER: I won't dwell on this, Your Honor. I'll
24  make.....
25  THE COURT: Okay.

Page 40

1   MR. SLUSSER: .....it quick.
2   THE COURT: All right. Go ahead.
3 Q All right. So how many -- how long was he in the
4   bathroom?
5 A I estimated between five and seven minutes.
6 Q And was the door locked or was this a situation where
7   somebody was just pushing on the other side?
8 A It felt like there was somebody pushing against the door,
9   like it wasn't secure. I had actually opened it a little
10  bit to pry an entry to, and then it was closed on me.
11 Q I'm handing you what's been marked for identification
12  purposes as number 1. And have you seen this before?
13 A Yes, I have.
14 Q What is it?
15 A It's a video tape recorded from my vehicle camera of the
16  traffic stop.
17 Q Showing exactly what then?
18 A I had actually started my video camera previously.
19  Usually when we turn on our overhead lights to do a
20  traffic stop, the camera automatically comes on. In this
21  type of situation I try to record as much as I can,
22  knowing that there's a possible situation approaching. So
23  I turned on my video camera prior to -- to turning on my
24  overheads.
25 Q All right.

Page 41

1 A It observes -- it shows me going up Pillar Mountain Road.
2   It shows the two vehicles passing by, one being the gold
3   colored pickup truck. It shows me turning around and then
4   following and then up to the residence, 1219 Purtov.
5 Q And have you reviewed this tape?
6 A Yes, I have.
7 Q Is this a true and accurate copy of the events on that day
8   and that late afternoon as you recall it?
9 A This one is, yes.
10  MR. SLUSSER: And I'd move that identification number 1 be
11  admitted as exhibit number 1.
12  THE COURT: Any objection?
13  MR. SCHMITT: I just -- if indeed that's what it is, I
14  have no objection, Your Honor, but I think we need to show just
15  a bit of it to confirm that.....
16  MR. SLUSSER: Well, I'll represent that's what it is, but
17  if it isn't, then it won't be admitted. I mean.....
18  THE COURT: How long is it?
19  MR. SLUSSER: It's about.....
20  THE COURT: Do you have.....
21  MR. SLUSSER: .....eight minutes.
22  THE COURT: .....an estimate?
23  MR. SLUSSER: Estimate.....
24  THE COURT: How long does it run?
25 A I don't know, Your Honor. It's.....

### Page 42

1    MR. SLUSSER: My estimate is -- I don't.....
2  A  .....longer than that.
3    MR. SLUSSER: Is it longer than that?
4  A  It's -- yeah, because it went way past the -- when I
5    actually put Mr. Brown into my vehicle, so it started
6    before I went up Pillar Mountain Road, past transporting
7    Mr. Brown to the police department, so it's probably a
8    good half hour, 45 minutes in length.
9    MR. SLUSSER: I'll make my motion contingent on the fact
10   that it represents the situation we're describing. If it's a
11   tape of something else, it's not going to be admitted. I just
12   want.....
13   MR. SCHMITT: Your Honor, the relevant.....
14   MR. SLUSSER: .....proceed -- I just want to proceed.
15   MR. SCHMITT: The relevant portion here lasts I think less
16   than two minutes. When he's on Pillar Mountain Road.....
17 A  When I first see the vehicle.....
18   MR. SCHMITT: .....to when he pulls up.....
19 A  .....to the point when I -- when.....
20   THE COURT: Uh-huh.
21 A  .....when I'm at the residence.
22   THE COURT: It seems like that's the only part I need to
23   see, isn't it?
24   MR. SLUSSER: No. No, it's not, Your Honor.
25   THE COURT: Okay.

### Page 43

1    MR. SLUSSER: It shows a whole lot. It shows how quickly
2    the gentleman jumped out of the car, that's true, and how
3    quickly the officer proceeded. It also shows that the witness
4    upon whom -- (1) the witness that testified has committed
5    perjury. It shows that alcohol containers were taken out of
6    the vehicle in hopes that the officer wouldn't see that. So it
7    shows a lot of things indicating this -- that there is
8    consciousness of guilt, that this person was in fact drinking
9    on that particular day, and in fact there was a flight from the
10   officer and there was in fact hot pursuit. I think -- I just
11   want the court to be able to see it.
12   MR. SCHMITT: I have no objection to the relevance, then
13   the admission. In fact, I'd like to cross examine Officer
14   Peterson about the two minutes or so when he was pursuing the
15   vehicle.
16   THE COURT: Well, what about the rest of it Mr. Slusser
17   has mentioned?
18   MR. SCHMITT: I don't think it's relevant for.....
19   THE COURT: I'm overruling.....
20   MR. SLUSSER: .....the hearing today.
21   THE COURT: .....that objection. It seems to me the
22   portion up to the time -- I don't know. I don't know. The
23   time the defendant comes out of the house I guess and is placed
24   in the officer's vehicle is relevant.....
25   MR. SLUSSER: Okay.

