IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

```
SCOTT BROWN,                    )
                                )
        Plaintiff,              )
                                )
v.                              )
                                )
FRANK PETERSON, Individually and)
in his official capacity as a   )
City of Kodiak Police Officer;  )
JEFF HOLDEN, Individually and in)
his official capacity as a City )
of Kodiak Police Officer, CITY  )
OF KODIAK; and JOHN AND JANE    )
DOES 1 - 10,                    )
                                )
        Defendants.             )
_____)
Case No. 3:05-cv-0002 [TMB]
```

P   PB
APR 2 1 2008

VIDEOTAPED DEPOSITION OF TAMMY HULSEY

April 2, 2008

APPEARANCES:

    FOR THE PLAINTIFF:      MR. ROBERT M. HERZ
                                  Attorney at Law
                                  425 G Street, Suite 600
                                  Anchorage, Alaska  99501
                                  (907) 277-7171

    FOR THE DEFENDANTS:     MR. FRANK S. KOZIOL
                                  Attorney at Law
                                  618 Christensen Drive
                                  Anchorage, Alaska  99501
                                  (907) 258-7706

    ALSO PRESENT:           CHIEF T.C. KAMAI

Ex. AR

Page 2

1  TABLE OF CONTENTS
2  Direct Examination by Mr. Koziol          4
3  Cross Examination by Mr. Herz            58
4  Redirect Examination by Mr. Koziol       80
5  Recross Examination by Mr. Herz          84
6  EXHIBITS MARKED:
7  A - Diagram                              51

Page 3

1                  PROCEEDINGS
2             (Kodiak, Alaska - 4/2/2008)
3       (On record)
4       REPORTER: My name is Salena Hile. I'm a court reporter
5  with Computer Matrix and a Notary Public in the state of
6  Alaska. Today is April 1st, 2008. The time is 4:30 p.m. This
7  is the first tape in the videotaped deposition of Tammy Hulsey
8  and we're at the Best Western in Kodiak, Alaska. This is in the
9  United States District Court for the district of Alaska, Scott
10 Brown, plaintiff, versus Frank Peterson, individually and in
11 his official capacity as a city of Kodiak police officer, Jeff
12 Holden, individually and in his official capacity as a city of
13 Kodiak Police Officer, city of Kodiak, and John and Jane Does 1
14 through 10. The case number is 3:05-cv-0002. This deposition
15 is being taken on behalf of the defendants.
16      Counselors, please identify yourselves for the record and
17 who you represent, starting with the plaintiff's attorney,
18 please.
19      MR. HERZ: Robert Herz. Last name's spelled H-E-R-Z,
20 representing plaintiff, Scott Brown.
21      MR. KOZIOL: Frank Koziol for the defendants.
22      REPORTER: Thank you. Okay. Ms. Hulsey, if you could
23 please raise your right hand.
24      (Oath administered)
25

Page 4

1  MS. HULSEY: I do.
2  REPORTER: Thank you.
3              TAMMY HULSEY
4  having first been duly sworn under oath, testified as follows
5  on:
6              DIRECT EXAMINATION
7  REPORTER: Can you please state your full name for the
8  record and spell your last name.
9  A   Tammy Hulsey, H-U-L-S-E-Y.
10 REPORTER: And a mailing address, please.
11 A   1221 Purtov.
12 REPORTER: Okay. Kodiak, yeah.
13 A   Of course.
14 REPORTER: And a daytime telephone number or a message
15 phone where you can be contacted.
16 A   539-5225.
17 REPORTER: All right. Thank you. And, Counselors, if
18 there's no stipulations, Frank, you may begin.
19 BY MR. KOZIOL:
20 Q   How would you like me to address you during this
21     deposition?
22 A   Tammy.
23 Q   Okay. Thank you, Tammy. This is a deposition in a civil
24     case. Have you ever been deposed before?
25

Page 5

1  A   No.
2  Q   Do you have any familiarity with the procedure?
3  A   Not really. You ask me questions. I answer.
4  Q   Okay.
5  A   I don't know that that's that hard.
6  Q   Okay. There are a few things though I might point out
7      procedurally. Unlike ordinary conversations, you might
8      want to wait for a pause so you know I'm done with my
9      question. I'll try to wait for a pause to make sure
10     you're done with your answer. That way we won't step on
11     each other's words as sometimes happens in ordinary
12     conversation and it'll make her job a lot easier when she
13     types this up. Okay?
14 A   Okay.
15 Q   All right. And that's -- the other thing is if it's a yes
16     or no, good to say yes or no rather than uh-huh or
17     unh-unh. Then she won't have to interpret the answer.
18     All right?
19 A   Okay.
20 Q   It's important that if you know the answer to a question
21     with reasonable confidence that you tell us. If you don't
22     know, you should just say you don't know rather than
23     speculate. Okay?
24 REPORTER: Yes?
25

Page 6

1  A  Yes.
2  Q  Yes. Okay.
3     REPORTER: Okay. Thank you. I'll remind you.
4  A  I'm sorry.
5  Q  And you're really the gatekeeper of knowing when it's
6     speculation and when it's not. I like to illustrate it
7     this way. If you know an answer about a fact a little
8     more than 50 percent all the way up to a hundred percent
9     certainty, that's the range you should testify in. If
10    you're at 50/50, flip of the coin, could be heads, could
11    be tails, or all -- or less than that, you should simply
12    say I don't know and not speculate for us. Okay?
13 A  Okay.
14 Q  All right. If you don't answer any -- if you don't
15    understand any of my questions, you should tell me that
16    and I'll be happy to rephrase them, but if you do answer,
17    then we're going to assume that you understood the
18    question and can answer the question, okay?
19 A  Okay.
20 Q  All right. I'd like to ask you some background questions
21    first. How old are you?
22 A  42.
23 Q  And how long have you lived in Kodiak?
24 A  Almost 18 years.
25

Page 7

1  Q  Okay. And what is your marital status?
2  A  I'm single.
3  Q  Okay. And were you married at some point?
4  A  Yes.
5  Q  To who?
6  A  Ray -- excuse me. His legal is Saben, S-A-B-E-N, Ray
7     Hulsey. He goes by Ray.
8  Q  Okay. And what was the term of that marriage?
9  A  Explain. The length?
10 Q  How -- yeah. What's the dates that you were married and
11    divorced or separated?
12 A  22 years.
13 Q  Okay.
14 A  Married 22 years.
15 Q  And when did you become -- is it divorced? You.....
16 A  Yes. Divorce.
17 Q  When did you become divorced?
18 A  April 2006.
19 Q  Okay. Do you know Frank Peterson?
20 A  Yes.
21 Q  And how long have you known him?
22 A  About three years.
23 Q  The date of the incident that we're going to talk about is
24    January 4th, 2003. Did you know him then?
25

Page 8

1  A  I have to recall -- the main reason I know Frank is we
2     were in a college class together.
3  Q  Okay.
4  A  And that was one of my first classes and yes, I do believe
5     I knew him at that point.
6  Q  Okay. Before that point, yes.
7  A  Uh-huh. (Affirmative)
8  Q  Okay. Do you know how long before that point?
9  A  I don't recall. No, I do not know.
10 Q  And as you sit here today, do you have a favorable or
11    unfavorable view of Frank Peterson?
12 A  Favorable.
13 Q  Okay. Do you know Jeff Holden?
14 A  No.
15 Q  You know Chief Kamai?
16 A  I know who he is.
17 Q  Okay. Do you have a favorable or unfavorable opinion of
18    the Kodiak Police Department in general? Or no opinion?
19 A  No opinion.
20 Q  Okay. All right. You and I have never talked before
21    today.....
22 A  That is correct.
23 Q  .....before this moment when the deposition just got
24    started, right?
25

Page 9

1  A  That is correct.
2  Q  Had you ever talked to Mr. Herz before today?
3  A  Not before today.
4  Q  Okay. And in fact before this moment in time, you never
5     talked to him.
6  A  I have talked to him.
7  Q  Ah. When did you talk to him today?
8  A  Three hours ago.
9  Q  Okay. And in person or by telephone?
10 A  By telephone.
11 Q  Okay. And how long was that conversation?
12 A  Four minutes, five minutes.
13 Q  Okay. And did you learn in that conversation that Scott
14    Brown has listed you as a witness in this case?
15 A  I already knew that.
16 Q  Okay.
17 A  He did tell me that, but I already knew that.
18 Q  Okay. So Mr. Herz told you you were a witness in this
19    case and listed by the plaintiff in the conversation
20    today.
21 A  He -- in the conversation today, he did not specifically
22    inform me of that, but that was part of the conversation.
23    He knew we were going to be here today.
24 Q  Okay. And did you learn from Scott Brown himself that you
25

Page 10

1   were listed as a witness in this case before today?
2 A No.
3 Q Ah. Did you know before today that you were listed as a
4   witness in this case?
5 A Yes.
6 Q How did you learn that?
7 A From his wife.
8 Q Beverly.
9 A Beverly.
10 Q All right. And when did Beverly tell you that you were
11   going to be a witness in this case?
12 A I couldn't give you a date, but very early on.
13 Q Okay. And can you tell what discussions you had with
14   Beverly about your being a witness in this case. How did
15   it come about that then she told you you were going to be
16   witness or she'd like you to be a witness?
17 A I was her neighbor for many years. Eight or nine,
18   something like that. I also worked with her at Arc and
19   Spark Welding for four years and when this incident
20   happened, we were working together.
21 Q Okay. And did you have a conversation with her about what
22   you may have observed of any events of that day?
23 A Yes, I'm sure we discussed it thoroughly.
24 Q Okay.
25

