TAMMY HULSEY   4/2/2008   BROWN v. PETERSON, et al.,
Vol 1   Case No. 3:05-cv-0002 TMB

21 (Pages 78 to 81)

Page 78

1  Q  Okay. Hang on a second.
2  A  Right here -- their house. The porch goes this way.
3     There are rails.....
4  Q  Right.
5  A  .....all the way across the porch.
6  Q  Right.
7  A  There's their front door.
8  Q  Right.
9  A  They come straight out.
10 Q  Right. Okay. All right. That's what I understood. So
11    you can walk straight out the door, down -- out onto the
12    porch and then keep going on into the parking lot, okay?
13    Right?
14 A  Yes.
15 Q  And this -- because we've got to make a record here. This
16    and that doesn't show up on the transcript real well. You
17    diagrammed this and you've written -- looking at the
18    rectangle, it says Brown's house, in the front you've got
19    sort of an L on the right side and you've marked the
20    portion nearest the house porch and you've got another L
21    and you've marked another portion that says porch. Does
22    the railing -- and then sort of the pathway going from the
23    house out to the parking lot, you've also marked as porch.
24 A  Yes.
25

Page 79

1  Q  So is the pathway -- does the railing extend all the way
2     out to the parking lot or how far out away from the house
3     does that extend?
4  A  All the way out to the parking lot.
5  Q  All right. And the railing that's parallel to the house
6     on both sides, does that extend even to where the edge of
7     the house is or actually go beyond that?
8  A  It goes just beyond it and then goes this way.
9  Q  Okay.
10 A  And it goes to each side. There's a sliding glass door on
11    this side. The porch goes to that and then there's steps
12    going down the hill. The porch goes over here to a back
13    door and stops there.
14 Q  Okay. All right. So if I could just ask you to add to
15    the diagram here, maybe put an arrow or something and
16    write railing to where the railing is and then maybe where
17    the railing ends out by the parking lot, write railing
18    ends so that we've got a clear idea of what's railing and
19    what's not.
20 A  The railing is all the way on the porch. There's railing
21    on every bit of it.
22 Q  Okay. But -- so, for instance, this line though here --
23    right here, is that railing?
24 A  Actually yes. It goes on each side because this slopes
25

Page 80

1     down to a hill.
2  Q  Okay.
3  A  This is actually a duplex. Their house or their apartment
4     of this duplex is even with the ground -- is level with
5     the ground. Then you have to go down steps that are on
6     this side as well as on this side of the hill to get to
7     the downstairs apartment. The hill's this way and -- you
8     know, like here and the house sits like this.
9  Q  Okay.
10 A  So, yes, there's rails all the way through here.
11 Q  So what you're highlighting by bolding -- going over with
12    your pen over and over would be all railing.
13 A  Yes.
14 Q  So can you continue to just kind of bold that out so we
15    know that all the bold lines there are rail as well as
16    over here. Okay. And so the extra thick bold lines would
17    represent railing. So as Scott's coming out of the house,
18    was it your impression that he's trying to move instead of
19    down the pathway towards the parking lot, he's trying to
20    move to his left more onto the porch so he doesn't have to
21    like leave the area around his house? Is that.....
22 A  Yes.
23 Q  That was the impression.....
24 A  He's -- he's struggling using this corner of the porch
25

Page 81

1     that I've already marked where he was standing.....
2  Q  Right.
3  A  .....as leverage is my best word for it.
4  Q  Okay. Now, you indicated that when Scott first came out
5     of the house you heard Bev yell, Scott, stop, right? And
6     then you heard her yell let me pull up your pants.
7  A  I heard her yell.....
8  Q  Or let me pull up his pants?
9  A  Yes.
10 Q  Okay.
11 A  I heard her yell to Scott for him to stope
12 Q  Uh-huh.
13 A  .....and then I heard her yell to the police officers to
14    allow her to pull up his pants.
15 Q  So, Scott, stop walking so I can pull up your pants and
16    then yelled to the officers stop, let me pull up his
17    pants?
18 A  She told Scott to stop.
19 Q  Okay.
20 A  Whether it was stop walking, stop struggling.....
21 Q  You don't know.
22 A  .....I don't know.
23 Q  Okay. And -- but what you saw physically her do was squat
24    all the way down?
25

Computer Matrix, LLC           Phone - 907-243-0668                      jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax     907-243-1473             sahile@gci.net

