JAMES ELLAR                              4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                               Case No. 3:05-cv-0002 TMB

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SCOTT BROWN,                           )
                                       )
                Plaintiff,             )
                                       )
v.                                     )
                                       )
FRANK PETERSON, Individually and)
in his official capacity as a    )
City of Kodiak Police Officer;   )
JEFF HOLDEN, Individually and in)
his official capacity as a City )
of Kodiak Police Officer, CITY  )
OF KODIAK; and JOHN AND JANE    )
DOES 1 - 10,                     )
                                       )
                Defendants.            )
_____)
Case No. 3:05-cv-0002 [TMB]

APR 23 2008

VIDEOTAPE DEPOSITION OF JAMES L. ELLAR

April 7, 2008

APPEARANCES:

    FOR THE PLAINTIFF:          MR. ROBERT M. HERZ
                                Attorney at Law
                                425 G Street, Suite 600
                                Anchorage, Alaska  99501
                                (907) 277-7171

    FOR THE DEFENDANTS:         MR. FRANK S. KOZIOL
                                Attorney at Law
                                618 Christensen Drive
                                Anchorage, Alaska  99501
                                (907) 258-7706

**Ex. AS**

JAMES ELLAR
Vol 1

4/7/2008

BROWN v. PETERSON, et al.,
Case No. 3:05-cv-0002 TMB

2 (Pages 2 to 5)

Page 2

1                TABLE OF CONTENTS
2     Direct Examination by Mr. Koziol            04
3     Cross Examination by Mr. Herz               53
4     Redirect Examination by Mr. Koziol          83
5  EXHIBITS MARKED:
6  A - Letters from Mr. Herz                     112
7  B - Introduction letter                       112
8  EXHIBITS PROFFERED:
9  Bates Stamp No. 10082                          35
10 A2 - Kamai deposition                          40
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              PROCEEDINGS
2        (Anchorage, Alaska - 4/7/2008)
3     (On record)
4        REPORTER: My name is Nathaniel Hile, Notary Public in and
5  for the state of Alaska, and a court reporter who represents
6  Computer Matrix Court Reporters whose business address is 700
7  West Second Avenue. This is the first tape in the videotape
8  deposition of James Ellar, taken pursuant to notice by the
9  defendant. The case is in the United States District Court for
10 the District of Alaska, Brown versus Peterson, et al. Today is
11 April 7th, 2008; the time is 1:56 p.m. We're at the offices of
12 Computer Matrix Court Reporters.
13        Counsel, please identify yourself for the record, stating
14 your representation, starting with the plaintiff's attorney.
15        MR. HERZ: Robert Herz, last name's spelled H-E-R-Z, for
16 plaintiff Scott Brown.
17        MR. KOZIOL: Frank Koziol for the defendants.
18        REPORTER: Thank you. Sir, please raise your right hand
19 and I'll swear you in.
20     (Oath administered)
21        MR. ELLAR: Yes, sir.
22        REPORTER: Thank you.
23              JAMES L. ELLAR
24 having been first duly sworn under oath, testified as follows
25

Page 4

1  on:
2              DIRECT EXAMINATION
3     REPORTER: Please state your full name and spell your last
4  name for the record, please.
5  A   James Leroy Ellar, E-L-L-A-R.
6     REPORTER: Thank you. And a mailing address, please.
7  A   23254 North Woods Drive, Chugiak, Alaska 99567.
8     REPORTER: Thank you. And a daytime telephone or message
9  phone, please.
10 A   688-1235.
11    REPORTER: Thank you. Counsel, if there are no
12 stipulations, Mr. Koziol, you may proceed.
13 BY MR. KOZIOL:
14 Q   Mr. Ellar, I understand you've been listed as an expert in
15    this case for plaintiff, is that your understanding?
16 A   Yes, sir.
17 Q   And what are the areas of your expertise?
18 A   I was a reserve police officer for the Anchorage Police
19    Shop -- Department from 1987 to 1996. I also was a
20    correctional officer for the state of Alaska from 1991 to
21    2007.
22 Q   What have -- have you ever been qualified as an expert in
23    any court?
24 A   I've testified in court, yes, on criminal cases.
25

Page 5

1  Q   That wasn't my question. Have you ever qualified as an
2     expert and what I mean by that is where there's been an
3     offer of proof by the person who called you wherein they
4     state something to the effect that you're offered as an
5     expert in a certain area.....
6  A   The answer would be no.
7  Q   Let me finish my question so.....
8  A   I had the question.
9  Q   What?
10 A   The answer's no, I have not been a expert witness.
11 Q   It's a good idea that you wait for the end of my question,
12    I'll wait for the end of your answer, so we're each
13    absolutely sure we know what you're saying no to or yes
14    to.
15 A   Okay.
16 Q   Okay. Because it's going to be typed up and it's going to
17    be hard to.....
18 A   I understand.
19 Q   So you don't think you've ever been qualified as -- as an
20    expert and offered as an expert in any court of law?
21 A   Yes, that's true.
22 Q   Okay. Have you ever had any contact with Mr. Herz prior
23    to him hiring you in this case?
24 A   No, sir.
25

Computer Matrix, LLC
700 W. 2nd Ave., Anchorage, AK 99501

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

JAMES ELLAR                              4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                Case No. 3:05-cv-0002 TMB

3 (Pages 6 to 9)

| Page 6 | Page 8 |
|---|---|
| 1 Q Do you know how he happened to hire you as an expert, how | 1 Q Okay. |
| 2    he knew about you, was that -- was that ever discussed | 2 A Pretty much. |
| 3    with him? | 3 Q All right. And what were -- was your -- what were your |
| 4 A Oh, I know exactly how it was. It was -- I sent out a | 4    hours of work when you were a reserve officer? |
| 5    introduction letter to him for my business, Iron Hand | 5 A You can work anything you'd like on any shift. They'll |
| 6    Investigations. | 6    approach you to also, you know, do undercover stuff like |
| 7 Q Okay. | 7    buy drugs and that kind of thing so it varies. |
| 8 A And through that he made contact with me for this case. | 8 Q But I'm interested in your experience or what -- what did |
| 9 Q And -- and what did your -- your letter say? | 9    your hours vary either per week or per month when you were |
| 10 A Just introducing myself, I have -- I have 25 years of law | 10    doing that? |
| 11    enforcement experience in this state, pleased to -- be | 11 A Well, I was pretty well into it so I was working every |
| 12    pleased to offer my services to attorneys or private | 12    weekend, they work 10 hour shifts so 20 hours per week for |
| 13    individuals. | 13    just about every weekend of the year times at least seven |
| 14 Q Did you say what -- what type of services you offered -- | 14    years straight of that, even my vacation time would be two |
| 15    you were offering? | 15    weeks off a year, I would go down and work full shifts. |
| 16 A Criminal and civ -- civil investigation. | 16 Q Okay. So you were basically working weekends when you |
| 17 Q So your letter didn't -- didn't offer your services as an | 17    were a reserve officer? |
| 18    expert witness? | 18 A Uh-huh. (Affirmative) |
| 19 A No. | 19 Q Yes? |
| 20 Q Okay. You've never been -- you never worked as a police | 20 A Yes. |
| 21    officer, is that a true statement? | 21 Q Okay. And you're saying you were working 10 hours a day |
| 22 A Well, you can look at that two sides. If you would list | 22    as a reserve...... |
| 23    that yes, I chased bad guys over backyard fences in | 23 A They work 10 hour shifts. |
| 24    Mountain View, pointed guns at people, wrestled people, | 24 Q And that's what you were doing? |
| 25 | 25 |

| Page 7 | Page 9 |
|---|---|
| 1    fought people with knives, wrote citations, reports, | 1 A Yes, sir. |
| 2    testified in court, various other aspects of police work, | 2 Q And tell me about the -- the supervision that you received |
| 3    yes, if you look at it as I was paid for it, no. | 3    when you were a reserve officer, how did that work? |
| 4 Q Okay. So you've never been -- you never had a job, a | 4 A You're required to ride along with a regular officer, he |
| 5    paying -- paying job as a police officer? | 5    is your supervision, but there are times when you get |
| 6 A No, sir. | 6    split up or are split up and have to do what you have to |
| 7 Q Okay. And the activities you're referring to was that | 7    do on your own. |
| 8    when you were an Anchorage reserve -- police reserve | 8 Q Okay. But for the -- I'd say the vast majority of the |
| 9    officer? | 9    time you're with the other officer when you're a reserve |
| 10 A Yes, sir. | 10    officer? |
| 11 Q And were you always under the supervision of someone when | 11 A Yes. |
| 12    you were a reserve officer? | 12 Q And you're taking direction from that officer? |
| 13 A Not always, no. | 13 A Yes. |
| 14 Q So tell me -- tell me how you qualified to be a -- a | 14 Q Okay. And during your -- the course of your work as a |
| 15    reserve officer and what it involves? | 15    reserve officer did you ever use any force? |
| 16 A You go through the hiring process, written test, oral | 16 A Yes. |
| 17    test, interview, physical agility test, background | 17 Q And what force did you use, if you can give me the range |
| 18    investigation, lie detector test, and then you go through | 18    of force? |
| 19    a 240 hour academy, then you go through field training | 19 A Everywhere from my presence of being there which is a |
| 20    that takes approximately three months to complete. And if | 20    force, verbal commands, physical restraining to the |
| 21    you've completed that you're allowed to participate as a | 21    possible use of deadly force with pointing a weapon at |
| 22    reserve officer. | 22    somebody. |
| 23 Q You're allowed to work for free at that point? | 23 Q You did that? |
| 24 A Yes, sir. | 24 A Yes, sir. |
| 25 | 25 |

JAMES ELLAR                                    4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                                     Case No. 3:05-cv-0002 TMB

