JAMES ELLAR                                     4/7/2008                 BROWN v. PETERSON, et al.,
Vol 1                                                                    Case No. 3:05-cv-0002 TMB

21 (Pages 78 to 81)

Page 78

1  Q  .....doing a traffic stop?
2  A  Yes, sir.
3  Q  Okay. And other than the license plate number is there
4     any other information that -- that's -- that's missing
5     there?
6  A  That it's the suspect vehicle that he originally went to
7     look for.
8  Q  And -- and what else that is -- should -- is there
9     anything else an officer should radio in when he makes a
10    traffic stop?
11 A  His location.
12 Q  And was the location listed on the radio log there?
13 A  No, sir.
14 Q  And was that a breach of standard policy for when an
15    officer makes a traffic stop.....
16 A  Yes, sir.
17 Q  .....to indicate where his location is?
18 A  Yes, sir, it has to do with officer safety.
19 Q  Okay. And should he also be giving the reason why he's
20    making the traffic stop?
21 A  No, not necessarily. So.....
22 Q  But if -- if he's dispatched on a -- on a possibly
23    intoxicated driver would it -- are -- are you saying it --
24    it would not be appropriate to radio in traffic stop,
25

Page 79

1     possibly intoxicated driver, driver license's number or
2     license plate number and location?
3  A  No, sir, not usually.
4  Q  Now let me ask you this, on a -- on a call of -- on a call
5     like this where there was a claim that rocks were sprayed
6     all -- all over a lady and the car's fishtailing and spins
7     a 360, you indicated that there was reasonable suspicion
8     to make a stop to conduct an investigation?
9  A  Uh-huh. (Affirmative)
10 Q  And you indicated that you couldn't make an arrest because
11    the offense wasn't committed in the officer's presence,
12    right?
13 A  Uh-huh. (Affirmative)
14 Q  But aside from that is there probable cause to believe
15    that reckless driving occurred or would -- or would you
16    need to do more of an investigation to make that
17    determination?
18 A  You would have to do more inves -- investigation to ensure
19    that your facts were true.
20 Q  Okay. Are -- are.....
21 A  Are your witnesses credible.
22 Q  Okay. So, I mean, is that because there could be other
23    explanations for why a car fishtailed or did a 360?
24 A  Yes, sir.
25

Page 80

1  Q  Could be some sort of accident?
2  A  Could be something wrong with the vehicle, just -- or it
3     could be just environment outside. It could be.....
4  Q  You mean like icy roads or something like that?
5  A  Icy roads.
6  Q  Okay.
7  A  A vehicle -- flatbed pickup truck if it's not loaded in
8     the back is very light in -- light in the back end which
9     can cause the vehicle to subsequently, you know, throw
10    gravel because it's light in the back, could be something
11    wrong with the vehicle.
12 Q  So without doing more of an investigation and talking to
13    the driver, you don't have -- you don't have enough
14    information to.....
15 A  No, sir.
16 Q  .....for probable cause for that crime?
17 A  No, sir.
18 Q  Okay. Were -- was there any information between the first
19    call by Skonberg and the second call because you've
20    mentioned a number of times needing to get information --
21    sometimes needing to determine whether the information's
22    credible or reliable, was -- was there anything that you
23    noted between the two calls that suggested that Skonberg's
24    observations may not be reliable?
25

Page 81

1  A  It's difficult to determine because the second call, very,
2     very limited information was gathered. It would not have
3     added to any more information to change my thoughts about
4     the original call.
5  Q  Okay. But that's not what I'm asking. Well, let me call
6     your attention, did -- in the second call didn't the call
7     -- the caller in the second call say that she was the
8     person that got sprayed by rocks and she got sprayed by
9     rocks 20 minutes earlier?
10 A  Yes, sir.
11 Q  Okay. And didn't Skonberg say that she just observed the
12    person get sprayed by rocks?
13 A  Yes, sir.
14 Q  Okay. And doesn't the fact that Skonberg's asserting she
15    got saw it happen and a few minutes later the next caller
16    said it happened 20 minutes earlier, does that in your
17    mind tend to undermine the reliability of what Skonberg's
18    telling the dispatcher?
19 A  Yes, sir.
20 Q  Okay. And if -- if -- as the officer responding to the
21    call, would you not want to know whether the information
22    that's being relayed to you is reliable or not?
23 A  Yes, sir.
24 Q  And so would you want to know about that discrepancy?
25

JAMES ELLAR                    4/7/2008              BROWN v. PETERSON, et al.,
Vol 1                                                 Case No. 3:05-cv-0002 TMB

22 (Pages 82 to 85)

Page 82

1  A  Yes, sir.
2  Q  So that you can do what?
3  A  It changes the way I would approach the case now. It
4     would make me skeptical of what information I had
5     therefore I would further investigate this situation
6     before I took any action.
7  Q  By further investigate you'd want to corroborate -- if
8     she's making a claim of reckless driving.....
9  A  Right.
10 Q  .....you'd want to corroborate whether there's reckless
11    driving going on or not?
12 A  Yes, sir.
13 Q  Okay. And so under those circumstances that's where you'd
14    feel a need -- you'd feel a need where corroboration of a
15    call needs to be made?
16 A  Yes, sir.
17 Q  Now Mr. Koziol asked you about your -- your statement
18    about whether Peterson's testimony was in your view not
19    credible when -- when he said that he had received a REDDI
20    report, okay. And I'm looking at your report on Page 4.
21    You indicated that the -- in Peterson's police report
22    dated January 4th, 2003, there is no mention of DUI from
23    dispatch, right?
24 A  Right.
25

