IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SCOTT BROWN,                        )
                                    )
            Plaintiff,              )
                                    )
v.                                  )
                                    )
FRANK PETERSON, Individually        )
and in His official capacity as     )
a City of Kodiak Police Officer;    )
JEFF HOLDEN, Individually and in    )
His official capacity as a City     )
of Kodiak Police Officer; CITY      )
OF KODIAK; and JOHN AND JANE        )
DOES 1-10.                          )
                                    )
            Defendants.             )
_____)
Case No. 3:05-cv-0002 [TMB]

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF EDWARD O. MOTT

April 8, 2008

APPEARANCES:

    FOR THE PLAINTIFF:          MR. ROBERT M. HERZ
                                Attorney at Law
                                425 G Street, Suite 600
                                Anchorage, AK 99501
                                (907) 277-7171

    FOR THE DEFENDANTS:         MR. FRANK S. KOZIOL, JR.
                                Attorney at Law
                                618 Christensen Drive
                                Anchorage, AK 99501
                                (907) 258-7706

Ex. AT

Page 2

1  TABLE OF CONTENTS
2  Direct Examination by Mr. Koziol           04
3  Cross Examination by Mr. Herz              82
4  Redirect Examination by Mr. Koziol        110
5  EXHIBITS MARKED:
6  A - Prior testimony                       111
7  B - List of documents reviewed            111
8  C - Fee documents                         111
9  D - (None sent)
25           P R O C E E D I N G S

Page 3

1        (Anchorage, Alaska - 4/8/2008)
2        (On record)
3        REPORTER: My name is Joseph Kolasinski, Notary Public in
4  and for the state of Alaska and a court reporter for Computer
5  Matrix Court Reporters, whose business address is 700 West
6  Second Avenue, Anchorage, Alaska. This is the first tape in
7  the videotape video conference of Edward Mott taken pursuant to
8  notice by the defendants. The case is in the United States
9  district court for the district of Alaska, Scott Brown vs.
10 Frank Peterson, et al., case number is 3:05-cv-0002. It is the
11 8th day of April, 2008. The time is 9:03 in Anchorage and
12 10:03 in Redmond, Washington, where Mr. Mott is located.
13       Counsel, if you'll please identify yourself for the
14 record, stating your representation, starting with the
15 plaintiff's attorney.
16       MR. HERZ: Robert Herz. Last name is spelled H-E-R-Z, for
17 the plaintiff, Scott Brown.
18       MR. KOZIOL: Frank Koziol for the defendants.
19       REPORTER: Thank you. Sir, if you'll raise your right
20 hand, I'll swear you in.
21       (Oath administered)
22       MR. MOTT: Yes, sir.
23       REPORTER: Thank you.
24              EDWARD O. MOTT
25 having been first duly sworn under oath, testified as follows

Page 4

1  on:
2              DIRECT EXAMINATION
3        REPORTER: Would you state your full name for the record
4  and spell your last name, please.
5  A   Edward O. Mott, M-O-T-T.
6        REPORTER: And a mailing address, please.
7  A   227 Bellevue Way NE, Suite #49, Bellevue, Washington 98004
8  and Bellevue is spelled B-E-L-L-E-V-U-E.
9        REPORTER: And a daytime phone number or message phone,
10 please.
11 A   (425) 452-9116.
12       REPORTER: Thank you. Counsel, if there are no
13 stipulations, you may begin.
14 BY MR. KOZIOL:
15 Q   Mr. Mott, I understand you've been hired as an expert for
16     the plaintiff in this case.
17 A   I have. Can you hear me okay?
18 Q   I can, just fine.
19 A   Okay. Good.
20 Q   Likewise, you can hear me all right?
21 A   Yeah.
22 Q   Are you generally familiar with the requirements of
23     Federal Rule 26(b)(4) for experts and what experts are
24     required to disclose?
25 A   Yes.

Page 5

1  Q   I didn't see in the disclosures that I got from Mr. Herz
2      that you listed your prior testimony either in depositions
3      or at trial for the last four years. Did you do that in
4      this case for me?
5  A   No, I did not. It was my error if I didn't see that. I
6      have that and I can fax that to you.
7  Q   Okay. That would be great. So maybe you can fax that to
8      the court reporter and if the court reporter can give you
9      the fax number.
10     REPORTER: 907-243-1473.
11     MR. KOZIOL: Okay. And then maybe we can mark that as
12 Exhibit A.
13 Q   Also, Mr. Mott, I believe that rule requires a setting
14     forth a specification of the materials that you reviewed
15     and upon which you rely for your opinions in this case. I
16     know you have a section in your report called
17     documentation review, but it's rather scant in terms of
18     describing what you reviewed. It says you reviewed a
19     Kodiak Police Department incident that occurred on January
20     4, 2003, but I don't really see any further specification
21     of what you reviewed. Am I right in so stating?
22 A   I have a list of 418 documents that I reviewed and some of
23     which are multiple pages in length.
24 Q   Okay. Who created that document?
25 A   I did.

EDWARD MOTT  4/8/2008  BROWN v. PETERSON, et al.,
Vol 1  Case No. 3:05-cv-0002 TMB

3 (Pages 6 to 9)

Page 6

1 A  I did.
2 Q  All right. So that document contained all of the
3    information that you reviewed.
4 A  Yes.
5 Q  Could you also fax that document to our court reporter.
6    MR. KOZIOL: We'll mark that as Exhibit B.
7 A  I will.
8 Q  All right. And then I guess while we're talking about the
9    documents in front of you, did you make any notes of the
10   documents you reviewed as you were reviewing the
11   documents?
12 A  Generally what I do is I go through and I use stick-ons
13   just to highlight, and then when I go back and I create my
14   report I have things that I've highlighted.
15 Q  Okay. So there really aren't any notes other than on the
16   stickums or the stickums don't even have notes, right?
17 A  No, they don't even have notes.
18 Q  Okay. And the report I got from you, I actually don't see
19   a date on it. I'm looking at a document that's seven
20   pages and I don't think it has a date on it, the one I
21   have. Am I right about that?
22 A  That's correct.
23 Q  Okay. Did you create more than one report; that is, did
24   you do any drafts before this one?
25 A  No.

Page 7

1 Q  So the report I have is the only report you've done in the
2    case.
3 A  Yes.
4 Q  Okay. And did you ever receive correspondence from
5    Mr. Herz either by letter and/or email?
6 A  I have some documents that came along with -- I mean like
7    we were discussing earlier. Packages of different
8    documents with Bates numbers on them.
9 Q  Right. But I'm talking about -- let's limit it to
10   letters. Did you get letters accompanying those
11   documents?
12 A  No.
13 Q  Did you have correspondence with Mr. Herz by email?
14 A  No.
15 Q  How were you informed as to what issues to address in the
16   case for purposes of your report?
17 A  He asked me to go through and read the information I had
18   and give my professional opinion on what I had -- what I
19   had read.
20 Q  But was he more specific than that as to what issues you
21   should address?
22 A  Not really.
23 Q  So basically it was left up to you as to what to comment
24   upon and what not to comment upon?
25 A  Yes.

Page 8

1 Q  Did you think it part of your task to comment upon
2    anything that was done properly by the police officers or
3    the dispatcher in this case or did you think it was your
4    job just to comment on what you thought were deficiencies?
5 A  I'm trying to think. What I generally do is I document
6    the things that I think are lacking or deficient in a
7    particular event or incident.
8 Q  So you do not set forth things that were done
9    properly.....
10 A  No.
11 Q  .....in your report. And why is that?
12 A  To tell you the truth, I don't think there was a lot that
13   was done right in this case.
14 Q  So are you saying that there's nothing you could have put
15   in your report that indicated the two police officers
16   involved and the dispatcher did anything right?
17 A  I don't think they did anything right.
18 Q  From looking at your resume, you were a police chief for a
19   brief period of time in your career, am I right, for one
20   year in 1977?
21 A  That's correct.
22 Q  On your resume it says interim chief of police. What does
23   that mean?
24 A  That means I was just temporary and that has got to be the
25   worst job in the whole world.

Page 9

1 Q  And you were interim because they were looking for a
2    permanent police chief and they selected you to fill in?
3 A  That's correct.
4 Q  Did you apply to be police chief?
5 A  Absolutely no.
6 Q  Why didn't you want to be police chief?
7 A  Well, one, I'm an investigator at heart and, two, if the
8    officers want it to be sunny one day and the other half
9    want it to be rainy the other day, you can't make them
10   happy. That's just not my bag.
11 Q  You title yourself on your letterhead as a police
12   practices expert, am I right?
13 A  Correct.
14 Q  So you're basically self-employed at the present time?
15 A  Along with being a retired -- well, I'm retired from
16   Bellevue Police and I also teach at Bellevue Community
17   College and have taught there for 27 years.
18 Q  Okay.
19 A  I just teach one class a quarter and then I do my
20   consulting work.
21 Q  What do you teach at Bellevue?
22 A  The criminal justice program.
23 Q  So how long have you been consulting?
24 A  Since 2003 when I retired.
25 Q  Do you consult in -- so basically then you've been a

Page 10

1  forensic expert from 2003 to the present?
2  A  Correct. I would kind of hesitate a little bit about
3     saying a forensic expert. I'm familiar with certain areas
4     of the forensic world, but not the whole thing.
5  Q  Okay. And all I meant by that term was that you consult
6     in legal cases with a view to testifying as an expert.
7  A  Yes.
8  Q  Does your consulting work encompass anything else other
9     than working on cases wherein you might be named as an
10    expert?
11 A  No.
12 Q  Since you've been consulting, what percentage of your
13    consulting work is in criminal cases versus civil cases?
14 A  Probably more civil than criminal, but I do once in a
15    while run into a criminal case, so let's say 25/75 and the
16    75 would be the civil.
17 Q  Okay.
18 A  And that's just a guess.
19 Q  All right. And in the criminal cases you consult, what is
20    the split between prosecution and defense?
21 A  Always defense.
22 Q  And in civil cases, what is the split between plaintiffs
23    and defendants?
24 A  Always the plaintiff.
25 Q  Why is that?

