EDWARD MOTT                          4/8/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                            Case No. 3:05-cv-0002 TMB

20 (Pages 74 to 77)

Page 74

1 Q  You folks in Washington use nicer words in calling
2    somebody an alcoholic than we do up here, I take it.
3 A  We have beverage problems down here.
4 Q  Okay. Have you read the expert report of Mr. Ellar, an
5    other plaintiff's expert?
6 A  I don't think I have.
7 Q  Did you even know there was another expert that Mr. Herz
8    had hired in this case?
9 A  No, I don't remember reading another expert's opinion.
10 Q  Okay.
11 A  In fact, I would probably shy away from seeing that for
12    the fact that I wouldn't want to be influenced by what
13    another person had to say.
14 Q  Let me tell you then a couple things Mr. Ellar, this
15    expert said yesterday. He said he thought Mr. Brown was a
16    liar when Mr. Brown testified that the only alcohol he
17    drank was in the bathroom and nothing before while he was
18    -- either before he was driving or while he was driving.
19    If I've recalled that accurately, and I think I have, do
20    you agree with such an opinion?
21 A  No. We don't have anything that corroborates that that's
22    not true. In fact, there was a gentleman that testified
23    in the DMV hearing that saw Brown at 4:30, I think it was,
24    in the afternoon saying he didn't smell any booze on him
25    at all.

Page 75

1 Q  Are you offering any opinions regarding any use of force
2    used by Officer Holden in this case or are you not?
3 A  I'm saying it was also excessive.
4 Q  Officer Holden?
5 A  Yes.
6 Q  All right. We've gone through the facts up to the point
7    where Officer Peterson used pepper spray. Tell me what
8    facts happened thereafter leading up to and including the
9    use of pepper spray by Officer Holden?
10 A  Officer Holden was called as a backup officer and he was
11    called twice. He comes in. He immediately smells pepper
12    spray and he also sprays the defendant, being Brown, in
13    the face. You've got another guy laying down -- the
14    brother laying on the ground who is overcome by pepper
15    spray. He doesn't have any idea why or what Mr. Brown has
16    been arrested for.
17 Q  Okay. Would it make a difference if he knew, reasonably
18    knew, that it was a DUI arrest?
19 A  That would help, but it's like if I said he's got a gun,
20    shoot, and then you don't see the gun but you shoot
21    anyway. That's not right.
22 Q  I want to get a little more facts from you as to what you
23    believe Officer Holden observed prior to his use of the
24    pepper spray. So I think you've told me he enters the
25    house and he sees an individual apparently reacting to

Page 76

1    pepper spray in the room, right?
2 A  Yes.
3 Q  What else does he see prior to using the pepper spray?
4 A  He sees Mr. Brown and Mr. -- Officer Peterson in a
5    scuffle, where Peterson is trying to get a pair of
6    handcuffs on Brown and not knowing any other facts he
7    blasts him with the pepper spray.
8 Q  So we clearly have an individual who is resisting arrest,
9    do we not, from -- actively resisting arrest, do we not,
10    according to what Officer Holden sees. Is that a fair
11    statement?
12 A  But it's not a lawful arrest.
13 Q  But Officer Holden wouldn't know that, right?
14 A  He would if Peterson had held off and waited until backup
15    got there and then they both would have went in together
16    and all this would have been for nothing.
17 Q  Mr. Mott, when Officer Holden.....
18 A  And any reason.
19 Q  When Officer Holden entered the house, he didn't know that
20    the arrest was unlawful, right?
21 A  No.
22 Q  Okay. So you can't blame him for not knowing, can you?
23 A  No, I blame Peterson.....
24 Q  I know. You can't blame.....
25 A  .....for not waiting. I'm blaming Peterson for not

Page 77

1    waiting for backup and then making a safe entry into it
2    and then taking custody of Mr. Brown in probably an
3    entirely different method.
4 Q  But you're not blaming Holden for it, right, not knowing
5    it was an unlawful arrest?
6 A  This is a hypothetical?
7 Q  No, on the facts. Do you have any evidence to
8    believe.....
9 A  I'm just asking you.
10 Q  Do you have any evidence to believe Holden knew this was
11    an unlawful arrest when he came in in response to a call
12    by Peterson?
13 A  No. No, he did not.
14 Q  So it would be reasonable for Officer Holden to believe a
15    lawful arrest was occurring. Isn't that the default
16    rather than I'm going to believe my fellow officer is
17    unlawfully arresting somebody?
18 A  You would hope so.
19    MR. KOZIOL: Nathan, we've got a frozen frame.
20 Q  We just had your frame freeze for a moment. It's good
21    now. And you would agree with me that what Officer Holden
22    saw was Mr. Brown actively resisting an arrest, getting
23    handcuffed, right?
24 A  Correct.
25 Q  So under your standards that you've told me about, I

Computer Matrix, LLC                    Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax     907-243-1473              sahile@gci.net

Page 78

1  thought it's permissible to use pepper spray when somebody
2  is actively resisting arrest. Did you not say that?
3  A  But the thing is it goes into this. Was it necessary for
4     Holden to pepper spray Brown when the fair fight would
5     have been -- now it's really a fair fight. It's two
6     against one.
7  Q  Mr. Mott, though you might prefer to have both officers go
8     hands-on, am I not correct that under your view of the
9     police procedure manual both in the City of Bellevue
10    Police Department and the City of Kodiak Department, under
11    the circumstances with somebody actively resisting arrest,
12    Officer Peterson was reasonable in using pepper spray and
13    it cannot be considered excessive force?
14 A  No. Not when you back up and you go was that a lawful
15    arrest. Do you know what I'm saying?
16 Q  Yeah, I do know what you're saying.
17 A  Hypothetically, I'll agree with you.
18 Q  Hypothetically, if it was a lawful arrest.....
19 A  Yes.
20 Q  .....and if Holden reasonably thought it was a lawful
21    arrest when he sees Brown actively resisting, it was
22    reasonable for him to use pepper spray according to the
23    policy and procedure manual of the City of Kodiak and even
24    the policy and procedure manual of the City of Bellevue,
25    right?

