IN THE UNITED StateS DISTRICT COURT

FOR THE DISTRICT OF ALASKA

SCOTT BROWN,                         )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )
FRANK PETERSON, Individually and     )
in his official capacity as a        )
City of Kodiak Police Officer;       )
JEFF HOLDEN, Individually and in     )
his official capacity as a City      )
of Kodiak Police Officer, CITY       )
OF KODIAK; and JOHN AND JANE         )
DOES 1 - 10,                         )
                                     )
            Defendants.              )
_____)
Case No. 3:05-cv-0002 [TMB]

COPY

VIDEOTAPED DEPOSITION OF CHIEF CHARLES I. KAMAI, JR.

April 2, 2008

APPEARANCES:

   FOR THE PLAINTIFF:           MR. ROBERT M. HERZ
                                  Attorney at Law
                                  425 G Street, Suite 600
                                  Anchorage, Alaska  99501
                                  (907) 277-7171

   FOR THE DEFENDANTS:          MR. FRANK S. KOZIOL
                                  Attorney at Law
                                  618 Christensen Drive
                                  Anchorage, Alaska  99501
                                  (907) 258-7706

Exhibit 3

Page 2

```
 1              TABLE OF CONTENTS
 2    Direct Examination by Mr. Herz         4
 3    Cross Examination by Mr. Koziol       55
 4    Redirect Examination by Mr. Herz      71
 5  EXHIBITS MARKED:
 6    A - Complaint log, 2 pages            59
 7    B - Contact card                      63
 8    C - Offense compilation               65
 9  BATES STAMPED DOCUMENTS:
10    10453   10454   10462   10015   11120   11121
11    10082   10078
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              P R O C E E D I N G S
 2              (Kodiak, Alaska - 4/2/2008)
 3              (On record)
 4       REPORTER: My name is Salena Hile. I'm a court reporter
 5  with Computer Matrix and a Notary Public in the state of
 6  Alaska. Today is April 2nd, 2008, and the time is 1:04 p.m.
 7  This is the first tape in the videotaped deposition of Chief
 8  Kamai and we are at the Best Western in Kodiak, Alaska. This
 9  is in the United States District Court for the district of
10  Alaska, Scott Brown, plaintiff, versus Frank Peterson,
11  individually and in his official capacity as a city of Kodiak
12  police officer, Jeff Holden, individually and in his official
13  capacity as a city of Kodiak Police Officer, city of Kodiak,
14  and John and Jane Does 1 through 10, defendants. The case
15  number A05-0002 CV. This deposition is being taken on behalf
16  of the plaintiff.
17       Counselors, please identify yourselves for the record and
18  who you represent, starting with the plaintiff's attorney,
19  please.
20       MR. HERZ: Robert Herz, last name's spelled H-E-R-Z,
21  represent plaintiff, Scott Brown.
22       MR. KOZIOL: Frank Koziol for the defendants.
23       REPORTER: All right. Thank you. And, Chief, can you
24  please raise your right hand.
25
```

Page 4

```
 1       (Oath administered)
 2    CHIEF KAMAI: I do.
 3    REPORTER: Thank you.
 4              CHIEF CHARLES I. KAMAI
 5  having first been duly sworn under oath, testified as follows
 6  on:
 7                 DIRECT EXAMINATION
 8    REPORTER: You can put your hand down. Please state your
 9  full name for the record and spell it for me, please.
10  A  Charles I. Kamai, Jr. The spelling of the last is
11     K-A-M-A-I.
12    REPORTER: And a mailing address?
13  A  217 Lower Mill Bay Road, Kodiak.
14    REPORTER: And how about a daytime telephone number or a
15  message phone where you could be contacted.
16  A  907-486-8000.
17    REPORTER: All right. Counselors, if there's no
18  stipulations, Mr. Herz, you may be begin.
19    MR. HERZ: Thank you.
20  BY MR. HERZ:
21  Q  Good afternoon, Chief Kamai. How are you?
22  A  I'm very fine, thank you.
23  Q  Have you ever been deposed in a civil case before?
24  A  Yes, I have.
25
```

Page 5

```
 1  Q  And how many times have you been deposed before?
 2  A  Just guessing over the last 20 years of my law enforcement
 3     career, probably a half dozen times.
 4  Q  Okay. So you understand you're under oath, right?
 5  A  I do.
 6  Q  Same kind of oath that you would take if you testifying in
 7     a criminal case.
 8  A  I do.
 9  Q  Right. And having gone through the experience of
10     testifying a half dozen times in civil cases over 20
11     years, you understand that if I ask you a question that
12     you don't understand, the expectation is you'll indicate
13     you don't understand it so the question can be rephrased
14     or put it to you in another way so it's understood.
15  A  Yes, I do.
16  Q  And that if you answer a question without indicating you
17     didn't understand, the assumption is you understood the
18     question and your answer that you gave was responsive to
19     the question as it was put to you.
20  A  I understand that.
21  Q  Okay. And you're agreeable with that, right?
22  A  Yes.
23  Q  Okay. Chief Kamai, you are currently Chief of the Kodiak
24     Police Department for the City of Kodiak, right?
25
```

Page 6

1  A  Yes, I am.
2  Q  And how long have you held that position?
3  A  I was appointed Chief of Police in February of 2000.
4  Q  And prior to that, were you with the Kodiak Police
5     Department?
6  A  Yes, I was.
7  Q  And in what capacity?
8  A  I began employment with the police department in September
9     of 1988 and I have held a variety of different assignments
10    and patrol as an officer and a supervisor and in the
11    police department's investigative units as a detective and
12    a detective supervisor.
13 Q  Okay. And so you'd indicated 20 years of law enforcement
14    experience and you indicated that you started with Kodiak
15    Police Department back in 1988. So this being 2008, it
16    sounds like -- I mean your whole career's been with the
17    Kodiak Police Department?
18 A  I spent a short period of time with the Anchorage Police
19    Department as a reserve officer prior to coming to Kodiak.
20 Q  And how long did you do that?
21 A  Probably a year.
22 Q  Okay. What kind of -- did you go to any kind of police
23    academy or training academy?
24 A  Yes, I did. The first academy I attended was Anchorage
25

Page 7

1     Police Department Reserve Academy 881 where I completed
2     the course curriculum there to be certified as a -- to be
3     recognized by the Anchorage Police Department as a reserve
4     officer and then from February through May of '89, I
5     attended and graduated from the Department of Public
6     Safety Police Academy in Sitka.
7  Q  Okay. And just so I understand, being I guess certified
8     or recognized as a reserved police officer, how is that
9     different than being recognized as a regular police
10    officer?
11 A  The academy course curriculum for APD, for example, was
12    not specifically.....
13 Q  This -- you're describing this as back in 1988, right?
14 A  Yes. I'm sorry. That's what I understood the question to
15    be.
16 Q  Okay. Now I'm asking you -- if your answer is based on
17    your experience from 1988, that's fine, but I'm asking you
18    if you qualitatively know what the difference is between,
19    you know, a reserve officer and a regular officer at APD.
20    And if your knowledge is only from 1988 and it's not
21    something that would be applicable to today, that's fine,
22    but.....
23 A  Sure.
24 Q  .....I'm just asking a more general question.....
25

Page 8

1  A  Okay.
2  Q  .....and if you can answer it in general, that's fine.
3  A  I think I can. I don't believe the reserve program exists
4     any longer with APD. I'm not precisely sure what date it
5     was phased out of the department, but I do believe now it
6     no longer exists. As far as the differences in academy
7     training, the Public Safety Academy curriculum, for
8     example, in Sitka is recognized and endorsed by the Alaska
9     Police Standards Council for certification of basic police
10    officers. The APD reserve academy that I attended was
11    not.
12 Q  At that time.
13 A  At that time.
14 Q  Okay. And you don't know if the reserve academy -- well,
15    at some point, was there two different academies for APD,
16    a reserve academy and then a regular APD academy?
17 A  Yes, there was.
18 Q  Okay. And do you know if reserve officers, whether the
19    reserve academy was at some point I guess no longer used
20    and reserve officers were trained the same as regular
21    police officers with APD? Do you have any information
22    along those lines?
23 A  No, I don't.
24 Q  Okay. So you were initially trained at the reserve
25

Page 9

1     academy with APD. Then you went to Sitka.....
2  A  Yes.
3  Q  .....for the Department of Public Safety Academy and that
4     was again what, in 1989 sometime?
5  A  Yeah. I believe it was February through May of 1989 was
6     when I was there.
7  Q  Okay. And since 1989, have you had any other formal
8     training at any kind of an academy?
9  A  I've not been through another police academy, but I
10    participated in training seminars and I reviewed the
11    Alaska legal bulletins and the like.
12 Q  Okay. Your job as -- and you were obviously Chief back in
13    2003 on January 4th, 2003, right?
14 A  Yes.
15 Q  And as Chief, you supervised Officer Frank Peterson and
16    Officer Frank Holden or.....
17 A  Yes.
18    MR. KOZIOL: Holden.
19 Q  Holden, right.
20 A  Yes.
21 Q  You've reviewed the circumstances of this case?
22 A  I'm familiar with them, yes.
23 Q  All right. And prior to coming here today, what kind of
24    materials did you review to prepare for this deposition?
25