### Page 44

1    THE COURT: .....so that objection's overruled.
2           DIRECT EXAMINATION CONTINUED
3  BY MR. SLUSSER:
4  Q  I think that's about -- well, let me ask you. Officer
5    Peterson, were there in fact Budweiser beer -- a Budweiser
6    beer container in that vehicle?
7  A  No, there was not.
8  Q  According to your observation?
9  A  Yes.
10 Q  Okay. And why was that?
11 A  I.....
12   MR. SCHMITT: Objection, Your Honor, it's calling for
13   speculation.
14   MR. SLUSSER: I'll conclude my questions. I'll withdraw
15   that. We'll.....
16 Q  Well, let me ask you, sorry, one last question. Have you
17   seen this particular container before, sir?
18 A  Yes, I have.
19 Q  And where have you seen this before? This particular
20   container?
21 A  That particular container? I got it -- I was the one that
22   got it from the -- the store and brought it to your
23   office.
24 Q  And can you just describe it in terms of its coloring and
25   marks?

### Page 45

1  A  It's red in color. It has a white -- white lettering --
2    white lettering on the sides and on the tops and on the
3    ends.
4  Q  And if someone carries this, how does one ordinarily carry
5    a container like this?
6  A  Well, it's got the handles on the -- on the top on the
7    ends.
8  Q  All right.
9    MR. SLUSSER: That's all I have, Your Honor.
10   THE COURT: Well, wait a minute though. Nobody's saying
11   what this is. This is a Budweiser beer carton, and it holds
12   what, 18 bottles or cans?
13 A  Eighteen bottles, Your Honor.
14   THE COURT: Okay. All right. And it's a cardboard box?
15 A  Yes, Your Honor.
16   THE COURT: All right.
17   MR. SLUSSER: That's all I have, Your Honor.
18   THE COURT: Cross examination.
19   MR. SCHMITT: Thank you, Your Honor.
20         FRANK R. PETERSON, JR.
21   testified as follows on:
22         CROSS EXAMINATION
23 BY MR. SCHMITT:
24 Q  Mist -- or, Officer Peterson, you have had a chance to
25   review the video tape, is.....

Page 46

```
 1  A   Yes, I have.
 2  Q   .....that correct?
 3  A   Yes.
 4  Q   From the point where you see Mr. Brown's vehicle coming
 5      down Pillar Mountain Road, it was not doing any traffic
 6      violation at that point, was it?
 7  A   No, it wasn't.
 8      THE COURT: I didn't hear the answer.
 9  A   No. No, Your Honor, not that I can -- not that I noted.
10  Q   Okay. And then you -- the vehicle, because you're still
11      going up Pillar Mountain Road, and it's going down, it's
12      out of your field of view, is that correct?
13  A   Yes, when I was turning.....
14  Q   So.....
15  A   .....around, you mean?
16  Q   Correct.
17  A   Okay. Yes.
18  Q   You do turn around and go back.....
19  A   Uh-huh. (Affirmative)
20  Q   .....down Pillar.....
21  A   Yes.
22  Q   .....Mountain Road?
23  A   Yes, sir.
24  Q   When the vehicle comes in view again of the camera.....
25  A   Uh-huh.
```

Page 47

```
 1  Q   .....it's making a left-hand turn to make this -- the turn
 2      onto Purtov, correct?
 3  A   Yes.
 4  Q   It didn't commit any traffic violation there, did it?
 5  A   No, sir.
 6  Q   And then after you turn onto Purtov, you see the vehicle
 7      for a brief moment in the distance, but it's like on a
 8      crest of a small hill, is.....
 9  A   Uh-huh.
10  Q   .....that not correct?
11  A   When it was on -- turning onto Purtov, or.....
12  Q   After it had been on Purtov. After you turned.....
13  A   After it had.....
14  Q   .....on Purtov.
15  A   .....been on Purtov, okay. There is a small crest, yes.
16  Q   Okay. I mean, the videotape is going to be the best
17      evidence here.....
18  A   Yes.
19  Q   .....of what you are actually.....
20  A   Yes.
21  Q   .....seeing?
22  A   Yes.
23  Q   Okay. You didn't see any traffic violations, did you?
24  A   Not -- no. No, I didn't.
25  Q   When you entered Mr. Brown's house, you did not have
```

Page 48

```
 1      probable cause to believe he was driving while
 2      intoxicated, did you?
 3  A   I did.
 4  Q   What information did you have, Officer Peterson?
 5  A   The report that I received from dispatch.
 6  Q   Your affi -- your complete -- police report is completely
 7      silent on that issue. You're making that up after you've
 8      had the chance to listen to Mr. Slusser and after you've
 9      had the chance to go back and listen to the other
10      information, haven't you?
11  A   No.
12  Q   Well, Officer Peterson, how long have you been a police
13      officer?
14  A   About three years.
15  Q   Okay. You know the importance of putting together an
16      accurate and concise police report, don't you?
17  A   Yes, I do. Yes.
18  Q   Your police report makes no reference to a ref -- to
19      alcohol before you entered the Brown house, does it?
20  A   I'm not sure. I'd have to look at my report. I've got it
21      right here if you want me to look at it.
22  Q   Why don't you look at it.....
23  A   Okay.
24  Q   .....look at the first three paragraphs and tell me where
25      it says in there anything about alcohol.
```