Page 11

1 A There was -- only the two of us were in the office
2   together and I know she was very distraught and very upset
3   when it all happened.
4 Q Okay.
5 A And, yes, she needed someone to talk to.
6 Q And so -- let's talk -- did you have more than one
7   conversation with her.....
8 A Oh, yes.
9 Q .....about it? How many would you say you had --
10   conversations you had with her about this incident?
11 A I would have to ballpark it. I'm not sure.
12 Q And if you can ballpark it and put parameters on it so we
13   know it's somewhere in between those parameters.
14 A Eight to ten.
15 Q Okay. And do those conversations kind of meld together or
16   can you separate them out?
17 A No, they meld together.
18 Q Okay. And so tell me what she told you about the
19   incident?
20 A She felt like Scott had come into the house and the police
21   should not have been there.
22 Q Okay. Did she say anything else?
23 A You know, this was a long time ago.
24 Q Understood. And so -- and it's understood that you can
25

Page 12

1   only do the best you can.
2 A Uh-huh. (Affirmative)
3 Q But I need to ask you if you remember anything else. I'm
4   not trying to challenge you that.....
5 A Okay.
6 Q .....you should, but I'm just asking if you do.
7 A Okay. Clarify. This basically is what I witnessed,
8   right? It's not hearsay.
9 Q Don't worry about the legal rules. A judge later will
10   determine what is admitted at trial and what is not.
11 A Uh-huh. (Affirmative)
12 Q Part of the purpose of a deposition is to find out
13   everything the witness knows whether it's based on
14   personal observation or what somebody told them, which
15   might be considered hearsay.
16 A Uh-huh. (Affirmative)
17 Q And I might tell you this. There are a lot of rules about
18   hearsay that block hearsay from being admitted.....
19 A Uh-huh. (Affirmative)
20 Q .....but sometimes the judge says there are exceptions and
21   hearsay can come in. So we won't know that until the
22   judge rules.
23 A Uh-huh. (Affirmative)
24 Q So that's why I want to know what she told you.
25

Page 13

1 A Specifically, she was very aggravated and angry at the
2   Kodiak Police Department.
3 Q Okay. And did she tell you why she was angry? Based on
4   what.
5 A She felt like they had no reason at all to suspect her
6   husband of something. She also felt like the Kodiak
7   Police Department targeted her and her family.
8 Q Before this date?
9 A Yes.
10 Q And did she explain what the targeting was before
11   January 4th, 2003?
12 A A lot of it had to do with her teenage son.
13 Q And what did she tell you about that in terms of targeting
14   her teenage son?
15 A This is public record. Her son has several MIPs. Her son
16   is has several driving without a license. I'm not sure
17   what that's called. You know, they knew his car. It was
18   like he drove down the street and the police stopped him.
19   Whether he was driving that vehicle or not, that vehicle
20   was stopped.
21 Q Okay.
22 A That's her opinion.
23 Q All right. So sometimes she told you he was driving and
24   they stopped him?
25

Page 14

1  A  Uh-huh. (Affirmative)
2     REPORTER: Yes?
3  Q  Yes?
4  A  Yes.
5  Q  And she felt that was unfair?
6  A  Yes.
7  Q  Okay. And sometimes he was issued citations for minor in
8     possession?
9  A  Yes.
10 Q  And he indeed did have possession of the alcohol?
11 A  Yes.
12 Q  But she felt that was unfair.
13 A  She felt like they targeted the whole family and really
14    watched him.
15 Q  Okay.
16 A  It was fair because he was in possession.
17 Q  She said it was fair, but they shouldn't have focused on
18    him and caught him.
19 A  Don't turn anything around.
20 Q  No, no. I'm just trying shorthand what you're saying she
21    said to you.
22 A  Every time he was charged with an MIP, he was indeed in
23    possession.
24 Q  And did she think that was unfair?
25

Page 15

1  A  But she felt like they specifically watched him more than
2     they would have any other Kodiak teenager.
3  Q  Okay. And she expressed that same sentiment about his
4     driving without a license.
5  A  Yes.
6  Q  Okay. And did she share with you any other targeting that
7     she felt was occurring to her son or anyone else in her
8     family?
9  A  The truck that she had -- that Scott had, the 16-foot,
10    gold, flatbed was very long and it hung over the sidewalk
11    when it was parked in the driveway. We also had a truck
12    at my house that did that and there was probably four or
13    five different times that we would get a parking ticket
14    for blocking the sidewalk.
15 Q  Both you -- your family.....
16 A  Oh.....
17 Q  .....and her.....
18 A  .....yes. Yes.
19 Q  Okay. And she expressed the view that was unfair?
20 A  She felt like that was part of the targeting them. They
21    were just trying to find something to cause them trouble.
22 Q  Did you share the sentiment that it was unfair for your
23    family to get the ticket too?
24 A  Oh, I wasn't happy. Yes.
25

Page 16

1  Q  Okay. All right. Did she share any other targeting
2     examples with you?
3  A  I don't recall.
4  Q  Okay. And so that we understand each other, she never
5     shared with you any targeting examples prior to
6     January 4th of 2003 regarding Scott.
7  A  I don't think so.
8  Q  Okay. Did she describe to you any other unhappiness with
9     the Kodiak Police Department regarding this incident
10    besides the police officer having no reason to suspect her
11    husband of anything?
12 A  I know when he was in jail, they got him the prescription
13    medicine that he needed for a fractured ankle. I'm not
14    totally sure what was wrong, but it was his ankle and he
15    had been on medication and he needed some of it, but yet
16    he had also been drinking and the police department gave
17    him those prescription drugs and she felt like that was
18    unfair and endangered him because he had already had the
19    alcohol and then to put the prescription drugs into his
20    system as well.
21 Q  So she expressed to you anger at the police actually
22    helping him get the medication for his ankle.
23 A  Yes.
24 Q  Okay. Did she ever tell you that Scott Brown wanted the
25

Page 17

1     medication for the ankle and that's why the police got it?
2  A  Yes.
3  Q  But she felt -- she expressed to you that -- the view that
4     they shouldn't have followed what he wanted.
5  A  Yes.
6  Q  Okay. Did you reach an independent judgment on that one?
7  A  I'd rather not say.
8  Q  Okay. All right.
9  A  Is that allowed? I mean.....
10 Q  I won't press the point.
11 A  Okay. Did she complain about anything else to you
12    regarding the incident of January 4th, 2003, or what
13    happened shortly thereafter besides what you've already
14    told me?
15 A  No. I think that covers it.
16 Q  Okay. And for example, just to see if it refreshes your
17    memory, did she ever complain about the manner in which
18    force was used to arrest Scott Brown and take him to jail?
19 A  Yes. I'm sure she did because she felt like they dragged
20    him out of the house.
21 Q  Okay. And that pretty well summarizes her view?
22 A  Uh-huh. Yes.
23 Q  Okay. All right. Did you learn from Beverly Brown what
24    evidence there was against him prior to the police officer
25

Page 18

1  entering his house after he entered the house that day?
2  What led up to the police officer going into the house?
3  Did you ever learn that from her?
4  A  Did I ever learn it or before that?
5  Q  No. Ever learn it.
6  A  Yes.
7  Q  And -- from Beverly Brown.
8  A  Yes.
9  Q  When was the first time you learned it -- or that she
10    discussed it?
11 A  I'm not sure on the dates, but it would have been within
12    the first few weeks.
13 Q  Okay. And what did she tell you about that, the --
14    whatever evidence there was or facts that led up to the
15    officer entering the house after Scott Brown that day?
16 A  She said there was a lady that had called the police
17    department and complained about a large gold, flatbed
18    truck doing donuts in -- I'm not sure if it was in one of
19    the parking lots like at Safeway or Wal-Mart, but I think
20    it was one of those parking lots and then the lady had
21    followed Scott's truck down Selief and called that in to
22    the police department. And this lady was scared that
23    Scott was going to do her personal damage and that's where
24    the call came from.
25

Page 19

1  Q  But your understanding from Beverly was that the -- what
2     is a donut by the way? What did you understand a donut to
3     mean?
4  A  Doing wheelies.
5  Q  A 360?
6  A  Yes.
7  Q  Okay.
8  A  In the parking lot.
9  Q  And your understanding from Beverly Brown was that the
10    witness saw the donuts or the wheelies in the Safeway
11    parking lot not on Selief.
12 A  No. I understood it was in a parking lot.
13 Q  Okay. All right. And did -- so that's the extent of what
14    she shared with you that the police knew prior to going
15    into the house?
16 A  Yes. I believe so.
17 Q  And did she express the opinion that that was insufficient
18    information to go after him into his house?
19 A  No. She expressed the opinion that if that lady was so
20    scared for her life, why in world was she following him.
21    That's the opinion.
22 Q  Okay. But she said also to you that the police had no
23    reason to suspect him -- Scott from doing anything. Did
24    you ever have her explain the apparent inconsistency,
25

Page 20

1  well, he was doing something, according to this woman, but
2  you say they had no reason to suspect him from doing
3  anything. Did you ever ask her to explain the apparent
4  inconsistency between those statements?
5  A  No. Mostly I just listened because she needed to vent.
6  Q  Okay. Did you -- during these conversations with her, did
7     you ever form an opinion yourself about whether it was
8     improper of the police to enter his house that day?
9  A  Yes.
10 Q  And what opinion did you form?
11 A  I feel like Scott had been drinking and driving and the
12    police needed to follow through.
13 Q  Okay.
14 A  I did not see them go in the house through a closed door
15    or an open door, but I did see them cross the porch to the
16    door.
17 Q  Okay.
18 A  From my angle, I could not see the door.
19 Q  And on what basis did you conclude that Scott had been
20    drinking and that justified the police going in the house?
21    What information did you get from any source that led you
22    to reach that conclusion?
23 A  No information from anyone -- source. I knew Scott.
24 Q  And what do you know about Scott?
25