Page 82

1  A  Yes.
2  Q  Okay. And so even though you didn't see his pants down
3     around his ankles -- as you said, you didn't see him flash
4     you, would it be fair to say that if his pants were just
5     sort of low riding on his hips so that like his -- you
6     know, the top of his butt cheeks or his butt crack was
7     showing, would it be fair to assume that there would have
8     been no reason for Beverly to squat all the way down to
9     the ground to adjust his pants if that's all they were
10    doing?
11 A  That is correct.
12 Q  Okay. So by seeing her squat all the way down to the
13    ground and hearing her say let me pull up his pants, you
14    infer that his pants were down around his ankles at that
15    point.
16 A  Yes, I do.
17 Q  Okay. And then you saw her -- did you see her stand back
18    up again?
19 A  Yes.
20 Q  All right. And then the police proceeded to move Scott
21    from the porch to the car.
22 A  Yes.
23 Q  Right? Okay. And -- all right. Now, even though you
24    didn't see Scott with his pants down yourself and you
25

Page 83

1     didn't see him flash you, would you agree that if you were
2     in Scott's position and the police were taking you out of
3     your own home and your pants were down around your ankles
4     that that would be an embarrassing condition because you
5     don't know if anybody else is seeing you like that?
6  A  That's common sense.
7  Q  Okay.
8     MR. HERZ: I don't have any other questions.
9     MR. KOZIOL: Just a few more.
10              TAMMY HULSEY
11 testified as follows on:
12              CROSS EXAMINATION
13 BY MR. KOZIOL:
14 Q  Is it logical to conclude -- reasonable to conclude that
15    Scott's pants fell down if indeed they fell down due to
16    the struggling he was engaging in with the police
17    officers?
18 A  It would be reasonable.
19 Q  Okay. And as we've noted, you're on Mr. Herz's witness
20    list and I don't know whether you'll be invited to testify
21    at trial in Anchorage, but in case you're not and this
22    videotape is used, I think it would be helpful just to
23    have you show the piece of paper to the camera and then
24    maybe go through -- just summarize what you've marked so a
25

Page 84

1     jury if they look at the tape can know the different
2     things you've done with it because otherwise we're just
3     going to have to show -- hand it to them and they won't be
4     able to have you put it in context. So if we could just
5     do that. I can -- why don't I hold it this way and if you
6     can just point out what you've drawn on here and maybe
7     just a.....
8  A  Okay.
9  Q  .....and maybe just a short explanation.
10 A  Can you see it?
11    REPORTER: Yes.
12 A  First off, this is the road. It does curve, so my house
13    is at an angle to where Scott and Beverly lived.
14 Q  And if you'd just identify your house and Scott's house.
15 A  This is my house.
16 Q  Okay.
17 A  And this is the Browns' house.
18 Q  Okay.
19 A  Their porch is -- well, first off, the parking lot --
20    let's do this. The parking lots are just one car length
21    in. They park straight side by side similar to what you
22    would have at a store parking lot -- a row. From the
23    parking lot, they step onto just a very small sidewalk and
24    then it goes to the porch into their front door.
25

Page 85

1  Q  Okay.
2  A  It's a straight shot to their front door. The porch --
3     there is railing that goes on this side as well as on this
4     side because there's a hill and then there's porch
5     railings all the way around.
6  Q  Okay.
7  A  Okay. This is a travel trailer which actually blocked
8     some of my view, this one right here.
9  Q  And then maybe we could take it chronologically as to
10    where you were standing when you first had the sighting
11    and then where Scott was and then just do a little
12    chronology.....
13 A  Okay.
14 Q  .....chronologically.
15 A  I actually had come out of my house and was standing on my
16    porch. When I first walked out, I saw my husband at the
17    time standing here. He had been working on a vehicle and
18    he was standing up instead of down at the vehicle looking
19    in that direction. So it drew my attention and from here,
20    I saw Scott run across the porch into the house.
21 Q  Where did you first see Scott when you first saw him?
22 A  He was right at the top of the porch. My best view is
23    right there is where it starts.
24 Q  Okay. And you've labeled it Scott and.....
25

TAMMY HULSEY    4/2/2008    BROWN v. PETERSON, et al.,
Vol 1    Case No. 3:05-cv-0002 TMB

23 (Pages 86 to 89)

Page 86

1  A  Yes.
2  Q  .....you've put an arrow to it. Okay.
3  A  Yes.
4  Q  And then where did you first -- I think then we went
5     chronologically to where you first saw the two police
6     officers, you made.....
7  A  They were.....
8  Q  .....your first observation of them.
9  A  They were behind him very quickly.
10 Q  Okay. But you've -- your first observation of the police
11    officers, you have two marks there, right?
12 A  Uh-huh. There were two of them.....
13 Q  Okay.
14 A  .....running in.
15 Q  Okay. All right.
16 A  And they -- I can't estimate how far apart from each other
17    they were. That's kind of why I just put it in two spots.
18 Q  Understand. And then when you described Scott struggling
19    and then where perhaps his pants were down when you heard
20    Beverly talk about let me pull them up, where was that?
21    Can you point out.....
22 A  Uh-huh. It was right here. Right at the corner of this
23    porch where it goes straight and then horizontal to the
24    house.
25