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1  Q   So you -- you were carrying a -- a firearm? | 1      correction guard? |
| 2  A   Yes, sir. | 2  A   Well, I worked overtime at Mat-Su Pretrial a few times. |
| 3  Q   Okay. Were you also carrying OC spray? | 3  Q   Okay. All right. Did you ever have occasion in your |
| 4  A   Not at that time. | 4      capacity as a correctional guard to use OC spray? |
| 5  Q   Not during the time you were a reserve officer? | 5  A   Yes. |
| 6  A   No, sir. | 6  Q   And I've been using OC spray and pepper spray |
| 7  Q   Okay. Were you carrying a taser? | 7      interchangeably, are -- are they the same? |
| 8  A   Not at that time. | 8  A   Relatively, yes. |
| 9  Q   Okay. Not during the entire time? | 9  Q   Is -- is there any difference? |
| 10  A   No, they..... | 10  A   No. |
| 11  Q   Okay. | 11  Q   Okay. |
| 12  A   .....didn't have them back then. | 12  A   I don't believe so. |
| 13  Q   All right. And what -- what years -- I should ask you | 13  Q   All right. |
| 14      that, what years were those that you were a reserve | 14  A   There is a difference in -- in -- different manufacturers |
| 15      officer? | 15      on the level of, how would you say, intensity of sprays. |
| 16  A   '87 to 2006. | 16  Q   Okay. But -- but the more intense isn't labeled one |
| 17  Q   Okay. Pepper -- OC spray or pepper spray was in existence | 17      versus the other or are you say -- suggesting that, I |
| 18      at that time, right? | 18      mean, I've been using the -- can I use the term pepper |
| 19  A   Yes, but it was not authorized used at the police | 19      spray and OC spray interchangeably or..... |
| 20      department during that time. | 20  A   Yes, sure. |
| 21  Q   At the Anchorage Police Department? | 21  Q   Okay. |
| 22  A   Yeah. | 22  A   Uh-huh. (Affirmative) |
| 23  Q   Okay. Do you know whether it is now? | 23  Q   And then within that umbrella, whichever one we're going |
| 24  A   It is. I should say towards the end of my career it was | 24      to call it, there can be different strengths? |
| 25 | 25 |

| Page 11 | Page 13 |
|---|---|
| 1      authorized. | 1  A   Yes. |
| 2  Q   And were you carrying it? | 2  Q   Okay. Did you ever have occasion to use pepper spray when |
| 3  A   Yes, I believe I was for the last couple years, I believe. | 3      you were a correctional guard? |
| 4  Q   Okay. Did you ever use it? | 4  A   Yes. |
| 5  A   No. | 5  Q   How many times? |
| 6  Q   Okay. Have you ever received the training in the use of | 6  A   In a tactical team environment we used it four or five |
| 7      OC..... | 7      times. |
| 8  A   Yes, from the police department and from the Department of | 8  Q   And did you on occasion carry it as part of your duties? |
| 9      Corrections. | 9  A   You're not allowed to carry it, no, sir. |
| 10  Q   And what years were you with the Alaska Department of | 10  Q   Okay. And is that because the prisoner might get a hold |
| 11      Corrections? | 11      of it and..... |
| 12  A   '91 to 2007. | 12  A   Uh-huh. (Affirmative) |
| 13  Q   Okay. And as a -- what was your position or positions | 13  Q   .....thus it's not a good idea to be carrying weapons? |
| 14      with the Department of Corrections? | 14  A   Right. |
| 15  A   My rank was a CO II, I was a field training officer, I was | 15  Q   Okay. So when it was used four to five times you had to |
| 16      tactical team leader, I was tactical team coordinator, I | 16      go get it and be thinking that you were going to be |
| 17      was tac -- field training coordinator, I was a range | 17      applying it then..... |
| 18      master, OC instructor, intervention, first aid, first | 18  A   Yes, it..... |
| 19      response fire fighter. | 19  Q   .....or possibly applying it? |
| 20  Q   Okay. And I note from your CV that I got you worked at | 20  A   Yes. |
| 21      Spring Creek in Seward and the Cook Inlet Pretrial in | 21  Q   Okay. All right. Now, I guess, let's start with DOC, |
| 22      Anchorage and Palmer Correctional Center..... | 22      Alaska Department of Corrections, did they have a -- a use |
| 23  A   Yes, sir. | 23      of force policy with -- or a -- let's say a spectrum of |
| 24  Q   .....are those the -- the only places you worked as a | 24      when you should be using force? |
| 25 | 25 |

JAMES ELLAR                           4/7/2008               BROWN v. PETERSON, et al.,
Vol 1                                                        Case No. 3:05-cv-0002 TMB

5 (Pages 14 to 17)

Page 14

1  A   Yes, sir.
2  Q   Okay. And where did OC spray or pepper spray fall on that
3      spectrum with the Alaska Department of Corrections?
4  A   I believe it fell just about right in the middle.....
5  Q   Okay. So.....
6  A   .....level three.
7  Q   .....so take me to level one, two and then three?
8  A   Level one's your presence; level two could be a -- a --
9      just a hands on, you know, escorting type; level three can
10     be an OC spray, a little bit more physical force maybe;
11     and level four you can go to deadly force.
12 Q   Did you have the option to use a baton?
13 A   That's level three, that's also along with OC.
14 Q   With OC?
15 A   Uh-huh. (Affirmative)
16 Q   Okay. So but -- and I'm -- I'm a little confused, you
17     said level two hands on and then level three might be a
18     little more force, can -- can you distinguish that, the --
19     the type of hands on level two compared to the type of
20     hands on level three?
21 A   Hands on level two would be I grasp your arm and direct
22     you in a direction of escort. Hand three -- level three
23     would be more of a hand to hand combat type thing.
24 Q   And -- and are you familiar with the distinction between
25

Page 15

1      soft hands and hard hands?
2  A   No.
3  Q   Okay. If we -- would level three include hitting,
4      punching.....
5  A   No.
6  Q   .....kicking by the officer?
7  A   No.
8  Q   Okay.
9  A   That's never allowed.
10 Q   Okay.
11 A   You're supposed to use just the res -- enough force to
12     restrain the individual, not to inflict pain.
13 Q   Okay.
14 A   If it happens to have pain while you're trying to subdue
15     him that's just the way it is.
16 Q   Okay. Then can you illustrate again for me level two use
17     of hands on and -- and I know you said -- well, you said
18     level two escorting, an escort position.....
19 A   Uh-huh. (Affirmative)
20 Q   .....what physically do you do to the person in an escort
21     position?
22 A   Well, it can vary depending on their compliance. It can
23     be just I grab you softly by the elbow and say let's
24     go.....
25

Page 16

1  Q   Okay.
2  A   .....and if he complies that's fine. If he doesn't it --
3      you know, a little bit more force and maybe both hands on
4      his arms, let's go, to maybe apply a -- a hold of some
5      sorts which are still not a -- a wrist lock or something
6      like that where you're still not applying enough pressure
7      to cause him pain, but you're getting the point across
8      that you would like him to do what you're asking him.
9  Q   And you might have control at that point of his body with
10     a wrist lock?
11 A   Yes.
12 Q   Okay. And then moving it up to a level three where you've
13     got the baton and the OC spray, what type of physical
14     force would you be using there?
15 A   That would be where you're -- you're physically forcing
16     the person to do what you want him to do.
17 Q   How, what -- what hands on techniques would you use then
18     in -- in that.....
19 A   Again a wrist lock, you're applying pressure, pressure
20     point submission, things of that sort.
21 Q   Okay. And you could inflict pain in the process?
22 A   Oh, yes.
23 Q   Okay. And that would be one of the ways to obtain
24     compliance is.....
25

Page 17

1  A   Yes.
2  Q   .....by inflicting pain?
3  A   Uh-huh. (Affirmative)
4  Q   Okay.
5  A   And it -- but as soon as the compliance is done you --
6      that's where your pressure ends too.
7  Q   Okay. And then when you were working as an Anchorage
8      police reserve officer was the spectrum of force that you
9      just described to me the same or was it different?
10 A   It's relatively the same, but you don't -- in both cases
11     you don't necessarily go from one, two, three, you can go
12     from one to four real fast.
13 Q   Depending on the circumstances?
14 A   Depending on the circumstances.
15 Q   You don't have to go through each and every step?
16 A   No. No.
17 Q   Okay. All right. But it.....
18 A   You.....
19 Q   I'm sorry, go ahead.
20 A   It -- it's basically as warranted by the individual you're
21     working with.
22 Q   But as far as you know the -- the spectrum of force that
23     you were trained on with the Anchorage Police Department
24     is basically the same as you've described to me.....
25

JAMES ELLAR                              4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                Case No. 3:05-cv-0002 TMB

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|
| 1 A Yes, sir. | 1 dealing with the situation has to direct the dispatcher on |
| 2 Q .....that DOC has? | 2 what he wishes. |
| 3 A Relatively the same, yes, sir. | 3 Q But am I correct -- correct then since -- well, let me ask |
| 4 Q Okay. And then like -- you -- in this case you looked at | 4 you this. If -- if you don't consider yourself an expert |
| 5 the city of Kodiak use of force policy..... | 5 in dispatching because you haven't been trained as one and |
| 6 A Uh-huh. (Affirmative) | 6 -- nor have you, you know, really read prior to this case |
| 7 Q .....and if I can call a spectrum of force? | 7 any dispatching policy and procedures, why did you address |
| 8 A Uh-huh. (Affirmative) | 8 dispatcher issues in, you know, one and a half pages of |
| 9 Q Okay. And is it pretty much the same as you've described | 9 your report in this case? |
| 10 here with Alaska DOC and the..... | 10 A Because that's the key to this case, the beginning of it. |
| 11 A I believe so, yes. | 11 Q Okay. But..... |
| 12 Q .....APD? Okay. | 12 A But..... |
| 13 A It's usually -- it's pretty universal. | 13 Q Or I'm sorry, go ahead. |
| 14 Q Okay. So you have no criticism of the -- of the city of | 14 A .....I might not have been trained as a dispatcher, but |
| 15 Kodiak use of force policy in and of itself, it seems a | 15 I've been trained as -- in the radio procedures of the |
| 16 reasonable policy for the city to have? | 16 Anchorage Police Department and being there for the number |
| 17 A Yes. | 17 of years I was there I also just have general knowledge of |
| 18 Q Okay. Have you -- have you ever worked as a dispatcher? | 18 how things are to be. |
| 19 A No, sir. | 19 Q But -- but..... |
| 20 Q Never been trained as a dispatcher? | 20 A I know..... |
| 21 A No, sir. | 21 Q I'm sorry, go ahead. |
| 22 Q Apart from this case how often have you ever seen dispatch | 22 A .....I'm -- I know that certain questions needs to be |
| 23 records? | 23 asked by a call taker, I know a sequence that they should |
| 24 A On occasion being up in dispatch at Anchorage Police | 24 be asked and it's all for the safety and information of |
| 25 | 25 |