Page 83

1  Q  Okay. And you're relying in -- on that as part of your
2     conclusion for determining he's not credible?
3  A  Yes, sir.
4  Q  Then you indicate in the affidavit in support of the
5     complaint that was dated January 6, 2003, he talks about
6     receiving a dispatch, but never mentions anything
7     concerning DUI information, right?
8  A  Yes, sir.
9  Q  And you're relying on that too in reaching your
10    conclusion?
11 A  Yes, sir.
12 Q  Then you also indicate that during grand jury testimony
13    for an assault II charge that's dated April 27th, 2003,
14    Peterson again talks of the dispatch, but never mentions
15    DUI?
16 A  Right.
17 Q  And then in evidentiary hearing on a motion to suppress on
18    April 3rd, 2003, he says he was told by dispatch that it
19    was a possible DUI, but he also admits his police report's
20    not accurate?
21 A  Correct.
22 Q  And then you indicate during the grand jury assault -- the
23    grand jury testimony for assault III dated June 5th, 2003,
24    Peterson again talks of the dispatch, but doesn't mention
25

Page 84

1     DUI as part of the dispatch?
2  A  Correct.
3  Q  All right. And so you then write based upon these facts I
4     -- I agree with the trial court and conclude it was more
5     probable than not Peterson didn't have any information
6     pertaining to a REDDI call or possible intoxicated driver
7     before entering into Mr. Brown's home?
8  A  Right.
9  Q  And -- and that's what you relied on in reaching your
10    conclusion?
11 A  Yes, sir.
12 Q  Okay. Officer Peterson at some point talks about what
13    types of things he looks for when he's making a stop and
14    he says I -- when -- when I receive a REDDI call or I
15    receive a report of someone driving recklessly, we always
16    try to look for other things, additional things, probable
17    cause to stop the vehicle, but not all the time. I don't
18    need to look for probable cause for myself, I try to stop
19    the vehicle for their safety -- for the safety of the
20    community because I don't want anybody else to get hurt.
21    Why did you make a note of that in this report?
22 A  It seems to me that he just disregards some -- somebody's
23    constitutional rights.
24 Q  And why do you say that?
25

Page 85

1  A  If you follow somebody long enough you can find something
2     to stop somebody. And if you don't think you -- you have
3     to go by the law you can stop people left and right.
4  Q  Well, I mean, are -- are you -- specifically where he says
5     I don't need to look for probable cause.....
6  A  Uh-huh. (Affirmative)
7  Q  .....was -- was that a statement that concerned you?
8  A  Yes, it does.
9  Q  And why is that?
10 A  It's -- it -- it's an officer that thinks he can do
11    whatever he pleases. He can go against -- against the law
12    to do what he wants.
13 Q  Does it also suggest to you that he doesn't understand
14    what probable cause is, I mean, he doesn't need probable
15    cause to stop a car, does he?
16 A  Not probable cause, no.
17 Q  All right. So does it tend to suggest to you he doesn't
18    know what probable cause is?
19 A  More than likely.
20 Q  Okay. He also made a note that on -- on Page 5 you
21    indicated he doesn't -- he -- Officer Peterson states he
22    doesn't believe he needs probable cause which you then
23    write, which is the wrong standard to stop any vehicle.
24    You can stop any vehicle to promote public safety. Is --
25

Computer Matrix, LLC                    Phone - 907-243-0668                jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax     907-243-1473                sahile@gci.net

JAMES ELLAR                           4/7/2008                BROWN v. PETERSON, et al.,
Vol 1                                                         Case No. 3:05-cv-0002 TMB

23 (Pages 86 to 89)

Page 86

1   is that your -- your conclusion?
2   A   Yes.
3   Q   And you made a note that Officer Peterson appeared to have
4       no training concerning constitutional rights, probable
5       cause, or anything like that from November 23rd, 1999
6       through May 10th, 2004. What do you -- what is your
7       opinion about the policies of the Kodiak Police Department
8       for not providing that kind of training during that period
9       of time?
10  A   It's -- it's not a good thing, refresher courses for
11      officers are always needed, updating laws is always
12      needed.
13  Q   Is there anything in your report, your APH report that --
14      that -- that you would want to correct at this point?
15  A   No, I don't think so.
16  Q   Okay. And do you stand by the conclusions in your report?
17  A   I do.
18  Q   Okay.
19      MR. HERZ: No further questions.
20      MR. KOZIOL: Why don't we go off the record?
21      (Off record)
22      (On record)
23              JAMES L. ELLAR
24      testified as follows on:
25

Page 87

1              REDIRECT EXAMINATION
2   BY MR. KOZIOL:
3   Q   Mr. Ellar, it's my observation that on a number of answers
4       you seemed to have changed your opinion from when I asked
5       you the question to when Mr. Herz asked you the question,
6       would you agree with that observation?
7   A   Yes, sir.
8   Q   Okay. And your opinions changed without any new facts
9       being given to you by Mr. Herz when he asked you the
10      question, they just.....
11  A   Uh-huh. (Affirmative)
12  Q   .....changed, right?
13  A   Yes, sir.
14  Q   Do you think a reasonable person might conclude that on
15      those issues where you had the change of mind between from
16      when I asked you to when Mr. Herz asked you, a reasonable
17      person might conclude that you're not giving credible
18      testimony?
19  A   I would hope not.
20  Q   But could a reasonable person so conclude that?
21  A   No, sir, I don't think so.
22  Q   So may one conclude that the difference between your
23      opinions that you gave me and the -- compared to the
24      opinions that you gave Mr. Herz, the only explanation for
25