Page 11

1  A  Because that's the attorneys -- like in this case here,
2     Mr. Herz would hire me to do the reading and do the
3     consulting.
4  Q  Do you do any marketing for plaintiff's attorneys as a
5     police practices expert?
6  A  No.
7  Q  Do you know how Mr. Herz found you in this case and hired
8     you?
9  A  Yes. It was through a mutual friend of ours by the name
10    of Mr. Joe Austin.
11 Q  What is your -- how are you billing Mr. Herz for the work
12    you've done? Is it by hour, is it a flat fee, how do you
13    do that?
14 A  By the hour.
15 Q  Also, as I recall, I think 26(b)(4) requires disclosure of
16    your billing system. Do you have a document that
17    indicates your fees, how you bill?
18 A  Yes.
19 Q  Could you attach -- send that to the court reporter too
20    and we'll mark that Exhibit C.
21 A  Yes.
22 Q  All right. Thank you. What is your hourly rate that
23    you're charging Mr. Herz?
24 A  $125 an hour.
25 Q  How many hours have you expended in this case so far?

Page 12

1  A  The total so far is $5,968.75.
2  Q  What is your fee for doing this deposition?
3  A  $600 minimum and anything over four hours it goes on the
4     hourly rate of 125.
5  Q  So, when you charge $600 minimum for a deposition, you
6     charge $600 whether the deposition takes a half hour or
7     whether it takes four hours, is that right?
8  A  That's correct.
9  Q  Has that fee that you charge, that minimum fee, has that
10    ever been challenged in any court by any attorney?
11 A  No.
12 Q  Are you aware of that type of fee structure for
13    depositions being challenged successfully?
14 A  No, I'm not.
15 Q  Why would you charge $600 minimum for four hours work if
16    the deposition takes, let's say, only an hour? Why would
17    you do that instead of just charge by the hour as you do
18    Mr. Herz?
19 A  Well, there's a lot of preparation to doing a deposition.
20    I have to -- as you see here in front, I've got all my
21    paperwork that I've been sent by Mr. Herz. I have to
22    review my report. There's a lot of preparation.
23 Q  But, Mr. Mott, do you understand that in -- well, at least
24    in the Alaskan jurisdiction, that the arrangement between
25    the attorneys is that they pay for the other side's

Page 13

1     expert's time in deposition only. The understanding is
2     that the opposing counsel does not pay for prep time, does
3     not pay for time spent, let's say, reviewing a deposition
4     before signing it. Do you understand that's the custom
5     and practice in Alaska?
6  A  I'm not aware of very many things about in Alaska.
7  Q  Okay. If we were to exclude -- so, are you telling me
8     that the preparation time that you incurred for being
9     prepared for this deposition, reviewing documents, et
10    cetera, you're not going to bill Mr. Herz for that?
11 A  No.
12 Q  If we were to exclude that preparation time from your bill
13    to me, would $125 per hour be reasonable to pay you for
14    your deposition time today?
15 A  No. The contract says $600 minimum for depositions and
16    there's a clause in it that says if you don't pay, he
17    pays.
18 Q  No, I understand. Here's my question, precise question.
19    If Mr. Herz would agree to pay you your hourly rate for
20    your deposition -- prep time for this deposition, would it
21    be reasonable then for me to pay you $125 per hour for
22    your in deposition time?
23 A  No.
24 Q  Why not? Are you going to lose money on that?
25 A  Well, yeah, that's part of it, but the other thing is I've

Page 14

1   already got it written down in my fee schedule as to a
2   deposition minimum zero to four hours is $600.
3 Q I know you have it written down. I'm not questioning
4   that. I'm trying to suggest to you that it was never my
5   understanding with Mr. Herz that I pay for prep time for
6   an expert. That doesn't occur up here.
7 A And I understand that. You're not being billed for my
8   prep time. All I'm saying is I take that in consideration
9   on my $600.
10 Q That's how you explain your minimum $600 whether I take an
11   hour of your time or four hours of your time, right?
12 A Right.
13 Q So are you saying if you bill your prep time -- I'd like
14   you to answer this. If you bill your prep time to Mr.
15   Herz to this deposition at your regular rate and you bill
16   me $125 for your deposition time, are you going to say
17   you're going to lose money and you're worse off
18   economically than if I pay you $600 for four hours? Is
19   that your testimony?
20 A You're going to pay me $600 and if you don't, then
21   Mr. Herz is going to pick up what you don't pay.
22 Q I understand that. That's not my question.
23 A I think I'm having a difficult time understanding your
24   question.
25 Q Here's my question. Two alternatives. I pay you $600 for

Page 15

1   whatever time it takes up to four hours. Alternative one.
2   Alternative two is I only pay you $125 per hour for your
3   in deposition time today but Mr. Herz pays you $125 for
4   your preparation time. That's alternative two. My
5   question to you is, are you going to be worse off in
6   alternative two as compared to alternative one or is it
7   going to be the same.
8 A Alternative two is not going to be beneficial to me.
9   Alternative one, if I understand right, is the 4600 flat
10   fee.
11 Q So you'll make more money on alternative one.
12 A If I understand your question correctly.
13 Q Okay. In your experience as a police officer, have you
14   ever used OC spray?
15 A I have.
16 Q Are the words interchangeable OC spray and pepper spray?
17 A Yes.
18 Q Then I might use one or both, but they mean the same to
19   you, correct?
20 A Yes.
21 Q You've worked for, am I right, two different police
22   departments in your career?
23 A Correct.
24 Q Issaquah Police Department and Bellevue Police Department.
25 A Correct.

Page 16

1 Q Do each of those organizations have a policy on the use of
2   pepper spray?
3 A They do. I take that back. When I was employed with
4   Issaquah, there was no such thing as OC spray or pepper
5   spray. When I went to Bellevue, the technology picked up
6   and they eventually started using OC spray.
7 Q They meaning Issaquah or Bellevue?
8 A Bellevue. Issaquah also uses it, but I wasn't working for
9   them then.
10 Q Okay. Fair enough. So I take it you're not familiar with
11   the Issaquah policy and procedure manual on the use of OC
12   spray then.
13 A No.
14 Q So the only policy and procedure manual that you're
15   familiar with in terms of your work experience is the
16   Bellevue.
17 A Yes.
18 Q Did it change over the years or has it always been the
19   same, their policy and procedure on the use of pepper
20   spray?
21 A Pretty much stayed the same. And then we went into a new
22   technology of the taser, which pretty much has taken the
23   place of OC and spray.
24 Q When did that change occur?
25 A Around 2000.

Page 17

1 Q Did the taser replace pepper spray or was it just an
2   adjunct to it?
3 A It's an adjunct to it. I mean the guys started carrying
4   the taser versus another thing on your belt. After a
5   while, the belt gets pretty bulky. You start running out
6   of room.
7 Q Okay. So I guess I don't understand. So ultimately did a
8   lot of guys have the choice of not carrying the pepper
9   spray when the taser came in effect?
10 A That's correct.
11 Q But they still could carry it if they want to.
12 A They could.
13 Q Is there a continuum of force that's described in the
14   Bellevue Police Department policy and procedure manual as
15   to the different uses of force and where it falls on the
16   spectrum?
17 A Correct.
18 Q Where does pepper spray fall -- did it fall on the
19   spectrum of use of force at the Bellevue Police
20   Department?
21 A Falls on pretty much the third category. First you have
22   the officer presence, then you have pain compliance and
23   then you have OC spray.
24 Q And then what's after that?
25 A Would be the nightstick and then the deadly force.

Page 18

1  Q  By presence, that also would include verbal commands?
2  A  That's correct.
3  Q  The second level, pain compliance, what does that mean?
4     What type of techniques were permitted to be used in the
5     Bellevue Police Department?
6  A  For arm locks, anything that would -- hair holds.
7     Anything that would fall under the pain compliance rule.
8  Q  Can you think of anything else besides hair holds and arm
9     locks?
10 A  Pressure points. You have arm locks.
11 Q  I guess by calling it pain compliance, I take it the point
12    of this is to actually inflict pain on the suspect in
13    order to obtain cooperation and then once cooperation is
14    obtained, the pain would be reduced or eliminated.
15 A  Exactly.
16 Q  Where would a baton fall in our spectrum?
17 A  That's number four.
18 Q  That's the stick.
19 A  Yes.
20 Q  Do you distinguish between soft hand techniques and hard
21    hand techniques?
22 A  Yes.
23 Q  What's the difference?
24 A  Soft hand would be more of a pain compliance operation and
25    hard hand would be hitting somebody in the face, hitting

Page 19

1     someone with a nightstick.
2  Q  So would soft hands be another way of describing a level
3     two pain compliance?
4  A  Correct.
5  Q  Hard hands, that would be another way of describing level
6     four?
7  A  Correct. I'm sorry, I think I said level four was the use
8     of deadly force. Actually it's level five.
9  Q  No, actually I think you said deadly force after the
10    stick.
11 A  Okay.
12 Q  You said presence, pain compliance, OC spray, the stick or
13    now we can call it hard hands and then deadly force.
14 A  Correct.
15 Q  Were you trained that an officer had to use each level of
16    force before moving to the next or are they permitted to
17    jump depending on circumstances?
18 A  You can jump depending on the circumstances.
19 Q  Okay. Did you review the use of force policy and
20    procedure manual for the City of Kodiak?
21 A  I did.
22 Q  Is it the same as the use of force spectrum you just
23    described for me for the Bellevue Police Department?
24 A  Basically the same.
25 Q  So you have no criticism of the use of force policy and

Page 20

1     procedure manual that the City of Kodiak is using.
2  A  No.
3  Q  And is this a pretty standard spectrum of force for police
4     departments?
5  A  Yes. Very standard.
6  Q  Have you ever testified as an expert before, giving an
7     expert opinion, since you've been a consultant on whether
8     or not the use of pepper spray was proper?
9  A  Yes.
10 Q  How many times?
11 A  Maybe five.
12 Q  How many of those in the last four years? I guess almost
13    all of them, huh?
14 A  Right.
15 Q  Okay. Can you name those cases?
16 A  Not off the top of my head, no.
17 Q  If you have your list in front of you that you're going to
18    send the court reporter, would you be able to name them at
19    that point?
20 A  Yes.
21 Q  Would you agree to circle the five cases wherein you gave
22    opinions on the use of force pepper spray?
23 A  Yes.
24 Q  Did you write reports in all five of those cases?
25 A  Yes.