Page 79

1  A  If you want to say am I okay to do that or can I go
2     hands-on with this person and help my officer or the other
3     officer, being Peterson, in a less confrontational manner.
4     You've already got the guy laying down on the ground.
5  Q  Mr. Mott, I'm not asking you which course you think would
6     be better, going hands-on or using pepper spray. All I'm
7     asking you is under the circumstances that Holden saw,
8     would you agree with me the policy and procedure manual
9     not only of the City of Kodiak but also the City of
10    Bellevue permits him to use pepper spray and you would not
11    consider it excessive force that he used it.
12    MR. HERZ: Asked and answered.
13 Q  Would you agree with that?
14 A  That's correct.
15 Q  Besides offering opinions on the use of force regarding
16    pepper spray, am I right that you've not -- you're not
17    offering any opinions, any other opinions that any other
18    force was excessive? It's only the topic of pepper spray,
19    as we've discussed.
20 A  Well, him entering the house.
21 Q  I know. Any force at all you think is unlawful, it
22    shouldn't be used, but assuming again the force -- the
23    entry was lawful and the officers could use reasonable
24    force. When I read your report here and your criticisms,
25    the only thing I see that you have targeted in terms of

Page 80

1     possibly excessive, depending on the circumstances, was
2     the pepper spray, nothing else, is that true?
3  A  And that's correct.
4  Q  Were you asked -- I didn't see this in your report. Were
5     you asked to address any issue of failure to render
6     medical aid to Mr. Brown? I didn't see that in your
7     report.
8  A  Failure to render aid. Well, as he was coming out of the
9     house his pants fell down and no one -- I take it that
10    they stayed down and he waddled probably out there, sat in
11    the back of the car.
12 Q  You think he -- I'm sorry, go ahead.
13 A  I don't.....
14 Q  I'm not trying to manufacture opinions from you.....
15 A  Right.
16 Q  .....Mr. Mott. I guess it was a real technical question.
17    I didn't see any criticism in your report of failure to
18    render medical aid. Is that a true statement?
19 A  That's true.
20 Q  Am I correct? Am I correct, if it ain't in your report,
21    you don't have any opinions regarding failure to render
22    medical aid?
23 A  That's correct.
24 Q  Did you ever discuss that topic with Mr. Herz?
25 A  No.

Page 81

1  Q  And from your reviewing all these records, you never saw
2     an issue of failing to render medical aid because
3     otherwise, I take it, you'd have put it in your report.
4  A  The only thing that I didn't put in my report that I can
5     tell you is I did not really appreciate when he was back
6     in the booking room and he was snorting and everything
7     else because of the pepper spray, I don't think they
8     really aerated his eyes and his skin very well. As I'm
9     used to here, when you get -- when you get hit with pepper
10    spray, you can't use enough water. You cannot use enough
11    water. I just thought, you know -- I guess I just let it
12    slip. I don't find fault in him.
13 Q  So you're not giving a professional opinion on that
14    one.....
15 A  No.
16 Q  .....true? Okay. We need to go off record to change the
17    tape.
18    REPORTER: This concludes the first tape. The time is
19    11:29.
20    (Off record)
21    (On record)
22    REPORTER: On record. This is the start of the second
23    videotape. The time is 11:30.
24    MR. KOZIOL: That's all the questions I have. Thank you.
25    EDWARD O. MOTT

EDWARD MOTT                            4/8/2008           BROWN v. PETERSON, et al.,
Vol 1                                                     Case No. 3:05-cv-0002 TMB

22 (Pages 82 to 85)

Page 82

1   testified as follows on:
2                CROSS EXAMINATION
3   BY MR. HERZ:
4   Q  Mr. Mott, can you see me?
5   A  No.
6   Q  We're going to adjust the camera so you can.
7   A  There you are.
8   Q  Okay. You were asked to provide as Exhibit B a list of
9      all the documents you reviewed. Didn't your report
10     indicate that that list was available upon request?
11  A  Yes.
12  Q  And prior to today, had Mr. Koziol or anybody from his
13     office request that list from you?
14  A  You mean under Title 26.....
15  Q  No.
16  A  ....for this -- for all the documents that I reviewed.
17  Q  Mr. Mott, just listen to the question.
18  A  Okay.
19  Q  Your report indicated that you reviewed documents before
20     preparing your report, right?
21  A  Correct.
22  Q  And you were asked if you would provide to Mr. Koziol your
23     list of documents that you reviewed. You indicated that
24     list was 400 and some odd documents, right?
25  A  Correct.