Computer Matrix, LLC              Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473           sahile@gci.net

3

Page 10

1  A  I reviewed a lot of materials. I reviewed the videotape
2     that was made in the booking room with Mr. Brown. I
3     listened to Officer Peterson's field contact tape he made
4     at the time, and I've also reviewed the in-car camera
5     video that was made by Officer Peterson.
6  Q  Okay. Have you reviewed any documents?
7  A  I've reviewed several documents.
8  Q  And those being what?
9  A  I want to say that I -- I think I've reviewed the
10    affidavit. I don't know if I've reviewed the police
11    report. I've reviewed.....
12 Q  The police report meaning Frank Peterson's police.....
13 A  Officer Peterson's police report.....
14 Q  Okay.
15 A  .....that was filed in connection with Mr. Brown's arrest.
16 Q  Okay.
17 A  I've reviewed documents I think provided by you from your
18    experts and I can't remember any -- specific recollection
19    of any other documents I reviewed.
20 Q  Okay. Have you -- did you review Officer Holden's report?
21 A  I have not.
22 Q  Have you reviewed the radio log that was produced by
23    Officer Croyle in this case?
24 A  Yes, I have.
25

Page 11

1  Q  Have you reviewed the handwritten notes made by Officer
2     Croyle in this case?
3  A  Yes, I have.
4  Q  Have you reviewed any of the transcripts from any of the
5     testimony given by Frank Peterson in connection with this
6     case?
7  A  I don't believe I have.
8  Q  So none of the Grand Jury transcripts?
9  A  No.
10 Q  Not the evidentiary hearing?
11 A  No.
12 Q  Okay. Not the trial transcript?
13 A  I don't believe so.
14 Q  Okay. In the witness list provided by the defendants in
15    this case, you are listed as TC Kamai, Police Chief for
16    the City of Kodiak, subject of information: the
17    January 4, 2003, incident that is the subject of this
18    litigation.
19 A  Okay.
20 Q  That's the notice that the plaintiff has been provided
21    about what you're a witness. So do you have -- do you
22    have any personal knowledge about what happened on -- I
23    mean aside from reviewing the documents and the tapes that
24    you've just indicated, do you have any personal
25

Page 12

1     information, you know, things you observed, things that
2     you heard on that day regarding the incident?
3  A  No. I wasn't involved with the investigation and the
4     arrest when it occurred.
5  Q  Okay. Anything from that day, you know, not just the --
6     from the point of being dispatched to the point of the
7     arrest in the house, but subsequent to that day at the
8     station house in the booking room or at the jail, anything
9     like that?
10 A  No.
11 Q  No personal knowledge.
12 A  Correct.
13 Q  Okay. So when -- regarding this notice where it says
14    subject of information: January 4, 2003, incident that's
15    the subject of this litigation, what is your understanding
16    of if you were called to testify what you would testify to
17    regarding the January 4, 2003, incident?
18 A  My assumption of what I would be called to testify to I
19    think is related to the complaint that's been filed
20    against the officers, the city, and the police department
21    in that I might have information or knowledge or might be
22    able to explain or articulate some of the department's
23    policies and procedures.
24 Q  Okay. So you think you would be called upon to talk about
25

Page 13

1     policies and procedures of the department.
2  A  Be my assumption.
3  Q  Okay. Anything else?
4  A  Well, I guess I should be able to answer questions
5     relating to their training because I think that's an issue
6     that's been raised in a complaint as well.
7  Q  Okay.
8  A  And how we train police officers.
9  Q  All right. Anything else?
10 A  Perhaps dispatch procedures and operations.
11 Q  Okay. So dispatch procedures and operations, training,
12    and policies and procedures. Anything else?
13 A  Not that I'm aware of at this time.
14 Q  Okay. Does the department have a policy and procedure
15    concerning pursuit of subjects into residences?
16 A  No.
17 Q  Does the department have any sort of hot pursuit policy?
18 A  We have a policy which we title emergency vehicle
19    operations which pertains to hot pursuit, but it focuses
20    principally upon motor vehicle operation.
21 Q  So vehicles pursuing vehicles -- police vehicles pursuing
22    other vehicles, what might be sort of colloquially
23    referred to as a police chase while driving.
24 A  Yes.
25

Computer Matrix, LLC              Phone - 907-243-0668         jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473      sahile@gci.net

4

Page 14

1  Q  Okay. So -- but not a foot pursuit into somebody's home.
2  A  Yes.
3  Q  Yes.....
4  A  Accurate, yes.
5  Q  Yes, there's no policy concerning that.
6  A  Yes.
7  Q  All right. And more specifically nothing that provides
8     guidance or instruction to officers about when you can
9     make a warrantless entry into a home in hot pursuit and
10    when it's not appropriate. You don't have anything like
11    that.
12 A  I can't recall anything right now.
13 Q  Okay. Does the department -- aside from a written policy
14    and procedure, has the department done any training
15    because my recollection is -- and you sat here for the
16    depositions of Officer Holden and Officer Peterson. They
17    both indicated that field training and that they have been
18    to the academy. So aside from those things where they
19    described training, is there anything else that the
20    department has done outside of those venues to provide
21    training regarding hot pursuit in, you know, a situation
22    such as this case where there's a foot pursuit into a
23    residence?
24 A  Yes.
25

Page 15

1  Q  Please describe that.
2  A  Okay. First I think it's important to clarify with
3     respect to field training and I think Officer Peterson and
4     Holden both characterized it fairly accurately, but what
5     they didn't mention was the fact that prior to recruit
6     officers entering field training, we have a period of time
7     that we refer to as part of that program is orientation.
8     Typically lasts about two weeks and during orientation, we
9     provide them with their training and the certifications
10    that we feel they need prior to beginning field training.
11    I'll give you examples, would be report writing, search
12    and seizure, constitutional law, all of their less than
13    lethal implement certifications as well as firearm
14    certifications. And they have that initial training.
15    Then they begin their field training program and through
16    that 12-week approximately program of training, there's
17    constant reinforcement by their field training officers on
18    those different points and an opportunity for them to
19    apply what they've learned in a field structure. In
20    addition to that, we receive periodic bulletins and
21    updates from either the Attorney General's office
22    pertaining to changes in law and when we received those,
23    we disseminate them to all of our police officers with an
24    instruction to review them and retain them in their
25

Page 16

1     personal records for future consultation. And in addition
2     to that, we also receive periodic Alaska legal bulletins
3     that are disseminated usually by the Police Standards
4     Council which address issues and case law which are
5     relevant to peace officers and we also provide those to
6     all of our peace officers, again with the same directive
7     that they review these and then retain them in their own
8     personal records for future consultation.
9  Q  Okay. So specifically though the question was outside of
10    the field training window that occurs when the recruit's
11    first hired and going to the academy, has the department
12    done any specific training regarding foot pursuits and
13    making warrantless entries into homes in a foot pursuit
14    situation.
15 A  I can't recall that specific topic as something that we've
16    done.
17 Q  Okay. The bulletins and things that come from the Alaska
18    Police Standards Council, if issues are raised in those
19    that occur -- and let me just -- sort of hypothetical.
20    Let's say an officer is hired in 2000 and one of these
21    bulletins or newsletters comes out in say 1995. While
22    it's your policy to make copies of those and give them to
23    each of the officers and require that they maintain them
24    in their -- in some sort of personal record or file, an
25

Page 17

1     officer who comes on duty five years after that bulletin
2     got issued, they're not going to have a copy of that,
3     right?
4  A  We wouldn't provide it to them, but to the best of my
5     recollection, I think older bulletins are available on the
6     Police Standards Council Website, so it's available to
7     them, but we wouldn't provide it to them.
8  Q  And there's no requirement that they read the older
9     bulletins.
10 A  No specific direction.....
11 Q  Okay.
12 A  .....from me.
13 Q  Right. So the specific direction is when an existing
14    current bulletin gets issued, copies are disseminated to
15    everyone who's currently on the force. They're instructed
16    to read them and then keep a copy of it.
17 A  Yes.
18 Q  Okay. What additional training -- aside from bulletins
19    and newsletters and things of that sort, what additional
20    training has Officer Peterson received regarding making
21    decisions about warrantless entries into homes generally
22    and on constitutional issues generally?
23 A  The only training that I am certain he has received is
24    what we've provided him through orientation, field
25

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473           sahile@gci.net

5

Page 18

1    training, and what he may have received while in
2    attendance at the police academy.
3  Q Okay. You heard me -- and same question for Officer
4    Holden regarding any additional training that you're aware
5    of that he's received regarding warrantless entries into
6    homes and constitutional issues.
7  A My answer would be the same. The only thing I'm certain
8    he received is what we provided him in orientation, field
9    training, and what he would have received at the police
10   academy.
11 Q Okay. Were you -- you heard -- you were present during
12   Officer Peterson's deposition yesterday?
13 A Yes.
14 Q You heard me ask him to tell me what the definition of
15   reasonable suspicion was, right?
16 A Yes.
17 Q And you heard me ask him to tell me what the definition of
18   probable cause was, right?
19 A Yes. I heard you ask the question.
20 Q Right. And later you heard him admit that when I asked
21   him those questions he got those definitions completely
22   wrong, right?
23 A Yes. That's accurate.
24 Q All right. And in fact he confused the definition of
25