Page 49

```
 1      (Pause)
 2  A   It doesn't.
 3  Q   So your report's not accurate is what you're saying?
 4  A   Yes, sir.
 5  Q   You made a mistake in putting your report.....
 6  A   Yes, sir.
 7  Q   You didn't observe a crime being committed in your
 8      presence, did you?
 9  A   In my presence, no.
10  Q   You did not have any personal information, anything that
11      you saw from your own eyes or smelled or heard Mr. Brown
12      saying to indicate that he had consumed alcohol before you
13      entered his house, did you?
14  A   Before I entered his house, no.
15  Q   Now, you knew two people were in the truck before you
16      entered the house.....
17  A   Uh-huh. (Affirmative)
18  Q   .....didn't you?
19  A   Yes.
20  Q   You didn't stop before you went in the house to speak to
21      the other person that was in the truck, did you?
22  A   No.
23  Q   You didn't confirm that he was the one -- or that he may
24      not have been the one driving over on Selief?
25  A   Who?
```

### Page 50

```
 1  Q   The person -- the other person that was in the truck?
 2  A   No.
 3  Q   You didn't ask about any alcohol consumption, did you?
 4  A   By the other person in the truck?
 5  Q   Just you didn't ask that person about alcohol consumption,
 6      did you?
 7  A   I didn't talk to the other person in the car.
 8      (Pause)
 9  Q   What were the road conditions like on the first of -- or
10      the 4th of January?
11  A   As I recall, they were -- they were good.
12  Q   It was cold though, wasn't it?
13  A   It was chilly.
14  Q   I mean, there was some snow and frost on the side of the
15      roads?
16  A   I can't -- I don't remember seeing my breath out, if
17      that's an indication.
18  Q   Okay. But the videotape will show that there was some
19      frost on the side of the road?
20  A   Okay. I'm not sure.
21  Q   Okay.
22  A   I'd have to look at it. I didn't look for that.....
23  Q   All right.
24  A   .....specifically.
25  Q   In your experience as a police officer, have you ever
```

### Page 51

```
 1      heard of a vehicle having difficulty being controlled
 2      because of having problems with the throttle if it was
 3      accelerating improperly?
 4  A   In my experience as a police officer?
 5  Q   Yes.
 6  A   No. I haven't had.....
 7  Q   In your personal.....
 8  A   .....any experience with.....
 9  Q   .....experience, have you ever heard of somebody having
10      difficulty controlling a vehicle, because the throttle was
11      sticking?
12  A   Yeah.
13  Q   It's a possible explanation for why a vehicle might be
14      driven erratically?
15  A   Sure.
16      MR. SCHMITT: Those were all the questions that I had for
17  Officer.....
18      THE COURT: Further questions on redirect?
19               FRANK R. PETERSON, JR.
20  testified as follows on:
21             REDIRECT EXAMINATION
22  BY MR. SLUSSER:
23  Q   Well, Officer Peterson, did you include in your report the
24      calls that you received from dispatch?
25  A   Yes, I did.
```

### Page 52

```
 1  Q   What was in your report about those calls?
 2  A   About what the -- the actions of the vehicle, spraying the
 3      gravel, the 360 on the road.
 4  Q   Did you put everything in the report that you had heard
 5      which attracted your attention to the matter that day?
 6  A   I was -- I didn't put in there it was REDDI.
 7  Q   I'm sorry?
 8  A   REDDI, report every drunk driver immediately. That's one
 9      of the.....
10  Q   Okay.
11  A   .....the statements that the dispatcher used.
12  Q   All right. Is there anything in your report that's not
13      accurate?
14  A   Everything's as accurate as -- as I think it can be. I
15      might have left out some things, but.....
16  Q   Now, are you folks, are you officers at KPD allowed to use
17      hearsay in making your stops under your policy?
18  A   Hearsay?
19  Q   That is information dispatch gives you?
20  A   Yes.
21      MR. SLUSSER: I don't have any other questions.
22      THE COURT: Did you prepare a probable cause affidavit to
23  accompany the DUI complaint?
24  A   Yes, Your Honor.
25      THE COURT: Did you put anything in there about a report
```

### Page 53

```
 1   of possibly an intoxicated driver or driver under the
 2   influence?
 3  A   I can't recall, Your Honor. I don't have my affidavit
 4      with me.
 5      THE COURT: Okay. Here's a copy of the court file with
 6   the DWI complaint. Take a moment to look at that.
 7  A   Thank you, Your Honor.
 8      (Pause - witness reading)
 9  A   Can you repeat the question for me, Your Honor?
10      THE COURT: I'm wondering if there's any mention in there
11   that you'd received a report from any source about the driver
12   of the gold truck possibly being under the influence of
13   alcohol?
14  A   No, Your Honor, not that I can see.
15      THE COURT: Okay. Further questions? First, Mr. Slusser
16   and.....
17      MR. SLUSSER: No, no further questions.
18      MR. SCHMITT: No, Your Honor.
19      THE COURT: .....Mr. Schmitt? Okay. You're excused. You
20   may step down.
21  A   Thank you, Your Honor.
22      THE COURT: Any further evidence?
23      MR. SLUSSER: No, I'd just ask that the court view the
24   tape either now or, if we're short on time, at some point.
25      THE COURT: Uh-huh. Well, we're short on time. I've got
```