Page 21

1  A  He likes to drink.
2  Q  And how do you know that?
3  A  I've been there.
4  Q  In the house?
5  A  Yes.
6  Q  And what did you see?
7  A  Beer bottles all the time. There was cases usually of
8     beer sitting on the back porch or sitting out on the
9     porch.
10 Q  Okay. Did you ever see hard liquor?
11 A  Yes.
12 Q  Where did you see the hard liquor?
13 A  Usually in the kitchen.
14 Q  Okay. Right on the counter?
15 A  Yes.
16 Q  Okay. And how often did you see hard liquor in the house?
17    Same amount of time you -- or whenever you saw the beer,
18    you saw the hard liquor too?
19 A  It -- pretty much.
20 Q  Okay. And over what period of time prior to January 4th,
21    2003, did you make observations of the beer and the liquor
22    in the house when you went over there? Every time you
23    went over there, you saw the liquor and the beer?
24 A  Pretty much, yeah.
25

TAMMY HULSEY                    4/2/2008                BROWN v. PETERSON, et al.,
Vol 1                                                   Case No. 3:05-cv-0002 TMB

7 (Pages 22 to 25)

Page 22

1  Q  Okay. And how often would you go to the house -- their
2     house and visit?
3  A  Couple times a month.
4  Q  And over what period of time prior to January 4th, 2003, a
5     couple a month where you visited? How far back?
6  A  Not very far back.
7  Q  A year? Two years?
8  A  Between six months and a year.
9  Q  Okay. And how often when you visited a couple times a
10    month did you reach the conclusion that Scott had been
11    drinking when he was there and you saw him?
12 A  I don't know.
13 Q  Can you -- did you reach your conclusion that you thought
14    he was drinking on this occasion which would justify the
15    police going in the house in your mind was that at all
16    based upon your having observed Scott drinking in his
17    house, drinking some of the beer or the liquor or was it
18    just the presence of the beer and the liquor in the house
19    that led you to conclude that he was a drinker?
20 A  I have seen him drink.
21 Q  Okay. And again prior to January 4th, 2003, how often
22    would you say you saw him drink? How many times? Any way
23    to give me an estimate of that?
24 A  There's no way to estimate that, no.
25

Page 23

1  Q  Okay. And when did you see him drink, did you conclude he
2     was intoxicated on those occasions?
3  A  No.
4  Q  Okay. Would he have been safe to drive on those
5     occasions?
6  A  I don't consider drinking and driving at all. If I've had
7     one beer, I do not drive.
8  Q  Okay. And do you apply that standard to other people in
9     terms of safety and driving or not? Let me withdraw that
10    question and ask you this. You have that -- your own
11    personal standard regarding that, right?
12 A  Yes.
13 Q  Do you think people in general can have one beer and drive
14    safely?
15 A  It depends on the person.
16 Q  Okay.
17 A  Probably.
18 Q  Okay. So I'm asking your judgment then. When you saw on
19    these occasions Scott drinking, did you form the opinion
20    that it would have been safe for him to drive?
21 A  That really depends on the time frame. If he'd had one or
22    if he had had five.
23 Q  Okay. Did you see him have five?
24 A  Yes.
25

Page 24

1  Q  Okay. About how many times? I mean more than once?
2  A  More than once.
3  Q  More than five?
4  A  Probably.
5  Q  Okay. And again this is all prior to January 4th, 2003.
6     I'm not interested afterwards, so your answer's still
7     that, probably more than five?
8  A  I don't know.
9  Q  More than once?
10 A  More than once.
11 Q  Okay. Is there any way to put an upper limit on it, but
12    less than ten?
13 A  Not really.
14 Q  Okay.
15 A  That is too long ago.
16 Q  Okay. Fair enough. All right. Did Beverly give you any
17    indication that Scott had been drinking that day either
18    before or after the police entered the house?
19 A  I don't recall if she specifically said he had been before
20    or not.
21 Q  Okay. How about after? Did she say he ever drank after?
22 A  She said he drank some in the bathroom.
23 Q  Okay. Did she tell you what he drank in the bathroom? I
24    mean beer versus hard alcohol?
25

Page 25

1  A  I believe it was hard alcohol.
2  Q  Okay. And can you describe to me what she said about
3     that? I mean did she tell you that the police officer
4     followed Scott into the house and then he went in the
5     bathroom and locked the door -- or shut the door?
6  A  She told me Scott ran in the house, went to the bathroom
7     and locked the door, and next thing she knew, the police
8     were coming in the house.
9  Q  Okay. And then she told you that Scott drank in the
10    bathroom?
11 A  Yes.
12 Q  And what was your reaction to that when she said that?
13 A  Whatever for?
14 Q  Okay. And what did she say?
15 A  He drinks all the time.
16 Q  That's what she said?
17 A  She told me that he had bottles everywhere around the
18    house and that drinking in the bathroom was not unusual.
19 Q  Did she tell you where the alcohol was in the bathroom?
20 A  I don't think so.
21 Q  Okay. Did she tell you how much he drank in the bathroom?
22 A  I don't think so. I don't recall.
23 Q  Okay. Did you ever form any opinion as to whether --
24    strike that. Only Scott would know whether he drank in
25

Computer Matrix, LLC                    Phone - 907-243-0668                    jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax     907-243-1473                    sahile@gci.net

Page 26

1  the bathroom, right.....
2  A  Correct.
3  Q  .....because he was alone in the bathroom.
4  A  Correct.
5  Q  Okay. She expressed the opinion that that's what happened
6     in the bathroom, right?
7  A  Yes.
8  Q  Did you ever form an opinion as to whether -- form an
9     opinion whether or not that was true, that Scott drank in
10    the bathroom?
11 A  I would have no idea if that's true.
12 Q  Okay. Did you ever see any alcohol in the bathroom.....
13 A  No.
14 Q  .....prior to this date again? All these questions are
15    prior to this date, January 4th, '03.
16 A  All right.
17 Q  No, you never did?
18 A  No.
19 Q  Did you ever have occasion to -- I take it they had a wash
20    basin in there, right?
21 A  A sink?
22 Q  Sink, yes.
23 A  Yes.
24 Q  All right. And was there a cabinet underneath the sink,
25

Page 27

1  as you recall?
2  A  Yes.
3  Q  All right. You ever have occasion to open that cabinet up
4     prior to.....
5  A  No.
6  Q  .....January 4th, 2003?
7  A  No.
8  Q  Okay. Did Beverly ever tell you that she didn't like
9     Scott Brown drinking alcohol?
10 A  Yes.
11 Q  And any time before January 4th, 2003?
12 A  I don't know for sure, but my guess is yes.
13 Q  Okay.
14 A  I heard that a lot.
15 Q  Okay. And what did she say to you about that?
16 A  That she doesn't like him when he drinks. When he gets
17    drunk, he says things that hurts their marriage.
18 Q  Did she ever tell you that she took any steps to try to
19    prevent him from drinking alcohol?
20 A  Oh, she pulled it out of his hand and poured it down the
21    sink all the time.
22 Q  You saw it?
23 A  No.
24 Q  Okay.
25

Page 28

1  A  She told me.....
2  Q  Okay. Fair enough. I just want to.....
3  A  Okay.
4  Q  .....know whether that's personal observation or what she
5     told you.
6  A  I did not see that.
7  Q  Okay.
8  A  I believe that, but I did not see that.
9  Q  Okay. And did she tell you what she poured out of his
10    hand, whether beer or hard liquor or she wasn't that
11    specific?
12 A  I know she has poured champagne down. She has told me
13    that she's poured champagne down the drain. She has
14    poured beer down the drain and I would almost guarantee
15    you it was hard liquor as well, what she's told me.
16 Q  But did she tell you she would pour it down the drain when
17    he reached a point of having drank the alcohol that she
18    then couldn't tolerate anymore?
19 A  No.
20 Q  Okay. Here's -- what appears to be an inconsistency and
21    maybe you can explain by what she said to you resolve the
22    inconsistency. But you've told me that virtually all the
23    times you've gone over there that you've seen beer and
24    hard liquor around the house.
25

Page 29

1  A  Uh-huh. (Affirmative)
2  Q  Yet she's telling you that she takes it from him and pours
3     it down the drain. And so my question to you is if she
4     was serious about him not drinking in the house that she
5     would pour all of the alcohol that you would ever see in
6     the house down the drain rather than just taking from his
7     hands. Did she ever discuss that one? If she were
8     pouring it out of what he's got in his hand, why don't you
9     pour all the rest of it out then.
10 A  She was inconsistent on when she poured it out. She would
11    go through spells. He would do real well for a while, and
12    then he would drink a little bit and she felt like he was
13    drinking too much and then it would all go down the drain.
14    Then it may be another three or four weeks before it
15    happens again.
16 Q  Okay. Did you ever see the aftermath of it all going down
17    the drain, that is you ever got to the house and you saw
18    no alcohol around? Did you ever see that or not?
19 A  I don't think so.
20 Q  Okay. And did she tell you in your conversations that she
21    was more opposed to hard liquor in the house than beer or
22    she never expressed such an opinion?
23 A  She was more opposed to hard liquor.
24 Q  She said that to you.
25