Page 87

1  Q  Okay. And then the area you said it appeared to you that
2     Scott was struggling to get to would be what area? Can
3     you point that out?
4  A  It was as if he was coming this direction like toward my
5     house and kind of trying to block some of the police
6     officers right here at the corner.
7  Q  Okay. And then where were the three -- the two officers
8     and Scott when you had your last observation of them?
9  A  They.....
10 Q  And I think you've labeled it here.
11 A  Yes. The police were escorting Scott. Right as they got
12    off the porch is where I no longer had vision of them.
13 Q  Okay. And that's because -- you've labeled the travel
14    trailer that was blocking your view and point out where
15    the travel trailer is.
16 A  It's sitting right here.
17 Q  Okay. Great.
18    MR. KOZIOL: Thanks. That's all the questions I have.
19    MR. HERZ: Okay. Just a couple of quick follow-ups.
20              TAMMY HULSEY
21 testified as follows on:
22            RECROSS EXAMINATION
23 BY MR. HERZ:
24 Q  Mr. Koziol asked you is it reasonable to conclude
25

Page 88

1     Mr. Brown's pants fell down due to his struggling. Do you
2     know whether -- do you have any way of knowing whether his
3     pants were down already before they -- the police brought
4     him out onto the porch while he was still in the house?
5  A  No, of course not.
6  Q  Okay. Would it matter to you if you were in Mr. Brown's
7     position whether you were struggling or not, if your pants
8     fell down, would you want somebody, whether it's the
9     police or somebody else to pick your pants up before you
10    got out the front door and were exposed to the rest of the
11    neighborhood?
12 A  I think you asked that before when I answered common
13    sense.
14 Q  Okay. Same answer, common sense?
15 A  Yes. Same answer.
16 Q  Okay. And then speaking of the neighborhood, you've got
17    two houses there in your diagram. Are there other houses
18    across the street on that street?
19 A  Yes.
20 Q  Okay. And a house to the -- on that diagram to the right
21    of Mr. Brown's house?
22 A  Yes.
23    MR. HERZ: Okay. I don't have any other questions.
24    MR. KOZIOL: That's it.
25

Page 89

1     REPORTER: Is that it?
2     MR. HERZ: Yep, that's it.
3     REPORTER: All right. Then that concludes the videotaped
4     deposition of Ms. Hulsey on April 2nd, 2008, at 6:16 p.m. Off
5     record.
6     (Off record)
7              (END OF PROCEEDINGS)

Computer Matrix, LLC    Phone - 907-243-0668    jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473    sahile@gci.net

| TAMMY HULSEY<br>Vol 1 | 4/2/2008 | BROWN v. PETERSON, et al.,<br>Case No. 3:05-cv-0002 TMB |
|---|---|---|

24 (Pages 90 to 91)

Page 90

```
1            CERTIFICATE
2  UNITED STATES OF AMERICA    )
                               )ss
3  STATE OF ALASKA             )
4       I, Joseph P. Kolasinski, Notary Public in and for the
5  state of Alaska, residing in Anchorage in said state, do hereby
6  certify that the deponent in the foregoing matter was duly
7  sworn to testify to the truth, and nothing but the truth;
8       That said testimony was taken at the time and place
9  therein stated;
10      That the testimony of said witness was recorded
11 electronically and thereafter transcribed under my direction
12 and reduced to print;
13      That the foregoing is a full, complete, and true record of
14 said testimony.
15      I further certify that I am not a relative, nor employee,
16 nor attorney, nor of counsel of any of the parties to the
17 foregoing matter, nor in any way interested in the outcome of
18 the matter therein named.
19      IN WITNESS WHEREOF I have hereunto set my hand and affixed
20 my seal this 20th day of April 2008.
21
22            _____
              Joseph P. Kolasinski, Notary Public
23            in and for the State of Alaska.
              My Commission Expires:  03/12/2012
24
25
```

Page 91

```
1            WITNESS CERTIFICATE
2  RE:  BROWN v. PETERSON, et al.,
   CASE NUMBER:   3:05-cv-0002 [TMB]
3  DEPOSITION OF: TAMMY HULSEY
   DATE TAKEN:    APRIL 2, 2008
4
       I hereby certify that I have read the foregoing deposition
5  and accept it as true and correct, with the following
   exceptions:
6
   Page   Line        Description
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
   If additional paper is needed, please sign and date each sheet.
23
24            _____
              TAMMY HULSEY            DATE
25
```

Computer Matrix, LLC                Phone - 907-243-0668           jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473         sahile@gci.net