| Page 19 | Page 21 |
|---|---|
| 1 Department. | 1 the officers responding. If they don't get that critical |
| 2 Q Okay. When you were a reserve officer? | 2 information at times, it can change the safety level for |
| 3 A Uh-huh. (Affirmative) | 3 the officer. |
| 4 Q True? | 4 Q And -- and how do you know that that's the information and |
| 5 A Uh-huh. (Affirmative) | 5 the order and -- and the order of information that |
| 6 Q You should answer yes so it's..... | 6 dispatchers are supposed to obtain if you've never worked |
| 7 A Yes. I'm sorry. | 7 as a dispatcher, never been trained as a dispatcher, in |
| 8 Q That's all right, everybody does that. For example, when | 8 fact, had never really read the Anchorage Police |
| 9 you were an Anchorage police reserve officer, did you ever | 9 Department's dispatching policies and procedures? |
| 10 actually look and read the -- the policies and procedures | 10 A Because I have dispatchers as friends and we talk. |
| 11 that a dispatcher is supposed to go through? | 11 Q Okay. Now you've -- I take it you've read the -- read or |
| 12 A No. | 12 listened to the dispatch information obtained by Douglas |
| 13 Q Okay. Have you ever read any department's policies and | 13 Croyle from Laurie Skonberg; is that right? |
| 14 procedures other than in this case regarding dispatching? | 14 A Do you mean the call? |
| 15 A No. | 15 Q Yeah, the first caller was Laurie Skonberg, I believe. |
| 16 Q Do you consider yourself to have -- to be an expert in the | 16 A Yes, I listened to it. Yes. |
| 17 policies and procedures of dispatchers? | 17 Q Listened to it. Okay. All right. And then is it your |
| 18 A No. | 18 understanding that Trooper Peterson was informed of that |
| 19 Q Okay. | 19 call and particularly informed that there was a gold |
| 20 A I might put into this that it is the responsibility of the | 20 flatbed truck going up Pillar Mountain? |
| 21 patrol officer to control the situation even with | 21 A Uh-huh. (Affirmative) |
| 22 dispatch. Sometimes dispatchers -- dispatchers are not | 22 Q True? |
| 23 trained as police officers either and they are a link for | 23 A Yes. |
| 24 the officer to the situation. Sometimes the officer | 24 Q Okay. And then am I right within, I don't know, five or |
| 25 | 25 |

Page 22

1    six minutes after getting dispatched Trooper Peterson saw
2    a gold flatbed truck coming down Pillar Mountain as he was
3    going up it?
4  A  Uh-huh. (Affirmative)
5  Q  True?
6  A  True.
7  Q  Okay. Let's stop at that moment in time. Do you have an
8    opinion as to whether Officer Peterson at that point in
9    time had reasonable suspicion to believe that the driver
10   of that vehicle had committed the crime of reckless
11   driving?
12 A  At that time if he believed that the facts that he had
13   were credible by the witness, yes, if he didn't, no.
14 Q  Okay. And I'm interested in your opinion, not what you
15   think Officer Peterson may have thought. Are you not
16   giving opinions on an objective basis rather than a
17   subjective basis as to what Peterson thought?
18 A  How do I know what he thought?
19 Q  Exactly. That's my point.
20 A  Yeah.
21 Q  So we can only go on a objective basis, what.....
22 A  Oh, okay.
23 Q  .....what we understood.....
24 A  I see what you mean.
25

Page 23

1  Q  Right.
2  A  Uh-huh. (Affirmative)
3  Q  Because you -- you -- you answered by saying well, if he
4    thought this or thought that.....
5  A  Sure.
6  Q  .....you're exactly right, how do we know what he thought.
7  A  Yeah.
8  Q  Okay. So let me ask you the question again.
9  A  Please.
10 Q  Based on your professional opinion, do -- do you have a
11   professional opinion as to whether Officer Peterson had
12   reasonable suspicion to stop the driver of that vehicle
13   when he saw him coming down Pillar Mountain as he was
14   going up, given the information he got from Laurie
15   Skonberg?
16   MR. HERZ: Objection. Form of the question. He didn't
17 get any information from Laurie Skonberg.
18   MR. KOZIOL: As -- okay. I'll -- I'll withdraw the
19 question and modify it.
20 Q  Given the information that was relayed to Officer Peterson
21   by Douglas Croyle from Laurie Skonberg, at that moment in
22   time when he saw the vehicle coming down Pillar Mountain
23   and he was going up Pillar Mountain, did he have
24   reasonable suspicion to conduct an investigatory stop
25

Page 24

1    based on reasonable suspicion for reckless driving?
2  A  Yes.
3  Q  Okay. Could he have made an arrest at that point in time
4    if he had stopped the vehicle right then?
5  A  For what?
6  Q  For reckless driving.
7  A  No.
8  Q  Why not?
9  A  He should observe an infraction in person.
10 Q  All infractions?
11 A  Uh-huh. (Affirmative)
12 Q  So not just -- so any -- any crime he -- he needs -- in
13   order to make an arrest he needs to have personally
14   observed the -- the offender.....
15 A  No. Oh, I'm sor.....
16 Q  .....commit the crime?
17 A  .....I'm sorry, no. No. That's not true.
18 Q  Okay. What -- what do you mean then?
19 A  There are things outside his scope that if he believes
20   that the witness or the information he has is credible
21   then he can issue a citation or a summons which is, you
22   know, an arrest.
23 Q  Okay. So I guess let -- let's stay with reckless driving.
24   If he'd been able to stop that vehicle right when he first
25

Page 25

1    saw it coming down Pillar Mountain could he have arrested
2    the driver based on the information he had gotten from
3    Douglas Croyle.....
4  A  Yes.
5  Q  .....via Laurie Skonberg, could he have arrested him for
6    reckless driving?
7  A  If he believed that his information was correct, yes.
8  Q  Okay. Again I'm not interested -- based on what -- not
9    what he believed, again you keep saying that and I thought
10   we agreed it's not based on his subjective belief because
11   we can't know what he's believing. So based on.....
12 A  Okay.
13 Q  .....what you've read.....
14 A  Let's put it this way. If I was in that patrol car, no.
15   And a senior officer would not have. He would have
16   followed the vehicle and observed its driving.....
17 Q  Okay.
18 A  .....because it eliminates a lot of extra stuff, time and
19   effort by courts and that kind of thing and saves money
20   for the department, that he has to be sure of what he's
21   doing.
22 Q  Okay. And -- and I didn't ask you what you'd have done or
23   what a senior officer would have done so let me ask the
24   question again. Could Officer Peterson have lawfully
25

JAMES ELLAR                                4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                 Case No. 3:05-cv-0002 TMB

8 (Pages 26 to 29)

Page 26

1   arrested the driver of that vehicle at the point he saw
2   him coming down from Pillar Mountain as he was going up if
3   -- assuming he could have stopped the vehicle there, based
4   on the information he got from the dispatcher who had
5   talked to Laurie Skonberg?
6  A  Yes.
7  Q  Okay. All right. Now I'd like to shift the question a
8   little bit to at that point in time -- same point in time
9   where he sees him coming down Pillar Mountain and he's
10  going up Pillar Mountain, did Officer Peterson -- could he
11  have conducted an investigatory stop of that driver for
12  DUI, driving while intoxicated?
13 A  Yes.
14 Q  Okay. Could he have also lawfully arrested that driver
15  for DUI?
16 A  Yes, if his observations were that the driver was
17  intoxicated, yes.
18 Q  No, that -- that's not my question, Mr. Ellar, sta -- stay
19  with my question. It -- it's the same question I've been
20  asking you, he gets the information from Douglas Croyle
21  who talked.....
22 A  Uh-huh. (Affirmative)
23 Q  .....to Laurie Skonberg.....
24 A  Uh-huh. (Affirmative)
25

Page 27

1  Q  .....okay, that information he has. And my question is at
2   the point in time he sees the vehicle coming down the
3   Pillar Mountain, assuming he could have stopped the
4   vehicle then, could he have lawfully arrested that driver
5   for DUI?
6  A  Yes.
7  Q  Okay.
8  A  But that's a lot of what ifs and that's not what happened.
9  Q  And -- and, I'm sorry, my hypothetical has to do with the
10  facts you've read and -- and what you understood Douglas
11  Croyle told Officer Peterson and then taking that
12  knowledge and applying it to the moment in time when the
13  vehicle was coming down the road and if he could have
14  stopped him then. So that's how you're answering those
15  questions, right?
16 A  Uh-huh. (Affirmative)
17 Q  Yes?
18 A  Yes.
19 Q  Okay.
20 A  Sorry.
21 Q  All right. You -- your -- from reading your report it
22  sounds like you're offering opinions as to whether or not
23  several police employees, Kodiak city department -- police
24  department employees, are telling the truth or not. Have
25

Page 28

1   I read your report accurately on some issues you're --
2   you're making.....
3   (Cell phone rings)
4  A  I'm sorry.
5  Q  That's all right. That reminds me, I'll turn mine off
6   too.
7  A  I'm sorry.
8  Q  That's all right.
9  A  Sorry. What was the question?
10 A  Yeah. From reading your report I have concluded and --
11  and tell me if I'm wrong, I've concluded that you're
12  offering opinions as to basically you're -- you're
13  offering opinions that three employees of the city of
14  Kodiak Police Department are not telling the truth in
15  certain matters, have I read your report right?
16 A  No, I'm -- that's not what I'm saying.
17 Q  Okay. I thought you -- you used words such as such and
18  such person is not credible in -- in when they say
19  something, I thought you said that -- you used those words
20  and applied it to three different police employees,
21  Officers Holden, Peterson and Dispatcher Croyle, did you
22  not say that in your report?
23 A  I don't know, read it to me.
24 Q  You don't remem.....
25

Page 29

1  A  Please.
2  Q  .....you don't remember?
3  A  I don't remember.
4  Q  Okay.
5  A  I.....
6  Q  All right. Reading from Page 4 and it's about two-thirds
7   of the way down. Based upon these facts I agree with the
8   trial court and conclude that it is more probable than not
9   that Officer Peterson didn't have any information
10  pertaining to a REDDI call or possible intoxicated driver
11  before entering into Mr. Brown's home. Officer Peterson's
12  testimony to the contrary is not credible on this point.
13  Now I inferred from that that you're basically concluding
14  that Officer Peterson's testimony under oath is not to be
15  believed?
16 A  Yes, sir.
17 Q  That -- that he basically lied?
18 A  Yes, sir, that's -- I'm agreeing with the courts.
19 Q  Okay. So you're basically saying here that Officer
20  Peterson when he says he got a REDDI call and received
21  that information from Douglas Croyle is lying about it,
22  right?
23 A  Yes, sir.
24 Q  Okay. Now why don't you summarize for me the basis for
25