Page 88

1       your change is that you were trying to please Mr. Herz
2       because he hired you?
3   A   No, sir.
4   Q   What other explanation is there for your changing your
5       mind within a few minutes on some very important
6       questions?
7   A   Simply for the fact that maybe I didn't understand the
8       questions specifically coming from you and what you wanted
9       from me.
10  Q   Oh, so you're saying some of my questions were unclear?
11  A   Well, with your -- you didn't want my opinion, you want my
12      opinion, you want my objective, you don't want my
13      objective, yeah, sometimes I was confused to where we
14      were.
15  Q   If that's true that you were confused by my questions, why
16      didn't you ask me to clarify?
17  A   On certain points I -- I did try to clarify things
18      and.....
19  Q   Didn't I clarify them for you?
20  A   I thought we did, but.....
21  Q   That's what I thought, Mr. Ellar.
22  A   And so did I, but then when Mr. Herz asked me different --
23      asked me in different ways, yes, sir, it.....
24  Q   So tell me as you sit here what questions that I asked you
25

Page 89

1       that were unclear, can you remember any?
2   A   I don't know. I -- I -- there's been quite a few
3       questions.
4   Q   Can you remember any, one?
5   A   No, I can't.
6   Q   Okay. Are you sure you're right that my questions were
7       unclear, that's your view? That's explains why you
8       testified.....
9   A   That's my opinion.
10  Q   That's your opinion as to why you testified differently
11      because my questions were unclear and his weren't?
12  A   His were more clarified for me, yes, sir.
13  Q   Okay. When I was asking you questions and correct me if
14      my -- you think my memory's wrong, but when I asked you
15      questions, I thought you said that based on the facts that
16      Officer Peterson had he had reasonable suspicion to stop
17      the Brown vehicle for reckless driving, did you not say
18      that to me?
19  A   I believe I did.
20  Q   Okay. Did you say the reverse to Mr. Herz, that he didn't
21      have reasonable suspicion to stop the vehicle?
22      MR. HERZ: Objection. Lack of -- the question's vague,
23  lack of foundation because I asked the.....
24      MR. KOZIOL: Wait, I -- I don't need an explanation.
25

Computer Matrix, LLC                    Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473               sahile@gci.net

JAMES ELLAR                          4/7/2008                BROWN v. PETERSON, et al.,
Vol 1                                                        Case No. 3:05-cv-0002 TMB

24 (Pages 90 to 93)

Page 90

1  MR. HERZ: All right. Well.....
2  MR. KOZIOL: Just a form objection's fine.
3  MR. HERZ: And leaves -- leaves und -- underlying facts
4  out of the question.
5  A  I cannot tell you if questions from either one of you were
6     -- were exactly the same.
7  Q  Okay. Let me -- okay. When I asked you whether you
8     thought on the facts that Peterson knew he had reasonable
9     suspicion to stop the vehicle for -- the Brown vehicle for
10    reckless driving you said yes, he had reasonable
11    suspicion?
12 A  Under the facts that he knew, yes, sir.
13 Q  Okay. Your opinion he had reasonable suspicion, right?
14 A  Yes, sir, if.....
15 Q  Okay. That -- that's how you answered when I asked you,
16    right?
17 A  Yes, sir.
18 Q  Did Mr. Herz -- as a memory question did Mr. Herz also ask
19    you the same question, did Officer Peterson have
20    reasonable suspicion to stop the Brown vehicle?
21 A  No, that's different.
22 Q  Okay.
23 A  You asked if he had facts, he doesn't.
24 Q  Let me start again. You agree with -- these are memory
25

Page 91

1     questions now, what happened, you know, within the last
2     two hours.....
3  A  Uh-huh. (Affirmative)
4  Q  .....okay? Did I ask you the question whether it was your
5     opinion that Officer Peterson had reasonable suspicion to
6     stop the Brown vehicle for reckless driving.....
7  A  And I said.....
8  Q  .....and was not your answer yes.....
9  A  Yes.
10 Q  .....he did? Okay. Did Mr. Herz ask you the same
11    question when he was questioning you, did he or not ask
12    you -- did he ask you or did he not ask you the same
13    question?
14 A  I don't know.
15 Q  Okay. Is your answer -- does your answer remain the same
16    that you believe Officer Peterson had reasonable suspicion
17    to stop the Brown vehicle for reckless driving?
18    MR. HERZ: Objection. Lack of foundation, facts not in
19 evidence.
20    MR. KOZIOL: Okay. All I need is a form objection,
21 please, I don't need anything else.
22    MR. HERZ: Well, no, I want to give a very specific
23 objection, I -- I don't.....
24    MR. KOZIOL: No, you're not entitled to under our rules
25

Page 92

1  unless I ask for it.
2     MR. HERZ: I'm not giving a speaking objection, but I
3  think I'm entitled to give more than just a objection to the
4  form of the question.
5     MR. KOZIOL: I don't think you are.
6     MR. HERZ: Well.....
7     MR. KOZIOL: But -- and I -- that's the way we've been
8  doing it all these times.
9     MR. HERZ: No, that's the way you've been doing it, I
10 don't -- I don't think saying form of the question is
11 sufficient because it's not specifying what's wrong with the
12 question.
13    MR. KOZIOL: Okay.
14    MR. HERZ: But that's, you know, neither here or there or
15 there.
16    MR. KOZIOL: All right.
17 Q  Is it still your opinion that Officer Brown had reasonable
18    suspicion to stop the vehicle for reckless driving prior
19    to Officer -- I'm sorry, let me strike the question. Is
20    it still your opinion that Officer Peterson had reasonable
21    suspicion to stop the Brown vehicle for reckless driving
22    based upon reasonable suspicion?
23    MR. HERZ: Objection. Vague.
24 A  Yes.
25