Page 21

1  Q  Are you willing to make copies of those five reports and
2     have them attached as the next exhibit?
3  A  I don't have them anymore.
4  Q  What happened to them?
5  A  Once I testify, they go in the shredder.
6  Q  The paper goes in the shredder, right?
7  A  Right.
8  Q  Are they still in your computer?
9  A  No.
10 Q  What happened to them on your computer?
11 A  I get rid of them.
12 Q  How do you get rid of them on your computer?
13 A  I delete them.
14 Q  Aren't they still in the hard drive?
15 A  I don't know. I've just recently wound up in a virus
16    where I had to have a guy from Microsoft come over. I
17    guess what he did is he cleaned my whole system up and I
18    had to start all over again. So I would assume the hard
19    drive is clean.
20 Q  Can you check?
21 A  Yeah.
22 Q  And if you have any of those reports, will you make them
23    available to me?
24 A  I will.
25 Q  If you can find any of those reports, I'd like to have you

Page 22

1  send them to the court reporter and we'll mark those as
2  Exhibit D. As a consultant, Mr. Mott, did you ever render
3  an opinion that the use of pepper spray was reasonable?
4  A  No.
5  Q  So, may I conclude from that answer that each and every
6     time that a plaintiff's attorney hired you to render an
7     opinion as to whether the use of pepper spray was
8     excessive or not, you always concluded it was excessive,
9     right?
10 A  Yes.
11 Q  What does the Bellevue Police Department manual say about
12    when pepper spray may be used, under what circumstances?
13 A  When someone is being attacked, resisting arrest,
14    resisting a lawful arrest or they are in the midst of
15    harming others, whether it's another officer or another
16    citizen.
17 Q  Can pepper spray be used if the individual has a weapon in
18    their hands, something that might be used to hurt the
19    officer?
20 A  That -- now that we're in the new technology, I think the
21    taser would be more apt to be used then. It all depends
22    on what kind of a weapon they have.
23 Q  Let's assume the officer doesn't have a taser.
24 A  Okay. So what kind of a weapon are we talking?
25 Q  Any object that could inflict serious bodily harm on the

Page 23

1  officer.
2  A  I would say no.
3  Q  That would be an inappropriate use of pepper spray?
4  A  Yes. Grievous bodily harm.
5  Q  I'm sorry?
6  A  Did you say you grievous bodily harm?
7  Q  Yes. No, I said serious bodily harm. I mean to say
8     serious bodily harm.
9  A  Right. Same thing.
10 Q  Okay. So tell me -- I take it some weapons that a person
11    might have in their hands would then justify the use of
12    pepper spray but not all weapons that could cause serious
13    bodily harm.
14 A  If it's a weapon, like there's a 21-foot rule on knives.
15    You can shoot someone that's standing with a knife at 21
16    feet away from you and be justified in using deadly force.
17 Q  Okay. I'm not talking about shooting somebody, I'm
18    talking about using pepper spray.
19 A  I know, but I just.....
20 Q  I take it if somebody had a knife, then you would approve
21    the use of pepper spray because you would approve shooting
22    him.
23 A  No, I would not approve using pepper spray on a knife.
24    Not at all.
25 Q  They should go right to shooting him?

Page 24

1  A  If that's what it needs to be.
2  Q  But if they used pepper spray instead, you wouldn't call
3     that excessive force if you're saying that shooting them
4     would be appropriate, right?
5  A  I don't think you can -- resisting arrest, doing harm to
6     another officer, to another citizen, that would be
7     appropriate use of the pepper spray, but with any kind of
8     a weapon at all, you're going to have to go another level.
9  Q  But in the hypothetical of somebody having a knife and was
10    threatening the officer, I take it you wouldn't say as an
11    expert, if the officer decided to use pepper spray, you
12    wouldn't say that was excessive force. Am I right?
13 A  I would say that would be stupid.
14 Q  I understand that, but that's not my question. My
15    question is you would not say it's excessive force since
16    you would say the officer even had the right to shoot him.
17 A  I don't like that question.
18 Q  Is there something you don't understand about that
19    question? Not liking it I don't think is grounds for not
20    answering it.
21 A  I understand that, but I'm saying I would not say that
22    that was excessive use of force.
23 Q  Okay. That seems logical to me. Now if the person had a
24    rock in their hands and was a threat to the officer, would
25    the officer be justified in using pepper spray?

Page 25

1  A  It all depends on how he's going to launch that rock. If
2     he's going to throw it or if he's going to hit -- use it
3     as an instrument to hit. I'd say, again, OC spray would
4     be out of the question.
5  Q  Does it matter whether he's going to hit the officer or
6     throw it in terms of OC spray?
7  A  Yes.
8  Q  Okay. Go ahead.
9  A  One, you're going to have to be a lot closer to administer
10    the OC spray. Thereby, if you allow it to get that close,
11    you're allowing the person that's holding this rock that
12    much closer to you.
13 Q  I'm not talking about you critiquing the officer as to
14    whether it's safe or unsafe. My questions have to do with
15    excessive force and your opinions as to whether it would
16    be excessive force, okay. So I don't want to mix the two,
17    all right? So, are you saying that it would be excessive
18    force for an officer to use pepper spray on an individual
19    who was a threat to the officer who had a rock in his
20    hand?
21 A  And you're saying would I say OC spray would be excessive?
22 Q  And under those circumstances would you say it would be
23    not excessive.
24 A  I would say -- I'd have to say that that individual is
25    going to have to have some -- oh, your screen just went

Page 26

1  blank. Okay, there you are. I'm going to say -- well,
2  what's he under arrest for?
3  Q  You need to know the answer to that -- you need to know
4     that fact before you give me an opinion?
5  A  That would help.
6  Q  DUI.
7  A  And he has a rock in his hand?
8  Q  Yes.
9  A  I know where you're going with this. It's that can of
10    beer.
11 Q  Go ahead.
12 A  It's that can of beer. And I'd say if it was a can of
13    beer and it's not a lawful arrest -- if it isn't a lawful
14    arrest.....
15 Q  Mr. Mott, I just want you to answer my question. You may
16    know 50 questions down the line here what I might ask you,
17    but I just want this question answered and whether we get
18    to that 50th question or not, we'll see. Just answer this
19    question.
20 A  Then I'd say use of OC spray would be out of the question.
21 Q  If the individual had a rock in his hand and was
22    threatening the officer.
23 A  Correct.
24 Q  An observer of this deposition would look at it and say
25    you really struggled with answering that question given

Page 27

1   the amount of time it took. Perhaps someone would say
2   that. Would you agree with me that reasonable police
3   officers could differ on the answer you just gave me?
4  A  A well trained officer wouldn't have a problem answering
5     that question.
6  Q  Then answer the same way as you.
7  A  I would hope so.
8  Q  All right. What about if the individual had a hammer in
9     their hands threatening the officer. Would your answer be
10    the same, that it would be excessive force to use pepper
11    spray?
12 A  It would be inappropriate to use pepper spray if he had a
13    hammer in his hand.....
14 Q  I'm not asking you.....
15 A  .....(indiscernible) next level.
16 Q  I'm not asking you the word inappropriate. Did you
17    understand my question? I said excessive force. That's
18    what I'm asking you. Because you need to answer my
19    questions because I don't know what you mean by
20    inappropriate. You could be talking about inappropriate
21    because it's involves -- it's a bad decision regarding
22    safety to the officer. I'm only asking you about
23    excessive force, okay? That's all.
24 A  Okay.
25 Q  Is it excessive force if the officer uses pepper spray if

Page 28

1   the individual has a hammer in their hands?
2  A  And I'd say a well-trained officer would use a different
3     method of disarming that individual with a hammer.
4  Q  That's not my question.
5  A  That's the answer you're going to get.
6  Q  Is it excessive force or not? Will you answer that
7     question? If the officer uses OC spray. Will you answer
8     the question or will you not?
9  A  I will answer it by saying he's going to have to go to
10    another level with the hammer used against him.
11 Q  What -- I guess I could ask you 20 more questions to try
12    to get an answer to that question, so let's do it. What
13    level can he go to?
14 A  He can go to a heavy hand, hard hand, or he could use
15    deadly force.
16 Q  And I take it since hard hand and deadly force is higher
17    on the spectrum than pepper spray, I take it from that you
18    would not say if the officer used pepper spray it would be
19    excessive force on a fellow who was threatening them with
20    a hammer. Do you agree?
21 A  Yes.
22 Q  If the individual had a can of beer that he was
23    threatening the officer with and the officer used pepper
24    spray, in your opinion, would that constitute excessive
25    force?