Page 83

1   Q  And that was going to be Exhibit B to this deposition,
2      correct?
3   A  Correct.
4   Q  Did not your report say that that list of documents was
5      available upon request?
6      MR. KOZIOL: Can you tell me where in the report. Can you
7   give me a page cite? You may be right. I'd just like to know
8   where it is so I can follow along.
9   A  Here it is, on page 2, at the top where it says
10     documentation. At the time of this report, I have
11     discussed the matter with counsel briefly so as to have a
12     general understanding of this matter. However, my
13     opinions are based upon the materials that I have received
14     and reviewed and upon my education, training -- da da da,
15     wait a minute. Have reviewed the documents provided to me
16     by Mr. Herz. A list of which I can provide upon request.
17  Q  Okay. So now my question was, prior to today when
18     Mr. Koziol said would you give him a list, would you
19     attach that to your deposition, has Mr. Koziol or anybody
20     from his office ever requested that you provide that list
21     prior to today?
22  A  Not that I'm aware of.
23  Q  Now you indicated that you've taught the criminal justice
24     program at Bellevue College.
25  A  Yes.

Page 84

1   Q  What kind of classes does that program consist of that you
2      teach?
3   A  Criminal justice.
4   Q  Is that the only class?
5   A  No, it's a whole program.
6   Q  And I'm asking you what are the classes that make up that
7      program.
8   A  Oh. Criminal law, criminology, criminal evidence and
9      procedures, constitutional criminal procedures, community
10     oriented policing, evidence technician, photography,
11     survey of law enforcement administration, murder
12     investigation, sexual assault investigation, sexual
13     harassment, fingerprint classification, criminal
14     investigations, interviewing and interrogation, racial
15     profiling and survey of police organizations and
16     administration.
17  Q  Looking at the continuum of force that you described,
18     level one, level two, level three, level four, level five,
19     if a suspect doesn't comply with verbal commands and the
20     officer decides to take the suspect to the ground, that
21     action of taking the suspect to the ground would be
22     described as being on which level?
23  A  Probably level two, pain compliance.
24  Q  If I understood you correctly, you indicated level three
25     -- use of OC spray would be the next level up, that would

Page 85

1      be level three.
2   A  Yes.
3   Q  Okay. Now, when you take a suspect to the ground, I take
4      it there's always at least some possibility of the suspect
5      being injured by that action, right?
6   A  That's correct.
7   Q  Or maybe the officer getting injured as well, right?
8   A  Correct.
9   Q  So is it always a valid excuse to not use that level of
10     force, taking somebody to the ground, is it always an
11     excuse not to do that and use OC spray instead just
12     because the suspect might get hurt or the officer might
13     get hurt by taking the suspect to the ground?
14  A  No.
15  Q  In your years of experience, were you ever called upon to
16     review use of force by other officers?
17  A  Yes.
18  Q  You were a reviewing officer?
19  A  Yes.
20  Q  You were asked by Mr. Koziol whether you've ever rendered
21     an opinion as an expert about whether the use of OC spray
22     was reasonable and you indicated that, no, whenever you've
23     rendered an opinion as an expert you've always concluded
24     it was not reasonable. When you were a reviewing officer
25     reviewing the use of force by another officer, did you

Computer Matrix, LLC               Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473           sahile@gci.net

EDWARD MOTT                    4/8/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                       Case No. 3:05-cv-0002 TMB

23 (Pages 86 to 89)

**Page 86**

1  ever have occasion to review another officer's decision to
2  apply OC spray?
3  A  Yes.
4  Q  When you did -- how many times would you say you were
5     called upon to review the use of force by an officer who
6     deployed OC spray? How many times would you say you did
7     that?
8  A  Probably 10.
9  Q  In those 10 cases, how many times in reviewing the
10    officer's actions did you conclude the officer's actions
11    were reasonable?
12 A  Eight. I know specifically because there was two of them
13    that were not.
14 Q  Okay. You were asked a number of questions about whether
15    the use of OC spray was appropriate when somebody was a
16    threat to the officer whether they were holding a hammer
17    or holding a rock, holding a bottle. Do you remember that
18    line of questioning?
19 A  Yes, I do.
20 Q  Is drinking a beer a threat?
21    MR. KOZIOL: Objection. Form.
22 A  No.
23 Q  I'm sorry, can you answer, please.
24 A  No. I said no.
25 Q  The act of drinking a beer is not a threat. Okay. Based

**Page 87**

1  on your review of the case documents in this matter, did
2  Mr. Brown ever threaten the officer with the beer bottle?
3  A  No. I think I wrote it was a can.
4  Q  Okay. Do you have Mr. -- do you have Officer Peterson's
5     report there?
6  A  Somewhere in here.
7  Q  How long do you think it would take you to find that?
8  A  Do you have the Bates number?
9  Q  No, I don't.
10 A  It's going to take a long time.
11    MR. KOZIOL: Why don't you just have him assume what's in
12 there, Mr. Herz, if you want.
13 Q  Okay. Assume it's a bottle and I understand you think
14    it's a can, but did you read anything, whether can or
15    bottle, Mr. Brown threatened the officer with a can or the
16    bottle?
17 A  No, did not.
18 Q  Now, is the act of disregarding an officer's command to
19    not drink a beer a threat?
20 A  No.
21 Q  Aside from disregarding Officer Peterson's command not to
22    drink a beer, up until the point where Peterson sprays
23    Brown with the OC spray, did Peterson (sic) disregard --
24    and this is after leaving the bathroom, after leaving the
25    bathroom, okay. Aside from disregarding the command not

**Page 88**

1  to drink the beer, did Peterson, based on anything -- or
2  did Brown, based on anything you read, disregard any other
3  verbal command by Peterson?
4  A  No.
5  Q  So under those circumstances where he's disregarded one
6     command not to drink, he's made no threats -- did he make
7     any verbal threats to the officer based on anything you
8     read?
9  A  No, other than he told him to get out.
10 Q  But he didn't threaten Peterson's physical safety?
11 A  No, not at all.
12 Q  So based on these facts, he's disregarded a command not to
13    drink a -- not to drink, he hasn't physically -- he hasn't
14    verbally threatened Peterson's physical safety, he hasn't
15    physically threatened Peterson's safety, he hasn't
16    threatened Peterson with the bottle and he's only used the
17    bottle to drink, do any of those facts justify going to
18    level three and using OC spray in this case?
19 A  No.
20 Q  Now you've made a number of observations. You indicated
21    that you think Peterson should not have gone in the house
22    without backup, right?
23 A  Correct.
24 Q  And he didn't have a lawful basis for going into the
25    house.