Page 19

1    probable cause with the definition of a civil standard
2    regarding preponderance of the evidence.
3  A Yes.
4  Q I have to assume you weren't real happy to hear that one
5    of your officers didn't -- couldn't articulate a fairly
6    standard legal standard that he is expected to apply on an
7    everyday basis.
8  A I think he didn't -- he didn't answer your question as you
9    wanted him to, but I also believe that he may have been
10   confused.
11 Q I just wanted him to give me a definition. I didn't have
12   an expectation about one thing or another.
13 A Uh-huh. (Affirmative)
14 Q But my question is given the fact that he got those
15   definitions wrong and he's expected to apply those legal
16   concepts every day, would it be fair to say that you
17   weren't happy with the fact that he didn't understand and
18   couldn't articulate those definitions. Were you happy
19   with that performance of your officer?
20 A I think he could have answered the question better, yes.
21 Q Okay. So the answer is you weren't happy with that
22   performance.
23 A I think he could have answered the question better.
24 Q You indicated that Officer Peterson had training in report
25

Page 20

1    writing in his field training period of time when he was a
2    recruit here at the Kodiak Police Department, right?
3  A Yes.
4  Q And what kind of -- what's the nature of that training?
5    What are recruits taught about writing reports?
6  A The recruits are taught that reports are important legal
7    documents that we rely on days, months, weeks, years down
8    the road for criminal prosecutions and potentially civil
9    litigation as well. They're taught that reports are
10   supposed to be clear, concise, chronological, and
11   accurate. We teach them our style of report writing, if
12   you'll allow me to say that, and how we expect things to
13   be done and how reports should be filed.
14 Q Okay. And do you -- would you agree that if Officer
15   Peterson was told that a 911 call came in reporting a
16   REDDI call and he neglected to put that in his report that
17   by doing that, he had failed to live up to the standards
18   that you just articulated?
19 A It's a fair statement to say he didn't meet my
20   expectations when he filed this report.
21 Q Okay. That would have been important and critical
22   information to include in a narrative police report,
23   right?
24 A Clearly.
25

Page 21

1  Q Okay. And you agree that would have been pretty important
2    and critical information to include in an affidavit in
3    support of a complaint where the complaint is alleging
4    driving under the influence.
5  A Yes.
6  Q Okay. And you heard Officer Holden indicate that he too
7    was told that this was a REDDI call and he too did not
8    include that information in his report. I assume you
9    would again agree that he did not meet the expectations
10   and didn't comply with the training he was provided in
11   report writing by the Kodiak Police Department.
12 A Yes, I would agree with that.
13 Q Okay. With regard to -- are there any sort of policy or
14   procedures in place regarding providing or pursuing
15   complaints by arrestees regarding any sort of injury they
16   may have received?
17 A There's an expectation, particularly since we -- we manage
18   and operate the Kodiak Jail for the DOC that at a point in
19   time an inmate makes a request for medical assistance that
20   we provide it to them.
21 Q Okay. So there has to be -- does the request have to be
22   clear and unequivocal? I mean does it have to be like an
23   affirmative request I need medical attention or is simply
24   complaining of an injury enough?
25

Computer Matrix, LLC                Phone - 907-243-0668                jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax    907-243-1473              sahile@gci.net

6

Page 22

1  A   I want to say that it has to be unequivocal if they ask
2      for medical attention. However, in a case where someone
3      perhaps may be incapacitated and unable to request it if
4      you're unconscious for an example.....
5  Q   Uh-huh.
6  A   .....then, you know, I would presume that common sense
7      would prevail and they would summon medical aid.
8  Q   Sure. Okay. But -- and just so I'm clear, the -- well,
9      let me just back up and clarify it. Is there a written
10     policy regarding officers' responsibilities for providing
11     medical assistance to arrestees? I just want to make sure
12     that I had a clear answer on that.
13 A   I'm searching my memory and the most accurate answer I can
14     give you is in our jail procedures, I know there is. On
15     the police side of the house and our patrol operations
16     procedures, I'm uncertain at this time.
17 Q   Okay. And so when you indicated where there's clear,
18     unequivocal, affirmative request for medical assistance,
19     was that based on the -- your knowledge of the -- your
20     definite knowledge that there's a policy that applies to
21     the jail or were you talking about a police officer's duty
22     in dealing with an arrestee?
23 A   The specific policy recollection relates to the jail.
24 Q   Right.
25

Page 23

1  A   As to the second half of your question, again I think that
2      if we have someone -- the officers understand that if they
3      have someone in custody and there's a request for medical
4      assistance that they're required to provide it.
5  Q   Okay. Where do they get that understanding from?
6  A   You could say that they got that understanding from me.
7  Q   And how did you impart that understanding to them?
8  A   Again I can't recall if we have a specific written policy
9      that addresses it, but I can recall instances in the past
10     where officers have requested assistance for people who've
11     requested it.
12 Q   So -- but that could have occurred simply because they
13     were exercising their discretion not because they were
14     responding to a policy that had been articulated.
15 A   That's possible.
16 Q   Okay. So if an arrestee complains of an injury, there's
17     no written policy about what duties the officer has to
18     follow up with those injury complaints, whether they have
19     to -- well, let me just -- there's no written policy about
20     what they have to do to follow up on those complaints?
21 A   None that I can recall at this time.
22 Q   Okay. Is there any written or informal policy about if
23     there is a complaint of an injury -- and let's assume for
24     the moment it's not obvious, in other words, they're not
25

Page 24

1      bleeding badly. There's no obvious compound fracture
2      where there's bone sticking out, but there's a complaint
3      of an injury. And is there any written or informal policy
4      about what the officer has to do to follow up to make sure
5      that the injury is either not serious or might require
6      medical attention?
7  A   And I don't know if this is going to answer your question,
8      but it occurs to me in that in our use of force policy, I
9      seem to recall language in there that talks about in the
10     application of force if there's a request for medical
11     assistance that it should be provided.
12 Q   Okay. But that goes back to a request for medical
13     assistance and I'm simply just saying the arrestee's
14     complaining of an injury. You know, let's say they said
15     my head hurts, you know, I'm -- you know, my vision's
16     fuzzy. I've got a headache. I feel like I got to throw
17     up and that's the complaint. But they don't specifically
18     say I want to go see a doctor or I need a medic or I need
19     to go to the hospital. They're not making a specific
20     request for assistance, but they're describing symptoms.
21     Okay? And none of those symptoms are obviously -- are
22     obvious to an officer. An officer can't see a headache.
23     They can't see dizziness. They can't see blurred vision.
24     What is the duty of the officer to follow up on a
25

Page 25

1      complaint like that? What step-by-step process does the
2      officer have to engage in?
3  A   Well, under the circumstances that you just described, I
4      would presume that if the prisoner was making those types
5      of statements to them that the officer perhaps would
6      inquire about the symptoms and if they require that kind
7      of -- if they required any attention.
8  Q   So you would hope they would do something, but there's
9      nothing either formal or written that requires them to do
10     something.
11 A   Again not that I can recall at this time.
12 Q   And if a prisoner says I had a preexisting injury and it's
13     now been reinjured and again it's not something that
14     obvious to the officer, he can't see it, similar to the
15     kinds of symptoms we were just describing, I take it your
16     answer would be the same, you would hope that they would
17     follow up on that, but there's nothing that requires them
18     to?
19 A   Again not that I can recall at this time.
20 Q   Other than the hot pursuit issue in this case and the use
21     of force issues that arise in this case and the medical
22     assistance issues that arise in this case, are there any
23     other policy or procedures based on your review of the
24     materials that you've made that are implicated by this
25

Computer Matrix, LLC                    Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473               sahile@gci.net

7

Page 26

1    incident?
2  A  I'm not sure I understand your question.
3  Q  Well, we've talked -- we haven't talked about use of
4     force, but that's obviously a potential issue in this
5     case, right?
6  A  Yes.
7  Q  And the department's got a policy and procedure concerning
8     use of force.
9  A  Yes.
10 Q  All right. And we've talked about whatever policy and
11    procedures may or may not exist regarding medical
12    assistance and also hot pursuit.
13 A  Yes.
14 Q  We talked about those things. All right. And you've
15    previously indicated you've reviewed materials, you know,
16    pertinent to this case that relate to this incident, okay?
17    So I'm asking based on your review of the materials --
18    okay -- and based on the -- and you've read the complaint
19    in this case.
20 A  I have.
21 Q  Okay. So based on your review of the materials that you
22    looked at in preparation of this deposition and based on
23    the complaint that was filed, what other department
24    policies and procedures are at issue that you can see?
25