Page 54

1  a 10:30, and do you have further evidence besides the video?
2      MR. SLUSSER: No.
3      THE COURT: And do you, Mr. Schmitt?
4      MR. SCHMITT: No further evidence. I'd just concur that
5  the court should view the initial part of the video before
6  making its ruling.
7      MR. SLUSSER: Well, if it's a concurrence, I didn't say
8  the initial part. I said the video, that's what I'm asking the
9  court to review.
10     THE COURT: Well, I think I'm going to see how long this
11 10:30 takes, and so I don't want the attorneys and Mr. Brown to
12 go away. And we might just view it here to see if there are
13 any objections, because I don't think you two are in agreement
14 on what I'm supposed to be watching, so I want to do the 10:30
15 as soon as we've got everybody assembled, and then we'll resume
16 this just to watch the video, and I have a few questions on the
17 law for you. Okay. So we'll be in a brief recess and start
18 our 10:30.
19     THE CLERK: All rise. Court is in recess subject to call.
20     (Off record)
21 10:30:13
22     (Other matters)
23 10:59:52
24     THE CLERK: Please rise. Court now resumes its session.
25     THE COURT: Please be seated. We're back to continue the

Page 55

1  suppression hearing in the Scott Brown case. Counsel and the
2  defendant are here, and so we're going to play the video, so
3  are you set up to go?
4      MR. SLUSSER: I can do it right now.
5      THE COURT: Okay.
6      MR. SLUSSER: I'd like to turn it around so the judge can
7  see it.
8      MR. SCHMITT: I don't believe Mr. Brown has had a chance
9  to see it either, Your Honor, so if he can step over here.
10     THE COURT: He may. Uh-huh. He may do that.
11     MR. SLUSSER: I think everybody can sort of be relaxed as
12 to their position. (Indiscernible, coughing)
13     THE COURT: I think so. Yeah, that's fine. And we marked
14 this as exhibit 1. You can just have a seat there, Mr. Brown.
15     MR. BROWN: Okay, sir.
16 11:00:21
17     (Begin video)
18     (Pause)
19     MR. SCHMITT: Just for the record, at this stage I believe
20 they're in the house.
21     THE COURT: That's not in the record, and unless you're
22 testifying.....
23     (Pause)
24     MR. SLUSSER: From the State's point of view, the court's
25 seen everything that I believe the court should see. So I'll

Page 56

1  just defer now to Mr. Schmitt (indiscernible).
2      MR. SCHMITT: I would agree, Your Honor.
3      THE COURT: We'll stop at the point then where the timer
4  on the video is 19-colon-58-point-oh -- colon-00.
5  11:04:20
6      (End video)
7      THE COURT: Okay. You can just provide that to the clerk
8  with the jacket. Okay. Slide that TV back around.
9      Okay. A few questions for counsel in lieu of just an
10 open-ended summation. Mr. Schmitt -- excuse me, Mr. Slusser,
11 is there any dispute from the state that there was no warrant
12 in existence for either the defendant's arrest or entry into or
13 search of the residence?
14     MR. SLUSSER: No dispute.
15     THE COURT: Okay. Is there any dispute regarding the
16 terms of Alaska Statute 12.25.100, the statute that permits
17 under some circumstances an officer's entry or breaking into a
18 residence or vessel after certain announcements are made? And
19 the question I have is, is there any dispute that the
20 announcements were not made under that statute?
21     MR. SLUSSER: Well, Your Honor, I don't recall addressing
22 that in the papers that were filed.
23     THE COURT: Uh-huh.
24     MR. SLUSSER: And I'd probably want to take a look at the
25 statute.

Page 57

1      THE COURT: It reads, a peace officer may break into a
2  building or vessel in which the person to be arrested is or is
3  believed to be if the officer is refused admittance after the
4  officer has announced the authority and purpose of the entry.
5      MR. SLUSSER: Yeah.
6      THE COURT: And so what's your assertion regarding the
7  facts about the officer's announcement of authority and purpose
8  of the entry?
9      MR. SLUSSER: Yeah. My argument for the propriety of the
10 officer's entry is based upon the case law of hot pursuit
11 rather than the statute, Your Honor.
12     THE COURT: Okay. That's fine. But I want to know what
13 your position is about the facts on whether the officer
14 announced the authority and purpose of the entry.
15     MR. SLUSSER: My belief as to the facts are exactly as the
16 testify -- as the officer testified. That is, he told the
17 gentleman to stop and I don't believe there's anything else
18 beyond that.
19     THE COURT: Uh-huh. Okay.
20     MR. SLUSSER: I mean, he may have identified himself as a
21 Kodiak police officer.
22     THE COURT: Okay. Is -- in your view, what is the
23 applicability of that statute, 12.25.100, in this particular
24 motion?
25     MR. SLUSSER: I don't believe it applies to hot pursuit