Page 30

1  A  Yes.
2  Q  Okay. And did she explain why?
3  A  Because it affected Scott differently.
4  Q  But it's true, alcohol is alcohol, isn't it, once it's in
5     your system. Doesn't matter what form.
6  A  I'm not a doctor.
7  Q  Would you agree with that?
8  A  I would think so.
9  Q  But did she ever explain.....
10 A  I think....
11 Q  .....how that makes any sense? That a certain type of
12    alcohol in a certain form would affect him differently
13    than in another form.
14 A  Maybe it's the percentage of alcohol in that form?
15 Q  All right. So it's not the form, but it's how much was
16    drunk.
17 A  That's a possibility.
18 Q  Okay. She didn't explain it that.....
19 A  No.
20 Q  .....finely though.
21 A  Beer did not affect him as much as hard liquor did.
22 Q  Okay. All right. Did you ever talk to Scott about this
23    incident?
24 A  No.
25

Page 31

1  Q  So have you ever talked to anyone else about this incident
2     other than Beverly and Mr. Herz here today?
3  A  I did tell my boss I was coming here today.
4  Q  Okay.
5  A  I'm -- I did not go into details.
6  Q  Okay. You didn't talk about the facts of the case with
7     him.
8  A  No. Just that it was a former neighbor.
9  Q  Okay.
10 A  Beverly and I work together Arc and Spark, but everyone at
11    Arc and Spark was in this conversation at one point in
12    time. So I possibly talked to other employees at that
13    time.
14 Q  Did you ever express the opinion that the police did wrong
15    in this case to anyone?
16 A  I don't think so.
17 Q  Okay. Did you ever form the opinion that the police did
18    wrong in this case?
19 A  No.
20 Q  Okay. So let's go to what you saw.
21 A  Okay.
22 Q  We're off of hearsay now.
23 A  Thank you.
24 Q  A little bit more background. I take it at this time,
25

Page 32

1     January 4, 2003, you considered yourself a friend of
2     Beverly's.
3  A  Yes.
4  Q  Did you consider yourself a friend of Scott's?
5  A  No.
6  Q  Okay. And in ranking your friendship with Beverly, how
7     would rank it? Would you consider her among your best
8     friends at the time or not?
9  A  Among a good friend.
10 Q  And I know you told me how long you knew her. I think you
11    said from six to nine months at the time, but my question
12    then is how long had you been neighbors? That same amount
13    of time?
14 A  No. They moved in -- I believe their youngest son was
15    about fourth grade, so I'd have to backtrack. They'd been
16    there at least three years.
17 Q  Okay.
18 A  Maybe four.
19 Q  But you only got to know her for the prior -- the
20    immediately prior six to nine months.
21 A  We talked on the street, friendly, neighborly kind of
22    thing, but we did not know each other until she started
23    working at Arc and Spark as well.
24 Q  Which then parallels the six to nine months?
25

Page 33

1  A  Uh-huh. (Affirmative)
2  Q  Yes?
3  A  Yes.
4  Q  Okay. All right. And what is the business of Arc and
5     Spark?
6  A  It's a welding shop.
7  Q  Okay. All right. So -- and if you look at their house --
8     they're not there anymore, right?
9  A  Correct.
10 Q  When did they move?
11 A  Last summer.
12 Q  And do you know where they moved to?
13 A  Washington.
14 Q  And have you kept in contact with Beverly?
15 A  I have talked to her on Christmas Day one time.
16 Q  Okay. I take it you're still friends with her.
17 A  Yes.
18 Q  Okay. If you look at their house, is your house to the
19    left or the right?
20 A  Right.
21 Q  So the immediate right is your house. Okay. And you
22    still live there.
23 A  Yes.
24 Q  Okay. All right. Do you know January 4th, 2003, to have
25

TAMMY HULSEY　　　　　　　　　　4/2/2008　　　　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

10 (Pages 34 to 37)

Page 34

```
 1    been a Saturday?
 2  A I think so.
 3  Q Okay. And do you know about what time your attention was
 4    drawn to their house on that day?
 5  A It would have been late afternoon.
 6  Q Okay. And what were you doing at the time?
 7  A My husband at the time was outside working on one of our
 8    cars.....
 9  Q Okay.
10  A .....and I had just come out the door with a glass of
11    water or a drink or something like that for him when it
12    all started.
13  Q Okay. And so that's when you first noticed something.....
14  A Uh-huh. (Affirmative)
15  Q .....occurring at the neighbor's property -- the Brown
16    property.
17  A Right.
18  Q And I'd like you, if you can, to freeze frame what you saw
19    at that moment in time so then we'll be able to know where
20    in our sequence of events you first started noticing
21    things. So can you just tell us what you first saw? Who
22    is where? Before describing what they were doing, who was
23    where?
24  A When I first walked out the door, the first thing I
25
```

Page 35

```
 1    realized was that Ray was no long squatted down by the
 2    tire of the vehicle. He was standing up and he was
 3    looking.
 4  Q Okay.
 5  A And I looked over and I saw Scott run into the house.
 6  Q Okay. And when you first saw Scott -- are there steps
 7    leading into the house?
 8  A No.
 9  Q Okay. So it's the same level.
10  A Uh-huh. (Affirmative)
11  Q Okay. Yes?
12  A Yes.
13  Q Okay. Thanks. And how -- and there's a door -- a front
14    door of course, right?
15  A Yes.
16  Q How far was he from the door when you first saw him?
17  A Ten feet.
18  Q Okay. And at that moment in time when he was ten feet --
19    he was running, but you first saw him about ten feet from
20    the door.
21  A Yes.
22  Q Okay. And did you see a police officer at the same time?
23  A No.
24  Q Okay. Where was Scott's vehicle?
25
```

Page 36

```
 1  A In the driveway.
 2  Q And the vehicle was what? A flatbed truck?
 3  A Yes.
 4  Q Okay. You didn't see him pull in.
 5  A No.
 6  Q Okay. Did you see any police lights at that moment in
 7    time when you saw Scott running?
 8  A No.
 9  Q Okay.
10  A I heard the sirens at that time.
11  Q Okay. So when you first came out, you heard sirens?
12  A Yes.
13  Q Didn't hear the sirens inside the house?
14  A I don't believe so.
15  Q Okay. So when you first came out and made this
16    observation of Scott, you heard sirens. You heard a
17    siren?
18  A It was right there at the same time frame.
19  Q Okay.
20  A Almost immediately when I saw my husband and I looked that
21    way, I saw Scott and the sirens.
22  Q Okay.
23  A And I heard the sirens.
24  Q All right. And then what happened next? What did you see
25
```

Page 37

```
 1    after that?
 2  A I saw Scott run in. His brother was with him, but I don't
 3    recall exactly when his brother went in the house.
 4  Q How do you know his brother went it was -- with him?
 5  A Because he came back out afterwards -- no. I know because
 6    I was told I believe that Damon was there.
 7  Q Okay. All right. So you never saw the brother outside
 8    the house.
 9  A After the police got there, I did see the brother outside
10    the house.
11  Q Was that -- okay. And let me have you ask it more
12    narrowly. Did you ever see the brother leave the vehicle?
13  A No.
14  Q Okay. All right. So you see Scott running. He's about
15    ten feet from the house -- the door to the house and you
16    hear a siren. What happens next?
17  A Within seconds, the police come and screech and two go in
18    the house -- two run in the house.
19  Q Okay. Two officers?
20  A Yes. Two officers.
21  Q Okay. And did you recognize who they were?
22  A No.
23  Q Okay. You knew Frank Peterson at the time?
24  A Yes. Vaguely. I knew him from my college class.
25
```

Computer Matrix, LLC　　　　　　　Phone - 907-243-0668　　　　　　　jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501　　Fax　　907-243-1473　　　　　sahile@gci.net

TAMMY HULSEY
Vol 1
4/2/2008
BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

11 (Pages 38 to 41)

Page 38

1  Q  Okay. Since you knew him from your college class at the
2     time, is it your opinion that neither of the officers was
3     Frank Peterson?
4  A  I have no opinion. It was not clear to tell who it was.
5  Q  You couldn't see well enough to determine the identity of
6     the police officers?
7  A  They were in uniform. They ran quickly. Specifying what
8     their face was like, they weren't looking at me.
9  Q  Okay.
10 A  I didn't get a good look at the face.
11 Q  How close were the officers to one another when they were
12    running into the house?
13 A  I don't know.
14 Q  No. I mean were they together. You saw them running in
15    together?
16 A  Yes, I believe so.
17 Q  Okay.
18 A  It as very close, but specifically.....
19 Q  Within a couple feet of each other.
20 A  Possibly.
21 Q  Okay. But when you made your observation of the police
22    officers, there were two police officers together and then
23    they ran into the house.
24 A  This is a long time ago. I believe so, yes.
25

Page 39

1  Q  Okay. And when you first saw the police officers, where
2     were they? When you first saw them, where were they in
3     relationship, let's say, to Scott's vehicle? Or the
4     door.....
5  A  I don't know.
6  Q  .....of the house when you first saw them? Can you tell
7     me that?
8  A  Not really.
9  Q  Okay. And if you can't tell me that, then are you able to
10    say whether or not Scott had made it inside the house when
11    the police officers were first -- first would have been
12    visible to you? Do you know or not know?
13 A  I do believe Scott was in the house, yes.
14 Q  And why do you believe that if you don't know where the
15    police officers were when you first saw them?
16 A  I may not have understood the question. I saw the police
17    officers run on the porch.
18 Q  Okay.
19 A  Okay. Which was shortly after Scott had gone in. But
20    where they parked, where they came, its relation to his
21    vehicle, I am not sure.
22 Q  That wasn't my question. My question wasn't where they
23    parked. My earlier question was where were they when you
24    first saw them. The individual police officers, where
25