Page 30

1    your thinking that Officer Peterson is lying?
2  A  It's not in his official police report.
3  Q  That he received a REDDI call?
4  A  He -- you don't -- you don't write something down and then
5     oh, I forgot or that, that's bad police work.
6  Q  But you could have a mistake made or quote, bad police
7     work, unquote without lying about it, right, you could
8     just have omitted it and still received the information,
9     isn't that possible?
10 A  It depends if you justify -- if you testify then to facts
11    and turn it around, yeah, that would be lying about it.
12 Q  Anyway go on with your -- your -- the basis for your
13    conclusion that Officer Peterson is lying, he didn't put
14    it in his police report, anything else?
15 A  The only -- it's not in Officer Holden's police report
16    that it was a REDDI call.
17 Q  How -- how does that -- how does that support the view
18    that Officer Peterson's lying that it's not in Holden's
19    police report?
20 A  Because now he's saying it was a REDDI call.  Which is
21    correct?
22 Q  Okay.
23 A  He's saying it a REDDI call now or in his police report
24    and another officer's police report it's not mentioned.
25

Page 31

1  Q  Okay.  So we have each police officer not mentioning it,
2     any other basis for your conclusion that Peterson's lying?
3  A  I believe he had testified many times and never brought it
4     up.
5  Q  Okay.
6  A  So and then he brings it up during a different time.
7  Q  Anything else?
8  A  No.
9  Q  Is there evid -- any evidence to the contrary, that is
10    supporting the view that it was just a mistake, an
11    innocent omission and that he's not lying and that he, in
12    fact, did receive the REDDI report from Dispatcher Croyle?
13 A  No, I don't think so.  I think it's the basis to his whole
14    case is to mention what the arrest was for and the
15    dispatch was for in his police report and following that
16    it would be Officer Holden's responsibility to list that
17    in his report too.  So you're telling me there's two
18    mistakes there or I forgot two times?  And then you --
19    reports go to a supervisor after that to be read and
20    approved and the supervisor missed it too.  So that's
21    three mistakes like, right, so far?
22 Q  Go ahead, it's your answer.
23 A  How far can you go when you're saying it's a mistake when
24    it's just bad police work is what it is.
25

Page 32

1  Q  So the question I had -- I had asked that you've answered
2     and I want to make sure this is your answer so I'll
3     summarize it and you can correct me if I'm wrong.  I asked
4     you whether there was any -- any facts that you looked at
5     that supported the view that Officer Peterson indeed got
6     the information orally from Dispatcher Croyle and that it
7     was simply a mistake, an innocent mistake, by not putting
8     it in the police report?
9  A  No, sir.  The only -- only thing I read was the dispatcher
10    stating that he had said it.
11 Q  Okay.  Under oath he said that, right?
12 A  Yes, I believe he did.
13 Q  Okay.  Did -- did you read and consider the back side of a
14    notification of revocation that was filled out by Officer
15    Peterson wherein the mention of REDDI was made in his
16    handwriting and the notary indicated in that document that
17    Officer Peterson signed it on January 7th, 2003, three
18    days after the incident, did you see that document?
19 A  I believe I did.
20 Q  Okay.  Isn't that document support for Officer Peterson's
21    assertion that he did receive it as a REDDI call?
22 A  No.
23 Q  Why not?
24 A  I am not really familiar with the notarization laws, but
25

Page 33

1     three days down the line after the fact I don't believe
2     that makes it a legal document anymore.
3  Q  After what fact?
4  A  That it was signed three days after the incident.
5  Q  How -- how do you know that he signed it January 4th,
6     2003?
7  A  No.....
8     MR. HERZ:  Objection.  That's not what he just testified
9  to.
10    MR. KOZIOL:  Okay.  Sorry, I.....
11    MR. HERZ:  It was three days after the incident that he
12 signed it.
13    MR. KOZIOL:  Okay.
14 A  And that's what you told me.....
15 Q  Okay.
16 A  .....the 7th.
17 Q  Right.  Right.  Okay.  So I'm -- I'm sorry, what's your
18    problem with having the signature on this document signed
19    three days after the incident and notarized?
20 A  And notarized.  I -- I believe that's not the way a
21    notary's supposed to work.
22 Q  Well, how's a notary supposed to -- isn't a notary
23    supposed to sign their name to when the officer signs it?
24 A  No, they're supposed to -- it's supposed to be notarized
25

Page 34

1    as the event hap -- the day of the event, I mean, what --
2    is there a time limit. I -- again I'm not really a
3    notary, I have no idea.
4  Q  Well, doesn't a notary just have to affix their signature
5    and date the time that the signature is signed, that's all
6    a notary's duty is, isn't it?
7  A  Yes.
8  Q  Okay. Are -- are you saying that the officer made a
9    mistake by filling out this form three days after the
10    event?
11  A  Yeah.
12  Q  But have you ever filled out such a form like that?
13  A  Yes, many years ago.
14  Q  And so you're saying those forms should be filled out the
15    day of the event?
16  A  I believe so, by Anchorage Police Department standards all
17    -- all reports generally are due before you leave the --
18    the shift, not three days later.
19  Q  Did you ever have to fill out forms when you were a
20    reserve officer with the Anchorage Police Department?
21  A  Yes, sir.
22  Q  And did you ever do it not by the end of your shift, but
23    another shift?
24  A  No, sir.
25

Page 35

1  Q  Did you ever see a -- any -- any Anchorage police officers
2    wait until the next shift to do it?
3  A  I don't remember, sir, I don't know.
4  Q  Okay. But anyway apart from when you think that signature
5    should have been affixed to that document, doesn't it
6    indicate indeed that Officer -- there's documentation
7    there that Officer Peterson had received a REDDI call
8    because he's describing it as a REDDI call three days
9    later?
10  A  So he contradicts his own police report.
11  Q  That would be a conclusion, wouldn't it?
12  A  So does that make him credible then?
13  Q  I'm -- my -- my simple question is doesn't that provide
14    some evidence that indeed he did receive that read --
15    REDDI call in your mind?
16  A  No.
17  Q  Okay. You've looked at dispatch records.....
18  A  Uh-huh. (Affirmative)
19  Q  .....have you?
20  A  Uh-huh. (Affirmative)
21  Q  Yes? You'll have to.....
22  A  Yes. Sorry. I'm sorry.
23  Q  The only reason for that is.....
24  A  I know. I know.
25

Page 36

1  Q  .....it's going to be typed and I don't want to have to
2    have him interpret the sound.
3  A  He shook his head yes.
4  Q  Okay. Did -- did you see a -- it looked like a copy of a
5    three by five card that was filled out by the dispatcher?
6  A  No. Anchorage Police Department does everything on the
7    computers.
8  Q  No, no. I'm talking about in this case, did you ever
9    see.....
10  A  Oh, in this case.
11  Q  .....that -- this -- that card?
12  A  No, sir, I did not.
13            (Exhibit 10082 proffered)
14  Q  Let me hand you what's been marked 10082. Have you ever
15    seen that document before?
16  A  No, sir.
17  Q  So it wasn't included in the materials that were sent to
18    you then?
19  A  No, sir.
20  Q  All right. I guess I ought to ask you, you have described
21    in general what you reviewed, did you bring those
22    materials with you?
23  A  No, I didn't.
24  Q  Was there some reason you didn't bring the materials that
25

Page 37

1    you're relying on today?
2  A  No, sir, I just didn't. It's a box of lots of papers.
3  Q  Did the -- didn't the notice of -- of deposition ask you
4    to bring the materials?
5  A  I believe it did.
6  Q  So why didn't you bring them?
7  A  I forgot. I forgot my shoes and had to go buy new shoes
8    to be here too.
9  Q  Okay. How long would it take you to get your file?
10  A  Couple hours.
11  Q  Why?
12  A  I live in Chugiak, it's rush hour traffic now.
13  Q  If -- if you had looked at that information -- if you'd
14    considered that information that's in the document I just
15    handed you, would you agree that that document supports
16    the view that Officer Peterson did receive the call as a
17    REDDI, if that document's filled out by Mr. Croyle?
18  A  I can tell you it -- it looks to be that the call coming
19    in was a REDDI call, whether it was relayed to the officer
20    or not that way I have no idea.
21  Q  Let me -- let me back up. Would you agree from your
22    reading the transcript of Skonberg's call -- you read the
23    transcript of Skonberg's call?
24  A  Yes, sir.
25

Page 38

1  Q  It came in as a REDDI, right?
2  A  She had the opinion that the driver might be intoxicated,
3     yes, sir.
4  Q  That's a REDDI call, right, can we label that as a REDDI
5     call coming in then?
6  A  Yes, sir.
7  Q  Okay. And so isn't it logical, Mr. Ellar, that if it came
8     in as a REDDI call that the dispatcher would have
9     dispatched it as a REDDI call, isn't there a certain logic
10    to that?
11 A  Should have been, yes.
12 Q  Okay. There'd be no reason why the dispatcher wouldn't
13    have mentioned it as a -- to the officer as a REDDI call,
14    would there, would there be any reason?
15 A  He forgot.
16 Q  Okay. But that's it, he forgot?
17 A  He forgot.
18 Q  Okay.
19 A  Like I forgot to put it in my report, like I forgot --
20    yeah, I forgot.
21 Q  Like you forgot your box?
22 A  Like my box, my shoes, yeah.
23 Q  Okay.
24 A  We're human, we forget.
25

Page 39

1  Q  Okay. But would you -- what -- what time frame would have
2     passed between the time the dispatcher got the call and
3     when he talked to Officer Peterson, do you have any -- did
4     you.....
5  A  I.....
6  Q  .....were you looking at the facts, was it almost
7     simultaneous?
8  A  I have no way of knowing that. I know Officer Peterson
9     was in the -- in the station, he received the call by
10    telephone, there's no way of telling how long it was
11    between talking to Ms. Skonberg and him getting Officer
12    Peterson of the telephone.
13 Q  Is there any reason for you not to believe that the call
14    came into Croyle and then immediately thereafter when that
15    call was done that he talked to Peterson, any reason to
16    not believe that on the.....
17 A  No.
18 Q  .....on what you read?
19 A  No. No.
20 Q  Okay. So what you're hypothesizing when you conclude that
21    Officer Peterson is lying is that Dispatcher Croyle simply
22    forgot to relay that important information that he got
23    from Croyle just seconds later?
24 A  No, I'm relaying that Officer Peterson isn't telling the
25