Page 93

1  Q  Okay. Did you testify when I asked you questions that
2     Officer Peterson had probable cause to arrest the driver
3     of the gold flatbed truck for reckless driving if he had
4     stopped him prior to the driver going into the house and
5     did you not answer yes, he had probable cause to make the
6     arrest?
7  A  Yes, I did.
8  Q  Okay. Did you answer to the contrary when Mr. Herz asked
9     you the same question?
10 A  Yes, because Mr. Herz, I believe, qualified the question a
11    little better.
12 Q  Okay. And what -- why did you give two different answers
13    to the same question, can you explain?
14 A  Mr. Herz pointed out the discrepancy between the two calls
15    of -- and the time factor which would eliminate that the
16    first caller, Ms. Skonberg, was credible.
17 Q  But he gave you that information after you had already
18    given the opinion that there was no probable cause, didn't
19    he?
20 A  Yes, sir.
21 Q  So you couldn't have taken that into account when you said
22    there was no probable cause when you answered his
23    question, right, you had already said there was no
24    probable cause to Mr. Herz before he gave that information
25

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473          sahile@gci.net

JAMES ELLAR                               4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                 Case No. 3:05-cv-0002 TMB

25 (Pages 94 to 97)

Page 94

1  about some time frame discrepancy between the two callers;
2  isn't that true?
3  A  Yes, sir.
4  Q  And in any sense how does whatever contradiction you
5     perceive that the dispatcher knew of with the second
6     caller saying it happened 20 minutes earlier, how does
7     that information, that possible contradictory information
8     the dispatcher might have gotten, affect the probable
9     cause that Officer Peterson had since that dispatcher --
10    there's no evidence the dispatcher ever told Peterson of
11    that discrepancy, do you agree?
12 A  The dispatcher didn't give that information to the
13    officer.....
14 Q  Right.
15 A  .....correct.
16 Q  I believe that's true, he didn't give any information
17    about some discrepancy between the two callers to
18    Peterson, you have no evidence of that, right?
19 A  No. No.
20 Q  Okay. So why wouldn't the probable cause that you
21    believed Peterson had to make the arrest for reckless
22    driving have remained the same when you answered Mr. Herz'
23    question because Peterson didn't even know of the
24    discrepancy so his probable cause would remain the same,
25

Page 95

1     would it not?
2  A  Well, I think I determined that there wasn't probable
3     cause.
4  Q  No, but you answered my question saying there was probable
5     cause?
6  A  I understand that.
7  Q  And you explained it because of this discrepancy, but if
8     Peterson didn't know of the discrepancy why isn't it still
9     your opinion that he had probable cause to make the
10    arrest?
11 A  Because there wasn't probable cause, he didn't have enough
12    facts.....
13 Q  Then why did you say.....
14 A  .....to base probable cause.
15 Q  .....then why did you say to me he did have enough?
16 A  Well, I don't know, sir.
17 Q  Okay. What's the definition of probable cause?
18 A  Making the decision a reasonable person would make given
19    the facts to make an arrest.
20 Q  And let's move to DUI for a moment. Did you say to me
21    when you were testifying that you thought Officer Peterson
22    had reasonable suspicion to stop the driver of the gold
23    flatbed truck, reasonable suspicion to stop based upon DUI
24    and your answer was affirmative.....
25

Page 96

1  A  Uh-huh. (Affirmative)
2  Q  .....didn't you say that to me?
3  A  Based on DUI?
4  Q  Yes.
5  A  If it was based on DUI then I -- I don't agree.
6  Q  No, it's a memory question.
7  A  Okay. If I did.....
8  Q  These are two.....
9  A  .....if I did.....
10 Q  .....these are two memory questions.
11 A  .....if I did -- I said -- if I did say yes, that's fine,
12    yes, sir, I did. If you say I did, I did, but.....
13 Q  Well, I'm asking you, I -- it -- it's a memory question.
14    Do you remember answering the questions do you think
15    Officer Peterson.....
16 A  No, I don't remember answering that question.
17 Q  Well, let me finish the question. Do you think Officer
18    Peterson had reasonable suspicion to stop the gold flatbed
19    truck based upon DUI when he saw it coming down Pillar
20    Mountain and I thought your answer was yes, he had
21    reasonable suspicion to stop based on DUI. Did you not
22    say that to me in this deposition?
23 A  I don't remember.
24 Q  Okay.
25

Page 97

1  A  But the rephrase -- with your question now, my answer's no
2     for DUI, he does not have reasonable suspicion to stop
3     that vehicle for DUI.
4  Q  And that's how you answered it with -- to Mr. Herz, right?
5  A  I guess so, yes, sir.
6  Q  Okay. Do you remember that, telling him.....
7  A  No, sir, I don't.
8  Q  Okay. All right.
9  A  There's been a lot of questions.
10    MR. HERZ: True.
11 Q  Even -- and -- and you're answering there was no
12    reasonable suspicion to stop based upon DUI.....
13 A  DUI.
14 Q  .....even if Officer Peterson had -- it had been
15    communicated to Officer Peterson this was a REDDI
16    report.....
17    MR. HERZ: Objection.
18 Q  .....is that true?
19    MR. HERZ: Form of the question.
20 A  No.
21 Q  Okay. Then it's not true?
22 A  If he.....
23 Q  Okay. Let me ask the question again.
24 A  .....now if he did have a REDDI report?
25

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473             sahile@gci.net

JAMES ELLAR                          4/7/2008                BROWN v. PETERSON, et al.,
Vol 1                                                        Case No. 3:05-cv-0002 TMB

26 (Pages 98 to 101)