Page 29

1  A  Yes.
2  Q  If the individual had a bottle of beer in his hands and
3     was a threat to the officer with that bottle of beer and
4     the officer used pepper spray, would that constitute
5     excessive force?
6  A  Yes.
7  Q  Have you ever been hit with a bottle of beer on your head?
8  A  No, I have not.
9  Q  Have you ever seen anyone hit with a bottle of beer on
10    their head?
11 A  Oh, yes.
12 Q  How many times?
13 A  Probably 10.
14 Q  Any of them police officers?
15 A  No.
16 Q  These were all -- okay. Did you see the aftermath of
17    somebody getting hit on the head with a bottle of beer
18    those 10 times or did you actually see it happening?
19 A  I saw it both.
20 Q  How many times did you see it actually happening?
21 A  Probably 50/50.
22 Q  Okay. Can you describe each of those 10 times what
23    happened.
24 A  A lot of blood. A lot of blood. If you get hit in the
25    head, you bleed a lot more than you actually -- your body

### Page 30

1  throws out a lot of blood when you have impact with an
2  object to your head, more so than you would on an arm.
3  Q  Did any of those individuals have concussions?
4  A  Some did.
5  Q  And were they give a Glasgow coma rating for the
6     concussions? Are you familiar with Glasgow coma ratings?
7  A  No, I'm not.
8  Q  Are you familiar with any ratings that EMT or emergency
9     room physicians will use to evaluate the severity of
10    concussions?
11 A  No.
12 Q  Is there any way for you to tell me from your own point of
13    view how serious the concussions were that you observed?
14 A  Some of them were life-threatening and others were simply
15    a gash in the forehead or on the back of the head. All of
16    them required to go to the hospital to get stitches.
17 Q  All right. So at the one end of the spectrum in terms of
18    injuries, the lowest end of the spectrum would be a gash,
19    is that right?
20 A  Yes.
21 Q  Do you know how big a gash it was when they had gashes?
22 A  Sometimes it was only like -- it would take two or three
23    stitches, so maybe two or three inches.
24 Q  And then sometimes it would be longer than that?
25 A  Oh, yeah.

### Page 31

1  Q  What was the longest one you observed?
2  A  The longest gash?
3  Q  Yes.
4  A  Oh, God. Probably six inches long.
5  Q  And then you indicated that some of these incidents were
6     life-threatening to the individual that got hit with the
7     bottle?
8  A  Yes.
9  Q  Was that due to the concussion?
10 A  I would assume that would have been the prognosis.
11 Q  Right. Were any of those individuals knocked unconscious?
12 A  Yes.
13 Q  How many of the 10?
14 A  Probably three.
15 Q  Did you ever follow up on those cases to determine whether
16    there was any hemorrhaging of the brain?
17 A  I was on patrol then, so I probably didn't do any follow
18    up on those. I'd have to say probably no.
19 Q  Okay. So the reason why you concluded that some of them
20    were life-threatening was that because of the unconscious
21    state that the individual was rendered?
22 A  Yes. And they were out sometimes for a couple days.
23 Q  In a coma for a couple days.
24 A  Yeah.
25 Q  Do you know what permanent disability they had, if any,

### Page 32

1     when they woke up from the coma?
2  A  I don't think they had any disability other than a real
3     headache.
4  Q  But do you know, for example, whether they were tested and
5     examined by a neurologist or a neuropsychologist to
6     determine whether there was any impairment physically or
7     cognitively?
8  A  No.
9  Q  On these 10 occasions, was the individual -- well, five of
10    them you actually saw, right?
11 A  Right.
12 Q  How was the head hit? Was the bottle thrown or was it
13    kept in the hand and then moved forward into the head,
14    smashed into the head?
15 A  As I remember, most of them they would take it by the --
16    take the bottle by the neck and just crash it over the
17    person's head.
18 Q  Okay. And that's what your recollection is for the five
19    that you observed.
20 A  Yeah. Yes.
21 Q  And based on your investigation of the other five, is that
22    also what you concluded, that the bottle wasn't hurled at
23    the other person's head, it was smashed into the head.....
24 A  Right.
25 Q  .....by the hand? So would you agree with me, given what

### Page 33

1     you've observed and then I guess investigated on the other
2     five, that a bottle could be a dangerous weapon?
3  A  Oh, yes.
4  Q  The bottles involved in these 10 cases, were they beer
5     bottles, any of them?
6  A  A couple of fifths, I remember that, but most of them were
7     beer.
8  Q  Twelve or 16-ounce beer bottles?
9  A  I don't remember.
10 Q  Do you consider a can of beer a dangerous weapon as a
11    bottle of beer is, as you've just testified?
12 A  You know, I don't know because I've never had a bottle of
13    beer or a can of beer smashed over my head.
14 Q  Well, you do know about the bottle of beer because you've
15    seen it five times.....
16 A  Right.
17 Q  .....and you've concluded that's a dangerous weapon,
18    right?
19 A  Yes, but I'm saying about a can of beer. I think they
20    would probably be about the same.
21 Q  The same effect on the person's head?
22 A  Right. Yeah.
23 Q  Why would you say that, Mr. Mott? Wouldn't a bottle of
24    beer, given that it's glass, likely slice the head open as
25    opposed to -- more easily than a can of beer would?

Page 34

1  A  A can of beer can be just as cutting.
2  Q  How do you know that? Have you ever seen anybody cut by a
3     can of beer that's been smashed into them?
4  A  I have not observed it, but I have seen the end result of
5     it.
6  Q  Okay. How many times?
7  A  Only a couple.
8  Q  Where was the can of beer smashed into the other person?
9  A  In their head.
10 Q  What type of injuries did you observe then from that?
11 A  Small cuts.
12 Q  How small?
13 A  Inch, maybe an inch and a half.
14 Q  So you've never seen -- they weren't as serious as the
15    gashes that occurred through the use of a bottle?
16 A  Correct.
17 Q  Would you infer from that that a beer can is a less
18    dangerous weapon than a bottle?
19 A  I wouldn't want either one of them cracked on my head, so
20    I would have to say no.
21 Q  All right. From your review of all these materials, am I
22    correct, you concluded that Mr. Brown had a can of beer in
23    his hands at the time pepper spray was used by Officer
24    Peterson?
25 A  That's correct.

Page 35

1  Q  Where did you read that it was a can of beer, do you
2     remember?
3  A  I think he said a can of beer.
4  Q  Who? Who is he?
5  A  Peterson. I think Peterson wrote in there that he had
6     picked up a can of beer and said he can have -- he can
7     drink a beer in his own house.
8  Q  Okay. Am I right that -- strike that. Can you tell me,
9     just describe for me what you believe was -- take me
10    through the facts up to the point that the pepper spray
11    was used. Just describe for me the relevant facts upon
12    which you base your opinion regarding the use of force as
13    to the pepper spray.
14 A  Well, first of all, do you want me to go back to where
15    Peterson -- Officer Peterson entered the house?
16 Q  Let me be real precise with my question. There are facts
17    upon which you rely, are there not, for giving an opinion
18    as to whether the use of the pepper spray was excessive or
19    not, right?
20 A  Correct.
21 Q  And that's my inquiry, excessive force or not. We'll
22    leave for other questioning whether you think any use of
23    force was lawful, all right? I don't want to mix those
24    questions up.
25 A  Okay.

Page 36

1  Q  So, for purposes of my question in terms of your reciting
2     facts, I'd like you to recite the facts upon which you
3     relied to give an opinion as to whether or not the use of
4     pepper spray was excessive. So I'd like you to start
5     wherever you think it's relevant to start.
6  A  I think I understand. I'm sure you'll butt in if I'm
7     wrong. So I'm saying that when Brown went into the
8     refrigerator and got himself a beer, he said I can drink
9     this beer if I want it, and Peterson says, no, you can't,
10    you're under arrest. At that point, that is not a legal
11    arrest on Peterson's part to Brown. He had no
12    jurisdiction to administer the pepper spray.
13 Q  Because he was unlawful in the house -- unlawfully in the
14    house?
15 A  Yes.
16 Q  Again, we're going to deal with that, your opinion on that
17    a little later. I understand. Your opinion is if he's
18    unlawful in the house, he shouldn't use any force, right?
19 A  Correct.
20 Q  Shouldn't even be there, right?
21 A  Correct.
22 Q  I understand that. But, again, my question wasn't that.
23    I thought you understood my question. Do you want me to
24    repeat the question?
25 A  Yeah, do it again.

Page 37

1  Q  Let's assume, I guess hypothetically, from your point of
2     view, that Officer Peterson was lawfully in the house and
3     he.....
4  A  You keep saying he was lawfully in the house.
5  Q  I'd like you to assume that for the purpose of this
6     question.
7  A  Okay.
8  Q  And that he could lawfully use reasonable force to make an
9     arrest, okay, and he had probable cause to make an arrest.
10 A  Okay.
11 Q  I think -- I want to know what facts are relevant to you
12    under that hypothetical for giving an opinion as to
13    whether or not the use of pepper spray was excessive or
14    not. That is excessive beyond reasonable force.
15 A  Okay. Understand.
16 Q  What facts are relevant?
17 A  Peterson failed to protect himself and the wife in there
18    and I think his brother also was in there by going right
19    into the house without waiting for backup. Waiting for
20    backup and having backup arrive, and I forget the
21    officer's name. Hogan?
22 Q  Holden.
23 A  Holden. Okay. If he'd have waited for that officer to
24    arrive, all of this would not have happened because cops
25    have a weird thing going. There's no such thing as a fair

## Page 38

1. fight. You always want to have two of you, two cops,
2. against one suspect. That's a fair fight. The reason you
3. do that is you minimize the amount of force that you have
4. to use and you can also utilize the use of force that
5. needs to be used on the individual that may resist this
6. arrest. So doing so, he was out of line by just charging
7. in there. He put himself, the brother, the wife and also
8. the other officer because the other officer had to come in
9. -- in fact, I think Brown -- no, Peterson called for
10. backup twice and, thereby, maybe even more dangerous.
11. Q Are you done with the answer?
12. A Yeah.
13. Q So, is that the only facts you rely upon to give an
14. opinion as to whether the use of pepper spray was
15. excessive or not, the fact that Peterson didn't go in with
16. another officer? That's it? That's the only fact you're
17. relying on?
18. A No, no, no. No. Because I'm saying also that it was an
19. unlawful arrest. So, therefore, no use of force should
20. have been used at all.
21. Q Okay. Let's try it this way. At the moment of time that
22. -- describe for me what happened in the sequence of events
23. from the time the officer entered the house, Officer
24. Peterson entered the house, to when the pepper spray was
25. used. Tell me what happened as far as you know.