**Page 89**

1  A  That's correct.
2  Q  And you don't think he properly deployed OC spray under
3     the circumstances we just described, right?
4  A  That's correct.
5  Q  And he shouldn't have deployed it inside the house.
6  A  That's correct.
7  Q  Did you think his report writing was complete?
8  A  No.
9  Q  Even Officer Peterson admitted under oath that his report
10    was not accurate, right?
11 A  Correct.
12 Q  Do you believe based on that Officer Peterson was properly
13    trained and supervised in this case?
14    MR. KOZIOL: Objection. Form.
15 Q  Are you familiar with, based on your experience as a
16    police officer, dispatching policies?
17 A  Yes.
18 Q  Have you -- in your career as a police officer, have you
19    been dispatched to investigate various crimes?
20 A  I have.
21 Q  Have you ever heard radio transmissions where other
22    officers have been dispatched?
23 A  I have.
24 Q  Have you ever had an opportunity to look at dispatch
25    records other than the ones you saw in this case?

Computer Matrix, LLC              Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473           sahile@gci.net

EDWARD MOTT                               4/8/2008                    BROWN v. PETERSON, et al.,
Vol 1                                                                 Case No. 3:05-cv-0002 TMB

24 (Pages 90 to 93)

Page 90

1  A   I have.
2  Q   Have you seen radio logs before?
3  A   Yes.
4  Q   Have you seen handwritten notes that dispatchers have
5      taken?
6  A   Yes.
7  Q   Now, in this case, there's been some testimony that the
8      dispatcher who received the 911 call from Laurie
9      Skonberg used a telephone to communicate from the dispatch
10     office to another telephone in the police station to
11     Officer Peterson that he should go respond to
12     Ms. Skonberg's complaint.
13 A   Correct.
14 Q   And that conversation was not -- the information that the
15     dispatcher provided to Officer Peterson in that
16     conversation was not recorded anywhere in the radio log,
17     do you believe that the failure to do that was proper or
18     improper?
19     MR. KOZIOL: Objection. Form.
20 A   Improper.
21 Q   And if there's no policy that telephone dispatches like
22     that should be recorded in the radio dispatch log, do you
23     think that policy is -- would you criticize that policy if
24     there is no such policy?
25     MR. KOZIOL: Objection. Form.

Page 91

1  A   I would. I could.
2  Q   When Officer Peterson goes in service, do you have an
3      opinion about when he radios in to the dispatcher whether
4      he should communicate to the dispatcher why he's going
5      into service?
6  A   Correct.
7  Q   And your opinion is.....
8  A   He should have gone into service saying I'm busy on a --
9      or I'm 10-6, which is another reason -- or another way of
10     saying you're busy. I'm busy on a call and what it is.
11     MR. KOZIOL: Mr. Herz, if I could just interrupt you. I
12 need to go to the bathroom. Too much water. Can we just stop
13 a moment?
14     MR. HERZ: Sure.
15     (Off record)
16     (On record)
17 Q   So if there's no -- we were talking about what Officer
18     Peterson should have radioed to dispatch when he went into
19     service, so if Officer Peterson on the telephone call had
20     been -- I want you to assume that this happened, okay.
21     Assume he had been told that there was possibly an
22     intoxicated driver, okay. When he went in service, are
23     you saying that he should indicate I'm going in service,
24     10-6, on a possibly intoxicated driver? That's what he
25     should have communicated to the dispatcher?

Page 92

1  A   Correct. So other officers would have been aware of that
2      call.
3  Q   In reviewing the radio log, did you see anything like that
4      in the radio log?
5  A   No, I did not.
6  Q   Do you know what a 10-50 is?
7  A   No.
8  Q   You're not familiar with that 10 code?
9  A   Not that high.
10 Q   If Officer Peterson hadn't indicated that, but the
11     dispatcher knew that he had dispatched Peterson on a
12     possibly intoxicated driver or on a REDDI call, if
13     Peterson didn't say he was going in service on that, based
14     on your background, training and experience, education,
15     should the dispatcher have included that information in
16     the radio log after he wrote in the radio log that
17     Peterson was going in service?
18 A   Yes, he should have.
19 Q   Now, a little while later Peterson calls in and says he's
20     making a traffic stop in this case, right?
21 A   Correct.
22 Q   And he gives the license plate number of the vehicle he
23     stops. Should he have provided any additional information
24     to the dispatcher at that point?
25 A   It would have been beneficial to say that this is the

Page 93

1      vehicle that looks like or the description matches that
2      vehicle that you told me about.
3  Q   Anything else?
4  A   And that the driver was exiting the vehicle and not
5      responding to his words of halt.
6  Q   Is it proper procedure and considered important for the
7      officer to indicate to dispatch what his location is?
8  A   It most certainly is.
9  Q   Wouldn't that be standard procedure on making a traffic
10     stop on vehicle license plate whatever it is and I'm at
11     this location?
12 A   Correct.
13 Q   Why is that important?
14 A   So if something goes awry, other officers already know in
15     what area of the city he's at.
16 Q   Did Officer Peterson, when he radioed in he was making a
17     traffic stop on that vehicle did he radio in his location?
18 A   No.
19 Q   Didn't he later have to be asked twice to provide his
20     location?
21 A   Yes.
22 Q   Is it also important for an officer to indicate when he's
23     making a traffic stop to indicate why he's making the
24     traffic stop, to radio that in also?
25 A   It's beneficial.