Page 27

1  A  I suspect report writing policies and procedures.
2  Q  Okay. And we talked a little bit about that.
3  A  Okay.
4  Q  Right? Okay. Anything else?
5  A  I'm not sure if this would be included in the last thing
6     concerning report writing, but perhaps dispatch
7     operations.
8  Q  All right. And I am going to talk to you in a little bit
9     about dispatch.....
10 A  Okay.
11 Q  .....issues, but those would be the one, two, three,
12    four -- the five issues -- policies and procedures, right?
13    Okay.
14 A  Yes.
15 Q  And we talked about training as it related to report
16    writing. Is there a written policy or procedure regarding
17    report writing?
18 A  Yes.
19 Q  And where -- and what does that basically indicate? What
20    does that say?
21 A  I believe it discusses what I had mentioned previously as
22    to how we write our reports, what our expectations are,
23    how they should be completed and a little bit of the
24    process on how they should be submitted for review.
25

Page 28

1  Q  Okay. So in addition to Officer Peterson's report and
2     affidavit not meeting training requirements, it'd be fair
3     to say then it didn't meet the policy and procedure
4     statement either, the expectations set forth in the
5     written policy and procedure?
6  A  I think that would be a fair statement.
7  Q  Okay. And that would be true of Officer Holden's report
8     then too, right?
9  A  Yes.
10 Q  Now, does the report writing policy and procedure, the
11    written one, apply to dispatchers?
12 A  No.
13 Q  Okay. So they're bound by separate dispatch policies and
14    procedures?
15 A  Yes.
16 Q  All right. Does the department have any policies and
17    procedures or anything informally, whether written or not,
18    about, oh, continuing education regarding updating
19    officers' background and knowledge on Alaska legal issues
20    outside of being given copies of those newsletters and
21    bulletins that you talked about previously?
22 A  Through our in-service training program, we seem to always
23    be in a state where we're constantly providing officers
24    additional training in subjects that are -- we feel are
25

Page 29

1     pertinent and relevant to their jobs. I can recall there
2     have been a few instances with cooperation from our
3     District Attorney's office where we've -- he's come over
4     and lectured on different law topics and -- so I think
5     that's -- kind of encapsulizes it.
6  Q  Okay. And -- but in the training an officer gets like
7     that in other places when they go to seminars and things
8     like that, that's all kept track of, that's all recorded
9     so that the officers -- you know, like, for instance, when
10    the officer gets training in use of force or additional
11    training in firearms handling or things of that sort,
12    those seminars and whatnot, those are kept track of, the
13    dates when they were done, the hours that were involved,
14    right?
15 A  Yes.
16 Q  And that information's maintained in the officer's
17    personnel file, right?
18 A  It's maintained in -- by our training manager in a file,
19    yes.
20 Q  Okay. So the -- and they -- the list of training that
21    they get, that would include those seminars put on by the
22    department of law, District Attorneys, things of that
23    sort, right?
24 A  Yes.
25

Computer Matrix, LLC                  Phone - 907-243-0668                jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax   907-243-1473                sahile@gci.net

8

Page 30

1  Q   All right. So if we got the list of training for both
2      Officer Holder and Officer Peterson, that would be
3      reflective of any of the additional training that we're
4      talking about, right?
5  A   Yes, but I would add the caveat as long as they've
6      submitted the appropriate -- we call them -- used to call
7      them training cards.
8  Q   Uh-huh.
9  A   And that's just notice to the training manager that
10     they've participated in something. So if they have
11     submitted a training card on it, it would be reflected in
12     their training record.
13 Q   Are they required to submit training cards when they
14     receive training?
15 A   Yes.
16 Q   So if they're following the rules and procedures of the
17     department, they would file such a card, right?
18 A   Yes.
19 Q   Okay. So -- is there any requirement that an officer
20     specifically update their training in particular subject
21     matters like -- and let me just kind of give you an
22     example. Like, for instance, is there any requirement the
23     department has that say every two or three years or
24     whatever the period of time might be that an officer
25

Page 31

1      refresh his education regarding constitutional issues,
2      warrant issues, probable cause issues, legal standards,
3      Alaska laws, things like that? Is there any specific
4      requirement that they update in that area, that category,
5      on a regular basis?
6  A   No.
7  Q   Okay. Were you aware that -- well, is it -- let me ask
8      this. Is it your understanding that dispatchers were
9      notarizing affidavits on the back of the Notice and Order
10     of Revocation forms?
11 A   That they were notarizing?
12 Q   Yeah. That that's -- that they are doing that.
13 A   Yes.
14 Q   Okay. And were you aware -- well, there's been some
15     suggestion -- some testimony that they may be fulfilling
16     their notary duties days after the affiant has actually
17     signed the affidavit. Were you aware that practice was
18     going on in your department?
19 A   Yes.
20 Q   And are you knowledgeable regarding the laws involving
21     notaries, that they're supposed notarize a signature when
22     the affiant personally appears before them and they're
23     supposed to date that on the day that the signature of the
24     affiant is applied to the document?
25

Page 32

1  A   Yes.
2  Q   And is it your testimony that in spite of those laws
3      you're allowing notaries in your office to execute -- or
4      notarize documents contrary to those laws and rules?
5  A   It's not by choice.
6  Q   Well, please explain.
7  A   There are periods of time when our dispatchers who are our
8      notaries, when we have new ones, there are periods of time
9      when we don't have dispatchers who are notaries and so --
10     and there was a period of time perhaps around this period
11     of time that the Brown arrest was made where we had
12     several new dispatchers that weren't, if I recall
13     correctly, and there weren't notaries on shift to execute
14     that paperwork when the officers submitted their reports.
15     So the reports would -- under those circumstances, they
16     weren't done until a notary did come on shift and they
17     were able to do it. Now of course by that time, the
18     officers had gone home. The end of their tour had
19     occurred and they had moved on. I also know that the way
20     we process reports when the officers complete their
21     reports and submit them, they turn them into a central
22     place where their supervisor is supposed to review them.
23     That could be a day. It could be two days or longer
24     before a supervisor gets to review them and then once the
25

Page 33

1      supervisors review the report and if it's approved, it
2      goes to dispatch for filing and processing.
3  Q   Okay. Let's kind of take those one at a time.
4  A   Sure.
5  Q   If the circumstances existed that you didn't have a
6      dispatcher on duty that was a notary -- and correct me if
7      I'm wrong. You're not saying -- you're not asserting that
8      that in fact was the case on January 4th, 2003. You're
9      just saying it was a possibility.
10 A   Correct. It's a possibility.
11 Q   Okay. So am I to understand correctly that only under
12     those circumstances would the affidavit be notarized later
13     when there was a notary on duty, but otherwise the
14     expectation was the affiant would sign and the notary
15     would notarize at the time the affiant signed the
16     document?
17 A   I relate back to my days when I used to do real police
18     work. If I were filing an affidavit or submitting a
19     Notice and Order of Revocation, those would be documents
20     that I would complete prior to the end of my shift and
21     take them to my dispatcher -- they were a notary -- and
22     sign it in front of them and have them seal it and certify
23     it and then process it. So that's how I understand the
24     process is supposed to work in an ideal situation.
25

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax   907-243-1473            sahile@gci.net

9

Page 34

1  However, confronted with some of these issue where we
2  don't always have a notary on duty at the time that these
3  documents are done, I think they are in fact being signed
4  and then submitted and then when we do have a notary
5  available, they are processing them in that.....
6  Q  Okay. I understand that, but that's not exactly the
7     question I asked. Is it the -- aside from the issue of
8     not having a notary on duty, is it your understanding that
9     aside from that when a notary is on duty, the affiants are
10    signing the documents in the presence of the notary and
11    they're being notarized on the day they're being signed?
12 A  That would be my understanding, yes.
13 Q  Okay. And you're saying that -- and would it be -- would
14    be your understanding that so long as a notary is present
15    that the affiant is -- as you indicated, your normal
16    practice would be to fill out -- to try and fill out that
17    document by the end of your shift at least and then have
18    it signed, but -- so if a notary's present, that would be
19    your understanding of how it's being done now.
20 A  Yes.
21 Q  All right. And if a notary's not present and you
22    understand that the affiant is signing without the notary
23    being present and notarizing it on that day and sealing it
24    on that day, why haven't you as Chief of Police instructed
25

Page 35

1     your officers that they're not to fill out these
2     affidavits and sign them until there is a notary present
3     and follow the laws of the State of Alaska regarding
4     notary as opposed to letting them fill out the documents
5     and sign them and having the notaries notarize them at
6     some later date without the officer present and dating
7     them on a date different from when the document's being
8     filled out? Why not just tell them you don't file that
9     document and you don't submit it for review until you've
10    notarized it and you followed the notary laws in doing so?
11 A  In the case of an affidavit, if we're dealing with someone
12    who is in custody, the affidavit needs to be notarized
13    prior to their arraignment, as I understand it, and if the
14    notary's not available, I don't know how that might affect
15    the person if they're in custody, their arraignment
16    because we don't have a notarized complaint or an
17    affidavit.
18 Q  All right. Timeout. Not talking about affidavits in
19    support of complaints now. Talking about the affidavit on
20    the back of the Notice and Order and Revocation form in a
21    DUI case which is being submitted to the DMV where the
22    officer's providing the DMV grounds for revoking the
23    arrestee's license. Okay? This is a different situation
24    than filing a complaint -- filing an affidavit in support
25