## Page 58

1 situations.
2     THE COURT: Okay. And so your position is for the hot
3 pursuit exception to a warrant requirement, the announcement
4 required by this statute is unnecessary?
5     MR. SLUSSER: That's right. Because he's chasing the
6 person. The per.....
7     THE COURT: Uh-huh.
8     MR. SLUSSER: If my hypotheti -- if there really is a true
9 hot pursuit situation, if -- I mean, if it's not a hot pursuit
10 situation, there needs to be an announcement.
11     THE COURT: Uh-huh.
12     MR. SLUSSER: But if there truly is a hot pursuit
13 situation, what's the need to -- there's no need to make an
14 announcement.
15     THE COURT: Uh-huh.
16     MR. SLUSSER: The guy is running from the officer.
17     THE COURT: Okay.
18     MR. SLUSSER: He knows what's going on.
19     THE COURT: For the hot pursuit that the state is arguing
20 in this case, is there a requirement that it be for a crime
21 that is called either a felony or a grave offense?
22     MR. SLUSSER: Absolutely not.
23     THE COURT: Okay. And tell me your rationale there.
24     MR. SLUSSER: First of all, I think it's a decided -- it's
25 pretty well established not only in Alaska, but other

## Page 59

1 jurisdictions, and we cite some kind of -- we cite a case to
2 that effect. It's an out-of-state case. But also Wilson
3 versus State is directly applicable. In fact, that happens to
4 be a DWI case. And if you read the case, I'm quite positive
5 there's -- I realize there's some attempt to distinguish that
6 case by the defendant, but if you read the case, there's
7 absolutely no distinction in the case that -- you know, between
8 a greenhouse and somebody's residence. It was decided on the
9 fact that you don't need a warrant for a DWI when there's a hot
10 pursuit situation. And, in fact, I would be amazed as a
11 prosecutor if there were such a distinction made, where we
12 could go into, for example, greenhouses, or garages or trailers
13 or something else on the curtilage without warrants. I've
14 never heard of that. I don't think there's any distinction on
15 that basis. It didn't talk about that in the case. The reason
16 -- it was decided on the same type of rationale that we're
17 advanc -- you know, that we're citing it for here today, and
18 that is when you have a hot pursuit, I don't care if it's a
19 misdemeanor, I don't care if it's based -- well, I -- you know,
20 if it's a DWI or not, there's -- entry is allowed.
21     THE COURT: Isn't there another distinction though between
22 this case and Wilson? In Wilson they mentioned the officer
23 observing the defendant committing a number of offenses.....
24     MR. SLUSSER: No. No, sir.
25     THE COURT: .....the erratic driving, losing control, or

## Page 60

1 almost doing so, the vehicle striking one of the patrol cars,
2 and then the defendant running a red light. So what offenses
3 did the officer observe here? What did Officer Peterson
4 observe?
5     MR. SLUSSER: None.
6     THE COURT: Okay. And so how is Wilson applicable?
7     MR. SLUSSER: Not -- it wasn't addressed in Wilson, Your
8 Honor, but an officer -- let me take a moment to explain this,
9 and please bear with me a second -- a moment, Your Honor. This
10 motion sort of evolved from an illegal entry motion to suppress
11 and the lack of a search warrant into sort of a stop motion,
12 illegal stop. So some of these issues I realize perhaps
13 weren't briefed as well as they might be. But if the court may
14 recall, if we're kind of moving into -- now characterizing this
15 whole thing as an improper stop, that is, whether the court had
16 -- whether the officer had probable cause or not, as the case
17 has evolved in this area, and I'm just saying this by way of a
18 preamble somewhat.
19     As the case has evolved in this area, you've got different
20 types of stop. You've got, you know, investigatory detention,
21 so forth and so on. And you don't really need probable cause
22 for example that a crime has been committed to stop somebody
23 for DWI. Actually I think you've got it here, no question
24 about it, but I'm saying just parenthetically, you don't have
25 to have full probable cause. You've got to have enough for an

## Page 61

1 investigatory detention, because my theory, and I don't -- you
2 don't have to buy my theory for the case -- for the court to --
3 for the state to prevail, but my theory is that you cannot
4 defeat even an investigatory detention by trying to flee into
5 your own house, that hot pursuit still applies. But
6 nonetheless.....
7     THE COURT: What authority says that?
8     MR. SLUSSER: Your Honor, I don't think the case -- that
9 that is addressed in -- at least in Alaska. But, look.....
10     THE COURT: I'm not.....
11     MR. SLUSSER: .....maybe I shouldn't have brought it up,
12 because I don't think.....
13     THE COURT: Well.....
14     MR. SLUSSER: .....you need to decide.....
15     THE COURT: Yeah.
16     MR. SLUSSER: All right. Go ahead.
17     THE COURT: I'm considering in asking that question the
18 Shraft (ph) case. It's an Alaska supreme court case, and they
19 talked about the recognized exceptions to warrant requirements.
20 And when they speak of hot pursuit, they speak of a search in
21 hot pursuit of a fleeing felon. And so that's -- my last
22 couple of questions have really gone to that. Is -- has the
23 law evolved so that now in Alaska it does not require a felon?
24     MR. SLUSSER: Well, absolutely not. That's the Wilson
25 case. That was a DWI, Your Honor.