Page 40

1     were they when you first saw them?
2  A  On the porch going in.
3  Q  Okay. So they were -- first time you saw them, they were
4     on the porch.
5  A  Uh-huh. (Affirmative)
6  Q  You didn't see them run up to the porch. They were on the
7     porch, right?
8  A  Yeah. But they were running.
9  Q  Okay. You saw them running and when you first saw them
10    running, they were on the porch.
11 A  Yes.
12 Q  Okay. All right.
13 A  Okay.
14 Q  Fair enough. And how much -- I know. This is not a
15    normal conversation, is it. This is lawyer conversation,
16    but.....
17 A  Exactly.
18 Q  .....this is important to us, so.....
19 A  That's fine.
20 Q  .....that's why it's not normal because we're interested
21    in minute facts. How much time passed, do you think --
22    you actually saw Scott go into the house, right?
23 A  Yes.
24 Q  How much time passed in terms of seconds after you saw
25

Page 41

1     Scott go into the house from then your observation of
2     seeing the police officers on the porch?
3  A  30 seconds, 45 seconds.
4  Q  All right. And during this 35 to.....
5  A  Are you timing 30 seconds?
6  Q  Well, if I had a second hand, I would, but I looked at my
7     clock here and I don't have a second hand. I can't do
8     that. But I might have if I had a second hand.
9  A  It was very close.....
10 Q  For -- what does that mean?
11 A  .....the time frame.
12 Q  Okay. You mean it was a short period of time.
13 A  Yes.
14 Q  Okay. Somebody might say 30 to 45 seconds is a long time,
15    but you don't think 30 to 45 seconds is a long time. I'll
16    withdraw that question. It's a stupid question. I'll ask
17    another one, but hopefully a better one. Did you ever
18    hear any of the police officers say anything as -- before
19    they entered the house? Hear anybody say stop?
20 A  I don't believe so.
21 Q  Okay. How loud was the siren that you think it was
22    hearing? Fairly loud siren? Any way to quantify the
23    loudness of the siren?
24 A  No.
25

Page 42

```
 1  Q  Okay.
 2  A  Police siren.
 3  Q  All right. So to your observation, we have three
 4     officers -- two officers and Scott enter the house, okay?
 5     Right?
 6  A  Right.
 7  Q  And do you know -- were you able to see the door after
 8     Scott entered, whether it was open or closed?
 9  A  No.
10  Q  You weren't in a position to see.
11  A  I was not in position.
12  Q  Okay. All right. So we have three individuals enter the
13     house. The siren is still going, right?
14  A  (Nodding head.)
15  Q  Yes?
16  A  Yes.
17  Q  Okay. And you don't see any lights though flashing --
18     police lights flashing still; is that right?
19  A  I don't know.
20  Q  Okay. What happens next to your observation?
21  A  There was a lot of noise coming from the house.
22  Q  Are you able to hear any words spoken?
23  A  No. It was not clear.
24  Q  Yelling?
25
```

Page 43

```
 1  A  Yes.
 2  Q  Okay.
 3  A  I would say within three or four minutes, the two police
 4     officers came out with Scott.
 5  Q  Okay. And what did you do during those three to four
 6     minutes? What were you doing?
 7  A  I was being a nosy neighbor.
 8  Q  By staying where you were or did you move into a better
 9     position to watch?
10  A  Oh, no. I stayed on my porch in front of my house.
11  Q  Okay. And what was -- Ray was your husband's name?
12  A  Uh-huh. Yes.
13  Q  What was -- did Ray change his position from where he was
14     changing -- changing a tire, is that what he was doing?
15  A  I -- he was working on the tire.
16  Q  Doing something to the tire.
17  A  Something along those lines.
18  Q  Did he change his position during those three, four
19     minutes?
20  A  I don't think so.
21  Q  Okay.
22  A  I think he got up and he kind of looked and then he went
23     back to working on the vehicle.
24  Q  During the three or four minutes.
25
```

Page 44

```
 1  A  Yes.
 2  Q  Okay.
 3  A  I mean he -- when it all first started, he was looking as
 4     well as I.
 5  Q  But it appeared he wasn't as -- his interest didn't
 6     continue as yours did during the three to four minutes.
 7     Is that a fair statement?
 8  A  I'd say that's a fair statement.
 9  Q  Okay. All right. So after three to four minutes passed,
10     your on the porch. What happens then? What do you see?
11  A  The police officers come out at that point.
12  Q  Yes.
13  A  They come out with Scott. It appears that he is wanting
14     to stay in the house. They're not -- it's not easy --
15     he's not making it easy on them to get him out of the
16     house.
17  Q  And what do you see him doing that leads you to that
18     conclusion? So I'm asking for body movement.
19  A  He's doing this. I mean he's trying to wiggle away from
20     them.
21  Q  Okay. And you just indicated -- I know we have it on
22     tape, but if it's typed up, you moved your arms kind of
23     back and forth.
24  A  Yes.
25
```

Page 45

```
 1  Q  Yes? Okay. Was he -- could you tell whether he was
 2     handcuffed at the time?
 3  A  I couldn't really tell.
 4  Q  Okay. And where were the police officers positioned in
 5     relationship to Scott when he was wiggling his arms,
 6     moving around?
 7  A  One on each side.
 8  Q  Okay. And did it appear to you that as part of his not
 9     really cooperating, was he trying not to walk forward too
10     or was he just wiggling the arms but seemingly walking
11     forward with them? Could you tell?
12  A  I couldn't tell.
13  Q  Okay. All right. So how long did this movement not
14     making it easy on the police continue to your observation?
15  A  I don't know.
16  Q  I didn't mean to mean.....
17  A  15 seconds. Is that what you mean?
18  Q  I'm sorry? No, actually I meant distance at that time.
19     Where did they take him?
20  A  Their porch -- their front door leads directly to a
21     walkway that goes to the asphalt where they park.....
22  Q  Okay.
23  A  .....into the road. It's not a long driveway. It's --
24     it's wide like a parking lot would be. There's probably a
25
```

Page 46

1   four-foot porch on each side of the house, but then the
2   walkway goes straight. He was trying to go the side of
3   the porch to where there would have been no way to get him
4   forward.
5 Q Okay. By his body movement, that's.....
6 A Yes.
7 Q .....what he was trying to do.
8 A Yes.
9 Q And the police officers were trying to have him not do
10  that.
11 A Yes.
12 Q Okay. And was he successful in moving them toward this
13  area?
14 A He was struggling. He's a big boy.
15 Q Okay.
16 A I don't know how successful he was.
17 Q Okay. And the police officers were touching him at the
18  time.
19 A Yes. They had his arms.
20 Q And how did they have him?
21 A They had his arms.
22 Q Okay. One on each side?
23 A Yes.
24 Q Okay. Were you able to recognize the police officers at
25

Page 47

1   this point or not?
2 A Honestly I wasn't trying to recognize the police officers.
3 Q Okay. All right. And so we have Scott struggling, trying
4   to move in a certain direction and them trying to prevent
5   him. Does that continue as they move him toward their
6   police car -- that struggle?
7 A I don't think so. I'm not sure.
8 Q Okay. Don't really remember.
9 A Right.
10 Q Okay. So you don't have a memory of, oh, Scott is really
11  deciding to cooperate now. You don't remember that.
12 A No.
13 Q Okay. But nor do you remember specifically whether the
14  same type of struggling was occurring. Just don't know.
15 A That's correct.
16 Q Okay. But did you notice any problem or anything
17  noteworthy of them moving him from where he was struggling
18  that you remember to the police car?
19 A When they first came out of the house and he was
20  struggling so much, Beverly came out right behind him. I
21  don't know time frame. Really quickly, she was out there
22  right behind him and I heard her yell at Scott to stop and
23  then I heard her yell let me pull up his pants.
24 Q Okay.
25

Page 48

1 A And I watched her bend down -- squat all the way down the
2   ground and come back up. I did not see his bare legs,
3   anything like that, but I saw her movement.
4 Q Okay.
5 A And I -- seems like that was when they actually had
6   control of Scott. Before that when he was struggling,
7   they didn't have control of him.
8 Q Okay. You never saw his pants down, right?
9 A No, he did not flash me.
10 Q Okay. And when you say you saw her bend down after she
11  said let me pull his pants up, were you in a position to
12  see whether his pants were down or up or was she blocking
13  your view of his pants?
14 A No. She was behind him -- more so behind him and the
15  police officers were closer to the front.
16 Q Okay. Were the police officers -- do you have a -- I
17  guess my question is do you have a view of his pants at
18  the point where she said let me pull his pants up and then
19  she bends down?
20 A No.
21 Q Okay. Because the police officer was blocking your view?
22 A And the porch railing, all of that.
23 Q Okay. But it's your testimony that Scott had been
24  immediately before that struggling with the police
25

Page 49

1   officers?
2 A Yes.
3 Q Okay. All right. So you see her bend down after she says
4   let me pulls his pants up and then the police officers
5   proceeded ahead to take him to the police vehicle?
6 A Yes.
7 Q Did you ever get a view of his pants?
8 A I don't have a clue.
9 Q And I guess what I mean by that is was your view of --
10  from his waist down always blocked by a police officer or
11  were you able to determine that Beverly was successful, if
12  that's what she was doing, and he had pants that were up
13  at his waist?
14 A I would like to assume that she was successful. I would
15  not want my husband out of the house into a police
16  department with his pants around his knees or his ankles.
17 Q Okay.
18 A But did I see that, I don't have a clue.
19 Q Okay.
20 A That does not ring -- that doesn't ring a bell as
21  something important.
22 Q Okay. But certainly if he had his pants down at his
23  ankles and you saw it, that's something you'd likely
24  remember.
25