Page 40

1     truth because of his police report and then his
2     contradiction of that in -- in his testimony in courts
3     after that.
4  Q  But in order for him not to be telling the truth Croyle
5     must not have told him it's a REDDI report, right?
6  A  No.
7  Q  Oh.
8  A  You're missing the -- the lie would have come from his
9     report and then his testimony, not otherwise.
10 Q  So you're say -- are you saying -- I just want to
11    understand this, you're saying that -- that Croyle could
12    have indeed and likely did tell Peterson it was.....
13 A  No, no.
14 Q  .....a REDDI?
15 A  Don't throw likely indeed in there. He could very well
16    have, yes.
17 Q  Okay. Croyle could very well have told Peterson it was a
18    REDDI.....
19 A  He could have, yes, sir.
20 Q  .....in your opinion?
21 A  Yes, sir.....
22 Q  Okay.
23 A  .....he could have.
24 Q  In fact, isn't it likely that he did, do you have an
25

Page 41

1     opinion on that, that it's likely he did?
2  A  What, you want my opinion now instead of.....
3  Q  Yeah.
4  A  .....my subjective?
5  Q  No, I want -- no, your opinions are subjective, yeah.
6  A  Or my objective?
7  Q  No, I do want your opinion. Isn't it likely that Croyle
8     told Peterson it was a REDDI if it came in as a REDDI and
9     he talked to him a couple seconds thereafter?
10 A  Yeah, I would think so, it would be likely, yes, sir.
11 Q  Okay. Okay. But you're -- what you're saying is that
12    Peterson likely forgot it later; is that right?
13 A  He did forget it.
14 Q  Okay. He did forget it?
15 A  He didn't put it in his police report.
16 Q  Okay.
17 A  Your words yourself, he forgot.
18 Q  All right.
19 A  And then he -- couple testimonies in court he forgot to
20    mention it also.
21 Q  Okay.
22 A  Forgot. Do you want this back?
23        (Kamai Deposition Exhibit A2 proffered)
24 Q  Yeah. Let me show you what's been marked Kamai Exhibit
25

JAMES ELLAR                    4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                      Case No. 3:05-cv-0002 TMB

12 (Pages 42 to 45)

Page 42

1   A2.  And I'd like you to look at that document,
2       particularly the first line, and ask you whether you've
3       ever seen that document before?
4  A  I believe I have.
5  Q  When did you see that document?
6  A  I believe it's part of my paperwork.
7  Q  Well, my question was.....
8  A  I cannot.....
9  Q  .....when did you get this document?
10 A  When I was hired by Mr. Herz here.
11 Q  So a month or so ago or how long ago?
12 A  Gosh, couple months ago, I believe.
13 Q  Okay.  I'll represent to you that we only got this
14     document last week.....
15 A  Okay.
16 Q  .....so I don't think you did see it.....
17 A  Well.....
18 Q  .....a month or two ago.
19 A  .....there's a lot of paperwork there.
20 Q  Okay.  So maybe another mistake?
21 A  Yeah, another mistake.
22 Q  Okay.  Everybody makes mistakes, right?
23 A  Yeah, they do.
24 Q  I'm not picking on you.
25

Page 43

1  A  I know.  I know.
2  Q  Okay.
3  A  That's what I said.
4  Q  But we're up to two now for you, right?
5  A  Okay.
6  Q  Okay.
7  A  But I didn't testify in court.
8  Q  All right.  Okay.  And since Mr. Herz didn't contradict me
9     that we got it last week, I -- I think you can take that
10    one to the bank.....
11 A  Sure.
12 Q  .....that we did just get it.
13 A  Sure.
14 Q  Okay.
15 A  I have no reason to believe you'd lie to me.
16 Q  Okay.  Thank you.  If the dispatcher typed up the first
17    line except for the information on the first line under
18    action taken, if he typed up that first line all the way
19    up to, but not including the -- the last section at the
20    time the Skonberg call came in, would that further support
21    your conclusion that the dispatcher, in fact, was viewing
22    it as a REDDI and he dispatched it to Peterson as a REDDI
23    and Holden?
24 A  Yes.
25

Page 44

1  Q  Okay.  You believe Officer -- am I right, you believe
2      Officer Holden is also not credible when he say -- well,
3      let's strike that.  Strike that, start again.  Do you know
4      whether or not Officer Holden is asserting that before he
5      left the police station he also was told he was to -- he
6      was going out on a REDDI report, do you know that as a
7      matter of fact?
8  A  I believe his report just says it was for reckless
9      driving.
10 Q  No, I think you're right on that, but -- but my -- my
11     question is.....
12 A  Whether he actually knew it or not?  I have no way of
13     knowing that.
14 Q  No.  No.  No, do you know that Officer Holden is asserting
15     now under oath that before he left the station on this
16     occasion he received the dispatch as a REDDI?
17 A  I don't know.
18 Q  Okay.  I'd like you to assume that's how he testified last
19     week, okay?
20 A  Okay.
21 Q  All right.  Is it your opinion that Officer Holden is also
22     not credible when he asserts that?
23 A  Based on his report, yes.
24 Q  Okay.  And that also he's lying just as Peterson's lying?
25

Page 45

1  A  Yes.
2  Q  Okay.  And is it also your opinion that Dispatcher Croyle
3      is not credible when he says -- no, never mind, I'll
4      strike that.  Did you ever from looking at all these facts
5      ever conclude that Scott Brown was lying regarding
6      anything?
7  A  Yes.
8  Q  Okay.  And what -- where did you conclude Scott Brown was
9      lying?
10 A  When he was talking to DMV.....
11 Q  And.....
12 A  .....I believe he said he had not been drinking.
13 Q  And what do you precisely, hadn't been drinking at all or
14     -- or not -- not before.....
15 A  No, driving, while he -- when he drove.
16 Q  Okay.  And you concluded he was lying about that?
17 A  I believe so, yes.
18 Q  Okay.  So you believe he had been drinking alcohol when he
19     was driving?
20 A  More than likely.
21 Q  Okay.  And did you reach any conclusion as to how much
22     alcohol he had drank when he was driving?
23 A  No.
24 Q  Okay.  And was a part of your conclusion that indeed Scott
25

Computer Matrix, LLC              Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501     Fax     907-243-1473       sahile@gci.net

JAMES ELLAR                4/7/2008              BROWN v. PETERSON, et al.,
Vol 1                                            Case No. 3:05-cv-0002 TMB

13 (Pages 46 to 49)

Page 46

1   Brown was lying about that at DMV and, in fact, was
2   drinking while he was driving your viewing the videocam
3   showing the brother taking beer out of the vehicle?
4 A That's part of it, yes, sir.
5 Q Okay. What other part is there that supports that
6   conclusion?
7 A I believe later on he admitted he was intoxicated.
8 Q While he was driving?
9 A Uh-huh. (Affirmative)
10 Q Yes?
11 A Yes.
12 Q Okay. Any other facts you rely on for that conclusion,
13   the videocam, the admission, anything else?
14 A No.
15 Q Okay. How about the -- the high BA, point -- .85, does
16   that support it?
17 A It could possibly, but it could also be that he drank
18   after he was out of the vehicle and in the home too.
19 Q Okay. All right. Any other lies you've noted that Mr.
20   Brown told?
21 A No, not -- that wasn't what I was looking for in my
22   investigation of this.
23 Q I understand. But how about this one, did -- did you see
24   where Scott Brown said that he didn't know the police
25

Page 47

1   officer was behind him when he pulled into his driveway
2   and that he ran into the house not because he thought the
3   police was chasing him, but that he had to go to the
4   bathroom, do you remember him saying that?
5 A I remember that, yes, sir.
6 Q Okay. Is he -- do you -- in your opinion do you think
7   he's telling the truth on that?
8 A Yes, sir.
9 Q And you saw the videocam?
10 A I did.
11 Q Okay. Did you see the vehicle pulling in to the driveway?
12 A I remember seeing the brake lights come on, I don't.....
13 Q You don't remember seeing movement?
14 A .....remember seeing the movement, no, just brake lights
15   coming on.
16 Q Okay.
17 A I remember seeing that.
18 Q All right. So obviously Mr. Brown was still in the
19   vehicle at that point, with the brake lights coming on?
20 A Yes, sir.
21 Q Okay. And did you notice whether or not at that point in
22   time the headlights or, I'm sorry, the.....
23 A Overheads.
24 Q .....overheads of the police car were on?
25

Page 48

1 A I believe they were.
2 Q Okay. And do you think it was reasonably visible to Mr.
3   Brown when he exited that those lights were on?
4 A No. The police car was substantially away from the -- Mr.
5   Brown's vehicle and where he parked there was another
6   vehicle between him and the patrol car.
7 Q Did you see the door open, the driver's door open on that
8   videocam?
9 A Yes, I did.
10 Q Okay. And how far was the police vehicle from the -- from
11   the gold flatbed truck in your estimation when the door
12   was opened?
13 A Ten, 20 feet.
14 Q Okay. And wouldn't you conclude that it's likely Mr.
15   Brown saw the lights at that point when the vehicle was
16   only 20.....
17 A Yes, sir, I would think so.
18 Q Okay. So isn't it more likely that he was running for the
19   -- from the police when he went into the house if he saw
20   those lights as opposed to having to go to the bathroom?
21 A No.
22 Q Okay. Could have been both reasons?
23 A Could have been both, yes, sir.
24 Q Okay. Likely was both reasons then in your opinion, if he
25

Page 49

1   saw the lights?
2 A No, not likely both in my.....
3 Q Okay.
4 A .....in my opinion, no.
5 Q So likely he just had to go to the bathroom, saw the
6   lights and -- and thought to himself doesn't concern me?
7 A Uh-huh. If he hadn't been doing anything wrong, yeah, a
8   normal.....
9 Q Okay.
10 A .....person would think go about your business.
11 Q But you already told me you believe he had -- he knew he
12   was doing something wrong and that is drinking while
13   driving, right?
14 A Later on his testimony, yeah.
15 Q No, I mean, but if you made that conclusion that he -- he
16   knew he was wrong at that point in time?
17 A True, probably.
18 Q Okay. So doesn't that make it more likely that he was
19   running from the police because he knew had been drinking
20   and driving?
21 A Possibly, I don't know what he's thinking.
22 Q Okay. No, but -- but I'm asking you for your opinion?
23 A My opinion, if it was me, yeah, probably, yes, sir.
24 Q So your opinion is given that the lights were on about 20
25