Page 98

1  Q  No, I -- I -- I want to explore that opinion that there
2     was no reasonable suspicion to stop for DUI. I'd like you
3     to assume Officer Peterson was told by Dispatcher Croyle
4     that this is a REDDI report and then gave all the other
5     information about the reckless driving. Did Officer
6     Peterson have reasonable suspicion to stop the vehicle for
7     DUI based upon that information, if he got the REDDI
8     report information from Croyle?
9  A  If he got the REDDI report, yes, sir.
10 Q  He had reasonable suspicion?
11 A  Yes, sir.
12 Q  Okay. And that's my recollection of how you testified
13    when I asked you questions, okay?
14 A  Uh-huh. (Affirmative)
15 Q  All right. Is that still -- that's a yes?
16 A  Yes, sir.
17 Q  Okay. Is that still your opinion based upon if he got the
18    information about reckless driving and got the information
19    from Croyle about a REDDI report?
20 A  Yes, sir.
21 Q  Okay. Now same information, reckless driving information
22    from Croyle and the REDDI information from Croyle, did
23    Officer Peterson have probable cause to make an arrest of
24    the driver of the gold flatbed truck if he had stopped him
25

Page 99

1     when the -- he saw the vehicle coming down Pillar
2     Mountain?
3  A  No, sir.
4  Q  Okay. Memory question, did you say to me earlier in this
5     deposition he did have probable cause to make an arrest
6     for DUI?
7  A  Yes.
8  Q  Okay. And the negative answer you just gave me, you gave
9     that negative answer to Mr. Herz.....
10 A  Yes, sir.
11 Q  .....right? Okay. Why did you change your mind from when
12    I asked you the question to when Mr. Herz asked you the
13    question, what new facts did you get, any?
14 A  I don't remember. I don't.....
15 Q  There weren't new facts that you got, that you can
16    remember, right?
17 A  Not that I remember.
18 Q  So you just.....
19 A  I don't know. I don't know.
20 Q  .....you just decided to change your mind without any
21    explanation, right?
22 A  Mr. Herz, I believe, asked the question a little
23    differently than that.
24 Q  Explain why you got -- you gave him a different answer to
25

Page 100

1     the same question I asked you in terms of how he -- how he
2     asked you.....
3  A  I.....
4  Q  .....I don't understand that?
5  A  .....I guess I just understood his question better.
6  Q  How did he phrase it any differently than I did?
7  A  I don't know. I.....
8  Q  Okay.
9  A  .....can't remember word for word in here.
10 Q  And which is your opinion now, was there probable
11    cause.....
12 A  No, sir.
13 Q  .....to make a DUI arrest or not?
14 A  No, sir.
15 Q  You had said to -- do you remember telling me that on the
16    -- on the facts that you looked at, you reviewed, it was
17    more likely than not that -- that Dispatcher Croyle told
18    Peterson it was a REDDI report, do you remember saying
19    that to me?
20 A  I do.
21 Q  Okay. Do you remember saying the opposite to Mr. Herz?
22 A  I do.
23 Q  But you didn't get any new facts, did you, in order to
24    render a completely different opinion for Mr. Herz, did
25

Page 101

1     you?
2  A  No, sir.
3  Q  Okay. You just changed your mind because -- is that
4     right?
5  A  I qualified it, yes, sir.
6  Q  Qualified -- you changed your mind from a -- a yes to a
7     no?
8  A  Yes, sir.
9  Q  Okay.
10 A  Because I'd like to believe that the dispatcher was
11    professional enough to pass on that information. I have
12    no basis to believe that, but I like to believe it. But
13    the facts of the.....
14 Q  Well, would -- do you still like to believe it?
15 A  Yes, sir, but the facts of the case are that he probably
16    didn't due to the fact that it's not listed anywhere
17    except for the dispatch card.
18 Q  The facts of the case are such that he likely did
19    communicate it to Peterson?
20    MR. HERZ: Objection.
21 A  No, sir.
22    MR. HERZ: That's not what he said.
23 A  No, sir.
24 Q  What is it?
25

Computer Matrix, LLC                  Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501  Fax     907-243-1473              sahile@gci.net

JAMES ELLAR   4/7/2008   BROWN v. PETERSON, et al.,
Vol 1   Case No. 3:05-cv-0002 TMB

27 (Pages 102 to 105)

Page 102

1  A  It's likely he did not. I would like to believe that he
2     did, but I don't think that's the facts.
3  Q  You told me, did you not, that you concluded based upon
4     your review of this information that it's likely Scott
5     Brown was lying when he said -- when he testified under
6     oath that he wasn't drinking and driving, right?
7  A  Yes, sir.
8  Q  And then you changed your mind when Mr. Herz asked you the
9     same question, right, or is my memory wrong?
10 A  I don't remember.
11 Q  Okay. So am I right it's still your opinion that it's
12    most likely Scott Brown lied when he said I wasn't
13    drinking and driving that day; is that true?
14 A  To DMV, yes, sir.
15 Q  Okay. And that's because on the totality of these facts
16    you don't believe any assertion that he wasn't drinking
17    and driving, the totality of these facts really indicate
18    that he was drinking and driving that day, right, and
19    that's what you're basing it on, the totality of all these
20    facts?
21 A  Yes, sir.
22 Q  Okay. Let's talk a little bit hot pursuit, okay? If
23    there was reasonable suspicion to believe that Scott Brown
24    committed the crime of reckless driving, could Officer
25