## Page 39

1. A Well, it sounds like he's standing outside the bathroom
2. door and Brown is inside the bathroom doing his business
3. and also drinking a better part of a fifth of Jack
4. Daniels, I think it was, and he was in there for a good
5. seven minutes, and then he decides to come out and Brown,
6. at that point -- yeah, Brown, at that point, says I can
7. drink a beer if I want. It's my house. He says, oh, no,
8. you -- and Peterson says, oh, no, you can't. You're under
9. arrest for drunk driving or DUI. That's when he pulls out
10. the can of mace and as he takes a drink, he sprays him.
11. There was no act of any kind of assault or anything on
12. Brown's part. He was just merely drinking a beer.
13. Peterson used that pepper spray to stop him from drinking
14. that beer.
15. Q Is it your understanding of the facts that Peterson (sic)
16. appeared to be intoxicated when he left the bathroom but
17. before he started drinking the beer?
18. A You mean Brown.
19. Q I'm sorry, yeah. Let me ask it again.
20. A Let's get this right.
21. Q Yeah, it's rather important. Was it your understanding of
22. the facts that Mr. Brown was intoxicated when he came out
23. of the bathroom but before he took the sip of the beer?
24. A You have to remember I'm not much of a drinker, but if I
25. was to drink the better half of a fifth of Jack Daniels,

## Page 40

1. I'd say I would be starting to get impaired somewhat.
2. Q I'm asking based on the facts that you read, any tapes
3. that you listened to. Did you conclude that Brown was
4. intoxicated when he left the bathroom but before he drank
5. the beer?
6. A He was on his way.
7. Q Okay. What factual support is there for that conclusion?
8. What I mean by that is what did Officer Peterson see to
9. lead to the conclusion that you just said that he was on
10. his way to being intoxicated? What facts are there
11. supporting that?
12. A I think without looking at my notes or my report, he
13. indicated that his eyes were watery, he smelled, he had a
14. strong odor of alcohol about his breath and person.
15. Q Was he staggering?
16. A That could have been there too.
17. Q Okay. Now, could the officer have reasonably believed
18. before Peterson (sic) comes out of the bathroom that
19. Peterson (sic) was not being cooperative, he was not
20. following the officer's direction?
21. A I don't mean to be personal, but I can kind of identify
22. with Mr. Brown because when I've got to make a head call,
23. I've got to go now. When he pulled up to his house, he
24. knew what he had to do. He had to go to the bathroom like
25. right now. So he's going in there and he shut the door.

## Page 41

1. Now, obviously, if you had to go to the bathroom, you have
2. to say give me some time here, you know. I'm going to the
3. bathroom. Why he's drinking the fifth of Jack Daniels, I
4. have no idea, okay.
5. Q Mr. -- I'm sorry. Go ahead.
6. A But he's got to do his business in there and I mean it's
7. like I don't think he wanted to poop his pants. So the
8. thing is, seven minutes is not that long of a time.
9. Q So you concluded that before he exits the bathroom it
10. would have been unreasonable for the police officer to
11. have believed that Mr. Brown was being uncooperative and
12. not following his orders, is that right?
13. A Yeah, because if you've got to go to the bathroom, you've
14. got to go to the bathroom and you just can't stop in mid
15. stream or whatever and so, okay, I'm going to come out.
16. Q Mr. Mott, I want to follow up that answer.
17. A Okay.
18. Q Aren't there two versions of whether or not Mr. Brown was
19. being cooperative? I'll recite the first version and the
20. second version. Of course, this is based upon what I
21. think the facts are, but you can say, oh, no, those aren't
22. the facts and tell me I'm wrong, that it's not in the
23. record. Otherwise, I'm going to ask you whether there
24. aren't two versions. Version one, Mr. Brown's version,
25. that he saw the police vehicle when he's coming down

Page 42

1  Pillar Mountain and the police vehicle is going up Pillar
2  Mountain, but didn't think the police officer was
3  interested in him and drove to his house, didn't know the
4  police officer was behind him or had lights flashing, had
5  to go to the bathroom immediately and got out of his
6  truck, still didn't know the police officer was there and
7  ran into the house to get to the bathroom because he had
8  to take a dump. Then lo and behold he hears the police
9  officer knocking on his bathroom door. That's version --
10 that's Brown's version. Do you agree that's his version?
11 A  Correct.
12 Q  I take it you've accepted that version as true for
13 purposes of your opinions.
14 A  Well, I want to hear version two.
15 Q  A wise man always listens -- waits for a version two.
16 Version two is.....
17 A  You've got to come back over here. There you go.
18 Q  All right. Version two is that the videocam shows police
19 lights on, at least on Purtov Street, the street that
20 Mr. Brown pulled into the driveway on, and that it shows
21 the gold flatbed truck actually pulling into the driveway
22 and it shows a door being opened, the driver's door being
23 opened, and from there Officer Peterson has testified that
24 he got out and is chasing Mr. Brown and Mr. Brown is
25 within his sights, still outside the front door, and he's

Page 43

1  yelling stop, stop, but Mr. Brown ignores him and goes in
2  the house and Officer Peterson follows him to the
3  bathroom. Now, under version two -- all right, that's
4  version two. Have you read a factual basis for version
5  two, read or viewed the video to support version two?
6  A  Yes, I did.
7  Q  Now, under version two, we may conclude, may we not, that
8  Mr. Brown knew before he entered that house that the
9  police officer wanted him to stop but he ignored the
10 police officer's order? Okay?
11 A  Because he had to go to the bathroom. I mean you're a man
12 just like me and when you've got to go, you've got to go.
13 I mean there's no -- get out of the way.
14 Q  So you think even on version two you would say it has to
15 be true that Mr. Brown had to go to the bathroom and take
16 a dump.
17 A  Yeah.
18 Q  Have you ever considered the possibility, Mr. Mott, that
19 Mr. Brown didn't have to go to the bathroom to do his
20 business, that what he wanted to do is go into the
21 bathroom and contaminate any evidence of drinking while
22 driving by drinking in the bathroom? Have you ever
23 considered that?
24 A  I did.
25 Q  And you rejected it over the view that Mr. Brown was

Page 44

1  telling the truth about not having known the police
2  officer was there?
3  A  You've got to back up a bit here because Peterson was only
4  told that Brown was operating a motor vehicle on a public
5  highway or whatever else in a reckless manner, but he was
6  only told that but had no first time -- first-hand
7  experience of visualizing that. That's what he was told
8  was going on. I have a question for you.
9  Q  What does that have to do with what we're talking about,
10 which version you accept, one or two?
11 A  Well, one because version two you're going on the premise
12 that Peterson already suspected him of being a drunk
13 driver.
14 Q  No, that wasn't in my version two. I didn't say that.
15 A  But that's where you were going.
16 Q  What question are you answering now or are you done
17 answering my question and I'll ask you a new question?
18 A  Ask me a new one.
19 Q  Okay. If under version two -- did we conclude version two
20 is correct hypothetically?
21 A  Parts of it could be.
22 Q  Okay. Let's assume for purposes of this hypothetical
23 question version two is correct, that the officer got the
24 facts right, then we can conclude, can we not, Mr. Brown
25 is lying when he says I didn't know the police officer was

Page 45

1  behind me, I just needed to go to the bathroom to do my
2  business, right? That's part of version two, Mr. Brown is
3  lying about it.
4  MR. HERZ: I'm going to object. Form of the question and
5  particularly got the facts right because it's not clear what
6  the facts are that underlie version two anymore.
7  A  And I would say it's a little of both. It's yes and no.
8  Q  No, no, no. I asked you a very precise question. If you
9  accept version two and you said there's a factual basis
10 for version two, that means Mr. Brown is lying about not
11 knowing the police are behind him chasing him, right?
12 MR. HERZ: Same objection.
13 A  I'm saying -- you're going to have to break that down.
14 Both parties I think are telling the truth at that point.
15 Q  Okay.
16 A  Brown feels I've just got to get to the -- I've got to go
17 to the toilet. Peterson goes, no, he heard me and he's
18 going in the house.
19 Q  So, did you conclude, Mr. Mott, that before Brown entered
20 the house he knew the officer wanted him to stop and he
21 just ignored the officer, am I right?
22 A  No, I don't think he did. No, I don't think so.
23 Q  I thought you just said both people are telling the truth.
24 A  Well, they are because Brown, he's got to take a shit like
25 nobody's business and Peterson is saying, hey, stop. So

Page 46

1   they both could be right.
2 Q But Peterson says Brown had to have heard me, had to have
3   seen my lights, he knew I wanted him to stop. Brown says
4   I didn't know he was trying to stop me. Right? We have a
5   conflict in the testimony, don't we?
6 A Right. Yes.
7 Q In hypothetical number two, the logical conclusion is, if
8   we accept what the officer said that's how it went down,
9   Brown is lying about that point. He actually knew that
10  the officer wanted him to stop, but you're saying he still
11  needed to go to the bathroom, right?
12 A Correct.
13 Q But if Brown is lying about not knowing that the police
14  officer wanted him to stop, that is he actually knew, then
15  haven't you considered the possibility that he's lying
16  about why he wanted to go in the bathroom?
17 A I don't see anywhere -- I'm not being funny about this,
18  but I'm not -- I don't see anywhere where it described
19  Brown as having eyes behind his head. He's leaving the
20  truck and he's going right to the house. He doesn't have
21  any eyeballs in the back of his head because he's not
22  turning around and looking.
23 Q Okay. Well, let's go on with the inquiry about the use of
24  pepper spray. So you're saying that up to the point that
25  Mr. Brown leaves the bathroom it would have been

Page 47

1   unreasonable for Officer Peterson to have believed
2   Mr. Brown was being uncooperative and not following his
3   directions and orders. Is that your testimony?
4 A Say that all over again.
5 Q Is it your testimony that when Brown leaves the bathroom,
6   Officer Peterson could not have reasonably believed Brown
7   was being uncooperative and not following his orders?
8 A Yeah, he wasn't doing what he was told.
9 Q Oh, he was being uncooperative, Brown was, before he came
10  out of the bathroom, is that right?
11 A Before he came out of the bathroom?
12 Q Yes.
13 A Or as he came out of the bathroom?
14 Q No, I used the word before he came out of the bathroom.
15 A No -- he had every right to be in that bathroom doing his
16  business.
17 Q That wasn't my question. Stay with my question or we'll
18  go a lot longer. I'm going to use your four hours, I
19  think. Was Officer Peterson reasonable or unreasonable in
20  concluding that Brown was uncooperative and didn't follow
21  his instructions before Brown left the bathroom?
22 A He was being unreasonable.
23 Q He should have perceived that Brown was being cooperative
24  up to the point where Brown left the bathroom, right?
25 A Correct.