Computer Matrix, LLC                    Phone - 907-243-0668                    jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473                    sahile@gci.net

Page 94

1  Q  Did Officer Peterson do that?
2  A  No.
3  Q  Do you believe Officer Peterson followed correct procedure
4     in making his radio communications to the dispatcher?
5  A  No, he did not communicate clearly.
6  Q  Do you think in that regard that's an indication he was
7     not properly educated and trained?
8  A  Correct.
9  Q  If the dispatcher knows or believes that Officer Peterson,
10    when he radios in, is making a traffic stop on the vehicle
11    for which he's been dispatched to locate, should the
12    dispatcher have included that information, that Officer
13    Peterson was making a traffic stop on a possible drunk
14    driver?
15 A  Correct.
16 Q  Was that included in the dispatch log?
17 A  Not that I saw.
18 Q  So, in your view, did the dispatcher follow correct
19    procedures in this case?
20    MR. KOZIOL: Objection. Form.
21 A  No.
22 Q  In your review of the policy and procedures for
23    dispatchers in the Kodiak Police Department, did you see
24    anything in the policies and procedures that instructed
25    dispatchers to record information on telephone dispatches?

Page 95

1  A  Yes.
2  Q  You did see that? I'm asking you in the policy.....
3     MR. KOZIOL: Wait, wait.
4  A  No, no, no, no.
5     MR. KOZIOL: He answered yes.
6  A  It was not -- it was not clear at all as far as when a
7     telephone call comes in and a complaint is lodged.
8  Q  Was there anything in the policy and procedure manual that
9     addressed that?
10 A  No.
11 Q  Okay. And was there anything in the policy and procedure
12    manual that you could see regarding dispatchers about
13    making sure that when officers go in service that they're
14    to indicate why the officer is going in service?
15 A  Correct.
16 Q  Let me ask you, did you read anything in the policy and
17    procedure manual that instructed a dispatcher to include
18    that information in the radio log?
19 A  No.
20 Q  Did you see anything in the policy and procedure manual
21    that instructed dispatchers on either getting information
22    from an officer or including information in the radio log
23    about why a traffic stop is being initiated? Did you see
24    anything like that in the policy and procedure manual?
25 A  No.

Page 96

1  Q  In your view, are those deficiencies in the policy and
2     procedures of the Kodiak Police Department in regard to
3     dispatching?
4  A  Correct. Can you scoot up this way.
5  Q  We'll see if we can just kind of adjust the angle here.
6  A  No, you're fine now.
7  Q  Did you see any policy and procedures instructing officers
8     on entering homes without warrants or in hot pursuit of --
9     well, let me withdraw the question. Did you see anything
10    in the policy and procedure manual on hot pursuit? Was
11    there a hot pursuit policy in the manual?
12 A  I don't recall reading one.
13 Q  So do you think in light of the fact that there's no
14    policy on hot pursuit the officers in the Kodiak Police
15    Department have not been properly supervised and trained
16    on matters of hot pursuit?
17 A  Correct.
18 Q  Did you see anything in Officer Peterson's personnel
19    records that indicates he ever got trained on hot pursuit?
20 A  No.
21 Q  Did you see anything in Officer Peterson's personnel
22    records where he got trained on constitutional law?
23 A  No, but I can only assume he was at the police academy.
24 Q  Okay, but I'm asking about supplemental training.....
25 A  No.

Page 97

1  Q  .....in his personnel records.
2  A  No.
3  Q  How about on making warrantless entries into homes?
4  A  No.
5  Q  Okay. Based on your review of the case, do you believe
6     that Officer Peterson was properly trained and supervised
7     on the circumstances under which he could hot pursue and
8     make a warrantless entry into somebody's house?
9  A  No, he was not.
10 Q  You indicated earlier that you couldn't remember or you
11    didn't know why Mr. Brown was drinking the Jack Daniels in
12    the bathroom. Do you remember saying that?
13 A  Yes.
14 Q  Do you remember reading in his deposition that he had --
15    you did read Mr. Brown's deposition, right?
16 A  Yes.
17 Q  Do you remember him indicating he had recently injured an
18    ankle and he had been on his feet all day, he hadn't
19    recently taken any pain medication and he was in a lot of
20    pain, his ankle hurt?
21 A  Yes.
22 Q  And that's why he drank the Jack Daniels?
23 A  Yes.
24 Q  Did you have an opportunity to review the video of the
25    officer -- from the dash camera of the officer's patrol

EDWARD MOTT　　　　　　　　　　4/8/2008　　　　　　　　BROWN v. PETERSON, et al.,
Vol 1　　　　　　　　　　　　　　　　　　　　　　　　　　Case No. 3:05-cv-0002 TMB

26 (Pages 98 to 101)