Page 36

1     of a complaint.
2  A  Okay.
3  Q  So it has nothing to do with bringing the arrestee in
4     front of a judge, okay? So -- and that's a separate issue
5     and if there's no notary available, there's a solution to
6     that problem too, but aside from that, because you're
7     sending a form to DMV and there's no, you know,
8     necessarily a rush to do so, why haven't you instructed
9     your officers to follow the law and sign those affidavits
10    in front of a notary rather than signing them essentially
11    in blank without the notary present and having your
12    notaries sign them later in violation of the law. Why
13    haven't you instructed your employees to follow the law?
14 A  My first inclination is to say I didn't believe that this
15    is a chronic problem for us now.
16 Q  Okay.
17 A  And I just don't believe it's a chronic problem that would
18    require it.
19 Q  Okay. Even though it's not a chronic problem, if you knew
20    it was going on, isn't the correct instruction to the
21    employee is if there's no notary available, if one of the
22    dispatchers is not a notary, you're not to file this
23    document? You're not to sign it until there is a notary
24    available?
25

Page 37

1  A  Would that be a fair instruction?
2  Q  Wouldn't -- not only fair, but wouldn't it be the correct
3     instruction so that they're following the law?
4  A  Yes.
5  Q  Okay. Now, in addition to not having a notary present at
6     the time, the other reason you gave for not following
7     that -- for not having the affidavit signed was -- or not
8     having it signed in front of a notary was that the
9     paperwork's got to be reviewed by a supervising officer,
10    right?
11 A  Correct.
12 Q  Okay. So again couldn't that particular document be
13    reviewed after a notary's been located and the officer has
14    executed the affidavit in front of the notary?
15 A  Ideally, yeah.
16 Q  Okay. Now, with regard to dispatch policies and
17    procedures, isn't the -- isn't a dispatcher supposed to
18    take down written information -- well, let me back up --
19    let me withdraw that question. When a 911 call comes in
20    to dispatch, dispatchers keep handwritten notes that they
21    work off, right?
22 A  Yes.
23 Q  And so when the call comes in, the first place they're
24    putting in information is on these handwritten note pads,
25

Computer Matrix, LLC            Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473         sahile@gci.net

10

Page 38

1   right?
2 A Yes.
3 Q Okay. And so when a 911 call comes in, aren't the
4   policies and procedures clear that they're supposed to
5   indicate in their records that they've received a 911
6   call?
7 A By record, you mean their notebooks?
8 Q Yeah, their notebooks.
9 A Yes.
10 Q That would be the first place that information would
11   appear, right?
12 A Yes.
13 Q Okay. And isn't it also true that dispatchers are trained
14   and taught that not only should they indicate that a 911
15   call has come in, but when a REDDI call comes in, they're
16   supposed to indicate that a REDDI call has come in, right?
17 A Yes.
18 Q Okay. And so in reviewing Officer Croyle's handwritten
19   notes, I take it you saw that he didn't write down in his
20   handwritten notes that he had received a 911 call and he
21   didn't indicate that he had received a REDDI call, did he?
22 Q I don't -- I can say without a doubt, there's no reference
23   to a REDDI in the handwritten notes I reviewed.
24 A Then you're not sure if he indicated he'd received a 911
25

Page 39

1   call?
2 Q Correct.
3 A Okay. Okay. I'm going to refer to Bates stamp
4   number 10453.
5   MR. KOZIOL: Mr. Herz.
6   MR. HERZ: I'm sorry.
7   MR. KOZIOL: Thank you.
8   MR. HERZ: And 10454.
9 Q So looking at the first entry there at I think it says
10   1651.
11 A Uh-huh. (Affirmative)
12 Q Is there anything that indicates that Officer Croyle is
13   taking notes regarding a 911 call?
14 A No.
15 Q And there's nothing to indicate he's receiving a REDDI
16   call.
17 A Correct.
18 Q And that's contrary to dispatch policies and procedures.
19 A Well, what our policies don't cover is any idiosyncracies
20   a note taker might be taking.
21 Q Well, but.....
22   MR. KOZIOL: Were you finished with your answer or.....
23 A Yes.
24   MR. KOZIOL: Okay.
25

Page 40

1 Q Okay. Well, if a policy is when you receive a 911 call
2   you're to write that down and when you receive a REDDI
3   call you're supposed to write that down and the dispatcher
4   doesn't write it down, that's not an idiosyncratic
5   decision on the part of the note taker. That's a
6   violation of the policy, isn't it?
7   MR. KOZIOL: Objection. Form.
8 A He didn't list it in his notes, but based on some of the
9   other documents I reviewed, he did list that it was a
10   REDDI call.
11 Q Right. But as we already established, this is the first
12   place that he puts information down.
13 A Uh-huh. (Affirmative)
14 Q Right?
15 A Yes.
16 Q And as we've already established, the policies and
17   procedures are when he's taking information down, he's
18   supposed to put it here first, right?
19 A Yep.
20 Q Because it's a contemporaneous note as to information
21   that's coming in from a caller.
22 A Uh-huh. (Affirmative)
23 Q And there is no contemporaneous note that reflects that
24   information here, is there?
25

Page 41

1 A Not apparent in this, what I'm seeing, no.
2 Q Okay. So -- and some things that might be at the
3   discretion of the note taker might be, oh, say, for
4   instance, the caller says the driver did a 360 or the
5   driver fishtailed, the note taker could say -- or the
6   driver is driving erratically, instead of writing driver
7   erratic, the note taker could say driver's reckless. That
8   would be idiosyncratic, right?
9 A Yes.
10 Q Okay. If the caller says the driver's driving
11   erratically, the driver's driving reckless, the driver's
12   doing a 360, the driver is fishtailing and the note taker
13   doesn't say any of that, completely leaves all that out,
14   that's not an idiosyncracy, that's failing to perform his
15   duties, isn't it?
16 A I guess the best -- the most accurate answer I can give
17   you is if he feels he didn't need to note that in his
18   notes here but if he completed it in the log complaint
19   that he would have to do subsequent to this, then in my
20   opinion, I think he's fulfilling what our needs are, what
21   the needs of the police department are.
22 Q Okay. But the information in the log complaint and -- and
23   I want to get our terminology straight, that when you're
24   talking about a log complaint, you're talking about what's
25

Computer Matrix, LLC               Phone - 907-243-0668                jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473             sahile@gci.net

11

Page 42

1   been alternatively referred to as a dispatch log or a
2   complaint card, right?
3 A Yes.
4 Q All right. And the policy and procedure is that complaint
5   card -- that dispatch log only needs to be filled in
6   completely by the end of the dispatcher's shift; is that
7   right?
8 A Yes.
9 Q All right. And so some of that information -- or all of
10  that information can be filled in after the fact.
11 A Yes.
12 Q Okay. And in filling out the dispatch log, if the
13  dispatcher's handwritten notes are incomplete, the
14  dispatcher has the ability to go back and if there's been
15  a 911 call listen to the 911 call so the dispatch log can
16  be filled in correctly, right?
17 A I think that's an accurate statement.
18 Q And the dispatcher also has the ability to listen to tapes
19  of the radio traffic that were recorded -- and radio
20  traffic is recorded, right?
21 A Yes.
22 Q And so the dispatcher can go back if his notes -- his
23  handwritten notes are incomplete and in order to fill out
24  a complaint card more completely can go back and listen to
25

Page 43

1   the radio traffic and fill in information that he's
2   gathered from that source, right?
3 A I think if it's necessary, yes.
4 Q All right. So the dispatch log is not necessarily a
5   record that reflects things that occurred at the time they
6   were happening. It's not necessarily a contemporaneous
7   record of an event, is it?
8   MR. KOZIOL: Objection. Form.
9 A It could be.
10 Q But it's not necessarily so.
11 A But it could be.
12 Q Right. Now, in the dispatch notes themselves, this block
13  on the dispatch log -- and I'm referring to Bates -- can
14  we go off record?
15  REPORTER: Sure. Off record.
16  (Off record)
17  REPORTER: All right.
18 Q The block that's in the complaint card under the title
19  dispatch notes, that -- the type we see here, that's being
20  filled in on a computer, right?
21 A Yes.
22 Q And again all of that information can be filled in either
23  as the dispatcher's going or later.
24 A Correct.
25

Page 44

1 Q Okay. And in this case -- and if anything's going to be
2   done contemporaneously, in other words, as it's happening,
3   it would be this information here under dispatch notes,
4   right?
5 A I think so, yes.
6 Q Okay. And so there's nothing in the dispatch notes here
7   that says that this was a REDDI call or the driver -- or
8   there was a report of an intoxicated driver, is there?
9 A I don't know if I've reviewed that document.
10 Q Well -- referring to 10462, take a look at the block under
11  dispatch notes.
12 A Okay.
13 Q So there's nothing -- and as we just established, if
14  anything's being done contemporaneously with the call, it
15  would be this information here, right? We just
16  established that. Is that right?
17 A Yes.
18 Q Okay. And there's nothing under dispatch notes that shows
19  that the call received was a REDDI call, is there?
20 A There's nothing typed in here; that's correct.
21 Q Okay. And there's nothing in the dispatch notes that says
22  the call involves a possibly intoxicated driver, right?
23 A That's correct.
24 Q In fact, there's a ten code, right, like 10-4, 10-8,
25