### Page 62

1    THE COURT: Okay. So you're saying the law has evolved so
2    it doesn't require a felony to be at issue?
3    MR. SLUSSER: That's right. That's.....
4    THE COURT: Does it require a crime to be at issue?
5    MR. SLUSSER: Of course. You've got to have -- there has
6    to be some -- at least -- I'm saying there's probable cause
7    that several crimes were committed here. I mention that so the
8    court doesn't misunderstand me. But I don't even think you
9    need that, you need sufficient evidence, or you need
10   sufficient cause, let's call it probable cause, whether it's
11   based on hearsay or whatever, for there to be an investigatory
12   detention. But, I mean, here there's actually -- and I -- I'll
13   -- and I'm happy to say why when it's my turn just to speak
14   freely, but there's probable cause here that several crimes
15   were committed.
16   THE COURT: Okay. And why don't you list those for me.
17   That will be helpful.
18   MR. SLUSSER: Well, first there's probable cause that --
19   and again I don't think you have to -- we have to even prove
20   probable cause, but, anyway, probable cause that a DWI
21   occurred. There's case law that says, you know, swerving in
22   the road, so much as swerving in the road is sufficient to
23   allow an officer to stop someone.
24   THE COURT: Well, are you saying that in this case
25   implicates a crime or not, or just permits the officer to stop

### Page 63

1    somebody?
2    MR. SLUSSER: Both. If the court -- if the court is
3    carefully asking me only as to what crimes involve probable
4    cause, I'll -- you know, I'll just -- I'll just speak about
5    that. There's probable cause here. Somebody goes ahead --
6    probable cause is a good reason to believe, that's what the
7    burden is. A good reason to believe. It is not a great
8    burden. Somebody that has.....
9    THE COURT: Okay. But.....
10   MR. SLUSSER: .....two episodes.....
11   THE COURT: Let me go back to the question. The question
12   is, what crimes were implicated in this case?
13   MR. SLUSSER: DWI.
14   THE COURT: DUI.
15   MR. SLUSSER: Reckless driving.
16   THE COURT: Uh-huh.
17   MR. SLUSSER: Eluding. Assault 3 upon which a grand jury
18   just based an indictment. Oh, well, I take that back, not
19   assault 3. I won't say that, because I think that was based on
20   further information, so.....
21   THE COURT: Okay. No assault.
22   MR. SLUSSER: I don't think -- I don't think there was
23   sufficient information imparted to the police at that point for
24   an assault. That's right.
25   THE COURT: Okay. So the crimes implicated for Officer

### Page 64

1    Peterson's use were DUI, reckless driving and eluding?
2    MR. SLUSSER: Yeah.
3    THE COURT: Uh-huh.
4    MR. SLUSSER: Probable cause. Right.
5    THE COURT: And then additionally you said -- and that an
6    officer may stop somebody for swerving in the road?
7    MR. SLUSSER: As one example of what somebody may be
8    stopped for. A DUI stop can be performed for that, for
9    example.
10   THE COURT: Okay. And to go one step beyond, if they
11   haven't stopped them, and they catch up to a vehicle after the
12   vehicle is stopped otherwise on its own, can the officer follow
13   that person into his residence without announcing why he's
14   there?
15   MR. SLUSSER: Yes. Absolutely.
16   THE COURT: And.....
17   MR. SLUSSER: That's my position.
18   THE COURT: Okay. And the authority for that again is?
19   MR. SLUSSER: One, the officer had more than just
20   sufficient basis for a stop here. There was actually probable
21   cause to believe those crimes I mentioned had been committed.
22   But -- do I -- maybe I need to explain that further, because
23   the court looks puzzled. But I -- I mean, I'm making a
24   distinction. I'm saying there's probable cause that three
25   misdemeanors had been committed here, actual probable cause.

### Page 65

1    And that alone is sufficient for the court -- for the state to
2    win its motion.
3    But I'm saying parenthetically we don't even have to bear
4    that burden, because you can't defeat even an investigatory
5    detention type stop, which might be something -- a standard
6    less than probable cause. You can't defeat that by fleeing
7    into one's house, that hot pursuit is sufficient to overcome.
8    Now, if the court asked me for authority for that, I don't
9    think there is any, it's -- other than logic, because it hasn't
10   been addressed here in Alaska to my knowledge.
11   But as far as whether you have probable -- whether or not
12   you have probable -- whether or not hot pursuit applies in a --
13   you know, where there's probable cause to think that a crime
14   has been committed, you know, I cite the Wilson case and the
15   DWI, which is a misdemeanor.
16   May I explain something a little bit, Your Honor, to make
17   it a little bit clearer?
18   THE COURT: Uh-huh. (Affirmative)
19   MR. SLUSSER: Let's supposing somebody's swerving in the
20   roadway, swerves a few times, crosses the centerline. The case
21   law is such that it's permissible to stop that vehicle and
22   begin a DWI investigation. And then the officer starts to
23   gather evidence, probable cause begins to accumulate. Now, the
24   Alaska law says you can stop somebody for swerving, for
25   example, in the roadway. I don't believe that -- I mean, I

TRANSCRIPT OF PROCEEDINGS   4/3/2003   STATE OF AK v. BROWN
Vol. 1                                    3KO-S03-012 CR

18 (Pages 66 to 69)