TAMMY HULSEY    4/2/2008    BROWN v. PETERSON, et al.,
Vol 1    Case No. 3:05-cv-0002 TMB

14 (Pages 50 to 53)

Page 50

1  A  Yes.
2  Q  Okay.
3  A  I saw her movement.....
4  Q  Okay.
5  A  .....and what she said and that's -- yes, I remember that.
6  Q  And may I -- did you -- have you concluded that the way he
7     moved to the police car in your observation, it was
8     unlikely that he had his pants down on his ankles because
9     he'd have to walk in very small steps?
10 A  I would make that conclusion.
11 Q  Okay.
12 A  That his pants were up. Am I understanding that question
13    right?
14 Q  Yes. The way.....
15 A  Okay.
16 Q  The way the three of them walked together.
17 A  Yes.
18 Q  Okay. And did you actually see him being put into the
19    police car or not?
20 A  I don't recall.
21 Q  Okay. And I.....
22 A  They have a very large -- or they had a travel trailer
23    that sat between my house and their house, parked in the
24    parking lot. So it wasn't a clear view. So I don't
25

Page 51

1     recall.
2  Q  Okay. I guess though my question to you is as the three
3     of them are moving him along, where was your last view of
4     the three of them? Had they, for example, reached the
5     sidewalk? Could you see up to the sidewalk or beyond the
6     sidewalk or no? Or somewhere else?
7  A  Just past the porch where the sidewalk is, yes, I would
8     say I could see that far.
9  Q  Okay. And the sidewalk I'm talking about is the sidewalk
10    that -- where he got citations for having his.....
11 A  Oh.
12 Q  .....his vehicle over.
13 A  No, probably not. It would have been just to the edge of
14    his porch and into his parking area.
15 Q  Okay. And that's when your view stopped.
16 A  Uh-huh. (Affirmative)
17 Q  Okay.
18    REPORTER: Yes?
19 A  Yes.
20 Q  Do you see -- in your opinion, did you see any -- either
21    of the two police officers use what you considered to be
22    excessive or unreasonable force as they were moving him
23    from his house to the police car?
24 A  I don't believe so.
25

Page 52

1  Q  Okay. Did you ever discuss with your husband at the time
2     Ray this incident?
3  A  We talked a little bit at that time.
4  Q  Okay. And did you ever discuss with him the topic of
5     whether the police used unreasonable or excessive force on
6     Scott Brown as they were taking him out of the house and
7     putting him in the squad car?
8  A  I don't know.
9  Q  You don't remember.....
10 A  I don't believe so.
11 Q  .....talking. Okay. Do you ever remember him expressing
12    an opinion that the police used unreasonable or excessive
13    force.....
14 A  No.
15 Q  .....in transporting him? Okay. He never expressed that
16    opinion to you?
17 A  I don't remember whether he did or not. I don't think he
18    did, but I don't remember.
19 Q  Okay. I'm just a little bit confused about I guess the
20    driveway and the porch and the sidewalk and where his
21    gold-colored vehicle is. Do you think it's possible for
22    you to do a bird's-eye view for me of let's say the
23    house -- the Scott Brown house, your house, his driveway,
24    where you saw the gold, flatbed truck parked, and then
25

Page 53

1     drawing the porch and that sidewalk for me? Is that
2     something you could do?
3  A  I can do that.
4  Q  Okay. Why don't -- go off the record and I'll have you do
5     that and then you can explain what you've drawn.
6  A  Okay.
7     MR. KOZIOL: Okay. Thanks.
8     REPORTER: Off record.
9     (Off record)
10    (On record)
11    REPORTER: Okay, we're back on record and we've marked
12 Exhibit A.
13              (Deposition Exhibit A marked)
14 Q  All right. While we were off the record, Tammy, you drew
15    for me a diagram -- a bird's-eye diagram of your house and
16    the Brown house as it's attached to Purtov Drive, correct?
17 A  Yes.
18 Q  And you've labeled the Brown house and then you've labeled
19    the porch area and then you've labeled the parking lot
20    area and then also a travel trailer that -- relevant to
21    the Brown house, correct?
22 A  Yes.
23 Q  And then for your own house, you labeled the house and
24    porch and the parking.....
25

Computer Matrix, LLC             Phone - 907-243-0668             jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473         sahile@gci.net

Page 54

1  A  Yes.
2  Q  .....area. Okay. And could you put an X on our drawing
3     when you made your first observation of Scott running
4     about ten feet from his door. Where you actually were,
5     your first observation.....
6  A  Where I was.
7  Q  Where you were. Okay. And could you put an arrow to that
8     and just, you know, maybe put T -- T-H. And you actually
9     wrote Tammy position. Okay. And then since you've said
10    that you -- when you first saw Scott he was about ten feet
11    from the door, can I infer from that from looking at this
12    drawing that he was on the porch.....
13 A  Yes.
14 Q  .....when you saw him. Okay. So if you could put an X
15    where you saw Scott the very first moment running. Okay.
16    And if you'd attach an arrow to that. All right. Now,
17    you actually used the word running, right?
18 A  Yes.
19 Q  And in my language, there's walking, there's walking fast,
20    there's jogging, and then there's running and then
21    somebody might call it sprinting even. I don't know. Is
22    that kind of a spectrum that you're familiar with?
23 A  Yes.
24 Q  Okay. And so on that spectrum, the appropriate word would
25

Page 55

1     be running?
2  A  Yes.
3  Q  Did you -- I don't know whether you can answer this
4     question, but I'll ask it. Do you think that -- did it
5     appear to you that Scott could be running any faster than
6     he was running? Do you have an opinion on that or not?
7  A  I don't really have an opinion.
8  Q  Okay. All right. Given your observations of Scott that
9     day, both before and after he entered the house, were you
10    able to form any.....
11 A  Sirens?
12 Q  Yes.
13 A  They're loud.
14 Q  Was it a siren like that that you heard?
15 A  It was a siren, yes.
16 Q  Okay. But a similar siren to what we just heard on our
17    tape?
18 A  Yes.
19 Q  Okay.
20 A  They're loud.
21 Q  Right. And that's what you heard, a loud siren.
22 A  Yes.
23 Q  That day, right?
24 A  Yes.
25

Page 56

1  Q  Okay. Were you able to form an opinion as to whether
2     Scott Brown was intoxicated that day from looking at him,
3     making these observations of him?
4  A  By looking?
5  Q  Yes.
6  A  Not specifically.
7  Q  Okay.
8  A  I was not that close to him.
9  Q  Fair enough. When you first saw the police officers, you
10    said they were on the porch also, the police officers,
11    correct?
12 A  Yes.
13 Q  Can you put maybe a circle where you first saw the two
14    police officers on the porch. That is your observation of
15    the police officers?
16 A  I would say it's almost exactly the same spot.
17 Q  Where the X is.
18 A  Because of the view that I had from over here.
19 Q  Okay.
20 A  There's also trees and things like that in here.
21 Q  Okay.
22 A  But I would really say they were just about the same spot.
23 Q  Could you draw arrows from that. Okay. And draw the
24    other arrow to the other police officer. Okay. All
25

Page 57

1     right. And I think you told us that when the police
2     officers were taking Scott out of the house that he was
3     struggling and moving in a direction to his left; is that
4     right? Is that correct?
5  A  Yes. Toward my house.
6  Q  Okay. All right. And I thought you said something like
7     he was moving in a certain -- to a certain place where
8     it'd make it hard for the police to take him away and
9     so.....
10 A  He was.....
11 Q  .....if you could point out on our map here where that
12    place was and describe why it's a place that would make it
13    hard for the police to have moved him to the squad car.
14 A  He was right here at the corner of the porch where it goes
15    to the side of the house or to the front of the house.
16 Q  Okay. If you could maybe put an arrow to that and
17    describe it as -- how should be describe that? The area
18    where Scott was moving -- appeared to be moving to?
19 A  Maybe where he lost his pants.
20 Q  Okay. All right. Put it that way then. All right. Then
21    you've written Scott without pants. Okay. Assuming that
22    indeed the pants were down when.....
23 A  Assuming, yes.
24 Q  .....when Beverly bent down. Okay. And then where --
25

Page 58

1  without drawing it, where on our map would your last
2  observation of Scott and the two officers have been?
3  Would it have been in the parking lot area there?
4  A  It would have been right here at the porch as well.
5  Q  Still on the porch.
6  A  About right here is where I can no longer see.
7  Q  And is that in the parking lot area?
8  A  That is right at the end of the porch where -- yes, their
9  parking lot. Right in here.
10 Q  So right where the porch becomes a parking lot.....
11 A  Uh-huh. (Affirmative)
12 Q  .....was your last observation.
13 A  Yeah. It would have been right there maybe just a hair
14    before.
15 Q  And maybe you could just -- you've made a mark -- maybe
16    put that last observation in there with an arrow or
17    something like that. And that looks like -- it's was your
18    last observation because we have the travel trailer there,
19    right?
20 A  Uh-huh. (Affirmative)
21 Q  Yes?
22 A  Yes.
23 Q  Okay. All right. And is there also a sidewalk at the end
24    of the parking lot that abuts Purtov?
25