Page 50

1    feet from the vehicle and you believe he appreciated the
2    fact that he was drinking and driving, that probably was
3    an additional reason for him to run into the house besides
4    having to go to the bathroom?
5  A  Probably, yes, sir.
6  Q  Okay. Let's turn to -- let's turn to inside the house for
7    a moment. Scott Brown, is it your understanding, runs
8    into the bathroom.....
9  A  Uh-huh. (Affirmative)
10 Q  .....right? Yes?
11 A  Yes, sir?
12 Q  Did you listen to the -- Peterson's on scene tape?
13 A  Yes, sir.
14 Q  Okay. And you read the transcript too?
15 A  Yes, sir.
16 Q  Okay. And what's -- why don't you take me through the
17   facts from the point of time where Peterson -- it's
18   Peterson and his wife that were outside the bathroom door,
19   right, and Pet -- and -- and -- I'm sorry. Peterson and
20   Scott Brown's wife, Beverly, are on the outside of the
21   bathroom door, Scott Brown's inside the bathroom, right?
22 A  Yes, sir.
23 Q  Okay. Now take me through what your understanding of the
24   facts are all the way up to the point where pepper spray
25

Page 51

1    was used, what do you understand happened?
2  A  Officer Peterson was yelling for him to come out of the
3    bathroom, the wife was pleading with him also to come out
4    of the bathroom and he was in the bathroom saying, you
5    know, you're violating my rights, you're -- I didn't do
6    anything wrong, things like that. Eventually he's
7    convinced to come out of the bathroom, he comes out of the
8    bathroom, I believe he proceeds into the kitchen and opens
9    a beer or some alcohol, I can't remember which.
10 Q  You don't know whether it was a beer or a.....
11 A  I.....
12 Q  .....a bottle or a can?
13 A  .....I'm pretty sure it was a beer.
14 Q  Bottle or can?
15 A  I don't know, sir, I don't remember.
16 Q  Okay.
17 A  Mr. Brown started to drink it, he was told by Officer
18   Peterson not to, a struggle ensued and Officer Peterson
19   OC'd Mr. Brown.
20 Q  During -- during the -- during the struggle.....
21 A  Uh-huh. (Affirmative)
22 Q  .....he -- he -- he uses the OC?
23 A  I believe so, yes, sir.
24 Q  Okay. And -- and describe the struggle that was occurring
25

Page 52

1    before the OC was used?
2  A  It seemed to me that it was -- and, you know, just being
3    able to hear it, who -- you know, who knows what's really
4    going on, it sounded to me that Officer Peterson was
5    trying to force Mr. Peter -- Mr. Brown not to drink any
6    more.
7  Q  Okay. So there was some hands on going on with Peterson
8    and he -- he wasn't getting Brown to stop drinking?
9  A  He wasn't getting the compliance he was asking for.
10 Q  And then he used the OC spray?
11 A  I believe so.
12 Q  Okay. And anything wrong in your opinion with him using
13   the OC spray at that point?
14 A  The whole situation was wrong.
15 Q  No, no. I'm not -- I'm .....
16 A  And just specifically all I need.....
17 Q  .....I'm now just talking about the application of force
18   at that point.
19 A  Okay.
20 Q  Or was that a reasonable thing to do at that point?
21 A  Yes, I think it probably was.
22 Q  Reasonable?
23 A  Yes.
24 Q  Okay. Did you -- did you hear on the -- did you ever hear
25

Page 53

1    on the tape -- never mind, strike that. If -- if -- if
2    Peterson had used the OC spray -- well, hold it, let me
3    strike that. Do you remember Peterson giving any -- any
4    warning to Scott Brown that don't drink that beer, do you
5    remember that?
6  A  Yes, sir, I believe so.
7  Q  Okay. And -- and did you think that was a reasonable
8    thing for Officer Peterson to say because he might have
9    been worried about contamination of the evidence, that is
10   the -- any blood alcohol level that was in Scott Brown's
11   body at the time, it would be a reasonable thing for a
12   police officer to try to prevent the evidence from being
13   contaminated?
14 A  Yes, sir.
15 Q  Okay. And did -- did you hear Officer Peterson on the
16   tape say -- warn him that I'm going to pepper spray you if
17   -- if you drink that beer?
18 A  I believe he did warn him, yes, sir.
19 Q  Okay. And did you hear on the tape Scott Brown say in
20   response to that warning about getting pepper sprayed, go
21   ahead?
22 A  No, sir, I don't -- I just don't recall that. No, sir.
23 Q  Okay. I'd like you to assume that was on the tape also,
24   something to the effect, you know, go on.....
25

Page 54

1  A   Okay.
2  Q   .....or go ahead.
3  A   Uh-huh. (Affirmative)
4  Q   Okay. And I'd like you to further assume that Peterson
5      had a bottle of beer in his hand.....
6  A   Uh-huh. (Affirmative)
7  Q   .....okay, not a can, it was a bottle actually. All
8      right?
9  A   Uh-huh. Yes, sir.
10 Q   Would it have been reasonable for Officer Peterson to have
11     used pepper spray at that point if after Brown says go
12     ahead with that bottle of beer he started drinking it,
13     would that have been reasonable to use pepper spray then?
14 A   Yes, sir, I think so.
15 Q   Okay. Something you might have done even under the
16     circumstances?
17 A   Possibly.
18 Q   Okay.
19     MR. KOZIOL: All right. That's all I have.
20     MR. HERZ: Okay. All right.
21     MR. KOZIOL: Do you want to take a break or do you want us
22 to keep going?
23     MR. HERZ: Do you need a break?
24 A   I'm good.
25

Page 55

1      MR. KOZIOL: Okay.
2      MR. HERZ: Let's go.
3      MR. KOZIOL: Let's go.
4           JAMES L. ELLAR
5  testified as follows on:
6           CROSS EXAMINATION
7  BY MR. HERZ:
8  Q   All right. The training you received as a reserve
9      officer, the 240 hour academy, is that the same as a paid
10     APD officer would receive?
11 A   No, sir.
12 Q   Okay. And what about the three months field training, is
13     that the same as what a paid APD officer would receive?
14 A   I believe they receive more.
15 Q   Okay. So do you know how -- how long the APD academy is
16     for a paid officer?
17 A   I do not. It's been a while. I believe it's a six week
18     academy, I'm not sure anymore.
19 Q   Well, if the -- if the -- if it's an eight hour day and
20     it's a 40 hour week and it's six weeks, what's that 480
21     hours?
22 A   Four eighty, 440.
23 Q   Or six times -- I'm sorry, six times 40 would be 240
24     hours, wouldn't it be the same thing?
25

Page 56

1  A   It would be, yes, sir.
2  Q   Okay. And so.....
3  A   But I believe -- I do believe it's substantially longer.
4  Q   Okay.
5  A   Just more in depth than.....
6  Q   Well, are you -- is -- is your belief -- I mean, are you
7      -- are you saying it's like more than -- you're more than
8      50 percent sure it's longer or you just don't know?
9  A   I'm not sure what it is.
10 Q   So you don't know?
11 A   I do believe it's longer.
12 Q   Okay. Well, is your -- is your belief more than 50
13     percent?
14 A   Yes.
15 Q   Okay. All right. Now your comments about dispatching,
16     you've -- you've ridden in patrol cars, right?
17 A   Yes, sir.
18 Q   You've heard dispatchers radio out information to police
19     officers?
20 A   Yes, sir.
21 Q   You -- you're -- you're one of those individuals that have
22     received dispatch calls?
23 A   Yes, sir.
24 Q   You've heard other conversations between dispatchers and
25

Page 57

1      other officers?
2  A   Many times.
3  Q   You've monitored radios between office -- you know,
4      officers communicating with other officers, right?
5  A   Yes, sir.
6  Q   And when you're in a patrol car and the dispatcher's not
7      directly communicating with you you can overhear
8      communications between dispatchers and other officers?
9  A   You hear everything, yes, sir.
10 Q   Okay. And so would it be reasonable to say that you --
11     based on your experience and knowledge that you have exp
12     -- you have information and knowledge that a lay person
13     does not have concerning dispatch practices?
14 A   Yes, sir.
15 Q   Okay. And do you think the information, the training and
16     the knowledge that you have about dispatching would be
17     helpful to an average lay person?
18 A   Yes, sir.
19 Q   Okay. All right. Now you were asked whether -- about
20     the information Laurie Skonberg related to Officer Croyle
21     and whether that -- and -- and the information that was in
22     the question by Mr. Koziol is that there's a gold flatbed
23     truck going up Pillar Mountain and that within five to six
24     minutes Peterson saw -- saw a gold flatbed going down,
25

JAMES ELLAR                    4/7/2008              BROWN v. PETERSON, et al.,
Vol 1                                                  Case No. 3:05-cv-0002 TMB

16 (Pages 58 to 61)

Page 58

1    whether that provided enough reasonable suspicion to -- to
2    stop the vehicle for reckless driving. If that's all he
3    had, that there's a gold flatbed truck going up Pillar
4    Mountain and that was it.....
5  A  Uh-huh. (Affirmative)
6  Q  .....is there any information in that there -- right there
7    about reckless driving at all?
8    MR. KOZIOL: Objection. Form.
9  Q  You -- you.....
10   MR. KOZIOL: Go ahead, you can.....
11 A  Do I get to answer?
12 Q  .....the objection's for the judge. You -- you.....
13 A  Oh. Oh, I'm sorry.
14   MR. KOZIOL: Yeah.
15 Q  If all the information is there's a gold flatbed truck
16   going up Pillar Mountain, is there any information
17   contained in that to tell you any -- to give you
18   reasonable suspicion about any bad driving what.....
19 A  No, sir.
20 Q  Okay. Now let's -- let's use the facts that are -- that
21   were actually in the phone call, okay. She saw a gold
22   flatbed -- and -- and this is in your report on Page 1, at
23   the bottom of Page 1 and the top of Page 2. Gold flatbed
24   truck had spun out in the Safeway parking lot and threw
25