Page 103

1     Peterson lawfully give hot pursuit into the house,
2     reasonable suspicion for reckless?
3  A  No, sir.
4  Q  If Officer Peterson had probable cause to believe there
5     was reckless driving done by Scott Brown, the driver of
6     that gold flatbed truck, could he have lawfully given hot
7     pursuit into that house?
8  A  I believe so.
9  Q  Okay. If Officer Peterson had reasonable suspicion to
10    believe that Scott Brown had committed the crime of
11    driving while intoxicated, do you believe he could have
12    lawfully given hot pursuit into the house?
13 A  No, sir.
14 Q  And then the last question on this line is if Officer
15    Peterson had probable cause to believe Scott Brown had
16    committed the crime of DUI, could he have given lawful
17    pursuit into the house?
18 A  Yes, sir.
19 Q  And -- and the basis of your conclusions about the law on
20    this area, reasonable suspicion and probable cause, to go
21    in a house on reckless or DUI is what?
22 A  Excuse me?
23 Q  Where did you get -- how do you reach your conclusions,
24    your training and experience.....
25

Page 104

1  A  Yes, sir.
2  Q  .....as a reserve officer?
3  A  Yes, sir.
4  Q  And were you taught this when you a reserve officer?
5  A  I believe so, yes, sir.
6  Q  And you authored two reports in this case?
7  A  No.
8  Q  And it -- it -- it's entirely possible I'm confusing you
9     with -- no, I'm not confusing it. Let me show you a
10    letter I got from Mr. Herz dated March 24th. Take a look
11    at that letter.
12 A  Oh, revised, yes, we did -- I did revise it.
13 Q  What was changed between the two reports?
14 A  What was it I took out? I omitted a -- an opinion,
15    gosh.....
16 Q  Do you remember which one?
17 A  It was against your client. I'm sorry, I'm -- I'm drawing
18    a blank.
19 Q  Do you want me to hand -- I'm going to hand you both
20    reports, will that help?
21 A  Sure.
22 Q  Okay. Because that -- I didn't want to spend my time
23    going line by line, but if you could tell me what the
24    difference is? See one of them's dated -- Bates stamped
25

Page 105

1     March 26th, that would be the later one and there's one
2     dated in my office Mar -- March 7th.
3     MR. HERZ: Do -- do you have the changes marked?
4     MR. KOZIOL: No.
5     MR. HERZ: Oh. Do you want to like to off record while
6     he's looking trying to find which -- what parts changed?
7  Q  Do you think it'll take a long time? We'll go off the
8     record if it's going to take a long time, but I thought
9     maybe you'd just pinpoint the one opinion, but it's up to
10    you, if you're going to take -- you know, take more than a
11    couple minutes then we'll go off the record.
12 A  Okay. Let's.....
13 Q  Okay.
14 A  Yeah, let's go off.
15    (Off record)
16    (On record)
17    MR. HERZ: I object to the questions being outside the
18 scope of the cross.
19    MR. KOZIOL: Okay.
20 Q  Mr. Ellar, you -- you were able to look at your two
21    reports and you concede you -- Mr. Herz sent me your
22    second report and he indicates in his letter that it --
23    that it appears to be slightly different and describes it
24    being a revised report. Do you see any difference between
25

Computer Matrix, LLC            Phone - 907-243-0668           jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473    sahile@gci.net

JAMES ELLAR　　　　　　　　　　　4/7/2008　　　　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

28 (Pages 106 to 109)

### Page 106

```
1      the two reports other than the date?
2   A  Yes.
3   Q  What -- what's different?
4   A  Actually some of the spacing of the -- of.....
5   Q  Lines?
6   A  .....lines on the -- on the sheet. I -- I reorganized
7      some of them.
8   Q  Are the words any different?
9   A  No, sir, the words are not different.
10  Q  Okay. No new opinions, you -- you indicated there was one
11     new opinion in the new one.....
12  A  No, no.
13  Q  .....but there's not?
14  A  No.
15  Q  Okay. That was a mistake on your part, a memory mistake?
16  A  It was -- yes.
17  Q  Okay. All right. On the videotape did it appear to you
18     that Mr. Brown had a broken ankle?
19     MR. HERZ: Objection. Outside the scope.
20  A  Undetermined.
21  Q  Oh, he could have had a broken ankle when you were looking
22     at that tape?
23     MR. HERZ: Objection. Outside the scope.
24     MR. KOZIOL: You can have a continuing objection to this
25
```

### Page 107

```
1      line.
2      MR. HERZ: Okay.
3      MR. KOZIOL: Okay. You won't have to -- yeah, I'll give
4      you a continuing on it. Okay?
5   A  It's undetermined by the tape whether he did or didn't. I
6      don't know.
7   Q  Couldn't tell? So you think people can walk -- did you
8      see him walking around on his ankle?
9   A  He did.....
10  Q  On both feet?
11  A  It was hard to tell because they walked in front of the
12     car and the scope of the camera doesn't go down to his
13     feet.
14  Q  Oh, I'm sorry, I'm talking about the -- the booking room
15     tape.
16  A  Oh, oh.
17  Q  Did you have the booking room tape?
18  A  Yes, sir.
19  Q  And he's walk -- did -- did it -- that was my -- that was
20     my original question, did he look like he had a broken
21     ankle on the booking room tape?
22     MR. HERZ: Same objection.
23     MR. KOZIOL: And you can have the same continuing
24     objection.
25
```

### Page 108

```
1      MR. HERZ: Thank you.
2   A  I'm -- he -- he did have a limp.
3   Q  Okay. Does that limp get -- what, do -- do you think he
4      had a broken ankle based on that limp?
5   A  I have no idea, I'm not a doctor.
6   Q  Did -- did it look like his ankle had improved by the end
7      of the tape, where he wasn't walking with a limp anymore?
8   A  I don't remember.
9   Q  Okay.
10  A  I do know he took his -- remember him taking his shoes and
11     sock off and complaining about it.
12  Q  And are -- are -- do you have a professional opinion as to
13     whether or not the city of Kodiak or any of the police
14     officer should have given him medical aid before it was
15     given to him?
16  A  Yes, sir.
17  Q  And what is it?
18  A  That it should have been given to him.
19  Q  And -- and.....
20  A  He's.....
21  Q  Okay.
22  A  If he had.....
23     MR. HERZ: Is this my -- my continuing objection still
24     applies.....
25
```