Page 48

1 Q So, in your view, we have a cooperative but on the way to
2   being intoxicated Brown coming out of the bathroom, right?
3 A Correct.
4 Q And then Officer Peterson tells Brown to -- do you
5   remember him saying don't pick up that beer or something
6   along those lines?
7 A Yes, words to that effect.
8 Q And then he says don't drink the beer, right?
9 A Correct.
10 Q And then he warns him, if you drink the beer, I'm going to
11  pepper spray you, right?
12 A I don't remember him saying that, but he could have. I'll
13  go on with it.
14 Q Okay. And he tells him he's under arrest, right?
15 A Yes.
16 Q Do you remember Brown saying, after Peterson warns him I'm
17  going to pepper spray you if you drink that, Brown saying
18  go ahead and do it? Something to that effect.
19 A I don't know if he said.....
20 Q Sorry?
21 A He could have -- he could have said words to that effect,
22  but not go ahead.
23 Q Would you agree with me that at the point Officer Peterson
24  used the pepper spray we have an on the way to being drunk
25  Mr. Brown not being cooperative, not following the

Page 49

1   officer's directions?
2 A Yes.
3 Q And we have Mr. Brown having in his hands what you've
4   earlier described as a dangerous weapon, a bottle of beer.
5   I'm sorry, you said it was a can of beer.
6 A Can of beer.
7 Q I'd like you to assume it was a bottle of beer, it wasn't
8   a can.
9 A Okay.
10 Q I'd suggest to you there's testimony on record that says
11  it was a bottle of beer, okay?
12 A Okay.
13 Q It's your opinion that Officer Peterson used excessive
14  force under those circumstances by using pepper spray?
15 A Yes.
16 Q Could Officer Peterson have reasonably used the baton
17  instead of OC spray under those circumstances?
18 A No. He can't use any kind of force at all when the arrest
19  in itself was unlawful.
20 Q Mr. Mott, for purposes of these questions I want you to
21  assume the arrest was lawful.
22 A But I can't.
23 Q You don't understand hypothetical questions?
24 A I understand hypothetical questions, but hypothetical
25  questions can soon turn into now you've agreed and I'm not

Page 50

1    going to agree to that.
2  Q  Now are you refusing as an expert to answer hypothetical
3    questions?
4  A  No.
5  Q  Okay.
6  A  Not at all.
7  Q  All right. Because I will get a court order to make you
8    answer those questions if you refuse.
9  A  No, no, no. Go ahead.
10 Q  Okay. So if you don't understand my questions when I give
11   you a hypothetical, you tell me, but if I give you an
12   understandable hypothetical, I really would like you to
13   answer them, okay.
14 A  Okay.
15 Q  So you understand -- you understand when you give an
16   opinion about excessive force, it implies that reasonable
17   force can be used. Do you understand that?
18 A  Yes.
19 Q  I'm asking you to assume he was lawfully in the house and
20   he could use reasonable force, all right? I know your
21   opinions are different on the premise. I know that. The
22   record is clear. We've got it in your report. I know
23   that. you don't need to keep saying it. For purposes of
24   these next questions I want you to assume he was entitled
25   to use lawful force. The question is whether he used

Page 51

1    excessive force, okay?
2  A  Okay.
3  Q  All right. So, given that premise, is it your opinion,
4    given all those facts, that we have an uncooperative
5    Mr. Brown, we have him on the way to being drunk, we have
6    him being under arrest with the officer telling him not to
7    drink the beer and he's holding a dangerous weapon in his
8    hand, as you've defined it, as a bottle of beer, is it
9    your opinion that Officer Peterson used excessive force
10   when he pepper sprayed him at that moment?
11 A  And the answer would be hypothetically no.
12 Q  He did not use excessive force.
13 A  Correct.
14 Q  All right. Now, let's talk about your opinions regarding
15   the unlawfulness of any force being used by Officer
16   Peterson and that's based, Mr. Mott, as I understand it,
17   on your view that Officer Peterson did not lawfully enter
18   the house. Do I have that right?
19 A  Correct.
20    MR. HERZ: Since we're moving to another topic area, I'm
21 wondering if since it's been an hour and a half if we can take
22 a break.
23    MR. KOZIOL: Okay. Sure.
24
25 A  I could use that.

Page 52

1    (Off record)
2    (On record)
3  Q  Mr. Mott, I'd like to change the topic to whether or not
4    the officer entered the Brown household lawfully or not.
5    I believe in your report you describe Officer Peterson as
6    not credible, is that right?
7  A  Could have been.
8  Q  Well, I'm referring to page 6, last paragraph, first
9    sentence. Tell me when you're there. I'll read it.
10 A  Page 6.
11 Q  Last paragraph, first sentence.
12 A  I do not find Officer Peterson credible.
13 Q  When he claims that he was dispatched to investigate a
14   possible intoxicated driver. I've read that correctly?
15 A  That's correct.
16 Q  So you're rendering an opinion that -- I mean are you
17   basically rendering an opinion that Officer Peterson is
18   lying when he asserts under oath that he was dispatched to
19   investigate a possible intoxicated driver?
20 A  He -- at one point there, he had reasonable suspicion but
21   not probable cause.
22 Q  Reasonable suspicion for what?
23 A  For being a drunk driver, that was all hearsay and could
24   not be corroborated by in person observation.
25 Q  Just so I understand you, it's your opinion looking at

Page 53

1    these facts that Officer Peterson had reasonable suspicion
2    to conduct an investigatory stop on a DUI, right?
3  A  Yes.
4  Q  As part of having reasonable suspicion to conduct an
5    investigatory stop, did Officer Peterson have the right to
6    use reasonable force on Mr. Brown in order to conduct that
7    investigatory stop?
8  A  No.
9  Q  So is it your opinion that officers that have reasonable
10   suspicion to believe crimes have been committed cannot use
11   any force on suspects that are uncooperative? That's your
12   view of the police authority?
13 A  Reasonable suspicion is a lesser standard than probable
14   cause. Okay?
15 Q  Yeah.
16 A  It's not required as evidence in criminal wrongdoing.
17   Reasonable suspicion is you've got to be able to
18   investigate further to get probable cause.
19 Q  I understand it, but I'm not talking about comparing and
20   contrasting the two standards. I'm talking about whether
21   an officer can use reasonable force as part of an
22   investigatory stop to conduct that investigation. I
23   thought your answer was no.
24 A  The answer is no and the reason being is he needs -- in
25   other words, he needs firsthand knowledge to be able to go

Page 54

1   through that door if, hypothetically, you're going to let
2   him go through the door.
3 Q I'm not talking about the door now. We're not talking
4   about the door. We're talking about reasonable force.
5 A Okay.
6 Q Mr. Mott, let me ask you this. Let's forget about the
7   door, forget about the house, all right, for a moment.
8   Officer Peterson, by your testimony, has reasonable
9   suspicion to conduct an investigatory stop on Mr. Brown
10  for DUI, right? You just said.....
11 A Correct.
12 Q Right?
13 A Yes.
14 Q Okay. Mr. Brown -- this is my hypothetical. Mr. Brown
15  hypothetically leaves the vehicle, the officer says stop,
16  I need to talk to you, Mr. Brown starts running, Officer
17  Peterson, as part of his authority for reasonable
18  suspicion to conduct an investigatory stop, can he use
19  reasonable force to keep Mr. Brown at the scene?
20 A No.
21 Q He just has to let him go, just run away, that's it?
22 A Yep.
23 Q So it's your view of police powers when they have
24  reasonable suspicion to conduct an investigatory stop they
25  cannot use any force. Is that your view?

Page 55

1 A That's correct.
2 Q Where did you learn that view? Where did you obtain that
3   view? From what source?
4 A From these reports and also from my experience.
5 Q Let's talk about your experience. Where did you learn
6   that police officers cannot use reasonable force when they
7   conduct an investigative stop? Did you read some cases?
8   Can you tell me who trained you in that?
9 A I'm saying it has to be -- he has to have more than
10  reasonable suspicion in order to get probable cause.
11  Probable cause, yeah, you can use force because then you
12  have the authority to make an arrest.
13 Q But reasonable suspicion you can't use any force.....
14 A No.
15 Q .....right?
16 A Right.
17 Q Have you conducted investigatory stops in your legal
18  career -- your police officer career?
19 A Some.
20 Q Okay. How many?
21 A A couple hundred.
22 Q Have you ever had the circumstance when you had legal
23  authority to conduct an investigative stop that the person
24  wanted to leave the scene?
25 A And I would have to allow them to do so.