### Page 98

1  car?
2  A  I did.
3  Q  When the officer -- when the officer goes up Pillar
4     Mountain Road and the Mr. Brown is going down Pillar
5     Mountain Road, the officer hasn't turned on his patrol
6     lights at that point, has he?
7  A  No, he has not.
8  Q  When he does turn on the lights, would you agree that for
9     the vast majority of the video you can't even see
10    Mr. Brown's vehicle in the video?
11 A  That's correct.
12 Q  It's only visible for very brief moments?
13 A  Correct.
14 Q  So is it reasonable to infer that if Peterson can't see
15    Brown's vehicle, that Brown may not be seeing Peterson's
16    vehicle and doesn't know Peterson is behind him with his
17    lights on?
18 A  Exactly.
19 Q  Now, when Peterson pulls up to Brown's house, Brown is
20    headed towards the front door, right?
21 A  Correct.
22 Q  While Peterson says that he believes Brown could hear him
23    and knew he wanted him to stop, does that mean that Brown
24    did hear him and knew that Peterson wanted him to stop?
25 A  No.

### Page 99

1  Q  Let me ask you a hypothetical about reasonable suspicion
2     and making an investigatory detention, okay?
3  A  Okay.
4  Q  Let's assume a police officer has received a call of a
5     possibly intoxicated driver and let's assume he's got
6     enough information to correctly identify the vehicle and
7     he stops the vehicle -- turns on his overhead lights and
8     the vehicle stops, he stops the vehicle, and the -- all
9     the driver does is provide his license and registration
10    and proof of insurance, okay?
11 A  Okay.
12 Q  Doesn't answer any questions, doesn't perform any field
13    sobriety testing, doesn't do anything.
14 A  Okay.
15 Q  Would you agree that the officer can only detain the
16    suspect long enough to conduct an investigation, whatever
17    it might entail, and then he's got to make a decision to
18    either let the driver go or arrest?
19 A  Correct.
20 Q  And if aside from providing a license, registration and
21    insurance the officer has no additional facts from which
22    he can determine he has probable cause, if the driver says
23    I'm leaving, I'm going to go, I'm done, and starts to walk
24    away, under those circumstances does the officer have
25    authority to use force to keep the driver from leaving the

### Page 100

1     scene if the officer is unable to do any more in terms of
2     investigating the initial complaint?
3  A  And does the odor of alcohol come into play at all?
4  Q  He's got no other information.
5  A  I'd say no. He has to let him go.
6  Q  Okay. Let's say there is an odor of alcohol, but no
7     evidence where the officer has observed any bad driving,
8     didn't see him cross the center line, didn't see him drive
9     badly, didn't see him commit a traffic infraction, but all
10    he has is an odor of alcohol. In fact, the driver does
11    not even admit to drinking, so the officer has a report of
12    a drunk driver and smells alcohol and that's it, does the
13    officer have probable cause to make an arrest just based
14    on odor alone?
15 A  How strong an odor?
16 Q  You can assume any strength of odor you want.
17 A  He's going to get arrested.
18 Q  I didn't say -- well, I mean, is there probable cause to
19    assume the driver is under the influence, not whether the
20    driver consumed alcohol, is there probable cause to make
21    an arrest? Can the officer based on odor alone make a
22    determination that the driver is impaired based on these
23    facts?
24 A  No.
25 Q  So if all he's got is odor and nothing else, does he have

### Page 101

1     any right to further detain the driver?
2  A  No.
3  Q  So if the driver says I'm walking away, I'm out of here,
4     does the officer have authority to use force to prevent
5     the driver from walking away.....
6  A  No.
7  Q  .....if all he has is reasonable suspicion?
8  A  No.
9  Q  You were asked by Mr. Koziol whether Officer Peterson had
10    reasonable suspicion to believe that Scott Brown was a
11    drunk driver and you said yes and I think he also asked it
12    another way, did Officer Peterson have reasonable
13    suspicion to believe Scott Brown was driving under the
14    influence and you answered yes, okay. Remember that?
15 A  Then I was wrong.
16 Q  All right. Let me ask you some questions. I want to give
17    you some facts and I want you to answer whether you think
18    reasonable suspicion exists based on the specific facts
19    I'm giving you, okay. Assume that the call comes in from
20    Laurie Skonberg to dispatch and she reports that a person
21    just sprayed gravel on somebody else in the parking lot at
22    Safeway, she followed the vehicle, she saw the vehicle
23    fishtail, she saw the vehicle do a 360 in the road. Okay?
24 A  Okay.
25 Q  That's the information. Assume that the dispatcher

EDWARD MOTT   4/8/2008   BROWN v. PETERSON, et al.,
Vol 1   Case No. 3:05-cv-0002 TMB

27 (Pages 102 to 105)

Page 102

1  provides that information to Officer Peterson, okay?
2  A  Okay.
3  Q  So you've got spraying gravel, fishtailing and a 360.
4  A  Okay.
5  Q  And let's assume that she's provided the information it's
6     a gold flat pick-up truck -- gold flatbed pick-up truck as
7     well. No license plate number. And Officer Peterson sees
8     that vehicle go down Pillar Mountain Road when he's going
9     up Pillar Mountain Road and assume for this purpose that
10    Officer Peterson can immediately pull that gold flatbed
11    pick-up truck over. I mean he's physically able to do it,
12    he doesn't have to drive further and turn around or
13    anything like that. Based on information, does Officer
14    Peterson have enough information to have reasonable
15    suspicion of a possibly intoxicated driver?
16 A  He has the right to pull that vehicle over.
17 Q  For what though, for drunk driving, for DUI, or for
18    something else?
19 A  I would think probably first would be to investigate was
20    it reckless driving or was it accidental, was it something
21    mechanical.
22 Q  So you're saying he has reasonable suspicion to
23    investigate the complaint about the fishtailing and the
24    360.
25 A  Yes, sir.