Page 45

1   10-20. There's a ten code for an intoxicated driver or
2   possibly intoxicated driver, right?
3 A I believe there is.
4 Q And that's a 10-50, isn't it?
5 A I believe it is.
6 Q So there's nothing even here that says possible 10-50.
7 A No.
8 Q I mean that would have been the short -- if you really
9   wanted to do a shorthand, that'd be really shorthand,
10  right?
11 A It would be, but I think it's important to note that we
12  went away from a ten code system to plain voice a few
13  years during this period of time, so we try to discourage
14  the use of ten codes.
15 Q And in what context? When you say plain voice, what are
16  you.....
17 A Using common language, just how like you and I are
18  speaking now.
19 Q You mean for dispatch notes?
20 A For radio communication.
21 Q You mean in terms of communicating back and forth with the
22  officers?
23 A Yes.
24 Q Okay. And you want to -- that sort of -- was that a
25

Computer Matrix, LLC             Phone - 907-243-0668           jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax   907-243-1473      sahile@gci.net

12

Page 46

1   written policy or an informal policy?
2 A It was an informal policy that occurred probably in the
3   early '90s.
4 Q Okay. But was it a mandate? I mean they were required to
5   do that, or it was just something that was discouraged?
6 A It's -- as I understand it, it's part of the national
7   incident response system where they're trying to develop
8   interoperability between public safety agencies. We found
9   that so many agencies use different ten codes.
10 Q Uh-huh.
11 A They couldn't talk to each other during critical
12   incidents.
13 Q Okay. But as we see in the radio log.....
14 A Uh-huh. (Affirmative)
15 Q .....Officer Croyle does use ten codes.
16 A Yes.
17 Q Okay. We see.....
18 A Limited use I should say. I'm sorry. I'll clarify.
19 Q Okay. Right.
20 A We have limited use.
21 Q But I mean we see references to a 10-6, a 10-7, a 10-20.
22   So -- and it's every couple of lines, right?
23 A Yes.
24 Q So all I'm saying is if a dispatcher's in a hurry and he
25

Page 47

1   wanted to indicate that this was a REDDI call or a
2   possibly intoxicated driver call, to really use shorthand,
3   he could just say 10-50 and that wasn't even done.
4 A It wasn't done in this circumstance; that's correct.
5 Q Okay. Now, is there any policy or procedure that guides a
6   dispatcher for instances where a dispatcher's
7   communicating information to an officer who's not on
8   patrol, who's at the station house where the dispatcher
9   says -- is basically dispatching that officer to a scene
10   or a location? Is there any policy or procedure that
11   guides the dispatcher as to whether or not he needs to
12   record the information he's providing to the officer that
13   he's dispatching?
14 A Nothing beyond relaying the information from the
15   complainant to the officer that's been assigned the call
16   that I'm aware of.
17 Q So there's no requirement that the dispatcher indicate
18   that he specifically dispatched a particular officer and
19   what the nature of the dispatch was.
20 A Well, I think if you look at the complaint card, it
21   identifies what officer was assigned the job and what that
22   represents to us is that's the officer that was assigned
23   the job. The dispatcher notes I think is what that block
24   says is the information that was taken by the dispatcher
25

Page 48

1   and then relayed to the responding resource.
2 Q Well, assuming that those notes were filled in
3   contemporaneously with the caller providing the
4   information.
5   MR. KOZIOL: Objection. Form.
6 Q We previously established that if anything on the
7   complaint card's contemporaneous, it would dispatch notes,
8   right, but we also established that those dispatch notes
9   could have been filled in after the fact.
10 A Correct.
11 Q Okay. So when you say that what the -- you know, that
12   your expectation is that the dispatcher will relay to the
13   officer what are in the dispatch notes on the complaint
14   card, that's assuming that that information had already
15   been filled in at the time of the dispatch and that may or
16   may not be the case.
17   MR. KOZIOL: Objection. Form.
18 A Well, they wouldn't -- the dispatcher, to my knowledge,
19   wouldn't create the complaint log and then contact the
20   officer. I think the dispatcher would take the
21   information, contact the officer, relay the information.
22   The officer would go out and some time between that point
23   and the end of their shift, they would complete the
24   complaint log.
25

Page 49

1 Q Okay. So when the dispatcher's relaying the information
2   then he's working off his or her written notes not the
3   information on a complaint card.
4 A I think the accurate answer would be their written notes,
5   any they've made and anything that they may have retained
6   in their mind from talking to the complainant.
7 Q Okay. And the complaint card indicates who the officer is
8   that's assigned, but again that information gets filled in
9   after the fact.
10 A Yes.
11 Q And so I want to go back to -- the question I asked is are
12   there any policy or procedures that are in place that
13   require a dispatcher to record who's being dispatched, why
14   they're being dispatched, and the information they are
15   given when it happens even when the dispatch is occurring
16   in the station house.
17 A As I understand your question, there is no policy that I
18   am aware of that prescribes a dispatcher -- how a
19   dispatcher should document information they're passing on
20   to responding.....
21 Q So there's no requirement that when a dispatch occurs in
22   that situation within the station house that some sort
23   of -- that the dispatcher is required to make a
24   contemporaneous record of what's communicated.
25

Computer Matrix, LLC              Phone - 907-243-0668             jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax   907-243-1473         sahile@gci.net

13

Page 50

1  A   As I understand your question, no.
2  Q   Okay.
3      MR. KOZIOL: We've been going for a little over a hour.
4      When you get a chance, I'd like to take a break.
5      MR. HERZ: Okay. Well, I think I'm pretty close to
6      finishing up, so.....
7  Q   When an officer goes in service because they've been
8      dispatched, isn't it expected that the officer -- the
9      officer will radio in to dispatch that he or she's going
10     into service; is that right?
11 A   Yes.
12 Q   And if they've been dispatched, would it not be expected
13     and appropriate that the officer says in service and
14     responding to whatever they've been dispatched to go do?
15 A   Not necessarily.
16 Q   Would the -- would policies and procedures require the
17     dispatcher when he notes or she notes that the officer's
18     going in service to note what they're going in service for
19     when they've been dispatched to a particular incident?
20 A   I'm sorry. Could you say that one more time?
21 Q   Sure. The previous question is what would be expected of
22     the officer? What would he or she communicate to
23     dispatch. This question is even if the officer doesn't
24     communicate it, are there policies and procedures that
25

Page 51

1      would require or guide the dispatcher when an officer goes
2      in service in response to a complaint to indicate that the
3      officer's going in service and why they're going in
4      service? What the incident is that they're responding to.
5  A   The dispatcher indicating that?
6  Q   Yeah.
7  A   And as in terms of the radio log?
8  Q   On the radio log, right. You know, write -- the
9      dispatcher writes I slash S, in service, and then is the
10     policy and procedure, either written or informal, that
11     they indicate what they're going in service for or when
12     they've been specifically dispatched to a complaint?
13 A   Not that I'm aware of, no.
14 Q   Are you familiar with the specific -- let me ask two
15     different questions. Who presently provides training to
16     dispatchers right now as we speak today?
17 A   My dispatch supervisor.
18 Q   And who's that?
19 A   Sergeant Delana Hatfield.
20 Q   Okay. And back in 2003, let's say -- well, let me -- back
21     in 2003, who was the supervisor that would have been
22     providing that training?
23 A   And you can ask me that question and I'm trying to think.
24     The supervisor -- I had a supervisor, Sergeant Nancy
25

Page 52

1      Perry, who had retired and was replaced by Sergeant
2      Hatfield. I can't recall what year she retired though.
3  Q   Okay.
4  A   So it would be one of the two.
5  Q   And who was the person who trained Doug Croyle?
6  A   I can't say for certain.
7  Q   Do you know what the content of the training consists of?
8  A   I have a general understanding of what the dispatcher
9      training program contains.
10 Q   Okay. Do you know in particular whether dispatchers are
11     instructed to indicate when an officer's been dispatched
12     in the manner we're talking about leaving the station
13     house and the officer radios in and says okay, I'm going
14     in service, whether or not the dispatchers are trained to
15     indicate whether -- you know, why they're going in service
16     or indicate -- like for instance in this case, the
17     dispatcher could have written I-S, in service, possible
18     10-50. Do you know if there's training that instructs the
19     dispatcher to indicate why there officer's going in
20     service?
21 A   Yes. But it pertains our procedures for dispatching fire
22     and EMS resources and not police to my knowledge.
23 Q   Okay. So you believe there's specific training provided
24     to dispatchers to indicate when fire -- or why fire and
25

Page 53

1      EMS are going in service, but that doesn't pertain to
2      officers.
3  A   Yes.
4  Q   Okay. But you don't know if your dispatchers have been
5      trained to do that or not for sure.
6  A   I'm willing to say that they haven't been trained to do
7      that because it's not -- as you describe the scenario,
8      it's not something that I'm familiar with from the days
9      when I did real police work and it's not something I'm
10     familiar with hearing now given the circumstances that
11     you've described.
12 Q   Okay. Familiar with hearing or familiar in terms of
13     reviewing logs?
14 A   Both.
15 Q   Okay. All right. And then what would be the training for
16     a dispatcher when an officer radios in that they're
17     conducting a traffic stop on a particular vehicle in a
18     REDDI case? Would the expectation be that the officer
19     would radio in, you know, traffic stop, you know, license
20     plate number, and, you know, a possible 10-50 or a REDDI
21     call?
22 A   No. I think they would -- if they found the vehicle, they
23     would make the traffic stop. They would, through using
24     the radio system, relay back to dispatch the location, the
25