Page 66

1  think it's probably arguable that there may not be probable
2  cause yet, but there's enough of a basis there for an
3  investigatory detention.
4      Let's make a hypothetical a little bit different than the
5  facts of this case. Supposing Officer Peterson saw Mr. Brown
6  swerving in the roadway just before he got to his house. And
7  he would have probable -- he would -- while he might not have
8  probable cause to arrest him at that point, he's got -- there's
9  a sufficient basis for him to make a stop. Now, supposing --
10 so he pulls over, as they both pull into the driveway. He has
11 under Alaska law a sufficient basis to stop him.
12     Now, if -- when you take it to this extent, there's not
13 Alaska law directly, you know, on point. But I'm saying, and I
14 believe it's correct, that were Mr. Brown to flee into the
15 house after having swerved a few times, hot pursuit -- the hot
16 pursuit doctrine would still apply. You can't defeat any type
17 of lawful detention by flight. You know, the very act of
18 flight itself gives -- you know, whether he's got an excuse
19 later or not about having to go to the bathroom, the very act
20 of flight itself begins to add to the officer's -- the
21 appropriateness of his license to stop the person. In itself,
22 it tells society something that's -- is going on.
23     So, you know, I'm saying that if there was a lawful
24 detention, if it -- if there was sufficient basis for a lawful
25 detention of any kind, you can't defeat that by fleeing into

Page 67

1  your house, and that -- and there's no reason to say, well, the
2  hot pursuit doctrine only applies if it's -- you know, if you
3  actually had the full probable cause.
4      Now, mind you, I'm saying in this case you had full
5  probable cause for three different crimes, but I'm just saying
6  parenthetically that's not even necessary.
7      THE COURT: So you're -- is your argument hinging on the
8  officer being able to stop or detain the defendant for further
9  investigation as opposed to an arrest?
10     MR. SLUSSER: Oh, I would say that would be the that would
11 be the clearest view of the law in my opinion, yes. But if the
12 officer -- I'm saying that the officer had probable cause here
13 for an arrest, but he doesn't need that. I mean, that's.....
14     THE COURT: Okay.
15     MR. SLUSSER: .....an alternative argument, which I think
16 is still correct.
17     THE COURT: Well, I didn't ask you about probable cause.
18     MR. SLUSSER: Yeah.
19     THE COURT: I asked you about an arrest. We're talking
20 misdemeanors here, and there are only some misdemeanors that a
21 police officer can arrest someone for without a warrant.
22     MR. SLUSSER: Well, okay, so let me.....
23     THE COURT: So.....
24     MR. SLUSSER: .....make sure I understand what the court's
25 saying is all.

Page 68

1      THE COURT: Well, I'm trying to.....
2      MR. SLUSSER: Or asking.
3      THE COURT: I'm trying to find out if your argument is
4  hinging upon the investigatory stop or detention argument as
5  opposed to the authority of the officer to actually arrest.
6      MR. SLUSSER: Well, yeah, I think that if he had simple
7  authority to detain or investigate, you cannot defeat that.
8  You cannot defeat that right by fleeing into your house, and
9  the hot pursuit doctrine even applies. So it's not necessary
10 even to show probable cause that a crime has been committed.
11 Although I believe we have that as well.
12     THE COURT: And you think the officer in this circumstance
13 could have arrested the defendant for what offense or offenses?
14     MR. SLUSSER: Well, for one, eluding committed in his
15 presence. He could not have arrested him for reckless driving,
16 because he didn't see that. Let me make sure that's correct.
17 And the DWI itself was committed in his presence, so he could
18 have arrested him for that.
19     THE COURT: What -- and what evidence is there of eluding?
20 What particular facts?
21     MR. SLUSSER: Well, if the court looks at the video.....
22     THE COURT: I did.
23     MR. SLUSSER: All right. It may want to look again,
24 because I had to look at it several times, but there are -- the
25 flashing red lights are on as the officer followed the person

Page 69

1  down the roads. You can see the reflection off of various
2  things. It's a little hard to pick up at first. You can see
3  the door open. Immediately after the patrol car comes to a
4  stop, the door opens on the gold pickup truck. You can see --
5  I mean, I wanted to get into it a little bit more, but the
6  eluding part continued on into the house for someone that
7  didn't just lock the bathroom door, but is like holding his
8  weight against it for the entire period.
9      THE COURT: But then.....
10     MR. SLUSSER: Go ahead.
11     THE COURT: Well, go ahead. Well, does that have anything
12 to do with the issue about -- with the issue regarding the
13 officer entering the front door without consent or a warrant?
14     MR. SLUSSER: If -- I'm just -- oh. Circumstantially it
15 goes to the person's, you know, intent or consciousness of
16 guilt, Your Honor. And it tells the court a little bit about
17 what was happening. So not directly, but circumstantially.
18     What else. On the video, and the court may need to look
19 at it again, you can see the brother, that is Damon Brown,
20 clearing the vehicle of the beer cans, taking a much longer
21 period, carrying that 18-pack of Budweiser beer. You can see
22 it's red and white if you look closely at it, similar to the 12
23 -- or 18-pack that was testified to here, going behind the
24 trailer and depositing it, hiding it behind the trailer before
25 returning to the vehicle. Again, evidence that in fact there

Computer Matrix, LLC          Phone - 907-243-0668          jpk@gci.net
310 K Street, Suite 200       Fax     907-243-1473          sahile@gci.net