Page 59

1  A  Yes.
2  Q  Okay. And that's the sidewalk you were talking about that
3     the citations occur.
4  A  Yes.
5  Q  Okay. And did you Mr. Herz talk about anything else in
6     your four- to five-minute conversation that we haven't
7     gone over in my questioning of you of over an hour?
8  A  Thank you.
9     MR. HERZ: And I'll be faster if you're done.
10 A  Thank you. Basically I think you've covered it.
11    Basically he introduced himself. I did not realize that
12    he was going to be here as well.
13 Q  Oh.
14 A  That was a lot of it and kind of told me that he expected
15    you to ask me identically to what you did.
16 Q  Okay. But in terms of information that you gave him.....
17 A  Uh-huh. (Affirmative)
18 Q  .....there was no additional information that you haven't
19    told me about up to this point in time; is that true?
20 A  Yes, that's true.
21 Q  Okay. And did he give you any information in that
22    conversation that you didn't know about before you had
23    that conversation with him?
24 A  I don't believe so.
25

Page 60

1  Q  Okay.
2  A  Besides that he was going to be here too.
3  Q  Right.
4     MR. KOZIOL: Okay. That's all the questions I have.
5     MR. HERZ: Okay. Would you like to take a five-minute
6  break?
7  A  No.
8     MR. HERZ: No. Okay. Let's keep forging on then.
9  A  Dance is over at 6:30, so that's your time frame.
10    MR. HERZ: I'll be done before then.
11 A  Thank you.
12    MR. HERZ: But, you know, Mr. Koziol could ask more
13 questions when I'm done.
14    MR. KOZIOL: But I will -- we're going to be done before
15 6:30.
16 A  Okay.
17    MR. HERZ: All right.
18           TAMMY HULSEY
19 testified as follows on:
20           CROSS EXAMINATION
21 BY MR. HERZ:
22 Q  I just want to go back and clarify a couple things. You
23    said you -- you initially said you've known Frank Peterson
24    for three years.
25

Page 61

1     MR. KOZIOL: You mean Scott. Oh, I'm sorry. I -- you are
2  talking about Frank Peterson. See, it's been too long a day.
3  I apologize. Go ahead.
4  Q  You initially.....
5  A  Yeah.
6  Q  .....indicated you knew Frank Peterson for three years and
7     then you -- and then when you were asked did you know him
8     back on January 4th of '03, you thought some about it and
9     said well, I knew we took a college class together, so I
10    knew it was before then, at least a short period of time
11    before then.
12 A  Right.
13 Q  So I'm trying to reconcile the three years because I'm
14    assuming when you answered three years, you were going
15    back from '08 to '05 and when you were asked about did you
16    know him in '03, that's five years. So.....
17 A  You're right.
18 Q  .....where.....
19 A  I do believe.....
20 Q  Where are we on that?
21 A  I do believe I knew him when this happened.
22 Q  Okay.
23 A  But to be honest, I have a hard time thinking that this
24    happened in January of '03. Has it actually been that
25

TAMMY HULSEY  4/2/2008  BROWN v. PETERSON, et al.,
Vol 1  Case No. 3:05-cv-0002 TMB

17 (Pages 62 to 65)

Page 62

1 long?
2 Q Yes.
3 MR. KOZIOL: Yeah, I think we can all agree on that.
4 Yeah.
5 Q Yeah. So.....
6 A That's insane and it's wrong. I'm sorry -- that it's
7 taken this long to get anything settled. One way or the
8 other, it should have been settled already.
9 Q Okay.
10 MR. KOZIOL: We all probably all agree with that too,
11 but -- okay. There are reasons, but we don't need to go into
12 them.
13 MR. HERZ: Yeah, I mean -- and I don't want to take up
14 time with it.
15 Q So does that mean it's -- that it's possible you did not
16 know Frank Peterson back in January -- I mean what exactly
17 now that we're talking about this again, do you think is
18 correct, that it was that you've only known him three
19 years or that you've known him more like five years?
20 A I really think I've known him more -- longer than three
21 years, yes.
22 Q Okay.
23 A Like closer to five.
24 Q And because you tied your memory to taking a college class
25

Page 63

1 together, do you have any clear recollection as to when
2 you took the college class?
3 A I know which class it was, so.....
4 Q Okay. Do you know when you took that class?
5 A Do we know when he went to Iraq because he had to leave
6 that class in the middle of that -- or right after that.
7 Q Well, I can tell you that that occurred in, if I recall
8 correctly, either March or October of '04. I believe it
9 was October of '04 when he went active military.
10 A Okay. Then we may need to clarify because that's when I
11 really knew Frank Peterson.
12 Q And then I think he came back in -- around December or
13 January of '05-'06. He went back active with KPD in March
14 of '06.
15 A Uh-huh. (Affirmative)
16 MR. KOZIOL: Your complaint was filed January of '05?
17 MR. HERZ: Yes.
18 MR. KOZIOL: Okay. Right before the statute of
19 limitations.
20 MR. KOZIOL: Right. So that's in -- congruent with what
21 you just said. Yes. I -- okay. All right.
22 MR. HERZ: Right because.....
23 MR. KOZIOL: Okay.
24 MR. HERZ: He was already deployed when we filed.
25

Page 64

1 MR. KOZIOL: And I can't -- I just don't remember.
2 MR. HERZ: Well, I know it was an 18-month --
3 approximately an 18-month hitch and he indicated two days ago
4 he returned in March of '06 and his personnel records indicate
5 he went active with KPD in March of '06. So if you back up 18
6 months, it'll get you there approximately.
7 MR. KOZIOL: But let's assume he's right for this point
8 and.....
9 A Okay. Let's clarify. I know who Frank Peterson is.
10 Q Okay. And the college class that you met him in, you met
11 him -- you said he had to leave that -- he had to
12 discontinue that class because he went to Iraq.
13 A It was right around that same time, yes.
14 Q Okay. You were taking the college class where?
15 A At this college, Kodiak College.
16 Q Okay. And -- all right. And so do they work on quarters
17 on semesters?
18 A Semesters.
19 Q All right. So that semester may have started in August or
20 September, something like that?
21 A It would have started -- that semester would have started
22 in September.
23 Q All right.
24 A But that couldn't have started in September because it was
25

Page 65

1 Accounting 102 which is the other half. It had to have
2 been January. So we're talking a long time ago and I know
3 that part because I'm getting my degree this year.
4 Q Okay.
5 A Finally.
6 Q So it could have been January of '04.
7 A It could have been.
8 Q All right. And so if you didn't deploy until the fall,
9 then you would have finished the whole semester class
10 together.
11 A No. He had to leave that class and I -- I don't remember
12 why now.
13 Q Okay.
14 A I -- you know, I apologize. That's.....
15 Q And you're sure it's the introductory accounting class.
16 A .....a long time ago. It was Accounting 102.
17 Q Okay. And you're sure that starts in January not in the
18 fall.
19 A Yes.
20 Q Okay. And if the records show that he actually deployed
21 in the fall, how do you reconcile your memory with the
22 records?
23 A I'm old.
24 Q Okay. So I mean -- all right. But I mean.....
25

Computer Matrix, LLC  Phone - 907-243-0668  jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501  Fax  907-243-1473  sahile@gci.net

TAMMY HULSEY   4/2/2008   BROWN v. PETERSON, et al.,
Vol 1   Case No. 3:05-cv-0002 TMB

18 (Pages 66 to 69)

### Page 66

1  MR. KOZIOL: Or the records are wrong, you know, and she's
2  right, so.....
3  Q   No, but I mean.....
4  A   You know, to be honest.....
5  Q   But right now, you're pretty sure about your memory,
6      aren't you?
7  A   I'm pretty sure that I have known Frank Peterson for a
8      while.
9  Q   Okay. And so that kind -- well, okay. I understand that.
10 A   Okay.
11 Q   But in terms of your recollection that he had to have left
12     the class to go to Iraq and the -- your recollection is
13     that class began in January, if he left Iraq in the fall,
14     your recollection doesn't square with the documents, does
15     it?
16 A   He had to leave that class.
17 Q   Okay. Which is.....
18 A   I thought it was for Iraq.
19 Q   Okay.
20 A   He had to leave that class. I guarantee that class
21     started in January.
22 Q   All right. So maybe he left the class for a different
23     reason?
24 A   Maybe.
25

### Page 67

1  Q   Okay. All right.
2  A   I'm not real sure how that really pertains to this.....
3  Q   Well, just -- well, it kinds of leads into the other thing
4      about memory. I mean do you know -- I mean would you
5      agree with the statement that memory doesn't work like a
6      video camera, that it's really an amalgamation -- a
7      combining of things that we remember and filling in of
8      things that didn't happen and getting things out of order
9      and things like that, that that's really more how memory
10     works?
11     MR. KOZIOL: Object as to form.
12 Q   You can answer.....
13     MR. KOZIOL: Judge will rule later on it. I just didn't
14 like that question, so.....
15 Q   Yeah. Yeah. I mean.....
16     MR. KOZIOL: .....don't worry about it.
17 Q   .....he makes his objections, but you still answer the
18     question as long as you can.
19 A   Yes, you're -- you remember things and yes, you fill in
20     the blanks as you learn things later.
21 Q   And the things that get filled in may or may not reflect
22     reality, right? Would you agree with that? Memory's
23     imperfect?
24 A   I'm not God. Yes.
25

### Page 68

1  Q   Okay. But even though the things that we fill in with may
2      not reflect reality, we can still have really strong
3      memories of things that are not based on what really
4      happened. Would you agree with that?
5  A   I believe that's possible.
6  Q   Okay. Now, you indicated that Beverly had complained
7      about the fact that even though Scott had asked for
8      medication, she was upset that the medication was given to
9      him because he had been drinking, right?
10 A   Yes.
11 Q   And did you understand that the medication related to the
12     fact that Scott had recently before this day severely
13     injured his ankle and was taking pain medication because
14     of that preexisting injury?
15 A   Yes.
16 Q   All right. And had you seen him in the day or two since
17     that injury walking around using a cane? Do you recall
18     that?
19 A   I do not recall.
20 Q   Okay.
21 A   I know he had a cane, but I don't recall.....
22 Q   Okay.
23 A   .....time frame when he was using it.
24 Q   All right. And on the day -- but you do know that right
25