Page 59

1    rocks over a lady. She was following the truck, she saw
2    it fishtailing and spun 360 in the roadway. Okay?
3  A  Uh-huh. (Affirmative)
4  Q  Now is that information sufficient to provide reasonable
5    suspicion to make a stop on a vehicle for reckless
6    driving?
7  A  Yes, sir.
8  Q  Okay. Now you were asked whether based on that
9    information an arrest could be made, okay?
10 A  Uh-huh. (Affirmative)
11 Q  All right. And you answered no, because you didn't
12   observe an infraction. Is reckless driving an infraction
13   or a misdemeanor.....
14   MR. KOZIOL: Objection.
15 Q  .....or a felony?
16   MR. KOZIOL: Objection. Form.
17 A  It's an infraction.
18 Q  You -- you're saying it's not punishable by any jail time?
19 A  No, sir, it's not.
20 Q  Okay. Have you looked at the statute on reckless driving
21   to see whether it's an infraction or a misdemeanor?
22 A  Yes, I have.
23 Q  Okay.
24 A  And I.....
25

Page 60

1  Q  I'll represent to you that the law is reckless driving is
2    a class A misdemeanor.....
3  A  Oh, okay.
4  Q  .....okay?
5  A  Okay.
6  Q  So now assume.....
7    MR. KOZIOL: I'm going to object. We -- we don't want you
8  testifying, Mr. Herz, we want him.
9  Q  Assume reckless driving's a misdemeanor, okay?
10 A  Okay.
11 Q  Under the law of Alaska can an officer who's not observed
12   a misdemeanor committed in his presence make an arrest?
13 A  Yes, sir.
14 Q  I'm sorry? Under the law.....
15   MR. KOZIOL: Wait, wait, he said yes.
16 Q  Is that your answer?
17 A  No, sir, it's not. I -- my personal opinion is.....
18 Q  I'm not -- wait, wait, wait.
19   MR. KOZIOL: Wait, no, no. Let him finish his answer.
20 You should -- you should allow him to finish his answer. And
21 then you could, you know, ask another question.
22   MR. HERZ: Yeah.
23 Q  I -- I didn't ask for your personal opinion.
24 A  Okay.
25

Page 61

1    MR. KOZIOL: Wait, wait, wait.
2  Q  I want to know what the law is.
3    MR. KOZIOL: Wait, I object to your interrupting his
4  answer. You ought to let him answer the question. Really,
5  that's -- that's kind of a bedrock rule. You got anything else
6  to say?
7  A  No.
8    MR. KOZIOL: Okay.
9  Q  Under the laws of Alaska, if an officer does not observe a
10   misdemeanor being committed in his presence, can he make
11   an arrest?
12 A  Yes.
13 Q  Can you repeat the question back that I just put to you?
14 A  Under the laws of Alaska can an officer make an arrest for
15   a misdemeanor not in his presence.
16 Q  Right. And your answer is?
17 A  Yes, I believe he can.
18 Q  And under what circumstances is that possible?
19 A  If he believes that the information he has is -- is from a
20   credible witness.
21 Q  Your -- your answer is that so long as he's received
22   hearsay information that's credible he can make an arrest?
23 A  If he believes the information is credible.
24 Q  Are you not confusing the law regarding whether an officer
25

Page 62

1    can make a -- an investigatory detention based on
2    reasonable suspicion and that in deciding whether he has
3    reasonable suspicion he can take into account hearsay
4    that's both credible and reliable?
5    MR. KOZIOL: Objection. Form. Confusing it with what.
6    MR. HERZ: Pardon me?
7    MR. KOZIOL: You only gave him half of the question,
8    aren't you confusing it with.....
9  Q  Aren't you confusing that standard with the rule that says
10    and this is by statute that says no off -- no law
11    enforcement officer can make an arrest for a misdemeanor
12    that's not committed in his presence, doesn't matter
13    whether he's got reliable and credible hearsay or not,
14    don't you have those two standards confused?
15 A  I'm -- yes, sir, I think I do.
16 Q  Okay. So I'm going to ask you again. If the officer
17    received information that somebody spun out in the Safeway
18    parking lot, threw rocks all over a lady, the lady's --
19    and -- and Skonberg's reporting she saw the vehicle
20    fishtail and spin 360 in the road. Can -- based on that
21    information can an officer make a lawful arrest?
22 A  No, sir.
23 Q  Because?
24 A  It's hearsay, it's -- he has no way of determining if the
25

Page 63

1    information is correct by Alaska statute because he can't
2    either.
3  Q  Okay. Can an officer -- can an officer make an arrest in
4    Alaska for a felony that's not committed in his presence?
5  A  Yes, sir.
6  Q  Okay. Is there a difference between probable cause to
7    believe that a crime has been committed and probable cause
8    to make an arrest?
9  A  I'm running over examples in my mind. I don't believe so.
10 Q  Well, can you have probable cause to believe that a crime
11    was committed and not know who did it?
12 A  Yes, sir.
13 Q  Okay. And so if you don't know who did it can you make an
14    arrest?
15 A  No, sir.
16 Q  Would you have probable cause to make an arrest?
17 A  Not if you didn't know who did it.
18 Q  So would there be a difference between whether
19    there's.....
20 A  Yes.
21 Q  .....probable cause.....
22 A  Okay. Yes, there would.
23 Q  .....to commit a crime or probable cause to make an
24    arrest?
25

Page 64

1  A  Yes, there would.
2  Q  Okay. Now you were asked -- let's add one more fact to
3    the hypothetical and let's say Skonberg told the
4    dispatcher that the driver was possibly intoxicated, okay?
5  A  Uh-huh. (Affirmative)
6  Q  And furthermore let's assume the dispatcher passed that
7    bit of information on to Officer Peterson, okay?
8  A  Uh-huh. Yes, sir.
9  Q  All right. Does the officer have reasonable to suspicion
10    to contect -- conduct an investigatory stop for driving
11    under the influence?
12 A  Yes, sir.
13 Q  Does he have probable cause to make an arrest?
14 A  No, sir.
15 Q  Why not?
16 A  There's no factual basis to believe that a crime has been
17    committed.
18 Q  What more do you need to know?
19 A  Personal observation of the officer. View -- view the
20    vehicle, view -- view the -- the suspect, corroborate what
21    information he already has.
22 Q  Does -- does the statement possibly intoxicated, does that
23    give you any information about whether the person making
24    the observation or making that statement made any personal
25

Page 65

1    observations about whether the driver is -- has actually
2    consumed alcohol?
3  A  No.
4  Q  Does -- does the statement possibly intoxicated tell you
5    -- give you any indication whether the person making the
6    call personally observed the person, the driver, have an
7    odor of alcohol about their breath or person?
8  A  No.
9  Q  Whether they'd recently came from a bar?
10 A  No.
11 Q  Okay. As an arresting officer, before you arrest somebody
12    for driving under the influence, do you need to make some
13    sort of determination about whether they are actually
14    under the influence or have consumed alcohol?
15 A  Yes, sir.
16 Q  And does the statement they may possibly be intoxicated
17    give you enough information to make that determination and
18    make an arrest?
19 A  No, sir.
20 Q  And up until the time Officer Peterson enters the house
21    and actually has contact with Mr. Brown, again assuming
22    he's told that there is -- that there -- the driver was
23    possibly intoxicated, does he have any additional
24    information, again before he gets to have contact with
25

JAMES ELLAR                          4/7/2008                BROWN v. PETERSON, et al.,
Vol 1                                                        Case No. 3:05-cv-0002 TMB

Page 66

1    Brown, that gives him -- does he have any other additional
2    information that would give him probable cause to arrest
3    for driving under the influence?
4  A  No, sir.
5  Q  Okay. Now you indicated that -- I think you -- you said
6    the statement was Officer Peterson testified to it,
7    meaning testified about -- well, I think your statement
8    was if he testified to it and then he turns around that's
9    lying, and I just want to try and make sure I, okay,
10   understand what you're meaning there. You mean -- when
11   you say testified to it, are you including statements made
12   under oath in an affidavit?
13 A  Yes, sir.
14   MR. KOZIOL: Objection. Form.
15 Q  Okay. And -- and so when you're saying he testified to it
16   and then he turned around -- and he turned that around,
17   are you comparing what he testified -- or what he said
18   under oath in his affidavit to his testimony at the
19   evidentiary hearing later?
20 A  Yes.
21 Q  Okay. All right. Now Mr. Koziol spoke to you about that
22   information on the back of the notice of intent to revoke
23   a driver's license that's issued to arrestees for driving
24   under the influence.....
25

Page 67

1  A  Uh-huh. (Affirmative)
2  Q  .....remember that?
3  A  Uh-huh. Yes, sir.
4  Q  And he told you that that document was notarized in
5    January 7th?
6  A  Yes, sir?
7  Q  Okay. And on that form Officer Peterson, assuming he
8    filled it out on the 7th and he signed it on the 7th, the
9    day it was notarized, and he asked you whether that -- the
10   fact that he wrote REDDI on that report was evidence that
11   he -- it actually was -- was actually told that it was a
12   REDDI -- REDDI report on January 4, remember that?
13 A  Yes, sir.
14 Q  Okay. If the form is being filled out by Officer Peterson
15   three days later, is that evidence that he learned at the
16   -- he learned that information at the time of the call or
17   is it evidence that he learned that information sometime
18   later?
19 A  That's undetermined, it could be either way.
20 Q  So it's information he could have learned sometime later?
21 A  Sure.
22 Q  Okay. And what is it about filling out a form three days
23   later that makes it evidence that he learned it on the day
24   in question, is there anything on that form that tells you
25

Page 68

1    he learned it on the day in question?
2  A  No, sir.
3  Q  So how is it evidence that he learned it on the day in
4    question?
5  A  It's not.
6  Q  Okay. So it isn't any evidence that he learned it?
7  A  It's nothing.
8  Q  Okay. You were also showed that dispatch card that had
9    the Bates stamp number at the bottom, 10082.....
10 A  Uh-huh. Yes, sir.
11 Q  .....and you'd indicated you had not seen that before?
12 A  Yes, sir.
13 Q  Okay. I'll represent to you that you were given all of
14   the dispatch records in this case?
15 A  I understand that.
16 Q  Okay. So you don't recall seeing it?
17 A  I don't recall seeing it.
18 Q  Okay.
19 A  There was quite a bit of documentation to go through.
20 Q  Okay. And up in the left-hand corner of that it said
21   REDDI call, right?
22 A  Yes, sir, in the.....
23 Q  Okay. And do you have any knowledge about whether that
24   information right there on that card was filled out at the
25