### Page 109

```
1      MR. KOZIOL: You -- you've still got it.
2      MR. HERZ: .....to this whole line of questioning?
3      MR. KOZIOL: The whole line of questioning on medical, you
4      stuff.....
5      MR. HERZ: Okay.
6      MR. KOZIOL: .....you got it.
7      MR. HERZ: All right.
8      MR. KOZIOL: Okay.
9   A  It's my professional opinion that if a -- if you have
10     somebody in your custody you're responsible for them and
11     if they're complaining of a injury you should have that
12     medically looked at.
13  Q  Okay. So on the videotape when he takes off his sock,
14     remember that.....
15  A  Uh-huh. (Affirmative)
16  Q  .....and he complained of his ankle.....
17  A  Uh-huh. (Affirmative)
18  Q  .....the police officers should have stopped right there
19     and got him medical attention, taken him to the hospital,
20     is that your opinion?
21  A  Yes, sir.
22  Q  Okay. How do you explain -- did -- did -- did it look to
23     you that he got better, his ankle got better as the tape
24     went on?
25
```

Computer Matrix, LLC　　　　　　Phone - 907-243-0668　　　　　　jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501　　Fax　　907-243-1473　　sahile@gci.net

JAMES ELLAR                                      4/7/2008              BROWN v. PETERSON, et al.,
Vol 1                                                                   Case No. 3:05-cv-0002 TMB

29 (Pages 110 to 113)

Page 110

1  A   I already answered that, I believe.
2  Q   Okay. You don't remember? I -- was that your answer?
3  A   Yeah.
4  Q   Okay. All right. If it -- it looked like he got better
5      where he wasn't even limping at the end and he put his
6      socks on and his shoes, is it still your opinion they
7      should have given him medical treatment when he pulled his
8      sock off and started complaining?
9  A   Yes.
10 Q   Okay. Because given all the circumstances he looked to
11     you to be a reliable reporter of information including his
12     pain; is that right, he looked like a reliable reporter?
13 A   It's his body, yes, sir.
14 Q   All right. He was obnoxious in the -- on that videotape,
15     wasn't he?
16 A   Yes, sir.
17 Q   Threatening to the officers?
18 A   I believe he did, yes, sir.
19 Q   Okay.
20     MR. HERZ: And again objection, outside the scope,
21     you.....
22     MR. KOZIOL: You got -- you got.....
23     MR. HERZ: .....you didn't ask any questions about the
24     video.
25

Page 111

1      MR. KOZIOL: .....you -- you got a continuing objection
2      there.
3      MR. HERZ: Yeah, okay.
4  Q   And he -- he -- he even talked about bribing the officers,
5      didn't he, do you remember that?
6  A   No, sir, I don't remember that.
7  Q   Okay. How much have you charged Mr. Herz for your
8      expertise up to this point in time?
9  A   Total?
10 Q   Yeah.
11 A   $2,000.
12 Q   Okay. And -- and how do you -- how did you bill that?
13 A   With a billing statement.
14 Q   Ah, but, I mean, per hour, flat fee, combination?
15 A   Hour.
16 Q   Okay. What's your hourly rate?
17 A   $40.
18 Q   Okay. And you indicated that if -- if an officer follows
19     someone long enough in a vehicle that -- and they're
20     driving a vehicle too, that they're -- they're eventually
21     going to find something, some basis to stop the vehicle,
22     right?
23 A   Usually, yes, sir.
24 Q   Okay. And is there anything wrong with that, doing that,
25

Page 112

1      an officer doing that?
2  A   I think so, yes, sir.
3  Q   I mean, but if the stop occurred because they were doing
4      something wrong, what's wrong with doing that?
5  A   I think you're singling somebody out for no reason or a
6      reason that's not a lawful infraction or some -- anything.
7  Q   So when you were working as a reserve officer didn't you
8      sometimes given the circumstances think there was
9      something suspicious about a vehicle, but you didn't have
10     reasonable suspicion to stop it and you followed it?
11 A   Yes, sir.
12 Q   Anything wrong with that?
13 A   It depends how far you follow it.
14 Q   Okay. Well, when -- when does it become wrong?
15 A   After a block.
16 Q   Okay. And do you read whatever that excerpt you -- you
17     quoted from Officer Peterson's testimony, you read that to
18     believe that Peterson is saying that I can stop a vehicle
19     and a -- and its driver if I don't have probable cause to
20     believe a crime is committed and I don't have reasonable
21     suspicion that -- to -- to do an investigatory stop, I can
22     stop it for no reason?
23 A   Yes, sir.
24 Q   That's how you read that?
25

Page 113

1  A   That's how I read that.
2  Q   And you think you're being fair in -- in terms of
3      interpreting that testimony?
4  A   Yes, sir.
5  Q   Did you make any notes of the -- of what you read?
6  A   No, sir.
7  Q   So you read it -- how did you retain what was read?
8  A   I marked it on the paperwork that I had.
9  Q   And then you typed it up?
10 A   Yes, sir.
11 Q   Okay. So really your notes are your -- is your file, is
12     your report.....
13 A   Okay, yes.
14 Q   .....right, there aren't any other notes?
15 A   No, sir.
16 Q   Okay. And did you get correspondence from Mr. Herz in
17     terms of assigning the case to you?
18     MR. HERZ: Objection. Outside the scope, but.....
19     MR. KOZIOL: Okay. You can -- you can have that too.
20     MR. HERZ: Yeah. You can answer the question.
21 A   I'm not sure what you mean.
22 Q   Did you get an engagement letter from him?
23 A   Yes, sir.
24 Q   Okay. And he.....
25