Page 56

1 Q No, my question was did it ever happen in your career?
2 A Yes.
3 Q How many times?
4 A Maybe another hundred.
5 Q A hundred times they walked away?
6 A Yeah.
7 Q When you were conducting an investigatory stop. A hundred
8   times they just walked away.
9 A You have to.
10 Q No, no, no.
11 A You don't have any.....
12 Q They walked away and you let them. You let them walk away
13  in all those cases?
14 A Right.
15 Q Have you ever heard anybody say to you that police
16  officers have the right to use reasonable force to detain
17  people? Have you ever heard those words, reasonable force
18  to detain?
19 A To detain, yes.
20 Q Under what circumstances do police officers have
21  reasonable force to detain?
22 A To clearly identify who the individual is and to dispel
23  any circumstances of whether any criminal acts are being
24  committed or going to be committed.
25 Q And why wouldn't a police officer who has reasonable

Page 57

1   suspicion to believe a DUI has been committed, why
2   wouldn't that police officer have the ability to use
3   reasonable force to detain?
4 A You have to be able to articulate why you need that person
5   detained with any kind of force at all.
6 Q Did you understand my question? A hypothetical.....
7 A Yes, I did.
8 Q .....reasonable suspicion, so it meets that standard,
9   Mr. Mott. It meets that standard. Why wouldn't a police
10  officer who meets that standard on a DUI, reasonable
11  suspicion to believe a DUI has occurred, why wouldn't that
12  police officer have the ability, the lawful authority to
13  use reasonable force to detain that suspect?
14 A What do you call reasonable force? I'm just asking.
15 Q Have you ever used those words before, Mr. Mott? In fact,
16  you've been using those words in your report, reasonable
17  versus unreasonable or excessive and non-excessive, right?
18 A Correct.
19 Q Let's just go with what you mean by reasonable force then.
20  I don't need to define it. We'll just take your
21  definition, whatever it is.
22 A You're going to have to stall until they exhibit -- if
23  it's a DUI or a DWI, DUI -- you're going to have to be
24  able to pick up some evidence either by their non-ability
25  or their ability to ambulatory -- you know, walk in an

Page 58

1  ambulatory way, their balance, their speech, all those
2  things combined, you're going to have to stall them by
3  saying that.
4  Q  Mr. Mott, let me ask you this. You've said police
5     officers under certain circumstances have the right to use
6     reasonable force to detain individuals, right? You've
7     agreed with me on that, right?
8  A  Yes.
9  Q  Under what legal standard do they have the right to detain
10    somebody using reasonable force? What legal standard must
11    they have in order to have that ability to use reasonable
12    force to detain? Tell me.
13 A  To -- for probable cause, then you can make a lawful
14    arrest.
15 Q  That wasn't the question.
16 A  That was my answer. You need to have probable cause in
17    order to use any kind of force at all in effecting that
18    arrest.
19 Q  Do you understand the distinction between detaining and
20    arresting?
21 A  Oh, yeah.
22 Q  I'm not talking about arresting, Mr. Mott. I'm talking
23    about detaining.
24 A  And detaining is the same thing. That's why you're going
25    to have to -- you're going to have to stall this person

Page 59

1  long enough to where you decide whether you've got
2  probable cause or just reasonable suspicion and you've got
3  to let them go.
4  Q  Detaining is the same thing as arresting in your mind?
5  A  No.
6  Q  Okay.
7  A  Detaining is stalling.
8  Q  And you can use reasonable force to stall then, right?
9  A  I would like to take that back. No.
10 Q  So you're going to change your opinion. You can't use
11    reasonable force to detain people even though you've heard
12    that before?
13 A  No, you can't.
14 Q  Cannot. So why did you give an opinion a few minutes ago
15    that police can use reasonable force to detain people and
16    now you're saying they can't use reasonable force to
17    detain people? Why did you change your mind? What
18    happened?
19 A  One, I think you're getting me confused.
20 Q  What words did I use that confused you? What question did
21    I give you that confused you?
22 A  I don't remember.
23 Q  But that's your explanation for why you changed your mind,
24    I confused you.
25 A  Yeah, you did.

Page 60

1  Q  All right. So Mr. Brown -- I'm sorry, Officer Peterson
2     had reasonable suspicion to believe Mr. Brown had
3     committed a crime of DUI at the time Officer Peterson
4     entered the house, right? That's your opinion.
5  A  Say that again.
6  Q  You've said on the record here, I thought, that Officer
7     Peterson had reasonable suspicion to believe Mr. Brown had
8     committed the crime of DUI. Did you not say that?
9  A  Yes.
10 Q  And he obviously had that reasonable suspicion to believe
11    Mr. Brown had committed a DUI before he entered the house,
12    right?
13 A  Okay.
14 Q  Do you agree?
15 A  Yeah.
16 Q  Now, is it your opinion that the case law is an officer
17    cannot give hot pursuit into a house on reasonable
18    suspicion to believe a DUI has been committed? Is that
19    your view of the case law in Washington or any other
20    jurisdiction?
21 A  Correct.
22 Q  Have you read any cases that say that?
23 A  Yeah, but I can't cite them for you right now.
24 Q  You have read them?
25 A  Yep.

Page 61

1  Q  How many?
2  A  At least two.
3  Q  How many on the other side, if any?
4  A  On the other side of what?
5  Q  Answering the question, yes, you can hot pursue on a
6     reasonable suspicion for DUI.
7  A  No, you can't go into a house with reasonable suspicion
8     when someone is suspected of being DUI.
9  Q  Mr. Mott, listen to my question. You've read two cases
10    that say -- that support your view, but you can't name the
11    cases, right?
12 A  Right.
13 Q  Can you name the jurisdictions?
14 A  I think they're both in Alaska.
15 Q  Did you read them as part of your preparation for this
16    case?
17 A  I think they were a part of some of this stuff in front of
18    me.
19 Q  That lawyer's opinion, Cindy Strout's opinion? Is that
20    where you read it?
21 A  I could have.
22 Q  Any other source?
23 A  I forgot, Cindy, whatever her name is.....
24 Q  Strout.
25 A  .....Strout. She expressed some information on that.

Page 62

1  Q  So that's what you're relying on, her opinion.
2  A  Yeah.
3  Q  Not your training and experience.
4  A  Not up here in Alaska.
5  Q  Anywhere. Any training and experience for answering that
6     question.
7  A  Down here in Washington, if someone gets to the house
8     before you can get to the door, they get in there, you've
9     got to go and get a warrant to go in there and arrest
10    them.
11 Q  Under all circumstances?
12 A  There's no such thing as fresh pursuit in a misdemeanor
13    case.
14 Q  All misdemeanors?
15 A  Yep.
16 Q  How do you know that, that's the law in Washington?
17 A  I just do.
18 Q  You can't remember where you got it from?
19 A  Probably from my academy and training.
20 Q  How many other jurisdictions say the same thing, you can't
21    hot pursue on misdemeanors no matter what kind of
22    misdemeanors?
23 A  I have no idea.
24 Q  I'm switching the question a little bit. Officer has
25    probable cause to believe a DUI has been committed. Can

Page 63

1     he hot pursue lawfully into a house in your opinion or not
2     because it's a misdemeanor?
3  A  Police officers have evidence enough to lead a reasonable
4     person to believe that a crime has been committed can
5     pursue into a house, yes.
6  Q  So, just so we understand each other, if the police
7     officer had probable cause to believe a DUI has been
8     committed, he can lawfully hot pursue into a house without
9     a warrant, right? That's what you just said.
10 A  I know, but wait a minute. You have to back up and
11    understand that the officer believed, and does he have
12    credible information, that the person is in violation of
13    DUI offense. If that's so, then he can pursue into the
14    house.
15 Q  For purposes of my question, it assumes the officer had
16    probable cause, good probable cause, okay, he's got good
17    probable cause to believe a DUI has been committed and I
18    take it it's your opinion he can lawfully enter the house
19    on hot pursuit without a warrant. Is that true? That's
20    your opinion.
21 A  My understanding is that's correct.
22 Q  Okay. So it's not -- and for purposes of that answer,
23    obviously DUI you're believing is a misdemeanor, right?
24 A  Correct.
25 Q  So, with probable cause, it's your opinion you can hot

Page 64

1     pursue on some misdemeanors if you've got probable cause
2     and you're in hot pursuit, right? Some misdemeanors.
3     Because obviously we just named one, DUI, right?
4  A  I'm thinking. Yes.
5  Q  Are there any other misdemeanors that you know of that a
6     police officer can hot pursue on if he's got probable
7     cause other than DUI?
8  A  You have theft cases, you have possession of marijuana,
9     assault cases and indecent exposure.
10 Q  You can hot pursue on probable cause for marijuana
11    possession, for probable cause for assault and indecent
12    exposure.
13 A  And theft.
14 Q  And theft, okay. Can they hot pursue in your opinion on
15    probable cause for reckless driving?
16 A  In Alaska, I think the answer is no.
17 Q  How about in Washington?
18 A  And it would be no, too.
19 Q  Is the answer yes for anywhere?
20 A  I don't know about anywhere else, but in Washington and
21    Alaska, no.
22 Q  And your answers on.....
23 A  You can summons -- you can summons the person, but you
24    can't go in there and arrest them.
25 Q  I'm talking about entering the house now, Mr. Mott.