Page 103

1  Q  All right. So there's reasonable suspicion for that.
2     Does he have reasonable suspicion of DUI based on those
3     facts alone?
4  A  No.
5  Q  Does he have, based on those facts alone, probable cause
6     to arrest for reckless driving?
7  A  No.
8  Q  Why not?
9  A  He doesn't know, first of all, was it an accident, was it
10    something mechanical, was it the weather? It's the
11    wintertime, so it could have been ice or it could have
12    been something mechanical or it could have been an
13    accident.
14 Q  Now let me add one fact. Laurie Skonberg says driver is
15    possibly intoxicated and assume for this hypothetical that
16    the dispatcher passes that information on to Officer
17    Peterson, okay?
18 A  Okay.
19 Q  Assume he does. Does that provide the officer reasonable
20    suspicion to stop the vehicle for an investigation of
21    drunk driving?
22 A  No.
23 Q  Why not?
24 A  He doesn't have enough information. He doesn't -- it
25    could have been accidental, it could have been mechanical,

Page 104

1     it could have been a drunk driver, it could have been he
2     was just driving recklessly. So he doesn't know any of
3     those things and the caller, I'm envisioning this, could
4     say, hey, that guy looks like he's drunk driving like
5     that, but she has no personal knowledge that he's consumed
6     any alcohol at all.
7  Q  So you're saying there's lack of personal observation on
8     the issue of whether the driver has consumed or not
9     consumed?
10 A  Correct.
11 Q  Assume for purposes of this question that the additional
12    fact that there's a report of a possibly intoxicated
13    driver and that information is passed on to Peterson, does
14    give Peterson reasonable suspicion to make a stop. Does
15    it give him probable cause to arrest for drunk driving?
16 A  No.
17 Q  Does Peterson, based on your review of the materials,
18    learn any -- again, assume he got that information that it
19    was a possibly intoxicated driver, does Peterson learn any
20    new and additional facts before he enters Mr. Brown's home
21    to give him probable cause to arrest for drunk driving?
22 A  No.
23 Q  You indicated that there were some misdemeanors, driving
24    under the influence for one, where you've got probable
25    cause to believe the offense was committed, you can hot

Page 105

1     pursue into the house. Remember saying that?
2  A  I remember saying that.
3  Q  Okay. You also listed a couple of other misdemeanors,
4     theft, assault, possession of marijuana and indecent
5     exposure. Where does that list come from? Is that
6     something that's true in Washington but not true in
7     Alaska? You believe that's true in Alaska as well? Where
8     does that list come from?
9  A  That list comes from Washington. Misdemeanors that are
10    not committed in your presence.
11 Q  Are you aware of any similar list in Alaska?
12 A  No, I'm not.
13 Q  Are you aware of any other misdemeanor other than DUI in
14    Alaska where you're allowed to enter a home if you have
15    probable cause but you haven't seen the offense committed
16    in your presence? Do you want me to rephrase that?
17 A  No. You need to see the offense committed in your
18    presence.
19 Q  So other than DUI -- let me rephrase. You've testified
20    that for DUI if you have probable cause you can hot pursue
21    into somebody's house, right?
22 A  Yes.
23 Q  Okay. And you don't need to see that committed in your
24    presence in order to do that.
25 A  No.

Page 106

1  Q   But for any other misdemeanor, in order to have probable
2      cause, the misdemeanor has got to be committed in your
3      presence, right?
4  A   Correct.
5  Q   But even if it is, even if you have probable cause, you
6      still can't hot pursue into the house, is that your
7      understanding?
8  A   That's my understanding.
9  Q   You were asked whether -- if a dispatcher filled out a
10     document that was contemporaneous with the call, in other
11     words if Laurie Skonberg calls in and says possibly
12     intoxicated driver and the dispatcher fills out a form at
13     that time that says something like that, either REDDI,
14     which is shorthand for report every drunk driver, or it
15     says possibly intoxicated driver, that you would change
16     your opinion that Peterson was mistaken. Remember giving
17     that testimony?
18 A   If that was when the other gentleman, Frank Koziol -- he
19     got me confused.
20 Q   Well, let me ask you some questions. If the dispatcher
21     says that he filled out the document at the time he
22     received the call, aside from him saying that, is there
23     any evidence that he filled out that document, any other
24     evidence that would corroborate his statement that that's
25     when he filled out the document?

Page 107

1  A   No.
2  Q   Okay. And if the evidence is that his handwritten notes
3      were the first notes that he took and there's nothing in
4      the handwritten notes that says he received a call for
5      drunk driving or REDDI, does that tend to suggest that he
6      didn't have that information or he didn't record that
7      information contemporaneously?
8  A   He didn't record the information.
9  Q   Would that tend to -- would that tend to suggest that
10     maybe he recorded the information later?
11 A   Could have been later.
12 Q   Even if the information is recorded at some point, is
13     there any information other than the dispatcher's claim
14     that he told Peterson it was a REDDI call, is there any
15     written documentation that he actually dispatched Peterson
16     on a REDDI call?
17 A   No.
18 Q   Is there any audio recording, like a radio recording, that
19     he dispatched Peterson on a REDDI call?
20 A   No.
21 Q   So even if the dispatcher says, well, I wrote down that
22     this was a REDDI call on some document at the time I took
23     the phone call, does that in any way convince you that the
24     dispatcher actually gave that information to Peterson?
25 A   No.