Computer Matrix, LLC                Phone - 907-243-0668            jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473         sahile@gci.net

14

### Page 54

1     fact that they're making a traffic stop, and the license
2     plate and/or description of the vehicle.
3  Q  Okay. If the dispatcher knew that it was a REDDI call
4     that they had dispatched the officer to and the officer
5     radios in traffic stop, license plate number, is the
6     dispatcher trained to indicate that the stop related to a
7     REDDI call when it is a REDDI call?
8  A  And the question was? I'm sorry?
9  Q  Are dispatchers trained to include that information in the
10    radio log?
11 A  I don't know.
12 Q  Okay. So we would want to talk to training supervisors
13    for dispatchers as to what they're teaching their
14    dispatchers to do in situations like that.
15 A  Yes.
16 Q  Is that right? And going back to the other issue
17    regarding when an officer goes in service, again it would
18    be appropriate to talk to a supervisor who's training
19    dispatchers as to what they should write when the officer
20    goes in service and they're not being -- and that's -- and
21    they're being dispatched to a particular incident and the
22    dispatch occurs not over the radio.
23 A  Correct.
24 Q  Okay. I want to show you a document, has a Bates stamp
25

### Page 55

1     number of 10015. Okay. This document's entitled Incident
2     History for a Person and I want to direct your attention
3     to the information that appears under -- it says case
4     number 20030101.
5  A  Okay.
6  Q  Okay. That contains a narrative of this -- first off, is
7     this a dispatch record also of some sort?
8  A  Yes.
9  Q  Okay. And what kind of dispatch record is this?
10 A  This is a contact history that we generate every time we
11    have contact with a citizen regardless of whether they're
12    a suspect, defendant, reporting party.....
13 Q  Okay.
14 A  .....victim.
15 Q  All right. So, you know, in Anchorage, that would be
16    called either a PLIMS or a Tiburon document, right?
17 A  Yes.
18 Q  Okay. And so I understand what the nature of the
19    information is. And when is this information included in
20    the incident report? When does that get typed in, what
21    we're looking at, this narrative?
22 A  I believe this is also done prior to the end of shift.
23 Q  Okay. And here it says related to this incident call
24    received by Douglas Croyle, officer assigned, Officer
25

### Page 56

1     Peterson. Called on cell phone reporting a golden,
2     flatbed truck left Safeway parking lot at a high rate of
3     speed, sprayed gravel all over female and store front,
4     swerving, weaving, did 360 on Selief, went up Pillar
5     Mountain Road, right?
6  A  Uh-huh. (Affirmative)
7  Q  Again no mention that this was either a REDDI call or a
8     possibly intoxicated driver or a 10-50.
9  A  And it also doesn't mention that he was arrested.
10 Q  It also doesn't mention that it was a 911 call, right?
11 A  Right.
12 Q  Okay. And would you agree all that information should
13    have been included?
14 A  If space allowed, yeah. A shorter synopsis would have
15    been that.
16 Q  Okay.
17 A  I would agree with that.
18 Q  And now what -- is there another dispatch record called
19    a -- that consists of maybe handwritten notes on
20    legal-size paper, 11 by 15, called a case log?
21 A  There might be.
22 Q  Okay. And where are those documents kept?
23 A  If it's what I believe it is, I think that's also
24    maintained in dispatch.
25

### Page 57

1  Q  Okay. And who would have custody and control over case
2     logs?
3  A  My assumption would be any of the dispatchers.
4  Q  Okay. And now the information in a case log, that's --
5     that information is written down contemporaneously with
6     information being imparted to the dispatcher, isn't it?
7  A  I would assume so.
8  Q  Okay. And that's like a one line description of the call
9     coming in?
10 A  I can't recall the content on that document.
11 Q  Okay. But that information again would get written down
12    secondary or after -- I mean the primary note taking is
13    that note taking in the notebook, what we've previously
14    looked at as Pages 10453 and 10454, these handwritten
15    notes.
16 A  That's the dispatcher's notebook, yes.
17 Q  Right. And that's the first place anything's written.
18 A  Presumably, yeah.
19 Q  Okay.
20    MR. HERZ: Okay. I don't have any further questions.
21    MR. KOZIOL: Want to go off the record for a moment.
22    REPORTER: Sure. Off record.
23    (Off record)
24    REPORTER: Okay. We're back on record and we're at Frank,
25

Computer Matrix, LLC              Phone - 907-243-0668             jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473        sahile@gci.net

15

Page 58

1  right?
2      MR. KOZIOL: Yeah.
3              CHIEF CHARLES I. KAMAI, JR.
4  testified as follows on:
5              CROSS EXAMINATION
6  BY MR. KOZIOL:
7  Q  Chief, I want to visit the topic of dispatch records.
8  A  Uh-huh. (Affirmative)
9  Q  And first of all, our incident in this case occurred on
10    January 4th, 2003, and that's when the documents relating
11    to this case I believe were created. What do you call the
12    computer system that was in effect on January 4th, 2003?
13 A  We refer to it as Filemaker Pro.
14 Q  Filemaker Pro.
15 A  Yes.
16 Q  Okay. And that's a computer system -- or what is that
17    system? Is it a computer or not computer?
18 A  It's a -- as I understand it, it's software. It's
19    utilized on the computer and we used it as a method of
20    making records.
21 Q  Okay. And how long do you know had that system been
22    existence prior to January 4th, '03?
23 A  To the best of my knowledge, it had been in existence at
24    the Kodiak Police Department for many, many years.
25

Page 59

1  Q  Okay. And then did you go to a different system --
2     different and had Filemaker Pro replaced?
3  A  Yes.
4  Q  When did that occur?
5  A  Sometime in mid 2003.
6  Q  Okay. But after our incident.
7  A  I believe so, yes.
8  Q  Okay. And then what was the new system called?
9  A  We refer to that system as Safety Suite.
10    MR. HERZ: I'm sorry. Safety what?
11 A  Suite.
12    MR. HERZ: Suite.
13 Q  Suite. Okay. And that's a software program -- computer
14    software program?
15 A  Yes.
16 Q  Okay. Now, have you been shown up to this moment in time
17    documents related to the Scott Brown case that were part
18    of Filemaker Pro and also Safety Suite?
19 A  Yes.
20 Q  Okay. And how can that be? If our incident occurred
21    while Filemaker Pro was in existence, how can there be
22    documents that are in Safety Suite?
23 A  We made a decision when we brought Safety Suite online
24    that we wanted to include old data in the system. So when
25

Page 60

1     we brought it online, we made a decision to have data that
2     was existing in Filemaker Pro from the beginning of
3     2003 -- January of 2003 until the moment that we brought
4     Safety Suite online imported into that so we would have
5     access to that data.
6  Q  Okay. All right. And if we're going to try to determine
7     what Douglas Croyle did on January 4th, 2003, or if it
8     spilled over to the next day when his shift ended, we want
9     to find Filemaker Pro documents, right?
10 A  Yes.
11 Q  That's what we're interested in, not documents from Safety
12    Suite.
13 A  Correct.
14 Q  Okay. So the -- just to be complete here, you were shown
15    11120 and 11121 and these are the notes that of Douglas
16    Croyle and apparently for the day in question, right?
17 A  Yes.
18 Q  And these notes are not part of either Filemaker Pro or
19    Safety Suite, right?
20 A  Correct.
21 Q  Okay. You had mentioned to Mr. Herz that there was a
22    document called a case log or complaint log? Am I right?
23    A complaint log?
24 A  Yes. Mr. Herz asked me about the existence of a case log.
25

Page 61

1  Q  Okay. And what's the proper term? Is it case log or
2     complaint log or it's interchangeable?
3  A  I believe they're interchangeable. We refer to it at the
4     Kodiak Police Department as a complaint log.
5  Q  Okay. So I'll just keep calling it a complaint log then.
6     And I think you indicated to Mr. Herz that you didn't
7     have -- you have not seen that document relating to this
8     case.
9  A  That's correct.
10 Q  Okay. And then while we were off record, you had someone
11    at the police department try to get it, correct?
12 A  Yes.
13 Q  And who did you have get it?
14 A  I believe I requested it specifically from Sergeant
15    Hatfield, the dispatch supervisor.
16 Q  Okay.
17    MR. KOZIOL: And then I'm going mark this -- Mr. Herz, I
18    propose marking it as a precise exhibit since it doesn't have a
19    Bates stamp number on it. We just got it.
20    MR. HERZ: That's fine.
21    MR. KOZIOL: To this depo. So maybe we'll mark it
22    Exhibit A and it consists of two pages.
23 Q  Would this be the first page and this the second page, so
24    we'll keep it in order?
25

Computer Matrix, LLC                Phone - 907-243-0668           jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473         sahile@gci.net