Page 70

1  was a flight going on, because in fact they had had alcohol in
2  the car, and there was a good reason to flee, because they were
3  drinking.
4     THE COURT: Uh-huh.
5     MR. SLUSSER: That's useful just to -- in considering the
6  credibility of various persons' testimony.
7        I should note, and I saw this argument in the reply. It's
8  well established -- if the court has any question about this,
9  please advise me, but it's very well established that an
10 officer can -- that the probable cause or the basis for any
11 kind of detention can be based upon reports from dispatch or
12 hearsay. There was some mention about it's got to be in the
13 officer's presence. If -- of course, if you hear that somebody
14 has just shot the mayor and.....
15    THE COURT: Well.....
16    MR. SLUSSER: .....dispatch has just told you that and
17 given you a description and you drive down to the scene and see
18 somebody matching that description to a T, you can perform a
19 stop on that person. So, in fact, if the court looks at our
20 probable cause affidavits that the officers sign all the time,
21 often hearsay is an incorporated reason in that. The PBC -- or
22 what is it, the portable breath test, PBT, of course, isn't
23 admissible in a trial, but it's -- according to case law it's
24 entirely appropriate as a basis for probable cause.
25    So, you know, we have to remember, of course, that in

Page 71

1  considering what probable cause existed, it is entirely
2  appropriate for the officer to base his or her actions on what
3  he -- somebody has told him. For that matter, this is not
4  necessary again for the state to prevail, but it isn't even
5  that particular offer, you know -- that particular officer's
6  knowledge, it's rather, you know, the objective knowledge
7  available to the police officer, or to the state, to the
8  government. I don't really want to get into all of that,
9  because that's a lot harder to argue and is not all that clear,
10 but I think that's parenthetically also the law.
11    THE COURT: Do you know the eluding statute?
12    MR. SLUSSER: Your Honor, I'm sorry, I don't off the top
13 of my head.
14    THE COURT: Okay.
15    MR. SLUSSER: I just want to summarize a couple sentences
16 when it's time, but I don't want to.....
17    THE COURT: Well, let me ask Mr. Schmitt a few things
18 here. So what of the -- what of the state's argument here,
19 they've narrowed this down, saying, well, there was reason to
20 arrest the defendant for eluding plus there was authority for
21 the officer to detain the defendant for further investigation,
22 and both of those permitted the warrantless entry.
23    MR. SCHMITT: In a word, I disagree. The -- initially the
24 eluding, the facts are there on the video tape for your honor,
25 and you can see, and as you can saw, Mr. Grown -- how would a

Page 72

1  reasonable personal in Mr. Brown's position know that he was
2  being followed by the police officer? I think that's as I
3  understand what the eluding is, you have to know you're being
4  followed. And the video tape, the first time you see Mr.
5  Brown's vehicle, it's making the left-hand turn onto Purtov,
6  with -- making the turn signal, doing an appropriate thing.
7  It's after that that you see the overhead lights getting
8  activated. So if the lights weren't on at that point, and
9  assuming Mr. Brown was looking in his rear view mirror rather
10 than looking ahead to make his turn, which would be the prudent
11 thing to do, how is he going to know a police officer is back
12 there coming after him. And then when you see his vehicle the
13 next time, it's on Purtov as he's pulling into his driveway.
14 There's no evidence, absolutely none, that Mr. Brown should
15 have known, and he denied in his affidavit, under oath, that he
16 knew he was being followed, so I don't see how you can get this
17 issue of eluding other than the most extreme twisting of the
18 facts, and those facts just aren't there.
19    And on the issue of the DWI, again there's nothing in the
20 police report. There's nothing in the affidavit that makes
21 reference to intoxication or some belief or some predicate. In
22 the cases that I've cited in my reply to Mr. Slusser's
23 opposition, there are cases outside of Alaska where patrons
24 have been in a bar, or people had real clear descriptions of
25 alcohol being involved. Absolutely none of that here. This

Page 73

1  occurred -- and in those cases usually the facts occurred in
2  the evening time, kind of a typical time for a DWI whereas this
3  was happening at 5:00 o'clock in the afternoon on a Saturday.
4     So I -- you know, the court, you know, that -- the court's
5  rule, was there -- was there truly probable cause for a DWI
6  arrest. I think the answer is no. Was there probable cause to
7  arrest for eluding, the answer is no. So there just was not
8  probable cause to make an arrest.
9     And then to cross the threshold of the home. This is a
10 Fourth Amendment threshold, Your Honor. It's Constitutional
11 magnitude. It's the real issue, and the -- and, you know, the
12 court has indicated it appreciates it, as well it should. And
13 this is -- it's a big issue. When the police come into a house
14 without a warrant, they have to have a pretty clear exception.
15 And I don't see any of the exceptions fitting here, Your Honor.
16    THE COURT: Okay. Now, what about the -- particularly the
17 state's argument that there can be a hot pursuit exception to
18 the warrant requirement when they want to ask a person
19 questions?
20    MR. SCHMITT: The Walsh case, I think it's Walsh or Welsh.
21 It's a U.S. Supreme Court case out of Wisconsin. Welsh, W-E-L-
22 S-H, versus Wisconsin. It's on -- cited in a footnote on page
23 6 of my initial motion, Your Honor. But that was a DWI case
24 out of Wisconsin, but in the days when it -- at least the first
25 time DWI in Wisconsin was not a misdemeanor. I was just dealt