### Page 69

1      around January 2nd, 3rd, 4th, the day of this incident
2      being January 4th, he still had this preexisting ankle
3      injury that he was taking medication for.
4  A   I know that because Beverly told me that.
5  Q   Okay. Do you have a recollection when you saw him of him
6      carrying a cane -- you know, when you saw him on the porch
7      going into his house, do you have any recollection whether
8      he had a cane with him at that time or not?
9  A   I do not believe so.
10 Q   You don't believe you have a.....
11 A   My recollection, I do not remember seeing a cane.
12 Q   You don't -- okay. So your recollection is there was no
13     cane, not that you don't have a recollection?
14     MR. KOZIOL: I'm going to object to that one.
15     MR. HERZ: Okay.
16 Q   Do you -- in your memory -- you know, my question was do
17     you have a.....
18 A   Can we go off the record for just a moment?
19 Q   Yeah. Sure. Sure.
20     REPORTER: Off record.
21     (Off record)
22     (On record)
23     REPORTER: We're on record.
24 A   Okay.
25

Computer Matrix, LLC   Phone - 907-243-0668   jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473   sahile@gci.net

Page 70

1  Q  All right. So just so I can clarify the last question
2     that was asked, you -- on the 4th when you saw Scott on
3     the porch, you do have a recollection and the recollection
4     is you don't remember seeing a cane.
5  A  That is correct.
6  Q  Is that fair?
7  A  Yes.
8  Q  Okay. And would it also be -- do you have a recollection
9     of seeing him in any way favoring a leg or limping or
10    hobbling or anything like that as he was moving?
11 A  I do not have a recollection of that.
12 Q  Okay. And would it be inaccurate in any way to say that
13    he was moving fast as opposed to running?
14 A  He was running.
15 Q  Okay. Regarding your sort of recounting of the
16    conversations you had with Beverly, you indicated that
17    there may have been eight to ten conversations and they
18    all kind of meld together, right?
19 A  Yes.
20 Q  Would it be also fair to say that you might not recall all
21    the things that she told you?
22 A  I might not recall them all.
23 Q  Okay. So that the list that you provided in response to
24    Mr. Koziol's questions may have been incomplete?
25

Page 71

1  A  It's possible.
2  Q  She may have complained about some things that you just
3     don't recall her saying at this point?
4  A  It's possible.
5  Q  Okay. And in terms of her describing the events of that
6     day, your recollection of what she said, would it also be
7     fair to say that you might not recall all the things that
8     she told you about the events of that day?
9  A  It's possible.
10 Q  Okay. And the things that she described to you as to why
11    she thought the police had -- what they were -- or what
12    the lady who had called the police about, her description
13    of that, is it possible that what your recollection is
14    about what she told you about the complaint might not be
15    accurate?
16 A  Can you reword that?
17 Q  Right. She told you -- Mr. Koziol asked you did she tell
18    you why it was that the police were going into the house
19    after Scott, what prompted them to do that, and you
20    indicated that Beverly had told you some lady had called
21    KPD about a gold, flatbed doing donuts at Safeway or
22    Wal-Mart. Okay? And my question is your recollection of
23    what Beverly told you, is it possible that some of those
24    facts are not exactly what Beverly told you? There might
25

Page 72

1     be some things that are accurate there and some things
2     that are not?
3     MR. KOZIOL: Objection. Form. Go ahead.
4  A  I suppose it's possible.
5  Q  Okay.
6  A  That is what I recall.
7  Q  Understood.
8  A  Thank you.
9  Q  Okay. When you had expressed your opinion earlier that
10    Scott had been drinking and driving, that wasn't based on
11    any personal observation of Scott drinking that day,
12    right?
13 A  No. I had not seen him that day.....
14 Q  Okay.
15 A  .....before this incident.
16 Q  All right. So that was just based on the fact that you
17    knew he drank.
18 A  Yes.
19 Q  And you'd seen him do that in his home.
20 A  Yes.
21 Q  Okay. Had you ever seen him drink and drive?
22 A  I'm not sure.
23 Q  Okay. Now, in the six to nine months -- I take it before
24    you and Beverly started working at Arc and Spark when you
25

Page 73

1     were just neighbors, you hadn't been over inside the Scott
2     Brown/Beverly Brown residence; is that right?
3  A  Not really.
4  Q  Okay. So the time during which you started going inside
5     the house was during that six- to nine-month period?
6  A  It was after she started working together.
7  Q  Okay. And how many times again would you say that you
8     were in the residence on, say, either a weekly or monthly
9     basis during that six- to nine-month period?
10 A  Couple times a month.
11 Q  Couple times a month, okay. And so the couple of times
12    you were there, you -- would you always see beer bottles
13    and liquor in the house?
14    MR. KOZIOL: Objection. Misstates. It's a couple times a
15 month, not a couple times she was there.
16 A  I remember seeing alcohol, yes.
17 Q  Every time.
18 A  Yes.
19 Q  Okay. All right. All right. And then the -- and the
20    reason you didn't see any alcohol in the bathroom is
21    because you never looked in the cabinets; is that right?
22 A  Yes.
23 Q  Okay. Did you ever see any liquor, beer, or any kind of
24    alcohol hidden around the house? Not in open plain view.
25

Page 74

1  A  No.
2  Q  Did Beverly ever talk to you about finding hidden liquor
3     or beer around the house?
4  A  Yes. Yes.
5  Q  Tell me about that.
6  A  She found liquor in the bedroom all the time. Had to
7     clean up his beer bottles.
8  Q  Okay. And what did -- did she ever complain about the
9     fact that he was hiding liquor -- that Scott was hiding
10    liquor on her?
11 A  Yes.
12 Q  Okay. Did she ever say that Scott hid liquor in the
13    bathroom or anywhere else in the house other than the
14    bedroom?
15 A  She said he had liquor everywhere.
16 Q  Hidden.
17 A  Everywhere. I do know at one point she told me he had
18    liquor on a window sill outside of the house. So he could
19    go into that room, open the window, and get the liquor.
20 Q  Okay. And based on your discussions with Beverly, I think
21    you testified earlier that she had explained to you that
22    Scott drinking in the bathroom was not unusual.
23    MR. KOZIOL: Objection. Form.
24 Q  Go ahead and answer.
25

Page 75

1  A  Say that again.
2  Q  When you testified earlier, you indicated that Scott
3     drinking in the bathroom was not unusual.
4     MR. KOZIOL: Objection. Form.
5  A  I've never seen him drink in the bathroom.
6  Q  I understand that, but.....
7  A  Okay.
8  Q  .....when you made that statement earlier, that was based
9     on information that Beverly told you?
10 A  Yes.
11 Q  That Scott drinking in the bathroom was not unusual.
12    That's something Beverly told you.
13 A  Yes.
14 Q  Okay. All right.
15 A  Can I clarify? Did I say that was not unusual or did I
16    say that that's what she told me he did at that time?
17    MR. KOZIOL: Go ahead -- you can clarify any answer you
18 give him.
19 A  I think that's what she told me he did at that time. I
20    don't remember specifically every day she said he drank in
21    the bathroom.
22 Q  Well, not every day, but.....
23 A  You know, but as a normal conversation -- I'm not sure
24    what you wrote down as what I said before.
25

Page 76

1  Q  Okay. Now I'm confused. It would be correct if I said
2     Beverly told you he drank in the bathroom on that day of
3     this.....
4  A  On that....
5  Q  .....incident.
6  A  Yes.
7  Q  Okay. Did Beverly ever tell you that on other occasions
8     Scott would drink in the bathroom, not every day, but just
9     on.....
10 A  I am not sure.
11 Q  Okay. So it's possible she may have said that, but you
12    don't recall.
13 A  I do not recall.
14 Q  All right. Do you recall seeing other police cars come to
15    the Scott and Beverly Brown house after the first two that
16    you saw during that period of the incident occurring?
17 A  I do not recall.
18 Q  Do you recall seeing an ambulance come to the Scott Brown
19    house during the time this incident was occurring?
20 A  I do not recall. I do not believe so.
21 Q  Okay. All right. You indicated that your husband at the
22    time Ray looked for a short period of time, if I
23    understand you correctly, was about the time that Scott
24    got there and the police pulled up, but once everybody was
25

Page 77

1     inside, during that three to four minutes everybody's
2     inside, he went back to whatever he was working on.
3  A  Uh-huh. I'm pretty sure, yes.
4  Q  Okay. When Scott and the police came out, did Ray stop
5     doing what he was working on and stand up and watch again
6     or did he just ignore it all and keep on working?
7  A  I'm not real sure.
8  Q  Okay. And you indicated when Scott was coming out, he was
9     wiggling in an effort to, what, stay in the house, stay on
10    the porch as opposed to -- well, let me withdraw the
11    question. Are there steps from the porch down to the
12    walkway or is it all at one level?
13 A  It's all at one level.
14 Q  Okay. But -- do I understand correctly there's like a
15    railing on the porch that would sort of separate that area
16    from the walkway?
17 A  No.
18 Q  Okay. So you come out of the house. The area you're
19    calling the porch, is it just sort of open to the yard and
20    the walkway and everything?
21 A  There -- no. There are rails on each side and then this
22    way, but there is nothing that separates the walkway porch
23    and their door, if I understood the question before that
24    correctly.
25