Page 69

1    time the call was made or whether it could have been
2    filled out sometime later during the shift or after the
3    shift?
4  A  I have no information on that.
5  Q  Okay. So just because that information's on the card
6    doesn't give you any information about whether the
7    dispatcher remembered getting a REDDI call at the time he
8    took the call from Skonberg or whether he figured it out
9    later?
10 A  No, sir, there's no information like that.
11 Q  Okay. Do you remember seeing the dispatcher, Dispatcher
12   Croyle's handwritten notes, remember looking at those?
13 A  I don't remember, but I don't remember -- recall them.
14 Q  Well, I'm sorry, you -- you what?
15 A  I don't recall seeing them, no, I don't.
16 Q  You -- you don't recall seeing them? I'll -- well, I'll
17   represent to you that in his handwritten -- handwritten
18   notes, he doesn't write anything on the handwritten notes
19   which he took when Skonberg called that it was a REDDI
20   call, and he doesn't write that the driver's possibly
21   intoxicated.....
22 A  Okay.
23 Q  .....doesn't write anything down like that.
24 A  Uh-huh. (Affirmative)
25

Computer Matrix, LLC                Phone - 907-243-0668                    jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473                 sahile@gci.net

JAMES ELLAR                              4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                               Case No. 3:05-cv-0002 TMB

Page 70

1  Q  Okay. So would you agree that that tends to suggest that
2      even though Skonberg said that the driver was possibly
3      intoxicated that the dispatcher didn't pick up on that?
4  A  Right.
5  Q  And -- and didn't -- and didn't hear it, otherwise he
6      would have written it down?
7  A  Possibly, yes, sir.
8  Q  Okay. Now you were asked about the time frame that passed
9      between the call when it came in and when Croyle passed on
10     the call to -- to Peterson. Isn't that one of the
11     problems with the dispatching in this case is there's no
12     record of what information Croyle passed on to Peterson
13     because he doesn't write it down anywhere?
14 A  Yes, sir.
15 Q  And doesn't write down even the time when he dispatched
16     Peterson by phone?
17 A  Yes, sir. He doesn't even -- he doesn't ask the call
18     taker specifically what time the incidents happened
19     either.
20 Q  So let me ask you this, you -- you were asked isn't it
21     likely that Croyle told Peterson it was a REDDI. If -- if
22     Croyle doesn't write down any -- anywhere in his
23     handwritten notes that it's a REDDI call.....
24 A  Uh-huh. (Affirmative)
25

Page 71

1  Q  .....doesn't write down anywhere in his handwritten notes
2      that the driver's possibly intoxicated and you don't have
3      any information that any of the other documents were
4      created at the time the call comes in, how is it that it's
5      more likely that Croyle told Peterson as opposed to the
6      fact that it's more likely Croyle forgot to tell Peterson
7      because he forgot to write it down.
8      MR. KOZIOL: Objection. Form.
9  A  Again de -- depending on the time limitation or the time
10     between the call and when he actually got in touch with
11     Officer Peterson which is undetermined, just being a -- a
12     personal citizen I would hope that he would be
13     professional enough to be able to remember that aspect,
14     but it's undetermined whether he did or not.
15 Q  Well, it's not in his handwritten notes, right?
16 A  True.
17 Q  And -- and it's not in Peterson's report, right?
18 A  Right.
19 Q  And it's not in his affidavit.....
20 A  Right.
21 Q  .....right? And it's not in Holden's report?
22 A  Right.
23 Q  So given the fact that all that stuff's missing why is it
24     that you conclude it's likely he told him -- I mean, is
25

Page 72

1      this wishful thinking on your part?
2  A  I guess so, yes, sir.
3  Q  Okay. Well, based on.....
4  A  Yes, sir, it would be.
5  Q  .....based on the fact that it's not in any of the
6      documents.....
7  A  Uh-huh. (Affirmative)
8  Q  .....is it more likely than not he didn't tell him?
9  A  I would assume so, yes, sir.....
10 Q  All right.
11 A  .....that -- that seems to be omitted from everything
12     else.
13 Q  Now you said that you concluded Scott Brown was lying
14     about drinking and driving because he admitted to drinking
15     and driving?
16 A  Yes, sir.
17 Q  I'll -- I'll represent to you there's no evid -- there's
18     no testimony anywhere in this case where Scott Brown
19     admits to drinking and driving. So if that's the case did
20     Scott Brown -- is there any evidence that you can rely on
21     where -- where you would conclude Scott Brown's lying
22     about drinking and driving?
23 A  Again, I'm trying to refocus on when the perjury part of
24     the case came up. I guess the answer would be no.
25

Page 73

1  Q  Okay. Now you -- you saw the video of Officer Peterson
2      following Mr. -- Mr. Brown, right?
3  A  Yes, sir.
4  Q  Okay. And for most of that video Mr. Brown's vehicle's
5      not even visible on the dash cam, is it?
6  A  Correct.
7  Q  Okay. And so it's reasonable to conclude because Mr.
8      Peter -- Officer Peterson's so far back and away from
9      Brown's vehicle that Brown likely didn't know Peterson was
10     behind him when -- when they're driving, right?
11 A  Yes, sir.
12 Q  Okay. Now if Brown has done nothing wrong and all
13     Peterson has is reasonable suspicion to make a stop, Brown
14     doesn't have any obligation to -- to -- to stop and talk
15     to Peterson, right, he's free to go in his home if he
16     wants to?
17 A  If he believes he's not doing any -- has not done anything
18     wrong, yes, sir.
19 Q  Okay. Now let's assume Brown has an obligation to stop
20     and talk to Peterson, but he doesn't, and all that
21     Peterson has is reasonable suspicion to conduct an
22     investigatory stop, okay, does Peterson have authority to
23     -- and -- and -- and so let -- let's assume at the moment
24     that Peterson pulls up to Mr. Brown's house and Scott
25

JAMES ELLAR                           4/7/2008                BROWN v. PETERSON, et al.,
Vol 1                                                         Case No. 3:05-cv-0002 TMB

20 (Pages 74 to 77)

Page 74

1     Brown gets out of the car, knows the lights are on, okay,
2     he doesn't know why Peterson wants to talk to him, but the
3     lights are on and let's assume Peterson has reasonable
4     suspicion to conduct an investigation and Brown goes in
5     his house. Does Peterson have any legal authority to
6     enter into that house if all he has is reasonable
7     suspicion to conduct a investigatory stop?
8     MR. KOZIOL: Objection. Form. Reasonable suspicion for
9  what crime.
10 Q   Reasonable suspicion to conduct an investigation for
11     reckless driving?
12 A   No, sir.
13 Q   Okay. Now are your opinions regarding the fact that it
14     doesn't appear Croyle used any established sequence to ask
15     questions based on your experiences as a reserve police
16     officer and listening to -- well, how many -- how many
17     tens or hundreds of dispatch calls to you think you've
18     heard?
19 A   Oh, thousands.....
20 Q   Thousands.
21 A   .....and thousands.
22 Q   Okay. Is your opinion that Croyle didn't establish -- did
23     -- did not use an established sequence to ask questions
24     based on your experience of receiving or overhearing
25

Page 75

1     thousands of dispatch calls?
2  A   It was extremely unprofessional, he -- he actually asked
3     almost no questions.
4  Q   And is it -- and is it based on your training and
5     experience that dispatchers use an established sequence to
6     ask questions?
7  A   Yes, sir.
8  Q   All right. What is your opinion about the policy of --
9     well, let me ask you this. When you were a receiv --
10     reserve officer were you ever sent out on a call while you
11     were physically at the station house?
12 A   Yes, I believe I was.
13 Q   And do you know whether that dispatch to you was recorded
14     anywhere in writing?
15 A   I don't believe it is, I believe though it's entered in
16     the computer.
17 Q   So it is recorded somewhere?
18 A   It is recorded, yes.
19 Q   Okay. But just like some -- somebody didn't handwrite it
20     down.....
21 A   No.
22 Q   .....you're saying it got recorded?
23 A   Right.
24 Q   Okay. Because everything's computerized?
25

Page 76

1  A   Right.
2  Q   Okay. And so what is your opinion about the Kodiak Police
3     Department's policy of not recording those dispatches?
4     MR. KOZIOL: Objection. Form.
5  A   I think it's irresponsible. There's no reason not to
6     record dispatches or not do handwritten -- not doing
7     handwritten recording anymore. It can't be unlikely that
8     they can't afford a computer to record things. It's
9     probably unlikely that they would have recordings of their
10     telephones with inner-depart -- inner-departmental, but it
11     would be the responsibility of the dispatcher to -- to
12     record and log things as they happened.
13 Q   When Officer Peterson goes in service the dispatch radio
14     log just says I slash S for in service, is there anything
15     missing there?
16 A   I would think that he would reason why he was in -- called
17     into service.
18 Q   Okay. And if -- and in the first incidence is it the
19     officer's duty to radio in why he's going in service?
20 A   Yes, sir.
21 Q   And if the officer doesn't indicate that in his radio
22     dispatch, is -- based on your training, background and
23     experience, should that be at least notated by the
24     dispatcher even if the officer doesn't give it?
25

Page 77

1  A   Yes, sir.
2  Q   Okay. Later on Officer Peterson -- and so do you think
3     that was an error of the part of Peterson not following
4     what should be reasonable policy about what information to
5     radio in when he goes into -- when he goes in service?
6  A   I don't know if it's an error for Officer Peterson or an
7     error on the dispatcher's part.
8  Q   Or both?
9  A   Or both.
10 Q   Okay. But, I mean, one or both, you know, in your opinion
11     made a mistake there?
12 A   It is an error, yes, sir.
13 Q   And -- and is -- is contrary to what a reasonable policy
14     should be?
15 A   Yes, sir.
16 Q   Now later on Officer Peterson radios in that he's making a
17     traffic stop, right?
18 A   I don't know, there's no documentation that.....
19 Q   Well, I mean, isn't it in -- isn't there in his radio log
20     a -- a T with a circle around it and then a license plate
21     number?
22 A   Oh, yes, sir, there is.
23 Q   And -- so he's radioed in he's.....
24 A   Yes, sir.
25