Computer Matrix, LLC                  Phone - 907-243-0668                              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473                           sahile@gci.net

JAMES ELLAR                                  4/7/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                    Case No. 3:05-cv-0002 TMB

30 (Pages 114 to 117)

Page 114

1  A   No. No, sir, we talked -- we just talked on the phone.
2  Q   Okay. So he never sent you a letter? Has he ever sent
3      you a letter?
4  A   Yes.
5  Q   Okay. Ah, then that -- all right. And I -- I -- in fact,
6      I showed you such a letter?
7  A   Yes.
8  Q   Did he ever show -- did he ever send you a letter ask --
9      telling you what he'd like you to do, what issues you --
10     he'd like you to address?
11 A   Yes, sir.
12 Q   Okay.
13 A   I believe so.
14 Q   All right. Would you agree to -- to make a copy of the
15     letters he sent to you and give them to our court reporter
16     here and we'll mark those Exhibit A since you don't have
17     your file here?
18 A   Yes, sir.
19 Q   Okay. And did he ever send you any emails?
20 A   Yes, sir.
21 Q   Okay. Would you agree to mark those -- make copies of
22     those emails and mark -- and -- and give those to the
23     court reporter, I'll mark those as Exhibit B?
24 A   I don't believe I have them anymore.
25

Page 115

1  Q   What happened to them, did you delete them?
2  A   I switched computers.
3  Q   And where's the old computer?
4  A   In the trash.
5  Q   And you didn't migrate your information from one computer
6      to the other?
7  A   Not my emails.
8  Q   Okay. Could have been done though, right?
9  A   I guess so, I'm not much on the computers.
10 Q   Okay. And did you ever email Mr. Herz?
11 A   Yes.
12 Q   And are -- do you still have those?
13 A   No.
14 Q   Okay. Those are gone too?
15 A   Yes.
16 Q   Okay. Did you ever send him any letters?
17 A   Just my initial introduction letter.
18 Q   Okay.
19     MR. KOZIOL: Could you mark that as Exhibit C, are we are
20 to C?
21     MR. HERZ: No, I think we're just up to A which was
22 whatever letter -- you said letters, but whatever letter or
23 letters I sent him was A.
24     MR. KOZIOL: Okay. Letters were A. Oh, and then.....
25

Page 116

1      MR. HERZ: You asked about.....
2      MR. KOZIOL: .....there was -- there was nothing -- no
3  notes and there's -- and there wasn't any emails. So come.....
4  Q   Let's mark that as B then, your -- that solicitation
5      letter, what did you call it?
6  A   Introduction letter.
7  Q   Introduction letter.
8  Q   Okay. All right. The two reports you looked at, are
9      those the only reports you created or were there any --
10     were there earlier versions of your first report?
11 A   I believe those are the only two.
12 Q   Okay. You have no drafts?
13 A   No, sir.
14 Q   You went right to a final.....
15 A   Well.....
16 Q   .....that you shared with Mr. Herz? Did you ever share a
17     draft.....
18 A   No.
19 Q   .....with him?
20 A   No.
21 Q   Okay.
22     MR. KOZIOL: And in 40 seconds it'll be 4:30.....
23     MR. HERZ: Good job.
24     MR. KOZIOL: ..... but I'm done.
25

Page 117

1      MR. HERZ: So am I.
2      REPORTER: This concludes the deposition, the time is
3  4:31. Off record.
4      (Off record)
5          (Deposition Exhibits A and B marked)
6          (END OF PROCEEDINGS)

Computer Matrix, LLC              Phone - 907-243-0668                 jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473            sahile@gci.net

JAMES ELLAR  
Vol 1

4/7/2008

BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

31 (Pages 118 to 119)

Page 118

1          C E R T I F I C A T E
2   UNITED STATES OF AMERICA    )
                                 )ss
3   STATE OF ALASKA             )
4       I, Joseph P. Kolasinski, Notary Public in and for the
5   state of Alaska, residing in Anchorage in said state, do hereby
6   certify that the deponent in the foregoing matter was duly
7   sworn to testify to the truth, and nothing but the truth;
8       That said testimony was taken at the time and place
9   therein stated;
10      That the testimony of said witness was recorded
11  electronically and thereafter transcribed under my direction
12  and reduced to print;
13      That the foregoing is a full, complete, and true record of
14  said testimony.
15      I further certify that I am not a relative, nor employee,
16  nor attorney, nor of counsel of any of the parties to the
17  foregoing matter, nor in any way interested in the outcome of
18  the matter therein named.
19      IN WITNESS WHEREOF I have hereunto set my hand and affixed
20  my seal this 21st day of April 2008.
21
22      _____
        Joseph P. Kolasinski, Notary Public
23      in and for the State of Alaska.
        My Commission Expires: 03/12/2012
24
25

Page 119

1            WITNESS CERTIFICATE
2   RE: BROWN v. PETERSON, et al.,
    CASE NUMBER:  3:05-cv-0002 [TMB]
3   DEPOSITION OF: JAMES L. ELLAR
    DATE TAKEN:   APRIL 7, 2008
4
        I hereby certify that I have read the foregoing deposition
5   and accept it as true and correct, with the following
    exceptions:
6
    Page   Line       Description
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
    If additional paper is needed, please sign and date each sheet.
23
24      _____
            JAMES L. ELLAR        DATE
25

Computer Matrix, LLC                Phone - 907-243-0668          jpk@gci.net  
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473        sahile@gci.net