Page 65

1  A  You can't go in the house.
2  Q  That's what we're talking about, entering the house.
3  A  You can't do it. Reckless driving, you're going to have
4     to do a summons.
5  Q  Now, I take it you can, in your opinion, if you've got
6     probable cause to believe the person committed a felony,
7     you can hot pursue into the house.
8  A  Oh, yeah.
9  Q  I just want to make sure I understand your full opinions
10    on reasonable suspicion. So your opinion is you can't hot
11    pursue with reasonable suspicion based on a misdemeanor,
12    right? You've already said that.
13 A  Correct.
14 Q  Can you hot pursue on reasonable suspicion for a felony?
15 A  I'm thinking. I'm thinking you're going to have to say no
16    because you've got to articulate enough to where then you
17    have probable cause to make an arrest. Reasonable
18    suspicion is just that. You're not quite ready to say
19    whether they've committed a crime or about to commit a
20    crime or they're not even involved in a crime.
21 Q  So your answer is, no, you can't hot pursue on reasonable
22    suspicion to believe a felony has occurred.
23 A  The same would go for that.
24 Q  Here's what I don't understand. You gave me an opinion a
25    little earlier that you can only not go into a house if it

Page 66

```
 1      was a misdemeanor. Remember saying that?
 2  A   No.
 3  Q   If it's just a misdemeanor, you can't go in the house. I
 4      thought you said that to me a few minutes earlier. Didn't
 5      you say that to me?
 6  A   Only with the exception of theft -- no, reasonable
 7      suspicion?
 8  Q   Yes.
 9  A   We're on reasonable suspicion?
10      MR. HERZ: Then I'm going to object because that
11  mischaracterizes his testimony.
12  Q   Never mind. I'll withdraw the question. I'll move on to
13      something else.
14  A   Okay.
15  Q   You said you have used OC spray -- I'm sorry, I don't
16      remember, how many times in your career?
17  A   Not very many. Did I say 25?
18  Q   Where were you? Under what circumstances.....
19  A   That may even.....
20  Q   I'm sorry.
21  A   That may even be a lot.
22  Q   But at most 25.
23  A   At the top, yeah.
24  Q   What would be the minimum?
25  A   Well, one.
```

Page 67

```
 1  Q   Is that the best you can do, more than one but less than
 2      25, or can you narrow it more than that?
 3  A   I don't want to do that.
 4  Q   Somewhere between 1 and 25 is the number of times you've
 5      pepper sprayed.
 6  A   Right.
 7  Q   Can you tell me where you used pepper spray. What were
 8      the surroundings?
 9  A   Well, I've used it always on the outside. It was
10      generally during traffic stops or in domestic violence
11      situations when we have a party outside and also in
12      training because in order for us to carry pepper spray we
13      also had to experience what it felt like to be sprayed
14      with pepper spray.
15  Q   How many times -- I'm sorry. Go ahead.
16  A   And you don't want to even feel that. That feels like
17      gravel in your eyes.
18  Q   How many times have you -- I'm sorry. Go ahead.
19  A   Go ahead.
20  Q   How many times have you been sprayed with pepper spray?
21  A   One time only.
22  Q   Where was it?
23  A   That was in training.
24  Q   Were you in a room?
25  A   We were outside and then we were rushed inside into a
```

Page 68

```
 1      shower and just let the water run it out of our eyes.
 2  Q   So you've never administered yourself pepper spray inside
 3      a house or a room?
 4  A   No, never.
 5  Q   When you were working as a police officer, were you aware
 6      that any of your fellow officers ever used pepper spray
 7      inside a house?
 8  A   We were told not to use it inside of a house because it
 9      not only affects you and the party you're using it on, but
10      it also affects other officers that may be in the same
11      room as you. So everybody is incapacitated.
12  Q   That wasn't my question.
13  A   I thought I did a pretty good job on that one.
14  Q   No, I didn't ask you what you were told. I asked you do
15      you know of any officers while you were with either -- no,
16      only with the City of Bellevue Police Department, do you
17      know whether any of those officers ever used pepper spray
18      inside a house?
19  A   And I'd have to say I'm not aware of any specific
20      situation.
21  Q   Is part of the reason you think for the instruction in the
22      City of Bellevue to not use pepper spray in a house is
23      part of the reason that the officer himself if he uses it
24      might get it in his own eyes?
25  A   Correct. Or the other officers that are with him.
```

Page 69

```
 1  Q   But would you agree with me under certain circumstances,
 2      even though it's not ideal to use it in a house,
 3      circumstances may present itself such that it would not be
 4      unreasonable to use it given the totality of
 5      circumstances?
 6  A   And the totality of the situation would be if you use
 7      officer safety first, you wait for backup, then you go in,
 8      then it's the cop's fair fight, there's more cops than
 9      there are suspects.
10  Q   I know you've criticized -- you're bringing up again,
11      you've criticized Officer Peterson for going into the
12      house because it was unsafe for him to do so, right?
13  A   It most certainly was. Most certainly was.
14  Q   But would you not agree there were extenuating
15      circumstances for him doing it? Could he not have been
16      reasonably concerned that there might be contamination of
17      the evidence for DUI if he allowed the individual to go in
18      a house and perhaps drink alcohol while he waited for
19      backup? Isn't that extenuating circumstances?
20  A   No. I will say this. It's only a drunk driving arrest --
21      or violation. It's not worth someone losing their life or
22      getting seriously injured in going through the house on
23      your own. That's what you've got to remember first. Most
24      officers are injured because they fail to wait for backup.
25  Q   Do you consider drunk driving to be a serious offense?
```

EDWARD MOTT  
Vol 1  
4/8/2008  
BROWN v. PETERSON, et al.,  
Case No. 3:05-cv-0002 TMB

19 (Pages 70 to 73)

Page 70

1 A  It's right up there, but it's not one that's life
2    threatening at the time, especially if the guy has left
3    his car. If you want to arrest him, you can impound his
4    truck. Then you've completely immobilized him.
5 Q  I don't know if you ever answered this question. When you
6    write in your report I do not find Officer Peterson
7    credible when he claims he was dispatched to investigate a
8    possible intoxicated driver. Are you basically saying in
9    that sentence that you believe Officer Peterson is lying
10   when he said under oath that I received such information?
11   MR. HERZ: Asked and answered.
12 A  I don't remember him ever being told that there was a
13   possible drunk driver with any credible witness. Somebody
14   may have seen him spin around and do donuts and all this
15   other stuff and they may have thought, gee, it looks like
16   a drunk driver to me, but in actuality it may not have
17   been.
18 Q  Are you saying he's lying when he testified that I
19   received the REDDI information from the dispatcher?
20 A  I would like to say Officer Peterson is not a liar, but I
21   would like to say that he is misquoted in his report if
22   that's, in fact, what he says.
23 Q  Did you read his testimony under oath, I believe it was at
24   least at the criminal trial, where he said I got a REDDI
25   report from the dispatcher? Did you read that?

Page 71

1 A  Yeah, I did.
2 Q  Do you have an opinion as to when he testified that way is
3    he lying or not?
4 A  No.
5 Q  He's not lying?
6 A  No, he's not lying. I don't think Officer Peterson is a
7    liar.
8 Q  Is he testifying accurately?
9 A  No.
10 Q  Okay. And that's because you don't find any credible
11    evidence supporting that testimony.
12 A  That's correct.
13 Q  I believe you conclude that the dispatcher never entered
14    any information in writing contemporaneously with his
15    dispatch to Officer Peterson such that it would support
16    the conclusion that Peterson was dispatched on a REDDI, is
17    that right?
18 A  That's correct.
19 Q  Hypothetical question, Mr. Mott.
20 A  Okay, I like these.
21 Q  Let's assume you do get credible information later from
22    the dispatcher's deposition.
23 A  How much later?
24 Q  Well, the dispatcher is going to be deposed tomorrow.
25 A  Okay. So we're talking this is later.

Page 72

1 Q  Soon. I'd like you to assume that the dispatcher -- you
2    will have evidence that the dispatcher contemporaneously
3    filled out a document or documents that he was dispatching
4    Peterson to a REDDI. If those documents exist and that's
5    how the dispatcher testified, will you change your opinion
6    about believing Officer Peterson is mistaken?
7 A  Sure.
8 Q  You cite in your report on page 6 a case called Cousins
9    vs. Alaska, MOJ No. 5090, July 12, 2006.
10 A  Uh-huh. (Affirmative)
11 Q  Do you have a copy of that MOJ in your file?
12 A  No.
13 Q  Where did you get that information from?
14 A  I got that from one of the documents on his personnel
15    file.
16 Q  What is it you remember about that? Are you saying that
17    there was some disciplinary action taken against him?
18 A  Yes. He conducted an unlawful investigatory stop,
19    violated the Fourth Amendment right of several juveniles.
20    In this case, any reasonable properly trained officer
21    would have included information about the report.
22 Q  In the Cousins matter, who concluded it was an unlawful
23    investigatory stop, do you remember?
24 A  No, I do not.
25 Q  So you don't remember whether it was a judge, whether it

Page 73

1    was a superior officer.
2 A  No, it would have been a judge.
3 Q  Because we're talking about an MOJ, motion on judgment, is
4    that what you mean, motion on judgment or motion of
5    judgment?
6 A  Motion of judgment, I think.
7 Q  Okay. Judges can be wrong though, can't they, Mr. Mott?
8 A  Oh, they sure are.
9 Q  Did you find any of Mr. Brown's testimony to not be
10   credible as you found certain portions of Officer
11   Peterson's testimony not credible?
12   MR. HERZ: Objection. Witness can't testify about whether
13 somebody is credible or not. He's not a human lie detector.
14 Q  Go ahead. Answer the question.
15 A  In all honesty, I think Mr. Brown has a beverage problem,
16    but I don't think he was wrong in anything that he
17    recounted at all.
18 Q  Do you think Mr. Brown is an alcoholic?
19 A  He has a beverage problem.
20 Q  What's the difference between an alcoholic and having a
21    beverage problem in your.....
22 A  That's like saying someone from Alaska is an alcoholic and
23    someone from Bellevue has a beverage problem.
24 Q  Just a matter of which state you're in.
25 A  Right.

Computer Matrix, LLC  
700 W. 2nd Ave., Anchorage, AK 99501  
Phone - 907-243-0668  
Fax    907-243-1473  
jpk@gci.net  
sahile@gci.net