Page 108

1  Q   Is there any document that Peterson wrote or filled out
2      that suggests he was given that information?
3  A   No.
4  Q   Was it in his report? Did he write in his report I
5      received information from the dispatcher of a possibly
6      intoxicated driver?
7  A   No.
8  Q   Did he write in his affidavit support of the complaint
9      that he'd received information about a possibly
10     intoxicated driver?
11 A   No, he did not.
12 Q   If Officer Peterson could not -- did not make a lawful
13     entry into the Brown home, your testimony is he could not
14     use lawful -- any kind of force against Mr. Brown, is that
15     right?
16 A   That's correct.
17 Q   And any force he used would have been excessive.
18 A   Exactly.
19 Q   Does that -- if Holden enters the house, does he have any
20     lawful right to enter the house if Peterson does not?
21 A   He's responding to Officer Peterson's request for
22     assistance.
23 Q   I understand that.
24 A   That's all.
25 Q   Does he have a law -- if Peterson does not have a lawful

Page 109

1      right to be there, does Holden have a lawful right to be
2      there?
3  A   No, he does not.
4  Q   If Peterson doesn't have a lawful right to use force, does
5      Holden have a lawful right to use force?
6  A   No.
7  Q   Was it your understanding that when Holden entered the
8      home he saw Peterson and Brown -- he saw Peterson
9      struggling with Brown on the floor?
10 A   No, I understood they were standing up.
11 Q   Okay. Seeing that alone, seeing that Peterson was trying
12     to handcuff Brown and not seeing any other actions by
13     Brown, did that give Holden all the authority he needed in
14     order to use OC spray?
15 A   No.
16 Q   If Peterson has his hands on Brown and all that Brown is
17     doing is pulling his hands away to keep from getting
18     handcuffed, does that give Peterson or Holden a right to
19     use OC spray?
20 A   No.
21 Q   In your opinion, should they have taken Brown to the
22     ground?
23 A   Yes.
24 Q   With the excuse of we were afraid we might get hurt while
25     doing that or Brown might get hurt while doing that, is

Page 110

1   to the ground and use OC spray instead?
2 A No.
3 Q Is there anything in your report that you've written that
4   you can think of based on the questions either Mr. Koziol
5   has asked you or that I've asked you that you feel needs
6   to be corrected?
7 A No, I think you've done a good job as far as getting me
8   back on line with the arrest.
9 Q Is there anything in your report that you think is wrong?
10 A That's wrong?
11 Q Yeah. Is there anything in your report based on the
12   questions you've been asked at this point?
13 A No.
14 Q Do you stand by the statements you've made in the report
15   about the facts of the case?
16 A I do.
17 Q Do you stand by the conclusions you reached based on those
18   facts?
19 A I do.
20   MR. HERZ: I've got no other questions at this time.
21           EDWARD O. MOTT
22   testified as follows on:
23           REDIRECT EXAMINATION
24 BY MR. KOZIOL:
25 Q Mr. Mott, have you ever been trained as a dispatcher?

Page 111

1 A I've worked in dispatch.
2 Q My question is have you ever been trained as a dispatcher?
3 A Yeah, I guess -- yeah, I have.
4 Q Have you ever worked as a dispatcher?
5 A Yes, I have.
6 Q How long?
7 A Maybe three months.
8 Q Where?
9 A In Issaquah.
10 Q You've changed a number of your opinions, would you agree
11   with me, from my asking questions to when Mr. Herz asked
12   you questions?
13 A Yes.
14 Q Was that because you were confused by my questions?
15 A Yeah, you confused me.
16   MR. KOZIOL: That's all.
17   MR. HERZ: I have nothing further.
18   REPORTER: That concludes the deposition. The time is
19   12:25 Alaska time.
20   (Off record)
21           (Deposition Exhibits A - C marked)
22           (END OF PROCEEDINGS)
23
24
25           C E R T I F I C A T E

Page 112

1
2   UNITED STATES OF AMERICA  )
3                             )ss
    STATE OF ALASKA           )
4
    I, Joseph P. Kolasinski, Notary Public in and for the
5
    state of Alaska, residing in Anchorage in said state, do hereby
6
    certify that the deponent in the foregoing matter was duly
7
    sworn to testify to the truth, and nothing but the truth;
8
    That said testimony was taken at the time and place
9
    therein stated;
10
    That the testimony of said witness was recorded
11
    electronically and thereafter transcribed under my direction
12
    and reduced to print;
13
    That the foregoing is a full, complete, and true record of
14
    said testimony.
15
    I further certify that I am not a relative, nor employee,
16
    nor attorney, nor of counsel of any of the parties to the
17
    foregoing matter, nor in any way interested in the outcome of
18
    the matter therein named.
19
    IN WITNESS WHEREOF I have hereunto set my hand and affixed
20
    my seal this 22nd day of April, 2008.
21
22
23   Joseph P. Kolasinski, Notary Public
     in and for the State of Alaska.
24   My Commission Expires: 03/12/2012
25

Page 113

1           WITNESS CERTIFICATE
2   RE: BROWN v. PETERSON, et al.,
    CASE NUMBER:  3:05-cv-0002 [TMB]
3   DEPOSITION OF: EDWARD O. MOTT
    DATE TAKEN:    APRIL 8, 2008
4
    I hereby certify that I have read the foregoing deposition
5   and accept it as true and correct, with the following
    exceptions:
6
    Page   Line        Description
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
    If additional paper is needed, please sign and date each sheet.
23
24
           _____
25          EDWARD O. MOTT        DATE