16

Page 62

```
 1  A   Yes.
 2  Q   Okay.
 3      REPORTER: .....the first one?  This one?
 4      MR. KOZIOL: Yep.  Maybe you can mark it Page 1 and Page 2
 5      in some manner.
 6               (Deposition Exhibit A marked)
 7      MR. KOZIOL: All right.  And I'll show this to Mr. Herz
 8      and, Mr. Herz, I'll direct your attention to the top of
 9      Page A2, that top line is what I'm going to ask the witness
10      about.
11  Q   So let me show you what's been marked A1 and A2 and just
12      tell me what those documents are.
13  A   These appear to be copies of the complaint log from the
14      first few days of 2003 -- calendar year 2003.
15  Q   Okay.  And this was given to you by the sergeant?
16  A   I.....
17  Q   Or obtained from the sergeant?
18  A   Obtained from Sergeant Hatfield, yes.
19  Q   Okay.  And does the -- the second page, which is
20      denominated as A2, on the top, does that indicate
21      information regarding our case?
22  A   Yes, it does.
23  Q   All right.  And prior to getting into what is stated in
24      there, do you know when the Filemaker Pro system was in
25
```

Page 63

```
 1      operation as it was at the time of our incident when these
 2      entries would be made by the dispatcher regarding
 3      information that's contained no these lines?
 4  A   As I understand it, the information that's contained here
 5      would have been made contemporaneous with the report.
 6  Q   What report are you talking about?
 7  A   Well, if they would have received -- and I'll refer to the
 8      first one which is relevant to this case, the REDDI
 9      report, at 1653 on January 4th of '03, it would have been
10      filled out sometime after receiving the report, would be
11      my assumption.
12  Q   Okay.  All right.  Within -- contemporaneously from
13      receiving the report or minutes later, hours later?
14  A   I -- well, I would believe that it would be
15      contemporaneous with receiving the report because the case
16      numbers are pretyped on the pages of the complaint log and
17      to try to keep the chronology of how -- of when we receive
18      complaints, the dispatchers try to keep this as current as
19      possible so that they don't end up with receiving multiple
20      calls for service and then getting things out of order as
21      far as assigning numbers to them.
22  Q   And we're going to be disposing Mr. Croyle and we'll ask
23      him, but -- specifically, but do you know whether he'd be
24      billing out in handwriting his notebook first before
25
```

Page 64

```
 1      filling out the top line of A2 or which would be filled
 2      out first?
 3  A   My assumption would be he would do his notebook first.
 4  Q   And then followed by -- shortly thereafter the.....
 5  A   Complaint log.
 6  Q   .....complaint log.  Okay.  And so the complaint log
 7      indicates that a case number was assigned and date
 8      reported of January 4th and the time 1653 and the offense
 9      is described as REDDI, correct?
10  A   Yes.
11  Q   Okay.  And then he writes down gold, flatbed swerving, did
12      360 on Selief?
13  A   Selief, yes.
14  Q   Selief.  Under circumstances, correct?  I've read that
15      right?
16  A   Yes.
17  Q   And then the complainant is Laurie Sconeberg, correct?
18  A   Yes.
19  Q   And then the address, he just puts Selief.
20  A   Yes.
21  Q   And then he puts officer assigned, Peterson and Holden,
22      correct?
23  A   Yes.
24  Q   And then he puts under action taken, can you read what he
25
```

Page 65

```
 1      says under action taken?
 2  A   I believe it's arrest abbreviated as A-R-R Scott Brown and
 3      then beneath that, it looks to me to be an A-S-T, an
 4      Alaska State Trooper case number as well, 030000047.
 5  Q   Okay.  And if you're right that that line is generally
 6      filled out contemporaneously with the caller, I take it
 7      the action taken section would by necessity be filled out
 8      substantially later.
 9  A   Yes.
10  Q   After the case has been resolved or the investigation's
11      ended.
12  A   Yes.
13  Q   Okay.
14      MR. HERZ: Are you done with that exhibit?
15      MR. KOZIOL: Yes.
16  Q   Now, under the Filemaker Pro system, was there also a
17      document called a contact card?
18  A   Yes.
19  Q   Okay.
20      MR. KOZIOL: And I'd ask Madam Court Reporter to mark this
21      as the next exhibit.
22      REPORTER: So this will be B.
23               (Deposition Exhibit B marked)
24      MR. HERZ: This is Exhibit B?
25
```

Computer Matrix, LLC              Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501   Fax   907-243-1473           sahile@gci.net

17

Page 66

```
 1    MR. KOZIOL: It is Exhibit B.
 2    REPORTER: Yes.
 3    MR. HERZ: And what did you call this document?
 4    MR. KOZIOL: Contact card. And I'll hand this to you,
 5  Mr. Herz, before I give it to the witness.
 6  Q  I'll hand you what's been marked as Exhibit B and how did
 7     you obtain that document?
 8  A  I spoke with Sergeant Hatfield and asked her to provide me
 9     with a copy of Scott Brown's contact card from Filemaker
10     Pro.
11  Q  Okay. And who fills out the contact card under the
12     Filemaker Pro system?
13  A  Well, it would have been the dispatcher who would be on
14     duty at the point in time we had any contact with the
15     subject of the card.
16  Q  Okay. And is there any reference to the -- our incident
17     and the contact by anyone at KPD with Scott Brown?
18  A  Yes.
19  Q  And what does it say for the entry?
20  A  Well, there's -- I'm sorry. Could you restate your
21     question?
22  Q  Yeah. Is there one entry regarding Scott Brown or is
23     there more than one entry on this document?
24  A  Well, all of the.....
25
```

Page 67

```
 1  Q  I'm sorry. Let me withdraw that question. Is there one
 2     entry or more than one entry for Scott Brown related to
 3     the January 4th, 2003, incident?
 4  A  One entry.
 5  Q  Okay. And would you read what that one entry says?
 6  A  The date is January 4th of '03. It says contacts, and
 7     abbreviated again, arrest, A-R-R, by Officer Peterson
 8     hyphen DWI, complaint number 200300101.
 9  Q  And is it your understanding that Douglas Croyle would
10     have filled this out?
11  A  Be my assumption, yes.
12  Q  Okay. Because he was -- he was the dispatcher on duty?
13  A  Yes.
14  Q  And obviously it would have been filled out after
15     Mr. Brown was arrested given the content of the contact,
16     right?
17  A  I believe so, yes.
18  Q  And is this a document that would be required to be filled
19     out by the end of Mr. Croyle's shift or not?
20  A  I believe it would be.
21  Q  Okay. All right. And then I want to show you what's been
22     previously marked and referred to as 10082. I think we've
23     seen that one before. And what is 10082?
24  A  This appears to be a copy of a Filemaker Pro complaint
25
```

Page 68

```
 1     card.
 2  Q  All right. And is that a document that appears to have
 3     been filled out by Douglas Croyle?
 4  A  Yes.
 5  Q  And the date is what?
 6  A  January 4th of 2003.
 7  Q  And does he refer to this as being a REDDI report for the
 8     Scott Brown matter?
 9  A  The UCR code that he uses under the crime index is labeled
10     citizen report DWI hyphen REDDI 9404.
11    MR. KOZIOL: Okay. And I'd like to mark this document the
12  next one.
13    REPORTER: That'll be C.
14          (Deposition Exhibit C marked)
15    MR. KOZIOL: And I'll hand this to Mr. Herz.
16    MR. HERZ: Could I have that back again?
17  Q  10082 has written on it citizen report DWI dash REDDI and
18     then if you keep going down the line, it has what appears
19     to be a UCR code of 9404? Have I read that right?
20  A  Yes.
21  Q  Does Exhibit C indicate what that code is -- or what is
22     Exhibit C first?
23  A  Exhibit C appears to be a compilation of the common
24     offenses that we see here in Kodiak and this precedes the
25
```

Page 69

```
 1     Uniform Crime Report booklet that we use to classify
 2     crimes or reported crimes.
 3  Q  Okay. So on Exhibit C, what does it say for 9404?
 4  A  Citizen report DWI - REDDI, 9404.
 5  Q  Okay. And so that coding is consistent with what
 6     Mr. Croyle wrote, citizen report DWI - REDDI, correct?
 7  A  Yes.
 8  Q  And then there's another code next to assist inside Alaska
 9     and that's 9605. First of all, what does assist inside
10     Alaska mean to you?
11  A  That is a UCR code that we use when we receive assistance
12     from another law enforcement agency in an investigation.
13  Q  Such as the troopers?
14  A  Such as AST, yes.
15  Q  Okay. And on Exhibit C, what is 9605 stated to mean?
16  A  Assist inside Alaska 9605.
17  Q  Okay. All right. Again that's consistent with what was
18     written down here.
19  A  Yes.
20  Q  Okay. Now, as far as you know.....
21    MR. KOZIOL: Could I have that back just for a moment?
22    MR. HERZ: A?
23    MR. KOZIOL: Yeah.
24  Q  As far as you know, Chief, regarding the incident on
25
```

Computer Matrix, LLC                Phone - 907-243-0668              jpk@gci.net
700 W. 2nd Ave., Anchorage, AK 99501    Fax    907-243-1473           sahile@gci.net

18